# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

WILLIAM MANIACI

    Plaintiff

    v.                                         Case No. 1:06CV01625
                                                   Judge Kollar-Kotelly

GEORGETOWN UNIVERSITY, et al.,

    Defendants

### MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS

    Plaintiff, William Maniaci, herewith states his opposition to the Defendants' Motion For Partial Judgment On The Pleadings. For the reasons set forth below, Plaintiff submits that the Motion should be denied.

    Plaintiff first notes that numerous matters outside the pleadings are presented by the Motion which should properly be presented as a Motion under Federal Civil Rule 56. See FCRP 12(c). Putting aside that procedural point, Plaintiff notes that he has filed a Motion For Leave To File Amended Complaint which is presently before the Court which requests, inter alia, dismissal of Defendants Eric Smulson and George W. Taylor. The Memorandum Of Defendants In Opposition To The Motion For Leave To File Amended Complaint, with regard to Eric Smulson and George W. Taylor, opposes only the request that the dismissal be without prejudice therefore it is pointless to discuss the issues presented as applied to either of them.

    The Motion For Leave To File Amended Complaint if granted would add as Defendants Roy Eddy and Larry Salley. Neither of these additional Defendants is still employed by Georgetown University and both may wish to assert defenses which would

not be consistent with the defenses which may be asserted by the other remaining Defendants. Inasmuch as the Motion For Leave To File Amended Complaint is still pending, in the language of FCRP 12(c), the pleadings are not closed and this Motion For Partial Judgment On The Pleadings is therefore not timely. There are numerous additional reasons for denial of the Motion.

The Defendants' Motion describes the pleading which it contends is not sufficient but sets forth its content only in Exhibit A. Mr. Maniaci alleged in paragraph (2) of the Complaint as follows:

> "On Saturday, February 18, 2006 at 10:00 a.m. William Maniaci, a sixty four year old man properly attired in a business suit and hat and walking with a cane, entered the Georgetown University campus through the main pedestrian entrance, and proceeded to the ground floor of a large building where he registered for the Palestinian Solidarity Conference. At the registration desk, Mr. Maniaci provided his name, biographical information, identification, and paid the ten dollar fee charged by Georgetown University as a condition of registration as a participant in the Palestinian Solidarity Conference in cash. He was given a badge, which he pinned on his left lapel, and a document entitled "Speech and Expression at Georgetown University" explaining the rights to which he was entitled in accordance with the license to participate in the Palestinian Solidarity Conference which he had just purchased. That document provided as "Limitations" on "free speech and expression" only a ban on "unlawful activity, actions that endanger or imminently threaten others, or activities that disrupt or obstruct the functions of the University." A copy is attached as Exhibit "A." Mr. Maniaci then proceeded through the screening area and took the elevator to the third floor and entered Gaston Hall. This event was to be a presentation by four panelists regarding divestment by Georgetown University of investments connected in some manner with Israel. It was advertised as open to the public."

The Motion failed to mention that Mr. Maniaci "paid the ten dollar fee charged by Georgetown University as a condition of registration as a participant in the Palestinian Solidarity Conference." Mr. Maniaci thus purchased from Georgetown University a license to participate, not an unimportant aspect of this occurrence. Further Georgetown University contracted by way of payment and acceptance of a document entitled "Speech

and Expression at Georgetown University" that the only limitation on his right to freedom of speech was if he engaged in "unlawful activity, actions that endanger or imminently threaten others, or activities that disrupt or obstruct the functions of the University." The Motion of Defendants mentions the day, February 18, 2006, but fails to mention that it was a "Saturday" and not a regular class day.

Mr. Maniaci further describes the actions of the Georgetown University and the other Defendants as follows:

> "(3)The event started at approximately 11:15 a.m. The presentations lasted for thirty to forty minutes, after which the panel took questions from the audience. At this time, Mr. Maniaci stood up, as fourth in line, in front of the microphone to ask a question. Mr. Maniaci waited his turn and then asked his question. Mr. Maniaci asked the panel: "If you approve or disapprove of the use of suicide bombers who murder innocent Israeli citizens as a means to accomplish your goals?" The panelists avoided answering the question and the faculty staff advisor pointed for the next question. At such time, Mr. Maniaci raised his hand and said: "Excuse me, but you did not answer the question." A faculty member identified as Todd Olson, Vice President of Georgetown University for Student Affairs, wanted to move on, so Mr. Maniaci repeated his statement again and was again dismissed by Mr. Olson who then indicated that he wanted the Georgetown University Police, including an Officer identified as George W. Taylor, to remove the Plaintiff.
> (4) At this moment, two muscular, campus police officers in their Georgetown University uniforms, one of whom has been identified as Defendant George W. Taylor, grabbed Mr. Maniaci, who responded: "I have not done anything wrong". The two campus police officers violently jerked Mr. Maniaci from his seat. He did not resist at all. As the officers pulled at Mr. Maniaci, he felt a blow to his right side, taking his breath away and causing him to gasp for air. Mr. Maniaci then dropped all of his papers and a notebook, but held onto his cane. He was thrown onto the aisle floor and dragged down the aisle. His limbs and head bumping into objects while being dragged. Mr. Maniaci was then lifted off the floor, hitting his head, and then thrown through the doors into the hallway on the concrete floor. Mr. Maniaci again hit his head as he hit the floor and bent his cane. During this period a Georgetown University official identified as Eric Smulson, Georgetown University, Assistant Vice President For Communications, was requested by bystanders to take action to stop the assault but refused.
> (5) Mr. Maniaci could not get up off the floor and he saw the room spinning. After waiting several minutes, Mr. Maniaci tried to get up, but lost his balance and started to fall when Robert Turk and Matt Finberg caught him. When Mr. Maniaci looked around there was a crowd around him taking pictures. A

>University official tried to block the cameras. At this time none of the Georgetown University faculty, officials or campus police helped him. A University official approached him and told him to leave and walked with him out to the main entrance."

The allegation thus is that the actual actors in physically harming Mr. Maniaci were directed to act by the Defendant, Georgetown University, through an executive officer, Todd Olson, Vice President of Georgetown, and that officials of the University in control failed to take action to prevent harm to Mr. Maniaci.

In order to facilitate reading of this Memorandum each issue is reviewed in the order in which it appears in the Defendants' Memorandum beginning on page 5 of that document.

## **VICARIOUS LIABILITY**

Defendants take the position that "a defendant employer and its administrators cannot be held vicariously liable under section 1983." As hereinafter detailed, administrators and the employer may be held liable for acts which they direct a subordinate to take. It is important to note that some cases refer to this basis of liability as being the administrator or employer's acts in directing the actions of the subordinates and therefore, literally at least, not truly liability in a vicarious sense, while others do refer to it as vicarious liability. In either case, where, as here, those against whom liability is asserted direct the actions or are present on the scene with supervisory power and fail to act to prevent the occurrence, there is liability.

The lead case in any discussion of the law in this area is Monell v. Department of Social Services, 436 U.S. 658, 56 L. Ed. 2d 611, 98 S. Ct. 2018 (1978). In Monell, supra, the Supreme Court considered a situation in which female employees who were pregnant were required to take unpaid leaves of absence from their employment with the New

York City Department of Social Services before it was medically necessary for them to cease working in their positions in the Department. Relief had been denied in the courts below relying upon Munroe v. Pape, 365 U.S. 167, 81 S. Ct. 473, 5 L. Ed. 2d 492(1961) on the basis that there was immunity for the employer and supervisors who had also been sued. The Supreme Court reversed holding that:

> "We conclude, therefore, that a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent [**2038] official policy, inflicts the injury that the government as an entity is responsible under § 1983. Since this case unquestionably involves official policy as the moving force of the constitutional violation found by the District Court, see *supra*, at [*695] 660-662, and n. 2, we must reverse the judgment below. In so doing, we have no occasion to address, and do not address, what the full contours of municipal liability under § 1983 may be. We have attempted only to sketch so much of the § 1983 cause of action against a local government as is apparent from the history of the 1871 Act and our prior cases, and we expressly leave further development of this action to another day." 98 S. Ct. 2018 at 2037 – 2038.

Thus the Supreme Court in Monell, id., made it clear that the immunity conferred by the decision was only immunity from the automatic imposition of vicarious immunity by virtue of the rule of respondeat superior. The Court then held that there was liability, even of a municipal corporation, for actions undertaken "by those whose edicts or acts may fairly be said to represent official policy" which "inflicts the injury." It is clear that action by supervisory personnel which results in injury or failure by a supervisor to act to prevent injury does impose liability on that supervisor and on the municipality through that supervisor. In Mc Clelland v. Facteau, 610 F. 2d 693(10 Cir. 1979) the Court considered a case in which the supervisor was not present when the actual harm was inflicted upon the Plaintiff ruling that:

> "We agree with those courts that have found a cause of action under section 1983 when the defendant was in a position of responsibility, knew or should have

known of the misconduct, and yet failed to act to prevent future harm. E.g., Sims v. Adams, 537 F.2d 829 (5th Cir. 1976); Wright v. McMann, 460 F.2d 126 (2d Cir.), Cert. denied, 409 U.S. 885, 93 S. Ct. 115, 34 L. Ed. 2d 141 (1972). The standard to be applied is the conduct of a reasonable person, under the circumstances, in the context of the authority of each [**11] police chief and what he knew or should have known. We find there is a genuine issue of fact whether defendants breached this duty." 610 F. 2d 693 at 697.

While it is correct that a single instance of misconduct does not establish a policy, when the actions of a corporate, policy making official of an organizational defendant bring about the harm or that official condones the harmful action, that organization is liable under Section 1983. In Pembaur v. City of Cincinnati, 475 U. S. 469, 89 L. Ed. 2d 452, 106 S. Ct. 1292(1986) the Court considered a matter in which a city sheriff and a city prosecutor had sent deputy sheriffs upon the plaintiff's land. The District Court dismissed the action and the Circuit Court upheld the decision upon the single instance line of reasoning. The Supreme Court reversed holding that:

> "The conclusion that tortious conduct, to be the basis for municipal liability under § 1983, must be pursuant to a municipality's "official policy" is contained in this discussion. The "official policy" requirement was intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible. n8 [*480] *Monell* reasoned that recovery from a municipality is limited to acts that are, properly speaking, acts "of the municipality" -- that is, acts which the municipality has officially sanctioned or ordered. Thus, our statement of the conclusion juxtaposes the policy requirement with imposing liability on the basis of respondeat superior:
> "We conclude, therefore, that a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy . . . , whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." Id., at 694. 474 U. S. 469 at 479 – 480.

The Court then went on to spell out the circumstances under which a single instance provided the basis for liability:

"With this understanding, it is plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances. No one has ever doubted, for instance, that a municipality may be liable under § 1983 for a single decision by its properly constituted legislative body -- whether or not that body had taken similar action in the past or intended to do so in the future -- because even a single decision by such a body unquestionably constitutes an act of official government policy. See, *e. g., Owen* v. *City of Independence*, 445 U.S. 622 (1980) (City Council passed resolution firing plaintiff without a pretermination hearing); *Newport* v. *Fact Concerts, Inc.*, 453 U.S. 247 (1981) (City Council canceled license permitting concert because of dispute over content of performance). But the power to establish [**1299] policy is no more the exclusive province of the legislature at the local level than at the state or national level. *Monell*'s language makes clear that it expressly envisioned other officials "whose acts or edicts may fairly be said to represent official policy," *Monell, supra*, at 694, and whose decisions therefore may give rise to municipal liability under § 1983.

Indeed, any other conclusion would be inconsistent with the principles underlying § 1983. To be sure, "official policy" often refers to formal rules or understandings -- often but not always committed to writing -- that are intended to, and do, establish fixed plans of action to be followed under similar circumstances [*481] consistently and over time. That was the case in *Monell* itself, which involved a written rule requiring pregnant employees to take unpaid leaves of absence before such leaves were medically necessary. However, as in *Owen* and *Newport*, a government frequently chooses a course of action tailored to a particular situation and not intended to control decisions in later situations. If the decision to adopt that particular course of action is properly made by that government's authorized decisionmakers, [***464] it surely represents an act of official government "policy" as that term is commonly understood. n9 More importantly, where action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly. To deny compensation to the victim would therefore be contrary to the fundamental purpose of § 1983." 474 U. S. 469 at 480 – 481.

Let us then review each of the Defendants in light of the above holding a city sheriff and a city prosecutor to be policymaking officials by comparison to allegations of the Complaint:

(1) Georgetown University – is a corporation organized under the laws of the District of Columbia. Todd Olson, who gave the Order to remove Mr. Maniaci from the

room, is Vice President of the corporation, Georgetown University, in charge of the conference proceedings and therefore by definition and law a policymaking person in the corporation. See Title 29, Chapter 3, Section 29-301.24, Lexis District of Columbia Code, 2001 Edition.

(2) Todd Olson – is the Vice President of Georgetown University for Student Affairs, cloaked with actual and apparent authority, who gave the order to remove Mr. Maniaci.[1] See Section 29-301.24.

(3) David F. Morrell – Vice President of Georgetown University for Campus Safety, present on the scene as the University officer in charge of the Georgetown University Police under whose direction Mr. Darrell K. Harrison served.[2] See Section 29-301.24.

(4) Darrell K. Harrison – is the Director of Public Safety of Georgetown University, i.e., the police chief[3]. As alleged on page 6 and page 8 of the Complaint, Mr. Harrison was present, had authority to intervene and did nothing to stop the attack on Mr. Maniaci. Mr. Harrison' position vis a vis Georgetown University is essentially identical to that of the city sheriff in Pembaur, id., above.

In summary, the Order to sieze Mr. Maniaci was given by a Vice President of the Georgetown University corporation, the police officers who seized and harmed him did so at the direction of that Vice President of the corporation, the Vice President under whose supervision the Police Department of the Georgetown University operated was

---

[1] Mr. Olson confirmed on deposition that he ordered expulsion of Mr. Maniaci as "an official of Georegetown." See Olson deposition, page 40.
[2] Mr. Morrell confirmed on deposition his presence at the event and his supervisory power over the Georgetown University Police. See Morrell deposition, pages 18 to 26.
[3] Mr. Harrison confirmed on deposition his presence at the event and supervisory power over Georgetown University Police. See Harrison deposition, pages 7 to 31.

present and concurred in the action, as alleged, and no action to stop it was taken by either that officer of the corporation or the police chief. The actions undertaken were clearly within the parameters necessary under <u>Monell</u>, id., and <u>Pembaur</u>, id., to impose liability on both Georgetown University and its supervisory personnel.

## **STATE ACTION**

Defendants next claim that the Georgetown University police officers were merely acting as private individuals defending their property in seizing Mr. Maniaci and throwing him to the floor and therefore there was no state action citing <u>Willacy</u> v. <u>Lewis</u>, 598 F. Supp. 346(D.D.C. 1984) and <u>Person</u> v. <u>Children's Hospital National Medical Center</u>, 562 A. 2d 648(D.C. 1989). Neither of these cases supports the proposition for which it is cited. <u>Willacy</u>, id., involved a physician's momentary detention of a person he thought to be mentally ill. The incident took place at the Washington Hospital Center, not premises owned or occupied by the defendant, Dr. Lewis, so far as the opinion indicates. It seems safe to assume that Dr. Lewis did not own the Washington Hospital Center and however his actions might be described he could not by any stretch of the imagination be described as a private person protecting their property.

<u>Person</u> v. <u>Children's Hospital National Medical Center</u>, supra, involved removal of a man thought to be intoxicated from hospital premises. It was alleged that the man was in fact a diabetic to which his symptoms were attributed. In denying the defendant's Motion To Dismiss the Court said:

> "While not previously recognized in this jurisdiction, we now adopt the rule generally in force in other jurisdictions that a possessor of land has a qualified

privilege to use force to remove someone else from the property. *See Ramirez v. Chavez*, 71 Ariz. 239, __, 226 P.2d 143, 145 (1951); *Haworth v. Elliott*, 67 Cal. App. 2d 77, __, 153 P.2d 804, 807 (2d Div. 1944); *Maddran v. Mullendore*, 206 Md. 291, __, 111 A.2d 608, 612 (1955); *Anderson v. Jenkins*, 220 Miss. 145, __, 70 So. 2d 535, 538 (1954); *Griego v. Wilson*, 91 N.M. 74, __, 570 P.2d 612, 614 (1977); *Scheufele v. Newman*, 187 Or. 263, __, 210 P.2d 573, 576 (1949); *Hughes v. Babcock*, 349 Pa. 475, __, 37 A.2d 551, 553 (1944); *see also* 6A C.J.S. *Assault & Battery* § 24 (1975). This privilege is described in the RESTATEMENT (SECOND) OF TORTS § 77 (1965):

An actor is privileged to use reasonable force, not intended or likely to cause death or serious bodily harm, to prevent or terminate another's intrusion upon the actor's land or chattels, if

(a) the intrusion is not privileged or the other intentionally or negligently causes the actor to believe that it is not privileged, and

(b) the actor reasonably believes that the intrusion can be prevented or terminated only by the force used, and

(c) the actor has first requested the other to desist and the other has disregarded the request, or the actor reasonably believes that a request will be useless or that substantial harm will be done before it can be made."

Significantly the Court went on to apply the rule:

"In applying this rule to the present case, we note that, although Person initially was an invitee and therefore was legally inside the Hospital, the Hospital was privileged to revoke that invitation and force Person to leave -- provided the Hospital used reasonable means to remove Person. Use of force is not privileged if the intrusion can be prevented or terminated in some other way, *see id.* comment g, such as by asking the intruder to leave, *id.* § 77(c). In any event, the means of removal will be unreasonable if the harms caused to the intruder will not be "appropriate in kind and proportionate in extent to the value of the actor's interest protected, and the character and extent of the invasion which it is designed to prevent or terminate." *See id.* comment i; *Maddran*, 206 Md. at __, 111 A.2d at 612 (force must be "suitable and moderate in any particular [**7] case"). Accordingly, because the law values human safety over property rights, force calculated to cause serious bodily harm or death will be excessive unless the intruder threatens to cause serious bodily harm or death to the actor or to a third person whom the actor is privileged to protect. *See* RESTATEMENT (SECOND) OF TORTS § 79; KEETON, DOBBS, KEETON & OWEN, *supra*, at § 21. Furthermore -- and of special significance here -- a possessor of land is not privileged to use even the slightest force to expel an intruder "if the possessor knows or should know that the intruder's condition or the surrounding circumstances are such that his [or her] expulsion will cause him [or her] death or serious bodily harm." RESTATEMENT (SECOND) OF TORTS, § 77 comment i." 562 A. 2d 650.

By the rule set out above, the actions of Georgetown University clearly contravened the law. The first requirement is that the intrusion is "not privileged" when in fact Mr. Maniaci paid a license fee to come upon the premises and his presence was therefore privileged. Secondly, the defendant must reasonably believe that only force can terminate the intrusion. There is no reason to hold such a belief in this case.[4] Thirdly there must be a request to leave which has been disregarded. In this case no such request was made.[5] Moreover, this request part of the rule set forth in Person, id., is required by statutory law in the District of Columbia which provision reads as follows:

> Any person who, without lawful authority, shall enter, or attempt to enter, any public or private dwelling, building, or other property, or part of such dwelling, building, or other property, against the will of the lawful occupant or of the person lawfully in charge thereof, *or being therein or thereon, without lawful authority to remain therein or thereon shall refuse to quit the same on the demand of the lawful occupant*, or of the person lawfully in charge thereof, shall be deemed guilty of a misdemeanor, and on conviction thereof shall be punished by a fine not exceeding $ 100 or imprisonment in the Jail for not more than 6 months, or both, in the discretion of the court. The presence of a person in any private dwelling, building, or other property that is otherwise vacant and boarded-up or otherwise secured in a manner that conveys that it is vacant and not to be entered, or displays a no trespassing sign, shall be prima facie evidence that any person found in such property has entered against the will of the person in legal possession of the property. (Emphasis added). Section 22-3302, Title 22, Subtitle I, Chapter 33, Lexis District of Columbia Code, 2001 Edition.

O'Brien v. United States, 444 A.2d 946(D.C. 1982) is not to the contrary. In that case two Washington Metropolitan Area Transit Authority policemen requested that the defendant leave and only after that he was removed by the officers.

The District of Columbia Court of Appeals has ruled on this question. In Woodward & Lothrop v. Hillary, 598 A. 2d 1142(D.C.App. 1991) the plaintiff went into a Woodward & Lothrop store to buy clothing. As he turned to leave, a District of

---

[4] On deposition all Defendants testified that Mr. Maniaci was doing nothing illegal.
[5] On deposition all defendants have testified and none has stated that there was a request to leave.

Columbia Commissioned Special Police Officer[6] grabbed him by the arm, allegedly struck him and wrestled him to the ground. There, as here, the Defendants argued that this was not "state action" such that a claim could be made under Section 1983. There, as here, the Defendants cited United States v. McDougald, 350 A.2d 375(D.C. 1976) as authority for that proposition. In holding that it was state action the Court of Appeals stated that:

> "Pursuant to D.C. Code § 4-114, the Mayor may appoint a special police officer for duty in connection with private property, upon application of the owner of such property. As we have previously observed, *Alston v. United States,* 518 A.2d 439, 440 n.3 (D.C. 1986), a special police officer's commission authorizes him or her to exercise arrest powers significantly broader than those of ordinary citizens or licensed security guards. The relevant statute provides that the officer "shall have the same powers as a law enforcement officer to arrest without warrant for offenses committed within premises to which his jurisdiction extends, and may arrest outside the premises on fresh pursuit for offenses committed on the premises." D.C. Code § 23-582(a) (1989). This authority, though, is limited to the specific place or property the officer has been commissioned to protect. 6A DCMR § 1100.2 (1984)." 598 A. 2d 1142 at 1144.

The Court went on to describe the rule of law:

> "The trial judge relied on decisions of this court holding that special police officers act as agents or instrumentalities of the state in conducting searches and seizures incident to their power to arrest, and thus are subject to the restrictions of the Fourth Amendment. *See, e.g., United States v. Lima,* 424 A.2d 113, 119-20 (D.C. 1980) (en banc); *Alston v. United States, supra* note 4, 518 A.2d at 441-43; *Lucas v. United States,* 411 A.2d 360, 362 (D.C. 1980). We agree that this principle controls the question presented here." 598 A. 2d 1142 at 1145.

In distinguishing the McDougald case the Court said:

> "United States v. McDougald, 350 A.2d 375(D.C. 1976), on which appellants rely, is not to the contrary. There we held that the mere fact a commissioned special police officer does the allegedly unconstitutional act does not itself denote official action. *Id.* at 378. In particular, we refused to attribute to the state an alleged due process violation -- *viz.,* a special police officer's instruction to a witness not to discuss a criminal case with defense counsel outside

---

[6] Defendant, David Morrell, Vice President of Georgetown University for Campus Safety, has confirmed in his deposition that all of the officers employed by Georgetown University hold District of Columbia Special Police Officer's Commissions. See Morrell deposition, page 6.

the presence of the prosecutor -- because the officer, in conveying the policy to the witness, "was not performing a public function authorized by his commission as a special policeman." *Id.* In the present case, the required nexus with the state is furnished not by the fact of the commission alone -- [**10] as in *McDougald* -- but by the convergence of the authority bestowed by the [*1146] commission and the officers' actions. n6 In *Alston,* citing *McDougald,* we recognized that special police officers are not "in all their actions" equated with regular police officers, 518 A.2d at 443 (emphasis added), but we held that a special police officer does act as a state agent or instrument when the challenge involves the arrest of a suspect and actions related thereto -- the broad [special police officer] power that distinguishes the [officer] from a private citizen." 598 A. 2d 1142 at 1145.

In the District of Columbia an arrest takes place when a person is detained for <u>any length of time</u>. <u>Gabrou</u> v. <u>May Department Stores</u>, 462 A. 2d 1102(D.C.App. 1983).

In summary, there is no question that state action occurred when the officers commissioned by the District of Columbia, upon the instruction of Georgetown University Vice President Todd Olson took hold of Mr. Maniaci.

### **VICARIOUS LIABILITY OF GEORGETOWN UNIVERSITY CORPORATE OFFICERS**

The Complaint alleges that:

"The actions taken by the officers, against Mr. Maniaci, were in the scope of their employment, and in furtherance of the business of Georgetown University. The officers are not independent contractors in any sense. The actions of the Public Safety Officers were ratified by the officials of Georgetown University who were present, observed the occurrence described above, and did nothing to stop the Officers in their actions." Complaint at page 6.

"The Georgetown University Public Safety Officers were acting under the color of law of the District of Columbia, pursuant to D.C. Code § 5-129.02. (2006). Said Officers were at all times under the control and direction of Georgetown University senior staff persons identified as David F. Morrell, Vice President for Campus Safety and Darryl K. Harrison, Georgetown University, Director - Department of Public Safety." Complaint at page 6.

"The Georgetown University officials who ordered the officers to grab the Plaintiff and all other officials with authority witnessing the occurrence, occupied a position of authority, and knew or should have known that the officer's actions

      had exceeded the force necessary, and failed to act to prevent further harm done to the Plaintiff." Complaint at page 8.

A supervisor is liable where that person participates in the act or knew what was happening and failed to exercise his authority to prevent the harm to the individual being harmed. In <u>Mc Clelland</u> v. <u>Facteau</u>, id., the Court imposed liability upon the basis that liability attached "when the defendant was in a position of responsibility, knew or should have known of the misconduct, and yet failed to act to prevent future harm." Id. at 697.

      In <u>Mc Clelland</u>, id., the supervisor was present when the actual harm was inflicted upon the Plaintiff and failed to act to prevent the harm. The Court ruled that:

> "We agree with those courts that have found a cause of action under section 1983 when the defendant was in a position of responsibility, knew or should have known of the misconduct, and yet failed to act to prevent future harm. E.g., <u>Sims v. Adams, 537 F.2d 829 (5th Cir. 1976);</u> <u>Wright v. McMann, 460 F.2d 126</u> (2d Cir.), Cert. denied, <u>409 U.S. 885, 93 S. Ct. 115, 34 L. Ed. 2d 141 (1972).</u> The standard to be applied is the conduct of a reasonable person, under the circumstances, in the context of the authority of each [**11] police chief and what he knew or should have known. We find there is a genuine issue of fact whether defendants breached this duty." Id. At 697.

      Defendants cite in support of their assertion that no liability can attach to them the case of <u>King</u> v. <u>Kidd</u>, 640 A. 2d 656 (D.C. 1993).  It is their contention that "a supervisory employee cannot be held vicariously liable for acts of subordinates." Memorandum, page 17. In <u>King</u>, supra, the Court actually held that Mr. King, one of the supervisors could be held liable stating:

> "Whether or not King's conduct in fact met the Title VII definition of sexual harassment, a question we need not answer, the evidence was sufficient to prove that his treatment of Kidd and collusion with Carter constituted a serious abuse of his supervisory authority [**62] that took advantage of Kidd's vulnerable position as a woman employee who had repeatedly complained about the acts of her immediate male supervisor. King's conduct thereby contributed to the "intimidating, hostile, or offensive working environment" Kidd was forced to endure, n18 had a detrimental impact on her employment opportunities, *see* <u>Contreras</u>, 565 P.2d at 1174, and was "sufficiently severe or pervasive to alter the

>conditions of [Kidd's] employment and create an abusive working environment," <u>Vinson</u>, 477 U.S. at 67 (internal quotation marks and brackets omitted) (establishing standard under Title VII). 640 A. 2d 656 at 674.

The case arose out of a situation which can only be described as disgusting in which a female employee was forced into the performance of sexual favors as a condition of her continued employment by the District of Columbia Government. Mr. King in fact took actions which amounted to a failure to do his duty as a supervisor. As can be seen from the excerpt above, the Court did not give Mr. King that which these defendants request in the case before the Court, to wit, a safe harbor insulating the supervisor from responsibility based upon his failure to do his duty. He did not deserve it and neither do these Defendants.

The Defendants' Motion For Partial Judgment On The Pleadings contends that David Morrell and Darryl Harrison have no liability because they did not actually give the Order to arrest Mr. Maniaci. It is alleged that they were on the scene with the officers who performed the arrest and those officers in carrying out these actions "were at all times under the control and direction of Georgetown University senior staff persons identified as David F. Morrell, Vice President for Campus Safety and Darryl K. Harrison, Georgetown University, Director - Department of Public Safety." See page 6 of Complaint. At this juncture those allegations must be taken as accurate. The Defendants' contention is not supported by the controlling law set forth above.

## **CONCLUSION**

William Maniaci submits that the Motion For Partial Judgment On The Pleadings must be denied.

**Date: 2/12/2007**

        **Respectfully submitted,**

        **THOMAS FORTUNE FAY, P.A.**

        *Thomas Fortune Fay*_____
        **THOMAS FORTUNE FAY (U.B.#23929)**
        **601 Pennsylvania Avenue, NW**
        **#900 - South Building**
        **Washington, D.C. 20004**
        **(202) 589-1300**
        **Attorney for Plaintiff**

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of February, 2007, a copy of the above FRCP Rule 26 Discosures was served electronically upon:

> John J. Buckley, Jr.
> Malachi B. Jones
> Colleen F. Shanahan
> Williams & Connelly, LLP
> 725 Twelfth Street, NW
> Washington, DC 20005

        *Thomas Fortune Fay*_____
        **Thomas Fortune Fay**