IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                            )
WILLIAM MANIACI                             )        Docket No. 06 CV 01625
                                            )
            Plaintiff,                      )        Judge Kollar-Kotelly
                                            )
            v.                              )        **Oral Argument Requested**
                                            )
GEORGETOWN UNIVERSITY, et al.               )        Next Scheduled Event:
                                            )        February 4, 2008,
            Defendants.                     )        Deadline for Opposition
_____)            to Dispositive Motions


**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

            Defendants Georgetown University, David F. Morrell, Darryl K. Harrison, Todd

Olson, Roy Eddy and Larry Salley, through undersigned counsel, hereby move this Court for an

Order, pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.1, granting

summary judgment in their favor and dismissing the Second Amended Complaint in its entirety.

The grounds for this Motion are set forth in the accompanying Memorandum in Support of

Motion for Summary Judgment.  In compliance with Local Rules 7(h) and 56.1, Defendants'

Statement of Material Facts Not in Dispute and a proposed Order are also attached.

Respectfully submitted,

January 14, 2008

_____ /s/ John J. Buckley, Jr. _____.
John J. Buckley, Jr., D.C. Bar No. 925081
Malachi Jones, D.C. Bar No. 455555
Richa S. Dasgupta, D.C. Bar No. 500509

WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
jbuckley@wc.com
(202) 434-5051
(202) 434-5058 (fax)

*Of Counsel:*
Jane E. Genster, D.C. Bar No. 939850
Vice President and General Counsel
Georgetown University
37th & O Streets, N.W.
Washington, D.C. 20057
(202) 687-6500
(202) 687-6527 (fax)

*Attorneys for Defendants Georgetown University, David F. Morrell, Darryl K. Harrison, Todd Olson, Roy Eddy and Larry Salley*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| | ) | |
| WILLIAM MANIACI | ) | |
| | ) | |
| Plaintiff, | ) | Docket No. 06 CV 01625 |
| | ) | |
| v. | ) | Judge Kollar-Kotelly |
| | ) | |
| GEORGETOWN UNIVERSITY, et al. | ) | <u>Next Scheduled Event</u>: |
| | ) | February 4, 2008, |
| Defendants. | ) | Deadline for Opposition |
| | ) | to Dispositive Motions |

**MEMORANDUM IN SUPPORT OF
<u>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>**

John J. Buckley, Jr., D.C. Bar No. 925081
Malachi Jones, D.C. Bar No. 455555
Richa S. Dasgupta, D.C. Bar No. 500509
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
jbuckley@wc.com
(202) 434-5051
(202) 434-5058 (fax)

*Of Counsel:*
Jane E. Genster, D.C. Bar No. 939850
Vice President and General Counsel
Georgetown University
37th & O Streets, N.W.
Washington, D.C. 20057
(202) 687-6500
(202) 687-6527 (fax)

January 14, 2008

*Attorneys for Defendants Georgetown
University, David F. Morrell, Darryl K.
Harrison, Todd Olson, Roy Eddy and
Larry Salley*

## <u>TABLE OF AUTHORITIES</u>

### FEDERAL CASES

*Alabama Student Party v. Student Government Association*, 867 F.2d 1344 (11th Cir. 1989) ................................................................................................................18

*Anderson v. Creighton*, 483 U.S. 635 (1987) ............................................................39

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ..............................................14

*Austin v. Paramount Parks, Inc.*, 195 F.3d 715 (4th Cir. 1999) ................................45

*Barbour v. Merrill*, 48 F.3d 1270 (D.C. Cir. 1995) ...................................................55

*Barham v. Ramsey*, 338 F. Supp. 2d 48 (D.D.C. 2004) ............................................44

*Brosseau v. Haugen*, 543 U.S. 194 (2004) ...............................................................33

*Brown v. United States*, 365 F.2d 976 (D.C. Cir. 1966) ...........................................22

*Burke v. N. Dakota Department of Corrections & Rehabilitation*, 294 F.3d 1043 (8th Cir. 2002) ................................................................................................................45

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .........................................................13

*Coleman v. United States*, 295 F.2d 555 (D.C. Cir. 1961) ........................................22

*Cooke-Seals v. District of Columbia*, 973 F. Supp. 184 (D.D.C. 1997) .....................41

*Cooper v. First Government Mortgage & Investors Corp.*, 238 F. Supp. 2d 50 (D.D.C. 2002) ...................................................................................................13, 14, 15, 44

*Cornelius v. NAACP Legal Defense & Education Fund*, 473 U.S. 788 (1985)............16

*Daniels v. Dillard Department Stores*, 881 F. Supp. 505 (D. Kan. 1995)...................51

*DeVargas v. Mason & Hanger-Silas Mason Co.*, 844 F.2d 714 (10th Cir. 1988)........45

*Dist. Council 20 v. District of Columbia*, 150 F. Supp. 2d 136 (D.D.C. 2001)......................45, 46

*Drumgold v. Howard University*, No. 99-2255 (PLF), 2005 WL 975761 (D.D.C. Apr. 25, 2005) ................................................................................................................15

*Edwards v. Okie Dokie, Inc.*, 473 F. Supp. 2d 31 (D.D.C. 2007)....................28, 41, 53

*Fields v. Office of Johnson*, --F.Supp.2d--, No. 04-0717 (JR), 2007 WL 2947398 (D.D.C. Oct. 10, 2007) ................................................................................................15

*Fuller v. United States*, 407 F.2d 1199 (D.C. Cir. 1967)............................................22

*Graham v. Connor*, 490 U.S. 386 (1989) ............................................................................33, 34

*Greene v. Washington D.C.*, No. 05-1097, 2006 WL 1712399 (D.D.C. June 16, 2006) .............17

*Greenya v. George Washington University*, 512 F.2d 556 (D.C. Cir. 1975)................................16

*Griffin v. Maryland*, 378 U.S. 130 (1964) .....................................................................21, 26, 27

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) .................................................................................39

*Hartman v. Moore*, 547 U.S. 250 (2006) .....................................................................................44

*Harvey v. Harvey*, 949 F.2d 1127 (11th Cir. 1992) ................................................................41, 45

*Haynesworth v. Miller*, 820 F.2d 1245 (D.C. Cir. 1987).............................................................44

*Henry v. United States*, 361 U.S. 98 (1959).................................................................................22

*Holcomb v. Powell*, 433 F.3d 889 (D.C. Cir. 2006) ....................................................................14

*Hudgens v. National Labor Relations Bd.*, 424 U.S. 507 (1976) ..................................................15

*International Action Center v. United States*, 365 F.3d 20 (D.C. Cir. 2004) .........................39, 42

*Jackson v. Ilinois Medi-Car, Inc.*, 300 F.3d 760 (7th Cir. 2002)...................................................45

*Jett v. Dallas Independant School District,* 491 U.S. 701 (1989) .................................................47

*Keener v. Wash. Area Metro Transit Authority*, 800 F.2d 1173 (D.C. Cir. 1986)........................21

*Kindt v. Santa Monica Rent Control Board*, 67 F.3d 266 (9th Cir. 1995)..............................17, 18

*Kivanc v. Ramsey*, 407 F. Supp. 2d 270 (D.D.C. 2006) ...............................................................44

*Lloyd Corp. v. Tanner*, 407 U.S. 551 (1972) ...............................................................................16

*Martin v. Malhoyt*, 830 F.2d 237 (D.C. Cir. 1987).................................................................39, 42

*Matsushita Electric Industries Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)...................14, 15

*Monell v. Department of Social Services.*, 436 U.S. 658 (1978) ...................................................46

*National Organization for Women v. Operation Rescue*, 37 F.3d 646 (D.C. Cir. 1994) .............16

*Norse v. City of Santa Cruz*, No. C 02-01479 RMW, 2007 WL 951854 (N.D. Cal. Mar.
28, 2007) ...................................................................................................................................20

*Park v. Shiflett*, 250 F.3d 843 (4th Cir. 2001)..............................................................................23

*Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986)...............................................................46, 47

*Perry Educ. Association v. Perry Local Educators' Association*, 460 U.S. 37 (1983) ...........16, 17

*Phi Lambda Phi Fraternity Inc. v. University of Pittsburgh*, 229 F.3d 435 (3d Cir. 2000) .........19

*Pierson v. Ray*, 386 U.S. 547 (1967) ...................................................................................38

*Pro-Football, Inc. v. Harjo*, 284 F. Supp. 96 (D.D.C. 2003) ..................................................14

*Raby v. Baptist Medical Center*, 21 F. Supp. 2d 1341 (M.D. Ala. 1998)...............................37, 38

*Richardson v. McKnight*, 521 U.S. 399 (1997)...........................................................37, 38, 39, 40

*Robinson v. District of Columbia*, 403 F. Supp. 2d 39 (D.D.C. 2005)........................................41

*Robinson v. District of Columbia*, Nos. 03-1455, 03-1456, 2006 WL 2714913 (D.D.C. Sept. 22, 2006) ................................................................................................................34

*Rojas v. Alexander's Department Store, Inc.*, 924 F.2d 406 (2d Cir. 1990) ................................45

*Scott v. District of Columbia*, 101 F.3d 748 (1996)......................................................................54

*Scott v. Harris*, 127 S. Ct. 1769 (2007) ..........................................................................15, 30, 31

*Smith v. Wade*, 461 U.S. 30 (1983).................................................................................................55

*St. Louis v. Praprotnik*, 485 U.S. 112 (1988) ........................................................................46, 48

*Steele v. District of Columbia Housing Authority*, No. Civ. A 02-1240 (CKK), 2006 WL 335770 (D.D.C. Feb. 14, 2006) ..................................................................................36

*Tarantino v. Syputo*, No. C 03-03450, 2006 WL 1530030 (N.D. Cal. June 2, 2006) ............39, 40

*Terry v. Ohio*, 392 U.S. 1 (1968) ...................................................................................................22

*Triplett v. District of Columbia*, 108 F.3d 1450 (D.C. Cir. 1997) .........................................48-49

*United States v. Bonanno,* 180 F. Supp. 71 (S.D.N.Y. 1960).......................................................22

*United States v. Jackson*, 415 F.3d 88 (D.C. Cir. 2005)........................................................28, 29

*Ward v. Utah*, 398 F.3d 1239 (10th Cir. 2005)............................................................................17

*White v. City of Norfolk*, 900 F.2d 1421 (9th Cir. 1990) ......................................................18, 19

*Widmar v. Vincent*, 454 U.S. 263 (1981)...............................................................................17, 18

*Williams v. Howard University*, 528 F.2d 658 (D.C. Cir. 1976) .................................................16

*Williams v. United States*, 341 U.S. 97 (1951) ......................................................................21, 26

*Wyatt v. Cole*, 504 U.S. 158 (1992) .......................................................................................38, 40

*Young v. Prince George's County*, 355 F.3d 751 (4th Cir. 2004) .................................................23

### STATE CASES

*Alston v. United States*, 518 A.2d 439 (D.C. 1986) ....................................................21, 25

*Armfield v. United States*, 811 A.2d 792 (D.C. 2002) ...................................................18

*Brown v. Argenbright Security Inc.*, 782 A.2d 752 (D.C. 2001) ...........................................52

*Davis v. United States*, 498 A.2d 242 (D.C. 1985)..........................................................23

*Dent v. May Department Stores Co.*, 459 A.2d 1042 (D.C. 1982) .........................................53, 54

*Fulwood v. Porter,* 639 A.2d 594 (D.C. 1994) ................................................................39, 41, 42

*Gabrou v. May Department Stores Co.*, 462 A.2d 1102 (D.C. 1983) ....................................37, 54

*Gay Rights Coalition of Georgetown University Law Center v. Georgetown University*, 536 A.2d 1 (1987) ..................................................................................................16

*In re E.A.H.*, 612 A.2d 836 (D.C. 1992) .......................................................................23

*Jonathan Woodner Co. v. Breeden*, 665 A.2d 929 (D.C. 1995) ....................................................55

*Kotsch v. District of Columbia*, 924 A.2d 1040 (D.C. 2007) ..........................................................29

*Limpuangthip v. United States*, 932 A.2d 1137 (D.C. 2007)................................................ passim

*Moorehead v. District of Columbia*, 747 A.2d 138 (D.C. 2000) ...................................................37

*Morris v. Faulkner,* 361 N.E.2d 112, 114 (Ill. App. Ct. 1977)......................................................53

*Person v. Children's Hospital National Medical Center*, 562 A.2d 648 (D.C. 1989) .................51

*Safeway Stores, Inc. v. Kelly*, 448 A.2d 856 (D.C. 1982)................................................29, 30, 54

*Scott v. District of Columbia*, 493 A.2d 319 (D.C. 1985)...................................................... 53-54

*Smith-Caronia v. United States*, 714 A.2d 764 (D.C. 1998) ........................................................18

*United States v. Gayden*, 492 A.2d 868 (D.C. 1985).....................................................................22

*United States v. McDougald*, 350 A.2d 375 (D.C. 1976) ...............................................20, 22, 26

*Weishapl v. Sowers*, 771 A.2d 1014 (D.C. 2001) .........................................................................54

## STATUTES

42 U.S.C. § 1983 ................................................................................................. passim

D.C. Code § 22-3302 (2007) ........................................................................................29

D.C. Code § 23-582 (2007) ...........................................................................................20

## MISCELLANEOUS

RESTATEMENT (SECOND) OF TORTS § 77 ................................................................51, 54

RESTATEMENT (SECOND) OF TORTS § 46 ....................................................................53

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................... 1

FACTUAL BACKGROUND ................................................................................... 4

    A.    Parties .......................................................................................... 4

    B.    Georgetown's Speech and Expression Policy ........................... 5

    C.    The Palestine Solidarity Movement Conference ...................... 6

    D.    JDL Members Develop "Operation Gideon" ........................... 7

    E.    Plaintiff Disrupts the Conference and Refuses To Leave Gaston Hall
or the Campus ............................................................................ 8

    F.    Dr. Gillern Examines Plaintiff at Walter Reed ...................... 12

    G.    Plaintiff's Files Suit Against Georgetown and Its Employees ............ 13

I.    Summary Judgment Standard ............................................................ 13

II.    Defendants Are Entitled to Summary Judgment on Count III (42 U.S.C. §
1983) ................................................................................................ 15

    A.    Defendants Are Entitled to Summary Judgment Dismissing Plaintiff's
First Amendment Claim in Count III (42 U.S.C. § 1983) .................. 15

        1.    Plaintiff Did Not Enjoy First Amendment Rights on
Georgetown's Private Property ................................. 15

        2.    Georgetown Was Entitled To Enforce Reasonable Time, Place,
and Manner Restrictions ........................................... 16

    B.    Defendants Are Entitled to Summary Judgment Dismissing Plaintiff's
§ 1983 Claim in Count III Because the Safety Officers Did Not Act
Under Color of State Law ......................................................... 20

        1.    Plaintiff Was Not Arrested ....................................... 22

        2.    Georgetown's SPOs Performed a Private Function .................. 24

    C.    Defendants Are Entitled to Summary Judgment Dismissing Plaintiff's
Arguable Fourth Amendment Claim in Count III (42 U.S.C. § 1983) .... 27

        1.    Probable Cause Existed To Arrest the Plaintiff ..................... 28

        2.    The Force Used Was Objectively Reasonable ....................... 30

    D.    Defendants Eddy and Salley Are Entitled to Summary Judgment on
Plaintiff's § 1983 Claim in Count III ....................................... 36

        1.    Qualified Immunity Is Available to Defendants Eddy and
Salley ....................................................................... 36

        2.    Defendants Eddy and Salley Did Not Violate Plaintiff's Clearly
Established Rights ..................................................... 39

        3.    Defendant Salley Was Not Involved In the Events at the ICC ......... 40

E.     The Administrator Defendants Are Entitled to Summary Judgment on
       Plaintiff's Section 1983 Claim in Count III .......................................................... 40

       1.     Plaintiff's Claims Against Defendants Olson and Morrell in
              Their "Official" Capacities Are Duplicative of the Claim
              Against Georgetown ................................................................................... 40

       2.     The Administrator Defendants Are Entitled to Qualified
              Immunity ...................................................................................................... 41

       3.     Plaintiff Cannot Establish Supervisory Liability on the Part of
              the Administrator Defendants .................................................................... 42

F.     Defendant Georgetown Is Entitled to Summary Judgment on
       Plaintiff's § 1983 Claim in Count III ..................................................................... 45

       1.     Plaintiff Fails To Identify Any Impermissible Express Policy ................. 46

       2.     Plaintiff Fails To Identify Any Widespread Unconstitutional
              Practice ........................................................................................................ 46

       3.     Plaintiff Fails To Identify Any Unlawful Act Performed or
              Ratified By a Person with Final Policy Making Authority ...................... 46

III.   Defendants Are Entitled to Summary Judgment on Plaintiff's Assault and
       Battery Claim in Count I .................................................................................................... 50

       A.     Defendants Were Entitled To Remove Plaintiff from Georgetown's
              Private Property ....................................................................................................... 51

       B.     There Is No Basis for Supervisory Liability ........................................................... 52

IV.    Defendants Are Entitled to Summary Judgment on Plaintiff's False Arrest
       Claim in Count II ................................................................................................................. 53

       A.     Plaintiff Was Not Detained or Confined ................................................................. 53

       B.     Probable Cause Existed To Arrest Plaintiff ........................................................... 53

V.     Defendants Are Entitled to Summary Judgment on Plaintiff's Claim for
       Punitive Damages in Count IV ........................................................................................... 55

CONCLUSION ............................................................................................................................. 55

## <u>INTRODUCTION</u>

This case involves a direct and cynical attack on Georgetown University's ("Georgetown" or the "University") commitment and ability to preserve and protect the untrammeled expression of ideas and information so central to the life of the University. The lawsuit is the final tactic in a calculated effort on the part of Plaintiff William B. Maniaci and his like-minded colleagues to discourage the occurrence of, to disrupt the sessions of, and ultimately to punish Georgetown for permitting a student group to host on its private campus, an educational conference whose participants espouse political positions with which Plaintiff and his colleagues vehemently disagree. Plaintiff concededly attended the conference for the purpose of protesting it. When he disrupted the conference, and manifested his intention to continue to cut off discourse by ignoring repeated requests for his cooperation, Plaintiff was to leave the auditorium but refused, and was accordingly removed – quickly and gently – and denied further participation in the event. His lawsuit, which is premised on unsupportable factual allegations and inapposite legal theories, seeks to render the University powerless in the face of a purposeful and successful effort to obstruct the free exchange of ideas and to discourage other educational institutions from permitting the free expression of ideas distasteful to Plaintiff on their campuses in the future.

Plaintiff was the chief of security and intelligence for the Jewish Defense League ("JDL") and spearheaded "Operation Gideon" through which the JDL intended to protest and disrupt the Palestine Solidarity Movement Conference ("PSM Conference" or the "Conference") held at the campus of Georgetown University on February 17-19, 2006. This lawsuit is part of Plaintiff and the JDL's avowed strategy of punishing Georgetown for making its facilities available for the Conference. Plaintiff and the JDL also seek to deter other universities from allowing similar conferences to be held on their campuses or otherwise permitting free speech

and expression that is distasteful to Plaintiff and his colleagues.  To that end, Plaintiff seeks an award of $8 million in punitive damages as well as millions in compensatory damages and attorneys' fees and costs.

Plaintiff asserts three claims against Georgetown and five of its current and former employees, Defendants Todd Olson, Darryl Harrison, David Morrell, Roy Eddy and Larry Salley.  His claims arise from his disruption on February 18, 2006 of the opening seminar of the PSM.  Plaintiff alleges in Count III that Georgetown and its employees deprived him of his First and his Fourth Amendment rights in violation of 42 U.S.C. § 1983 when they ejected him from the Conference in response to his repeated and sustained disruption.  In Count II, which is asserted against Georgetown and Defendants Eddy and Salley only, Plaintiff claims that he was falsely arrested.  And in Count I, which is asserted against all Defendants, Plaintiff asserts that the challenged actions also constituted assault and battery.

Plaintiff's claims are factually and legally unsustainable.  The material facts are either undisputed or not reasonably subject to dispute.  Indeed, the possibility for credible factual disagreement is dramatically limited  because the events of the seminar — including Plaintiff's disruptive conduct and subsequent removal — were videotaped by third parties.  The video recordings submitted in connection with Defendants' motion, as well as substantial deposition testimony and medical evidence, so severely undermine Plaintiff's allegations that no reasonable jury could find in his favor.  Accordingly, resolution by summary judgment is appropriate here and, for the reasons more fully described below, all claims should be resolved in Defendants' favor and the Second Amended Complaint dismissed in its entirety.

Count III warrants dismissal on two separate grounds.  Count III (§ 1983 claim) must be dismissed because Plaintiff cannot establish that he has suffered any constitutional injury.  The First Amendment does not guarantee Plaintiff the right to speak and assemble on

Georgetown's private property and, in any event, he was ejected pursuant to reasonable time, place and manner restrictions. Similarly, Plaintiff sustained no violation of his Fourth Amendment rights because he was not arrested. Nonetheless, had Plaintiff been arrested, such an arrest would be lawful as Georgetown's employees had probable cause to arrest the Plaintiff for unlawfully remaining on the University's property and the force that they employed was objectively reasonable. For the same reason, summary judgment is appropriate on Plaintiff's assault and battery and false arrest claims.

Second, Count III must be dismissed because Plaintiff cannot satisfy the requirements for bringing a § 1983 action against Georgetown or its employees. Plaintiff's ejection by Georgetown's private security personnel does not constitute state action because they acted pursuant to Georgetown's private policies and not the law enforcement powers granted to them by the District of Columbia. Furthermore, Georgetown does not maintain an unlawful policy or practice that caused Plaintiff's alleged injuries. Finally, Georgetown's employees are entitled to qualified immunity.

Third, Counts I (common-law assault and battery claim) and II (common law false arrest claim) must also be dismissed. The Defendants were entitled to remove Plaintiff from Georgetown's property, they did not arrest him or commit an assault and battery by doing so, and they had probable cause to arrest him if they had chosen to do so. Furthermore, the video recordings and other evidence establish that the force used by the security officers was reasonable.

Finally, Count IV (prayer for punitive damages) must be dismissed because Plaintiff cannot offer evidence of injuries that would entitle him to punitive damages.

## FACTUAL BACKGROUND

The relevant facts are set forth in detail in the accompanying Statement of Material Facts Not in Dispute. A brief summary of those facts is set forth below.

### A.    Parties

Plaintiff William B. Maniaci, a firearms dealer and retired police officer, is an opponent of the goals and mission of the Palestine Solidarity Movement ("PSM"). Defs.' Stmt. of Material Facts Not in Dispute ¶¶ 1, 3, 46-47, 60 ("Facts"). At all relevant times, he was the chief of security and intelligence for the Jewish Defense League ("JDL"), which Plaintiff has described as a Zionist organization, and he attended the Conference in that capacity. *Id.* ¶ 3. His attendance at the PSM Conference as well as the attendance of other JDL officers and sympathizers was part of JDL's "Operation Gideon" which was intended to disrupt the Conference. *Id.* ¶¶ 46, 52-53. JDL paid for the lodging and travel expenses of the JDL members who attended the Conference. *Id.* ¶ 54. Plaintiff brought a concealed .45 caliber hand gun to his deposition at the offices of Defendants' counsel. *Id.* ¶ 8.

Defendant Georgetown is a private non-profit university incorporated under the laws of the District of Columbia. *Facts* ¶ 11. At all relevant times, Defendants Todd Olson, David Morrell and Darryl Harrison (collectively the "Administrator Defendants") were Georgetown administrators. *Id.* ¶¶ 12-13. Mr. Olson is the Vice President of Student Affairs. *Id.* ¶ 12. Mr. Morrell, was until early 2007, the Vice President for University Safety. *Id.* ¶ 14. Mr. Harrison is the Director of Public Safety. *Id.* ¶ 13. Defendants Roy Eddy and Salley Eddy were at all relevant times officers in Georgetown's Department of Public Safety ("DPS"). *Id.* ¶¶ 15-16.

### B.    Georgetown's Speech and Expression Policy

Adopted in and effective since 1989, Georgetown's Speech and Expression Policy

recognizes that "discourse, discussion, debate: the untrammeled expression of ideas" is central to

the nature and life of the university.  *Facts* ¶ 33.  To that end the policy embraces standards that

foster the maximum exchange of ideas and opinions.  *Id*.  It recognizes the that all members of

the Georgetown academic community have an interest in freedom of speech and expression.  *Id*.

¶ 34.  It broadly permits individual members and groups of members of the academic community

to invite individuals to address the community, regardless of the content of their speech.  *Id*. ¶.

Use of the University forum neither requires University approval nor implies University

acceptance or endorsement of the views expressed.  *Id*. ¶ 36.

The exercise of free speech and expression under the policy is not, however, without

limits.  It is subject to reasonable and content-neutral restrictions on time, place and manner.

"[A]ctivity that disrupts or obstructs the functions of the University or imminently threatens such

disruption or obstruction" is not, for example, permissible under the policy.  *Facts* ¶ 35.  In

addition, as the rights of each community member are limited by the rights of another, "[c]utting

off discourse" violates the policy:  "Making it impossible for others to speak or be heard or seen,

or in any way obstructing the free exchange of ideas, is an attack on the core principles the

University lives by and may not be tolerated."  *Id*.  Thus, disagreement is countenanced and

protest affirmatively allowed "as long as any speaker's right to free speech and the audience's

right to see and to hear a speaker are not violated." *Id*.

The Speech and Expression Policy was developed by the Committee on Speech and

Expression after widespread consultation with faculty, students and administrators.  *Facts* ¶ 37.

The Vice President for Student Affairs has the responsibility for administering the policy.  *Id*. ¶

40.  The Committee on Speech and Expression, which consists of four faculty members and four

undergraduate students, is a standing committee that advises the Vice President for Student

Affairs about matters relating to speech and expression.  *Id*. ¶ 37.  The Vice President for

Student Affairs and the Committee on Speech and Expression, acting together, are jointly

authorized  to "consider and implement revisions and improvements to the [guidelines

enumerated in the Speech and Expression Policy] in a manner consistent with the ideals

articulated in [it]."  *Id*. ¶ 37.

  **C.**  **The Palestine Solidarity Movement Conference**

   The PSM Conference was planned, organized, and sponsored by Students for

Justice in Palestine ("SJP"), a student group at Georgetown.  *Facts* ¶ 19.  The goal of the

Conference was to promote divestment from Israel as a means of protesting what its supporters

viewed as human rights abuses by the Israeli government.  *Id*. ¶ 20.

   Georgetown does not endorse the views of SJP and does not support divestment

from Israel.  *Facts* ¶ 25.  Consistent with its longstanding Speech and Expression Policy,

however, Georgetown makes its facilities available to student groups for the purpose of holding

student organized events.  *Id*. ¶¶ 22-23.  Consistent with this policy and practice, the University

made its facilities available to SJP which hosted the Conference.  *Id*. ¶¶ 22-23, 26.

   Five prior PSM conferences had been held at various public and private

universities between 2000 and 2005.  *Facts* ¶ 27.  The 2005 conference took place at Duke

University ("Duke").  *Id*. ¶.  A delegation of Georgetown administrators, including Mr. Morrell,

traveled to Duke to learn from their counterparts about the challenges it faced in hosting the prior

conference.  *Id*. ¶ 28.  As a result, Georgetown developed a detailed plan to protect the security

of its community and property while providing ample outlets for expression.  *Id*. ¶¶ 28-29.  This

plan included, among other things, the creation of designated protest and demonstration areas,

separated by group or organization, where supporters and opponents of the Conference could safely express their views. *Id*. Details regarding the precautionary measures taken by Georgetown can be found in Defendants' Statement of Material Facts Not in Dispute. *Id*. ¶¶ 31-32.

    **D.**     **JDL Members Develop "Operation Gideon"**

    The JDL had, as of 2006, been designated as a hate group by the Southern Poverty Law Center and was described as a "violent extremist organization" in an FBI report on terrorism in 2000-2001. *Facts* ¶ 4-5. In December of 2001, then-chairman of the JDL, Irv Rubin, and another JDL associate Earl Krugel, were indicted by the federal government on charges of conspiring to bomb the King Fahd Mosque in Los Angeles as well as the office of an Arab American congressman, Darrell Issa. *Id*. ¶ 6. Mr. Krugel plead guilty to the charges and Mr. Rubin died while awaiting trial. *Id*. At the time when these events occurred, the Plaintiff was the deputy chairman of the JDL. *Id*.

    For several months prior to the Conference, Plaintiff (acting as JDL's chief of security and intelligence) and other JDL members and sympathizers devised "Operation Gideon," a plan for protesting and disrupting it. *Facts* ¶¶ 46-47. JDL members, including Plaintiff, viewed the Conference as "part of a continuing psychological attack on the United States perpetrated by IslamoNazis." *Id*. ¶ 50. They hoped to "disrupt" the Conference so that Georgetown would "suffer . . . public humiliation [and] degradation," and "to make it so that no other university would ever host something like this again in such a manner." *Id*. ¶ 46. Plaintiff contacted Georgetown prior to the Conference and expressed his intention to attend and protest on behalf of the JDL. *Id*. ¶ 60. In response, Georgetown officials directed him to the University's Speech and Expression Policy which as discussed above, describes both the breadth

of the rights of speech and expression enjoyed by the Georgetown community as well as the limits on those rights. Despite his identification as an opponent of the Conference, Georgetown made no attempt to discourage Plaintiff from registering for or attending the Conference. *Id.* ¶¶. 62-64.

        **E.**     **Plaintiff Disrupts the Conference and Refuses To Leave Gaston Hall or the Campus**

On the morning of Saturday, February 18, 2006, Plaintiff registered for the PSM Conference with Conference sponsors Students for Justice in Palestine ("SJP") and sat down in Gaston Hall, an auditorium on the third floor of Georgetown's Healy Hall, where the Divestment Seminar was scheduled to take place. *Facts* ¶ 72. Plaintiff paid a ten dollar registration fee to SJP and received an information packet and agenda that included a copy of Georgetown's policy on Free Speech and Expression. Second Amended Complaint ("Compl.") ¶ 2. The SJP collected the registration fee; it was not a fee charged or received by Georgetown. *Facts* ¶ 73.

The events of the Divestment Seminar were recorded on videotape. Defendants have submitted as exhibits in support of this motion, three third-party video recordings of the Divestment Seminar as well as a transcript of key portions of the video recordings. *See* Exs. 43-47. These events are also described in greater detail in Defendants' Statement of Material Facts Not in Dispute. *Id.* ¶¶ 77-139. Defendants respectfully request the Court to view the video recordings since they are critical evidence as to what actually transpired at the event.

Following presentations by the panel of speakers, a question and answer session was held. *Facts* ¶ 87. At the outset of the Divestment Seminar, and again at the beginning of the question and answer period, Vice President of Student Affairs, Todd Olson, announced the ground rules for the question and answer session. *Id.* ¶¶ 86-88. Mr. Olson told audience members that they were limited to one question per person and were required to phrase their

comments only in the form of a question.  *Id*. ¶¶ 86-88.  Mr. Youmans also repeated these

ground rules at the beginning of the question and answer session.  *Id*. ¶ 89.

> When it was his turn, Plaintiff asked the panel:
>
> I'd like to know your position on suicide bombing.  If you would
> renounce suicide bombing and the murder of innocent Israeli
> women and children, as a viable, uh, venue for you to accomplish
> your goals.  And given that that is terrorism, and no one can deny
> blowing himself up on a bus and killing innocents is not terrorism .
> . . . I would like you to answer either affirmative or negative
> whether you do support terrorism or not.

*Facts* ¶ 92.  Panelist Susan Blackwell addressed Plaintiff's question at length stating in pertinent

part that "I unreservedly condemn all acts of terrorism, by which I mean acts or threats of

violence against unarmed civilians for political ends.  And that applies . . . that applies to suicide

bombs in pizza parlors in Israel."  *Id*. ¶ 95.  After she responded, Plaintiff loudly shouted "You

haven't answered my question."  *Id*. ¶ 97.  Plaintiff was advised by Mr. Olson and the seminar

moderator, Will Youmans, that he was disrupting the event and that his opportunity to speak had

ended.  *Id*.  Plaintiff ignored their instructions and persisted in shouting from his seat, interjecting

at least <u>eight</u> times.  *Id*. ¶¶98-103.  Time after time, Mr. Youmans requested Plaintiff to desist

from his disruptive behavior.  *Id*. ¶¶ 104-114.  Plaintiff ignored these requests and repeatedly

interrupted both Mr. Youmans' attempts to respond to his comments and another audience

member's attempt to ask his question.  *Id*.

> When it became clear that Plaintiff (who by then had interrupted the proceedings

<u>eight</u> times and attempted to shout down others, and who had received <u>five</u> warnings and

requests to desist from Messrs. Olson and Youmans) was committed to continuing his disruptive

behavior, Mr. Olson again advised the Plaintiff that his opportunity to speak had ended and

asked his "staff" to "escort" the Plaintiff from the room.  *Facts* ¶¶ 115-116.  The purpose of Mr.

Olson's request was to enforce Georgetown's Speech and Expression Policy which prohibits disruptive behavior of the type engaged in by Plaintiff. *Id*. ¶ 187. Mr. Olson's purpose was not to have Plaintiff arrested or enforce criminal laws. *Id*.

Safety Officers Salley and Eddy responded to Mr. Olson's request. *Facts* ¶¶. Plaintiff ignored Mr. Olson's instruction and did not alight from his seat or leave the auditorium. *Id*. ¶. Officers Eddy and Salley approached Plaintiff and Officer Eddy bent over to speak to him and, identifying himself as a "University official," asked him to leave the auditorium. *Id*. ¶. Plaintiff refused and remained seated. *Id*. ¶. The Safety Officers lifted him out of his seat and attempted to stand him up in the aisle. *Id*. ¶. Plaintiff again resisted by going limp and refusing to stand on his own. *Id*. ¶. After the Security Officers lifted him and moved him into the aisle, he continued to resist refusing to stand up or walk, thus requiring the Safety Officers to carry him out of the room. *Id*. ¶. As the Safety Officers strained to support Plaintiff's 220 pound frame and carry him from the room, he continued to resist by repeatedly placing his cane between Officer Salley's legs in an effort to trip him. *Id*. ¶. After carrying him out of Gaston Hall, Officers Eddy and Salley gently placed Plaintiff on the floor in the adjacent hallway in the foyer of the Healy Hall. *Id*. ¶¶. Plaintiff's removal took no more than thirty seconds and took him no more than forty-five feet from where he had been seated. *Id*. ¶. He was not handcuffed, arrested, or taken into custody. *Id*. ¶. After reviewing the video recordings of the events of the Divestment Seminar, Defendants' expert witness Charles J. Key, Sr. concluded that the actions of the Safety Officers were "objectively reasonable and consistent with accepted standards of police practices, policies, and training." Aff. of Charles J. Key, Sr. (Ex. 59) at 7-8.

Other JDL member's became involved in Plaintiff's disruption of the Conference. As soon as Mr. Olson requested that Plaintiff be escorted from the room, JDL sympathizer Jim Nutting and JDL Chairman Matthew Finberg sprang into action. *Facts* ¶. They positioned

themselves in the aisle near Plaintiff and obstructed the Safety Officers' path. *Id.* ¶. JDL Chairman Finberg also used this time to place himself directly in front of the next questioner, Rabbi Weiss,[1] whom Plaintiff had already interrupted. *Id.* ¶. Mr. Finberg openly admitted that he stood in front of Rabbi Weiss in order to block him from speaking because "I don't like him and I didn't think he should be there and I think he's dangerous to my people." *Id.* ¶.

　　　　Shortly after being placed in the foyer, Plaintiff stood up with no visible injuries or signs of distress. *Facts* ¶; Exs. 53-A through 53-C. At that time, Mr. Morrell told Plaintiff to leave the campus and that he was barred from further participation in the Conference. *Id.* ¶. At first, Plaintiff agreed to leave the campus but then disregarded this request, and headed across campus towards the Bunn Intercultural Center ("ICC"), another University academic building, where additional Conference activities were taking place. Mr. Harrison accompanied Plaintiff as he walked to the ICC and advised him that he would not be permitted to enter the ICC. *Id.* ¶. Plaintiff nonetheless continued toward and attempted to enter the ICC building. *Id.* ¶. In front of the ICC, Georgetown administrators, including David Morrell, Todd Olson, and Darryl Harrison, advised Plaintiff that he would not be permitted to enter the ICC. *Id.* ¶. Plaintiff ignored their requests and insisted that he be allowed to enter. *Id.* ¶. At his request, Plaintiff was permitted to use the restroom at the ICC but a Safety Officer held the door slightly ajar with his foot to prevent Plaintiff from locking himself inside. *Id.* ¶. After Plaintiff had used the restroom, he was escorted back to the foyer of the ICC and again directed to leave the campus. *Id.* ¶. When Plaintiff continued to defy that direction, Georgetown officials contacted Metropolitan Police Sergeant Sam DeLisi who escorted Plaintiff off campus. *Id.* ¶.

---

[1] Rabbi Weiss is a member of Neteuri Karta, a group within the Jewish faith that holds views contrary to the JDL. Facts ¶ 123 n.3

Plaintiff did not seek medical attention at that time.  He instead sat in a car outside Georgetown's campus gate for several hours and then went out to dinner with several JDL colleagues for a hamburger and a beer.  *Facts* ¶.  On Sunday morning, before returning to Georgetown, Plaintiff fell down while waiting for a bus.  *Id*. ¶.  Plaintiff did not seek medical attention at that time.  He instead returned to the Conference and spent much of the day intermittently waiving an Israeli flag outside Georgetown's main gate.  *Id*. ¶¶.  Later that evening, after Plaintiff and his JDL colleagues had returned to their hotel, Plaintiff began stuttering and slurring his words and began mistakenly referring to Mr. Turk as "Jim-Bob."  *Id*. ¶ 166.  As a result, his friends encouraged him to visit the hospital.  *Id*.  Plaintiff had experienced a very similar episode of slurring and stuttering prior to the PSM Conference during which he also mistakenly referred to Mr. Turk as "Jimbo".  *Id*. ¶ 170.

### F.  Dr. Gillern Examines Plaintiff at Walter Reed

On Sunday evening, well over twenty-four hours after the relevant events on Georgetown's campus, Plaintiff went to Walter Reed Army Medical Center complaining of lower back pain, an episode of dizziness, and right ankle swelling.  *Facts* ¶¶ 167-68.  Dr. Suzanne Gillern, the emergency room physician on duty, examined him and found no head injuries, no back tenderness, no ankle pain, no bruising, but some ankle swelling.  *Id*. ¶ 171.  The results of Plaintiff's neurological exam and CT scan were normal.  *Id*. ¶ 172.  Dr. Gillern concluded that he had sprained his ankle and possibly suffered a concussion based on his statement about his fall, although there was no physical evidence of head injury.  *Id*. ¶ 173.  She discharged Plaintiff the same evening.  *Id*.  Plaintiff did not seek any further medical treatment.  *Id*. ¶¶ 174-75.

G.    **Plaintiff's Files Suit Against Georgetown and Its Employees**

This lawsuit followed.[2]  Defendants were served with the Complaint on September 21, 2006.  The Court granted Defendants' Motion for Judgment on the Pleadings in part and limited Count II to Defendants Georgetown, Eddy and Salley.  *See* Order of Sept. 10, 2007 ("Order").  Plaintiff filed a Second Amended Complaint on September 21, 2007, which contains four counts:  In Count I, Plaintiff asserts a claim against all Defendants for assault and battery.  In Count II, Plaintiff asserts a claim for false arrest against Defendants Georgetown, Eddy and Salley.  In Count III, Plaintiff asserts a § 1983 claim against all Defendants for a "deprivation of right to speech and assembly."  Finally, in Count IV, Plaintiff asserts a claim for punitive damages.

## ARGUMENT

I.    **Summary Judgment Standard**

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits, show that there is no genuine issue as to any material fact and that the movant  is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The plain language of this rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Cooper v. First*

---

[2] About a week prior to filing or serving his initial Complaint on Georgetown, Plaintiff provided a copy to freelance journalist and JDL sympathizer Lee Kaplan and gave him "an exclusive" interview on his proposed lawsuit. *Facts*  ¶ 66.  Kaplan's article titled, "Georgetown University sued for $8 million dollars for attack on elderly Orthodox Jew at PSM Conference*"* ran in the Canadian Free Press on September 15, 2006, five days before the Complaint was filed and six days before Defendants were served. *Id.* ¶ 67.  *See* Docket in *Maniaci v. Georgetown Univ.*, No. 06 CV 01625 (CKK).  Plaintiff also filed a criminal complaint against Georgetown with the FBI, but the United States Depart of Justice summarily declined to take any action. *Id.* ¶ 71.

*Gov't Mort. & Investors Corp.*, 238 F. Supp. 2d 50, 53–54 (D.D.C. 2002) (same).  "A fact is

'material' if a dispute over it might affect the outcome of a suit under governing law; factual

disputes that are 'irrelevant or unnecessary' do not affect the summary judgment determination."

*Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006) (*quoting Anderson v. Liberty Lobby,

Inc.*, 477 U.S. 242, 248 (1986)).  An issue is "genuine" if "the evidence is such that a reasonable

jury could return a verdict for the non-moving party."  *See Anderson*, 477 U.S. at 248; *Holcomb*,

433 F.3d at 895.

        The Court must draw all justifiable inferences in the nonmoving party's favor and

accept the nonmoving party's evidence as true, but the nonmoving party "must establish more

than the mere existence of a scintilla of evidence in support of its position."  *Cooper*, 238 F.

Supp. 2d at 53; *see also Anderson*, 477 U.S. at 247-48 ("[T]he mere existence of *some* alleged

factual dispute between the parties will not defeat an otherwise properly supported motion for

summary judgment; the requirement is that there be no *genuine* issue of *material* fact.")

(emphasis in original); *Pro-Football, Inc. v. Harjo*, 284 F. Supp. 2d 96, 112 (D.D.C. 2003)

("[T]he mere existence of a factual dispute, by itself, is not sufficient to bar summary

judgment.").  Indeed, "[w]hen the moving party has carried its burden under Rule 56(c), its

opponent must do more than simply show that there is some metaphysical doubt as to the

material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)

(footnote omitted).

        Moreover, "the nonmoving party may not rely solely on allegations or conclusory

statements.  Rather, the nonmoving party must present *specific facts* that would enable a

reasonable jury to find in its favor."  *Cooper*, 238 F. Supp. 2d at 53–54 (emphasis added)

(citations omitted); *see also Harjo*, 284 F. Supp. 2d at 112–13 ("Mere allegations or denials in

the adverse party's pleadings are insufficient to defeat an otherwise proper motion for summary

judgment."). Neither may the non-moving party avoid summary judgment by relying on his own unsupported testimony and self-serving statements. *See Fields v. Office of Johnson*, -- F.Supp.2d--, No. 04-0717 (JR), 2007 WL 2947398, at *1 (D.D.C. Oct. 10, 2007) (mem.); *Drumgold v. Howard Univ.*, No. 99-2255 (PLF), 2005 WL 975761, at *4 (D.D.C. Apr. 25, 2005).

"Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citations omitted). In particular, "[w]hen opposing parties tell two different stories, *one of which is blatantly contradicted by the record*, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 127 S. Ct. 1769, 1776 (2007) (emphasis added); *see also Cooper*, 238 F. Supp. 2d at 54 ("If the evidence is merely colorable, or is not significantly probative, summary judgment may [nevertheless] be granted.").

## II. Defendants Are Entitled to Summary Judgment on Count III (42 U.S.C. § 1983)

### A. Defendants Are Entitled to Summary Judgment Dismissing Plaintiff's First Amendment Claim in Count III (42 U.S.C. § 1983)

The gravamen of Plaintiff's First Amendment claim in Count III (42 U.S.C. § 1983) is that his right to "free speech and assembly" was restricted when he was ejected from the Conference. *See* Compl. ¶ 18. Plaintiff's claim fails, however, because the First Amendment does not guarantee free expression and assembly on private property and, in any event, he was ejected from the Conference based on permissible time, place, and manner restrictions.

#### 1. Plaintiff Did Not Enjoy First Amendment Rights on Georgetown's Private Property

As a general matter, the First Amendment's constitutional guarantee of free expression "has no part to play" on private property. *Hudgens v. Nat'l Labor Relations Bd.*, 424

15

U.S. 507, 521 (1976).  It imposes no limitations upon "the owner of private property used nondiscriminatorily for private persons."  *Lloyd Corp. v. Tanner*, 407 U.S. 551 (1972) (finding that Vietnam War protesters did not have a right to assemble at a private shopping center); *Nat'l Org. for Women v. Operation Rescue*, 37 F.3d 646, 655 (D.C. Cir. 1994) (no First Amendment right to trespass on private property).  Consistent with this precedent, the District of Columbia Court of Appeals has recognized that Georgetown is not subject to the constitutional restrictions that govern public institutions.  *See Gay Rights Coal. of Georgetown Univ. Law Ctr.  v. Georgetown Univ*., 536 A.2d 1, 20 n.15 (1987) ("A public university may not impose content-based restrictions on speech  . . . . Georgetown, is under no such constitutional restrictions."); *see also Williams v. Howard Univ*., 528 F.2d 658, 660 (D.C. Cir. 1976) (per curiam) (Howard University not subject to § 1983 liability); *Greenya v. George Wash. Univ*., 512 F.2d 556, 561 (D.C. Cir. 1975) (George Washington University not subject to § 1983 liability).  Therefore, Defendants are entitled to summary judgment on Plaintiff's First Amendment Claim in Count III.

### 2. Georgetown Was Entitled To Enforce Reasonable Time, Place, and Manner Restrictions

Even if Plaintiff had a First Amendment right to free expression while present on Georgetown's private property (which he did not), Defendants would nevertheless be entitled to summary judgment because Georgetown's action in barring him from the Conference was a valid enforcement of a reasonable time, place and manner restriction.

The Supreme Court has cautioned that "[e]ven protected speech is not equally permissible in all places and at all times."  *See Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 799 (1985).  Hence certain time, place and manner restrictions are permissible. *See Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45-46 (1983).  Such regulations "do[ ] not regulate *what* is said, but merely [ ] such matters as *when*, *where*, and *how*

*loud*. *See Ward v. Utah*, 398 F.3d 1239, 1254 (10th Cir. 2005) (quotation marks omitted). First

Amendment analysis of time place and manner restrictions typically begins with a determination

of whether the relevant forum is a public forum, a limited public forum, or a non-public forum.

*Perry*, 460 U.S. at 44–45. It is clear that Gaston Hall and the other Georgetown facilities used

during the Conference are not traditional public fora such as public streets or parks "which have

immemorially been held in trust for the use of the public." *Id.* at 45 (quotation marks omitted).

Even as to limited public fora, time, place and manner restrictions are permissible

so long as they are reasonable and not content-based. *See Perry*, 460 U.S. at 45–46; *Widmar v.*

*Vincent*, 454 U.S. 263, 276 (1981) (affirming the right of a public university to establish

reasonable time, place and manner restrictions); *Greene v. Washington D.C.*, No. 05-1097, 2006

WL 1712399, at *4 (D.D.C. June 16, 2006) (reasonable time, place, and manner restrictions

permissible at UDC's law library). Indeed, Plaintiff concedes that Georgetown was entitled to

limit the time, place, and manner in which Conference participants could speak, including

limiting speakers to a single question, requiring them to phrase their comments in the form of a

question, prohibiting them from shouting and from interfering with another person's right to

speak. *Facts* ¶ 91. The time, place, and manner restrictions that Plaintiff violated during the

Divestment Seminar included (a) a prohibition on "[a]ctivities that disrupt or obstruct the

functions of the University," (b) a prohibition on speech that would interfere with the audience's

"right to hear a speaker," (c) a restriction requiring audience members to phrase their comments

in the form of a question, and (d) a restriction requiring audience members to limit their

comments to a single question. *Facts* ¶ 35, 88-89. Each of these restrictions comfortably meets

Constitutional standards.

The touchstone of whether a restriction is reasonable is whether it serves a

legitimate government interest. *See Kindt v. Santa Monica Rent Control Bd.*, 67 F.3d 266, 271

(9th Cir. 1995); *Smith-Caronia v. United States*, 714 A.2d 764, 766 (D.C. 1998). Substituting

Georgetown for the government in this inquiry, its prohibition of disruptive conduct as well as its

limitations on how many questions a participant may ask and the form of any comments are

precisely the type of reasonable time, place and manner restrictions that have been held to serve

a governing body's legitimate interest in conducting efficient and orderly meetings. *See White v.

City of Norfolk*, 900 F.2d 1421, 1424-25 (9th Cir. 1990) (authorizing removal of any person who

"disrupts, disturbs or otherwise impedes" the orderly conduct of a city council meeting); *Kindt*,

67 F.3d at 271 (limiting public commentary at board meeting to three minutes); *Armfield v.

United States*, 811 A.2d 792, 795–97 (D.C. 2002) (upholding rule prohibiting activity that

"disrupt[s], or disturb[s] the orderly conduct of any session of the Congress"); *Smith-Caronia v.

United States*, 714 A.2d at 765, 767 (same with respect to protesters removed from Senate

gallery).

   More importantly, courts have long recognized that even with respect to *public*

universities, a university's judgment on matters relating to its educational mission requires "great

deference by federal courts." *See Ala. Student Party v. Student Gov't Ass'n*, 867 F.2d 1344,

1347 (11th Cir. 1989). Accordingly, a university has a "right to exclude even First Amendment

activities that violate reasonable campus rules or substantially interfere with the opportunity of

other students to obtain an education." *Id*. at 1353 n.5 (*quoting Widmar*, 454 U.S. at 277). As

Georgetown's Speech and Expression Policy makes clear, both its broad protection of discourse

and its time place and manner restrictions explicitly serve the central educational mission of the

University, and Georgetown was well within its rights to establish and implement such rules.

Plaintiff's contention that the First Amendment (or the nominal fee that he paid to SJP, not

Georgetown) required Georgetown to tolerate Plaintiff's purposeful interference with the

Divestment Seminar is untenable. *Facts* ¶ 46 (According to JDL Chairman Finberg, the JDL's

goal was to "g[et] the cameras and microphones off the speakers and on [the JDL]."). *See, e.g., Phi Lambda Phi Fraternity Inc. v. Univ. of Pittsburgh*, 229 F.3d 435, 445 (3d Cir. 2000) (University need not tolerate activities "where they infringe [on] reasonable campus rules, interrupt classes, or substantially interfere with the opportunity of other students to obtain an education.") (quotation marks omitted).

Nor can there be any dispute that Georgetown's restrictions on speech and expression were content-neutral; the content of speech is simply not a factor. Indeed, the Speech and Expression Policy invites and explicitly accommodate dissent, emphasizing that "speech or expression in protest or opposition" at university events "*may do so* long as . . . . the audience's right to see and to hear a speaker are not violated." Ex. 24 at M000218 (emphasis added). The panelists at the Divestment Seminar invited questions from all members of the audience without regard to content. In addition, as Plaintiff was well aware, there were throughout the duration of the Conference, ample designated demonstration areas where protesters could and did safely express their dissent and opposition. *Facts* ¶ 31. The facts establish that Georgetown's restrictions did not limit what a speaker was permitted to say, but only when, where, at what length and how loudly speakers were permitted to express themselves.

Moreover, there is absolutely no evidence that Defendants ejected the Plaintiff from the Conference based on the content of his speech. To the contrary, the undisputed facts are that Georgetown welcomed Plaintiff even after he indicated that he intended to protest the Conference and that university officials excluded Plaintiff only after he had asked his allotted question and interjected by shouting at least eight times, disregarding numerous requests to desist from his disruptive behavior. *Facts* ¶ 114; *White*, 900 F.2d at 1425 (speech may be restricted when it becomes "irrelevant or repetitious"). On this record, no reasonable trier of fact could

possibly conclude that the Plaintiff was ejected on account of his viewpoint or the content of his speech.

In terms of the right to exclude persons who engage in disruptive behavior at meetings, this case is indistinguishable from *Norse v. City of Santa Cruz*, No. C 02-01479 RMW, 2007 WL 951854 (N.D. Cal. Mar. 28, 2007). There, the court upheld the ejection and arrest of a man who disrupted a city council meeting by giving a Nazi salute as a means of protesting the Mayor's refusal to allow another participant to continue speaking. *Id.* at *1 (granting judgment to the City prior to trial on the basis of the undisputed facts). A council member who witnessed the salute brought it to the Mayor's attention who then instructed Norse to leave the council chambers. When Norse refused, a police officer acting as the council's sergeant-at-arms arrested him. *Id.* The court found that the plaintiff's ejection and arrest did not violate the First Amendment because the plaintiff clearly disrupted the meeting and the Mayor's "action in ejecting Norse . . . was a reasonable means . . . . [of] controlling the conduct of the meeting," not taken based upon the content of Norse's speech. *Id.* at *4.

Accordingly, Defendants are entitled to summary judgment dismissing Plaintiff's § 1983 claim in Count III to the extent that it is premised on a violation of his First Amendment rights.

**B.    Defendants Are Entitled to Summary Judgment Dismissing Plaintiff's § 1983 Claim in Count III Because the Safety Officers Did Not Act Under Color of State Law**

As this Court recognized in its prior decision, Plaintiff's § 1983 claim rises and falls on whether he can establish that the Safety Officers acted under color of law. *See* Memorandum Opinion of Sept. 10, 2007 ("Op.") at 24. This question in turn depends on whether the Safety Officers, who were commissioned as special police officers ("SPO") under

the laws of the District of Columbia, were performing a public "police" function or a "private" function. *See United States v. McDougald*, 350 A.2d 375, 378 (D.C. 1976); D.C. Code § 23-582 (2007).

Since this Court's prior ruling on Defendants' motion for judgment on the pleadings, the District of Columbia Court of Appeals has decided *Limpuangthip v. United States*, 932 A.2d 1137 (D.C. 2007), which squarely addresses the issue in the context of SPOs employed by a private university. *Id.* at 1147 (holding that two SPOs who assisted in searching a George Washington University student's dorm room were not state actors because they were not enforcing criminal laws). The court's decision in *Limpuangthip* should guide this Court's analysis as to whether Georgetown's Safety Officers — District of Columbia commissioned SPOs — were acting under color of District of Columbia law. *See Keener v. Wash. Area Metro Transit Auth.*, 800 F.2d 1173 (D.C. Cir. 1986) (D.C. Court of Appeals entitled to deference on matters of local law).

In *Limpuangthip*, the District of Columbia Court of Appeals comprehensively reexamined its precedents addressing the question of whether an SPO is a state actor, and for the first time, synthesized the existing case law into a single framework for analyzing the issue. 932 A.2d at 1144–48. Specifically, the court clarified that the animating principle is that an "SPO is a state or 'public' actor when he or she *invokes state authority through manner, word or deed*, i.e., he or she acts like a regular police officer." *Id.* at 1144 (emphasis added). In analyzing this question, a court should not "focus[ ] on the fact of an arrest alone." *Id.* at 1143. Instead, the court should "focus[] [more] broadly on whether [the SPOs] were performing their 'police' functions." *Id.*

As the court explained in *Limpuangthip*, whether an SPO performed a public or private function is determined by examining such factors as:  who initiated the challenged action, *see Alston v. United States*, 518 A.2d 439, 443 (D.C. 1986), whether the SPO purported to act under the state's authority, *see Williams v. United States*, 341 U.S. 97, 99 (1951) and *Griffin v. Maryland*, 378 U.S. 130, 135 (1964), and what the purpose of the SPO's action was, *see McDougald*, 350 A.2d 375.  All three of the factors identified in *Limpuangthip* militate against finding that Georgetown's SPOs were performing a public police function at the Conference.

### 1.    Plaintiff Was Not Arrested

Plaintiff's sole argument in support of state action is that Georgetown's Safety Officers arrested him.  *See* Plaintiff's Mem. of Points and Auths. in Opposition to Defs.' Mot. for Partial Judgment on the Pleadings ("Opp'n.") at 12–13.  This allegation finds no support in the record.  Significantly, Plaintiff has conceded that he was not arrested.  Ex. 1 (Maniaci Dep.) at 158, 298-99.  He has also testified that the Safety Officers on the scene confirmed that the was not being arrested.  *Id.* at 298.  Nor is there any evidence in the record of any indicia of arrest such as handcuffing, booking, or formal custody.  *Facts* ¶¶ 114, 159.  To the extent that Plaintiff claims that the brief restriction of his movement entailed in his removal from Gaston Hall constituted an arrest, that is simply not the law.

"There must be some detention of the person to constitute [an] arrest."  *Coleman v. United States*, 295 F.2d 555, 563–64 (D.C. Cir. 1961) (quotation marks omitted).[3] Nevertheless, not every detention rises to the level of an arrest.  *See Terry v. Ohio*, 392 U.S. 1, 88

---

[3] The broad definition of arrest espoused in *Henry v. United States*, 361 U.S. 98 (1959), which the court relied on in *Coleman*, is not applicable here:  the Supreme Court's observation in *Henry* that the arrest was complete when the officers approached the car must be read in light of the fact that the government *conceded* that this is when the arrest took place.  *Id.* at 103.  *See United States v. Bonanno,* 180 F. Supp. 71, 85 (S.D.N.Y. 1960) (distinguishing *Henry* on this ground).

(1968); *Brown v. United States*, 365 F.2d 976, 979 n.4 (D.C. Cir. 1966) ("[W]e do not say that mere detention would give rise to an arrest in all circumstances."); *Fuller v. United States*, 407 F.2d 1199, 1207 (D.C. Cir. 1967) (brief detention is not necessarily an arrest); *United States v. Gayden*, 492 A.2d 868, 872 (D.C. 1985) (certain police seizures "do not result in a full scale arrest"). Thus, while Plaintiff may have been momentarily carried out of Gaston Hall (an event lasting approximately thirty seconds), it does not follow that he was arrested.

Indeed, courts have declined to find that an arrest took place where a suspect was detained much longer than Plaintiff and where much greater force was employed. *Young v. Prince George's County*, 355 F.3d 751 (4th Cir. 2004) is an illustrative example. Young, an off-duty FBI agent, was stopped by a police officer, handcuffed, forced to the ground face-first, struck in the head and kneed in the back. *Id*. at 753–54. Young was then detained for approximately twenty-five minutes until the officer was able to confirm his FBI status. *Id*. Neither the use of force nor the length of the detention persuaded the court that the officer had curtailed "Young's 'freedom of action to a degree associated with formal arrest.'" *Id*. at 756 (granting summary judgment to the officer) (*quoting Park. v. Shiflett*, 250 F.3d 843, 850 (4th Cir. 2001)).

The District of Columbia Court of Appeals reached a similar conclusion in *In re E.A.H*., 612 A.2d 836 (D.C. 1992). There the court declined to find that an arrest had occurred despite the fact that fourteen-year-old E.A.H. was "obviously seized." *Id*. at 837 (internal quotation marks omitted). Police officers executed a search warrant at E.A.H.'s home and confined "all of the occupants of the house in the living room on the ground floor" with armed officers guarding all exits. *Id*. During this detention E.A.H. was questioned by the police for about three minutes. *Id*. Nevertheless, the court concluded that "the restraint on E.A.H.'s liberty . . . did not approach a level comparable to that of a formal arrest." *Id*. at 839 (observing that

23

"[n]o weapons were drawn, E.A.H. was not handcuffed, and the police left without arresting him."). *See also Davis v. United States*, 498 A.2d 242, 244 (D.C. 1985) (no arrest when a suspect was detained for fifteen minutes by an officer who "displayed his service revolver to effect the stop").

Viewed in light of this authority, Plaintiff's extraordinarily quick removal from Gaston Hall — which lasted approximately thirty seconds — clearly did not rise to the level of an arrest. The same is true of his alleged detention at the ICC. It is undisputed that in both cases he was not handcuffed and that the Safety Officers were unarmed. *Facts* ¶¶ 114, 208, 216. Plaintiff, by his own admission, was left free and walked away from each encounter. *See* Ex. 1 (Maniaci Dep.) at 289, 303. Indeed, the manifest intention of the Georgetown officials was not that Plaintiff be in any way detained or on University property, but that he voluntarily depart first Gaston Hall and later the campus for any other destination of his choosing. *Facts* ¶ 160. Plaintiff was always free to depart and could easily have avoided any further interaction with Defendants if he had complied with their instruction to leave the Conference. No reasonable jury could find in Plaintiff's favor on these facts.

### 2. Georgetown's SPOs Performed a Private Function

In any event, *Limpuangthip* makes clear that an arrest by an SPO does not constitute state action *per se* — other factors must come in play. 932 A.2d at 1143–44. One important factor is whether the SPO is acting at the behest of his private employer. When an SPO self-initiates action to enforce criminal laws, he may be said to be invoking the authority granted to him by the state. That is not the case when an SPO acts at his private employer's direction. This factor was of particular significance to the District of Columbia Court of Appeals' analysis in *Limpuangthip* where the court emphasized that a private party — an administrator — "made the decision to search [the room]" in order to enforce the university's

private policies.  *Id*. at 1146 (quotation marks omitted).  Thus, the SPOs were not asserting

police powers granted to them by the District of Columbia, but instead complying with

instructions from their private employer.  The District of Columbia Court of Appeals contrasted

this with the facts of *Alston* and *Lucas* in which the SPOs had themselves initiated the challenged

actions.  *Id*.

        This factor compels summary judgment in favor of Defendants as it is undisputed

that Safety Officers Eddy and Salley did not approach Plaintiff on their own initiative but acted

at Mr. Olson's direction to "escort" Plaintiff from Gaston Hall; they did not approach Plaintiff on

their own initiative.  *Facts* ¶¶  116-18.  Similarly, it was Messrs. Olson and Morrell who made

the decision to bar Plaintiff from the Conference and from Georgetown's campus after as a

consequence of his violation of the University's Speech and Expression policy; the Safety

Officers did not make this decision.  *Id.* ¶¶  143-44.  And when Plaintiff left Gaston Hall,

Director of Public Safety Harrison walked with him to the ICC and advised him that, because of

that decision to bar him from the campus, Plaintiff would not be allowed to enter the ICC

building.  *Id.* ¶ 149.  Plaintiff does not allege that any of the Safety Officers who were present at

the ICC initiated the encounter of which he complains.

        The second factor, the purpose of the challenged action, also weighs strongly in

favor of Defendants.  Plaintiff's removal from Gaston Hall and the decision to bar him from the

Conference were indisputably taken for the purpose of enforcing Georgetown's Speech and

Expression Policy and not for the purpose of criminal law enforcement.  *Facts* ¶ 187.  This

should have been abundantly clear to Plaintiff who received repeated warnings from Mr. Olson

and Mr. Youmans that he was creating a disruption and that his "opportunity to speak had

ended."  *Id*. ¶¶ 103, 116.  Even  JDL Chairman Finberg testified that Mr. Morrell expressly

informed Plaintiff that he was "banned" from the Conference for violating the University's

policies.  *Id.* ¶ 144.  And in any event it is undisputed that Plaintiff was not accused of or charged with violating any law.[4]

This significance of the purpose of the Safety Officer's action, which can be traced back to the District of Columbia Court of Appeals' decision in *McDougald*, was recently reaffirmed and emphasized in *Limpuangthip*.  *See* 932 A.2d at 1143–44.  In *Limpuangthip,* the District of Columbia Court of Appeals emphasized that the administrative search was taken for the purpose of enforcing the university's private policies and not to "collect evidence for a criminal case."  932 A.2d at 1141, 1147 (quotation marks omitted).  In doing so, the court recognized that *McDougald* turned, in large part, on the fact that in instructing a witness not to discuss a case with a defense attorney, the defendant SPO was simply enforcing the store's private policies.  The SPO's "motive and intent" was to "protect the interests of [his private employer] and its employees;" thus he was "not performing a public function authorized by his commission as special policeman."  350 A.2d at 378.  *McDougald* and *Limpuangthip* compel the same conclusion in this case:  that the purpose of the Safety Officers' actions was enforcement of the University's private Speech and Expression policy to protect the interests of the Georgetown community, and therefore the Safety Officers did not act under color of state law.

Finally, as this Court has recognized, it is also necessary to consider whether the SPO purports to assert the authority granted to him by the state.  *See* Op. at 26; *Limpuangthip*, 932 A.2d at 1145–46.  For example, in *Williams*, the Supreme Court found that an SPO hired by a lumber company who "took four men to a paint shack  . . . . and used brutal methods to obtain a confession from each of them" was a state actor, in part, because the SPO "went about flashing his badge."  *Williams*, 341 U.S. at 98-99.  Similarly, in *Griffin*, the Supreme Court found that an

---

[4] Nevertheless, Defendants maintain that the Safety Officers had probable cause to arrest Plaintiff for trespass and thus would have been justified if they had chosen to do so.

SPO who arrested four African-American patrons for refusing to comply with an amusement park's segregation policy was acting under state law because he "consistently identified himself as a deputy sheriff rather than as an employee of the park." 378 U.S. at 135. There is no comparable allegation or evidence that Safety Officers Eddy or Salley purported to be anything other than safety officers acting on behalf of Georgetown. *Facts* ¶ 122. Indeed, it is uncontroverted that Eddy identified himself as "a university official." *Id*. It is also undisputed that the Safety Officers were not armed and carried no batons or weapons of any sort. *Id*. ¶¶ 208, 216. Under these circumstances, no reasonable jury could conclude that Georgetown's Safety Officers purported to assert state authority. *See Limpuangthip*, 932 A.2d at 1145-46 (the fact that SPOs were uniformed and carried batons and radios was insufficient).

For these reasons, a reasonable trier of fact would have to conclude that Georgetown's Safety Officers performed a private function in ejecting and excluding the Plaintiff from Georgetown's private property. As a result, all Defendants are entitled to summary judgment on Plaintiff's Section 1983 claim.

**C.      Defendants Are Entitled to Summary Judgment Dismissing Plaintiff's Arguable Fourth Amendment Claim in Count III (42 U.S.C. § 1983)**

Plaintiff has titled his Section 1983 as a claim for "Deprivation of [his] Right to Free Speech and Assembly," arguably implicating his First and Fourth Amendment rights. The discussion in Part II.A.1, *supra,* establishes that Plaintiff enjoyed no First Amendment rights on Georgetown's campus. Plaintiff makes no reference to the Fourth Amendment in Count III or elsewhere in the Second Amended Complaint. Compl. at 9. Putting aside this omission, Plaintiff cannot establish that his Fourth Amendment rights were violated because Safety Officers Eddy and Salley had probable cause to arrest him, and the force that they used was objectively reasonable.

### 1.     Probable Cause Existed To Arrest the Plaintiff

As explained in Part II.B.1, *supra*, Plaintiff was not arrested.  He has conceded as much.  *See* Ex. 1 (Maniaci Dep.) at 158, 298–99.  Nevertheless, even if he was arrested, Plaintiff's Fourth Amendment claim fails because any arrest was clearly supported by probable cause.  Probable cause is determined by the totality of the circumstances and is measured according to an *objective standard*.  "An officer has probable cause to arrest if he has reasonably trustworthy information that would be sufficient to warrant a prudent person to believe [that] the arrestee committed or was committing an offense." *Edwards v. Okie Dokie, Inc.*, 473 F. Supp. 2d 31, 42 (D.D.C. 2007).  An officer's "actual motives . . . [are] not relevant as long as [his] actions [are] objectively reasonable." *United States v. Jackson*, 415 F.3d 88, 91 (D.C. Cir. 2005) (first alteration in original) (quotation marks omitted).

#### a.     Gaston Hall Incident

There can be no serious dispute that before Safety Officers Eddy or Salley touched Plaintiff, he had already been asked at least five times to cease his disruptive behavior. *Facts* ¶ 114.  Nor can there be any dispute that in his final warning, Mr. Olson stated "Sir, you do not have the opportunity to speak any longer.  I would like to ask our staff to escort this gentleman from the room.  He is creating a significant disruption." *Id.* ¶ 116.  This statement clearly indicated Plaintiff was being asked to leave.  Thus any dispute as to whether Officer Eddy also asked him to leave, a fact that is corroborated by substantial testimony and clearly shown on the video recordings of the incident, is immaterial.

#### b.     ICC Incident

There is similarly no dispute that Plaintiff was asked to leave Georgetown's property prior to arriving at the ICC and again in front of the ICC.  Plaintiff has himself alleged as much.  Compl. ¶ 5 (At Gaston Hall, "[a] University official approached him and told him to

leave and walked him out to the main entrance."); Compl. ¶ 6 (Morrell "approached [Plaintiff] and told him he was being barred from the Conference.").

Having been directed to leave three times (both at Gaston Hall, and en route to and in front of  the ICC), Plaintiff was no longer legally entitled to remain on Georgetown's private property.[5]  *See Kotsch v. Dist. of Columbia*, 924 A.2d 1040, 1045 (D.C. 2007) ("[O]ne who lawfully enters a building may be guilty of a misdemeanor by refusing to leave after being ordered to do so.") (quotation marks omitted); *see also* D.C. Code § 22-3302 (2007).  It is irrelevant whether Safety Officers Eddy and Salley subjectively perceived him to be violating the law because their actions were objectively reasonable.  *See Jackson*, 415 F.3d at 91; (Ex. 59) Key Aff. at 8 ("These events would lead a reasonable officer to conclude that Mr. Maniaci was put on notice that he was no longer legally permitted to be on the premises; thus, reasonable officers possessing this information would believe that they could . . . remove him."); Dep. of Matthew Finberg (Ex. 29) at 142 (Finberg, JDL's Chairman and attorney, agreed that it was appropriate for Georgetown to remove Plaintiff.).

*Safeway Stores, Inc. v. Kelly*, 448 A.2d 856 (D.C. 1982), provides a particularly instructive example.  The plaintiff was asked to leave a Safeway store by the store's management and refused to do so.  *Id*. at 858.  A police officer was called to the scene and allegedly joined the store's security official in beating and handcuffing the plaintiff and then transporting him to the police station where he was charged with unlawful entry.  *Id*.  The plaintiff in that case claimed that he did not understand that he had been asked to leave despite clear testimony from the store's assistant manager and arresting police officer.  *Id.* at 863.  The court dismissed the

---

[5] Plaintiff contends that the fact that he paid a registration fee to the SJP to gain admission to the Conference granted him a license to remain at the Conference.  This registration fee, which was paid to SJP and not Georgetown, did not entitle him to remain there in violation of Georgetown's Speech and Expression Policy and the laws of the District of Columbia.

plaintiff's testimony as incredible and reversed judgment against Safeway, finding that probable cause existed to arrest the plaintiff for unlawful entry.  *Id.*  By the same logic, no reasonable jury could credit Plaintiff's contention that he was not asked to leave, particularly in light of Mr. Olson's request that Plaintiff be escorted from the room.  Once Plaintiff refused, probable cause to arrest was present and Safety Officers Eddy and Salley would have been justified in arresting him.

**2.      The Force Used Was Objectively Reasonable**

**a.      Gaston Hall Incident**

Plaintiff contends that Georgetown's Safety Officers used excessive force in removing him from Gaston Hall.  The resolution of his claim is substantially assisted by the fact that almost all of the relevant events were captured on video.  *Facts* ¶ 79.  The video recordings in the record (Ex. 43 – 44), which were shot from two different angles, blatantly discredit Plaintiff's story and so severely undermine his credibility that no reasonable jury could believe him.[6]  *Facts* ¶ 134.  The Supreme Court has instructed lower courts not to adopt the plaintiff's version of the facts under these circumstances.  *Scott v. Harris*, 127 S. Ct. 1769, 1776 (2007).

Indeed, the present case is markedly similar to *Scott* in which the Supreme Court, after viewing a videotape of the events in question, reversed the lower court's denial of summary judgment on plaintiff's excessive force claim after directed that judgment be entered in the officer's favor. 127 S.Ct. at 1776.  The plaintiff in that case was rendered a quadriplegic when a

---

[6] Plaintiff's willingness to fabricate is not surprising in light of the philosophy he espouses as indicated by quotations he imbeds in his standard e-mail. Ex. 1 (Maniaci Dep.) at 197–98 (Plaintiff's e-mails include a quotation from Sun Tzu which reads "warfare is based on deception.").  Plaintiff viewed his actions as a part of "Operation Gideon", a name that he borrowed from movie "Gideon's Sword" a movie about a Mossad execution squad.  *Facts* ¶ 48. One aspect of Operation Gideon was deceptively registering for tables at the ICC under the assumed named "Palestinians are People Too."  *Id.* ¶ 59.

police officer rammed his police cruiser into the plaintiff's vehicle on the highway. *Id*. at 1773–74. Review of a videotape taken from the police cruiser pursuing the Plaintiff was central to the Supreme Court's decision. Recognizing that "[the plaintiff's] version of events (unsurprisingly) differs substantially from [the officer's] version," the Supreme Court nonetheless directed that judgment be entered in favor of the officer because the plaintiff's "version of events [was] so utterly discredited by the record that no reasonable jury could have believed him." *Id*. at 1774-76.

Guided by *Scott*, this Court should not credit Plaintiff's fictional account of what was said or how he was treated at Georgetown, including his provocative allegations that he was jerked from his seat and then kneed and dragged from Gaston Hall. *See* Ex. 1 (Maniaci Dep.) at 259 (Olson "didn't say 'escort' me"), 261 ("I didn't have an opportunity to cooperate"), 261–62 ("I had the wind knocked out of me. Somebody kneed me in the rib cage.").

The Court should instead "view [ ]the facts in the light depicted by the videotape[s]." *Scott*, 127 S. Ct. at 1776. The video recordings clearly show that Plaintiff's behavior persisted despite multiple warnings from Messrs. Youmans and Olson that his opportunity to speak had ended. *Facts* ¶¶ 114. They show that contrary to Plaintiff's testimony, Mr. Olson simply asked that Plaintiff be "escort[ed]" from the room. *Id*. ¶¶116, 132. The video recordings also show that Officers Salley and Eddy responded to Mr. Olson's request, and before touching Plaintiff, they bent down to speak to him. *Id*. ¶ 121-22. Contrary to Plaintiff's contention, he had ample opportunity to comply with Mr. Olson's instruction that he leave the room. The video recordings show that after several moments had passed, and after Plaintiff refused to stand up on his own, Safety Officers Eddy and Salley carefully placed their arms under Plaintiff's armpits, lifting him out of his seat. *Id*. ¶¶ 125, 134. Plaintiff was not "violently jerked" out of the seat as he alleges. The video recordings show that the officers initially tried to

31

stand Plaintiff up on the aisle way, but that he went limp, thus forcing the officers bear his weight and to carry him from the room. *Id.* ¶¶ 126-28, 134.   They did not, contrary to Plaintiff's allegations, knee him in the ribs to knock the wind out of him.  The video recordings show how the officers strained to support Plaintiff's 220 pound frame while Plaintiff continued to resist by repeatedly placing his cane between Officer Salley's legs in an effort to trip him. *Id.* ¶¶ 127-28. They also show that the Safety Officers carried Plaintiff out head first and that his head and arms remained safely above the ground and did not bump into any objects along the way. *Id.* ¶ 134. Finally, the video recordings also show that someone held the doors open as Officers Eddy and Salley calmly and carefully exited with the Plaintiff into the foyer. *Id.*

The video recordings also belie Plaintiff's testimony that officers Eddy and Salley or anyone else immediately "pounced upon" him in the adjacent hallway. *Facts* ¶ 134.  It bears emphasizing that even Plaintiff does not even contend that it was Salley or Eddy or any other University Official who allegedly "pounced upon" him. *See* Ex. 1 (Maniaci Dep.) at 269 (stating that he do[esn't] know [who pounced upon him].  It was someone on my back.").  Moreover, Plaintiff's claims simply cannot be squared with the reality that both Safety Officers are visible standing peacefully in the doorway immediately after carrying him out. *Facts* ¶ 113.  Officer Eddy holds the door while speaking to someone and Officer Salley renters Gaston Hall to resume his post less than fifteen seconds of leaving Plaintiff outside. *Id.* Officer Eddy also reenters Gaston Hall approximately three minutes later as he is clearly visible approaching another gentleman who created a disruption. *Id.* Photographs taken just moments after Plaintiff's alleged kneeing in the ribs further discredit the Plaintiff's story as does Dr. Gillern's physical examination of Plaintiff the next day.  In the photographs, Plaintiff is in no apparent distress, has no visible bruises and is clearly standing unassisted. *Id. ¶ 131*.  Dr. Gillern similarly observed no bruising during her examination. *Id.* ¶ 171.

In addition to the videotapes and photographs, Plaintiff's claims are overwhelmingly discredited by the deposition testimony of the witnesses, including many of his Plaintiff's JDL colleagues. *See* Ex. 29 (Finberg Dep.) at 126–27 (did not observe the officers punch or knee Plaintiff); Dep. of Michael Smith (54) at 161–62 (did not observe the officers punch, kick or strike Plaintiff); Dep. of Keith Bailey (Ex. 50) at 148–50 (did not observe officers punch or kick Plaintiff and did not see Plaintiff's head hit any objects as he was carried out); Dep. of David Morrell (Ex. 7) at 29-30 (Officers Eddy and Salley "gently deposit[ed] Plaintiff on the floor."); Dep. of Todd Olson (Ex. 5) at 49 (officers acted "professionally and reasonably"); Decl. of Erik Smulson (Ex. 49) at ¶¶ 8-9 (officers did not pounce upon, knee or strike Plaintiff in the hallway).

Viewing the facts as depicted in the videotapes, photographs and as corroborated by substantial deposition and other testimony, it is beyond dispute that the Safety Officers used reasonable force. "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Graham v. Connor*, 490 U.S. 386, 396 (1989). Like probable cause to arrest, excessive force is also evaluated under an objective reasonableness standard. *See Brosseau v. Haugen*, 543 U.S. 194, 197 (2004) (per curiam). Under this standard, all the circumstances of the case – including whether the suspect was actively resisting arrest – should be examined. *See Graham*, 490 U.S. at 396-97.

When Safety Officers Eddy and Salley approached the Plaintiff, he had already refused to comply with multiple requests to desist from his disruptive behavior. He then rebuffed public safety officer Eddy's request that he leave the room, an act of resistance that required the officers to physically remove the Plaintiff. The video recordings show (and multiple witnesses confirm) that Plaintiff went limp in an effort to resist being carried out. Ex. 7 (Morrell Dep.) at 30 ("he went limp of his own accord"); Ex. 8 (Eddy Dep.) at 37 ("he went limp to

prevent from being removed"); Ex. 9 (Salley Decl.) ¶ 13 (Plaintiff "refused to stand and walk but instead went limp.")  Under these circumstances, it was objectively reasonable for the officers to remove Plaintiff by lifting him by his armpits and carrying him out of the room as Defendants' expert, Charles J. Key, Sr. has opined.  *See* Ex. 59 (Key Aff.) at 7-8 (The officers actions were "objectively reasonable and consistent with standard police policies, procedures, and training.), and 10 ("By opting to carry Mr. Maniaci, the officers jeopardized their own health and chose a less painful and injurious methodology for removing him from the hall.").  That their hold on the Plaintiff may have caused some non-permanent bruising does not render their actions unreasonable.  *Graham*, 490 U.S. *Id*. at 10 ("Humans don't have handles . . . Plaintiff's photographs of his injuries are the types of bruises that are to be expected when a person has to be carried out.").

This point is illustrated by *Robinson v. District of Columbia*, Nos. 03-1455, 03-1456, 2006 WL 2714913 (D.D.C. Sept. 22, 2006), in which Judge Lamberth found no violation of the Fourth Amendment where a suspect was "shoved . . . . onto the hood of his car, and held . . . . down while [the officer] put[] handcuffs on the plaintiff's wrists . . . tightly enough to cause swelling and abrasions."  *Id*. at *4 (granting summary judgment to defendants).  In doing so, he observed that although "[t]he crimes plaintiff was suspected of having committed were not violent crimes" and "[n]othing in the record suggests that plaintiff resisted arrest," nevertheless "[t]his [was] not a situation where an arrestee was beaten, shot, or permanently injured as a result of the arresting officers' use of force."  *Id.* (collecting cases).  As in *Robinson*, Plaintiff claims no permanent injuries as a result of being carried from the room.  On these facts, the force that Safety Officers Salley and Eddy used in removing Plaintiff was objectively reasonable.

b.     **The ICC Incident**

Plaintiff does not appear to allege that Georgetown's Safety Officers used excessive force in barring him from the ICC. The allegations in the Second Amended Complaint address only the Gaston Hall incident. Compl. ¶ 17–19. In any event, an excessive force claim with respect to the ICC incident is easily rejected as the force that the Safety Officers used at the ICC was unquestionably reasonable.

As a preliminary matter, there is insufficient evidence to allow a reasonable jury to find that any force was applied on Plaintiff at the ICC entrance. Rather, even Plaintiff's JDL cohorts contradict him on this allegation. Ex. 29 (Finberg Dep.) at 151 (Plaintiff "was treated very civilly); Ex. 54 (Smith Dep.) at 191-92 (Plaintiff was "lean[ing] up against the wall" at the ICC, no officer pushed him); Ex. 2 (Nutting Dep.) at 223 (He did not see officers push or grab the Plaintiff at the ICC); Ex. 6 (Harrison Dep.) at 45 (did not receive any reports of any officer putting his hands on Plaintiff after he left Gaston Hall).

Plaintiff himself claims only that he was "pushed up against the wall" and held briefly until he asked to use the bathroom. Ex. 1 (Maniaci Dep.) at 296, 298–99. Even if the Court accepts the Plaintiff's version of the facts, the Safety Officers' actions were objectively reasonable. Having been ejected from the Conference, Plaintiff attempted to unlawfully enter another private University building where Conference activities were proceeding. When the officers stopped him, he did not agree to leave peacefully but insisted on entering the building. *Id.* at 298 ("I told him, well, if I'm not under arrest, I'm going to the bathroom."). The officers were not required to allow Plaintiff to enter the building and were entitled to use force to prevent him from doing so.

This Court (Kollar-Kotelly, J.) previously determined that the fact that an arresting officer allegedly "twisted [a disabled plaintiff] around and slammed [him] against the wall" while making an arrest did not amount to excessive force. *Steele v. Dist. of Columbia Hous. Auth.*, No. Civ. A 02-1240 (CKK), 2006 WL 335770, at *7 (D.D.C. Feb. 14, 2006) (granting summary judgment to a defendant police officer). In doing so, the Court astutely observed that "police officers routinely push suspects against the wall when placing handcuffs on them" and reasoned that because "the Plaintiff suffered no significant physical injury other than being temporarily "'slammed' against a wall" that "the amount of force used . . . was clearly not excessive, and was certainly reasonable under the circumstances." *Id.* The facts of this case lead to the same conclusion: the Safety Officers did not use excessive force even if they briefly restrained the Plaintiff against a wall, and the Plaintiff suffered no permanent injuries as a result.

For these reasons, Defendants are entitled to summary judgment dismissing Plaintiff's Section 1983 claim in Count III to the extent it is premised on a violation of his Fourth Amendment rights.

### D.    Defendants Eddy and Salley Are Entitled to Summary Judgment on Plaintiff's § 1983 Claim in Count III

Defendants Eddy and Salley are entitled to summary judgment for the additional reason that they are entitled to qualified immunity. Defendant Salley is also entitled to summary judgment to the extent that any of Plaintiff's claims are premised on the ICC incident because it is undisputed that he was not present at that time.

### 1.    Qualified Immunity Is Available to Defendants Eddy and Salley

If the Court determines that Safety Officers Eddy and Salley were state actors performing a public "police" function, then it must also conclude that like traditional police officers, they are entitled to qualified immunity. The Supreme Court has not spoken directly on

this issue. Nevertheless, the Supreme Court's reasoning in *Richardson v. McKnight*, 521 U.S. 399 (1997), the leading case on immunity for private parties subject to Section 1983 liability, counsels in favor of qualified immunity for Safety Officers Salley and Eddy, or at a minimum, a defense for a good faith belief in the lawfulness of their actions.[7]

In order to determine whether special police officers subject to Section 1983 liability enjoy qualified immunity, a court must "look both to history and to the purposes" that underlie immunity for government-employed police officers. *Richardson*, 521 U.S. at 404. Both factors militate in favor of qualified immunity for Safety Officers Eddy and Salley. *See Raby v. Baptist Med. Ctr.*, 21 F. Supp. 2d 1341, 1358 (M.D. Ala. 1998) (granting immunity to hospital's state-licensed police officers, Alabama's analog to SPOs). There is ample precedent in the District of Columbia supporting an immunity-like defense for special police officers who act in good faith. *See Moorehead v. Dist. of Columbia*, 747 A.2d 138, 147 (D.C. 2000) (A special police officer "need not prove probable cause in the constitutional sense, but rather must prove that he had a reasonable good faith belief that the suspect committed the offense.") (quotation marks omitted); *Gabrou v. May Dep't Stores Co.*, 462 A.2d 1102, 1104 (D.C. 1983) (per curiam) (same).

Government-employed police officers have historically enjoyed some type of immunity under state and common law as well as federal constitutional law. *Raby*, 21 F. Supp. 2d at 1356. Immunity enables officers to avoid choosing between dereliction of their duties and

---

[7] *Richardson's* ultimate holding, which denied qualified immunity to prison guards employed by a private correctional facility, is inappropriate here as the Supreme Court explicitly limited its decision to the context of a "a private firm, systematically organized to assume a major lengthy administrative task . . . . . with limited direct supervision by the government," which "undertakes that task for profit and potentially in competition with other firms." 521 U.S. at 413; *Raby v. Baptist Med. Ctr.*, 21 F. Supp. 2d 1341, 1356 (M.D. Ala. 1998) (*Richardson* does not apply to privately employed security officers). Georgetown is not the type of private for-profit firm that *Richardson* was concerned with.

liability for damages.  *Id.*; *see also Pierson v. Ray*, 386 U.S. 547, 554 (1967).  The same reasoning applies to SPOs who perform many of the same functions as MPD officers and are subject to the same rules and regulations in performance of these functions.  *See Moorehead*, 747 A.2d at 143 n.8.

Furthermore, like the medical center's officers in *Raby* and unlike the prison guards in *Richardson*, while Georgetown's Safety Officers serve an important need, their tasks are incidental to the University's main purpose.  *Raby*, 21 F. Supp.2d at 1357.  Georgetown's primary function is education, not law enforcement.  Thus, the marketplace pressures faced by a private correctional facility that obviated the need for immunity for private prison guards in *Richardson* are absent in this case.  *Id*; *see also* note 6, *supra*.

More importantly, while it may be appropriate to subject employees of a private for-profit prison facility to liability on the theory that the threat of litigation will provide the firm with appropriate incentives to manage its employees, there is no justification for applying this policy to a non-profit educational institution.  Denying qualified immunity to Georgetown's employees would place the University in a no-man's land where it is potentially liable for constitutional torts created for governmental entities (not for private entities like Georgetown), yet cannot benefit from well-established doctrines of immunity that have shaped the contours of liability.  As this lawsuit acutely demonstrates, the lack of qualified immunity could increase the likelihood of opportunistic litigation that unfairly diverts the University's attention and funds away from its educational mission.

Finally, even if the Court were to conclude that qualified immunity is unavailable to Safety Officers Eddy and Salley, they would nonetheless be entitled to an affirmative defense based on good-faith as the Supreme Court alluded to in *Wyatt v. Cole*, 504 U.S. 158 (1992) and

reinforced in *Richardson*.  504 U.S. at 169; 521 U.S. at 413; *see also Tarantino v. Syputo*, No. C

03-03450, 2006 WL 1530030, at \*9–10 (N.D. Cal. June 2, 2006) (granting summary judgment to

employees of a private towing company on the basis of such a good faith defense).  This defense

is available under District of Columbia law, and for the reasons discussed above, there is no

logical or persuasive justification for denying it in connection with constitutional torts premised

on identical conduct.

### 2.    Defendants Eddy and Salley Did Not Violate Plaintiff's Clearly Established Rights

Turning then to the merits of the qualified immunity inquiry: Police officers are

"shielded from liability for civil damages insofar as their conduct does not violate clearly

established statutory or constitutional rights of which a reasonable person would have known."

*Fulwood v. Porter,* 639 A.2d 594, 597 (D.C. 1994) (*quoting Harlow v. Fitzgerald*, 457 U.S. 800,

818 (1982)).  In order to hold Safety Officers Eddy and Salley personally liable, Plaintiff must

demonstrate that "the unlawfulness of [the] defendant's action[s] was so 'apparent' that no

reasonable officer could have believed in the lawfulness of his actions."  *Martin v. Malhoyt*, 830

F.2d 237, 253-54 (D.C. Cir. 1987) (citation omitted) (*quoting Anderson v. Creighton*, 483 U.S.

635, 640 (1987)).

The first step in the qualified immunity inquiry is to determine whether the

plaintiff has suffered a deprivation of an actual constitutional right.  *See Int'l Action Ctr. v.*

*United States*, 365 F.3d 20, 24 (D.C. Cir. 2004).  Here, Plaintiff has suffered no such

constitutional injury.  *See* Parts II.A and II.C, *supra*.

Even if Plaintiff could establish a constitutional injury, it is beyond dispute that he

had no right, much less a clearly established right, to remain at the Conference after creating a

disruption and being directed to leave.  In fact, there is substantial case law indicating that

Defendants were entitled to eject Plaintiff from the Conference. *See generally*, Part II.A, *supra*. And although the contours of the law regarding arrest and use of force are better established, there is ample authority to permit reasonable officers to conclude that (or at least disagree in good faith as to whether) Safety Officers Salley and Eddy had probable cause to arrest the Plaintiff, that they used objectively reasonable force, and that they were performing a private function such that their actions did not constitute state action. *See* Parts II.B, II.C, *supra*.

For the same reasons, Defendants Eddy and Salley are entitled to an affirmative defense on the ground that they had probable cause to arrest the Plaintiff (or at least lawful grounds to eject him) and believed in good faith that the force they used was objectively reasonable. *See Richardson*, 521 U.S. at 412-13; *Wyatt*, 504 U.S. at 169; *Tarantino*, 2006 WL 1530030, at *9–10.

### 3. Defendant Salley Was Not Involved In the Events at the ICC

It is undisputed that Officer Salley was not present at the ICC and that he had no further interaction with Plaintiff after the incident at Gaston Hall. *Facts* ¶ 213. Accordingly, Officer Salley is entitled to summary judgment on all of Plaintiff's claims to the extent that they are based on the ICC incident.

### E. The Administrator Defendants Are Entitled to Summary Judgment on Plaintiff's Section 1983 Claim in Count III

### 1. Plaintiff's Claims Against Defendants Olson and Morrell in Their "Official" Capacities Are Duplicative of the Claim Against Georgetown

Plaintiff's Section 1983 claim against Olson and Morrell must be dismissed. Plaintiff purports to sue Olson and Morrell only in their "official" capacities. Compl. ¶¶ 18 (h), (i). "A section 1983 suit against an official in his official capacity is not a suit against the official, but a suit against the official's office, and a Plaintiff's claims against a defendant in his

official capacity are treated as claims against the municipality." *Edwards v. Okie Dokie, Inc.*, 473 F. Supp. 2d 31, 40 (D.D.C. 2007) (citation omitted). Therefore, as this Court recognized in *Robinson v. District of Columbia*, 403 F. Supp. 2d 39 (D.D.C. 2005), "courts have routinely dismissed corresponding claims against individuals named in their official capacity as 'redundant and an inefficient use of judicial resources.'" *Id.* at 49 (*quoting Cooke-Seals v. Dist. of Columbia*, 973 F. Supp. 184, 187 (D.D.C. 1997) (mem.)). Applying this principle, Plaintiff's Section 1983 claims against Defendants Olson and Morrell must also be dismissed.[8]

### 2.    The Administrator Defendants Are Entitled to Qualified Immunity

Plaintiff's individual capacity claim against Mr. Harrison fails because he is entitled to qualified immunity. *See* Part II.D.1, *supra* (explaining why SPOs and by logical extension their supervisors are entitled to qualified immunity pursuant to Supreme Court precedent); *Harvey*, 949 F.2d at 1130 (private defendants in 42 U.S.C. § 1983 actions should have at minimum, the same defenses available to public defendants). Plaintiff, who seeks to impose liability on Mr. Harrison by analogizing his role to that of a "police chief," *see* Compl. ¶ 18(j), has implicitly waived any objection to application of qualified immunity. The incongruity of denying this protection to private parties found to be subject to suit as state actors is even more acute in the case of a supervisor where the analysis of liability and qualified immunity are nearly inseparable. *See Fulwood*, 639 A.2d at 599 (stating that with respect to a supervisor, the "immunity issue" and the "liability issue" are "effectively the same."). Accordingly, Mr. Harrison is entitled to qualified immunity (and in the alternative, to an affirmative defense based on good-faith).

---

[8] The Complaint is silent as to whether Mr. Harrison is sued in his official or individual capacity. To the extent that Plaintiff's Section 1983 claim against Mr. Harrison can be read to state an official capacity claim, it must also be dismissed as duplicative of the claim against Georgetown. *See Robinson*, 403 F. Supp. 2d at 49–50.

Thus, in order to hold Mr. Harrison (or any of the Administrator Defendants)[9] personally liable, Plaintiff must demonstrate that "the unlawfulness of [the] defendant's action was so 'apparent' that no reasonable [police chief] could have believed in the lawfulness of his actions." *Malhoyt*, 830 F.2d at 253–54 (citation omitted). Plaintiff cannot meet this standard here because his First and Fourth Amendment rights were not violated, much less clearly established. *See* Parts II.A, II.C, *supra*.

### 3.    Plaintiff Cannot Establish Supervisory Liability on the Part of the Administrator Defendants

The District of Columbia Court of Appeals has observed that to the extent that a supervisor's liability hinges on his inattentiveness, the question of "whether [a supervisor] violated clearly established rights of which he should have known — the immunity issue — and the question of whether he exhibited deliberate indifference to the violation of constitutional rights by street-level officers — the liability issue — are effectively the same." *Fulwood,* 639 A.2d at 599-600 (also emphasizing that the burden of proof rests on the plaintiff). Accordingly, the absence of clearly established rights in the present case clearly forecloses any claim against Mr. Harrison (or Messrs. Morrell and Olson) for failure to act.

In addition, to the extent that Plaintiff's claim is premised on Harrison's direct actions, his allegations are necessarily limited to the ICC incident. And it is undisputed that Mr. Harrison was not present at Gaston Hall during Plaintiff's removal, and there is no evidence that he was consulted about or approved Plaintiff's removal before hand.  Plaintiff could not possibly establish an "affirmative link" between Mr. Harrison and the challenged conduct. *Facts* ¶¶ 142, 193. *See Int'l Action Ctr.*, 365 F.3d at 27-28; *Barham v. Ramsey*, 338 F. Supp. 2d 48, 63

---

[9] Qualified immunity analysis is unnecessary as to Defendants Olson and Morrell because they are sued only in their official capacities. Nevertheless, this discussion applies equally to any individual claims against them.

(D.D.C. 2004) (no liability where supervisor "was not on the scene at the time of the [Plaintiff's removal], was not consulted about [Plaintiff's removal] before [it] occurred, and did not approve [of Plaintiff's removal] before [it] occurred").  Even with respect to the ICC incident, Plaintiff alleges only that Mr. Harrison "directed and participated in preventing [Plaintiff] from staying on the Georgetown . . . . campus and exercising those rights."  Compl. ¶ 18(j).  As explained in Parts II.A, II.C, *supra*, Plaintiff's exclusion from the Conference and from Georgetown's campus did not violate his First or Fourth Amendment rights.  Furthermore, there was no state action. Accordingly, Mr. Harrison is not subject to §1983 liability for the actions that Plaintiff alleges.

Similarly, there is no affirmative link between Messrs. Olson or Morrell and any of the alleged events that form the basis of Plaintiff's Fourth Amendment claim sufficient to impose liability for any direct action.  Plaintiff's Section 1983 claim against Mr. Morrell is limited to the Gaston Hall incident.  *See* Compl. ¶ 18(i).  Plaintiff does not (nor could he) allege that Mr. Morrell actually instructed the Safety Officers as to the manner of Plaintiff's removal or that he was consulted about the removal beforehand.  *Facts* ¶ 198.  Plaintiff's description of his removal (which has also been captured on video) is not supported by the record as explained in detail in Part II.C.2.  *Facts* ¶ 134.  The video recordings clearly show that Safety Officers Eddy and Salley reasonably and appropriately removed Plaintiff from Gaston Hall.  *Id.*  Thus there was no reason for Mr. Morrell to direct the actions of the Safety Officers or intervene in their actions. And in any event, Plaintiff's removal was so quick — lasting only thirty seconds —  that even if the Safety Officers had used unreasonable force, Mr. Morrell had no realistic opportunity to intervene.  *Id.* ¶ 129.

In its prior decision on Defendants' motion for judgment on the pleadings, this Court that Plaintiff alleged that a bystander asked Mr. Morrell to intervene in Gaston Hall.  *See* Op. at 15; 21-22.  Compl. ¶ 4, 18(i).  At the summary judgment stage, Plaintiff may not rely on

conclusory allegations; he must come forward with admissible evidence supporting his claims. *Cooper*, 238 F. Supp. 2d at 53–54. There is simply no evidence that any bystander asked Mr. Morrell to intervene in the Safety Officers' actions — Plaintiff's counsel apparently realized that fact and thus declined to question Mr. Morrell on this point. Moreover, as explained above, even if Mr. Morrell had been asked to intervene, he had neither cause nor the opportunity to do so. Under these circumstances, Mr. Morrell cannot be said to have condoned or approved of the Safety Officer's actions. Nor can Plaintiff establish, as this Court has indicated he must, that Mr. Morrell's inaction was a "substantial factor" in bringing about his removal or the manner in which the removal was effected. *See* Op. at 21 (*citing Kivanc v. Ramsey*, 407 F. Supp. 2d 270, 274 (D.D.C. 2006)). Accordingly, Mr. Morrell is entitled to summary judgment dismissing Plaintiff's Section 1983 claim. *See Barham*, 338 F. Supp. 2d at 63.

Plaintiff's Section 1983 claim against Mr. Olson is also limited to the Gaston Hall incident. Compl. ¶ 18(h). Plaintiff's claim is fatally flawed in at least two respects. First, it is undisputed that Mr. Olson did not instruct the Safety Officers to "physically remove" Plaintiff. He asked that Plaintiff be "escort[ed]" from the room. *Facts* ¶¶ 116, 134. It was only when Plaintiff failed to cooperate and refused to get up from his seat that the Safety Officers decided to and had to apply force. *Id*. ¶¶117-19, 125. Second, it is also undisputed that Mr. Olson lacked supervisory authority over the Safety Officers other than to trigger removal of an individual at the seminar. Ex. 5 (Olson Dep.) at 46–47 (after Olson instructed the officers to remove someone, any further supervision "would come from supervisory personnel in [the area of public safety]."). Mr. Olson is not liable for the Safety Officer's actions in the absence of supervisory authority over the manner of their conduct. *See Haynesworth v. Miller*, 820 F.2d 1245, 1262 (D.C. Cir. 1987) (supervisor cannot be liable for the acts of a subordinate absent responsibility for supervising the wrongdoer) (abrogated on other grounds by *Hartman v. Moore*, 547 U.S. 250

44

(2006)).  In sum, there is no support for Plaintiff's allegation that Mr. Olson "instructed Defendants Salley and Eddy to physically remove [Plaintiff] to prevent him from speaking in exercise of his free speech rights." Compl. ¶ 18(h).  Accordingly, Mr. Olson is also entitled to summary judgment dismissing Plaintiff's Section 1983 claim in Count III.

### F.     Defendant Georgetown Is Entitled to Summary Judgment on Plaintiff's § 1983 Claim in Count III

Defendant Georgetown is entitled to summary judgment on Plaintiff's  Section 1983 claim because it did not maintain any impermissible policy or practice that caused Plaintiff's alleged injuries.  It is well-established that a private employer such as Georgetown is not liable for  the actions of its employees under § 1983 on a *respondeat superior* theory.  *See DeVargas v. Mason & Hanger-Silas Mason Co.*, 844 F.2d 714, 722–23 (10th Cir. 1988); *Jackson v. Ill. Medi-Car, Inc.*, 300 F.3d 760, 766 (7th Cir. 2002); *Burke v. N. Dakota Dep't of Corr. & Rehab.*, 294 F.3d 1043, 1044 (8th Cir. 2002) (per curiam); *Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 729 (4th Cir. 1999); *Harvey v. Harvey*, 949 F.2d 1127, 1129-30 (11th Cir. 1992); *Rojas v. Alexander's Dep't Store, Inc.*, 924 F.2d 406, 408–09 (2d Cir. 1990).  A private corporation (assuming that it is a state actor) is only liable when "an official policy or custom of the [private] corporation causes the alleged deprivation of federal rights" such that the corporation itself can be said to be responsible.  *Austin,* 195 F.3d at 728; *Rojas*, 924 F.2d at 408–09 (same).

In order to prove the existence of such an unconstitutional policy or practice, a plaintiff must allege and prove that: (1) there was an express policy in place that produced the violation; (2) there was a "widespread practice" that was "so permanent and well settled as to constitute a 'custom or usage' with the force of law"; or (3) that the unlawful act was performed or ratified by a person with final policymaking authority.  *Dist. Council 20 v. Dist. of Columbia*,

150 F. Supp. 2d 136, 143 (D.D.C. 2001) (*quoting Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978), *St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988), and *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986)).  Plaintiff fails on all counts.

### 1.    Plaintiff Fails To Identify Any Impermissible Express Policy

Plaintiff's § 1983 claim against Georgetown is premised on an allegation that the university "implement[ed] [a] policy that tolerated and permitted a practice of unjustified, unreasonable, and unlawful harassment and deprivation of liberty without due process of law." Compl. ¶ 18(k).  There are only two policies that are relevant to Plaintiff's claim, Georgetown's Speech and Expression Policy and its policy requiring Safety Officers to use only reasonable force in performance of their duties.  *Facts* ¶¶ 33-43.  Plaintiff does not contend that it was impermissible for Georgetown to implement these policies or that they are in and of themselves unconstitutional.

### 2.    Plaintiff Fails To Identify Any Widespread Unconstitutional Practice

Moreover, Plaintiff does not contend, nor is there any evidence on the record, that there was any unconstitutional "well settled" or widespread practice" at Georgetown.  *Dist. Council 20*, 150 F. Supp. 2d at 143 (quotation marks omitted).

### 3.    Plaintiff Fails To Identify Any Unlawful Act Performed or Ratified By a Person with Final Policy Making Authority

In response to Defendants' Motion for Judgment on the Pleadings, Plaintiff explained that his Section 1983 claim against Georgetown is based on the alleged actions of its final policymakers, Defendants Olson, Morrell, and Harrison.  *See* Opp'n at 6–7.  Plaintiff's claim lacks support in the record for the reasons explained below.

a.      **Todd Olson**

Plaintiff alleges that Mr. Olson, in his capacity as a "policymaker," "instructed Defendants Officers Eddy and Salley to physically remove [Plaintiff] to prevent him from speaking in the exercise of his free speech rights for which he had paid notwithstanding his admission that [Plaintiff] did nothing unlawful."  Compl. ¶ 18(h).  As explained in Part II.E.2, *supra,* there is no evidentiary support for these allegations.  Mr. Olson did not instruct the Safety Officers to "physically remove" Plaintiff, and he lacked supervisory authority over the manner in which they removed him.

Moreover, Mr. Olson is not a final policymaker for the purposes of either of Georgetown's relevant policies.  As a result, Plaintiff's claim founders as a matter of law.  *See Jett v. Dallas Indep. Sch. Dist*., 491 U.S. 701, 737 (1989) ("[T]he identification of those officials whose decisions represent the official policy of the [municipality] is [ ] a legal question to be resolved by the trial judge . . . .").  Plaintiff has acknowledged that "[m]unicipal liability attaches only where the decisionmaker possesses *final authority* to establish municipal policy with respect to the action ordered."  *Pembaur*, 475 U.S. at 481 (emphasis added).

There is simply no evidence Mr. Olson had such authority with respect to the Speech and Expression Policy.  To the contrary, Mr. Olson testified that he had no role in establishing Georgetown's Speech and Expression policy and has no unilateral authority to modify or amend it.[10]  *Facts* ¶ 190.  Moreover, there is no evidence that Mr. Olson (or any of the Administrator Defendants) had the authority to deviate from Georgetown's speech policies.  *Id*. ¶.  It is undisputed that Mr. Olson's role at the Conference was to "moderate" the Conference, in other words to exercise discretion within the confines of the University's long-standing Speech

---

[10] Indeed, the policy on its face clearly indicates that it was promulgated before Mr. Olson (or any of the Administrator Defendants) arrived at Georgetown.  *Facts* ¶ 33.

and Expression Policy that he is responsible for administering. Ex. 5 (Olson Dep.) at 16; 23, 26, 28; Ex. 12 (Porterfield Dep.) at 8-9. On these facts, it is clear that Mr. Olson did not make Georgetown's final policy on issues of speech and expression. *See Praprotnick*, 485 U.S. at 127 ("[W]hen an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departures from them, are the act of the municipality.").

The same is true with respect to Georgetown's policy regarding the use of reasonable force. The record is devoid of any evidence that Mr. Olson had any role in establishing or authority to direct Safety Officers with respect to Georgetown's policy on the use of reasonable force. To the contrary, Mr. Olson testified that the manner in which the Safety Officers removed the Plaintiff was outside his scope of authority. *Facts* ¶ 186.

### b.    Darryl Harrison

Plaintiff alleges that Mr. Harrison, in his capacity as a "policymaker," "notwithstanding the Plaintiff's purchase of a license to exercise his free speech rights, directed and participated in preventing [Plaintiff] from staying on the Georgetown . . . campus and exercising those rights." Compl. ¶ 18(j). Again, the record lends no support for Plaintiff's conclusory allegations.

As the Director of Public Safety, Mr. Harrison clearly had no authority to establish or deviate from Georgetown's Speech and Expression Policy. Indeed, the Speech and Expression Policy explicitly constrained his actions for the purposes of the Conference. Security Operations Plan (Ex. 20) at GTN000577 ("DPS response will be guided by the Free Speech and Expression Policy"), GTN000580 (requiring Harrison to "consult with the appropriate University senior Officials" in the performance of his duties at the Conference"). *See Triplett v. Dist. of*

*Columbia*, 108 F.3d 1450, 1453 (D.C. Cir. 1997) (defendant was not a final policy-maker where the rules it promulgated were subject to approval by a higher authority).

The record is equally devoid of any evidence that Mr. Harrison had the authority to deviate from Georgetown's policy on the use of reasonable force. *Facts* ¶ 196. To the contrary, Mr. Harrison lacked authority to alter Georgetown's policy ad-hoc to allow the use of excessive force. *Id.* Indeed, even Plaintiff does not contend that Georgetown delegated to Mr. Harrison the authority to sanction unlawful conduct. Nor does Plaintiff contend that Mr. Harrison himself performed or ratified any unreasonable use of force. It is undisputed that Mr. Harrison was not present during Plaintiff's removal from Gaston Hall and was not consulted about his removal beforehand. *Id.* ¶ 193. And as explained in Part II.C.2.b, *supra*, Plaintiff fails to raise a triable issue as to whether any force was used at the ICC. Indeed, Mr. Harrison has testified that he was not aware that a Safety Officer put his hands on Plaintiff after Plaintiff left the Healy Hall. Ex. 6 (Harrison Dep.) at 45. And in any event, even the force that Plaintiff alleges was reasonable under the circumstances. *See* Part II.C.2.b, *supra*.

In sum, no reasonable jury could find that Mr. Harrison performed or ratified an unconstitutional act in his role as a final policy maker for Georgetown.

### 4. David Morrell

Plaintiff's claim against Mr. Morrell is limited to the events that took place in Gaston Hall and the adjacent foyer. *See* Compl. ¶ 18(i). As explained in Part II.E.3 addressing Mr. Morrell's individual liability, these allegations are not supported by the record and cannot form the basis for liability due to Mr. Morell's conduct. Mr. Morell did not issue any instruction to the Safety Officers regarding the manner of Plaintiff's removal; nor did he have, in the thirty seconds it took to effect the removal, a reasonable opportunity to intervene or a reason to do so.

*See* Part II.E.3, *supra*.  Moreover, there is no evidence that any bystander asked Mr. Morrell to intervene.

It is also undisputed that Mr. Morrell, as Director of University Safety, had no role in establishing Georgetown's Speech and Expression Policy.  And like Mr. Harrison, he was explicitly constrained by it and had no authority to deviate from it.  *Facts* ¶ 200; Ex. 20 (Security Operations Plan) at GTN000577, GTN000580.  Similarly, Plaintiff does not and could not contend that Mr. Morrell had authority to deviate from Georgetown's policy regarding the use of reasonable force or to allow the use of excessive force by Georgetown's Safety Officers.  *Facts* ¶ 201.  There is simply no evidence that Georgetown delegated to Mr. Morrell the authority to authorize what would amount to unlawful conduct.

In summary, Plaintiff has failed to raise any triable issue as to whether Georgetown maintained an unconstitutional policy or practice, or to demonstrate that any Defendant with final policy-making authority performed or ratified an unlawful act.  Accordingly, Georgetown is entitled to summary judgment dismissing Plaintiff's Section 1983 claim.

## III.    Defendants Are Entitled to Summary Judgment on Plaintiff's Assault and Battery Claim in Count I

In Count I, Plaintiff sues all the Defendants for assault and battery due to his removal from Gaston Hall.  *See* Compl. ¶ 11(a)-(c).  The ICC incident is not implicated in these allegations.  *Id*.  Defendants are entitled to summary judgment on Plaintiff's assault and battery claim because Defendants were entitled to forcibly remove Plaintiff from Georgetown's private property.  The claim against the Administrator Defendants fails for the additional reason that there is no basis for supervisory liability on assault and battery claims.

### A.    Defendants Were Entitled To Remove Plaintiff from Georgetown's Private Property

Assuming that Plaintiff can prove the elements of an assault and battery claim, Plaintiff's claim still fails because Safety Officers Salley and Eddy were entitled to forcibly remove Plaintiff from Georgetown's private property.  The District of Columbia has expressly adopted section 77 of the RESTATEMENT (SECOND) OF TORTS (1965), empowering a "possessor of land" to "use force to remove someone else from the property." *Person v. Children's Hosp. Nat'l Med. Ctr.*, 562 A.2d 648, 650 (D.C. 1989); *see also Daniels v. Dillard Dep't Stores*, 881 F. Supp. 505 (D. Kan. 1995) (denying assault and battery claims against department store).  Section 77 provides that a property owner may use reasonable force to terminate an intrusion if the following requirements are met:

> (a) the intrusion is not privileged or the other intentionally or negligently causes the actor to believe that it is not privileged, and
>
> (b) the actor reasonably believes that the intrusion can be prevented or terminated only by the force used, and
>
> (c) the actor has first requested the other to desist and the other has disregarded the request, or the actor reasonably believes that a request will be useless or that substantial harm will be done before it can be made.

RESTATEMENT (SECOND) OF TORTS § 77 (1965).

All three requirements present in this case.  Plaintiff's intrusion was not privileged: Although he initially entered Georgetown's campus lawfully, Georgetown revoked his privilege to remain there when he refused to cease his disruptive behavior.  When Plaintiff rebuffed Defendants' repeated requests to leave Gaston Hall the Safety Officers were justified in believing that Plaintiff's intrusion could be terminated only by force.  *See Person*, 562 A.2d at 650–51.  At that point, Safety Officers Salley and Eddy were justified in using reasonable force to remove Plaintiff from Georgetown's private property.  As explained in Part II.C.2, *supra*, the

force the Safety Officers used at Gaston Hall was objectively reasonable.  *See also Daniels*, 881

F. Supp. at 510–11 (dismissing assault claim against security officers alleged to have forced store

patron to the ground, placed their knee on her back, and then handcuffed and detained her).

### B.    There Is No Basis for Supervisory Liability

The Court has already determined that Plaintiff's assault and battery claim against

the Administrator Defendants must be based on some act or omission by these individuals.  Op.

at 29–30.  Because Safety Officers Salley and Eddy's actions were justified, there can be no

liability on the part Georgetown University or the Administrator Defendants for improperly

supervising them, failing to prevent their actions, or failing to take remedial action.

It is also uncontroverted that none of the Administrator Defendants ordered the

Safety Officers to "forcefully remove" Plaintiff from Georgetown's premises as he alleges.  Mr.

Olson asked only that Plaintiff be "escort[ed] from the room."  *Facts* ¶ 116.  Furthermore, they

lacked the authority and/or the opportunity to prevent Plaintiff's removal.  As the Vice President

for Student Affairs, Mr. Olson had no further authority to direct the Safety Officers' actions.  *Id*.

¶ 186.  Similarly, it is undisputed that Mr. Morrell did not instruct the Safety Officers with

respect to Plaintiff's thirty-second removal and did not have sufficient opportunity to prevent it.

*Id*. ¶¶ 129, 198.  And finally, Mr. Harrison was not even present in Gaston Hall.  *Id*. ¶ 193.

Thus, it is beyond dispute that Mr. Harrison did not order Plaintiff's removal and that he lacked

both notice of and the opportunity to prevent it.  Accordingly, all three Administrator Defendants

are entitled to summary judgment on Plaintiff's assault and battery claim.  *See Brown v.

Argenbright Sec. Inc*., 782 A.2d 752, 760 (D.C. 2001) (granting summary judgment for

defendant because no person with supervisory authority saw the incident at issue or had an

opportunity to stop it).

### IV.    Defendants Are Entitled to Summary Judgment on Plaintiff's False Arrest Claim in Count II

The elements of the tort of false arrest are:  "(1) the detention or restraint of one against his will within boundaries fixed by the defendant, and (2) the unlawfulness of the restraint."  *Edwards*, 473 F. Supp. 2d at 44; *Dent v. May Dep't Stores Co*., 459 A.2d 1042, 1044 (D.C. 1982) ("The gist of any complaint for false arrest . . . is an unlawful detention.") (quotation marks and footnote omitted) (per curiam).  On this record, no reasonable jury could conclude that either of these elements have been met.[11]

#### A.    Plaintiff Was Not Detained or Confined

As explained in Part II.B.1, *supra*, Plaintiff was not arrested.  No reasonable jury could find that the Plaintiff was confined or imprisoned within fixed boundaries either.  *See Edwards*, 473 F. Supp. 2d at 44.  Plaintiff has testified that Defendants repeatedly directed him to leave Georgetown's campus and that he was free and allowed to leave on his own.  *See* Ex. 1 (Maniaci Dep.) at 287, 303.  That Plaintiff was excluded from Gaston Hall and the ICC does not constitute detention or confinement.  *See Morris v. Faulkner*, 361 N.E.2d 112, 114 (Ill. App. Ct. 1977) (denying plaintiff's claim for false imprisonment where he was barred from a tavern because "it would be absurd to consider plaintiff as having been confined to all the world but the tavern"); RESTATEMENT (SECOND) OF TORTS § 46 (recognizing a distinction between exclusion and confinement).

#### B.    Probable Cause Existed To Arrest Plaintiff

"The focal point for [false arrest] claims is normally whether the arresting officer was justified in arresting a plaintiff."  *Edwards*, 473 F. Supp. 2d at 44.  If the officer was justified, "the conduct of the arresting officer is privileged and the action fails."  *Scott v. Dist. of*

---

[11] The Court has dismissed Defendants Olson, Morrell, and Harrison as to Count II.  *See* Order.

*Columbia*, 493 A.2d 319, 321 (D.C. 1985) (quotation marks omitted).  "Once a prima facie case

of false arrest  . . . has been established" a showing of probable cause "constitutes a valid defense

[to such] an action."  *Dent*, 459 A.2d at 1044 (also stating that probable cause exists if "the facts

and circumstances known to the arresting officer warrant a prudent man in believing that [an]

offense has been committed") (alterations in original) (quotation marks omitted).  For the reasons

explained in Part II.C.1 *supra*, Officers Eddy and Salley had probable cause to arrest Plaintiff

because he unlawfully refused to leave Gaston Hall, and thus were justified in arresting him.

Even if they did not have probable cause in the constitutional sense, the Safety

Officers' conduct nonetheless was justified if they could have reasonably believed that their

conduct was lawful.  *See Weishapl v. Sowers*, 771 A.2d 1014, 1021 (D.C. 2001) ("[T]he officer

need not prove probable cause in the constitutional sense.").  "[A] police officer may justify an

arrest by demonstrating that '(1) he or she believed, in good faith, that his or her conduct was

lawful, and (2) this belief was reasonable.'"  *Scott v. Dist. of Columbia*, 101 F.3d 748, 754-55

(1996).  When the facts are clearly established, the issue of probable cause is a matter of law for

the court.  *See Safeway Stores, Inc. v. Kelly*, 448 A.2d 856, 862 (D.C. 1982).  The court must

view the evidence of probable cause "from the perspective of the arresting officer and not the

plaintiff."  *Id*.  Here, it was reasonable for Defendants Eddy and Salley to believe that their

actions fell within the parameters of the RESTATEMENT (SECOND) OF TORTS section 77 regardless

of whether the Plaintiff was actually guilty of trespassing on Georgetown's property.  *See

Gabrou*, 462 A.2d at 1104 (dismissing shopper's false arrest claim because security guard had a

good faith belief that shopper was shoplifting).

For the aforementioned reasons, Defendants are entitled to summary judgment

dismissing Plaintiff's false arrest claim in Count II.

**V.       Defendants Are Entitled to Summary Judgment on Plaintiff's Claim for Punitive Damages in Count IV**

Even if Plaintiff could withstand summary judgment with respect to liability, he would not be entitled to punitive damages.  "[A] jury may be permitted to assess punitive damages in an action under Section 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." [12]  *Smith v. Wade*, 461 U.S. 30, 56 (1983); *Barbour v. Merrill*, 48 F.3d 1270, 1277 (D.C. Cir. 1995).  It is clear that Defendants' alleged actions do not satisfy this demanding standard.  Assuming arguendo that the Defendants' were ultimately held to have violated Plaintiff's civil rights, the substantial authority cited by Defendants would nonetheless support a good-faith belief on their part that their actions were lawful.  *See* Part II.D.2, *supra*.  Accordingly, no reasonable jury could find that Defendants' actions were motivated by evil intent or evinced a reckless or callous disregard for Plaintiff's rights.

## CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment should be granted.

---

[12] Plaintiff's punitive damages claim is based on a violation of his constitutional rights only. However, a nearly identical standard applies under state law.  *See Jonathan Woodner Co. v. Breeden*, 665 A.2d 929, 938 (D.C. 1995) (requiring ill will, recklessness, or willful disregard under D.C. law).

Respectfully submitted,

January 14, 2008

_____/s/ John J. Buckley, Jr._____.
John J. Buckley, Jr., D.C. Bar No. 925081
Malachi Jones, D.C. Bar No. 455555
Richa S. Dasgupta, D.C. Bar No. 500509

WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
jbuckley@wc.com
(202) 434-5051
(202) 434-5058 (fax)

*Of Counsel:*
Jane E. Genster, D.C. Bar No. 939850
Vice President and General Counsel
Georgetown University
37th & O Streets, NW
Washington, DC 20057
(202) 687-6500
(202) 687-6527 (fax)

*Attorneys for Defendants Georgetown University, David F. Morrell, Darryl K. Harrison, Todd Olson, Roy Eddy and Larry Salley*

## CERTIFICATE OF SERVICE

I certify that the foregoing Motion for Summary Judgment, Statement of Material Facts Not in Dispute, and accompanying exhibits were filed with the Court on the 14th day of January, 2008, and that service was made via ECF and by First Class Mail to:

Thomas Fortune Fay, Esq.
601 Pennsylvania Avenue, NW
#900 – South Building
Washington, D.C. 20004


        /s/ John J. Buckley, Jr.        .
        John J. Buckley, Jr.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
)
WILLIAM MANIACI )
)
               Plaintiff, )      Docket No. 06 CV 01625
)
               v. )      Judge Kollar-Kotelly
)
GEORGETOWN UNIVERSITY, et al. )      <u>Next Scheduled Event</u>:
)      February 4, 2008,
             Defendants. )      Deadline for Opposition
_____)      to Dispositive Motions

## **<u>DEFENDANTS' STATEMENT OF MATERIAL FACTS NOT IN DISPUTE</u>**

        Pursuant to Federal Rule of Civil Procedure 56(e) and Local Rules 7(h) and 56.1,

Defendants Georgetown University, David F. Morrell, Darryl K. Harrison, Todd Olson, Roy

Eddy and Larry Salley, by and through counsel, hereby set forth the following material facts as

to which they contend there is no genuine issue:

## **<u>PARTIES</u>**

**A.**     **Plaintiff William B. Maniaci**

        1.     Plaintiff William B. Maniaci is a resident of Nevada.  Dep. of William

Maniaci (Ex. 1) at 5-6.

        2.     Plaintiff is a retired police officer.  Ex. 1 (Maniaci Dep.) at 8-10.

        3.     At all relevant times, Plaintiff was an active member of and served as the

"chief of security and intelligence" for  the Jewish Defense League ("JDL") which Plaintiff has

described as a Zionist organization.  Ex. 1 (Maniaci Dep.) at 103, 114, 195.

4.      A report by the United States Federal Bureau of Investigation ("FBI") on terrorism in 2000-2001 described the JDL as "a violent extremist organization."  Ex. 1 (Maniaci Dep.) at 97-98; Terrorism 2000/2001, http://www.fbi.gov/publications/ terror/terror 2000_ 2001.pdf.

5.      The Southern Poverty Law Center had, as of 2006, designated the JDL as a hate group.  Ex. 1 (Maniaci Dep.) at 98-99; Dep. of Jim Nutting (Ex. 2) at 79; Active U.S. Hate Groups in 2006, http://www.splcenter.org/intel/map/hate.jsp?T=34&m=5.

6.      From about 1995 through 2002, Plaintiff also served as "deputy chairman" and "chief of security" of the JDL under Chairman Irv Rubin.  Ex. 1 (Maniaci Dep.) at 82-84.  In 2002, Chairman Rubin and his JDL associate Earl Krugel, were arrested and indicted for conspiring to bomb the office of Arab-American Congressman Darrell Issa and the King Fahd Mosque in Los Angeles.  Ex. 1 (Maniaci Dep.) at 88, 91, 97.  Mr. Krugel pleaded guilty to the charges and Mr. Rubin died before trial.  *Id*. at 91-93.

7.      Plaintiff is a federally licensed firearms dealer.  Ex. 1 (Maniaci Dep.) at 12-13.  He owns a firearms business called Macabbee Arms.  *Id*; Ex. 2 (Nutting Dep.) at 36-37.  A picture of the Plaintiff from his Macabbee Arms website is attached as Exhibit 3.

8.      Plaintiff arrived at the law offices of Defendants' counsel armed with a concealed .45 caliber handgun which he kept on his person during the course of his deposition.  Ex. 1 (Maniaci Dep.) at 12-13.  He testified that he "always carr[ies] a weapon."  *Id*. at 12-13, 379.

9.      With respect to the events that occurred at Georgetown University on February 18, 2006, Plaintiff acted in close coordination with several other JDL officers, members and/or sympathizers who also attended those events. Ex. 1 (Maniaci Dep.) at 138-42.

10.      One of these JDL officers, Robert Turk, who at all relevant times held the position of Eastern Regional Director of the JDL, also attended his deposition with a concealed semi-automatic weapon on his person. Dep. of Robert Turk (Ex. 4) at 13-15; 31-32.

**B.      Defendants**

11.      Defendant Georgetown University ("Georgetown" or the "University") is a private non-profit university incorporated under the laws of the District of Columbia. Act of June 10, 1844, 6 Stat. 912, *amended by* Act of Oct. 4, 1966, Pub L. No. 89-631, 80 Stat. 877.

12.      Defendant Todd Olson is an employee of Georgetown and at all relevant times held the position of Vice President of Student Affairs. Dep. of Todd Olson (Ex. 5) at 6. He has been employed by Georgetown since 2002. *Id*. at 6.

13.      Defendant Darryl Harrison is an employee of Georgetown and at all relevant times held the position of Director of Public Safety. Dep. of Darryl Harrison (Ex. 6) at 6. He has been employed by Georgetown since 1999. *Id*. at 6. Before coming to Georgetown, Mr. Harrison spent twenty five years as a member of the Metropolitan Police Department ("MPD"); he held the position of Captain Commander of the Special Events Branch of the Special Operations Division when he retired. *Id*. at 5.

14.      Defendant David Morrell was until early 2007, an employee of Georgetown and at all relevant times held the position of Vice President for University Safety. Dep. of David Morrell (Ex. 7) at 5-6. He came to Georgetown in 2003. *Id*. Before coming to Georgetown, Mr.

Morrell spent twenty four years with the United States Secret Service and also served as the head of security for the Smithsonian Institution.  *Id.* at 5.

15.    Defendant Roy Eddy is an employee of Georgetown and at all relevant times he was an officer in the Department of Public Safety.  Dep. of Roy Eddy (Ex. 8) at 7-9.  At all relevant times, Safety Officer Eddy was commissioned as a special police officer pursuant to District of Columbia law. *Id* at 7; D.C. Code § 5-129.02.

16.    Defendant Larry Salley was until April 2006 an employee of Georgetown and at all relevant times he was an officer in the Department of Public Safety.  Decl. of Larry Salley (Ex. 9) ¶ 1.  At all relevant times, Safety Officer Salley was commissioned as a special police officer pursuant to District of Columbia law.  *Id* ¶ 2; D.C. Code § 5-129.02.

### THE PALESTINE SOLIDARITY MOVEMENT CONFERENCE

17.    The Palestine Solidarity Movement Conference (the "PSM Conference") took place on February 17-19, 2006.  *See* PSM Conference Agenda ("PSM Agenda") (Ex. 10); Jewish Defense League Handout ("JDL Handout") (Ex. 11).

18.    Students for Justice in Palestine ("SJP") is a student group at Georgetown.  Dep. of Daniel Porterfield (Ex. 12) at 7-8; Ex. 5 (Olson Dep.) at 9.

19.    SJP sponsored the PSM Conference.  Ex. 12 (Porterfield Dep.) at 7-8; Ex. 5 (Olson Dep.) at 9; Georgetown Statement on SJP Conference ("Georgetown Stmt.") (Ex. 13).

20.    The stated mission of the Palestine Solidarity Movement ("PSM") is to "support the struggle of Palestinians against Israeli occupation" by "tak[ing] a principled stand against the human rights abuses of the Israeli government."  PSM Conference Information

Packet ("PSM Packet") (Ex. 14) at GTN000961.  A primary focus of the PSM Conference was to "promote divestment from" Israel.  *Id.*

      21.    Georgetown did not sponsor the PSM Conference.  Palestine Solidarity Movement Conference Frequently Asked Questions ("PSM FAQs") (Ex. 15) at GTN00062.

      22.    Georgetown has a practice of extending University benefits such as use of its facilities to any of its student organizations in accordance with its "broad educational mission."  Ex. 5 (Olson Dep.) at 8-9; Ex. 13 (Georgetown Stmt.).

      23.    Consistent with this practice, Georgetown made its facilities available to SJP for the Conference.  Ex. 5 (Olson Dep.) at 8-9.  Among the facilities which Georgetown made available for Conference activities were an auditorium in Healy Hall called Gaston Hall as well as a number of rooms in another building called the Bunn Intercultural Center ("ICC").  *Id.* Ex. 10 (PSM Agenda); Ex. 11 (JDL Handout).

      24.    Georgetown allows individual student groups to decide whether a particular event will be open only to the University community or to the public at large.  Ex. 5 (Olson Dep.) at 13-14.  SJP made the decision to open the Conference up to members of the public at large.  *Id.*

      25.    Georgetown itself does not support the mission or the goal of the PSM; University President John J. DeGioia explicitly stated that Georgetown does not support PSM's objective of divestment from Israel.  Ex. 15 (PSM FAQs) at GTN 000067; DeGioia Statement on Divestment from Israel ("DeGioia Stmt.")  (Ex. 16).  President DeGioia's comments are excerpted below:

            Some people have asked me if Georgetown will consider the [Palestine Solidarity Movement's] call for divestment from Israel.

5

The answer to that question is no. I do not support divestment from Israel.

It is clear there are a wide range of opinions on the conflict in the Middle East and that the appropriate way for Georgetown University to address the situation is through dialogue, research, and intellectual discovery.

26.    In this spirit of addressing conflict through dialogue and the "free and open exchange of ideas," Georgetown made its facilities available to SJP for the Conference even though the ideas expressed "may be difficult or objectionable" to the University itself. Ex. 13 (Georgetown Stmt.); Ex. 12 (Porterfield Dep.) at 41; Ex. 15 (PSM FAQs) at GTN000076.

27.    PSM Conferences had previously been held at four different university campuses including Duke University ("Duke"), the University of Michigan, Ohio State University, and the University of California at Berkeley. Ex. 13 ("Georgetown Stmt.").

28.    Several months prior to the Conference, a team of Georgetown administrators including Erik Smulson, David Morrell, Jeanne Lord and Martha Swanson traveled to Duke to discuss the university's experience in hosting the Palestine Solidarity Movement Conference in 2005. Duke Visit Memorandum ("Duke Memo") (Ex. 17) at GTN000790; Dep. of Erik Smulson (Ex. 18) at 13 ("we worked to learn about what happened at past conferences, as we prepared our plan to help respond to the conference at Georgetown").

29.    The Georgetown Administrators wished to ensure that Georgetown would be prepared to "balance the free-speech of both the sponsors of the event and those wishing to offer counter programming or protest in a safe and respectful manner." Ex. 17 (Duke Memo) at GTN000790.

30.     The Georgetown team learned from their Duke counter-parts that based on Duke's past experience, they could expect a number of challenges from persons and organizations opposed to the PSM's policy goals and opposed to the University's plan to allow the PSM Conference to be held on its premises.   These challenges included:

a.   unsubstantiated claims that the Palestine Solidarity Movement has ties to terrorism;

b.   security threats including bomb threats and/or death threats on university officials;

c.   a misinformation campaign by groups trying to disrupt the conference;

d.   attendance by individuals claiming to be journalists who work for organizations opposed to the conference;

e.   demonstrations and protests.

Ex. 17 (Duke Memo) at GTN000790-791; Ex. 18 Smulson Dep. at 13-14.

31.     Based in part on what the administrators learned from Duke, Georgetown took a number of measures to balance the free speech interests of the Conference organizers with the interests of those wishing to offer counter-programming and to protest.

a.   Creating a website to respond to inquiries and provide relevant information, including Georgetown's policy on speech and expression.  Olson campus-wide email (Jan. 23, 2006) ("Olson Email") (Ex. 19).

b.   Developing a comprehensive Security Operations Plan with an emphasis on the Free Speech and Expression Policy.  Security Operations Plan ("Sec. Op. Plan") (Ex. 20) at GTN000577.

    c.   Designating demonstration areas, separated by organization, where protesters could demonstrate safely and peacefully.  Ex. 20 (Sec. Op. Plan.) at GTN 000577.

    d.   Mandating attendance at the event by the majority of the Department of Public Safety.  Ex. 8 (Eddy Dep.) at 10, 12-13; Department of Public Safety Briefing Updating (Jan. 10, 2006) (Ex. 21) at GTN000428.

    e.   Supporting a full schedule of "Pro-Israel" alternative programming sponsored by the Georgetown Israel Alliance.  Alternative Programming Memorandum (Feb. 14, 2006) (Ex. 22).

32.    Georgetown also confirmed with the FBI, the United States State Department, the United States Treasury Department and the Metropolitan Police Department ("MPD") that the PSM and the speakers scheduled to participate in the Conference had no terrorist affiliation.  Ex. 7 (Morrell Dep.) at 10-12; Ex. 12 (Porterfield Dep.) at 11-13.

## GEORGETOWN'S POLICY ON SPEECH AND EXPRESSION

33.    Georgetown is committed to "promoting free speech and expression to foster the maximum exchange of ideas and opinions among its students and faculty."  Speech and Expression at Georgetown University (Ex. 23) at M000153.  It recognizes that "discourse, discussion, debate: the untrammeled expression of ideas" is central to the nature and life of the university.  *Id*.  In furtherance of this commitment, in 1989 Georgetown developed and adopted a Speech and Expression Policy.  *Id*.

34.    The policy begins with the following statement:

[A]ll members of the Georgetown University academic community, which comprises students, faculty and administrators, enjoy the right to freedom of speech and expression.  This freedom includes the right to express points of view

on the widest range of public an private concerns and to engage in the robust expression of ideas.  The University encourages a balanced approach in all communications and the inclusion of contrary points of view.  As is true with the society at large, however, this freedom is subject to reasonable restrictions of time, place, and manner, as described herein, although such restrictions shall be applied without discrimination toward the content of the view being expressed or the speaker.

Speech and Expression Policy (Ex. 24) at M000217.

35.     The exercise of speech and expression is not absolute and the policy clearly indicates that "cutting off discourse" and "[m]aking it impossible for others to speak or be heard or seen, or in any way obstructing the free exchange of ideas, is an attack on the core principles the University lives by and [will] not be tolerated."  Ex. 24 (Speech and Expression Policy) at M000217.  Specifically, the Speech and Expression Policy provides that the right of free speech and expression does not include:

[U]nlawful activity or activity that endangers or imminently threatens to endanger the safety of any member of the community or any [of] the community's physical facilities, *or any activity that disrupts or obstructs the functions of the University or imminently threatens such disruption or obstruction* . . . An individual or group wishing to protest at an event may do so *as long as any speaker's right to free speech and the audience's right to see and to hear a speaker are not violated*.

*Id*. at M000217-18 (emphasis added).

36.     Furthermore, "the use of the University forum [does] not imply acceptance or endorsement by the University of the views expressed."  Ex. 24 (Speech and Expression Policy) at M000218.

37.     The Speech and Expression Policy was developed by the University's Committee on Speech and Expression.  Ex. 24 (Speech and Expression Policy) at M000216.  This Committee, comprised of four faculty members and four undergraduate students, is responsible for advising the Vice President for Student Affairs on matters relating to speech and

expression.  *Id*. at M000216, M000221.  The Vice President for Student Affairs and the Committee on Speech and Expression, acting together, are jointly authorized  to "consider and implement revisions and improvements to the [guidelines enumerated in the Speech and Expression Policy] in a manner consistent with the ideals articulated in [it]."  *Id*. at M000221. The Vice President for Student Affairs has no unilateral authority to deviate from the Speech and Expression Policy as indicated in Paragraph 41.

38.     The Speech and Expression Policy applied to the Conference events and activities.  Ex. 12 (Porterfield Dep.) at 16; Ex. 5 (Olson Dep.) at 16.

39.     The response of Georgetown's Department of Public Safety during the Conference was "guided by" the Speech and Expression Policy.  Ex. 20 (Sec. Op. Plan) at GTN000577.

40.     Mr. Olson, in his role of Vice President for Student Affairs, was responsible for "administering" the Speech and Expression Policy.  Ex. 24 (Speech and Expression Policy) at M000216.

41.     None of the individuals named Defendants had authority to deviate from or amend Georgetown's Speech and Expression Policy.  Decl. of Todd Olson (Ex. 25) ¶¶ 8-9); Decl. of Darryl Harrison (Ex. 26) ¶ 4-5).  Nor did they have authority to create a new policy in its place.  *Id*.

## GEORGETOWN'S POLICY ON REASONABLE FORCE

42.     Georgetown has a policy that requires all members of the DPS to employ only reasonable force in the performance of their duties.  Ex. 26 (Harrison Decl.) ¶ 6.

43.    None of the individuals named as Defendants had authority to deviate from or amend Georgetown's policy requiring the use of reasonable force or to create a new policy in its place that permitted the use of excessive force.  Ex. 26 (Harrison Decl.) ¶ 8; Ex. 25 (Olson Decl.) ¶ 10.

## THE JDL AND "OPERATION GIDEON"

44.    JDL first learned that the 2006 PSM Conference was scheduled to take place at Georgetown from JDL sympathizer Lee Kaplan.  Ex. 4 (Turk Dep.) at 40, 69-70.

45.    Mr. Kaplan, who has described himself as a self-employed "investigative journalist," supports the JDL's goals.  Dep. of Lee Kaplan (Ex. 27) at 14.  He has, in his words, "infiltrate[ed]" a number of prior PSM Conferences, sometimes by "disguising [himself] as a Pakistani" or "taking notes and photographs with hidden equipment."  Ex. 28 ("The Divestment Conference at Georgetown") at GTN0002518-19; Ex. 27 (Kaplan Dep.) at 20.

46.    According to JDL Chairman Finberg, the JDL's goal in attending the Conference was to force Georgetown to "suffer . . . public humiliation [and] degradation," and "to make it so that no other university would ever host something like this again in such a manner."  Dep. of Matthew Finberg (Ex. 29) at 77-78.

47.    Plaintiff testified that he and the JDL viewed the Conference organizers as their "enemy," and that Plaintiff believes that "there's no such thing as a Palestinian."  Ex. 1 (Maniaci Dep.) at 145-47, 207.  Plaintiff and his JDL colleagues called their planned activities in connection with the Conference "Operation Gideon."  *Id*. at 143.

48.    The name "Operation Gideon" was Plaintiff's idea.  Ex. 29 (Finberg Dep.) at 71.  He testified that the name refers to an operation by the Israeli Mossad (Israel's

intelligence agency) that was the subject of a film, called "The Sword of Gideon." Ex. 1

(Maniaci Dep.) at 144. That film is about the actions of a Mossad execution squad. *See* Film

Overview, http://movies.nytimes.com/movie/48217/Sword-of-Gideon/overview.

49.    A pamphlet that Plaintiff authored and distributed in connection with

Operation Gideon identified Plaintiff and Mr. Turk as the JDL contacts for the Conference.

Operation Gideon Pamphlet ("Op. Gideon. Pamphlet") (Ex. 30) at M000084.

50.    The pamphlet authored by Plaintiff described the Conference as "part of a

continuing physiological warfare attack . . . perpetrated by IslamoNazis." Ex. 30 (Op. Gideon

Pamphlet) at M00083 (underlining in original).

51.    The pamphlet authored by Plaintiff also described Operation Gideon's

objective as follows.

> Our Mission is to make the public and the Jewish Communities in the United
> States aware of, and to respond to lies being spread by the Muslim Students
> Association (MSA), their affiliates, ***and the terrorists who will be addressing the***
> ***public*** during the three days of the "Palestinian" Solidarity Conference, at
> Georgetown University.

*Id*. at M00086 (emphasis added) (quotation marks in original).

52.    Plaintiff attended the Conference as a registered participant on behalf of the

JDL. Ex. 1 (Maniaci Dep.) at 106 ("We were there as the [JDL]"), 141.

53.    Plaintiff was joined by four other JDL members and/or sympathizers,

Matthew Finberg, Jim Nutting, Robert Turk, George Haas and Keith Bailey. Ex. 1 (Maniaci

Dep.) at 141-42.

54.    JDL paid for the registration, lodging and transportation expenses that Plaintiff and other JDL sympathizers incurred in connection with the Conference.  Ex. 1 (Maniaci Dep.) at 124-26, 143.

55.    At all relevant times Mr. Finberg served as JDL's Chairman and Attorney. Ex. 29 (Finberg Dep.)  at 48, 152-53.   Mr. Turk was the JDL's Eastern Regional Director.  Ex. 4 (Turk Dep.) at 31-32; Jan. 18, 2006 Letter from Turk to Georgetown ("Turk Letter") (Ex. 31).

56.    The JDL delegation also met with Mr. Kaplan the day before the Conference; Mr. Turk shared a hotel room with him.  Ex. 4 (Turk Dep.) at 41.

57.    In addition to sending officers and members to the Conference, JDL also solicited protestors via emails like the "Call to Action" distributed by JDL Chairman Finberg on January 30, 2006, submitted as Exhibit 32.  JDL planned to bus these protesters into Washington D.C.  Ex. 4 (Turk Dep.) at 73-75.

58.    In their "Call to Action," the JDL described the Conference as an attempt by PSM to "appear intellectual when their goal is that of the Nazis."  Ex. 32 (Call to Action) at GTN 000797.

59.    Another aspect of JDL's "Operation Gideon" was to deceptively register for the PSM Conference under an assumed name "Palestinians Are People Too" in order to obtain permission to place an information table in the ICC (one of the University buildings where the Conference was to be held).  Ex. 4 (Turk Dep.) at 118; Ex. 1 (Maniaci Dep.) at 218-20; Ex. 2 (Nutting Dep.) at 146-47.

60.    Prior to attending the Conference, Plaintiff contacted Georgetown and informed university officials of the JDL's intent to protest the Conference.  Ex. 1 (Maniaci Dep.)

at 195-97; Feb. 9, 2006 Maniaci Email (Ex. 33) at GTN1030 ("I represent the Jewish Defense

League and I am contacting you so that we may be on firm footing of mutual understanding.

Our group will protest the [Conference]").

      61.    Plaintiff also had a telephone conversation with Mr. Harrison,

Georgetown's Director of Public Safety, regarding protest and demonstration areas at the

Conference.  Ex. 6 (Harrison Dep.) at 10-12; Ex. 1 (Maniaci Dep.) at 188-89.

      62.    Georgetown officials directed Plaintiff to Georgetown's Speech Policy.  Ex.

1 (Maniaci Dep.) at 188.

      63.    Plaintiff reviewed Georgetown's Speech Policy prior to attending the

Conference.  Ex. 1 (Maniaci Dep.) at 188-90.

      64.    Despite Plaintiff's identification as a JDL member and an opponent of the

Conference, Georgetown did not discourage him from registering for or attending the

Conference.  Ex. 1 (Maniaci Dep.) at 157-58.

      65.    Plaintiff and members of the JDL delegation met freelance photographer

Carrie Devorah at a deli in Washington, D.C. on Friday February 17, 2006, the day before the

Conference.  Ex. 1 (Maniaci Dep.) at 271-72.  They told her that they were going to a press

conference related to the PSM Conference and recruited her to come along and take pictures.

*Id*.; Dep. of Carrie Devorah (Ex. 34) at 33.

      66.    Before serving his initial Complaint on Georgetown, Plaintiff sent a copy of

the Complaint to Mr. Kaplan and "gave [him] an exclusive" interview on his planned lawsuit.

Ex. 27 (Kaplan Dep.) at 196-98.

67.    Mr. Kaplan's resulting article titled "Georgetown University sued for $8 million dollars for attack on elderly Orthodox Jew at PSM," submitted as Exhibit 35 was published on September 15, 2006 in the Canadian Free Press.  This article was published almost a week before Plaintiff filed the Complaint in this action and before Georgetown was served with the summons and Complaint or otherwise received notice of the lawsuit.  *See* Docket in *Maniaci v. Georgetown Univ.*, 06-1625(CKK) (Complaint was filed on Sept. 20, 2006 and Georgetown was served the next day).

68.    Mr. Kaplan's purpose in writing this article was to prevent other universities from hosting PSM Conferences.  Ex. 27 (Kaplan Dep.) at 195-98.  Mr. Kaplan wrote the article publicizing Plaintiff's lawsuit against Georgetown and its administrators and employees so that other universities would not "be as *stupid as Georgetown*, and take a chance on the same thing happening to them, and support terrorism in the process."  *Id*. at 195-98 (emphasis added).

69.    On February 20, 2006, the day after the Conference concluded, JDL Chairman Finberg published an article indicating he and other JDL members who attended the Conference in order to "disrupt" it "were successful in interfering with several of their seminars."  *What Really Happened at the Georgetown PSM Conference* (Ex. 36) at GTN000486.  The JDL accomplished this by "g[etting] the cameras and microphones off the speakers and on [the JDL] many times."  *Id*.  He also wrote in another related article that "the PSM Conference [was] a Flop, thanks to the [JDL]."  *PSM Conference a Flop, thanks to the Jewish Defense League*  (Ex. 37) at GTN000496.

70.    Another JDL sympathizer, Bill Levinson, also wrote an article shortly after the PSM Conference concluded, submitted as Ex. 38, which congratulated the JDL for their

"overwhelming and decisive public relations victory over the [PSM] at [Georgetown] during the past weekend." *Id.* at GTN0001062. When questioned about this article at his deposition, Plaintiff engaged in the following exchange with Defendants' counsel.

> Q   Just looking at the first paragraph in Mr. Levinson's article, he says, quote . . . The first-time use of aggressive and proactive tactics damaged the PSM's credibility and indeed the commitment of its members so badly that it is unlikely that this organization will ever again hold another annual conference in North America again, unquote.
>
> A   From your mouth to God's ears.

Ex. 1 (Maniaci Dep.) at 335-36.

71.    In addition to publicizing his suit against Georgetown, Plaintiff also filed a complaint against the University with the FBI. Ex. 1 (Maniaci Dep.) at 356. In the cover letter to his complaint, submitted as Exhibit 39, Plaintiff alleged that he "was beaten for asking a question during an open panel discussion." The United States Department of Justice summarily declined to take any prosecutorial action based on the FBI's investigation of the complaint and confirmed that it had closed its investigation on November 8, 2006. U.S. Dep't of Justice Notice to Close Legal Case File (Ex. 40).

## EVENTS OF SATURDAY, FEBRUARY 18, 2006

### C.    Plaintiff Causes a Disruption in Gaston Hall

72.    On Saturday, February 18, 2006, Plaintiff entered the main campus of Georgetown University and registered with the SJP for the PSM Conference. Ex. 1 (Maniaci Dep.) at 231-32.

73.    Plaintiff paid a registration fee of ten dollars that was collected by the SJP, the student group that invited the PSM to hold the Conference. Compl. ¶ 2; Ex. 5 (Olson Dep.) at 14. The fee was not collected by Georgetown and was not paid to Georgetown. *Id.*

74.    Registrants received a packet of information that included a copy of Georgetown's Speech and Expression Policy.  Ex. 5 (Olson Dep.) at 16-17.

75.    Plaintiff produced a document in discovery captioned Media Information Packet, submitted as Exhibit 41 which was also distributed at the Conference and which Plaintiff acknowledged that he may have "looked at."  Ex. 1 (Maniaci Dep.) at 222-23.  This Packet included the following Code of Conduct that participants were required to abide by.

> *By registering for the 5th Annual PSM Conference, I agree not to engage in disruptive behavior— visibly, physically or audibly — by obstructing the space of the sessions, standing in the way of the conference registrants or speakers, shouting over others, or attempting to derail productive movement-building conversation with hate speech.* Those in violation of the above statement will be asked to leave the conference.

Ex. 41 (PSM Media Info. Packet) at M000114 (emphasis in original).

76.    After registering, Plaintiff entered Gaston Hall on the third floor of Healy Hall where a seminar entitled "The Status of the Divestment Movement" ("Divestment Seminar") was scheduled to begin at 9:30 AM.  Ex. 1 (Maniaci Dep.) at 233-34; Ex. 10 (PSM Agenda) at M000127.

77.    Plaintiff sat in the fifth or sixth row in the center aisle seat.  Ex. 1 (Maniaci Dep.) at 234, 237.  A diagram of the Gaston Hall auditorium is submitted as Exhibit 42.  This diagram was introduced as Exhibit 15 to Plaintiff's deposition and during the deposition Plaintiff marked to diagram to indicate where he was sitting.  *Id.*; Ex. 1 (Maniaci Dep.) at 235-37.

78.    The Divestment Seminar began later than scheduled due to logistical difficulties.  Ex. 5 (Olson Dep.) at 25-26.  It did not begin until approximately eleven o'clock.  *Id*.

17

79.    Portions of three video recordings that were taken during Divestment Seminar by members of the registered media and the SJP are submitted as Exhibit 43 ("AA Video"), Exhibit 44A ("Quest Video"), and Exhibit 45 ("SJP Video").

80.    The AA Video was taken by representatives of an Arabic language news network called Al Aribiya, the Quest Video was taken by a company called Quest Productions as part of a PBS/WETA documentary, and the SJP Video was taken by SJP member Katherine Pitsch.  Ex. 46 (List of Registered Media).

81.    These video recordings truly and accurately depict the events that transpired during the Divestment Seminar in Gaston Hall on February 18, 2006.  Ex. 25 (Olson Decl.) ¶ 5.

82.    In addition to the video recordings themselves, a transcript of key portions of the Quest Video and SJP Video ("Video Tr.") is also submitted as Exhibit 47.

83.    In order to assist the Court, two additional versions of the Quest Video are submitted as Exhibits 44B and 44C.  In Exhibit 44B, key portions of the Video Transcript have been synchronized with the video in order to highlight what is being said.  And in Exhibit 44C, two still frames identifying key individuals depicted in the video have been inserted.  All three versions of the Quest Video are of an identical length and the citations to the timestamp in the Quest video that follow are applicable to all three versions.

84.    Mr. Olson, as the Vice President for Student Affairs, was present at the Divestment Seminar  "[t]o articulate" Georgetown's standards "for the conduct of free speech and expression" and also "if necessary, to advise [participants and visitors] that their behavior was out of line with [Georgetown's] speech and expression policy."  Ex. 12 (Porterfield Dep.) at 9; Ex. 5 (Olson Dep.) at 23.

85.    Mr. Morrell, the Vice President for University Safety was also present in Gaston Hall during the Divestment Seminar.  Ex. 7 (Morrell Dep.) at 8-9.  He was stationed in the back of the auditorium.  *Id*. at 26.

86.    At the outset of the panel discussion portion of the Seminar in Gaston Hall, Mr. Olson informed the audience that they would have an opportunity to ask questions of the panelists after the panel discussion session.  Ex. 47 (Video Tr.) at 1; Ex. 7 (Morrell Dep.) at 22.  Specifically, he indicated that (1) each audience member would be limited to one question, and that (2) any comments from audience members must be phrased in the form of a question.  Ex. 47 (Video Tr.) at 1.  Mr. Olson  stated:

> Please be sure to phrase your comments in the form of a question.  In the interest of time we ask each person to be concise and ask only one question.  Thank you.

*Id*.

87.    After Mr. Olson's announcement, a panel discussion was held that lasted approximately one hour.  Ex. 44A (Quest Video) at 18:05:00-18:55:30 (this extended portion of the video has not been submitted).

88.    After the panel discussion, Mr. Olson again repeated the ground rules for audience members who wished to ask questions and a question and answer session was held between the audience and the panelists.  Ex. 5 (Olson Dep.) at 50; Ex. 29 (Finberg Dep.) at 110; Ex. 7 (Morrell Dep.) at 22-23.  He again stated:

> Please be sure to phrase your comments in the form of a question.   In the interest of time we ask each person be concise and ask only one question.  Thank you.

Ex. 47 (Video Tr.) at 2.

89.    Will Youmans, one of the co-founders of SJP who served as the moderator during the Divestment Seminar, further explained how the question and answer period would be structured.  He stated:

You may line up at the microphone if you have a question.  First come, first served.  *Please make them succinct*.  We have about 10 minutes for questions, then we have an important announcement to make before you get up and leave. *So please remember: ask in the form of a question, no rhetorical questions*. Okay, so I think we're ready for the first question.  Please introduce yourself before you ask your question.

Ex. 47 (Video Tr.) at 2 (emphasis added).

90.    Due to time constraints, the seminar organizers adjusted the format of the question and answer period so that after three audience members asked their questions successively, the panelists would address all three questions in the order they were asked.  Ex. 1 (Maniaci Dep.) at 241; Ex. 5 (Olson Dep.) at 29-30; Ex. 7 (Morrell Dep.) at 20.

91.    Plaintiff admitted at his deposition that Georgetown had the right to impose precisely the types of restrictions that were enunciated by Messrs. Olson and Youmans.  Ex. 1 (Maniaci Dep.) at 168-75, 183-84.  Plaintiff's relevant testimony is excerpted below.

Q   Do you acknowledge that Georgetown . . . . had a right to limit the time when a speaker could speak?

A   Yes.

Q   And the place where the speaker could speak.

A   Yes.

Q   And the manner in which a speaker could speak.

A   Yes.

Q   So, for example, if [Georgetown] were to say, you can't shout when you ask questions, would that be, in your view, a limitation that Georgetown University had a right to impose on a speaker?

A   Yes.  It would be reasonable.

*Id*. at 168-69.

Q    Did Georgetown University, in your view, have the right to say, you may ask one question as opposed to, say, several questions?

A   Yes.  If that was imposed on everyone fairly, yes.

Q    Well, did Georgetown University have the right to say that anything you say must be put in the form of a question?  Would that be within the right of the University?

A    Probably.

Q    Did Georgetown University have the right to say that you should not interfere with someone else's right to speak?

A    Yes.

*Id*. at 169-70.

Q    If Georgetown University says there's going to be only questions, not dialogue, just a question, and you're limited to one question, did Georgetown University have the right --

A    Yes.

Q    -- to impose that limitation?

A    Yes.

*Id*. at 170-71.

Q    Was it Georgetown University or you that had the right to make the ground rules for the conference?

A    Their conference.  They can make the ground rules.

*Id*. at 174-75.

Q    Looking now at [Georgetown's Speech and Expression Policy].  It states that the right of free speech and expression does not include.  And then it goes on to list a number of activities. And I direct your attention to the last paragraph, or I should say the last clause where it says, quote, any activity that disrupts or obstructs the functions of the university, or imminently threatens such disruption or obstruction, end quote. When you went to [Georgetown] to attend the conference, did you understand that the right of free speech and expression did not include any activity that disrupts or obstructs the functions of the university, or that imminently threatens such disruption or obstruction?

A    Certainly.

Q    And did you believe and understand that Georgetown University had a right to impose that limitation?

A    Of course.

*Id*. at 183-84.

92.     Plaintiff lined up at the microphone along with other audience members.

Ex. 1 (Maniaci Dep.) at 242.  When it was his turn at the microphone, Plaintiff stated his name

and asked the panelists:

> I have one question for you and it's a policy question.  Uh, I'd like to know your
> position on suicide bombing.  If you would renounce suicide bombing and the
> murder of innocent Israeli women and children, as a viable, uh, venue for you to
> accomplish your goals.  And given that that is terrorism, and no one can deny
> blowing himself up on a bus and killing innocents is not terrorism . . . . I would
> like you to answer either affirmative or negative whether you do support terrorism
> or not.  Thank you.

Ex. 47 (Video Tr.) at 4; Ex. 1 (Maniaci Dep.) at  243.

93.     Plaintiff's question was the third question in a group of three.  Ex. 44A

(Quest Video) at 18:59:27-19:02:05.

94.     After asking his question, Plaintiff returned to his seat.  Ex. 44A (Quest

Video) at 19:02:14-19:02:21; Ex. 5 (Olson Dep.) at 37.

95.     Panelist Susan Blackwell,[1] a professor at the University of Birmingham in

England, responded to Plaintiff's question.  She stated:

> I'd like to address the question on suicide bombing.  I hope we won't get this
> question repeated twenty different ways because that, that can happen sometimes
> at meetings.  I'm speaking for myself when I say this, I'm not speaking on behalf
> of any organization, okay.  My personal view and if other people want to give
> their own personal views, that's up to them.
>
> Um, I have gone on the record about this many, many times.  And **I unreservedly
> condemn all acts of terrorism, not all violence because I'm not a pacifist, I
> believe in self-defense. I unreservedly condemn all acts of terrorism by which
> I mean acts or threats of violence, against unarmed civilians for political
> ends.  And that applies . . . That applies to suicide bombs in pizza parlors in
> Israel.**  It also applies to F-16s dropped, uh, uh, firing on civilians in Gaza.  So I
> condemn  . . . I condemn equally and unreservedly the terrorism of, of groups like
> Hamas and Islamic Jihad when they target innocent civilians.  I also unreservedly

---

[1] Plaintiff testified at his deposition that in his view, Dr. Blackwell, like any speaker who
supported divestment from Israel, was a terrorist.  Ex. 1 (Maniaci Dep.) at 178-79.

condemn the state terrorism of Tony Blair, Ariel Sharon and George Bush, all of whom . . . Each of whom has more blood on his two hands alone than the whole of Hamas and Islamic Jihad together.

Ex. 44A (Video Tr.) at 6 (emphasis added).

96.    After Dr. Blackwell had completed her response, Moderator Youmans indicated "We only have time for one more round of three questions."  Ex. 47 (Video Tr.) at 6.

97.    At this point, Plaintiff cut Mr. Youmans off, shouting from his seat: "You didn't answer my question."  Ex. 47 (Video Tr.) at 6; Ex. 3C (Finberg Dep.) at 121-22.

98.    Mr. Youmans began to respond: "Thank you . . ." but was again interrupted by the Plaintiff.  Ex. 47 (Video Tr.) at 6; Ex. 44A (Quest Video) at 19:07:25-19:07:27.

99.    Plaintiff shouted: "I asked for a policy statement from you."  Ex. 47 (Video Tr.) at 6; Ex. 44A (Quest Video) at 19:07:27-19:07:29.

100.    Mr. Youmans tried to respond again, barely managing to get out the words "Would you . . ." before he was interrupted for the third time by the Plaintiff.  Ex. 47 (Video Tr.) at 6; Ex. 44A (Quest Video) at 19:07:28-19:07:30.

101.    Plaintiff again interrupted for the fourth time, shouting: "You haven't answered my question."  Ex. 47 (Video Tr.) at 6; Ex. 44A (Quest Video) at 19:07:29-19:07:31.

102.    Mr. Youmans attempted to respond for a third time and this time was able to state: "***Thank you, but you are disrupting.  Please, we can talk about this afterwards***."  Ex. 47 (Video Tr.) at 6 (emphasis added); Ex. 44A (Quest Video) at 19:07:30-19:07:34.

103.    Mr. Olson also addressed the Plaintiff, stating "***You have had an opportunity to ask your question.  Your opportunity has ended***."  Ex. 47 (Video Tr.) at 6 (emphasis added); Ex. 44A (Quest Video) at 19:07:33-19:07:36.

23

104.    Mr. Youmans attempted to resume the question and answer period.  He addressed the audience members still waiting in line at the microphone: "[P]lease introduce yourself before you ask a question.  Three more questions."  Ex. 47 (Video Tr.) at 6; Ex. 44A (Quest Video) at 19:07:37-19:07:42.

105.    Before the next person in line could speak, Plaintiff interrupted for the fifth time, shouting: "You didn't answer my question."  Ex. 47 (Video Tr.) at 6; Ex. 44A (Quest Video) at 19:07:41-19:07:44.

106.    Mr. Youmans again addressed the audience members in line: "Please go ahead with the question."  Ex. 47 (Video Tr.) at 6; Ex. 44A (Quest Video) at 19:07:42-19:07:44.

107.    The next person in line, a woman who identified herself as "Noelle," asked another question of the panel.  Ex. 47 (Video Tr.) at 6; Ex. 44A (Quest Video) at 19:07:44-19:07:59.

108.    As soon as Noelle had finished asking her question, and the next questioner, Rabbi Weiss (a member of the Neteuri Karta sect, *see* Paragraph 123, *infra*) looked at the panel and opened his mouth to speak, Plaintiff interjected for a sixth time, shouting from his seat: "Are you for or against . . ." Ex. 47 (Video Tr.) at 6; Ex. 44A (Quest Video) at 19:08:06-19:08:09.

109.    Mr. Youmans responded: "***I'm sorry sir, please don't interrupt***.  You've already asked your question.  Thank you."  Ex. 47 (Video Tr.) at 6-7 (emphasis added); Ex. 44A (Quest Video) at 19:08:08-19:08:12.

110.    Plaintiff continued to engage Mr. Youmans, interjecting for a seventh time, and preventing Rabbi Weiss from speaking by shouting: "But you didn't answer my question."  Ex. 47 (Video Tr.) at 7; Ex. 44A (Quest Video) at 19:08:11-19:08:14.

111.   Mr. Youmans responded: "***She did, she addressed your question***." (referring to Dr. Susan Blackwell, see Paragraph 95, *supra*) Ex. 47 (Video Tr.) at 7 (emphasis added); Ex. 44A (Quest Video) at 19:08:14-19:08:15.

112.   Plaintiff was not dissuaded, but instead shouted: "No, I asked for your policy statement and she gave a personal . . ." Ex. 47 (Video Tr.) at 7; Ex. 44A (Quest Video) at 19:08:15-19:08:19.  This was the eighth shouting interruption by Plaintiff.

113.   Mr. Youmans began to respond: "There is no policy, I don't know. . ."  Ex. 47 (Video Tr.) at 7; Ex. 44A (Quest Video) at 19:08:15-19:08:20.

114.   At this point, Plaintiff had interjected <u>eight</u> times since Dr. Blackwell responded to his question and had ignored what in substance amounted to <u>five</u> requests by Mr. Olson and Mr. Youmans to desist so that the question and answer session to continue and others in line could have an opportunity to ask their questions.  *See* Paragraphs 96-113, *supra*.

115.   Based on his disruptive conduct (*see* Paragraphs 96-113, *supra*) Plaintiff was clearly in violation of Georgetown's Policy on Speech and Expression since his "continuing speech was preventing . . . the question and answer session from proceeding.  It was difficult to hear over him, and it was creating a disruption."  Ex. 5 (Olson Dep.) at 36-37.

116.   As a result, Mr. Olson advised the Plaintiff:

Sir, you do not have the opportunity to speak any longer.  I would like to ask our staff to <u>escort</u> this gentleman from the room. He is creating a significant disruption.

Ex. 47 (Video Tr.) at 7 (emphasis added); Ex. 44A (Quest Video) at 19:08:20-19:08:28.

117.    Mr. Olson did <u>not</u> instruct anyone to use physical force to remove the Plaintiff nor did he ask anyone to arrest Plaintiff or take him into custody.  Ex. 47 (Video Tr.) at 7 (emphasis added); Ex. 44A (Quest Video) at 19:08:20-19:08:28.

118.    Georgetown Safety Officers Roy Eddy and Larry Sally responded to Mr. Olson's request.  They approached the Plaintiff from the back of the auditorium.  Ex. 43 (AA Video) at 00:00:03-00:00:11; Ex. 44A (Quest Video) at 19:08:37-19:08:41.

119.    Plaintiff ignored and disobeyed Mr. Olson's instruction to leave the auditorium, instead remaining seated.  He was uncooperative and made no effort to get up.  Ex. 43 (AA Video) at 00:00:15-00:00:45; Ex. 44A (Quest Video) at 19:08:32-19:08:41.

120.    As the two Safety Officers walked towards the Plaintiff, two of Plaintiff's JDL colleagues and participants in JDL's Operation Gideon, Matthew Finberg and Jim Nutting, immediately moved towards him, positioning themselves in the aisle and in close proximity to Plaintiff and the two officers.  Ex. 44A (Quest Video) at 19:08:30-19:08:37; Ex. 48 (Photograph of Finberg and Nutting moving to the aisle in Gaston Hall).[2]  Messrs. Finberg and Nutting interfered with the officers' activities.  Ex. 6 (Harrison Dep.) at 30-31, 39-40.

121.    When Safety Officers Eddy and Salley reached Plaintiff's seat, Mr. Eddy leaned over to speak with Plaintiff.  Ex. 43 (AA Video) at 00:00:35-00:00:45; Ex. 44A (Quest Video) at 19:08:58-19:09:10; Ex. 5 (Olson Dep.) at 40.

122.    Mr. Eddy testified that he identified himself as a "university official" and "told [Plaintiff] that he would have to leave the hall" but that Plaintiff "refused" and remained

---

[2] This photograph was taken by Carrie Devorah on February 18, 2006 and was produced with demonstrative markings by Plaintiff's counsel.  It was also Exhibit 16 H to Plaintiff's deposition.

seated.  Ex. 8 (Eddy Dep.) at 25-26, 36; Ex. 9 (Salley Decl.) ¶ 11; Deposition of Michael Smith

(Ex. 54) at 160-61.

123.   While this was going on, Rabbi Weiss, [3] the next audience member in line

attempted to ask his question, but JDL Chairman Finberg stood in front of him in order to block

his view of the panel and prevent him from speaking.  Ex. 44A (Quest Video) at 19:08:51-

19:09:05.

124.   Mr. Finberg explained his reason for blocking Rabbi Weiss:

> I stood in front of him.  I knew he couldn't use the microphone because it was the
> [S]abbath . . . I don't like him and I didn't think he should be there and I think he's
> dangerous to my people . . . I said, I don't like you.  He said, Get out of my way.  I
> said, No.  And nobody could see him.  It was beautiful.

Ex. 29 (Finberg Dep.) at 115-16.

125.   After it became apparent that Plaintiff would not cooperate, would not

voluntarily leave, and would not alight from his seat, Safety Officers Eddy and Salley carefully

lifted Plaintiff up out of his seat, gripping him under his armpits, and carried him into the aisle, a

distance of less than three feet from his seat.  Ex. 43 (AA Video) at 00:00:45-00:00:55; Ex. 44A

(Quest Video) at 19:09:12-19:09:38; Ex. 8 (Eddy Dep. at 26, 36); Ex. 9 (Salley Decl.) ¶¶ 12-13.

126.   At first the Safety Officers tried to stand Plaintiff up in the aisle, but

Plaintiff continued to resist by refusing to stand up and instead going limp, forcing them to carry

him from the auditorium.  Ex. 8 (Eddy Dep.) at 37; Ex. 7 (Morrell Dep.) at 29-30; Ex. 9 (Salley

Decl.) ¶ 13; Ex. 44A (Quest Video) at 19:09:12-19:09:38; Ex. 43 (AA Video) at 00:00:45-

00:01:00.

127.   At the time, Plaintiff weighed approximately 220 pounds.  Medical Records (Ex. 52) at VA000441, VA000445.  Plaintiff used his own dead weight to resist the officers' efforts to remove him from the auditorium.

128.   Plaintiff continued to resist by placing his cane between Officer Salley's legs as he was carried out of the auditorium.  Ex. 9 (Salley Decl.) ¶ 13; Ex. 44A (Quest Video) at 19:09:10-19:09:38; Ex. 43 (AA Video) at 00:01:00-00:01:10.  Plaintiff did this in an attempt to trip Safety Officer Salley.

129.   Plaintiff's removal from Gaston Hall lasted only thirty seconds.  Plaintiff was carried less than forty-five feet from where he was originally seated to the foyer outside Gaston Hall.  Ex. 44A (Quest Video) at 19:09:10-19:09:38; Ex. 43 (AA Video) at 00:00:45-00:01:10.

130.   Someone held the auditorium doors open as the Safety Officers carried Plaintiff out of Gaston Hall into the adjacent hallway and foyer.  Ex. 43 (AA Video) at 00:01:00-00:01:15; Ex. 44A (Quest Video) at 19:09:33-19:09:42.

131.   After carrying him out of Gaston Hall, Safety Officers Eddy and Salley gently placed Plaintiff on the floor in the foyer outside the auditorium.  Ex. 8 (Eddy Dep.) at 36; 29 (Finberg Dep.) at 135 (the officers sat Plaintiff down, he was not thrown to the ground); Ex. 7 (Morrell Dep.) at 29-30 (the officers "gently deposit[ed] Plaintiff on the floor."); Decl. of Erik M. Smulson (Ex. 49) ¶ 7 (the officers "gently placed" Plaintiff on the floor and did not have "any other physical contact" with Plaintiff.).

---

[3] Rabbi Weiss is a member of Neteuri Karta, a group within the Jewish faith that holds views contrary to the JDL.  Ex. 29 (Finberg Dep.) at 104; Ex. 2 (Nutting Dep.) at 177; Ex. 1 (Maniaci Dep.) at 331-32.

132.   The Safety Officers' purpose in removing Plaintiff from Gaston Hall was to enforce Georgetown's private policies; they did not invoke the law enforcement powers granted to them by the District of Columbia.  Ex. 9 (Salley Decl.) ¶ 22.

133.   Approximately fifteen seconds after removing the Plaintiff to the foyer, Officer Salley re-entered Gaston Hall.  Ex. 44A (Quest Video) at 19:09:38-19:09:48.  Officer Eddy had also re-entered Gaston Hall within three minutes of removing Plaintiff to the foyer.  *Id.* at 19:09-38-19:12:46; Ex. 43 (AA Video) at 00:00:15-00:00:50.[4]

134.   In sum, the video recordings of the Divestment Seminar contradict Plaintiff's deposition testimony as well as the allegations in the Second Amended Complaint in numerous material respects.

    a.  Plaintiff testified that Susan Blackwell "didn't address my question."  Ex. 1 (Maniaci Dep.) at 248.  The video recordings demonstrate that panelist Susan Blackwell answered Plaintiff's question at length.  Ex. 47 (Video Tr.) at 6.

    b.  Plaintiff testified that he was removed after he "raised [his] hand and [he] said excuse me, but you haven't answered my question" a "couple of times."  Ex. 1 (Maniaci Dep.) at 252.  The video recordings demonstrate that Plaintiff interjected no less than <u>eight</u> times, interrupting both Moderator Youmans and audience member Rabbi Weiss.  Ex. 44A (Quest Video) at 19:07:20-19:08:30.  Plaintiff did not raise his hand or say "excuse me."  *Id.*

---

[4] There is a break in the AA Video.  However, the amount of time that has passed can be calculated by reference to the Quest Video.

c.   Plaintiff testified that Mr. Olson " pointed to [him]" and "said [the] words --
     he said remove that man." Ex. 1 (Maniaci Dep.) at 257.  The video recordings
     show that after Plaintiff had been requested to decease from disrupting the
     Divestment Seminar at least <u>five</u> times, Mr. Olson stated "I would like to ask
     our staff to <u>escort</u> this gentleman from the room."  Ex. 47 (Video Tr.) at 7
     (emphasis added).  Mr. Olson did not point to Plaintiff and say "remove that
     man."  *Id*.

d.   Plaintiff testified that the Safety Officers "grabbed" him and that he "flew out
     of [his] seat."  Ex. 1 (Maniaci Dep.) at 259-60.  The video recordings show
     how Officers Eddy and Salley calmly approached Plaintiff, leaned over to
     speak to him, and then after several moments had passed, carefully lifted him
     from his seat.  Ex. 44A (Quest Video) at 19:09:00-19:09:38.

e.   Plaintiff testified the Safety Officers "kneed [him] in the rib cage" while he
     was between his seat and the aisle which "knocked all [his] wind out."  Ex. 1
     (Maniaci Dep.) at 261-62, 264.  The video recordings which show the events
     from two different angles, demonstrate the Plaintiff was not kneed or struck in
     any manner.  Ex. 44A (Quest Video) 19:09:00-19:09:38; Ex. 43 (AA Video)
     at 00:0014-00:01:14.

f.   Plaintiff alleges that he "dropped [his] papers" but "managed to hold on to
     [his] cane."  Ex. 1 (Maniaci Dep.) at 262.  The video recordings show that
     Plaintiff gripping the notebook in his hand during his removal from the
     auditorium.  Ex. 44A (Quest Video) 19:09:00-19:09:38.

g. Plaintiff testified that he "remember[s] [] bumping into elbows and shoes. [He] remember[s] seeing shoes on the floor and the rug going by and bumping into chairs and hitting the concrete pavement outside." Ex. 1 (Maniaci Dep.) at 262. The video recordings show that Plaintiff did not hit the floor and that Officers Eddy and Salley carried him carefully out of the auditorium without incident. Ex. 44A (Quest Video) at 19:09:00-19:09:38; Ex. 43 (AA Video) at 00:0014-00:01:14. He did not bump against anything else as he was carried out of the auditorium.

h. Plaintiff alleged in his complaint that he "was then lifted off the floor, hitting his head, and then thrown through the doors into the hallway on the concrete floor." Compl. ¶ 4. Yet at his deposition, Plaintiff testified that he "[didn't] know if [he] was [thrown through the doors] or not." Ex. 1 (Maniaci Dep.) at 268. Thus, the Complaint's allegation is unsubstantiated. In any event, the video recordings show that an unidentified individual held the auditorium doors open while Officers Eddy and Salley carefully carried Plaintiff into the foyer outside. Ex. 44A (Quest Video) at 19:09:33-19:09:42; Ex. 43 (AA Video) at 00:0014-00:01:14. Plaintiff was not thrown through the doors.

i. Plaintiff testified that he was "pounced upon" after being placed in the foyer, yet could not identify who pounced upon him or even say that it was a University employee. Ex. 1 (Maniaci Dep.) at 269. The video recordings show both Safety Officers standing peacefully in the hallway moments after removing Plaintiff from Gaston Hall. They also show that both Safety Officers reenter Gaston Hall almost immediately: Officer Salley reenters the auditorium within fifteen seconds and Officer Eddy within three minutes. Ex.

44A (Quest Video) at 19:09:38-19:12:48; Ex. 43 (AA Video) at 00:01:10-00:01:50.

135.   Plaintiff's allegations are similarly contradicted by the testimony of many witnesses, including some of his JDL colleagues as indicated Paragraphs 136 through 139 below.

136.   Keith Bailey, another JDL sympathizer, sat next to Plaintiff at the Divestment Seminar.  Dep. of Keith Bailey ("Bailey Dep.") (Ex. 50) at 146-47; Photograph of Mr. Bailey in Gaston Hall (Ex. 51).[5]  From this vantage point, Mr. Bailey closely observed Plaintiff's removal and testified that he did not see the officers punch or kick Plaintiff and did not see Plaintiff's head hit any objects as he was carried out.

> Q.  Okay.  When they were moving him down the aisle towards the stage, did you see them punch or kick him?
>
> A.  I didn't see that.
>
> Q.  Okay.  When they were moving him down the aisle towards the stage, did you see  Mr. Maniaci's head hit any objects?
>
> A.  I didn't see that either.

Ex. 50 (Bailey Dep.) at 149-50.

137.   As described in Paragraph 120, JDL Chairman Finberg quickly moved into the aisle near Plaintiff after Mr. Olson asked the Safety Officers to escort Plaintiff from the room.  Photographs produced by Plaintiff's counsel, submitted as Exhibits 48 and 51, show Mr. Finberg within inches of Plaintiff while he was being removed.  Mr. Finberg testified that it was appropriate to remove Plaintiff at that time and that he did not see the Security Officers punch, kick, or knee Plaintiff.

---

[5] This photograph, also taken by Ms. Devorah on February 18, 2006, was produced with demonstrative markings by Plaintiff's counsel.  It was also Exhibit 16G to Plaintiff's deposition.

Q.   You said that they went to lift him by his shoulder.  Prior to doing that, did they -- did you see a campus security guard try to punch Mr. Maniaci?

A.   No.

Q.   Did you see a campus security guard try to kick or knee Mr. Maniaci?

A.   No.

Ex. 29 (Finberg Dep.) at 126-27.

Q.   Okay.  Do you think that it was appropriate to  have Mr. Maniaci removed at that point in time?

A.   Yes.

Q.   Because he was being disruptive?

A.   Yes.

*Id*. at 142.

138.   Metropolitan Police Department Lieutenant Michael Smith, another JDL sympathizer, was also present at the Divestment Seminar.  Ex. 54 (Smith Dep.) at 132.  Mr. Smith, a seasoned police investigator with extensive training regarding the use of force, also saw the Security Officers remove Plaintiff from Gaston Hall.  *Id*. at 12-13, 29-30, 159-60.  Mr. Smith testified that he did not see Plaintiff fall on the ground nor did he see the officers punch, kick or strike Plaintiff.

Q.   And then was Mr. Maniaci thrown to the ground?

A.   Not that I have seen.

Q.   Okay.

A.   Not anywhere inside the hall.

Q.   Did he fall on the ground?

33

A.  Not that I saw.

*Id*. at 161-62.

Q.  While Mr. Maniaci was in his seat, did you see either the DPS officers kick him?

A.  No.

Q.  Did you see either of the DPS officers punch Mr. Maniaci while he was still in his seat?

A.  No.

Q.  What about after they had lifted him up out of the seat, did you see either of the DPS officers kick him?

A.  No.

Q.  After they had lifted Mr. Maniaci up out of his seat, did you see either of the DPS officers punch or strike Mr. Maniaci?

A.  No.

*Id*. at 162-63.

139.   Erik M. Smulson, then the Assistant Vice President for Communications, was in the hallway outside Gaston Hall when Safety Officers Eddy and Salley carried Plaintiff out and placed him gently on the floor.  Ex. 49 (Smulson Decl.) ¶¶ 6-7.  He too has indicated that the Safety Officers did not "pounce" upon, strike or knee Plaintiff.  *Id.* ¶¶ 8-9.

### D.    Plaintiff Is Asked to Leave the Campus

140.   In the foyer, Plaintiff was not handcuffed or otherwise restrained, arrested, detained, or taken into custody.  Ex. 7 (Morrell Dep.) at 32, Ex. 9 (Salley Decl.) ¶ 23.  Indeed, at his deposition, Plaintiff testified that he was not arrested.  Ex. 1 (Maniaci Dep.) at 158.  To the contrary, Officers Salley and Eddy left him free to leave the building as he pleased.  *Id.* at 289; Ex. 8 (Eddy Dep.) at 44.

141.    Shortly after being placed in the foyer, Plaintiff stood up and pictures that were taken by Ms. Devorah,[6] submitted as Exhibits 53-A through 53-C, show him in no apparent distress, with no visible bruises, talking to his JDL colleagues.

142.    At about one o'clock in the afternoon, after Plaintiff had been removed, Mr. Harrison arrived at Healy Hall as well.  Ex. 6 (Harrison Dep.) at 13-14.  He observed Plaintiff talking with a number of people, including Mr. Olson and Mr. Morrell.  *Id.* at 14-15.

143.    Mr. Olson and Mr. Morrell decided to inform Plaintiff that due to his violation of the Georgetown's Speech and Expression Policy, he was "no longer welcome to attend the other sessions at [the] Conference."  Ex. 5 (Olson Dep.) at 42.

144.    Mr. Morrell approached Plaintiff and asked him to leave.  Ex. 1 (Maniaci Dep.) at 289-90; Compl. ¶ 5.  Plaintiff was told he was "banned" for violating Georgetown's Speech and Expression Policy.  Ex. 29 (Finberg Dep.) at 136-37.

145.    Plaintiff responded that he was leaving, and he and Mr. Turk walked out of Healy Hall.  Ex. 1 (Maniaci Dep.) at 289-90.

146.    Plaintiff did not request or seek any medical attention.  Ex. 4 (Turk Dep.) at 169-70.

---

[6] These photographs were produced with demonstrative markings by Plaintiff's counsel and were Exhibits 17 A through 17 C to Plaintiff's deposition.

### E.     Plaintiff Goes to the Intercultural Center

147.   Disregarding Mr. Morrell's instruction to leave the campus and contrary to his own promise to comply, Plaintiff instead walked over to the ICC, another Georgetown building, where additional Conference workshops were proceeding. Ex. 1 (Maniaci Dep.) at 293; Ex. 41 (Media Packet) at M000112-113.  The ICC is located approximately 150 yards from Healy Hall. Ex. 1 (Maniaci Dep.) at 294; Ex. 6 (Harrison Dep.) at 14-15.

148.   As indicated in Paragraph 58, *supra*, as part of Operation Gideon, JDL members deceptively registered under the assumed name "Palestinians are People Too" in order to obtain permission to place information tables in the ICC.

149.   Mr. Harrison walked along with him and advised Plaintiff that he would not be permitted to enter the ICC and asked him to leave the Campus.  Ex. 6 (Harrison Dep.) at 17-18, 20-21.

150.   When he arrived at the ICC, Messrs. Morrell and Olson and a number of Georgetown Safety Officers were also present.  They again told him that he was not permitted to enter the ICC building and again asked him to leave. Ex. 1 (Maniaci Dep.) at 296; Ex. 7 (Morrell Dep.) at. 13-14; Ex. 6 (Harrison Dep.) at 43-44; Ex. 5 (Olson Dep.) at 43-44.

151.   Officer Eddy was also present at the ICC at that time. Ex. 8 (Eddy Dep.) at 41-42.

152.   The Safety Officers did not use any force against Plaintiff at the ICC as many of Plaintiff's JDL colleagues testified.  This testimony is described in Paragraphs 153 though 155 below.

153.   JDL Chairman Finberg walked with Plaintiff from Gaston Hall to the ICC. Ex. 29 (Finberg Dep.) at 150.  Mr. Finberg testified that the Security Officers did not push Plaintiff against a wall at the ICC.

Q.   Do you remember him -- campus security guards pushing Mr. Maniaci?

A.   **No, no.  He was treated very civilly after that**.

Ex. 29 (Finberg Dep.) at 151 (emphasis added).

154.   MPD Lieutenant Smith, a JDL sympathizer, testified that he observed the ICC incident and that Plaintiff "leaned up against the wall with his back up against the wall and was just standing there"; no officer pushed Plaintiff.  Ex. 54 (Smith Dep.) at 191-92.

155.   Jim Nutting, another JDL sympathizer, who trained at the Reserve Police Officers Academy and works as a security officer for the Metropolitan Transit system in San Diego, has both training and experience in the use of force.  Ex. 2 (Nutting Dep.) at 7, 8, 21-22. Mr. Nutting testified that he did not see the officers push or grab Plaintiff at the ICC.

Q.   Were they grabbing Mr. Maniaci?

A.   I don't remember seeing that.

Q.   Were they pushing Mr. Maniaci?

A.   I didn't see that.  I don't remember it.

Ex. 2 (Nutting Dep.) at 223.

156.   After being advised that he was not under arrest, Plaintiff insisted on entering the ICC.  Ex. 1 (Maniaci Dep.) at 298.

157.   When the Plaintiff asked to use the bathroom facilities, he was permitted to do so.  Ex. 1 (Maniaci Dep.) at 299 (testifying that he threatened to wet the Safety Officer's leg if

he was not permitted to use the bathroom).  A Safety Officer placed his foot in the door holding it ajar because Georgetown officials feared that Plaintiff may attempt to lock himself inside the restroom.  Ex. 8 (Eddy Dep.) at 43-44.

158.   Once Plaintiff had used the bathroom, he was escorted back to the foyer of the ICC.  Ex. 1 (Maniaci Dep.) at 301-02.  Shortly thereafter, Georgetown officials requested the assistance of Metropolitan Police Department Sergeant Sam DeLisi.  Sgt. DeLisi arrived and escorted Plaintiff off of the campus to his car.  *Id.* at 302-03; Dep. of Sam DeLisi (Ex. 55) at 37-39; 45-46.

159.   Plaintiff was not handcuffed by the Security Officers at the ICC or at any other point during the Conference.  Ex. 2 (Nutting Dep.) at 192-93; Ex. 55 (DeLisi Dep.) at 45; Ex. 27 (Kaplan Dep.) at 148; Ex. 29 (Finberg Dep.) at 136; Ex. 54 (Smith Dep.) at 173; Ex. 9 (Salley Decl.) ¶ 23.

160.   Plaintiff was not in DPS custody at any point during the ICC incident.  Ex. 7 (Morrell Dep.) at 34.  Indeed, Plaintiff has conceded that the Safety Officers verbally confirmed that he was not under arrest at the ICC.  Ex. 1 (Maniaci Dep.) at 298-99.  As is apparent from the events described in Parts C through E, Georgetown wanted Plaintiff to leave the campus, not to arrest him.

## F.    After Leaving Campus

161.   After he left the campus, rather than seek medical attention, Plaintiff sat in a car for several hours.  Ex. 1 (Maniaci Dep.) at 295.  That evening, he went out to dinner with several JDL colleagues for a hamburger and a beer.  *Id.* at 296-297.  Plaintiff then returned to his hotel room, again without seeking any medical attention.  *Id.*

## Events of Sunday, February 19, 2006

**G.    Plaintiff Collapses**

162.    The next day, Sunday February 19, 2006, Plaintiff walked out to a traffic circle near the Wyndham hotel in downtown Washington D.C. to direct buses carrying demonstrators to the hotel.  Ex. 1 (Maniaci Dep.) at 305-06.

163.    While waiting for the buses, Plaintiff suddenly fell down.  Ex. 1 (Maniaci Dep.) at 305-06; Ex. 50  (Bailey Dep.) at 211-12.  This occurred at about eleven o'clock.  Ex. 1 (Maniaci Dep.) at 306-07.

164.    Plaintiff got back up and walked to the hotel to sit down.  Ex. 1 (Maniaci Dep.) at 309-10.  He did not seek any medical treatment at this time.  Ex. 50 (Bailey Dep.) at 216-17.  The buses showed up shortly thereafter and Plaintiff went with them to Georgetown's campus.  Ex. 1 (Maniaci Dep.) at 310.

**H.    Plaintiff Returns to Georgetown**

165.    When he arrived at Georgetown, Plaintiff had an Israeli flag with him and he took it to the main gate of the University and stood there for approximately 20-30 minutes.  Ex. 1 (Maniaci Dep.) at 312-13, 315.  Photographs of Plaintiff standing with the Israeli flag are submitted as Exhibits 56-A, and 56-B.[7]  Then Plaintiff went to the back the car and sat down for a little while.  *Id*. at 315.  After a few minutes he returned to the main gate with his Israeli flag and stood for another 20-30 minutes.  *Id*.  Plaintiff continued to cycle between standing at the

---

[7] These photographs were taken by Charles Nailen of Georgetown.  They were exhibits 19A and 19E to Plaintiff's deposition.

main gate with his flag and sitting in the car for at least two hours between noon and two or three o'clock. *Id.*

166.   Later that evening, after Plaintiff and his JDL colleagues had returned to their hotel, Plaintiff's colleagues told him to visit the hospital because he began stuttering, slurring his words, and mistakenly referring to Mr. Turk as "Jim-Bob." *See* Ex. 1 (Maniaci Dep.) at 316-17.

### I.     Plaintiff Visits Walter Reed Medical Center

167.   Plaintiff arrived at the emergency room at Walter Reed Medical Center a few minutes after eight o'clock on Sunday evening. Ex. 1 (Maniaci Dep.) at 318.

168.   Dr. Suzanne Gillern examined and treated the Plaintiff. *See* Dep. of Suzanne Gillern (Ex. 57) at 17. Plaintiff complained of lower back pain, an episode of dizziness, and right ankle swelling. Ex. 57 (Gillern Dep.) at 25-26.

169.   Dr. Gillern recorded Plaintiff's medical history which included congestive heart failure, chronic obstructive pulmonary disease and a recent stroke or short-term stroke referred to as a TIA. Ex. 57 (Gillern Dep.) at 22-23; Gillern Treatment Notes (Ex. 58); Ex. 1 (Maniaci Dep.) at 19-40.

170.   At the time, Plaintiff had already experienced a TIA prior to the PSM Conference, which involved a very similar episode of stuttering and slurring of his words during which he mistakenly referred to Mr. Turk as "Jimbo" on the telephone. Ex. 1 (Maniaci Dep.) at 23-28; 320-321.

171.   Dr. Gillern's physical examination of Plaintiff revealed no head injuries, no back tenderness, no ankle pain, and no bruising. Ex. 57 (Gillern Dep.) at 33-36, 45-48, 53-54.

She noted that Plaintiff did not appear to be "suffering or in a lot of pain." *Id*. at 30. She also noted that Plaintiff did not report any loss of consciousness. *Id*. at 28-29.

172.    Dr. Gillern ordered a CT scan and blood tests; both came back normal. Ex. 57 (Gillern Dep.) at 38-40. She also conducted a neurological exam of the Plaintiff and that was normal as well. *Id*. at 36-37.

173.    Dr. Gillern concluded that Plaintiff had a sprained ankle and may have suffered a concussion. Ex. 57 (Gillern Dep.) at 44-45. Her conclusion regarding the concussion was not based on any physical evidence; it was based solely on Plaintiff's statements about his fall earlier that day. *Id*. at 45.

174.    Plaintiff was discharged the same evening. Ex. 57 (Gillern Dep.) at 47.

175.    Dr. Gillern referred Plaintiff to his primary care doctor for follow-up, but he did not seek any further medical care because he soon "felt okay" and "had no further symptomology." Ex. 1 (Maniaci Dep.) at 321-22.

## <u>Summary of Plaintiff's Disruptive Behavior</u>

176.    Plaintiff violated Georgetown's policy on Speech and Expression by (1) disrupting the seminar by shouting from his seat and (2) interfering with other speaker's right to speak and the audience's ability to hear other speakers. *See* Paragraphs 96-116, *supra*.

177.    Plaintiff violated two ground rules enunciated by Vice President of Student Affairs, Todd Olson, (1) that audience members limit themselves to a single question and (2) that they phrase their comments in the form of a question. *See* Paragraphs 96 -116, *supra*. He also violated repeated instructions from Mr. Olson and Mr. Youmans to cease speaking and allow the session to proceed.

178.   Plaintiff interrupted the question and answer session <u>eight</u> times by shouting at the panelists and the moderator.  *See* Paragraph 114, *supra*.

179.   Plaintiff ignored and disobeyed <u>five</u> requests to cease his disruptive behavior.  *See* Paragraph 114, *supra*.

180.   Plaintiff refused to leave Gaston Hall despite being asked to do so.  *See* Paragraphs 116, 119, and 122, *supra*.

181.   Plaintiff refused to alight from his seat.  Plaintiff also refused to stand up and walk out of Gaston Hall on his own and instead resisted by going limp and using his body as a dead weight.  *See* Paragraphs 119, 125-126, *supra*.

182.   Plaintiff further resisted Safety Officer Eddy and Salley's attempt to carry him from the auditorium by attempting to trip Officer Salley with his cane.  *See* Paragraphs 128, *supra*.

183.   Plaintiff disobeyed Vice President of University Safety, David Morrell's instruction to leave the Conference.  *See* Paragraphs 143 -144, *supra*.

184.   Plaintiff ignored Director of Public Safety, Darryl Harrison's warning that Plaintiff would not be permitted to enter the ICC.  *See* Paragraphs 149-150, *supra*.

## <u>Summary of the Defendants' Interactions with Plaintiff</u>

**A. Todd Olson, Vice President of Student Affairs**

185.   Mr. Olson was present in Gaston Hall and remained there while Plaintiff was removed to the foyer.  Ex. 25 (Olson Decl.) ¶ 7.

186.   Mr. Olson did not direct Safety Officers Eddy and Salley to physically remove Plaintiff from Gaston Hall.  Ex. 47 (Video Tr.) at 7.  He asked them to <u>escort</u> Plaintiff from the room.  After he made his request, Mr. Olson lacked authority to instruct or supervise the officers; such authority was vested in members of the Department of Public Safety, not Mr. Olson.  Ex. 5 (Olson Dep.) at 46-47.

187.   The purpose of Mr. Olson's request to Safety Officers Salley and Eddy to escort Plaintiff from Gaston Hall was to enforce Georgetown's Speech and Expression Policy which prohibits disruptive behavior.  Ex. 25 (Olson Decl.) ¶ 6.   Mr. Olson's purpose was not to enforce criminal laws regarding trespass, and he did not ask the officers to arrest Plaintiff pursuant to their SPO law enforcement powers.  *Id.* ; Ex. 47 (Video Tr. ) at 7.  Moreover Mr. Olson testified that "It appeared to me from what I saw that the officers acted professionally and reasonably" in removing Plaintiff from the auditorium.  Ex. 5 (Olson Dep.) at 49.  The video recordings confirm this.

188.   Mr. Olson did not instruct the Safety Officers to use excessive force against, hit, or strike Plaintiff.  Ex. 47 (Video Tr.) at 7.

189.   Mr. Olson had a conversation with the Plaintiff in front of the ICC during which he and Mr. Morrell informed Plaintiff that he was not permitted to enter the building.  Ex. 5 (Olson Dep.) at 43-44.

190.   Mr. Olson does not have the authority to unilaterally deviate from or change Georgetown's existing Speech and Expression Policy.  Ex. 25 (Olson Decl.) ¶ 8.

191.   Mr. Olson does not have the authority to make final policy for Georgetown relating to the use of only reasonable force.  Ex. 25 (Olson Decl.) ¶ 10.

**B. Darryl Harrison, Director of Public Safety**

192.   Prior to the Conference, Mr. Harrison provided Plaintiff with information regarding the procedures that Georgetown had put in place to accommodate protestors such as the location of the protest and demonstration areas.   Ex. 6 (Harrison Dep.) at 10-12.

193.   Mr. Harrison was not present at Healy Hall when Plaintiff was removed from Gaston Hall.  Ex. 6 (Harrison Dep.) at 13-14, 26-27.

194.   Mr. Harrison walked with Plaintiff over to the ICC.  Ex. 6 (Harrison Dep.) at 17-18, 20-21.  He did not observe or receive any reports of use of force against Plaintiff at the ICC.  Ex. 6 (Harrison Dep.) at 45-46.

195.   Mr. Harrison does not have the authority to make final policy for Georgetown relating to speech and expression.  Ex. 26 (Harrison Decl.) ¶ 4.

196.   Mr. Harrison does not have the authority to unilaterally deviate from or change Georgetown's policy requiring only the use of reasonable force to authorize the use of excessive force.  Ex. 26 (Harrison Decl.) ¶ 8.  He did not authorize the use of excessive force with respect to the Plaintiff.  Id. ¶ 9.

**C. David Morrell, Vice President of University Safety**

197.   Mr. Morrell was present in the back of Gaston Hall during the Divestment Seminar.  Ex. 7 (Morrell Dep.) at 26.

198.   Mr. Morrell did not direct or instruct the conduct of Officer Eddy or Officer Salley in Gaston Hall.  Ex. 7 (Morrell Dep.) at 26.

199.   Mr. Morrell had a brief conversation with Plaintiff in front of the ICC during which Plaintiff was told to leave the ICC.  Ex. 7 (Morrell Dep.) at 13-14.

200.   Mr. Morrell does not have the authority to make final policy for Georgetown relating to speech and expression.  Ex. 25 (Olson Decl.) ¶ 9.

201.   Mr. Morrell did not have the authority to deviate from or change Georgetown's policy requiring only the use of reasonable force to authorize the use of excessive force.  Ex. 26 (Harrison Decl.) at ¶ 8.

**D. Roy Eddy, Safety Officer**

202.   Officer Eddy approached Plaintiff at the direction of Mr. Olson.  Ex. 8 (Eddy Dep.) at 17-18.

203.   Officer Eddy asked Plaintiff to leave Gaston Hall, and when he refused to comply, he along with Officer Salley carried Plaintiff out of the auditorium and placed him on the floor in the foyer.  Ex. 8 (Eddy Dep.) at 26, 36.

204.   Officer Eddy did not strike or knee Plaintiff while removing him from Gaston Hall or at any time while Plaintiff was on Georgetown's campus.  *See* Paragraphs 118-122, 125-131, 134-138, 152-160.

205.   Officer Eddy observed Plaintiff's interaction with the Georgetown administrators at the ICC.  Ex. 8 (Eddy Dep.) at 41-42.

206.   Officer Eddy does not have the authority to make final policy for Georgetown relating to speech and expression.  Ex. 26 (Harrison Decl.) ¶ 5.

207.   Officer Eddy does not have the authority to make final policy for Georgetown relating to the use of only reasonable force.  Ex. 26 (Harrison Decl.) ¶ 7.

208.   Officer Eddy was unarmed at all relevant times; he did not carry a weapon of any kind including a baton.  Ex. 26 (Harrison Decl.) ¶ 10.

209.   Officer Eddy did not handcuff or arrest Plaintiff.  *See* Paragraphs 140, 159-160.

**E. Larry Salley, Safety Officer**

210.   Officer Salley, along with Officer Eddy, carried Plaintiff out of Gaston Hall and placed him on the floor in the foyer.  Ex. 9 (Salley Decl.) ¶¶ 12-13.

211.   Officer Salley did not strike or knee Plaintiff while removing him from Gaston Hall or at any time while Plaintiff was on Georgetown's campus.  *See* Paragraphs 118-122, 125-131, 134-138; Ex. 9 (Salley Decl.) ¶¶ 14-17.

212.   Officer Salley immediately returned to Gaston Hall and had no further interaction with Plaintiff.  Ex. 9 (Salley Decl.) ¶¶ 16-17.

213.   Officer Salley was not present at the ICC.  Ex. 9 (Salley Decl.) ¶¶ 20.

214.   Officer Salley does not have the authority to make final policy for Georgetown relating to speech and expression.  Ex. 26 (Harrison Decl.) ¶ 5.

215.   Officer Salley does not have the authority to make final policy for Georgetown relating to the use of only reasonable force.  Ex. 26 (Harrison Decl.) ¶ 7.

216.   Officer Salley was unarmed at all relevant times; he did not carry a weapon of any kind including a baton. Ex. 26 (Harrison Decl.) at ¶ 10; Ex. 9 (Salley Decl.) ¶¶ 21.

Respectfully submitted,


January 14, 2008                        _____/s/ John J. Buckley. Jr._____.
                                       John J. Buckley, Jr., D.C. Bar No. 925081
                                       Malachi Jones, D.C. Bar No. 455555
                                       Richa S. Dasgupta, D.C. Bar No. 500509

                                       WILLIAMS & CONNOLLY LLP
                                       725 Twelfth Street, N.W.
                                       Washington, D.C. 20005
                                       jbuckley@wc.com
                                       (202) 434-5051
                                       (202) 434-5058 (fax)

                                       *Of Counsel:*
                                       Jane E. Genster, D.C. Bar No. 939850
                                       Vice President and General Counsel
                                       Georgetown University
                                       37th & O Streets, N.W.
                                       Washington, D.C. 20057
                                       (202) 687-6500
                                       (202) 687-6527 (fax)

                                       *Attorneys for Defendants Georgetown
                                       University, David F. Morrell, Darryl K.
                                       Harrison, Todd Olson, Roy Eddy and Larry
                                       Salley*