# EXHIBIT 1

March 29, 2007          William Maniaci          Maniaci vs. Georgetown
                        Washington, D.C.

Page 1

1              IN UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF COLUMBIA

3

4    WILLIAM MANIACI,              )        COPY

5              Plaintiff,          )

6        v.                        )   Case No.

7    GEORGETOWN UNIVERSITY,        )   06 CV 01625

8    et al.,                       )           CONDENSED

9              Defendants.         )

10

11                        Thursday, March 29, 2007

12                        Washington, D.C.

13

14      VIDEOTAPED DEPOSITION OF WILLIAM MANIACI

15

16      The videotaped deposition of WILLIAM

17   MANIACI, was held on Thursday, March 29, 2007,

18   at 9:39 a.m., taken at the offices of Williams &

19   Connolly, 725 12th Street, NW, Washington, D.C.,

20   before Vicky Stallsworth Reiner, Registered

21   Merit Reporter, Certified Realtime Reporter and

22   Notary Public.

Case 1:06-cv-01625-LFO    Document 39-3    Filed 01/14/2008    Page 3 of 62

March 29, 2007              William Maniaci          Maniaci vs. Georgetown
                          Washington, D.C.

Page 2

**A P P E A R A N C E S**

ON BEHALF OF THE PLAINTIFF:
    THOMAS FORTUNE FAY, ESQ.
    CARAGH FAY, ESQ.
    Law Offices of Thomas Fortune Fay, P.A.
    700 Fifth Street, N.W., #200
    Washington, D.C. 20001
    (202) 589-1300

ON BEHALF OF THE DEFENDANTS:
    JOHN J. BUCKLEY, JR., ESQ.
    MALACHI B. JONES, JR. ESQ.
    COLLEEN F. SHANAHAN, ESQ.
    Williams & Connolly
    725 12th Street, N.W.
    Washington, D.C. 20005

ALSO PRESENT:
    Chris Bossard, Video Operator

Page 3

**C O N T E N T S**

WILLIAM MANIACI                 EXAMINATION
    BY MR. BUCKLEY  ......................   6
    BY MR. FAY  .........................  383

        E X H I B I T S
MANIACI EXHIBIT NO:              PAGE NO:
1   ...................................   77
2   ...................................   77
3   ...................................   80
4   ...................................   80
5   ...................................  108
6   ...................................  127
7   ...................................  149
8   ...................................  161
9   ...................................  190
10  ...................................  193
11  ...................................  202
12  ...................................  212
13  ...................................  214
14  ...................................  220

Page 4

**E X H I B I T S**
(Continued)

MANIACI EXHIBIT NO:              PAGE NO:
15  ...................................  235
16  ...................................  271
17  ...................................  290
18  ...................................  296
19  ...................................  313
20  ...................................  318
21  ...................................  327
22  ...................................  333
23  ...................................  342
24  ...................................  349
25  ...................................  353
26  ...................................  355
27  ...................................  356
28  ...................................  360
29  ...................................  361
30  ...................................  364
31  ...................................  373
32  ...................................  381

Page 5

**P R O C E E D I N G S**
- - - - -
        THE VIDEO OPERATOR:  This begins the
videotaped deposition of William --
        THE WITNESS:  Maniaci.
        THE VIDEO OPERATOR:  -- Maniaci being
taken in the case entitled William Maniaci
versus Georgetown University, et al.  The case
is filed in the United States District Court for
the District of Columbia.
        It's being held today in the law
offices of Williams & Connolly LLP, 725 12th
Street, Northwest, Washington, D.C.  Today is
March 29, 2007.  The time is currently 9:40.
        The court reporter is Vicky
Stallsworth.  Videographer Chris Bossard.  Both
here representing Brynteson Reporting.
        I will now ask counsel to please
identify themselves for the record.
        MR. BUCKLEY:  I'm John Buckley with
Malachi Jones and Colleen Shanahan on behalf of
the defendants.

2 (Pages 2 to 5)

March 29, 2007                William Maniaci          Maniaci vs. Georgetown
                              Washington, D.C.

Page 6

1        MR. FAY:  Thomas Fortune Fay
2   representing Mr. Maniaci.  And Caragh Fay will
3   be here in just a little bit as one of his other
4   attorneys.
5        THE VIDEO OPERATOR:  The court
6   reporter will now swear in the witness.
7   Whereupon,
8             WILLIAM MANIACI
9   was called as a witness, and, having first been
10  duly sworn, was examined and testified as
11  follows:
12            EXAMINATION
13  BY MR. BUCKLEY:
14       Q    Okay.  Would you please state your
15  name.
16       A    William Maniaci.
17       Q    Where do you reside?
18       A    I reside at 4545 Park Rose Circle in
19  Reno, Nevada.
20       Q    Do you have a business address?
21       A    No, sir.  I'm retired.
22       Q    What is your date of birth?

Page 7

1        A    October 3rd, 1941.
2        Q    Could you please summarize your
3   educational background.
4        A    I attended the university after
5   graduating high school in Kirkwood, Missouri, at
6   16.  I attended -- I was a freshman at the
7   University of Missouri at 16.  I attended the
8   University of Missouri for 2 years.  Then I
9   dropped out of college.  I worked for a while
10  and ended up joining the Army at the age of
11  around 18.  And spent 14 years in the military.
12       I subsequently attended the -- while I
13  was in the military, I attended the University
14  of Louisville.  And I also attended classes at
15  the University of Hawaii.
16       And I went to Truckee Meadows
17  Community College for 2 years as well.  It's in
18  Reno.
19       Q    Did your studies focus on any
20  particular subject at any of those institutions?
21       A    Journalism and criminal justice.
22       Q    Where did you study criminal justice?

Page 8

1        A    At the University of Louisville, the
2   University of Hawaii.  At the University of --
3   actually, it's part of the University of Nevada
4   system, Truckee Meadows Community College.
5        Q    You indicated that you served 14 years
6   in the US military.
7        A    That's correct.
8        Q    Can you tell us precisely what those
9   years were.
10       A    I entered in 1961.  And I left -- I
11  left the military in 1976.
12       Q    Was all that service in the United
13  States Army?
14       A    Yes.
15       Q    Okay.  Turning now to the period after
16  you ended your service in the United States
17  military, could you summarize your employment
18  history.
19       A    When I left the military, I went to
20  work for the Department of Defense.  And my
21  travels took me to Kuwajleen in the Marshall
22  Islands, back to Hawaii where I worked with the

Page 9

1   Department of Defense police.
2        I went, also, to the island of Kauai
3   and was deputy chief of security for all the
4   naval installations on the island of Kauai.
5        I worked for a period of time on the
6   big island in Kona for the State of Hawaii at
7   the airport, airport police.  And then I went
8   to -- I was -- I went to Midway, where I spent
9   about a year, Midway Island.  And left the DoD
10  and secured a position as a broadcaster, talk
11  show, actually, on KGU Radio in Honolulu where
12  we had a talk show every afternoon for 3 years.
13  We were affiliated with the ABC Network.
14       That radio station was sold.  And that
15  entailed a change of format.  And I was invited
16  to work for a gentleman by the name of Bobby
17  Singer in Phoenix, Arizona.
18       I worked there as the editor -- he was
19  getting his newspaper off the ground.  So I
20  helped edit -- edit that and stayed there for
21  about 6 months.  And I got an offer to -- as the
22  general manager of a radio station in Brunswick,

3 (Pages 6 to 9)

March 29, 2007          William Maniaci          Maniaci vs. Georgetown
                        Washington, D.C.

Page 10

1  Maryland, WTRI.  And I was there for about a
2  year.  1986, I think that was.
3         And then I went from Brunswick,
4  Maryland, to Reno, Nevada, where I had an offer
5  as a -- and I did have a -- talk show on
6  radio -- a radio station, KOH.  I was there for
7  about a year.  And I met the chief of police
8  from Yerington, Nevada.  And I was -- I had
9  missed law enforcement.  And I was -- he invited
10  me to go to work for him.  And I went to work as
11  an officer on the Yerington Police Department.
12  And I retired as a Sergeant from that department
13  in 1999.
14         And then I went back to Truckee
15  Meadows Community College for about a year and a
16  half.  And I studied communications and
17  computers.
18     Q    Okay.  For how many years were you
19  employed as a police officer with the Yerington
20  Police Department?
21     A    11 years.
22     Q    11 years.  Prior to joining the

Page 11

1  Yerington Police Department, had you ever had
2  the power of arrest?
3     A    Yes.
4     Q    In what connection?
5     A    When I was in the military,
6  practically my entire career was involved -- I
7  was involved in the military police and
8  investigation -- as an investigator in the US
9  Army.
10     Q    Now, again, after you left the
11  Yerington Police Department, what did you do?
12     A    I went to school.
13     Q    Uh-huh.
14     A    And then --
15     Q    But what course of study did you
16  receive?
17     A    Computer science.
18     Q    And then, following that, what did you
19  do?
20     A    I worked for one year for America West
21  Airlines as a customer service representative.
22  And I left their employ and have been retired

Page 12

1  since -- for the last 3 or 4 years, I guess.
2     Q    Do you hold any licenses?
3     A    I'm sorry, what --
4     Q    Do you hold any licenses?
5     A    What type of license?
6     Q    Any type of license.  Are you
7  licensed, for example, by the federal government
8  in any respect?
9     A    Yes.  I'm licensed by the federal
10  government to carry a concealed weapon in all 50
11  states and the District of Columbia.
12     Q    Are you carrying a concealed weapon
13  today?
14     A    Absolutely.  It's like the American
15  Express card.
16     Q    Okay.  What weapon do you have with
17  you?
18     A    I have a .45.
19     Q    You have a 45-millimeter gun?
20     A    .45 caliber.
21     Q    Okay.  Do you carry a weapon at all
22  times?

Page 13

1     A    Yes.
2     Q    And for how long have you carried a
3  weapon?
4     A    All my life.  My adult life.  From the
5  military into civilian law enforcement.  And
6  I've continued to carry.
7     Q    Now, what do you use the federal
8  license for?  You said you're federally licensed
9  as an arms dealer?
10     A    Yes.  I have a federal firearms
11  license.  And it's more of a hobby than anything
12  else.  I do -- I am licensed to sell firearms.
13  I do that, if you're interested.  And that way I
14  can -- I can pursue my hobby.  I collect World
15  War II firearms.
16     Q    Do you have a collection of them?  I
17  mean you have --
18     A    Yes.  Yes, I do.
19     Q    Is it an extensive collection?
20     A    Not extensive.
21     Q    What does it include?
22     A    A Russian -- Russian -- World War II

4 (Pages 10 to 13)

Case 1:06-cv-01625-LFO    Document 39-3    Filed 01/14/2008    Page 6 of 62

March 29, 2007                William Maniaci              Maniaci vs. Georgetown
                             Washington, D.C.

Page 18

1    A    With security in my hotel.
2    Q    Okay.  When you go to the airport with
3    your weapon, how do you clear security?
4    A    There's a standard procedure.  A
5    firearm that you transport must be locked in a
6    lockbox, secured in your suitcase.  And it has
7    to be declared when you check in.
8         And the firearm is examined to make
9    sure it's not loaded.  The box is relocked.  And
10   it goes -- it goes through normal baggage.
11   Q    Uh-huh.  Do you have any other
12   licenses, federal or state, at this time?
13   A    No.
14   Q    Okay.
15        MR. FAY:  You mean even like a
16   driver's license?
17        MR. BUCKLEY:  Well, I realize that, as
18   you're pointing out, my -- my question would
19   have included that.
20   BY MR. BUCKLEY:
21   Q    So, yes, do you have a driver's
22   license?

Page 19

1    A    Yes, sir, I do.
2    Q    Any other licenses that you may have?
3    A    No.  Not that I can think of.
4    Q    Okay.  Have you taken any medications
5    in the last 24 hours?
6    A    Yes.
7    Q    What medications do you -- have you
8    taken?
9    A    I take medication for my blood
10   pressure.  I take medication for my -- my heart.
11   I take diuretics, which I just took a few
12   minutes ago.  And I take medication -- an
13   antistroke medication.  I take an
14   anticonvulsant.  And some dietary supplements,
15   calcium and vitamins.
16   Q    Have you taken all those medicines
17   within the last 24 hours?
18   A    Uh-huh.
19   Q    Okay.  Can you give me the names of
20   the medications you've taken?
21        MR. FAY:  Bill, say yes or no instead
22   of -- I realize today it's being videotaped.

Page 20

1    But on the transcript, it makes it difficult --
2         THE WITNESS:  Yes.
3         MR. FAY:  -- for the court reporter.
4    So.
5         THE WITNESS:  I don't know the names
6    of all the medications.  But I would be happy to
7    try to furnish you a list of -- of everything.
8    BY MR. BUCKLEY:
9    Q    Okay.  Can you do your best, since
10   we're here, to tell me the names that you do
11   recall.
12   A    I'd be happy to show them to you.
13   Q    Okay.  Do you have them with you?
14   A    I have some of them with me, yeah.
15   Q    Okay.  That's fine.
16   A    I've taken my morning meds.  And I
17   take medications four times a day.
18   Q    Uh-huh.
19   A    The noon medications are -- this is a
20   blood pressure med here.  This is a
21   multivitamin.  This is for my prostate.  This is
22   potassium.  And this is calcium.

Page 21

1    Q    Okay.  Are those the medications that
2    you take daily?
3    A    Daily, yes.
4    Q    Okay.  Were you taking those same
5    medications in February 2006?
6    A    Yes.  I believe so.
7    Q    Do you recall any additional
8    medications that you were taking at that time?
9    A    No.
10   Q    Why do you take those medications?
11   What are they for?  What medical conditions are
12   they for?
13   A    I have COPD.
14   Q    What is COPD?
15   A    It's chronic obstructive pulmonary
16   disease with emphysema.
17   Q    How long have you had that?
18   A    For several years now.
19   Q    And what are the symptoms of that?
20   A    I am very short of breath.  I can't
21   walk long distances without resting.  I have
22   difficulty climbing stairs.

6 (Pages 18 to 21)

Case 1:06-cv-01625-LFO    Document 39-3    Filed 01/14/2008    Page 7 of 62

March 29, 2007          William Maniaci          Maniaci vs. Georgetown
                        Washington, D.C.

Page 22

1          I have congestive heart failure.
2      Q    What are the symptoms of that?
3      A    Shortness of breath.  And I retain
4  fluid if I don't take diuretics.
5      Q    Okay.  Are there any other medical
6  conditions for what you're taking those
7  medicines?
8      A    I -- let's see.  I have -- I've had --
9  I take an antistroke medication.
10     Q    Have you had strokes in the past?
11     A    I've had -- not a stroke, but I've had
12  what they call a TIA.
13     Q    What is a TIA?
14     A    Like a mini stroke without --
15  resulting in no permanent disability.
16     Q    Okay.  What does -- what does TIA
17  stand for?
18     A    I -- I have no idea.  That's the
19  acronym that the doctors gave it.
20     Q    When did you last have a TIA?
21     A    Probably 6 or 8 months ago.  Last
22  summer.

Page 23

1      Q    Last summer.  What were the symptoms
2  when you experienced the TIA?
3      A    Stuttering.  The inability to express
4  myself properly.  And numbness and tingling in
5  my arms.
6      Q    Uh-huh.  Did you experience any
7  vertigo?
8      A    No.
9      Q    Or dizziness?
10     A    No.
11     Q    Okay.  Before that time, when did you
12  last previously experience a TIA, a mini stroke?
13     A    That was the first one.
14     Q    The first one was last summer?
15     A    Yes, uh-huh.
16     Q    The summer of 2006?
17     A    This past year, yes.
18     Q    Okay.  And is there some way you can
19  date it a little more precisely as to what month
20  you had this TIA, mini stroke?
21     A    I wish I could give you an exact date,
22  but I -- I can't.

Page 24

1      Q    Do you recall where you were?
2      A    I was in Reno.
3      Q    Okay.
4      A    And I spent, I believe, five days in
5  the Veterans hospital there in Reno, Nevada.
6      Q    What is the treatment for that, for
7  TIA?
8      A    I just received rest and monitored --
9  and they monitored my condition.  And I had a
10  CAT scan.  And I was discharged with a
11  medication that I take twice a day now to
12  prevent further episodes.
13     Q    Were you advised of the result of the
14  CAT scan?
15     A    Yes.
16     Q    What were you told?
17     A    I was told that there was no -- no
18  evidence of any damage as a result.  But there
19  was -- there was evidence what they call a TIA
20  which they told me was a mini stroke.  But I
21  have no residual damage.
22     Q    Have you been advised that you will

Page 25

1  experience any memory impairment because of
2  having had a TIA or mini stroke?
3      A    No, sir.
4      Q    Have you been advised that you've had
5  any ongoing impairment because of the mini
6  stroke?
7      A    No, sir.
8      Q    Okay.  Prior to -- again, prior to
9  last summer, the summer of 2006, have you ever
10  had a TIA or mini stroke before?
11     A    Not to my knowledge.
12     Q    That was the first one you've ever
13  had?
14     A    Yes, sir.
15     Q    Okay.  What medication do you take for
16  the mini stroke?
17     A    I don't know the name of the
18  medication.
19     Q    Is it one of the pills that --
20     A    Yes.
21     Q    -- that you showed us?
22     A    Yes, it is.

7 (Pages 22 to 25)

March 29, 2007          William Maniaci          Maniaci vs. Georgetown
                         Washington, D.C.

Page 26

1    Q    Could you just look at the pill today
2  and, perhaps, again, and just tell us which one
3  it is.
4    A    Yeah.  I'll be glad to.  It's this --
5  this capsule right here which I take twice a
6  day, once in the morning and once in the
7  evening.
8    Q    Does it have a name?  Do you see a
9  name?
10   A    On the medication?
11   Q    Yes.
12   A    No.  It just says 01A on here.
13   Q    Okay.  So is it correct, then, that
14 you were not taking that medication in February
15 19 -- excuse me, February 2006 --
16   A    Yes.
17   Q    -- when you --
18   A    Yes, sir.
19   Q    You say "yes, sir."  You mean you were
20 not taking that medication in February 2006?
21   A    That's correct.
22   Q    Okay.  But you started that medication

Page 27

1  over the summer of 2006.
2    A    Yes.
3    Q    Okay.  When you were experiencing the
4  symptoms and signs of the mini stroke, did you
5  know what was happening?  Did you have any
6  understanding of what the underlying problem
7  was?
8    A    Not immediately.  I did not.  As a
9  matter of fact, one of my friends, I was talking
10 to him on the telephone.  And he asked me if
11 something was wrong because apparently I was
12 slurring my words and stuttering, which I don't
13 usually do, at least not as bad as I was at that
14 time.  And he suggested that I get medical
15 attention.  And I talked to my wife.  And then
16 she recognized that something was wrong and she
17 took me to the hospital.
18   Q    Did you have any difficulty recalling
19 people's names or the correct word for objects?
20   A    Yes.  Yes.  I was addressing one of my
21 friends by someone else's name.
22   Q    Oh, really.  Who was that?

Page 28

1    A    I was talking to Bob Turk on the
2  telephone and I was calling him Jimbo, which is
3  another friend of mine.  And he said, wait a
4  minute, something is wrong here.
5    Q    Who is Jimbo?
6    A    A friend of mine.
7    Q    Okay.  So did Mr. Turk advise you to
8  seek medical attention?
9    A    I believe so.
10   Q    Okay.  Have you ever had pneumonia?
11   A    Yes.
12   Q    When?
13   A    I had a bout probably 2 months ago.
14 I'm not sure that it was pneumonia.  But I ended
15 up in the hospital for a day.  And probably
16 2 years ago, I had a bout with pneumonia.
17   Q    Were you hospitalized at that time as
18 well?
19   A    I think I was, yeah.
20   Q    And did the doctors advise you as to
21 what the underlying cause of the pneumonia was?
22   A    No.

Page 29

1    Q    Did they suggest it was related to
2  your emphysema in any way?
3    A    No.  I don't believe so.
4    Q    Are you a smoker?
5    A    Yes.
6    Q    How many cigarettes or packs of
7  cigarettes do you smoke a day?
8    A    Less than one.
9    Q    Less than a pack?
10   A    Yes.
11   Q    And how long have you had a smoking
12 habit at that level; that is, a half a pack a
13 day?
14   A    I smoked on and off since I was 16
15 years old.
16   Q    Okay.  And undoubtedly your physicians
17 have advised you that, particularly considering
18 you have emphysema, you shouldn't smoke.
19   A    Yes.
20   Q    And you've been told that more than
21 once, I would imagine.
22   A    That's right.

8 (Pages 26 to 29)

March 29, 2007               William Maniaci        Maniaci vs. Georgetown
                              Washington, D.C.

Page 30

1    Q   And you decided not to comply with
2  their medical advice?
3    A   They've left -- left it up to me
4  actually.
5    Q   Well, it's always up to the patient.
6    A   That's right.
7    Q   And why did you decide not to follow
8  their advice to stop smoking?
9    A   I enjoy smoking.
10   Q   Uh-huh.  Okay.  Did --
11      MR. FAY:  If this were a tobacco case,
12 I would say he was addicted by the negligence of
13 one of your clients, Mr. Buckley.
14      MR. BUCKLEY:  That can be your next
15 case.  I don't think we have any tobacco
16 clients.  But I'll check and advise you.
17 BY MR. BUCKLEY:
18   Q   Have you ever experienced asthma?
19   A   Yes.
20   Q   How long have you been an asthmatic?
21   A   I was asthmatic in I think around --
22 before I was -- before I left the military.

Page 31

1  Probably in 1975.  1976.  I started experiencing
2  chronic bronchitis and asthma.
3    Q   When was the last time you had some
4  physical problem because of asthma?
5    A   Every time I climb the stairs -- a
6  stairway, I have to pause.  I haven't had any
7  asthma attacks for years.
8    Q   Do you take any medication --
9    A   Yes, I do.  I take Singulair, which is
10 a oral medication.
11   Q   How often do you take that?
12   A   Every day.
13   Q   Is that one of the pills that you
14 showed us before?
15   A   It's -- yes, it is.
16   Q   Okay.  Have you ever had any surgery?
17   A   Yes, I have.
18   Q   What surgery have you had?
19   A   I had a broken tibia and fibula.  I
20 had --
21   Q   When did you have that?
22   A   That was in -- excuse me while I think

Page 32

1  here.  Nineteen -- probably 1987 or '88.
2    Q   How did that happen?
3    A   I was arresting a drunk and got him
4  down and put my -- my right leg on the ground.
5  And I was on top of him.  And my right leg was
6  between his -- his two legs.  And he scissored
7  on me and just snapped my leg like a toothpick.
8    Q   What surgery did you have to have
9  because of that?
10   A   I had surgery on my right -- right
11 leg, right knee, right ankle.
12   Q   How many fractures did you have, just
13 the fracture of --
14   A   Two.  The tibia and fibula were
15 broken.
16   Q   Okay.  And the surgery was to reset
17 them?
18   A   That's correct.
19   Q   And how long were you disabled because
20 of that?
21   A   Not very long.  I was in a cast.  And
22 I went back to work in a cast.  So maybe a week.

Page 33

1    Q   Okay.  Have you had any other surgery?
2    A   I had an operation on my right
3  shoulder --
4    Q   When was that?
5    A   -- for the rotator cuff.
6    Q   Okay.
7    A   That was early '90s.
8    Q   How did that happen?
9    A   I was, again, in the process of
10 holding somebody who was cuffed with this hand
11 and put -- and trying to put him in the car.
12 And he tried to run.  And I held on to the car
13 and held on to the cuffs, so he kind of jerked
14 my shoulder out.  But he didn't go anywhere.
15 And I ended up a couple of weeks later with an
16 operation on my right shoulder for the rotator
17 cuff.
18      I had a gallbladder operation.  And --
19   Q   What year was that?
20   A   Within the last 10 years.  I can't
21 remember the exact date.
22   Q   Okay.

9 (Pages 30 to 33)

March 29, 2007              William Maniaci          Maniaci vs. Georgetown
                            Washington, D.C.

Page 34

1    A    I had both lenses in my eyes replaced.
2    Q    Cataract surgery?
3    A    Yes.  The laser surgery.  And I had a
4  bullet removed from my right leg.
5    Q    When was that?
6    A    Let's see.  It was 1968.
7    Q    Uh-huh.
8    A    And I had --
9    Q    Who shot you?
10    A    Some North Vietnamese soldier, I
11  assume.  And I had surgery -- kind of
12  embarrassing.  I had anal surgery because I was
13  hit there with a ricocheting bullet or shrapnel.
14         And I don't recall any other
15  surgeries.  I think -- oh, yes.  There was one
16  other.  I have surgery on my neck to reduce
17  pressure on my spinal cord.  And that was a
18  result of an injury that I suffered in 1977, I
19  think.
20    Q    How did that come about?
21    A    We were assaulting a house in Hawaii,
22  known drug dealer.  The guy -- it was in the

Page 35

1  middle of the night.  No moon.  It was very
2  dark.  And this fellow had dug a ditch in the
3  back of his house 6 feet deep and 3 feet wide.
4  And I went into it head first and fractured my
5  cervical spine in doing that.
6    Q    Okay.  And that resulted in the
7  surgery you just described?
8    A    That's right.
9    Q    All right.  Have we covered all the
10  surgeries?
11    A    Yes, I think so.
12    Q    I noticed you brought two canes with
13  you today.
14    A    Uh-huh.
15    Q    Do you normally use two canes?
16    A    I normally walk with a walking stick
17  or a cane.  And I brought the other one because
18  it was the one that I was using when I was in
19  Georgetown.  And it shows -- it depicts that the
20  cane had been bent during the altercation that
21  we had.
22    Q    So you brought that cane with you

Page 36

1  today?
2    A    Yes, I did.
3    Q    Okay.  Normally you just use one cane
4  or walking stick?
5    A    That's correct.
6    Q    And in which hand do you hold it?
7    A    My left hand.
8    Q    Why is that?
9         MR. FAY:  Again, let -- let
10  Mr. Buckley finish the question --
11         THE WITNESS:  I'm sorry.
12         MR. FAY:  -- then start the answer.
13  Otherwise you get a jumble here, okay.
14  BY MR. BUCKLEY:
15    Q    In which hand do you hold the cane,
16  your left hand?
17    A    Yes.
18    Q    And why do you hold it in your left
19  hand?
20    A    I'm right-handed.  And it's just
21  convenient for me.  It seemed natural to hold it
22  in my left hand.

Page 37

1    Q    How long have you used a cane?
2    A    Probably since around 19 -- after I
3  retired from the police department, I started to
4  get arthritis in my hips.  And it just -- it's
5  easier for me to walk when I have that support.
6  So probably in -- since 2000.
7    Q    Is that because of the arthritis in
8  your hips?
9    A    Yes, sir.
10    Q    Is it also because of any of the other
11  conditions that you described, any of the
12  injuries that you sustained over the years?
13    A    No.  I can walk without the cane.  But
14  it steadies me.  And I rest frequently because
15  the -- it's painful to walk any great distance.
16  And the doctors recommended that I -- that I
17  walk with a cane or walking stick.
18    Q    In the last 5 years, have you ever
19  fallen?
20    A    Yes.
21    Q    How many times?
22    A    Twice.

10 (Pages 34 to 37)

March 29, 2007          William Maniaci          Maniaci vs. Georgetown
Washington, D.C.

Page 38

1    Q    When was the first time?
2    A    The first time was at -- here in
3    Washington, D.C.  And it was near -- nearby the
4    hotel where we had be staying.  And I just
5    blacked out and found myself on the ground and
6    picked myself up.  And that was the first time
7    that it happened.
8         The other fall that I had was because
9    I was clumsy and I tripped in a parking lot.
10   And that resulted in no injury.
11       Q    Have you ever felt that you were going
12   to fall or nearly fell at any other time in the
13   last five years?
14       A    Not that I can recall.
15       Q    Have you had any episodes of dizziness
16   in the last 5 years?
17       A    Yes.
18       Q    How many episodes of dizziness have
19   you had?
20       A    It's hard for me -- hard for me to
21   say.  Sometimes when I -- I think because the
22   blood pressure medication and things that I

Page 39

1    take, if I bend over and I stand up rapidly,
2    sometimes, I feel a little lightheaded.
3        Q    Uh-huh.
4        A    The doctors say that's perfectly
5    normal.
6        Q    Uh-huh.  Do you ever see flashes of
7    light or -- when that happens to you, when you
8    get up?
9        A    No, sir.
10       Q    Okay.  Have we covered all of your
11   medical conditions, illnesses and problems?
12       A    Not quite.  I'm subject to migraine
13   headaches.  I've had migraines ever since I was
14   in Vietnam.  And I was taking a medication for
15   the migraines as well.  But the migraines, as
16   I've gotten older, seem to have subsided quite a
17   bit.  I don't -- I don't experience them very
18   often anymore.
19       Q    Have you suffered any hearing loss?
20       A    Yes.
21       Q    How did that happen?
22       A    Explosions.  Close proximity to

Page 40

1    explosions while I was in the military.  And I
2    have tinnitus in both ears.
3        Q    Do you use hearing aids?
4        A    I have hearing aids but I don't -- I
5    don't wear them.  I don't think -- you know, as
6    long as I'm conversing with someone, if you see
7    me looking at your mouth, that supplements my --
8    my hearing loss.  And I -- I can understand
9    pretty easily that way.
10       Q    Are there occasions when you use the
11   hearing aids?
12       A    Sometimes.  Not very often.  When I
13   watch television, I use a head set.
14       Q    Okay.  How long have you had the
15   hearing aids?
16       A    Five or 6 years.
17       Q    Is that because some doctor prescribed
18   them?
19       A    Right.  I had -- I had a hearing test.
20   And I was found that I had a hearing loss in
21   both ears.  And tinnitus.  It's a high-pitched
22   squeal that just never goes away.

Page 41

1        Q    Were you told the extent of your
2    hearing loss?
3        A    I don't know in percentage wise.  It's
4    high frequency.
5        Q    I was going to ask that question.
6    High frequency hearing loss?
7        A    (Nodding head.)
8        Q    Okay.  How is your hearing today?  Can
9    you hear me?
10       A    Yes, sir, I can.
11       Q    Do any of the medications that you
12   take or that you have taken in the last 24 hours
13   impair in any way your ability to listen and
14   understand questions?
15       A    No, sir.
16       Q    Do any of those medications impair
17   your ability to respond to the questions?
18       A    No.
19       Q    Do any of those medications, to your
20   knowledge, impair your memory ability in any
21   way?
22       A    No.

11 (Pages 38 to 41)

March 29, 2007           William Maniaci           Maniaci vs. Georgetown
                         Washington, D.C.

Page 82

1   last -- last summer sometime we officially left
2   the organization.
3       Q    The summer of 2006?
4       A    Uh-huh.
5       Q    Okay.  Why did you join the JDL?
6       A    Because Antisemitism was on the rise
7   and rampant and I wanted to do something and do
8   my part, do something proactive against bigotry
9   and Antisemitism.
10      Q    What was the mission of the JDL?
11      A    The -- the JDL didn't have a mission
12  statement at that time.  The --
13      Q    Is it --
14      A    -- slogan -- they had a slogan.  The
15  slogan was "never again."
16      Q    What did that refer to?
17      A    It refers to the Holocaust.
18      Q    Did the JDL eventually have a mission
19  statement?
20      A    I don't recall a specific mission
21  statement from the Jewish Defense League.
22      Q    What positions did you hold within the

Page 83

1   JDL?
2       A    I was under Irv Rubin.  I was their
3   chief of security.
4       Q    What position did Irv Rubin hold?
5       A    He was the chairman.  And I was his
6   second in command or deputy chairman.
7       Q    During what period of time?
8       A    From about 1995 through the time that
9   Irv Rubin was incarcerated.
10      Q    What year was that?
11      A    Was it 2002?
12      Q    What were your responsibilities as
13  deputy chairman?
14      A    Mostly publicity.  I was decent in
15  writing.  Press releases.  I would accompany
16  Irv -- Irv lived in Los Angeles.  I lived in
17  Reno.  We didn't have a whole lot of direct
18  contact.  We kept in touch via the telephone.
19           And it was my job to organize, you
20  know, logistics when we were going somewhere and
21  made sure we had the hotel reservations and
22  proper equipment and liaison with agencies that

Page 84

1   we would be in contact with.
2       Q    You said you were deputy chairman and
3   you were also chief of security.
4       A    Right.  That was just a title.  This
5   was no security to perform.
6       Q    I'm sorry.
7       A    There was no security necessary.  It's
8   just a title that he gave me.
9       Q    Okay.  Was that the complete title or
10  was it longer?
11      A    Yeah.
12      Q    Chief of security?
13      A    Yeah.
14      Q    Okay.  Did you receive any
15  compensation --
16      A    None.
17      Q    -- for your services -- again, let me
18  finish the question.
19           Did you receive any compensation for
20  your services as deputy chairman or chief of
21  security?
22      A    No.

Page 85

1       Q    Did the JDL have any offices?
2       A    No.
3       Q    Did you ever become chairman of the
4   JDL?
5       A    Yes.
6       Q    When was that?
7       A    When Irv Rubin was incarcerated, I
8   took over as acting chairman.
9       Q    How long did you serve as chairman or
10  acting chairman, I should say?
11      A    Approximately 2 years.
12      Q    And when did you cease being acting
13  chairman?
14      A    I stepped down when we had a
15  leadership conference.  And because I wanted to
16  spend more time with my family.  I was retired.
17  And for health reasons.  And that's when Matt
18  Finberg took over as chairman.
19      Q    What year was that?
20      A    About 3 years ago.  I think.  Yeah,
21  about 3 -- 3 years ago.  Two or 3 years.
22      Q    2004, approximately?

22 (Pages 82 to 85)

March 29, 2007          William Maniaci          Maniaci vs. Georgetown
                        Washington, D.C.

Page 86

1    A    Approximately, yeah. I think.
2    Q    Were you always acting chairman or did
3 you ever become just chairman?
4    A    Well, when Irv Rubin died, I was the
5 chairman and retained that position until the
6 conference that we had. And I stepped aside and
7 we elected Matt Finberg.
8    Q    Where was the conference held?
9    A    At -- in Reno, Nevada, at the Atlantis
10 Hotel.
11    Q    And after you stepped down as
12 chairman, did you continue as chief of security?
13    A    Yes.
14    Q    And did you assume any other position,
15 such as deputy chairman or any other title?
16    A    No. No. I was chief of security.
17 The -- was slash -- security/intelligence. And
18 that involved keeping track of various nefarious
19 groups, Nazi groups, neo-Nazis, anti-Semitic
20 activities, and funneling that information to
21 the proper -- proper sources.
22    Q    When did you resign from the JDL?

Page 87

1    A    We left en mass as a result of the
2 conference that we had in Reno, the same
3 conference that Matt Finberg was elected
4 chairman. We left en mass after that.
5         Let me digress for a second. If
6 you're interested in the history of the JDL, I
7 would be glad to tell you why there was a break
8 between the JDL and the present organization.
9    Q    Okay. I'm going to ask you that
10 question. But I would just like to get the
11 sequence of events down first.
12         You said that you ceased being
13 chairman of JDL in approximately 2004?
14    A    That's right.
15    Q    And that Mr. Finberg succeeded you --
16    A    That's right.
17    Q    -- in that position?
18    A    That's right.
19    Q    And this was as a result of a
20 conference that was held in Reno, Nevada, at the
21 time?
22    A    That's right.

Page 88

1    Q    But something else happened in 2006
2 that caused you to leave the organization; is
3 that right?
4    A    Not -- not -- the phraseology is not
5 correct.
6    Q    Okay. Did you leave en mass in 2004?
7    A    It was final -- the break with the
8 Jewish Defense League was final about a year
9 ago. And it was because we -- we couldn't
10 accept the actions of Mr. Rubin and Mr. Krugel
11 and the publicity that that generated and the
12 bad press that the Jewish Defense League
13 received as a result of Mr. Krugel and
14 Mr. Rubin's actions.
15    Q    How long had you known Mr. Rubin?
16    A    Since 1992.
17    Q    Since 1992. Did he sort of recruit
18 you into the JDL?
19    A    We -- sort of. In fact, I called
20 them. I called them on the telephone and asked
21 them if there was a position for someone like
22 myself. And I said -- they said, why? And I

Page 89

1 said I would like to -- I would like to get
2 involved and fight bigotry and Antisemitism and
3 do it in whatever way I can that's within the
4 law.
5         And Mr. Rubin was very receptive. We
6 became friends, long-distance friends. He
7 visited me a couple of times in Reno, stayed at
8 my home.
9         We traveled to Coeur d'Alene, Idaho on
10 a couple of occasions, where we actively
11 confronted the Aryan Nations.
12    Q    Were you an admirer of Mr. Rubin?
13    A    I was a friend of Mr. Rubin's, not an
14 admirer, no.
15    Q    But you were a good friend of his.
16    A    I was a friend. As close as you can
17 be at a distance. We had a working
18 relationship.
19    Q    How frequently did you communicate
20 with him when say he was the chairman and you
21 were the deputy chairman?
22    A    Several times a week. We would talk

23 (Pages 86 to 89)

March 29, 2007          William Maniaci          Maniaci vs. Georgetown
Washington, D.C.

Page 90

1  on the phone about things that were happening in
2  the communities across the country.  We talked
3  about things that were going on in Israel.
4      Q    How often did you see him?
5      A    Sporadically.  As the needs arose, as
6  I had time, we would get together.  Like, for
7  example, if we went to Idaho.
8      Q    Did you socialize with him?
9      A    No.
10     Q    So when you would meet, it would be
11 always be related to business or activities of
12 JDL?
13     A    That's right.
14     Q    Who is Mr. Krugel?
15     A    Mr. Krugel is a person that I had only
16 met on one occasion.  And he was described as
17 having a close relationship to Mr. Rubin.  He
18 had been with the JDL for a number of years.
19 But that was down in Los Angeles.  So I had no
20 contact with him.
21     Q    Did he hold a position within JDL, a
22 title?

Page 91

1      A    According to the press he did.  And
2  according to what I knew he never had a
3  position.
4      Q    Are you aware that in December of 2001
5  Mr. Rubin and Mr. Krugel were arrested by the
6  federal government on charges of conspiring to
7  blow up the King Fahd Mosque in Los Angeles, as
8  well as the office of an Arab-American
9  Congressman, Darrell Issa?
10     A    Yes.  I'm aware of that.
11     Q    Were you ever interviewed by any law
12 enforcement officials in connection with the
13 charges against Mr. Rubin and Mr. Krugel?
14     A    No.
15     Q    No?
16     A    No.  Not to my recollection.  I -- no.
17 There was never any official interview that I
18 can recall.
19     Q    Do you agree that blowing up a mosque
20 would be a terrorist act?
21     A    Absolutely.
22     Q    Do you agree that blowing up the

Page 92

1  office of an Arab-American Congressman would be
2  a terrorist act?
3      A    Yes, I do.
4          MR. FAY:  Republican or democrat?
5  Scratch that.
6          MR. BUCKLEY:  I don't think it's a
7  laughing matter.
8          MR. FAY:  No.
9  BY MR. BUCKLEY:
10     Q    Mr. Krugel eventually plead guilty to
11 the charges?
12     A    That's what the newspaper said.
13     Q    And he was later murdered in prison.
14     A    That's right.
15     Q    Do you know how that came about, who
16 killed him?
17     A    I -- after he was murdered, I think it
18 was in Phoenix, Arizona, I wrote the US
19 Department of Prisons, under the, what is it,
20 Freedom of Information Act, requesting, you
21 know, information about the incident.
22          I received a letter back from them

Page 93

1  saying that the request was denied.  That the
2  matter was still under investigation.
3          Subsequent to that, the investigation
4  I think now has been closed.  It was discovered
5  that he was murdered while in the prison yard.
6  He was hit in the back of the head with a
7  concrete block which crushed his skull.  And the
8  perpetrator was a white supremacist.
9      Q    Now, Mr. Rubin died in jail before he
10 went to trial on the charges; is that correct?
11     A    Yes, sir.  No, he didn't die in jail.
12 He died in the hospital.
13     Q    He died in the hospital.  Was it a --
14 was he free?  That is to say, he died in a
15 hospital.  Wasn't he incarcerated after he was
16 arrested?
17     A    Yes, he was.  But he was hospitalized.
18 It wasn't in a prison.  After the incident in
19 the Los Angeles County Jail, I think it was.
20 I'm not sure.  I wasn't there.  But I was told
21 by his wife what had happened.
22     Q    What were you told?

24 (Pages 90 to 93)

March 29, 2007          William Maniaci          Maniaci vs. Georgetown
                        Washington, D.C.

Page 94

1    A    I was told he had been murdered.
2    Q    Were there also suggestions that he
3    had committed suicide?
4    A    There were.  But the Irv Rubin that I
5    knew personally, the impression that I had of
6    Mr. Rubin that he was a religious Jew and that
7    he would not commit suicide or take his own
8    life.  That would be a sin in our religion.
9    Q    And did his wife tell you who she
10   believed had murdered him?
11   A    She was a conspiracy theorist.  I had
12   no idea who the perpetrators might have been.
13   He had a lot of enemies, both -- mostly Muslim
14   and white supremacists.  I have no idea what
15   transpired.  Apparently there was no videotape
16   running when this incident occurred.  They tried
17   to say that he slashed his own throat with a
18   razor and jumped over the tier, a second or
19   third story tier and hit the concrete floor
20   below.
21       The Irv Rubin that I knew would not
22   have done something like that.

Page 95

1        And subsequently I talked to his wife
2    when he was in the hospital in Los Angeles.  And
3    she said that, quote, she says, I looked under
4    my husband's bandages, and there were no -- no
5    cuts on his throat.
6        So I don't know.  There was no autopsy
7    done because of his religion.  And....
8    Q    Did the coroner list the cause of
9    death as suicide?
10   A    I don't know.  I haven't seen a death
11   certificate.  And I don't know if there is still
12   an investigation on that incident.
13   Q    Now, did you become acting chairman of
14   JDL at the time that Mr. Rubin was arrested in
15   December 2001?
16   A    Yes.
17   Q    And, again, you held that position
18   until Mr. Finberg succeeded you sometime in
19   2004 --
20   A    Yes.
21   Q    -- as chairman?
22   A    Yes.

Page 96

1    Q    But when you were the acting chairman
2    of the JDL, what did you understand the JDL's
3    mission was?
4    A    To -- to confront bigotry and
5    Antisemitism.  To keep track of the people that
6    were the major -- major perpetrators, the major
7    dangers to the Jewish community, to support --
8    to support Israel and Israel defense forces to
9    support our community, community service.
10       We were a service organization, not a
11   violent organization.
12       We were -- would be confrontational,
13   if necessary, as far as -- and by that I mean we
14   had demonstrated against different things.
15       For example, Randy Weaver, if you're
16   familiar -- do you know who Randy Weaver is?
17   Q    No.
18   A    Randy Weaver was one of the people
19   that was involved in a shoot out with the --
20   with the FBI in Idaho and had a reputation of
21   supporting the Aryan Nations.  And he was
22   supposed to have been a guest speaker at a gun

Page 97

1    show in Reno, Nevada.
2        In my capacity, as chairman, I
3    contacted the Hilton Hotel in Reno and advised
4    them who this person was that was going to be a
5    featured speaker.  And they canceled his
6    appearance.  That's the type of thing that we
7    did.
8    Q    So why did you, again, eventually
9    resign from the JDL?
10   A    Because of the -- the stigma left
11   behind by Mr. Rubin.  And the accusations made
12   against him and Mr. Krugel were 180 degrees away
13   from anything that I wanted to be associated
14   with.  And the same held true with the rest of
15   our membership, at least the board of directors.
16       We had active duty police officers,
17   attorneys.  We're not the type of people that
18   want to be associated with anything that could
19   be considered terrorism.
20   Q    Are you aware that an FBI report in
21   2000 and 2001 on terrorism described the JDL as,
22   quote, a violent extremist Jewish organization,

25 (Pages 94 to 97)

March 29, 2007          William Maniaci          Maniaci vs. Georgetown
Washington, D.C.

Page 98

1  unquote?
2         MR. FAY:  Could you identify the
3  report?
4  BY MR. BUCKLEY:
5     Q   I'm just asking the question.  Are you
6  aware --
7     A   Yes.
8     Q   -- of this report?
9     A   Yes, I was.  It was written by one --
10  one agent.  It was not -- not the opinion of or
11  the policy of the Federal Bureau of
12  Investigation.
13     Q   Was it a report issued by the FBI?
14     A   It was issued -- it was written by
15  a -- an agent.  And it's a matter of record.
16     Q   It's a public report?
17     A   Yes.
18     Q   You've read the report?
19     A   Not the entire report.  I think I've
20  read the paragraph that you mentioned.
21     Q   Okay.  Were you aware that the
22  Southern Poverty Leadership Conference lists the

Page 99

1  JDL as a hate group?
2     A   Yes.
3     Q   And are you aware that the others on
4  that list prepared by the leadership conference
5  include, for example, the KKK and --
6     A   Yes.  I know who's on the list.  But
7  it's not accurate.  We're not a hate group.
8     Q   Mr. Finberg, he's a member of the JDL,
9  or was?
10     A   Yes.
11     Q   Is he still a member of the JDL?
12     A   No.
13     Q   Mr. Nutting, is he a member of the
14  JDL?
15     A   No.
16     Q   Was he at any time?
17     A   Yes.
18     Q   What positions did he hold within the
19  JDL?
20     A   He was the -- the chairman of the Los
21  -- the San Diego chapter.  And subsequently he
22  was the western regional director.

Page 100

1     Q   What area does that encompass?
2     A   Eleven western states.
3     Q   How long did he hold that position?
4     A   He's currently holding that position
5  and probably been involved as the western
6  director for a couple years, I guess.
7     Q   Is he still with the JDL?
8     A   No.
9     Q   I thought you said he's currently
10  holding that position.
11     A   Well, he holds that position in B'nai
12  Elim.
13     Q   Okay.  I want to get to that.  Let's
14  just stick, for now, with JDL.
15         So he was the western regional
16  director.  Referring, again, to --
17     A   Yes.
18     Q   -- Mr. Nutting.
19     A   Yes.
20     Q   Mr. Finberg, did he hold any positions
21  in addition to being, for a while, the chairman
22  of JDL?

Page 101

1     A   He was our corporate counsel.
2     Q   Was he ever your personal counsel?
3     A   He was my personal advisor during a
4  short period of time.
5     Q   You mean your personal legal advisor?
6     A   Yes.
7     Q   Did you ever pay him any money for his
8  services?
9     A   No.  It was pro bono.
10     Q   I just -- I don't want to know the
11  details.  Just describe the nature of the
12  services he provided to you as your counsel.
13         MR. FAY:  Well, I would object to
14  that.  That goes -- it's not my attorney/client
15  privilege.
16         MR. BUCKLEY:  Just the subject matter.
17  I don't want to know any communications.
18         MR. FAY:  Well, I don't --
19  BY MR. BUCKLEY:
20     Q   Were they with respect to strictly
21  personal matters?  Or did they relate to the
22  business of the JDL?

26 (Pages 98 to 101)

March 29, 2007          William Maniaci          Maniaci vs. Georgetown
                        Washington, D.C.

Page 102

1    A    They were, at the time, related
2  directly to the incident at Georgetown
3  University.
4    Q    Okay.  Mike Smith, do you know who he
5  is?
6    A    Yes, I do.
7    Q    Is he a member of the JDL?
8    A    No.
9    Q    Does he have any connection with the
10  JDL?
11   A    No.
12   Q    How do you know him?
13   A    He is a member of B'nai Elim.
14   Q    Okay.  I'll get back to him in a
15  minute in connection with that relationship.
16       Mr. Turk, what was his position within
17  the JDL?
18   A    He was chairman of JDL Connecticut.
19  And then he was -- became eastern regional
20  director.
21   Q    And Mr. Bailey, was he a member of the
22  JDL?

Page 103

1    A    No.
2    Q    As of February 18th, 2006, is it
3  correct that you were then the deputy chairman
4  of the JDL?
5    A    I was either deputy chairman or
6  chairman.  I don't know what the situation was
7  at that time.
8    Q    At the same time, you were also chief
9  of security and intelligence for the JDL?
10   A    Yeah.
11   Q    And at that time, again referring to
12  February 18th, 2006, Mr. Finberg was the
13  corporate counsel for JDL?
14   A    Yes.
15   Q    And Mr. Nutting was the western
16  regional director of JDL?
17   A    Yes.
18   Q    And Mr. Turk was the eastern regional
19  director of JDL?
20   A    Yes.
21   Q    Okay.  When was the B'nai Elim --
22   A    Elim.

Page 104

1    Q    Is that how it's pronounced?
2    A    B'nai Elim.
3    Q    B'nai?
4    A    Elim.
5    Q    B'nai Elim?
6    A    Yes.
7    Q    When was that organization formed?
8    A    It was formed when we decided to
9  disassociate ourselves from the Jewish Defense
10  League.
11   Q    And when was that?
12   A    That was -- it was decided at -- not
13  this conference, but the year before.
14       Can I -- can I digress for a second?
15   Q    Go ahead.  I think it would be
16  helpful.
17   A    Okay.  We -- we decided, the group
18  of -- the board of directors, the people -- some
19  of the people that you've named but not all,
20  that we didn't want to be associated with the
21  Jewish Defense League because of the reputation
22  that they had developed.  And it was something

Page 105

1  that, even though we tried very diligently to
2  overcome could not be overcome.
3       There was a lawsuit filed by us
4  against Shelley Rubin over the -- over the name
5  of the JDL.  And that was prosecuted by
6  Mr. Rubin -- I mean, by Mr. Finberg and, quite
7  frankly, was mishandled.  And as a result, we
8  withdrew the lawsuit and we left the Jewish
9  Defense League and formed a new organization
10  named B'nai Elim.
11       The current -- the JDL is currently
12  still -- still alive under the stewardship of
13  Shelley Rubin and Irv Rubin's son, Ari, to the
14  best of my knowledge.  But I've had no
15  communication with them at all.
16   Q    Did B'nai Elim exist in February 2006?
17  Had it been formed by that time?
18   A    I don't know what the exact dates
19  were.  When we left -- when the lawsuit was
20  withdrawn against Shelley Rubin, then we decided
21  to form a new organization.  And it was formed,
22  I believe, by Mr. Finberg and incorporated in --

27 (Pages 102 to 105)

March 29, 2007          William Maniaci          Maniaci vs. Georgetown
                        Washington, D.C.

Page 106

1  in Denver. But I'm not -- I'm not -- I don't
2  have the details. I'm not -- it wasn't my
3  position to know the details.
4      Q   Who would -- who would know when B'nai
5  Elim was formed?
6      A   Mr. -- the exact dates would be known
7  by Mr. Finberg. He would -- he did the legal
8  work for it.
9      Q   To the best of your recollection, when
10 you were at Georgetown in February of 2006 --
11     A   It was still JDL.
12     Q   All right. It was still JDL.
13     A   Yes.
14     Q   And B'nai Elim had not yet been
15 formed.
16     A   That's right.
17     Q   So you were there under the auspices
18 or for the JDL.
19     A   We were there as the Jewish Defense
20 League; that's right.
21     Q   Okay. Okay. Now, let me -- ask you
22 about this lawsuit that you said that you filed

Page 107

1  against Mrs. Rubin and that was mishandled.
2  What did you mean when you said it was
3  mishandled?
4      A   The court dates -- some of the dates
5  were not met. I think some of the deadlines
6  were not met. And as a result, I don't know
7  what the legal procedures were. I was not in
8  Denver. And Mr. Finberg was out of the country,
9  I believe in Israel. And he left the -- he left
10 the filings or whatever had -- deadlines had to
11 be met up to his associates in his law firm.
12 And something -- things were missed. And it
13 was -- came to a point where it would have been
14 impossible for us to proceed. And so it was
15 withdrawn.
16     Q   Did Mrs. Rubin ever sue you --
17     A   No.
18     Q   -- over this matter?
19     A   No. She did not. They threatened a
20 lawsuit, but it was never filed.
21         MR. FAY: Wait until the question is
22 finished before you answer, Bill.

Page 108

1      (Maniaci Exhibit No. 5 was marked for
2  identification.)
3  BY MR. BUCKLEY:
4      Q   Let me show you what's been marked as
5  Exhibit 5. You'll see it's a document called
6  Complaint for Unfair Competition, Trademark
7  Dilution, Trademark Infringement, Invasion of
8  Privacy, Declaratory Relief and Related Causes
9  of Action. It's filed in the United States
10 District Court for the Central District of
11 California.
12     It lists the Jewish Defense League
13 Inc., a New York corporation, along with Shelley
14 Rubin, Ari Rubin, Kelman Rubin, and Shelley
15 Rubin as plaintiffs. And it lists as defendants
16 Mr. Finberg, yourself, and others. Do you see
17 that?
18     A   Yes.
19     Q   Were you aware of this lawsuit?
20     A   I was told that if we did not drop
21 our -- this was -- this came to me from our
22 attorney. That if we did not agree to drop our

Page 109

1  lawsuit, then Ms. Rubin had planned on suing
2  each one of us as an individual. And it was
3  coercion because none of us could afford to
4  defend this kind of a lawsuit. So we dropped
5  our lawsuit. This was withdrawn, and that was
6  the end of this matter.
7      Q   Do you see on the first page there's a
8  stamp indicated this is actually docketed on
9  March 2006. So it was actually filed.
10     A   I wasn't aware of that.
11     Q   Were you served with the complaint and
12 summons?
13     A   I may have been. I don't remember.
14     Q   And how was this lawsuit resolved?
15 Exhibit Number 5, how was that resolved?
16     A   It was withdrawn, as far as I know.
17     Q   All right.
18     A   It was a condition of us dropping our
19 lawsuit. And Mr. Finberg said, unless we
20 dropped out suit against them, that they would
21 proceed against us.
22     Q   Okay.

28 (Pages 106 to 109)

March 29, 2007                William Maniaci            Maniaci vs. Georgetown
                              Washington, D.C.

Page 114

1    Q    Okay. Who have been the chairman of
2  the B'nai Elim since its inception?
3    A    Excuse me.
4    Q    Who have the chairmen been of B'nai
5  Elim been since its inception?
6    A    Since its inception, it's been
7  Mr. Finberg and Mr. Turk.
8    Q    And your position as also been just as
9  chief of security?
10   A    Intel. Intelligence.
11   Q    Intelligence. Okay. Is Mr. Bailey a
12 member of B'nai Elim?
13   A    No.
14   Q    Is Mr. Smith a member of B'nai Elim?
15   A    Yes.
16   Q    He is?
17   A    Yes, sir.
18   Q    And does he have a title?
19   A    No.
20   Q    I think you told me before that
21 Mr. Smith was not a member of JDL.
22   A    He wasn't.

Page 115

1    Q    Okay. How did you get to know
2  Mr. Smith?
3    A    I was introduced to him. But I don't
4  recall exactly how we met. I think I met him in
5  a kosher deli here in D.C. I can't remember the
6  name of it.
7    Q    What year?
8    A    It was when we came up here to
9  Georgetown. For the demonstration at
10 Georgetown.
11   Q    You met him here at that time in a
12 kosher deli in D.C.
13   A    Yes, yes.
14   Q    Did you meet him before you went to
15 the Georgetown campus on Saturday,
16 February 18th?
17   A    Yes. Yes, I did.
18   Q    So how many days were you here before
19 the conference?
20   A    I was here 3 or 4 days before the
21 conference. I don't recall it specifically.
22 Two or 3 days maybe.

Page 116

1    Q    So in that period 2 or 3 days before
2  the conference, you met him and befriended him?
3    A    I don't recall the specifics of how we
4  met right now. I really don't. We -- we met.
5  And subsequently found that we had things in
6  common and we were friends. There's not that
7  many Jewish cops around, you know.
8    Q    Okay. What things did you have in
9  common with him?
10   A    Being Jewish --
11   Q    A Jewish cop?
12   A    And being police officers. Yeah.
13   Q    All right. How about Mr. Bailey? How
14 did you meet him?
15   A    I met Mr. Bailey years ago. He
16 contacted the Jewish Defense League and -- but
17 he never became a member. He never filled out
18 an application. He never paid any dues.
19        And he was kind of a groupie, but a
20 nice kid. By kid, he's in his 50s.
21   Q    That's a kid?
22   A    Yeah.

Page 117

1        MR. FAY: To us.
2        THE WITNESS: And he -- he was the son
3  of a Holocaust survivor. He's a volunteer guide
4  at the Holocaust Memorial Museum here. And he
5  had very strong feelings about Antisemitism.
6        The first time Mr. Bailey joined with
7  us in anything is when -- do you recall several
8  years back, I don't know the year, but it's when
9  the Nazis were supposed to have a march on
10 Washington, D.C. And it turned out that they
11 never showed up, but there was a million dollars
12 in overtime expended by the police department.
13 And they wanted to sue the Nazis for that, your
14 chief of police did.
15        Anyway, we were here for that. That
16 was the first time that I had had any
17 physical -- you know, met Mr. Bailey in person.
18 And he seemed like a nice kid, a nice guy. And
19 he just kind of wanted to tag along and we had
20 no objections to that.
21 BY MR. BUCKLEY:
22   Q    So not a member but a supporter of

30 (Pages 114 to 117)

March 29, 2007         William Maniaci         Maniaci vs. Georgetown
                       Washington, D.C.

Page 122

1  wasn't -- I didn't see any dues.  Maybe once in
2  a great while, if I got an application in from
3  someone, there would be $36 in it.  And that
4  would go for -- for computer paper and ink or
5  something.
6      Q    Who paid the AmEx bills?
7      A    I did.
8      Q    All the AmEx bills out of your own
9  funds?
10     A    That's right.
11     Q    If you were paying them out of your
12 own funds, why did you have a JDL credit card?
13     A    Because I was the chairman of JDL.
14 And I didn't want to mingle -- mingle -- I just
15 did it.  There was no real reason.
16     Q    You say you didn't want to mingle but
17 you're saying there were no JDL funds.
18     A    There weren't.  There were no JDL
19 funds.  But I didn't want to have my expenses
20 that were related to the Jewish Defense League
21 on a personal credit card.  I did it on the JDL
22 credit card but I still paid the bill.

Page 123

1      Q    All right.  When you came to
2  Washington in February 2006 for the conference
3  at Georgetown University, did you use the JDL
4  AmEx card --
5      A    No.
6      Q    -- for your -- let me finish asking
7  the question.
8      A    Okay.
9      Q    Did you use the JDL AmEx card for your
10 hotel expenses or your rental car or any other
11 expenses, including meals, while you were here?
12     A    I did not.  However, there was a debit
13 card from our bank account that Mr. Finberg had
14 opened.  And I believe Mr. Turk was using that.
15     Q    Well, how did you pay for your hotel
16 bill when you were here in February 2006?
17     A    The B'nai Elim -- or not B'nai Elim,
18 but the -- there were funds available from a
19 donation, as I recall, that -- that was paid for
20 out of JDL funds.  That was paid for out of JDL
21 funds that were a result of a large donation, a
22 single donation.

Page 124

1      Q    Who made the donation?
2      A    I don't recall the lady's name.  It
3  went to the Jewish Defense League.  It was
4  deposited in Colorado.  And I don't recall her
5  name.  I wrote her a letter of thank you.  But I
6  don't recall the lady's name.
7      Q    Was the donation made for the specific
8  purpose of funding the JDL activities at the
9  Georgetown conference?
10     A    No.  It was just a -- it was a check
11 made out to the Jewish Defense League.
12     Q    And when was that donation made?
13     A    I don't know.  I don't remember the
14 date.
15     Q    What was the amount?
16     A    $15,000.
17     Q    And so you drew down on those funds in
18 order to defray your expenses in connection with
19 the Georgetown conference?
20     A    Yes.
21     Q    And that included your hotel room when
22 you were here?

Page 125

1      A    Yes.
2      Q    And your meals?  And your
3  transportation?
4      A    For the most part.
5      Q    You rented a car when you were here,
6  correct?
7      A    There was a car rented.  I don't
8  remember if I rented it or if somebody else
9  rented it.
10     Q    Well, you drove it, didn't you?
11     A    I think so.
12     Q    Do you recall driving it?
13     A    Yeah, I do.  I do recall driving the
14 car.
15     Q    Where did you drive it?
16     A    I drove it from -- from our hotel to
17 Georgetown University.
18     Q    Where was the car picked up?
19     A    I don't remember.  The airport, I
20 suppose.
21     Q    Do you recall what rental agency?
22     A    No.

32 (Pages 122 to 125)

March 29, 2007                    William Maniaci          Maniaci vs. Georgetown
                                   Washington, D.C.

Page 126

1      Q    And how about your airfare?  Again,
2  that was paid for by the JDL?
3      A    Uh-huh.
4      Q    Do you recall if that was put on the
5  debit card or AmEx card of the JDL?
6      A    It was not put on the AmEx card.  It
7  was -- to the best of my knowledge, it was all
8  debit.
9      Q    From a bank account that was the JDL's
10  bank account --
11      A    That's right.
12      Q    -- that Mr. -- I forget his name.
13      A    Finberg.
14      Q    No, no.  Someone maintained.  A person
15  in Chicago.
16      A    Mr. Finberg maintained the account in
17  Colorado.  But our treasurer -- the official
18  treasurer was Ian Sigel.
19      Q    Okay.
20      A    And, back then, the treasurer was Rich
21  Miller, too.  Let me -- I got the names
22  confused.  Ian Sigel is our treasurer --

Page 127

1  treasurer now.  At the time that we went to
2  Georgetown, Richard Miller was the treasurer.
3  And he lives in Boulder, Colorado.  I think it's
4  Boulder.  Close to Denver.
5      Q    Okay.
6          MR. BUCKLEY:  We're up to Exhibit 6.
7          (Maniaci Exhibit No. 6A, 6B and 6C was
8  marked for identification.)
9  BY MR. BUCKLEY:
10      Q    Again, I'm going to show you three
11  copies of photographs that I've marked as
12  Exhibit 6 A, B and C.  I believe these were
13  photographs that were taken off of the B'nai
14  Elim Web site.  I'm just going to hand you
15  what's now been marked -- let me make sure I
16  have the right sequence here.  This is -- this
17  is A.  Okay.
18          Looking at what's been marked as
19  Exhibit A, can you identify the persons in the
20  photograph.  Beginning -- starting at the left
21  and moving to the right.
22      A    From left to right, this is Mike

Page 128

1  Smith.  On the left.  In the center, that's
2  George Haas.  George is a dentist up in
3  Connecticut.  And that's me on the right.
4      Q    Okay.  When was the photograph taken?
5      A    It may have been taken when we were
6  here for Georgetown.
7      Q    Why do you say that?
8      A    Well --
9      Q    Why do you think it may have been?
10      A    It could have been.  We were
11  together -- it could have been -- in fact, it
12  probably was.  Because George Haas is there and
13  George was with us.  So this could have been in
14  the kosher restaurant.  Or it looks like a
15  restaurant where we might have had dinner or
16  something.
17      Q    This is not Mr. Smith's house?
18      A    No.
19      Q    Okay.  Was Mr. Haas, he was at the
20  Georgetown conference?
21      A    Yes.
22      Q    Was he in Gaston Hall at the time of

Page 129

1  the incident?
2      A    No.  He was at our table that we had
3  rented in the cultural center.  We had two
4  tables, as a matter of fact.
5      Q    Okay.  Look at Exhibit 6 B and again,
6  beginning at the left-hand side, would you just
7  identify the persons shown in that photograph?
8      A    Myself.  Beginning with myself.
9  Followed by Jim Nutting.
10          MR. FAY:  This is left as he faces the
11  photograph.
12          MR. BUCKLEY:  That's correct.
13          MR. FAY:  Yeah.
14          THE WITNESS:  That's Dr. Paul Williams
15  in the center.
16  BY MR. BUCKLEY:
17      Q    Who is Dr. Paul Williams?
18      A    He's an evangelist minister who is our
19  friend.  The next person with the white hair,
20  I -- I'm not familiar with him, with his name.
21          Following that, in the dark glasses,
22  is Bob Turk.  And then on the end, I believe

33 (Pages 126 to 129)

March 29, 2007                    William Maniaci          Maniaci vs. Georgetown
                                  Washington, D.C.

Page 138

1  significance of Georgetown University and its
2  prominence in the country, that this would be
3  the right time to confront the lies being told
4  about Israel.
5      Q    Was there a meeting at which you, that
6  is, you being members of JDL, discussed whether
7  to attend the conference, that you should attend
8  and what you should do at the conference?
9      A    We're all from different parts of the
10  country.  And our communication was done by --
11  mostly by telephone.
12      Q    Do you recall a face-to-face meeting
13  with anyone where you planned the activities
14  relating to the Georgetown conference?
15      A    I'm sure we did, after we arrived
16  here.  Everybody met prior to the -- to the
17  Georgetown conference.
18          There was planning done over the
19  telephone.  There was a lot of work done on the
20  East Coast, where they were inviting --
21  elderlies used to come down from different
22  cities, Boston or Baltimore.  Bob -- Bob Turk

Page 139

1  and Mr. Faybyshenko handled the busing
2  arrangement.  But there were two bus loads of
3  elderly people that came down to Georgetown to
4  protest.
5          There was prior planning.
6  Mr. Faybyshenko and Mr. Turk were the ones that
7  did the -- made the arrangements.
8      Q    Who is Mr. Faybyshenko?
9      A    Gennadiy Faybyshenko.  He's a member.
10  He was a member of JDL.  He's a member of B'nai
11  Elim.  And he's the New York operations
12  director.
13      Q    And --
14      A    And he was the director for Russian
15  affairs as well.  Because there's a lot of
16  Russian immigrants here.  And he's -- he's a
17  native Russian and speaks the language fluently.
18      Q    What did he arrange for?
19      A    There was -- arrange for two bus loads
20  of elderly people that were actually Russian
21  immigrants, some of them Holocaust survivors,
22  that came down to protest the event on

Page 140

1  Georgetown University on the second day.
2      Q    Did JDL pay for their expenses?
3      A    Yes.  They paid for the buses, bus
4  transportation.
5      Q    How about the lodging and meals?
6      A    There was no lodging.  They returned
7  the same day.
8      Q    They came down on a Saturday and went
9  back the same day?
10      A    They came down Sunday morning and rode
11  the bus back.
12      Q    Oh, they were just there on Sunday?
13      A    Just on Sunday, yes.
14      Q    Okay.  Were there any other people who
15  were bused in for Saturday?
16      A    No.  Not to my knowledge.
17      Q    And Mr. Turk and, again, Mr. -- I have
18  to get my mouth around that name.
19      A    Faybyshenko.
20      Q    Faybyshenko were responsible for the
21  busing arrangements for people to come down on
22  Sunday?

Page 141

1      A    Yes.
2      Q    Is that right?
3      A    That's correct.
4      Q    Okay.  Who from the JDL attended the
5  Georgetown conference?
6      A    There was myself and Mr. Finberg and
7  Mr. Nutting and Mr. Haas.
8      Q    Anybody else?
9      A    I don't think so.  No, I believe
10  that's -- I believe that's pretty much it.
11      Q    So -- and then Mr. Smith and
12  Mr. Bailey, who were not JDL members, they were
13  persons whom you met with once you came to
14  Washington --
15      A    Right.
16      Q    -- and then they went over to the
17  Georgetown campus on -- on Saturday, correct?
18      A    Not entirely.  Mr. -- Mr. Bailey came
19  with us.  And Mr. Smith didn't come with us.  He
20  was there.  But he wasn't part of our activity.
21  He was there because he wanted to be there.
22  And -- but he didn't participate in any

36 (Pages 138 to 141)

March 29, 2007                William Maniaci              Maniaci vs. Georgetown
                            Washington, D.C.

Page 142

1   demonstrations.  He was there as a interested
2   observer.
3       Q    Did he register for the conference?
4       A    I don't know.
5       Q    Did Mr. Bailey register for the
6   conference?
7       A    I don't know.
8       Q    But you distinguished between
9   Mr. Smith's attendance and Mr. Bailey's
10  attendance?
11      A    Mr. Bailey was with us.  He was -- he
12  attended the -- he attended the lecture.  So if
13  he attended the lecture, he had to register or
14  he couldn't have gotten in the lecture.
15      Q    Okay.  I think you didn't mention the
16  name Mr. Turk.  But obviously Mr. Turk was there
17  as well.
18      A    Yes, he was.
19      Q    Okay.
20      A    So was Mr. Finberg and so was
21  Mr. Nutting.
22      Q    Okay.  So the JDL would have paid for

Page 143

1   their expenses; that is, yours, Mr. Nutting,
2   Mr. Finberg, Mr. Haas and Mr. Turk?
3       A    As far -- the registration?
4       Q    Yes.
5       A    Probably.
6       Q    And also the transportation and meals,
7   lodging, when you were here?
8       A    It's not fair to say the meals because
9   I -- we took meals out of our pocket.
10      Q    Okay.  But it's fair to say the
11  transportation and the lodging --
12      A    Yes, sir.
13      Q    Those expenses were paid for by JDL?
14      A    Yes.
15      Q    Okay.  What is Operation Gideon?
16      A    That was a -- that was a name that we
17  gave the operation for Georgetown.
18      Q    Who gave it that name?
19      A    I don't recall.
20      Q    Why did you call it Gideon?
21      A    No particular reason.
22      Q    What is the Biblical significance of

Page 144

1   Gideon?
2       A    It brings to mind the sort of Gideon.
3   Gideon was a heroic figure.
4       Q    In the Bible, what did Gideon do?
5       A    I don't remember.
6       Q    Are you familiar with Gideon's
7   trumpet?
8       A    It could be.  Yeah.
9       Q    What happen to the walls of Jericho?
10      A    They came tumbling down.
11      Q    They certainly did.
12           MR. FAY:  The only Gideon I know was
13  the guy that was in the case.
14           MR. BUCKLEY:  I didn't think I could
15  beat you on the Old Testament.
16           THE WITNESS:  I think it was referring
17  to -- Gideon, as I recall, was a film called the
18  Sword of Gideon.  Do you remember that?  And
19  that was an operation by the Israeli Mossad.  So
20  that was called the Sword of Gideon.  So maybe
21  we picked -- picked the name up from that.
22  BY MR. BUCKLEY:

Page 145

1       Q    What was that operation?
2       A    It's probably still classified.  I'm
3   not sure.
4       Q    You would have access to classified
5   information relating to the activities of the
6   Mossad?
7       A    No.  I don't have any access.
8       Q    Well, tell me what you know then.
9       A    I don't know anything.
10      Q    Well, you mentioned this operation by
11  the Mossad.
12      A    It was a movie.  There was a movie
13  called --
14      Q    Oh, it was a movie?  I see.
15      A    There was a movie called Operation of
16  Mossad.
17      Q    Excuse me.  When did the movie come
18  out?
19      A    It's been 10 years ago.  Ten, 15 years
20  ago.
21      Q    Okay.  I'll have to rent it.
22      A    You'd enjoy it, I'm sure.

37 (Pages 142 to 145)

March 29, 2007               William Maniaci          Maniaci vs. Georgetown
                              Washington, D.C.

Page 146

1    Q    So the -- the activities of JDL in
2    connection with the conference held at
3    Georgetown that was referred to by JDL was
4    Operation Gideon?
5    A    Initially, yeah.
6    Q    Okay.
7    A    And then we just, it -- yeah.  We gave
8    it a name.  But then it didn't really mean
9    anything.
10    Q    Who led the planning for the JDL
11    activities in relation to the conference?
12    A    Myself and Mr. Turk were the primary.
13    Q    What did your plans entail, broadly
14    speaking?
15    A    To find out what was being said.  We
16    wanted to attend the conference.  We wanted to
17    collect -- my intention was to collect
18    intelligence, to find out who the speakers were,
19    what they were saying, to have our people attend
20    the seminars and find out what was being said
21    and what was going on, so that we could -- we
22    could counter the information that was being --

Page 147

1    you know, the false information that was being
2    espoused.  We wanted to be able to know our
3    enemy, in other words.
4         We also planned to demonstrate
5    peacefully outside of the hall where these --
6    these events were being held.
7         And there were signs and Israeli flags
8    being waved.  And it was an expression of
9    support for Israel and support for the United
10    States.  Because these people were blaming the
11    United States for all the ills in the world,
12    along with Israel.
13    Q    Did you disagree with the aim of the
14    conference?
15    A    Yes.  The aim of the conference was
16    divestment from Israel.  Of course we disagree
17    with that.
18    Q    Explain what divestment from Israel
19    means.
20    A    Divestment from Israel means a
21    withdrawal of any financial support or
22    investment in Israel.  Israeli businesses,

Page 148

1    Israeli-made products.  Whatever business
2    relationship an institution may have with the
3    State of Israel or an Israeli business,
4    divestment means to end that relationship.
5    Q    And you understood that the objective
6    of the Palestine Solidarity Movement was
7    divestment from Israel?
8    A    That's one of their -- yes, sir, I
9    did.
10    Q    And did you desire to protest that
11    objective?
12    A    We desired to show our support for the
13    State of Israel and for the United States.
14    Q    But did you intend to protest the
15    message of the conference; that is, the
16    Palestinian student -- or I should say the
17    Palestinian Solidarity Movement's objective of
18    divesting from Israel?
19    A    Was that our intent?
20    Q    Yes, to protest that.
21    A    A peaceful protest, yes.
22    Q    And how were you going to protest?

Page 149

1    A    Outside like -- like exactly what was
2    done.  A show of Israeli and American flags.
3    Q    How about inside the conference
4    itself.  What was your plan?
5    A    To gather information.  To listen.
6    There was a question and answer period.  And I
7    took that opportunity to answer -- to ask a
8    question.  But I had no idea that there was
9    going to be a question and answer period.
10         (Maniaci Exhibit No. 7 was marked for
11    identification.)
12    BY MR. BUCKLEY:
13    Q    Okay.  Let me show you what's been
14    marked as Defendants' Exhibit Number 7, which is
15    a document that you produced.  It's Bates
16    stamped M 83 through M 86.  It's entitled, on
17    the first page, JDL, Operation Gideon.
18         Does this refer to the JDL's plans in
19    connection with the Palestinian Solidarity
20    conference held at Georgetown?
21    A    I believe so.  But if you allow me a
22    minute, I would like to read the document.

38 (Pages 146 to 149)

March 29, 2007              William Maniaci              Maniaci vs. Georgetown
                            Washington, D.C.

Page 154

1  correct?
2       A    The international solidarity movement
3  is the mother organization of the off shoot
4  student organization in support of Palestine.
5       Q    Turn to page 3 of the document.
6       Directing yourself -- your attention,
7  rather, to the first paragraph, you state,
8  quote, we suspect that Georgetown University
9  will attempt to prohibit members of this
10 organization or other supporters of Israel from
11 having an opportunity to be heard and to
12 verbally interact with attendees of this
13 conference for the purpose of refuting the lies
14 which will be spoon-fed to impressionable
15 students and others attending the conference,
16 end quote.
17      Again, you wrote that?
18      A    I think so, yeah.
19      Q    And what was the basis for your
20 assertion that Georgetown University would
21 attempt to prohibit the JDL and other supporters
22 of Israel from having an opportunity to be heard

Page 155

1  and verbally interact with the attendees of the
2  conference?
3       A    There have been a history of -- for
4  example, are you familiar with Daniel Pipes?
5  Have you ever heard the name Daniel Pipes?
6       Q    Yes.
7       A    He has been at universities trying to
8  speak.  And he has been drowned out by members
9  of Palestinian support groups.  And universities
10 have taken no action whatsoever to stop this.
11      And it was our -- our belief that,
12 since Georgetown was allowing this conference to
13 be on -- you know, at the university, that they
14 wouldn't take any action that would be fair or
15 balanced with regard to the message the
16 Palestinian student association was trying to
17 put out.
18      Q    Prior to February 2006, had you ever
19 attended -- strike that.
20      Prior to February 2006, had you ever
21 been on the campus of Georgetown University?
22      A    No, sir, I have not.

Page 156

1       Q    Do you have any personal familiarity
2  with Georgetown University's past experience,
3  for example, in allowing the free exchange of
4  ideas at conferences held at the university?
5       A    I read their -- their policies
6  regarding the free exchange of information.
7       Q    Okay.  But my question is:  Did you
8  have any personal knowledge of what had
9  transpired in any prior conferences at
10 Georgetown University respective of what groups
11 were sponsoring the conferences?
12      A    No.
13      Q    Were you personally aware of any
14 instance where Georgetown University had
15 prohibited, say, members of the JDL from having
16 an opportunity to be heard?
17      A    No.
18      Q    Were you, per se, familiar with any
19 instance in which Georgetown University had at
20 any other conferences prevented anybody from
21 having an opportunity to be heard?
22      A    No.

Page 157

1       Q    Directing your attention, again, to
2  page 3, you wrote in the third paragraph, quote:
3  We suspect that Georgetown University will
4  attempt to cause our members and supporters who
5  attempt to participate in the conference to be
6  arrested for trespassing and other false and
7  trumped up charges, unquote.
8       Again, you wrote that?
9       A    Yes, I did.  I think --
10      Q    What was your basis for suspecting
11 that Georgetown would attempt to have JDL
12 members arrested for trespassing?
13      A    I think I was having a psychic moment.
14      Q    At the time, did you have any
15 knowledge that Georgetown University had ever
16 caused anyone to be arrested for trespassing or
17 arrested on any other false -- so-called false
18 or trumped up charges for participating in a
19 conference held at Georgetown?
20      A    No.
21      Q    When you registered at the conference,
22 you made clear that you were connected with JDL,

40 (Pages 154 to 157)

March 29, 2007               William Maniaci          Maniaci vs. Georgetown
                             Washington, D.C.

Page 158

1  correct?
2      A   I believe so.
3      Q   And so did the other members of JDL.
4  They all made known their affiliations with JDL?
5      A   I wasn't present when they signed it.
6  I don't know.
7      Q   Was there a plan to hide the fact that
8  any member of JDL was in fact a member of JDL?
9      A   No. No. We --
10     Q   Okay.
11     A   We -- we made frequent contacts with
12 the University officials and tried to dialogue
13 and have a peaceful relationship.
14     Q   Right. So you were not denied the
15 right to participate in the conference because
16 you were associated with JDL, correct?
17     A   Not directly.
18     Q   And you weren't arrested for trespass
19 because you attempted to attend the conference,
20 correct?
21     A   No. But I could call your
22 attention --

Page 159

1      Q   Directing your attention --
2      A   I could call your attention to other
3  incidents that took place on the campus that
4  were tantamount to harassment by the campus
5  police.
6      Q   I'm talking about, at the time you
7  wrote this document, you had no knowledge that
8  Georgetown had ever arrested anybody from
9  attending a conference at Georgetown.
10     A   No. But I have --
11     Q   That's my question.
12     MR. FAY:  Wait.
13     THE WITNESS:  I have general
14 knowledge.
15     MR. FAY:  You asked a question. Let
16 him answer it.
17     THE WITNESS:  I have general knowledge
18 of what takes place on college campuses during
19 protests. And in particular protests that are
20 not popular with the administration.
21     There are standard procedures that the
22 universities use which I am familiar with. And

Page 160

1  I drew upon my knowledge and my experience, my
2  life experience, my knowledge of law enforcement
3  and my beliefs as to what would happen on this
4  campus.
5      And as I said, I might have been
6  having a psychic moment but it seems that I was
7  pretty accurate with what I wrote.
8  BY MR. BUCKLEY:
9      Q   Have you ever met the president of
10 Georgetown University?
11     A   No, sir, I haven't.
12     Q   Dr. Jack DeGioia.
13     A   No.
14     Q   Do you know anything about him?
15     A   No. Other than the fact that he
16 accepted with glee $20 million from Saudi
17 Arabia.
18     Q   Directing your attention to the bottom
19 of page 3 of Exhibit Number 7. You refer in the
20 last full paragraph -- I should say the
21 penultimate paragraph to the Georgetown
22 University speech and expression policy, which

Page 161

1  you indicate is attached. Is that correct?
2      A   I believe we did attach it.
3      Q   I think I have the attachment. Let me
4  show you that document. Is it 9? Yeah. Okay.
5  Let me show you what we're going to mark as
6  Exhibit Number 9.
7      MS. SHANAHAN:  It's actually
8  Exhibit 8.
9      MR. BUCKLEY:  Exhibit 8. Excuse me.
10 Exhibit 8.
11     (Maniaci Exhibit No. 8 was marked for
12 identification.)
13 BY MR. BUCKLEY:
14     Q   I've handed you a document that's been
15 Bates stamped M 92 through M 101, which
16 indicates that your counsel produced it on your
17 behalf.
18     On the first page there's a
19 handwritten note that says, quote, mission
20 statement and info summarized by W. Maniaci and
21 other JDL persons prior to 2/18/06 to provide to
22 other JDL protesters, unquote.

41 (Pages 158 to 161)

BRYNTESON REPORTING, INC.
(703) 768-8122     www.bryntesonreporting.com    Fax:  (703) 768-8921

Case 1:06-cv-01625-LFO    Document 39-3    Filed 01/14/2008    Page 27 of 62

March 29, 2007          William Maniaci          Maniaci vs. Georgetown
                        Washington, D.C.

Page 166

1    Q    And you also caused certain portions
2  of the policy to be bolded.
3    A    Apparently.
4    Q    Why did you -- first of all, why did
5  you bold certain portions of the policy?
6    A    Well, at the time, I may have thought
7  that those were important.
8    Q    Do you recall now why you believe
9  those particular --
10    A    No.
11    Q    -- portions were important?
12    A    I don't -- I don't recall.  No, I
13  don't.
14    Q    Okay.  Tell me why you prepared this
15  document.
16    A    So everybody that was participating
17  would be aware of the free speech expression
18  policies espoused by Georgetown University.
19    Q    Why did you want them to be aware of
20  it?
21    A    So that there wouldn't be any mistakes
22  made.

Page 167

1    Q    What types of mistakes were you
2  concerned about?
3    A    Violation of Georgetown University's
4  policies.
5    Q    Did you want to comply with the
6  University's policies?
7    A    Yes.
8    Q    You didn't want to violate them?
9    A    That's correct.
10    Q    Let's go back to Exhibit Number 7,
11  again, if you will.
12    A    Okay.
13    Q    Looking at the bottom of the page,
14  again, on page 3, which is Bates stamped M 85.
15    MR. FAY:  This is 7, is it?
16    MR. BUCKLEY:  Yes.  That's correct.
17  Exhibit Number 7.
18    MR. FAY:  Okay.
19  BY MR. BUCKLEY:
20    Q    The Bates stamped page M 85, page 3 of
21  4.
22    A    Uh-huh.

Page 168

1    Q    Here you refer to the portion of the
2  policy that states that free speech in the
3  constitutional sense will be limited by and only
4  by reasonable and nondiscriminatory
5  considerations of, quote, time, place and
6  manner, unquote.  Do you see that?
7    A    Yes.
8    Q    Do you acknowledge that Georgetown
9  University had a right to limit the time when a
10  speaker could speak?
11    A    Yes.
12    Q    And the place where the speaker could
13  speak.
14    A    Yes.
15    Q    And the manner in which a speaker
16  could speak.
17    A    Yes.
18    Q    So, for example, if Georgetown
19  University were to say, you can't shout when you
20  ask questions, would that be, in your view, a
21  limitation that Georgetown University had a
22  right to impose on a speaker?

Page 169

1    A    Yes.  It would be reasonable.
2    Q    And if Georgetown University said that
3  this is not the time for you, as a speaker, to
4  speak, did Georgetown University, in your view,
5  have that right?
6    A    It depends on the circumstance.
7    Q    If Georgetown University said to you,
8  this is not the time for you to speak, did
9  Georgetown University have the right to impose
10  that limitation?
11    A    It would depend on the circumstance.
12    Q    Did Georgetown University, in your
13  view, have the right to say, you may ask one
14  question as opposed to, say, several questions.
15    A    Yes.  If that was imposed on everyone
16  fairly, yes.
17    Q    Well, did Georgetown University have
18  the right to say that anything you say must be
19  put in the form of a question?  Would that be
20  within the right of the University?
21    A    Probably.
22    Q    Did Georgetown University have the

43 (Pages 166 to 169)

March 29, 2007                    William Maniaci          Maniaci vs. Georgetown
                                  Washington, D.C.

Page 170

1  right to say that you should not interfere with
2  someone else's right to speak?
3      A    Yes.
4      Q    Did Georgetown University have the
5  right to say that you should not interrupt
6  somebody else when the other person is speaking?
7      A    It depends on the circumstance.  If
8  there's free dialogue, two people conversing and
9  exchanging ideas, those questions need not
10 apply.
11     Q    Where are you coming up with this?
12 What's the basis for these statements as to what
13 you believe are limitations on Georgetown's
14 ability to limit the time, place and manner of
15 speech?
16     A    If -- if they say that there's going
17 to be dialogue and free exchange of ideas, that,
18 to me, means a conversation between individuals.
19     Q    If Georgetown University says there's
20 going to be only questions, not dialogue, just a
21 question, and you're limited to one question,
22 did Georgetown University have the right --

Page 171

1      A    Yes.
2      Q    -- to impose that limitation?
3      A    Yes.
4      Q    Okay.  Turning to the same document,
5  again, Exhibit 7, page M 86, and page -- looking
6  at the top half of the page, down to numbered
7  paragraph number 10.
8      A    I've got M 84.
9      Q    M 86.
10     A    Oh, yeah.  Okay.
11     Q    Page 4 of 4.
12     A    Okay.
13     Q    On Exhibit number 7 looking at the top
14 half of the page.  There are a number of
15 paragraphs.
16     A    Uh-huh.
17     Q    Each numbered.  And then looking at
18 paragraph 10, again, listing the limitations on
19 speech, it refers to, quote, making it
20 impossible for others to speak, unquote.
21         Do you recognize that as an
22 appropriate limitation that the University could

Page 172

1  impose on persons attending the conference; that
2  is, that they should not make it impossible for
3  others to be -- to speak?
4      A    This is part of their -- their policy,
5  their free -- this is an item of their entire
6  free speech policy.
7      Q    Well, do you agree that Georgetown
8  University had a right to make that policy?
9      MR. FAY:  Could you rephrase the
10 question.  I say that because it sounds like
11 you're asking whether Georgetown had a right to
12 make it impossible for others to speak.
13     MR. BUCKLEY:  No.
14     MR. FAY:  And I don't think that's
15 what you meant.
16 BY MR. BUCKLEY:
17     Q    I think I -- I thought I made it clear
18 that one of the things that Georgetown
19 University was prohibiting was activities of
20 persons who sought to make it impossible for
21 others to speak.
22         Do you acknowledge that Georgetown had

Page 173

1  the right to prohibit attempts by persons
2  attending the conference to interfere with the
3  right of others to speak?
4      A    It depends on the circumstance.  If
5  there's a free exchange of dialogue, and you or
6  I disagree with one other, one of us may talk
7  over the other one.  And I don't think that
8  there's any law or rule that specifies that we
9  can't do that in the -- in the free exchange of
10 ideas.
11     Q    Is it Georgetown University that
12 decides whether it's going to be a free
13 dialogue, a back-and-forth, or whether it's
14 going to be simply a question and answer period
15 where you're limited to one question?
16     A    If they say that there's going to be a
17 question followed by dialogue and then change
18 the rule in the middle of the game, I don't
19 think this would apply.
20     Q    Is that a legal opinion?
21     A    No, it's my opinion.
22     Q    That's your personal opinion?

44 (Pages 170 to 173)

March 29, 2007          William Maniaci          Maniaci vs. Georgetown
Washington, D.C.

Page 174

1    A    Yes, it is.
2    Q    And does Georgetown University have to
3  agree with you and conduct its conference the
4  way --
5    A    No.
6    Q    -- you want it to be conducted?
7        MR. FAY: Objection. That's absurd.
8        THE WITNESS: Is this a legal opinion?
9  This is not a legal opinion either. This is a
10  policy. Policies are not law. They're not
11  etched in stone. Policies are guidelines. This
12  is a policy.
13  BY MR. BUCKLEY:
14    Q    Okay. Was it you or Georgetown
15  University that had the right to interpret its
16  own policy?
17    A    If a policy is published and made
18  public, anybody that reads it can make their own
19  interpretation.
20    Q    Was it Georgetown University or you
21  that had the right to make the ground rules for
22  the conference?

Page 175

1    A    Their conference. They can make the
2  ground rules.
3    Q    And it was your obligation to abide by
4  their ground rules, correct?
5    A    It depends on the circumstance.
6    Q    Wasn't it your obligation as an
7  attendee to abide by the ground rules that
8  Georgetown imposed on the conference?
9    A    It depends on the circumstance.
10    Q    Are you reserving the right to violate
11  Georgetown's ground rules?
12    A    It depends on the circumstance.
13    Q    Well are you or are you not? Are you
14  reserving --
15    A    I can't answer that question.
16    Q    Why can't you answer it?
17    A    Because I believe I have answered it.
18  It depends on the circumstance and the
19  situation.
20    Q    So you're reserving a right when you
21  so choose to violate Georgetown's ground rules?
22        MR. FAY: He didn't say that.

Page 176

1  BY MR. BUCKLEY:
2    Q    Are you?
3    A    You're putting words in my mouth.
4    Q    Are you --
5        MR. FAY: He didn't say that. Come
6  on.
7        MR. BUCKLEY: It's a question. Are
8  you reserving the right --
9        MR. FAY: No. No. You're haranguing
10  him now.
11        THE WITNESS: You're harassing me.
12        MR. FAY: You've got no -- you asked
13  about five times --
14        THE WITNESS: There's no reason for
15  this.
16        MR. FAY: We're going to be here until
17  midnight.
18  BY MR. BUCKLEY:
19    Q    Are you reserving the right to violate
20  Georgetown's ground rules when you believe it's
21  appropriate?
22    A    It depends on the circumstance.

Page 177

1    Q    Are there some circumstances where you
2  believe you have a right to violate Georgetown's
3  ground rules?
4    A    There are some situations where I
5  believe their ground rules may not apply.
6    Q    Directing your attention again to
7  Exhibit Number 7, page M 86, looking at, again,
8  at the penultimate paragraph, I just want to
9  address your attention to -- or direct your
10  attention to a portion of what's written there
11  where you wrote, quote, the terrorist who will
12  be addressing the public during the three
13  days --
14    A    I don't see where you're --
15        MR. FAY: I'm sorry.
16        MR. BUCKLEY: It's the penultimate
17  paragraph right here.
18        MR. FAY: What page is that?
19        MR. BUCKLEY: Page M 86.
20        MR. FAY: Okay.
21  BY MR. BUCKLEY:
22    Q    Do you see that?

45 (Pages 174 to 177)

March 29, 2007          William Maniaci          Maniaci vs. Georgetown
                        Washington, D.C.

Page 178

1     A    The paragraph begins with what?
2     Q    It begins with the words "our
3   mission."
4     A    Okay.
5     Q    Okay.  Directing your attention down
6   three lines to the clause that begins, quote,
7   the terrorists.
8         Do you see that?
9         MR. FAY:  The next to the last
10  paragraph?
11        THE WITNESS:  And the terrorists who
12  will be addressing the public....
13        MR. FAY:  Yeah, he's talking about
14  this.
15        THE WITNESS:  I see.
16  BY MR. BUCKLEY:
17    Q    Let me read that.  You wrote this.
18  You wrote, quote, the terrorists who will be
19  addressing the public during the three days of
20  the Palestinian Solidarity conference at
21  Georgetown University, end quote.
22        Which terrorists were you referring

Page 179

1   to?
2     A    It's my belief that the people who
3   were preaching divestment from Israel were
4   supporting terrorism.
5     Q    Well, you refer to them as terrorists.
6     A    If you support terrorism, you're a
7   terrorist.
8     Q    Okay.  So the people at the conference
9   who were supporting divestment from Israel were,
10  in your view, terrorists?
11    A    Yes.  The speakers, in my view, were
12  terrorists insofar as the definition of a
13  terrorist can -- doesn't necessarily have to be
14  someone who is violent.  Terrorism can be
15  psychological.
16    Q    Okay.  But in your view, applying your
17  definition, for example, Sue Blackwell, one of
18  the speakers at the conference you attended, is
19  a terrorist.
20    A    Sue Blackwell supported the --
21  supports the use of suicide bombings and
22  violence against Israeli civilians, and that's

Page 180

1   terrorism.
2     Q    Let's just talk about her opinion with
3   respect to divestment, okay.
4     A    No.  I look at her as an individual
5   and what she supports.  If she supports
6   terrorists, she's a terrorist.
7     Q    Are people who support divestment from
8   Israel terrorists?
9     A    Some are.
10    Q    Is supporting divestment from Israel
11  supporting terrorism?
12    A    No.
13    Q    Was Mr. Youmans, who was a moderator
14  at the panel you attended, was he a terrorist?
15    A    I don't know.
16    Q    Looking again at this page M 86, you
17  say in the last paragraph, quote, our mission is
18  to cause Georgetown University to allow
19  supporters of Israel to speak and to be heard or
20  suffer the ramifications and the consequences of
21  their refusal or inability fairly to enforce
22  their policies and support the First Amendment

Page 181

1   rights of all, unquote.
2         You wrote that?
3     A    I believe so.
4     Q    What did you mean when you said that
5   Georgetown University was going to suffer the
6   ramifications and consequences?
7     A    Well, if they -- if they refused to
8   abide by their own policies, we would make that
9   a matter of public record on Web sites and in
10  newspapers and by talking to journalists.  And
11  basically causing that adverse publicity to
12  become public record, public knowledge.
13    Q    Is this lawsuit that you filed against
14  Georgetown University part of your mission to
15  cause it to suffer the ramifications and
16  consequences?
17    A    No, sir.
18        MR. FAY:  What are we looking at
19  timewise?  It's about 20 of 1:00, now.
20        MR. BUCKLEY:  Oh, we should take a
21  break for lunch then.
22        MR. FAY:  It doesn't seem likely this

46 (Pages 178 to 181)

March 29, 2007          William Maniaci          Maniaci vs. Georgetown
Washington, D.C.

Page 182

1  is going to get over at a time where we wouldn't
2  eat lunch.
3          MR. BUCKLEY:  No.
4          MR. FAY:  Outside of some European
5  countries that are more civilized than we are.
6          THE VIDEO OPERATOR:  Shall we go off
7  the record?
8          MR. BUCKLEY:  Yes, please.
9          THE VIDEO OPERATOR:  We're going off
10 the record at 12:41.
11         (Whereupon, at 12:41 p.m., the
12 deposition was recessed, to be reconvened at
13 1:45 p.m. this same day.)
14
15
16
17
18
19
20
21
22

Page 183

1          AFTERNOON SESSION    (1:50 p.m.)
2          THE VIDEO OPERATOR:  We're back on the
3  record at 1:50.
4  Whereupon,
5          WILLIAM MANIACI
6  having been previously duly sworn, was examined
7  and testified further as follows:
8          EXAMINATION (Continued)
9  BY MR. BUCKLEY:
10     Q    Mr. Maniaci, would you look at the
11 Exhibit Number 8 again and turn to the page
12 that's been Bates stamped M 95.  Again, we're
13 looking at your recreation in different
14 typescript of Georgetown University's policy on
15 speech and expression, correct?
16     A    Yes, sir.
17     Q    Looking now at that page, which is
18 page 3 of 9, M 95, and looking again at the
19 bottom of the page to paragraph number 1.  It
20 states that the right of free speech and
21 expression does not include.  And then it goes
22 on to list a number of activities.

Page 184

1          And I direct your attention to the
2  last paragraph, or I should say the last clause
3  where it says, quote, any activity that disrupts
4  or obstructs the functions of the university, or
5  imminently threatens such disruption or
6  obstruction, end quote.
7          When you went to Georgetown University
8  to attend the conference, did you understand
9  that the right of free speech and expression did
10 not include any activity that disrupts or
11 obstructs the functions of the university, or
12 that imminently threatens such disruption or
13 obstruction?
14     A    Certainly.
15     Q    And did you believe and understand
16 that Georgetown University had a right to impose
17 that limitation?
18     A    Of course.
19     Q    Who is Bill Levinson?
20     A    I've heard the name.  I can't put a
21 face with the name.
22     Q    Is he a member of JDL?

Page 185

1      A   No.  Not to my knowledge.
2      Q   Have you ever received any E-mails
3  from him?
4      A   I think so.  The name is familiar.  I
5  believe he's involved in Jewish activism.  But I
6  don't -- I wouldn't recognize him if he were
7  sitting next to me.
8      Q   Do you know where he resides?
9      A   No, sir.
10     Q   Have you ever spoken to him?
11     A   I may have through the course of my
12 duties with these organizations, but I don't
13 recall any conversation.
14     Q   Do you remember communicating with him
15 in any way, by E-mail or otherwise, in relation
16 to this Georgetown event?
17     A   It's very possible.  If he is an
18 activist with a different organization, it's
19 very possible that I did.
20     Q   Uh-huh.  Before you referred to Rabbi
21 Shifren; is that correct?
22     A   Rabbi Shifren was there, yes.

47 (Pages 182 to 185)

March 29, 2007          William Maniaci          Maniaci vs. Georgetown
Washington, D.C.

Page 186

1    Q    Yes.  Okay.  What is his first name?
2    A    Nachum.
3    Q    Okay.
4    A    N-A-C-H-U-M.
5    Q    Was he a member of the JDL at the time
6  of the event?
7    A    Yes.
8    Q    Is he a member of B'nai Elim?
9    A    Yes.
10    Q    What is your relationship with him?
11    A    I know him as a rabbi.  We -- I have
12  no direct relationship other than the fact that
13  he's a member and he's a rabbi and we belong to
14  the same organization.
15    Q    Does he hold any -- or did he hold any
16  position in JDL?
17    A    Other than being a spiritual advisor,
18  no.
19    Q    How about in the current organization?
20    A    Same role.  He's a spiritual -- he's a
21  rabbi.  He writes his interpretation of the
22  Parsha, Weekly Torah Portion.  And we publish

Page 187

1  that usually.  That's handled through our Web
2  site.
3    Q    Did you coordinate with him in terms
4  of attending the event in Georgetown in February
5  of 2006?
6    A    I'm sure we discussed his attendance.
7    Q    Do you know where he lives?
8    A    He lives in Southern California in the
9  Los Angeles area.  I think he's known as the
10  surfing rabbi, so it's somewhere close to the
11  ocean.
12        MR. FAY:  Only in California.
13  BY MR. BUCKLEY:
14    Q    Did JDL pay his expenses to come to
15  the conference?
16    A    I believe it was taken out of the
17  funds that we had available, yeah.
18    Q    Okay.  When did you first communicate
19  with Georgetown University regarding your desire
20  to attend the conference?
21    A    I don't remember.
22    Q    Do you remember how you communicated

Page 188

1  with Georgetown?
2    A    I communicated with them by telephone,
3  and via E-mail.
4    Q    Do you recall which you did first?
5    A    I think I called the security office
6  and -- just to see who I should speak with.
7    Q    And did you wind up speaking with
8  somebody?
9    A    Yeah.  I spoke first with somebody
10  that answered the phone.  And we had a
11  conversation.  I let him know why I was calling.
12  And --
13    Q    What did you say when you explained
14  the purpose of your call?
15    A    I said I'm looking -- you know, that
16  we intend to demonstrate or protest the
17  solidarity conference.  And I wanted to know
18  what parameters there were so we wouldn't be
19  breaking any of their rules.  And I asked them
20  to send me whatever they could.  They did send
21  me either E-mail -- I think they E-mailed me
22  copies of their speech policy.  And I had a

Page 189

1  discussion -- amiable discussion with Darryl --
2  what's his last name?
3    Q    Harrison?
4        MR. FAY:  Harrison.
5        THE WITNESS:  Right.  At the time I
6  didn't know he was the chief of police.  But I
7  was given him on the line as the person to talk
8  to.  And we had a very nice conversation.
9  BY MR. BUCKLEY:
10    Q    Tell me what you recall about that
11  conversation.
12    A    I recall that we agreed to have a cup
13  of coffee together when I arrived in Georgetown.
14    Q    Do you recall anything else about the
15  conversation?
16    A    Not really, except that I -- I really
17  don't.  I recall it was friendly.  It was a
18  friendly conversation.  And I know that I told
19  him that we're not there to cause any trouble or
20  break any laws.  We wanted to do whatever we do
21  completely within the parameters established by
22  the university for this type of event.

48 (Pages 186 to 189)

March 29, 2007      William Maniaci      Maniaci vs. Georgetown
Washington, D.C.

Page 190

1    Q    Did you visit the Georgetown
2 University Web site and look at the policy
3 regarding speech and expression?
4    A    I'm sure I did.
5        MR. BUCKLEY:  Are we up to Exhibit
6 Number 9?
7        MS. SHANAHAN:  Yes.  Although I've
8 already marked these previous ones.
9        MR. BUCKLEY:  Okay.  Well, hold it.  I
10 don't want to mess up your whole marking system
11 here.  Sorry.  Thanks.
12        (Maniaci Exhibit Number 9 was marked
13 for identification.)
14 BY MR. BUCKLEY:
15    Q    Let me give you a document which I've
16 marked as Exhibit Number 9, which I will
17 represent to you was taken from the Georgetown
18 University Web site and is the speech and
19 expression policy at Georgetown as it appeared
20 in February 2006, and as it appears today.
21        Actually, this is a document that your
22 counsel produced, M 153 to 155.  So we did not

Page 191

1 take this, that is, we, Williams & Connolly, did
2 not take this off the Web site.  You actually
3 produced it.
4        MR. FAY:  I think that's correct.
5 BY MR. BUCKLEY:
6    Q    Okay.  So -- and it's dated January 3,
7 2006 on the last page.
8        So, again, looking at Exhibit Number
9 9, this would be the Georgetown University
10 speech and expression policy as you read it and
11 viewed it and understood it in February 2006,
12 correct?
13    A    I'm not sure if it's been changed
14 between that time and now.  This is --
15    Q    No.  I said -- I said in
16 February 2006.  This is a document that you
17 produced.
18    A    I -- evidently.  If you say so.
19    Q    Well, it has a Bates stamp M 153,
20 which your counsel affixed to the document.
21    A    Right.  But I'm not sure that I
22 produced this document.  I don't know where this

Page 192

1 document came from.
2    Q    It's a document that your counsel
3 produced on your behalf.  That's why it has a
4 Bates stamp M.
5    A    If counsel says so, yeah.
6        MR. FAY:  I think the date at the
7 bottom is the date of the last promulgation of
8 these by Georgetown, which, since that would
9 have been only five days before the event, it
10 seems unlikely that they amended them after
11 that.  But....
12        MR. BUCKLEY:  Yeah.  I think we're all
13 on the same page here.
14 BY MR. BUCKLEY:
15    Q    This is Georgetown's speech and
16 expression policy as it existed when you
17 attended the conference --
18    A    Okay.
19    Q    -- in February 2006.  Do you have any
20 reason to doubt that?
21    A    No, I don't.
22    Q    Okay.  So you read it and you

Page 193

1 understood it.
2    A    Yes.
3    Q    Okay.
4    A    Particularly the part about suspending
5 or limiting discourse --
6    Q    Okay.
7    A    -- is contrary to the university's
8 nature.
9        (Maniaci Exhibit Number 10 was marked
10 for identification.)
11 BY MR. BUCKLEY:
12    Q    Have a look at what I've now marked as
13 Exhibit Number 10, which is a document with the
14 Bates stamp GTN 1030 to 1033.  And it begins
15 with an E-mail from you sent on Thursday,
16 February 9, 2006.
17    A    Okay.
18    Q    Just take a moment to look at this
19 document.
20    A    Okay.
21    Q    Is that an E-mail that you wrote and
22 sent to Georgetown University on February 9,

49 (Pages 190 to 193)

March 29, 2007          William Maniaci          Maniaci vs. Georgetown
                        Washington, D.C.

Page 194

1  2006?
2      A   Yes, sir.
3      Q   And -- are its contents accurate in
4  that they express your views and understanding
5  at the time?
6      A   Yes.
7      Q   And looking again at the first page of
8  the document, you state that you represent the
9  Jewish Defense League and that, quote, our group
10  will protest the Palestinian Solidarity
11  Conference, unquote.
12         And that's a correct statement, right?
13     A   Yes.
14     Q   You further state that you initially
15  contacted Sam Samonte.
16     A   I believe that's the name of the
17  gentleman that I spoke to who answered the phone
18  at the campus security office.
19     Q   And that he eventually directed you to
20  the Office of Student Affairs?
21     A   Apparently so.
22     Q   And is that the course of events that

Page 195

1  brought about this E-mail to Mr. Olson, who's
2  the Vice President for Student Affairs and Dean
3  of Students?
4      A   Right.  He apparently advised me to
5  contact the Office of Student Affairs with my
6  questions.
7      Q   Okay.
8      A   And that prompted this E-mail.
9      Q   And you wanted to know what the limits
10  were on your protest.
11     A   As stated in this E-mail.
12     Q   That's correct?
13     A   I had several questions listed here.
14     Q   Okay.  Turn to page 2, where you state
15  in the middle of the page, quote, obviously we
16  are a Jewish, religious and Zionist
17  organization, unquote.
18         What do you mean by Zionist
19  organization?
20     A   We believe that Israel belongs to the
21  Jewish people, and that we encourage immigration
22  from all countries in the world of all Jews to

Page 196

1  Israel.
2      Q   You further state, clearly, our
3  viewpoint and ideology clash head-on with the
4  agenda of the conference participants, end
5  quote.
6          Would you explain that?
7      A   It's obvious that the -- the
8  conference is -- was one for divestment from
9  Israel, and to condemn Israel for its presumed
10  treatment of the Palestinians, who really have
11  no claim to Israel anyway.
12     Q   Was it your design to make sure the
13  conference did not achieve its goal in terms of
14  promoting divestment --
15     A   No.
16     Q   -- from Israel?
17     A   No.  It was our goal to prevent --
18  present a counter viewpoint.
19     Q   You signed this at the bottom, Bill
20  Maniaci, Deputy Chairman, Chief, Intelligence
21  and Security, Jewish Defense League.  Again,
22  those were your positions at the time?

Page 197

1      A   Uh-huh.
2      Q   Okay.  Turn to the next page.  There
3  are a number of quotations.  And some of the
4  quotations are cut off.  But there's one or two
5  I want to ask you about.
6          Looking down, again, on page 3 of 4,
7  that's Bates stamped GTN 1032.  And directing
8  your attention to the top of the page, you'll
9  see the fourth quote says, quote, all warfare is
10  based on deception, unquote.  And the quotation
11  is attributed to Sun Tzu.  Why do you have that
12  as part of the standard quotations that you
13  attach to your E-mails?
14     A   It was just there.  It was just
15  something that we put in.
16     Q   What did you mean by that, that all
17  warfare is based on deception?
18     A   You have to read Sun Tzu to understand
19  that.
20     Q   I don't have the time this afternoon.
21  So why don't you tell me what you understand
22  that quote means?

50 (Pages 194 to 197)

March 29, 2007            William Maniaci         Maniaci vs. Georgetown
                         Washington, D.C.

Page 206

1   with it.
2       A    It's part of a document that was
3   E-mailed to The Hoya during an exchange of what
4   they would accept as a paid ad in The Hoya
5   newspaper.
6       Q    Okay.  Did you write the ad which is
7   attached or is part of the E-mail?
8       A    I believe so.
9       Q    It begins on the third page of the
10  document with the words:  If you are an
11  American, please read.  If you are Jewish, this
12  message is vital?
13      A    Yes.
14      Q    And you wrote the text?
15      A    I did write that, yes.
16      Q    If you go to two pages later, there's
17  a Star of David with a fist.  Is that the symbol
18  of the JDL?
19      A    Yes.  That's the JDL logo.
20      Q    Okay.  And going back to the first
21  page of the proposed ad, it says that it's an
22  invitation to protest; is that correct?

Page 207

1       A    Uh-huh.  I think that's a common
2   activity on a college campus, isn't it?
3       Q    And then you say further in the first
4   full paragraph that the Palestinians, which you
5   put in quotation marks -- why did you put that
6   term in quotation marks?
7       A    Because there's no such thing as a
8   Palestinian.
9       Q    Okay.  You say that they are a show
10  for a bunch of terrorists who hate our
11  democratic non-Muslim country as much as they
12  hate Israel.  Is that correct?
13      A    Yes.
14      Q    Were you referring to the organizers
15  of the conference?
16      A    Let me reread this and I'll tell you.
17  No.  You took that out of context.  That wasn't
18  the meaning of that particular phrase.
19      Q    Turn back to the second page of the
20  document.  It refers to the quotation, I guess
21  from -- well, strike that.
22          It refers to something called a Chayah

Page 208

1   Squad or Chayah Squads.
2       A    Chayah Squad.
3       Q    Chayah Squad?
4       A    Uh-huh.
5       Q    What is the purpose of referring to
6   the Chayah Squads?
7           MR. FAY:  What page are you on?
8           MR. BUCKLEY:  Page 2.
9           THE WITNESS:  What's the purpose?
10  BY MR. BUCKLEY:
11      Q    Yes.
12      A    The purpose of any quote.  To --
13  education.
14      Q    Did The Hoya respond to your proposed
15  ad?
16      A    I had several responses from The Hoya.
17  Initially they agreed to run our ad.  They took
18  our credit card number.  And we had several
19  exchanges of -- where they requested the -- that
20  the copy be changed here and there, which we
21  complied with.  And we believed the ad was going
22  to be run.  And then at the very last minute,

Page 209

1   they notified us that they decided not to run
2   the ad.
3       Q    Do you have any of those E-mails?
4       A    No, I don't.  They were on a computer
5   that crashed.
6       Q    When did it crash?
7       A    Oh, a month ago maybe.
8       Q    A month ago?
9       A    Yeah.  Do you want the hard drive?
10  I'll be glad to let you take the information off
11  of it.
12      Q    What kind of a computer is it?
13      A    A Dell.
14      Q    And what do you mean it crashed?
15      A    The hard drive crashed.  It was
16  unformattable.  I couldn't recover any data.  So
17  I took the hard drive out and put a new hard
18  drive in and reinstalled Windows and I'm back up
19  and running.
20      Q    What happened to the old hard drive?
21      A    It's on the floor in my office.
22      Q    Did you give it to anyone to try to

53 (Pages 206 to 209)

Page 218

1      THE WITNESS: Or Bayann Hamid or
2  something down here. I have no idea.
3      MR. FAY: I don't know.
4  BY MR. BUCKLEY:
5      Q    Did the JDL have a table at the ICC on
6  the Georgetown University campus?
7      A    I wasn't allowed to go into the ICC.
8  So I couldn't testify to the fact that they had
9  a table or not.
10     Q    Were you advised that the JDL had a
11 table there?
12     A    Yes. I was advised that they had a
13 table.
14     Q    Who arranged the --
15     A    George -- Dr. Haas.
16     Q    Dr. Haas arranged for the table?
17     A    Yes.
18     Q    And how did he arrange for that table?
19     A    I guess he paid for it with his credit
20 card.
21     Q    And did he disclose that it was a
22 table for the JDL?

Page 219

1      A    You have to ask Dr. Haas.
2      Q    Uh-huh. Are you aware that the person
3  who registered for the table in the ICC
4  registered under the name of an organization or
5  group called Palestinians Are People, Too?
6      A    Could have.
7      Q    Have you heard of that group before?
8      A    I didn't -- no.
9      MR. FAY: Bill, you should stay in one
10 place.
11     THE WITNESS: I'm sorry, my neck was
12 hurting.
13     MR. FAY: The young man with the
14 camera here is going to go crazy. Sorry.
15 BY MR. BUCKLEY:
16     Q    You were answering.
17     A    I'm sorry. Where was I?
18     Q    You were talking about whether you had
19 heard of the group or heard of the phrase before
20 Palestinians Are People, Too?
21     A    Yeah. I have. Dr. Haas mentioned
22 that.

Page 220

1      Q    Mentioned what?
2      A    I heard him say something about
3  Palestinians Are People, Too.
4      Q    What did he say about it?
5      A    I don't recall his words. Why don't
6  you ask him?
7      Q    Did he -- I'm trying to get your
8  knowledge.
9      A    I don't have direct knowledge.
10     Q    Did he say he registered under that
11 name, Palestinians Are People, Too?
12     A    The only thing I was certain of is
13 that he had -- he told me he had gotten two
14 tables for us in the ICC. And that was fine.
15     Q    Okay. Let me hand you what's been
16 marked as Exhibit Number 14.
17     (Maniaci Exhibit Number 14 was marked
18 for identification.)
19 BY MR. BUCKLEY:
20     Q    This is a document that your counsel
21 produced on your behalf. It's Bates stamped
22 M 110 through M 125. Can you identify it?

Page 221

1      A    This appears to be a handout that was
2  given. It could have been a conference -- media
3  information packet. I can identify it because
4  it says it's a Palestinian Solidarity Movement
5  information packet.
6      Q    Well, can you explain how you received
7  this since it's a media packet and you said you
8  didn't register as media?
9      A    It could have been sent to
10 Mr. Finberg. Mr. Finberg could have made
11 copies. He could have laid it around where we
12 were convening. That's probably what happened.
13     But I'm -- it's supposition. I have
14 no idea.
15     Q    Okay.
16     MR. FAY: We sent this to you folks.
17 You asked for everything we had from the
18 conference. We didn't mark things as somebody
19 came in -- a number of people came in who had
20 been at the conference. It was probably picked
21 up from somewhere. But we don't know where it
22 came from.

56 (Pages 218 to 221)

Case 1:06-cv-01625-LFO     Document 39-3     Filed 01/14/2008     Page 37 of 62

March 29, 2007          William Maniaci          Maniaci vs. Georgetown
Washington, D.C.

Page 222

BY MR. BUCKLEY:

1  
2     Q    Did you read it at the time?
3     A    I may have looked at it.
4     Q    Okay.
5     A    I don't know if I did or not. It's
6  addressed to the media. I don't know if I read
7  it or not.
8        If this was a handout at the beginning
9  of the conference, I'm sure I didn't have an
10 opportunity to read it because all the paperwork
11 that I had was knocked out of my hands when I
12 was assaulted. So....
13    Q    Why don't you turn to the third page
14 of the document. It's page 3 of 16. It's Bates
15 stamped M 112. You'll see it refers to the
16 events on Saturday, February 18th. And you'll
17 note that there was scheduled at 9:30 a.m. a
18 speaker panel. And the topic was, quote, the
19 status of the divestment movement, unquote. Is
20 that the session that you attended?
21    A    Yes, it is.
22    Q    Turn to page 5 of 16. You'll see on

Page 223

1  that page a paragraph that's entitled Conference
2  Code of Conduct. Do you see that?
3     A    Uh-huh.
4     Q    Looking at the second paragraph below
5  that heading, you'll see it states, quote, by
6  registering for the Fifth Annual PSM Conference,
7  I agree not to engage in disruptive behavior,
8  visibly, physically or audibly, by obstructing
9  the space of the sessions, standing in the way
10 of the conference registrants or speakers,
11 shouting over others, or attempting to derail
12 productive movement-building conversation with
13 hate speech, unquote.
14        Did you agree to abide by that rule?
15    A    I don't know. I don't know if I
16 signed such a document. This was in a media
17 packet.
18        MR. FAY: This is the conference's
19 statement. At least that's what it says on the
20 front.
21        THE WITNESS: This is a handout.
22        MR. FAY: Georgetown, not his.

Page 224

1        THE WITNESS: I paid my money and
2  signed in.
3        MR. BUCKLEY: Pardon? You're arguing
4  with me, which I don't want. I'm asking
5  questions of the witness.
6        MR. FAY: Yeah.
7        MR. BUCKLEY: I don't want to argue
8  with you over the meaning of the document.
9        MR. FAY: How can he answer about what
10 the meaning is of this when he didn't do it?
11        MR. BUCKLEY: You know better than to
12 argue.
13        MR. FAY: It was put out by somebody
14 else. Come on.
15        MR. BUCKLEY: You're arguing over the
16 questions. That's improper.
17        MR. FAY: No, it isn't improper.
18        MR. BUCKLEY: It is improper.
19        MR. FAY: You're permitted to ask
20 relevant questions, Mr. Buckley. That's it.
21        MR. BUCKLEY: This is relevant. Very
22 relevant.

Page 225

1        MR. FAY: Explain how, then.
2        MR. BUCKLEY: I'm not going to get
3  into a colloquy with you. That's improper.
4  It's improper to invite --
5        MR. FAY: Well, if we continue on with
6  stuff -- look. On the front of this, it
7  indicates that it comes from the Palestinian
8  Solidarity Movement.
9        MR. BUCKLEY: You're arguing. I don't
10 want you to be coaching the witness. I don't
11 want you to be arguing about the document.
12        MR. FAY: Okay. I'm going to instruct
13 him not to answer any more questions about the
14 meaning of something published by the
15 Palestinian Solidarity Movement unless he says
16 he knows what it is.
17        MR. BUCKLEY: He acknowledged that he
18 may have read the document at the time. You
19 produced it.
20        MR. FAY: That --
21        MR. BUCKLEY: I can ask questions
22 about it.

57 (Pages 222 to 225)

March 29, 2007          William Maniaci          Maniaci vs. Georgetown
Washington, D.C.

Page 230

1  Friday. I'm not sure.
2      Q    What do you recall about that
3  conversation?
4      A    I recall that his demeanor was totally
5  different than it was the first time we spoke.
6  Instead of being friendly, he was more
7  confrontational. And I do recall telling him
8  verbatim, I told him that we're here to build
9  bridges, not to burn them. I told him that we
10  were there in the spirit of mutual cooperation.
11  And all we wanted to do is what was within the
12  legal parameters.
13      Q    Okay.
14      A    I think I mentioned that we would
15  be -- I was concerned because we would be -- we
16  knew we'd have some very elderly people being
17  bused in. And I was concerned because the
18  weather was cold. And I knew that they would be
19  in need of restroom facilities. And I received
20  his assurance that they would be allowed to use
21  the restroom while they were on the campus.
22      Q    Did he say --

Page 231

1      A    It turns out they were refused
2  restroom privileges.
3      Q    Did he say anything else?
4      A    I don't remember.
5      Q    Okay. Let's turn to Saturday,
6  February 18th. You were staying at the Wyndham
7  Hotel on, was it M Street and 14th --
8      A    Yes.
9      Q    -- Northwest?
10          How did you get from there to the
11  Georgetown University campus?
12      A    Rode in Bob Turk's rental car.
13      Q    Okay. Had you done anything else that
14  morning?
15      A    Excuse me?
16      Q    Had you done anything else that
17  morning?
18      A    I probably had breakfast.
19      Q    Had you gone to services that day?
20      A    No. No. As a matter of fact, it's
21  not required as long as we pray ourselves, which
22  I did.

Page 232

1      Q    Okay. What time did you arrive on the
2  Georgetown University campus?
3      A    I don't remember.
4      Q    What did you do once you arrived?
5      A    Proceeded to whatever the hall that
6  was, where the registration was, paid my fee.
7  Signed up. Went through their security. Went
8  upstairs and found a seat and sat down.
9      Q    Who was with you when you came in and
10  registered and went upstairs to the hall?
11      A    Keith Bailey may have been with me. I
12  think maybe he was alongside of me. But I'm not
13  sure.
14      Q    Mr. Turk was with you?
15      A    I went in -- no, Mr. Turk wasn't with
16  me at that particular time.
17      Q    Uh-huh.
18      A    I had intended to -- I had registered
19  for the conference. And I was intent on sitting
20  down and hearing what the participants were
21  saying.
22      Q    So Mr. Turk drove you over.

Page 233

1      A    Yes.
2      Q    But he did not go with you to the
3  registration line?
4      A    He was on campus. He could have been
5  next to me. He could have been walking behind
6  me. I don't know exactly when he registered. I
7  know he did register.
8      Q    Before entering Gaston Hall, did you
9  see Mr. Smith?
10      A    I don't know who Mr. Smith is. Who's
11  Mr. Smith? Oh, that Mr. Smith. Are you
12  speaking of the officer?
13          MR. FAY: D.C. police --
14  BY MR. BUCKLEY:
15      Q    If I call him Lieutenant Mike Smith?
16          MR. BUCKLEY: You can't talk.
17  BY MR. BUCKLEY:
18      Q    Lieutenant Mike Smith?
19      A    Did I see him that morning? I don't
20  remember.
21      Q    Did you see him before you entered the
22  hall?

59 (Pages 230 to 233)

March 29, 2007          William Maniaci          Maniaci vs. Georgetown
Washington, D.C.

Page 234

1     A    I don't recall.  I don't know if I did
2  or not.  I wasn't looking for him.  I was intent
3  on getting through their security, getting
4  upstairs and having a seat.
5     Q    Okay.  Do you recall how many rows
6  back you sat from the stage?
7     A    Probably -- I wasn't too far from the
8  stage.  I was probably five or six rows back
9  from the stage on the -- as you're facing the
10 stage, I would be on the left-hand side.
11    Q    Where was the microphone positioned in
12 relation to where you were sitting?
13    A    Behind me a couple rows.
14    Q    Okay.  What do you recall -- first of
15 all, what time do you recall the session
16 beginning?
17    A    It was late.  I think it was scheduled
18 to begin at -- I'm not sure of the time anymore.
19 But I know they made a couple of announcements
20 apologizing because the conference was late due
21 to some traffic problems, parking problems,
22 apparently.

Page 235

1         (Maniaci Exhibit Number 15 was marked
2  for identification.)
3  BY MR. BUCKLEY:
4     Q    Okay.  Let me show you what I've
5  marked as Exhibit Number 15.  It's just a rough
6  sketch.  And looking at the top of the document,
7  that's -- there's a box there.  And that
8  represents the stage.
9     A    Uh-huh.
10    Q    And to the left-hand side is just a
11 hallway outside Gaston Hall.
12    A    Uh-huh.
13    Q    You can see the doors, the two double
14 doors there are drawn leading from the hallway
15 or the foyer into Gaston Hall.
16    A    I don't think they're in the right
17 place, but that's okay.
18    Q    Okay.  Can you tell me approximately
19 where you were sitting, to the best of your
20 recollection?
21        MR. FAY:  Can you identify -- by the
22 box you mean up at the top?

Page 236

1         MR. BUCKLEY:  Yes.
2         MR. FAY:  Where it says 300A and
3  there's a --
4         MR. BUCKLEY:  Yeah.  That's the stage
5  area, if you will.
6         THE WITNESS:  This is the stage.
7  BY MR. BUCKLEY:
8     Q    Right.
9     A    Right?
10    Q    Right.
11    A    And the panel was sitting up here at a
12 table.
13    Q    All right.
14    A    And I was sitting probably right about
15 here.  And the microphone -- the podium that
16 they put up was right about here.
17    Q    Okay.
18        MR. FAY:  Why don't you hold that up
19 so he can see it on the TV?
20        THE WITNESS:  I'm sorry.
21 BY MR. BUCKLEY:
22    Q    Why don't you point to where the stage

Page 237

1  was.
2     A    This is the stage here.  I was sitting
3  approximately in this position, a few rows back
4  from the stage.  And when they set up the podium
5  with the microphone for the people that were
6  going to ask questions, it was behind me a
7  couple of rows, towards the rear of the
8  auditorium.
9     Q    Okay.  Were you sitting in the aisle
10 seat?
11    A    Yes.
12    Q    And Mr. Bailey was to your left?
13    A    Yes.  He wasn't right next to me, but
14 he was nearby.
15    Q    Was there an empty seat next to you?
16    A    I think there was.  Yeah, there was an
17 empty seat.
18    Q    And then was Mr. Bailey sitting in the
19 seat after that, so it would be the third seat
20 in?
21    A    I believe so.
22    Q    What do you recall happening when the

60 (Pages 234 to 237)

March 29, 2007                William Maniaci              Maniaci vs. Georgetown
                             Washington, D.C.

Page 238

1   session began?
2        A    I recall an announcement that the
3   session was going to begin.  And the -- the
4   speakers were introduced.  And we were -- we
5   were told that each person would give their
6   own -- their presentation.  And then at the end
7   of the presentation, the audience would have an
8   opportunity to ask questions and dialogue with
9   the presenters.
10       Q    Do you recall Todd Olson, who is the
11  vice president for student affairs at
12  Georgetown, speaking to the audience before the
13  session began?
14       A    There was a male in a suit that was
15  obviously an administrator.  And I've seen Todd
16  Olson's picture a few times.  But there's other
17  people there.  I'm not sure that I'd --
18       Q    It was a person --
19       A    I would probably recognize him to see
20  him, but...
21       Q    Okay.  It was a person in a suit who
22  was an administrator.

Page 239

1        A    Yeah.
2        Q    And did he explain that, during the
3   question and answer session, each person in the
4   audience who wanted to ask a question would be
5   limited to one question?
6        A    Not at that particular time he didn't.
7   I think the instructions were given after --
8   what was said before they gave their
9   presentation was that the audience -- the
10  attendees would be allowed the -- afforded the
11  opportunity to ask questions of the panel and to
12  dialogue with the panel.
13            And then afterwards, they said we've
14  set up a microphone and a podium in the aisle.
15  And would you please, those wanting to ask
16  questions, would you please line up behind the
17  podium.  And I wanted to ask a question, so I
18  left my seat, walked back to -- I think I was
19  the third or fourth in line.  Third in line, I
20  think, behind the podium.
21       Q    Okay.  Let me just focus on now what
22  was said at the start of the session.  And then

Page 240

1   we'll get to the question and answer session in
2   a minute.
3            At the start of the session, did
4   Mr. Olson say that each person would be limited
5   to one question?
6        A    I believe so, yeah.
7        Q    And did he say that whatever the
8   person in the audience said had to be in the
9   form of a question?
10       A    I don't recall that.  He may have.  He
11  may not.
12       Q    Now, do you recall another person, a
13  Mr. Youmans, who was a moderator on the panel?
14       A    He was one of the panelists, wasn't
15  he?
16       Q    Okay.  Do you recall Mr. Youmans
17  saying as well that members of the audience were
18  not allowed to ask rhetorical questions?
19       A    I don't recall that statement.
20       Q    Okay.  Then do you recall that each of
21  the presenters spoke?
22       A    Yes.

Page 241

1        Q    And then do you recall after they
2   spoke that Mr. Olson again addressed the
3   audience and explained that there would be a
4   question and answer session, and that every
5   person in the audience who asked a question
6   would be limited to one question?  Do you recall
7   that?
8        A    They -- I recall that they changed the
9   procedure.  Initially, I think that they were
10  going to let the person go to the podium, ask
11  his question, receive an answer while he was
12  standing there so he could dialogue.
13            But I think that there was more people
14  than they expected that wanted to ask questions.
15  So that's when they said, okay, we're going to
16  limit you to one question apiece.  Ask your
17  question.  Have a seat.  And the panel will
18  address your questions in the order in which
19  they were asked.
20       Q    Okay.  Do you recall at this time,
21  that is, after the presenters had spoken, that
22  Mr. Olson again said that you must phrase your

61 (Pages 238 to 241)

March 29, 2007          William Maniaci          Maniaci vs. Georgetown
                        Washington, D.C.

Page 242

1  statement in the form of a question?
2      A   I don't recall him saying that.
3      Q   Do you recall him saying that --
4      A   A question is a question.
5      Q   Do you recall him saying that the
6  statement had to be in the form of a question?
7      A   No. I don't.
8      Q   Okay. Do you recall him saying that
9  members of the audience would each ask a single
10  question in groups of three? So there would be
11  three questions --
12     A   Right. He said three people, and then
13  sit down, and your questions would be addressed
14  in the order that they were received.
15     Q   Okay. So in due course, you got on
16  line to go to the microphone, correct, to ask
17  your question?
18     A   Yes.
19     Q   And then you say there were two or
20  three people before you. And then it came to
21  your turn.
22     A   That's right.

Page 243

1      Q   What did you say when you got to the
2  mic to ask your question?
3      A   I gave my name. I'm Bill Maniaci.
4  And I'm with the Jewish Defense League. And my
5  question is. And I asked my question.
6      Q   What was your question?
7      A   I don't remember the exact wording of
8  the question. But it had to do with whether or
9  not they -- they condoned the use of suicide
10  bombers killing innocent women and children to
11  accomplish their goals.
12     MR. BUCKLEY:  Okay. We have to take a
13  break to change the tape.
14     MR. FAY:  Okay.
15     THE VIDEO OPERATOR:  This ends
16  videotape number 2. We're going off the record
17  at 2:45.
18     (Recess.)
19     THE VIDEO OPERATOR:  This begins
20  videotape number 3. We're back on the record at
21  2:51.
22  BY MR. BUCKLEY:

Page 244

1      Q   Okay. Did you ask the panelists to
2  comment on whether they supported terrorism or
3  not?
4      A   No. I asked the panelists to comment
5  on whether they supported the use of suicide
6  bombers to accomplish their goals.
7      Q   But you say you never asked them to
8  indicate whether they supported terrorism or
9  not?
10     A   I asked them do you or do you not
11  support the use of suicide bombers that kill
12  innocent Israeli women and children to
13  accomplish their goals.
14     Q   Did you also ask them whether they
15  supported terrorism or not?
16     A   I asked them the question that I just
17  related to you.
18     Q   And nothing else?
19     A   Nothing else.
20     Q   Before you asked your question -- I
21  think you indicated that initially the panel was
22  taking single questions and then responding to

Page 245

1  single questions. And they changed the format
2  to move to basically group questions, where
3  three people would ask a single question at a
4  time; is that right?
5      A   I thought that was for expediency.
6      Q   Okay. Going a little bit earlier,
7  then, when the panel was entertaining single
8  questions, did Rabbi Shifren ask a question?
9      A   Yes, he did.
10     Q   Do you recall what question he asked?
11     A   I couldn't hear him. He didn't use
12  the microphone. And he was down in front.
13     Q   Was that for religious reasons?
14     A   Yes.
15     Q   And do you recall him being advised
16  later when he was trying to respond to the panel
17  after an answer to his question, that he was
18  advised that he was limited to a single
19  question?
20     A   I don't -- I don't know what the
21  exchange was between Rabbi Shifren and anyone on
22  the panel. I have no idea.

62 (Pages 242 to 245)

March 29, 2007          William Maniaci          Maniaci vs. Georgetown
Washington, D.C.

Page 246

1    Q   Did --
2    A   I do know that he was chased up the
3  aisle by security. And that's all I know.
4    Q   Did Mr. Olson advise Rabbi Shifren
5  that the opportunity for him to ask his question
6  had ended?
7    A   I said I didn't know what exchange may
8  have taken place between Rabbi Shifren and
9  anyone on the stage.
10    Q   Okay. Do you recall Mr. Olson, again,
11  the Georgetown administrator, indicating to
12  Rabbi Shifren that he was creating a
13  disturbance?
14    A   What part of I didn't hear anything
15  that went on don't you understand, sir?
16    Q   Are you addressing that to me?
17    A   Yes, sir.
18    Q   Okay. Did you hear Mr. Olson advising
19  Rabbi Shifren that he would have to leave the
20  room or be escorted from the room?
21    A   I've answered that question.
22        MR. FAY: I think he's already

Page 247

1  answered it.
2        MR. BUCKLEY: It's a different
3  question.
4        THE WITNESS: It's the same question.
5        MR. FAY: No. You asked -- you began
6  with an all-encompassing question. He said he
7  didn't hear what was going on because they
8  weren't using the microphone. And then you
9  kept --
10  BY MR. BUCKLEY:
11    Q   I'm talking about after -- Mr. Olson
12  from the stage. Did Mr. Olson ask that Rabbi
13  Shifren be escorted from the room?
14    A   I don't know.
15    Q   Okay. Let's go back to then, when you
16  asked your question. Then did the panel answer
17  a series of questions before it got to your
18  question?
19    A   Yes.
20    Q   Okay. And then did one of the
21  panelists address your question?
22    A   Yes.

Page 248

1    Q   Which panelist was that?
2    A   It wasn't -- it was the female. I
3  would know her name if you give it to me. It's
4  not Erakat. It's the other one.
5    Q   Sue Blackwell?
6    A   Sue Blackwell.
7    Q   And did you understand who Sue
8  Blackwell was?
9    A   Yes. She was the -- I was -- my
10  question was the third question that I
11  answered. And she addressed the question by
12  saying that the United -- that Israel had been
13  bombing Palestinian childrens with F-16s or
14  something, and that President Bush is
15  responsible for the war and all the evils in the
16  world, along with Israel. She didn't address my
17  question.
18    Q   Did Ms. Blackwell say, quote, I
19  unreservedly condemn all acts of terrorism,
20  unquote?
21    A   I believe she did.
22    Q   Did Ms. Blackwell state, quote, I

Page 249

1  unreservedly condemn all acts of terrorism by
2  which I mean acts or threats of violence against
3  unarmed civilians for political ends, unquote?
4    A   I don't know if she did or not. I
5  don't remember that.
6    Q   Did she further state, quote, and that
7  applies to suicide bombs in pizza parlors in
8  Israel, unquote?
9    A   I don't remember her saying that.
10    Q   Are you denying she said that?
11    A   No. I'm saying I didn't hear her say
12  that. I don't know what else I can tell you.
13    Q   Are you contending that Ms. Blackwell
14  in her answer did not state that she
15  unreservedly condemned all acts of terrorism,
16  including suicide bombers in Israel?
17    A   I'm saying she didn't answer the
18  question as I phrased it. I'm saying that she
19  spun the question. I'm saying that she brought
20  President Bush into the question. I'm saying
21  that she brought F-16s from the Israeli Air
22  Force into the question, which had nothing to do

63 (Pages 246 to 249)

March 29, 2007          William Maniaci          Maniaci vs. Georgetown
Washington, D.C.

Page 250

1  with the question. My question could have been
2  answered with a simple yes or no.
3      Q    Did Ms. Blackwell condemn suicide
4  bombing in Israel?
5      A    I don't believe she did.
6      Q    Did she unreservedly condemn all acts
7  of terrorism?
8      A    I don't know. Did she?
9      Q    I'm asking you. You were there.
10     A    I didn't hear her.
11     Q    You didn't hear her?
12     A    I didn't hear her. If she said that,
13  I didn't hear her.
14     Q    Were you wearing your hearing aids
15  that day?
16     A    No, I was not. And there was a lot of
17  background noise. And I was trying to
18  concentrate on what was being said.
19     Q    Wasn't she speaking into a microphone?
20     A    I suppose she was.
21     Q    Wasn't she using the voice
22  amplification system?

Page 251

1          MR. FAY: Wait a minute.
2          THE WITNESS: I don't know if she was
3  or not. Was she? You tell me. I don't know.
4  I was in the audience.
5          MR. FAY: This is just arguing with
6  the witness.
7          MR. BUCKLEY: No. You're interrupting
8  his answer.
9          THE WITNESS: No. You're harassing
10  me, sir.
11         MR. FAY: Come on.
12         MR. BUCKLEY: I'm not.
13         THE WITNESS: Yes, you are.
14         MR. FAY: Come on. This is arguing
15  with the witness. He already said he didn't
16  hear something.
17         MR. BUCKLEY: I'm asking --
18         MR. FAY: Then you said, well, was she
19  using a microphone.
20         MR. BUCKLEY: I'm asking his ability
21  to observe and understand what was happening.
22  That's all.

Page 252

1          THE WITNESS: I answered your
2  question. And you continue to ask the same
3  question over and over. I gave you a response.
4          MR. FAY: Let me handle the
5  objections.
6          MR. BUCKLEY: These are all different
7  questions.
8  BY MR. BUCKLEY:
9      Q    After Ms. Blackwell responded, did
10  Mr. Youmans state that we only have time for one
11  more round of three questions?
12     A    I don't know. After she responded --
13     Q    Yes?
14     A    I raised my hand and I said excuse me,
15  but you haven't answered my question.
16     Q    Where were you positioned at that
17  time?
18     A    In my seat.
19     Q    So you were not using the microphone.
20     A    No. I was sitting in my seat as I
21  depicted right here on this diagram.
22     Q    And did you shout out: You didn't

Page 253

1  answer my question?
2      A    I said excuse -- I raised my hand.
3  And I said: Excuse me, you haven't answered my
4  question.
5      Q    How many times did you say that?
6      A    A couple of times.
7      Q    Uh-huh. Did Mr. Youmans advise you
8  that you were disrupting?
9      A    Not to my recollection, he did not.
10     Q    Did he advise you that, quote, we can
11  talk about this afterwards, unquote?
12     A    I don't recall him saying that. I do
13  remember that I -- and I said, excuse me, you
14  haven't answered my question. And I was going
15  to say something about the promise of dialogue.
16  But I never got to get that far.
17     Q    Did Mr. Olson then advise you, quote,
18  you have had an opportunity to ask her a
19  question. Your opportunity has ended, unquote?
20     A    I don't know if he did or not. I was
21  raising my hand and looking at the -- at the
22  lady that was supposed to respond to my

64 (Pages 250 to 253)

March 29, 2007          William Maniaci          Maniaci vs. Georgetown
Washington, D.C.

Page 254

1  question.
2      Q    Did Mr. Youmans then again call for
3  others to ask more questions?
4      A    He -- I believe -- I believe they
5  tried to proceed without answering the question.
6      Q    What did you do?
7      A    I raised my hand and said excuse me,
8  please, you didn't answer my question. The
9  purpose was to answer the question.
10     Q    How certain are you that you used the
11 phrase, quote, excuse me, please, unquote?
12     A    I'm certain that I said excuse me.
13 I'm certain that I raised my hand and I said
14 excuse me, please answer my question.
15     Q    Were you shouting this from your seat?
16     A    No. I wasn't shouting. The volume
17 was sufficient for them to hear me on the stage.
18 We were only five rows from the stage. I was
19 not shouting.
20     Q    Did Mr. Youmans then direct the person
21 who was at the mic to ask her question, to go
22 ahead and ask her question?

Page 255

1      A    I don't know.
2      Q    Do you recall --
3      A    What I recall --
4      Q    What --
5      A    -- what I recall -- what I recall is
6  that the gentleman who was on the university
7  staff pointing at me and saying remove that man.
8      Q    I'm going through the sequence of
9  events. Do you then recall that a woman whose
10 name was Noelle, who was associated or a student
11 at Vanderbilt University, asked a question?
12     A    No. I don't recall that.
13     Q    Okay. Do you recall you speaking --
14 you again speaking after the young woman had
15 asked her question?
16     A    I told you I raised my hand, I
17 believe, a couple of times. I prefaced it with
18 excuse me, please answer -- or you haven't
19 answered my question. That's what I said.
20          And the next thing I recall is the
21 gentleman pointing at me on the stage and saying
22 remove that man. That's what I remember.

Page 256

1      Q    Do you recall another man behind the
2  young woman who was ready to ask his question,
3  who was wearing a large hat with fur around it?
4      A    They were behind me. I don't know who
5  was back there. I was seated in front. And the
6  podium was to the rear of where I was seated. I
7  don't know what was behind me.
8      Q    Are you familiar with a Rabbi Weis who
9  was there?
10     A    No. I'm not familiar with Rabbi Weis.
11     Q    Uh-huh. Do you recall again being
12 advised by Mr. Youmans, please don't interrupt,
13 quote-unquote?
14     A    I'll stand on what I just told you.
15     Q    Okay. Do you recall again being told
16 by Mr. Youmans, quote, you've already asked your
17 questions, thank you, unquote? Do you recall
18 that?
19     A    No.
20     Q    Do you recall again your saying,
21 quote, but you didn't answer my question,
22 unquote? Do you recall that?

Page 257

1      A    I recall saying that you didn't answer
2  my question, yes.
3      Q    Okay. Do you recall Mr. Youmans
4  responding, quote, she did, she answered your
5  question, unquote?
6      A    No. I don't remember that.
7      Q    Do you recall Mr. Olson saying to you,
8  quote, sir, you do not have an opportunity to
9  speak any longer. I would like to ask our staff
10 to escort this gentleman from the room. He's
11 creating a significant disruption, unquote?
12     A    That isn't what was said. He said
13 remove that man.
14     Q    He said: Remove that man?
15     A    Yeah.
16     Q    Did he say anything else other than,
17 remove that man?
18     A    Not that I recall. He pointed to me
19 and he said words -- he said remove that man --
20          MR. FAY: Is this from Youmans or
21 Olson? I think --
22          THE WITNESS: -- or words to that

65 (Pages 254 to 257)

March 29, 2007          William Maniaci          Maniaci vs. Georgetown
Washington, D.C.

Page 258

1  effect. Olson.
2        MR. BUCKLEY: Don't interrupt.
3        THE WITNESS: Olson I think it was.
4        MR. BUCKLEY: I'm going to call the
5  judge if you keep it up.
6        MR. FAY: Well, fine. Call the judge.
7  You mixed up Youmans and Olson. Okay?
8        MR. BUCKLEY: No, I haven't.
9        MR. FAY: Make it clear to him who
10  you're asking about.
11       THE WITNESS: You're trying to confuse
12  me, sir.
13  BY MR. BUCKLEY:
14    Q    I'm not.
15    A    Yes, you are.
16    Q    Did Mr. Olson tell you, quote, sir,
17  you do not have an opportunity to speak any
18  longer. I would like to ask our staff to escort
19  this gentleman from the room. He is creating a
20  significant disruption, unquote?
21    A    That's not what he said.
22    Q    What did he say?

Page 259

1    A    He pointed at me and said remove that
2  man, or words to that effect.
3    Q    Do you recall Mr. Youmans saying,
4  quote, at that point, quote, please move on with
5  the next question, sir?
6    A    I don't recall Mr. Youmans saying
7  anything.
8    Q    After Mr. Olson spoke, what do you
9  recall happening?
10    A    I recall a very muscular police
11  officer, in fact there were two of them, one
12  that was tall, one that was short and muscular
13  with a bald head, leaning over and putting his
14  hand on my arm. And I recall telling him that I
15  haven't done anything wrong. And that's about
16  as far as it got before I flew out of my seat.
17    Q    Do you recall the public safety
18  officer asking you to arise from your seat and
19  leave?
20    A    No.
21    Q    Did you refuse to leave?
22    A    No. I said I haven't done anything

Page 260

1  wrong. That's all I got out of my mouth.
2    Q    Did you in fact refuse to stand up and
3  leave the room?
4    A    No. I didn't refuse to stand up and
5  leave the room. I said I haven't done anything
6  wrong. I had my cane here and I had -- my cane
7  on the floor and I had a notebook balanced here
8  on my cane so I could take notes, which is what
9  I was trying to do.
10       And then I was grabbed. And I said I
11  haven't done anything wrong. And then I was --
12  progressed from there.
13    Q    Isn't it a fact that Mr. Olson asked
14  that you be escorted from the room?
15    A    I don't know. He didn't say escort to
16  me.
17    Q    Didn't you understand that you were
18  being asked to leave the room?
19    A    I -- no. I hadn't done anything
20  wrong.
21    Q    That's not responsive to my question.
22  My question is didn't you understand that you

Page 261

1  were being asked to leave?
2    A    No. I wasn't being asked to leave.
3    Q    Okay. When the officers came, didn't
4  they tell you to stand up?
5    A    No. He put his hand on my arm and I
6  told you what -- what I said, I haven't done
7  anything wrong.
8    Q    Did he ask you to stand up?
9    A    Not to my recollection.
10    Q    Did you understand that you were being
11  escorted out?
12    A    No.
13    Q    Did you cooperate with their effort to
14  have you arise from the chair and leave the
15  room?
16    A    I didn't have an opportunity to
17  cooperate.
18    Q    Did you engage in passive resistance?
19    A    No, I did not.
20    Q    Did you go limp?
21    A    No, I did not. I had the wind knocked
22  out of me. Somebody kneed me in the rib cage.

66 (Pages 258 to 261)

BRYNTESON REPORTING, INC.
(703) 768-8122    www.bryntesonreporting.com   Fax:  (703) 768-8921

March 29, 2007          William Maniaci          Maniaci vs. Georgetown
Washington, D.C.

Page 262

1      Q    Where were you when this allegedly
2  happened?
3      A    Where was I?
4      Q    Yes.
5      A    I don't know.  Somewhere between
6  the -- the seat and the aisle, in the grips and
7  clutches of those two officers.  And someone
8  kneed me in the ribs, knocked all of my wind
9  out.  I dropped my papers.  I managed to hold on
10 to my cane.
11        And all I remember is bumping into
12 elbows and shoes.  I remember seeing shoes on
13 the floor and the rug going by and bumping into
14 chairs and hitting the concrete pavement
15 outside.  That's what I remember.
16     Q    Did you drop your papers when you were
17 still seated in the chair?
18     A    I don't know exactly when the papers
19 were dropped.  I managed to hold on to the cane.
20     Q    Did the two officers lift you up out
21 of the chair?
22     A    They got me out of the chair by using

Page 263

1  brute force.  And what they grabbed, I don't
2  know.  They grabbed me.  They knocked the wind
3  out of me.  And I couldn't resist.
4      Q    Did they grab you by your arms and
5  lift you up out of the chair?
6      A    I don't know.  They grabbed me
7  somewhere.
8      Q    Was Mr. Turk there?
9      A    I didn't see where Mr. Turk was.
10     Q    Did you see Mr. Turk at all during
11 this time?
12     A    I saw Mr. Turk help me up when I was
13 on the floor outside the auditorium.
14     Q    Did you see him when you were still in
15 the auditorium after Mr. Olson had asked that
16 you be escorted from the room?
17     A    No, I didn't see Mr. Turk.
18     Q    Did you see Mr. Finberg at that time,
19 that is after Mr. Olson had asked you to be
20 escorted from the room?
21     A    No, I didn't.  All I saw --
22     Q    Did you see Mr. Nutting there in the

Page 264

1  aisleway --
2      A    All I saw were shoes, the floor, and
3  furniture.  I didn't see anybody.
4      Q    Are you claiming that one of the
5  Georgetown public safety officers kneed you in
6  the groin or the ribs?
7      A    In the rib cage, yes, I am.  How else
8  could I have been struck in the rib cage and had
9  all the wind knocked out of me?  I was gasping
10 for breath.
11     Q    Did you see one of the officers, in
12 fact, give you a knee to your --
13     A    No.  I felt a blow to my right rib
14 cage.
15     Q    Why do you say this blow was delivered
16 by one of the officers?
17     A    Because the officer was right next to
18 me.  How else could I get hit in the rib cage?
19     Q    Can you describe --
20     A    There was no one else there that could
21 do it.
22     Q    Can you describe the person who

Page 265

1  allegedly kneed you in the ribs?
2      A    No.  I can't.
3      Q    Okay.
4      A    I can tell you it was one of the two
5  officers that were assaulting me.
6      Q    What happened after you were taken up
7  out of your seat, lifted up out of your seat?
8      A    I was dragged.  I wasn't just lifted
9  up.  I was lifted up and I was hit in the rib
10 cage.  I lost my breath.
11     Q    Were you thrown onto the aisle floor?
12         MR. FAY:  Wait, wait.  You asked him a
13 question.  Let him finish the answer.
14 BY MR. BUCKLEY:
15     Q    Let's take it a step at a time or in
16 sequence.
17     A    Okay.  Sure.
18     Q    Let's not get --
19     A    Sure.  What would you like me to tell
20 you?
21     Q    Let's start with you were in your
22 chair and then you say the officers lifted you

67 (Pages 262 to 265)

March 29, 2007          William Maniaci          Maniaci vs. Georgetown
                        Washington, D.C.

Page 266

1  up out of the chair.
2      A    All I remember, and for the last time,
3  all I remember is being grabbed. And there was
4  a swift progression of events after being
5  grabbed. I was jerked from my chair. I was
6  struck in the right side. I lost my wind. And
7  I was concentrating on trying to breathe because
8  I had the wind knocked out of me. I was gasping
9  for breath.
10         And I was being dragged on the floor,
11  banged into chairs and people's shoes. And I
12  ended up on the concrete floor outside. And the
13  time span of this, I don't know, it must have
14  been four, five, six seconds. I don't know how
15  long it took.
16     Q    Did you cooperate with the officers in
17  their attempt to get --
18     A    I didn't have a chance to cooperate.
19  I didn't resist.
20     Q    Let me finish the question. Did you
21  cooperate with the officers in their attempt to
22  remove you from the auditorium?

Page 267

1      A    I didn't know they were going to
2  attempt to remove me from the auditorium.
3      Q    Didn't you in fact go limp and force
4  them to carry you out?
5          MR. FAY: He's answered that three
6  times.
7          THE WITNESS: I answered that
8  question.
9          MR. FAY: Go ahead and answer that
10  again.
11         THE WITNESS: I didn't go limp. I had
12  the wind knocked out of me from a blow to my
13  right rib cage. I had no wind.
14  BY MR. BUCKLEY:
15     Q    Do you contend you were thrown onto
16  the aisle floor?
17     A    Yes.
18     Q    Do you contend --
19     A    And picked up. I was picked up -- I
20  was thrown down, picked up and carried.
21     Q    Okay. Do you contend that as you were
22  being carried out of the room, your head and

Page 268

1  limbs were bumping into objects?
2      A    Yeah.
3      Q    What objects were they bumping into?
4      A    Shoes. I remember shoes. I remember
5  the edge -- the edges of chairs, I think. I
6  remember blows. I was trying to get my breath
7  back.
8      Q    Blows where? As you were being
9  carried out?
10     A    I remember bumps and -- it was a
11  traumatic time.
12     Q    Uh-huh.
13     A    I don't remember a whole lot except
14  the initiation of the assault and then being
15  deposited on the concrete floor outside the
16  auditorium.
17     Q    Uh-huh. Do you claim that you were
18  thrown head first through the doors?
19     A    I don't know if I was or not.
20     Q    Have you ever claimed that you were
21  thrown through the doors?
22     A    I was thrown through the doors onto

Page 269

1  the concrete floor.
2      Q    Were the doors open?
3      A    I don't remember.
4      Q    Are you claiming that you hit your
5  head on the doors?
6      A    I don't know.
7      Q    Are you claiming that you were thrown
8  onto the floor --
9      A    Yes.
10     Q    -- outside?
11     A    I was thrown onto the floor.
12     Q    You were not placed there --
13     A    I wasn't placed gently on the floor,
14  no, sir, I was not. And I was pounced upon
15  after I was placed on the floor.
16     Q    Pounced upon by whom?
17     A    I don't know. It was somebody on my
18  back.
19     Q    On your back? Well, were you
20  placed --
21     A    I was thrown on the -- I was thrown on
22  the floor face first. I hit my head on the

68 (Pages 266 to 269)

March 29, 2007          William Maniaci          Maniaci vs. Georgetown
                        Washington, D.C.

Page 270

1  floor. I don't remember where my hands were,
2  where my knees were or where anything else was.
3  But I know there was a weight on my back.
4      Q    Okay. Did you get up from the floor?
5      A    I tried. And I had difficulty
6  standing.
7      Q    Did someone help you?
8      A    Yeah. Robert Turk helped me stand up.
9  And then I was -- there was a table there that I
10 sat on or leaned against.
11     Q    Did you notice other people in the
12 foyer who were familiar to you?
13     A    No.
14     Q    Or did you see --
15     A    Not immediately. There was a lot of
16 people around. And there were flash bulbs.
17 There were pictures being taken. I didn't care
18 who was around me then.
19     Q    How many times did you hit your head
20 from the point in time you were lifted up out of
21 the chair to the point you wound up in the
22 hallway or foyer?

Page 271

1      A    I don't have a clue. I have no idea.
2      Q    Let's look at some photographs.
3          (Maniaci Exhibit Number 16 was marked
4  for identification.)
5      MR. BUCKLEY: Let's mark these, we'll
6  do these A, B, C, D, et cetera.
7  BY MR. BUCKLEY:
8      Q    Your counsel produced photographs that
9  were taken by a woman whose name is -- is it
10 Carrie Devorah?
11     MR. FAY: Devorah, I think it is.
12     MR. BUCKLEY: Devorah?
13     MR. FAY: I think it's D-E-V-O-R-A-H.
14 BY MR. BUCKLEY:
15     Q    Okay. Do you know who she is?
16     A    Yes, I do.
17     Q    How do you know her?
18     A    I met her outside of -- and, again, I
19 can't remember the name of the deli -- in
20 Washington, D.C. the day of -- the day before
21 this event, the day we were to have a press
22 conference at Georgetown.

Page 272

1      Q    Uh-huh. How did you meet her?
2      A    She was walking up the street, and we
3  were going to our car. And I was with
4  Mr. Finberg and a couple of other individuals.
5  And somehow we started -- we started talking.
6  She asked if we were Chabad or something. We
7  said no. And we found out that she was a
8  journalist. And we -- through conversation, we
9  told her that we were on our way to Georgetown
10 University for a press conference.
11     Q    Uh-huh. And what did she say?
12     A    She says, oh, that's wonderful. I'm a
13 journalist.
14     Q    Did she say she was a photographer?
15     A    Uh-huh. A photojournalist.
16     Q    Did she say she was going to go and
17 take pictures?
18     A    Yeah.
19     Q    Of what happened?
20     A    Excuse me?
21     Q    She said she was going to go and take
22 pictures of what happened at Georgetown?

Page 273

1      A    There hadn't anything happened at
2  Georgetown.
3      Q    No. That she told you beforehand she
4  was going to go to the conference the next day
5  with her camera and take pictures?
6      A    It was our understanding that she was
7  going to be covering the conference, along with
8  some other reporters, yes.
9      Q    Was she covering it on behalf of some
10 media entity?
11     A    I think she's a freelance
12 photojournalist. That's how she makes a living.
13     Q    Had she previously planned to go to
14 the conference?
15     A    You have to ask her. I don't know.
16     Q    How long did this conversation take?
17     A    Very brief. It was on the street. We
18 were getting into our car and we told her where
19 we were going.
20     Q    Is it the same deli that you met with
21 Mike Smith?
22     A    That's right.

69 (Pages 270 to 273)

March 29, 2007                William Maniaci          Maniaci vs. Georgetown
                            Washington, D.C.

Page 286

1    picture?
2        A    I don't appear to be in that picture.
3        MR. FAY:  Hold on just a minute.
4    These can't possibly be in correct numerical
5    sequence, if 16G is Mr. Maniaci still sitting,
6    unless these guys picked him up, carried him out
7    and then carried him back and plunked him in a
8    chair.  And I don't know that that's anybody's
9    story.
10       MR. BUCKLEY:  I'm trying to find out.
11   I didn't take these pictures.
12       MR. FAY:  Okay.
13       MR. BUCKLEY:  You produced them.  I'm
14   trying to find out what they mean.
15       MR. FAY:  I'm just pointing that out.
16   I'm not --
17   BY MR. BUCKLEY:
18       Q    Okay.  Look at 16H.
19       A    Okay.
20       Q    I'm sorry.  Do you see yourself in
21   16F?
22       A    16 what?

Page 287

1        Q    F again, 16F.  You don't see yourself
2    there at all?
3        A    No.  I don't see myself.
4        Q    Okay.  Look at 16H then.  Do you see
5    yourself in that?
6        A    I don't know.  There's some papers, it
7    looks like papers there.  Item numbered 4?
8        Q    It could be your papers?
9        A    It could be my hand holding papers.  I
10   don't know.
11       Q    Okay.  Look at 16I.  Can you tell us
12   what's happening there?
13       A    Yeah.  These two guys have got ahold
14   of me there.
15       Q    Are you being hit, as shown in that
16   picture?
17       A    I don't know.  I don't know.
18       Q    Look at 16J.  Can you tell me what is
19   happening there?
20       A    Well, there's -- it could be me
21   holding some papers or something.  But I
22   don't -- I can't tell in the photo.  All I see

Page 288

1    is --
2        Q    All right.  Look at 16K.  Tell me what
3    that is.
4        A    I can't tell.  The photo is blurry.
5        Q    Okay.
6        A    I see the two officers there.
7        Q    Uh-huh.  How about 16L?  Can you tell
8    me what that depicts?
9        A    It looks like two officers carrying
10   me -- if that's me, carrying me head first
11   through the doors.
12       Q    Okay.  Do you recall the officers ever
13   saying anything to you?
14       A    No.  I don't remember them saying
15   anything to me.
16       Q    Okay.  And what happened after you
17   wound up on the floor in the hallway, and you
18   got up, were the officers still there?
19       A    No.
20       Q    Did any --
21       A    I didn't see the officers there at
22   all.

Page 289

1        Q    Okay.  Who did you speak to at that
2    point in time?
3        A    Bob Turk.
4        Q    Anybody else?
5        A    I think it could have been, Matt could
6    have been there.
7        Q    Matt Finberg?
8        A    Uh-huh.
9        Q    Anybody else?
10       A    I don't know.  I was pretty unsteady.
11   And Bob helped me up, helped me to my feet.
12       Somebody came over and talked to us.
13   A university representative.  And I don't
14   remember what was said.  But I know that we said
15   we were leaving.  And we went -- took the
16   elevator downstairs and went out the front door.
17   I was helped by Bob Turk.
18       Q    So somebody from the university spoke
19   to you but you don't recall who it was.
20       A    It was a university suit.  One of the
21   people that was the administrators that was --
22       Q    It wasn't Mr. Olson, though?

73 (Pages 286 to 289)

March 29, 2007          William Maniaci          Maniaci vs. Georgetown
Washington, D.C.

Page 290

1    A    I don't know.
2    Q    Okay.  You don't recall what he said?
3    A    I don't recall his exact words.  I do
4  know that we had told him that -- that we were
5  going downstairs, or we could take the
6  elevator -- I remember going downstairs on the
7  elevator and Bob Turk helping me downstairs.
8         We went out in front.  And we paused
9  outside and -- where I could catch my breath.
10  It was just Bob Turk and myself.  Nobody else.
11  And then we decided that we would walk to the
12  other building where we had tables rented,
13  because I wanted to get something to eat, and I
14  was feeling uneasy.  And I wanted to be able to
15  sit down and rest and go to the bathroom as
16  well.
17    Q    Okay.  Well, before we get there, look
18  at Exhibit 17.
19         (Maniaci Exhibit Number 17 was marked
20  for identification.)
21         THE WITNESS:  Okay.  Yeah.
22  BY MR. BUCKLEY:

Page 291

1    Q    How many photographs are there there?
2  Are there three?
3    A    One, two, three.
4    Q    Okay.  Now, let's look at A.  When was
5  this taken, to the best of your knowledge?
6    A    I guess it was taken -- I've got my
7  attendee badge on.
8    Q    Uh-huh.
9    A    And I think I was being escorted
10  downstairs.  This must have been by the
11  elevator.
12    Q    Uh-huh.  I see it shows Lieutenant
13  Mike Smith present.
14    A    I see him right there.
15    Q    Do you know whether he was in Gaston
16  Hall at the time of the incident?
17    A    I don't -- not to my knowledge.  I
18  don't know.
19    Q    Did he ever speak to any of the
20  university public safety officers?
21    A    Not to my knowledge.
22    Q    He didn't intervene in any way?

Page 292

1    A    No.
2    Q    And Mr. Nutting, had he been inside --
3  obviously he had been inside the hall at the
4  time of the incident, correct?
5    A    I think we saw his picture inside the
6  hall.
7    Q    Right.  Correct.  17B, this is just
8  basically the same people; is that correct?
9    A    Yeah.
10    Q    And 17C is just you and Mr. Nutting
11  and Mike Smith again, correct?
12         MR. FAY:  17B is the two on one page?
13         MR. BUCKLEY:  Yeah.  That's right.
14  BY MR. BUCKLEY:
15    Q    17C is just you and Mr. Nutting,
16  correct?
17    A    I think it's all the same picture.
18    Q    Okay.  Now, you had before --
19    A    It appears to be the same photograph,
20  only enlarged.
21    Q    Now, you had before a black fedora and
22  winter top coat, correct?

Page 293

1    A    I'm wearing a top coat there.
2    Q    Yeah.  Okay.
3    A    And I had a black fedora.  And it's
4  probably in my hand.
5    Q    Okay.  Where's your cane?
6    A    In my other hand.
7    Q    And where are your papers?
8    A    I don't know where the papers were.
9    Q    Okay.
10    A    They were picked up by somebody.
11  By -- Keith Bailey picked up my papers.
12    Q    So you went downstairs in front of the
13  Healy building, correct?
14    A    Uh-huh.
15    Q    And you decided to go to the
16  Intercultural Center?
17    A    Yes.
18    Q    Where JDL had a booth.
19    A    No.  We didn't have a booth.  We had
20  two tables.
21    Q    Two tables?
22    A    And some chairs.  And there was a food

74 (Pages 290 to 293)

March 29, 2007          William Maniaci          Maniaci vs. Georgetown
Washington, D.C.

Page 294

1  concession there.  And there was a little lounge
2  where they had couches and chairs where you
3  could sit down and relax.  And that's what I
4  needed to do at that time.
5      Q    And so you walked -- and what's the
6  distance -- what is the distance between the
7  front of the Healy building and the ICC
8  building?
9      A    Probably 150, 175 yards.
10      Q    And you walked with Mr. Turk from one
11  location to the other?
12      A    Yes, I did.  We walked slowly.  And he
13  supported me.  And it was -- I know it was cold.
14  The wind was blowing.  It was raining.  It was
15  kind of nasty out there.
16      Q    Were you approached by Mr. Harrison of
17  Georgetown's public safety department at that
18  time?
19      A    Darryl Harrison?
20      Q    Yes.
21      A    Not that I recall.
22      Q    Did you not walk with him from the

Page 295

1  Healy building to the ICC building?
2      A    No.  I walked with Bob Turk.
3      Q    And where was Mr. Finberg at this
4  time?
5      A    I don't know.
6      Q    Where was Mr. Nutting at this time?
7      A    I don't know.
8      Q    Where was Lieutenant Smith at this
9  time?
10      A    I don't know.
11      Q    Where was Mr. Bailey at this time?
12      A    I don't know.
13      Q    Where was Mr. Haas?
14      A    I don't know where anyone was other
15  than myself and --
16      Q    Just the two of you?
17      A    The two of us.
18      Q    Okay.
19      A    I assume Mr. Haas was in the ICC
20  building at our tables.
21      Q    At the two tables?
22      A    Yeah.

Page 296

1      Q    So you walked down to the ICC
2  building.  And what happened there?
3      A    I went in through the -- into the
4  foyer.  It's a double -- it's encased in glass.
5      Q    Okay.
6      A    It's -- and I got in to the first part
7  of the foyer.  And I was pushed up against the
8  wall or the glass wall on the left side as
9  you're going in, by the same officer that had
10  accosted me in the other building.
11      Q    Well, there are two officers who were
12  involved in escorting you --
13      A    This was the bald-headed officer.
14      Q    The bald-headed officer?
15      A    Yes.
16      (Maniaci Exhibit Number 18 was marked
17  for identification.)
18  BY MR. BUCKLEY:
19      Q    Okay.  Let me show you what's been
20  marked as Deposition Exhibit 18, which is simply
21  a sketch of the ICC building.
22      And would you, using your red pen,

Page 297

1  just indicate where you were, if you can
2  recognize where the double doors are.
3      A    I'm trying to -- where's the entrance
4  on this sketch?
5      Q    Right here.  Right here.
6      A    This is the entrance?
7      Q    Yes.
8      A    I don't think so.  Or if it is, it's
9  not as I remember it.
10      Q    Okay.
11      A    Because I think it was larger and
12  around to the left side.  There was -- in this
13  area, there was couches -- there was a
14  relaxation area in here.  We had couches and
15  chairs.
16      Q    Okay.
17      A    It wasn't like it's depicted here.
18      Q    Let's not use that then if you don't
19  recognize it, if you don't think it accurately
20  depicts the --
21      A    No, it --
22      Q    -- the scene.

75 (Pages 294 to 297)

March 29, 2007          William Maniaci          Maniaci vs. Georgetown
Washington, D.C.

Page 298

1      A    It's not the same as I remember.
2      Q    Then just in your own words describe
3  what happened.  You went into the foyer.  Is
4  that when you first had another discussion with
5  the Georgetown public safety officers?
6      A    I went into the foyer.  And I wanted
7  to go in and go to the restroom.  And I wanted
8  to get something to drink --
9      Q    Right.
10      A    -- and to sit down.  And I was
11  contacted directly by one of the public safety
12  officers.  The same fellow I had described with
13  the bald head, who just pushed me up against the
14  glass wall.  And there were other officers
15  coming in my periphery.  But I was concentrating
16  on this gentleman.
17          And I asked him -- remember asking
18  him, am I under arrest?  And he said no.
19          And then I told him, well, if I'm not
20  under arrest, I'm going to the bathroom.  He
21  says you're not going anywhere.  And they
22  persisted in holding me against my will without

Page 299

1  arresting me for quite some time.  And it wasn't
2  just 2 or 3 minutes or 5 minutes.  It went into
3  15 or 20 minutes before they would even let me
4  go to the bathroom.  And then they only did when
5  I told them I was taking diuretics and I wasn't
6  bashful about getting his leg wet.
7          And he believed me.  And then he --
8  they relented and they let me go to the
9  bathroom, escorted.  And they didn't even let me
10  use the restroom in private.  They threw the
11  door open so all could see while I was standing
12  there and relieving myself.  And that was very
13  embarrassing.
14      Q    Was there anyone else in the restroom
15  when you were there?
16      A    There was only one stall.  But the
17  door is right -- if you hold the door open,
18  people from outside can see into the restroom.
19      Q    Did you notice anybody outside looking
20  in?
21      A    I was looking straight ahead at the
22  urinal.  I don't know if there was anybody

Page 300

1  behind me or not, but I know that the doors were
2  wide open.  And they refused to let me have any
3  privacy.
4      Q    Was there a urinal or was there a
5  toilet?  What was there?  Both?
6      A    I think there was a urinal on the
7  wall, I think.  It could have been a toilet.  I
8  don't remember.  It was a bathroom.  It was a
9  single stall bathroom type.
10      Q    Before the time you went to use the
11  restroom, had you been asked to leave the
12  campus?
13      A    No.  No.  I had not been asked to
14  leave the campus.
15      Q    Before you went to the bathroom had
16  you spoken to Mr. Harrison, Darryl Harrison of
17  the public safety department?
18      A    I don't know if he -- if I did he
19  hadn't identified himself.
20      Q    Did you see Mr. Olson there at the
21  ICC?
22      A    I saw the same -- a couple of the same

Page 301

1  people in suits that I had seen in the
2  auditorium.
3      Q    Now, do you know who David Morrell is?
4      A    Morrell and Olson, I would recognize
5  both of them.  But I get them confused as to
6  who -- which one is Morrell and which one is
7  Olson.
8      Q    Did you ever speak to Mr. Morrell?
9      A    I may have.  I don't know.
10      Q    If the person in the photograph that
11  we looked at earlier is Mr. Olson, that is the
12  person who is on the stage, if that's Mr. Olson,
13  and the other person is Mr. Morrell, do you ever
14  recall speaking to Mr. Morrell?
15      A    I may have.  I don't recall.
16      Q    Do you recall speaking to him at the
17  ICC?
18      A    No, I don't remember.
19      Q    So after you came back from using the
20  bathroom, what happened next?
21      A    Then I was brought back into the
22  foyer.  And Matt Finberg was there.  And I think

76 (Pages 298 to 301)

March 29, 2007          William Maniaci          Maniaci vs. Georgetown
Washington, D.C.

Page 302

1  Morrell and -- both of them may have been there.
2  And Mr. Finberg asked one of them to see the
3  university provost.  And they said, no, you
4  can't see the university provost.  And I think
5  that they said we want Mr. Maniaci to leave.
6        And I -- they brought in a -- an
7  officer from the Metropolitan Police Department.
8  And -- who was -- I think his name was -- his
9  name was DeLisi.  He's a sergeant.  And he said
10  that I'm here to escort you off of the campus.
11  And we moved outside, right outside the door.
12        And at that time, Mr. Finberg was
13  there, along with Rabbi Shifren.  And they were
14  sharing a room in the hotel, which is right
15  there, adjacent -- it was the university hotel
16  that they had a room.
17        And Matt and the Rabbi asked me why
18  don't you come up to our room.  You can have
19  some kosher food and you can rest.  I said that
20  sounds really good.  And then it was either
21  Morrell or the other gentleman that said you're
22  not going anywhere.  You're not going there.

Page 303

1  They refused to let me go to his room.
2        And so then it was -- I really wasn't
3  feeling well.  And Bob Turk -- excuse me.  Bob
4  Turk asked me if -- or asked the officer if he
5  would -- he says, I believe that Mr. Maniaci is
6  feeling ill and needs some medical attention.
7  Would you call him an ambulance.  They said he
8  can have all the medical attention he wants
9  after he's removed -- after he gets off campus.
10  Q    This is what Sergeant DeLisi said?
11  A    Yeah.  So then Bob Turk walked me the
12  150 yards or so from that location to the front
13  pedestrian gate.  And our car was parked just
14  down the street a little bit.  And they walked
15  me down to the car.  And I sat in the car.  And
16  he -- Bailey brought me something to drink and
17  something to eat.  And I sat there for a couple
18  of hours.  And then we went back to the hotel.
19  Q    The Wyndham Hotel on M and 14th?
20  A    Yeah.
21  Q    What did you do after that?
22  A    Excuse me.  My neck is hurting really

Page 304

1  bad.
2  Q    Sure.
3  A    I don't remember.  I probably laid
4  down.
5  Q    What did you do that evening?
6  A    I -- we were going to go out to
7  dinner.  And I was still not feeling well.  And
8  we were -- I remember we were in the lobby of
9  the Wyndham Hotel with some of our friends.  And
10  apparently I was calling my friends by the wrong
11  first name or something.  I was calling Jimbo
12  Bob and Bob Jimbo.  And they said you better
13  go -- go to the doctor and see a doctor.  And I
14  said, okay.  And then Bob Turk drove me to the
15  hospital.
16  Q    Are you describing something that
17  happened on Saturday?
18  A    No.  Sunday.
19  Q    Sunday.
20  A    Sunday night.  Yeah.
21  Q    Okay.
22  A    Which night were you referring to?

Page 305

1  Q    I was referring to what happened
2  Saturday.
3  A    Saturday night, I don't recall what we
4  ate.
5  Q    Do you recall where you ate?
6  A    No.  Someplace in Georgetown on the
7  way back.
8  Q    Did everybody get together, that is
9  Mr. Finberg and Mr. Bailey and so forth?
10  A    I know that I was with Bob Turk.  And
11  probably Finberg was along.  I don't remember
12  who else was there.  Maybe -- probably
13  Mr. Nutting.  And I remember we had -- we
14  stopped in a place and had -- I had hamburger
15  and a beer.
16  Q    Okay.  And then you went back to your
17  hotel and went to bed?
18  A    That's right.
19  Q    And the next morning, what happened
20  the next morning, Sunday morning?
21  A    Sunday morning, I got up and showered.
22  And we -- we were expecting two busloads of

77 (Pages 302 to 305)

BRYNTESON REPORTING, INC.
(703) 768-8122     www.bryntesonreporting.com    Fax:  (703) 768-8921

March 29, 2007              William Maniaci              Maniaci vs. Georgetown
                           Washington, D.C.

Page 306

1  elderly people coming in to demonstrate at
2  Georgetown.  And the buses were to meet with us
3  at our hotel on the street, and then they would
4  follow us out to Georgetown University, since
5  the bus drivers weren't familiar with the area.
6      And the buses -- buses were late.  And
7  I think Bob probably got a phone call or called
8  someone and found out that the buses were
9  driving around in circles in the general area of
10  where we were, but they couldn't find the
11  Wyndham Hotel, which is just off on the little
12  side street.
13      And so Mr. Bailey and I said, okay,
14  we'll walk up, half a block up to the street to
15  the corner, and if we see the buses then we can
16  wave the bus and direct the bus into the -- into
17  the side street so they can get to the hotel.
18      And while I was there waiting for the
19  bus, I fell down.  And I just -- one minute I
20  was standing upright, the next minute I was flat
21  on my nose and I don't know why.
22      Q    What time of day was this?

Page 307

1      A    It was midmorning.  11 o'clock, maybe.
2  Ten, 11 o'clock.  I'm not sure.
3      Q    You had had breakfast?
4      A    Yes.  Uh-huh.
5      Q    Had you taken your medications?
6      A    Oh, of course.  Of course.  And I
7  picked myself up.  And Keith ran over and said
8  what happened.  I said, no, I'm okay.  I just
9  dusted myself off then and waited for the bus.
10  And then in fact, I think -- I think I walked
11  back to the hotel and sat down.
12      Q    When you were walking, waiting for the
13  buses, you said you went out to a place where
14  there was a traffic circle?
15      A    There was a roundabout there.
16      Q    A roundabout, and a statue of somebody
17  on a horse?
18      A    Yeah.  Yeah.  And we were on the side
19  of the road there and looking for the bus to
20  come around the roundabout.
21      Q    And you were kind of standing there.
22  Did you have your cane with you?

Page 308

1      A    Yes.
2      Q    And were you carrying anything?
3      A    No.  No.  I don't think so.
4      Q    And did you feel dizzy?
5      A    No.  I didn't.
6      Q    Did you --
7      A    If I felt dizzy, I would have sat
8  down.
9      Q    You didn't feel dizzy.  You just
10  blacked out?
11      A    Yes.  I found myself on the pavement.
12  And I wasn't aware of falling or anything.  I
13  don't know what happened.
14      Q    Do you -- were you on the sidewalk or
15  did you fall into the street?  Did you fall onto
16  anything?
17      A    There was some gravel on the roadway.
18  Because I remember my knee was skinned up a
19  little bit.  But I didn't fall onto any objects
20  or anything.
21      Q    Did you twist your foot when you fell?
22      A    No.  I might -- my ankle had already

Page 309

1  been twisted.  I was limping on it.  It was
2  swollen.  But my ankle didn't give way.
3      Q    Did you -- by the way, before the
4  conference at Georgetown, didn't you walk with a
5  limp at that time?
6      A    I always walk with a cane.  I don't
7  know if it's a pronounced limp or not.  But I
8  always walk -- if my hips are hurting, I might
9  look like I'm limping.
10      Q    Okay.  So you have this like blackout
11  basically.
12      A    Yeah.
13      Q    You fall down.
14      A    It was just like that.  I don't think
15  I was on the ground long.  I think I just fell
16  and got right back up.  I don't know.
17      Q    You don't know how long you were out?
18      A    No.  I don't think I was out.  I think
19  it was just down and back up.
20      Q    And who was there to help you again,
21  Mr. Turk?
22      A    No.  Mr. Turk wasn't there.  It was

78 (Pages 306 to 309)

Case 1:06-cv-01625-LFO    Document 39-3    Filed 01/14/2008    Page 55 of 62

March 29, 2007          William Maniaci          Maniaci vs. Georgetown
Washington, D.C.

Page 310

1   Mr. Bailey.
2       Q    Mr. Bailey.  Had he walked with you
3   from the hotel?
4       A    Both of us walked out with the
5   intention of looking for the buses, to wave the
6   bus back into the hotel.
7       Q    So what did you do next?
8       A    I went back to the hotel and sat down.
9       Q    And then what?
10      A    Then the buses showed up.  And I rode
11  one of the buses out so I could show the driver
12  the route to take.  And I think Mr. -- somebody
13  drove the car.
14      Q    You didn't drive the car.
15      A    I don't remember -- I don't think I
16  drove the car.  I think I rode in the bus, now
17  that I think about it.  And I know when we got
18  out there, the car was parked in pretty much the
19  same spot that we parked the day before.  And I
20  had no intention of going back onto the
21  Georgetown campus.  So I sat in the car.
22      Q    Did you have an Israeli flag?

Page 311

1       A    Yes, I did.
2       Q    And did you take it out to the main
3   gate of the university?
4       A    Yeah, I did.  I did.
5       Q    Did you stay on the sidewalk?
6       A    I did.
7       Q    Were you told that was Georgetown
8   property and you weren't --
9       A    Yes, I was.
10      Q    And you were to move?
11      A    He said that the sidewalk belonged to
12  him, the officer.  And he said this is my
13  sidewalk.  I said okay.  Then I stepped down off
14  the sidewalk into the street.  And I said I
15  don't believe I'm still in your jurisdiction.
16      Q    Had you recognized that officer from
17  the prior day?
18      A    He looked familiar, but he wasn't one
19  of the ones that I had dealt with.  There was
20  one -- one officer there that was a pretty nice
21  guy when I first got there.  He was -- we
22  started shooting the breeze.  And I said I guess

Page 312

1   I'm going to hang out here today.  He said okay,
2   that's fine.  But then there was a sergeant that
3   came up, and the sergeant was the guy that got
4   nasty.
5       Q    Were you interviewed by the media?
6       A    No.
7       Q    I'm talking about Sunday when you were
8   in front of the main gate of the university.
9       A    People took some pictures of me.  But
10  I don't know that I -- I don't think I was
11  interviewed by anyone.
12      Q    Do you recall someone with a tape
13  recorder, perhaps a video camera?
14      A    Could have been.
15      Q    Do you recall that at all?
16      A    I recall people with cameras and a lot
17  of things happening.  I don't -- wait a minute.
18  Yeah.  I think somebody did.  There was a kid --
19  there was a kid, a young fellow that had a tape
20  recorder and a microphone.  I don't remember who
21  he said he was for or with or anything.
22      Q    What do you recall saying?

Page 313

1       A    I don't remember.
2       (Maniaci Exhibit Number 19 was marked
3   for identification.)
4   BY MR. BUCKLEY:
5       Q    Okay.  Let me show you what's been
6   marked as Exhibits -- let's show you 19A first.
7   Can you tell me what you believe that depicts?
8       A    That's me.  And there's somebody there
9   talking to me.  I don't have a clue as to who it
10  is.
11      Q    Do you think it's a person who's
12  recording your voice?
13      A    It looks like he has a microphone in
14  his hand.
15      Q    Uh-huh.  Let me show you 19B.  Again,
16  is that in front of the main gate of the
17  university on Sunday, February 19th?
18      A    That's right.  That's right.
19      Q    Is that Mr. Finberg there?
20      A    Where?  On the left side?
21      Q    Yes.
22      A    The tall guy with the beard and the

79 (Pages 310 to 313)

March 29, 2007          William Maniaci          Maniaci vs. Georgetown
Washington, D.C.

Page 314

1  ponytail. Yes, that's Mr. Finberg.
2      Q    Who is the man with the backpack?
3      A    I don't know.
4      Q    Okay. I believe Exhibit 19C is more
5  or less the same thing, is it not?
6      A    Yes, sir.
7      Q    And Exhibit 19D as well?
8      A    It appears to be.
9      Q    Okay. Look at 19E. Are there any new
10  persons there who we have not seen in the prior
11  photographs?
12      A    Keith Bailey is there on the left-hand
13  side.
14      Q    Okay.
15      A    Next to him is one of those
16  80-year-old Holocaust survivors that had been in
17  attendance. And he was talking to me. I talked
18  to several of these old guys and they were kind
19  of upset because the university wouldn't let
20  them go to the bathroom.
21      Q    How long were you there in front of
22  the main gate of the university?

Page 315

1      A    I -- the car was really close. So I
2  walked up there. I stayed there for 20 minutes,
3  half an hour. And I would go back to the car
4  and sit down for a while. Then I got back up
5  and walked back up to the main gate.
6      Q    With the flag and with your cane?
7      A    Yeah.
8      Q    And how long did that go on?
9      A    Not that long. Probably -- I don't
10  know. An hour or two.
11      Q    And that would be between what time of
12  day? Between --
13      A    Afternoon. It was in the afternoon.
14      Q    Like noon, 2:00?
15      A    No. It was afternoon. It was later
16  afternoon. You can -- if my sense of direction
17  is correct, this would be late afternoon because
18  you can see the length of the shadows. And the
19  sun would be setting in that direction. So this
20  was -- it was still wintertime. And it was
21  getting late in the afternoon. Maybe 2 or
22  three o'clock may be.

Page 316

1      Q    Two or three o'clock. Okay. What did
2  you do after that?
3      A    I went back to the hotel, I think.
4      Q    And then after you went back to the
5  hotel, what happened next?
6      A    Then that was what I was describing to
7  you earlier when I got confused on the days. It
8  was -- we had gone down to the lobby of the
9  hotel. And we -- to meet, you know, my other
10  associates. And we were going to get something
11  to eat. And that's when it was suggested to me
12  that I should go to a doctor. And that's what
13  we did.
14      Q    Okay. Now that we're on the right
15  day, what happened as I understand it is that
16  you were calling --
17      A    As I recall --
18      Q    -- Mr. Turk Jimbo?
19      A    -- they said I was calling Mr. Turk
20  Jim, and I was calling Jim Bob. And I was
21  stuttering and maybe slurring my words a little.
22  So they thought it would be a good idea if I was

Page 317

1  looked at. And I said okay. I reluctantly said
2  okay. I didn't want to go to a doctor.
3      Q    So you went to Walter Reed?
4      A    Yes.
5      Q    Had you ever been there before?
6      A    No.
7      Q    What time did you go?
8      A    Bob drove me to Walter Reed. We had a
9  little trouble finding it because neither one of
10  us knew exactly where it was. We looked on the
11  map. I don't know how long it took us to get
12  there. Maybe an hour.
13      Q    What time did you leave the hotel for
14  Walter Reed?
15      A    I don't remember what time it was. We
16  hadn't gone to dinner, I think. I don't think
17  we had eaten yet.
18      Q    Uh-huh.
19      A    We just went straight out to Walter
20  Reed. By the time we got out there -- maybe we
21  got out there to Walter Reed at 9 or 10 o'clock.
22      Q    Okay. Let me show you a document your

80 (Pages 314 to 317)

March 29, 2007                    William Maniaci          Maniaci vs. Georgetown
                                  Washington, D.C.

Page 318

1   counsel produced that apparently is the
2   emergency care and treatment form from Walter
3   Reed.
4           MR. BUCKLEY:  Are we up to Exhibit 20?
5   Okay.
6           (Maniaci Exhibit Number 20 was marked
7   for identification.)
8   BY MR. BUCKLEY:
9       Q    This is Exhibit 20.  This has been
10  Bates stamped M 74 through M 82.  You'll note in
11  the top of the first page there's an entry for
12  time seen.  And it's military time, 2045.
13      A    Where are you looking?
14      Q    The right-hand corner.
15      A    It says 2020 here.  Arrival time at
16  2020.
17      Q    Okay.  What time would that be?
18      A    20 minutes past 8:00.
19      Q    Okay.  And when were you seen?
20      A    Almost immediately, I thought.
21      Q    Yeah.
22      A    They put me in a room almost right

Page 319

1   away.
2       Q    Okay.  Have you seen this document
3   before?
4       A    Yeah.  I've seen this copy before.
5       Q    Okay.
6       A    I can't read it.  But I've seen it.
7       Q    Looking right here at the center of
8   it, in a box that says 61-year-old male, do you
9   see that?
10      A    Can you point to it?
11      Q    Right here.  61-year-old male?
12      A    Here?
13      Q    Yeah.
14      A    Okay.  Yes.  64-year-old male.
15      Q    64.  Sorry, I took a few years off
16  your age.  I'm sure you won't complain.
17      A    No.  No.  Not at all.
18      Q    Look over to the right-hand box.  It
19  says MDHX.  Do you see that, medical history?
20      A    I see M -- yeah, it looks like MDHX.
21      Q    Looking down, there's a reference to
22  your, is it CD -- CDPD or is that the --

Page 320

1       A    It says CHF.
2       Q    That's congestive heart failure,
3   right?
4       A    That's right.  COPD.
5       Q    COPD.  And stroke TIA 2 months ago?
6       A    Okay.
7       Q    Does that refresh your recollection
8   that you had --
9       A    I think -- yeah, it does.
10      Q    -- an earlier stroke?
11      A    It does.  I had trouble with the time
12  frame, putting it in proper perspective.
13      Q    So that would have been in
14  approximately December 2005?
15      A    This is what?  This is --
16      Q    February 2006.
17      A    February.  December.  It could have
18  been.
19      Q    Now do you recall that TIA episode?
20      A    Yeah.
21      Q    Do you recall what happened at the
22  time?  What happened?

Page 321

1       A    I recall being taken to the hospital
2   by my wife and being told that I had a TIA.
3       Q    What symptoms do you recall
4   experiencing?
5       A    The same thing.  Slurring of words.
6   And disorientation.  And numbness.  I think it
7   was -- what else did she say?  I was bumping --
8   I would bump into walls or something when I was
9   trying to navigate around the house.  Anyway,
10  she took me to the hospital right away.
11      Q    Okay.  So what medications did the
12  doctor give you at Walter Reed?
13      A    I think they gave me something while I
14  was there orally.
15      Q    Yeah.
16      A    And then they gave me a prescription,
17  pain pills to take as needed.
18      Q    Okay.  And then you were referred to
19  your primary care doctor for follow-up?
20      A    Yeah.
21      Q    Did you seek further medical care?
22      A    No, I didn't.  I just waited until my

81 (Pages 318 to 321)

March 29, 2007    William Maniaci    Maniaci vs. Georgetown
Washington, D.C.

Page 322

1 regular appointment because I had no further
2 symptomology. So -- I felt okay.
3 Q  Going back to the prior day, again, to
4 Saturday when Sergeant DeLisi escorted you off
5 the campus. You went up to the main gate.
6 A  Uh-huh.
7 Q  Was there a cruiser, a Georgetown
8 University department of security cruiser, squad
9 car if you will --
10 A  Parked.
11 Q  -- parked there at the main gate?
12 A  On the sidewalk.
13 Q  Yeah.
14 A  Both days, just like it's depicted
15 right here, there's one parked there.
16 Q  On Saturday, did you sit on the hood
17 of the car and have a cigarette?
18 A  No, I didn't.
19 Q  No?
20 A  No. I didn't sit on the hood of the
21 car.
22 Q  Did you have a cigarette at the main

Page 323

1 gate?
2 A  I probably had a cigarette.
3 Q  How many cigarettes in a pack? Is it
4 about 24? Has it changed?
5 A  Twenty.
6 Q  Twenty. Okay. It's been a while
7 since I had a cigarette.
8 A  Do you miss it?
9 Q  Huh?
10 A  Do you miss it?
11 Q  Not really. No.
12     Twenty. So you have about 10 a day.
13 So --
14 A  It depends.
15 Q  It depends. Stress, you might have
16 more, right?
17 A  I don't know. Whenever I feel like
18 I'd like to have a cigarette, I have one.
19 Q  Okay.
20 A  I don't have to ask permission from
21 anybody.
22 Q  It's still America.

Page 324

1     They gave you a CAT scan at Walter
2 Reed?
3 A  Yes.
4 Q  And you were told it was negative?
5 A  I was told that there were -- that --
6 Q  Does it say a CT scan of the head, and
7 you were told it was negative?
8 A  All I know is the doctor told me that
9 I had a mild concussion, and that's what I was
10 being treated for.
11 Q  The doctor reported there was no loss
12 of consciousness.
13 A  I didn't lose consciousness while I
14 was at Walter Reed.
15 Q  No. Prior to that. Never mind.
16 Strike that.
17     You didn't seek any medical assistance
18 on Saturday, correct? February 18th?
19 A  No. After I -- after we left the
20 campus, I went to the -- went to the car and sat
21 down. And I think it was Keith brought me
22 something to drink and something to eat. And

Page 325

1 they checked on me periodically. And I stayed
2 there until the group left, and I went back to
3 the hotel with the group.
4 Q  You didn't feel you needed any medical
5 assistance at that time?
6 A  No. Not at that time.
7 Q  Then Sunday that changed when you
8 started to slur your speech and stutter?
9 A  It changed when my friends suggested
10 that I go to Walter Reed for an examination, or
11 to a hospital.
12 Q  After you collapsed or whatever
13 happened at the roundabout, did you lose
14 consciousness now, when you fell?
15 A  One minute I'm like talking to you.
16 The next minute I'm on the ground. It was that
17 fast. And then I -- what am I doing here? And
18 I got up and brushed myself off and that was it.
19 Q  Is it hard for you to say whether or
20 not you lost consciousness?
21 A  If it was, it was momentarily. I must
22 have lost consciousness and balance and

82 (Pages 322 to 325)

March 29, 2007                    William Maniaci            Maniaci vs. Georgetown
                                  Washington, D.C.

Page 330

1    Q   Hadn't they told everybody you're
2  limited to one question, and that's it?
3    A   I think so.
4    Q   And you persisted?
5    A   No. I didn't ask another question. I
6  made a statement that she hadn't answered my
7  question. I think we went over this before,
8  have we not?
9    Q   Look at the second paragraph of
10 Mr. Finberg's article. He says, quote, we were
11 successful in interfering with several of their
12 seminars, and got the cameras off the speakers
13 and on us many times, end quote.
14     Is that correct?
15    A   If that's what Mr. Finberg did, that's
16 what he did.
17    Q   Well, weren't you successful in
18 interfering with the seminar you attended?
19    A   No. I didn't attend any seminars.
20    Q   Didn't you -- did you -- strike the
21 seminars. Rather than quibble over what a
22 seminar is. Didn't you interfere with the panel

Page 331

1  discussion?
2    A   We've been over this before, sir. And
3  I said I had not interfered with any
4  discussions.
5    Q   Do you know what Mr. Finberg was
6  referring to when he says --
7        MR. FAY: Where are you reading from
8  on panel discussion?
9        MR. BUCKLEY: I wasn't reading from
10 the document.
11       MR. FAY: Oh.
12       MR. BUCKLEY: I said let's not get
13 caught up on the terminology.
14       MR. FAY: Okay.
15 BY MR. BUCKLEY:
16    Q   Do you know what Mr. Finberg was
17 referring to when he said, quote, we were
18 successful in interfering with several of their
19 seminars, end quote?
20    A   No. I was off campus. I had no idea
21 what they did on campus.
22    Q   Turn to page 2 of the document. I

Page 332

1  just want to ask you about a group that's
2  referred to. Looking at the first whole
3  paragraph, about three quarters of the way down,
4  refers to the Nuturei Karta.
5        Are you familiar with that group?
6    A   Yes.
7    Q   What is that group?
8    A   They are a -- they claim to be an
9  ultrareligious Jewish organization. They are
10 way, way out in left field. As far as we're
11 concerned, they don't represent any Jewish
12 organizations. They don't speak for any
13 mainstream Jewish organizations. The Nuturei
14 Karta interpret the Torah as meaning that the
15 third temple will drop out of the sky on top of
16 the temple mountain. Until that time, the Jews
17 don't belong in Israel.
18    Q   So they agree with the Palestinians in
19 that regard?
20    A   They agree with anybody that's
21 contrary to Israel -- that's against Israel. We
22 really don't have anything to do with those

Page 333

1  people. They were the, quote-unquote, advisor
2  on Jewish affairs to Yasser Arafat. They
3  attended the Holocaust Denial Conference in Iran
4  and agree with that. And I think that should
5  speak for itself.
6    Q   Okay. This document -- have you seen
7  this document before today?
8    A   This document?
9    Q   Yes.
10    A   No, I haven't seen this before.
11    Q   Do you know how this document was
12 distributed? Do you know whether the, say, for
13 example, the JDL distributed it?
14    A   I don't have a clue. It could have
15 been on their Web site. It could have been
16 anywhere. I don't know.
17    Q   Let me show you what I'm now going to
18 mark as Exhibit Number 22.
19       (Maniaci Exhibit Number 22 was marked
20 for identification.)
21 BY MR. BUCKLEY:
22    Q   Again, this is a document that

84 (Pages 330 to 333)

March 29, 2007         William Maniaci         Maniaci vs. Georgetown
                       Washington, D.C.

Page 334

1  Mr. Murray at Georgetown printed out. It comes
2  from the Israpundit Web site.
3      A   Mr. Eric Smulson.
4      Q   Right. He printed it out. That's all
5  that means. If you look down at the body of the
6  document --
7      A   Okay. What have I got to do with the
8  Israpundit?
9      Q   Huh? It's a printout from the
10  Israpundit Web site.
11     A   Okay.
12     Q   And, apparently, it's an article by
13  Mr. Levinson entitled, quote, Palestinian
14  Solidarity Movement Routed at Georgetown.
15     A   Where do you see that?
16     Q   Unquote. Right here. At the top of
17  the page.
18     A   Okay.
19     Q   Are you familiar with this publication
20  called Front Page?
21     A   Front Page?
22     Q   Yes.

Page 335

1      A   Are you talking about Front Page
2  magazine?
3      Q   I don't know.
4      A   That's the only Front Page that I'm
5  aware of.
6      Q   Okay. Is that something that
7  Mr. Kaplan runs?
8      A   No.
9      Q   Or he works for?
10     A   Front Page magazine is -- is not run
11  by Mr. Kaplan. He's submitted articles there, I
12  believe. But he's not employed by them.
13     Q   What type of publication is that,
14  Front Page?
15     A   I don't know. They have their own Web
16  site. They have their own viewpoints. It is, I
17  think, a very conservative Web site.
18     Q   Just looking at the first paragraph in
19  Mr. Levinson's article, he says, quote,
20  Civilization's defenders, including
21  representatives of the Jewish Defense League,
22  Stop the ISM, and Hillel, won an overwhelming

Page 336

1  and decisive public relations victory over the
2  Palestinian Solidarity Movement at Georgetown
3  University during the past weekend.
4      The first-time use of aggressive and
5  proactive tactics damaged the PSM's credibility
6  and indeed the commitment of its members so
7  badly that it is unlikely that this organization
8  will ever again hold another annual conference
9  in North America again, unquote.
10     A   From your mouth to God's ears.
11     Q   Do you agree that the JDL used
12  aggressive and proactive tactics at the
13  conference?
14     A   Again, you're asking me for a
15  definition of aggressive. Your definition and
16  mine may be entirely different.
17     I think that what they're talking
18  about there as aggressive and proactive are the
19  fact that we had 100 senior citizens out there
20  waving American and Israeli flags. I think that
21  is what is meant by aggressive and proactive.
22     Q   If you look further down that page to

Page 337

1  a numbered paragraph, he refers to
2  counterdemonstrations. He further refers to,
3  quote, humiliating and embarrassing questions to
4  the PSM speakers, unquote. Do you agree that
5  members of the JDL asked humiliating and
6  embarrassing questions to the PSM speakers?
7      A   Not that I heard.
8      Q   Did you ask any humiliating and
9  embarrassing questions?
10     A   No. I asked a question that could
11  have been answered with a yes or a no.
12     Q   Did you intend your question to be
13  provocative?
14     A   Not really. I wanted to see if they
15  would admit their involvement in suicide
16  bombing.
17     Q   Who is they?
18     A   Their support. I asked -- it was a
19  question where I wanted to know what their
20  policy was. It was a very simple question. And
21  they didn't answer the question. They spun it
22  over to Republicans, George Bush, United States

85 (Pages 334 to 337)

March 29, 2007          William Maniaci          Maniaci vs. Georgetown
                         Washington, D.C.

Page 354

1   A   No.
2   Q   Didn't you try to give him the
3   criminal complaint?
4   A   I asked Lieutenant Smith what I should
5   do, because I told -- in fact, this was again at
6   the Jewish delicatessen.
7   Q   I'm going to visit that place.
8   A   You should.  And I told Lieutenant
9   Smith that I had attempted to make a complaint.
10  And I outlined the circumstances.  And he said
11  just a moment, and he got on the radio, and he
12  called, and an MPD officer came and took my
13  complaint.
14  Q   Okay.  Now, did you ask Sergeant
15  DeLisi why he didn't intervene on Saturday since
16  he was there at Gaston Hall?
17  A   He wasn't there at Gaston Hall.
18  Q   Sergeant Mike Smith?
19  A   You said Sergeant DeLisi.
20  Q   Excuse me.  Let me begin again.  Did
21  you ask Lieutenant Mike Smith why he didn't
22  intervene on Saturday?

Page 355

1   A   No.  It would have been a stupid
2   question.  It's not his jurisdiction.
3   Q   He's an MPD officer.
4   A   But that's -- it's not his
5   jurisdiction.  He was there as an observer.  He
6   was there for his own reasons.  He was not on
7   duty.  And they have their own commissioned
8   police officers.  They were the ones that were
9   misbehaving.  So it wasn't in his purview to
10  interfere.
11      (Maniaci Exhibit Number 26 was marked
12  for identification.)
13  BY MR. BUCKLEY:
14  Q   Look at Exhibit Number 26, which is a
15  letter dated March 6, 2006, from you to the
16  Federal Bureau of Investigation.  Can you tell
17  me what this document is?  It's Bates stamped
18  GTN 1663.
19  A   What would you like to know?
20  Q   What is it?
21  A   It's a copy of a letter that was
22  addressed to the Federal Bureau of

Page 356

1   Investigation, signed by myself.
2   Q   Okay.  Did you later file a criminal
3   complaint or a document entitled criminal
4   complaint?
5   A   Yes.
6       (Maniaci Exhibit Number 27 was marked
7   for identification.)
8   BY MR. BUCKLEY:
9   Q   Let me show you what's been marked as
10  Exhibit Number 27.  Can you tell me what this
11  document is?
12  A   It appears to be a copy of the
13  document that I initiated.
14  Q   And who prepared this document?
15  A   I did.
16  Q   Did you have any assistance in
17  preparing it?
18  A   No, I did not.
19  Q   Was it reviewed by anyone else before
20  it was submitted to the FBI?
21  A   No, it was not.
22  Q   Did any lawyer review it?

Page 357

1   A   Negative.
2   Q   Did you ever sign this statement?
3   A   Did I ever sign it?
4   Q   Yes.
5   A   I assume that I signed the cover
6   letter that went out with -- accompanying this
7   document.
8   Q   Did any representative of the FBI ever
9   contact you?
10  A   Yeah.  Excuse me.  I was contacted by
11  a couple of FBI representatives.
12  Q   Do you recall their names?
13  A   No, I don't.  It was -- it was one
14  lady and one man.
15  Q   Were you ever advised of the result of
16  their investigation?
17  A   Initially, I was told that they
18  intended to prosecute and take it before a grand
19  jury.  That -- I was told by one agent that
20  there was an egregious misconduct on the part of
21  the MPD -- not the MPD, but the Georgetown
22  officers.  And I was led to believe that it

90 (Pages 354 to 357)

March 29, 2007                William Maniaci        Maniaci vs. Georgetown
                              Washington, D.C.

Page 378

1  has been covered.
2          MR. BUCKLEY: But it's concealed, so
3  how would we know whether he had it or not.
4          MR. FAY: Oh, for God's sake.
5          THE WITNESS: You have to take my word
6  for it. If you doubt my word, well, then, if
7  you have X-ray vision, go ahead and use it.
8  This is ridiculous.
9          MR. FAY: Come on. You think, by
10 looking at whether or not he has a weapon with
11 him and what kind of weapon today, you will be
12 able to tell whether a year ago in another place
13 he had a weapon.
14 BY MR. BUCKLEY:
15     Q    Let me ask you this question.
16         MR. FAY: You're really seriously
17 contending that's relevant in some sway.
18 BY MR. BUCKLEY:
19     Q    Let me ask you this question.
20         MR. FAY: How?
21 BY MR. BUCKLEY:
22     Q    Why did you bring a weapon to this

Page 379

1  deposition?
2      A    I carry a weapon every place I go now.
3      Q    Well, you didn't bring it to
4  Georgetown University.
5      A    I didn't want to take it on to
6  Georgetown University.
7      Q    Why did you bring it to the offices of
8  Williams & Connolly?
9      A    Because I always carry a weapon. If
10 you prefer I'm not here, I'll be glad to leave.
11         MR. FAY: Do you want to see his
12 license?
13         THE WITNESS: Would you like me to
14 leave because I'm armed? If you think I'm
15 armed, I'll be happy to leave. I don't want to
16 be here anyway. If it bothers you, I'll leave.
17 BY MR. BUCKLEY:
18     Q    Otherwise --
19     A    Otherwise, let's move on.
20     Q    Otherwise you'll always have a weapon
21 with you?
22     A    Yes.

Page 380

1      Q    Do you agree that Georgetown
2  University had a right to ask you to leave the
3  auditorium if you were disruptive?
4      A    Depending on the circumstances.
5      Q    Yes, if you were disruptive, you could
6  be removed?
7      A    I said depending upon the
8  circumstances. If it was a matter of conjecture
9  as far as the disruption is concerned, if I were
10 having a dialogue with someone, it would be an
11 individual determination of what is disruptive
12 and what isn't. I don't know what's disruptive.
13     Q    Did Mr. Olson ever indicate that
14 questioners would be able to have a dialogue
15 with the panelists --
16     A    Yes.
17     Q    -- as opposed to simply asking a
18 question?
19     A    Yes, he did.
20     Q    What did he say?
21     A    He said that you will be able to ask
22 questions and dialogue with the panel.

Page 381

1      Q    He used the word dialogue?
2      A    Yes, he did. And I saw that on the
3  tape that you furnished us, by the way.
4      Q    Did he say you have to ask just one
5  question?
6      A    I think that was in there somewhere.
7  We've covered this before.
8          MR. BUCKLEY: I have nothing further.
9          MR. FAY: It's after 5:00. I don't
10 have any questions.
11         THE VIDEO OPERATOR: This ends
12 videotape number 4. We're going off the record.
13         MR. FAY: Hang on a minute. Hang on.
14         MS. CARAGH FAY: You're fine. You can
15 go off the record.
16         THE VIDEO OPERATOR: Okay. Going off
17 the record at 5:05.
18         (Discussion off the record.)
19         THE VIDEO OPERATOR: We're back on the
20 record at 5:05.
21         (Maniaci Exhibit Number 32 was marked
22 for identification.)

96 (Pages 378 to 381)