# EXHIBIT 5

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - - -x

WILLIAM MANIACI, :

Plaintiff, :

vs. : Case No. 1:06CV01625

GEORGETOWN UNIVERSITY, et al., :

Defendants. :

- - - - - - - - - - - - - - - - - -x

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Washington, D.C.

Wednesday, January 10, 2007

Videotaped Deposition of

TODD A. OLSON

a Defendant, taken on behalf of counsel for the Plaintiff in the above-entitled matter, before Denise M. Brunet, RPR and Notary Public in and for the District of Columbia, taken at the offices of Williams & Connolly, LLP, 725 Twelfth Street, Northwest, Washington, D.C., commencing at 9:40 a.m., when were present on behalf of the respective parties:



c61d9d30-bc6f-4ef9-afed-0df7df1e92de

work during my master's degree. I worked at my first professional position at the University of Denver beginning in 1986. I worked at that institution for 16 years at nine different job titles, all in the student affairs area. I'm not sure if you want all of that detail.

But then in 2002, moved to Georgetown University. The first year here was in the role of associate vice president for student affairs. After that, I was asked to move into the role of vice president of student affairs beginning in 2003.

Q Perhaps you should describe what vice president for student affairs, what that term means. In our more liberal society, I'm sure there are a lot of jokes made about student affairs, but what is -- what is entailed?

A Student affairs at Georgetown, as at most other universities, is a rather broad area that encompasses a lot of student life, student activities and services for students in their life outside the classroom.

So at Georgetown, it involves management



and supervision of life in our residence halls, of our student organizations and activities, and of services like our career center, our counseling center, student recreation facilities, et cetera.

Q So it would include, among other things, a number of extracurricular activities?

A Exactly.

Q I take it it would not include athletics but other extracurricular activities?

A Exactly.

Q Does Georgetown University have a system under which student organizations are recognized by the university?

A We have a system under which we grant student organizations a status called access to benefits. And that system was developed before I arrived at the university, but that's the system we use.

Q Okay. What's the standard for applying and being accepted, I guess, is the best way to put it?

A That we ask students to have a written



constitution, to have at least a few interested students and to comply with the policies for student organizations that we have at the university.

Q When you say access to benefits, what privileges does the organization get when it is recognized by the school --

A Okay.

Q -- given access to benefits?

A When a student organization is given access to benefits, those benefits include the use of some basic office space and functions in the Leavey Center Building, includes the ability to reserve meeting spaces and event spaces on campus to host meetings, events, et cetera. In some cases, but not always, it includes funding from the university.

Q To what extent, when an application is made generally, is there any type of investigation, what some of the hip people call vetting? But I don't mean to apply any definition to that.

To what extent is there any investigation of the organization and the people who will be the initial members of the organization before granting



this access to benefits?

A Uh-huh. First of all, we start with a presumption that these are our students. And it's only our students who can make this application, so there's no vetting of the individuals. We've already selected them as our students prior to that.

In terms of the organization, we just -- we do inquire about the stated purpose of the organization and, in our view, just look at whether that's consonant with the broad educational mission of the university.

Q Okay. Now, in this case, the literature, which -- which I've obtained, indicates that this conference, the Palestinian Solidarity conference, was being sponsored, if you will, by Students for Justice in Palestine.

Now, was that a Georgetown University student organization that had been given access to benefits?

A Yes.

Q Okay. What year was that, if you know?

A I don't know, sir.

Page 10

Q What -- what did their constitution or charter provide in terms of the -- the mission of the organization?
A I am not directly familiar with it, but I knew that it had to do with advocating for causes related to justice issues in the Palestinian territories.
Q Okay. And I take it when you say justice issues in the Palestinian territories, you mean for people who would generally be thought of as Palestinians?
A Yes.
Q Once an organization like the student -- or any student organization was recognized, to what extent would there be any further investigation of a particular activity which was proposed?
A Generally, there would be -- I wouldn't term it investigation, but there would be requests for information from student groups when they wanted to host a meeting or conference or when they asked for funds from the university.
Q Okay. Now, was the Students for Justice in

Page 11

Palestine at Georgetown University a chapter of an organization that was at other schools or maybe even had organizational slots that weren't hooked up with schools, but was it just Georgetown or was it hooked up, affiliated with some type of a citywide, districtwide, maybe even national or international organization?
A What I know is that there are other chapters on other university campuses with the same name.
Q Okay. Did -- did it become -- you were at Georgetown at the time it became recognized, that is to say, was given access to benefits?
A I'm not certain --
Q Okay.
A -- because we have numerous student organizations. I'm not familiar with the specific date on which that group was granted access to benefits.
Q To what extent was there any investigation -- by investigation, your -- I don't mean somebody sneaking around in the middle of the

Page 12

night, but simply looking through records and so forth -- of the Students for Justice in Palestine prior to this recognition?
A I don't know.
Q Do you recall seeing in your files any documents that indicated there was any investigation?
A I do not recall that.
Q I take it you don't recall seeing any such documents?
A I don't recall seeing any such documents.
Q Okay. From the time when you became vice president for student affairs, which was --
A 2003.
Q -- 2003, tell us about your contacts with the Students for Justice in Palestine.
A Uh-huh. I would say that, as with most student organizations at Georgetown, I had limited contacts with the individual students in the organization.
I met one or two students associated with it. I'd heard the name of the organization, but was not -- not familiar with it at any depth prior to

Page 13

their decision to host this conference.
Q Okay. When application was made for this conference --
A Uh-huh.
Q -- what was put forth or indicated as the purpose of the conference?
A To convene people from across the United States interested in discussing issues of justice in Palestine.
Q To what extent when this was proposed were the participants limited in this conference?
In other words, would they be limited to the students at Georgetown, students majoring in political science maybe, college students generally, or could anybody come and sign up for the conference?
A Anyone interested could come and sign up for the conference.
Q Was that a requirement where there was going to be a conference of this type at Georgetown in the either formal rules and regulations or simply the way that Georgetown operated?
A In the way that we operate, we allow





c61d9d30-bc6f-4ef9-afed-0df7df1e92de

Page 14

students to make a choice whether they want to have a meeting or conference open only to Georgetown students or to the public at large.

Q Okay. Now, I notice in this conference that there was some type of a minimal fee -- and I can't remember what it was, $25 or something -- a minimal fee to be paid.

Did Georgetown -- was that a fee collected by Georgetown or collected by Students for Justice in Palestine?

A It was collected by Students for Justice in Palestine.

Q Now, the -- for the use of these facilities during that time, did the Students for Justice in Palestine in turn, then, pay the school anything, whether it was a cleanup fee afterwards or a rental fee or anything?

A Yes.

Q And what -- how would that be figured?

A That would -- there are rates charged for using certain gathering spaces on campus, certainly for catering, et cetera. And so the student group was

Page 15

billed by the university and was then paid by the student -- the university was paid by the student group.

Q And do you recollect what that fee was in this case?

A The fee for participant, I'm -- I don't remember exactly. It was in the vicinity of $20.

Q Okay.

A It was moderate.

Q What about the amount paid to the school? In other words, would that whole $20, if that was the fee, would that all be paid over to the school to cover the rental and, you know, hot coffee and sandwiches or whatever?

A I'm not certain of the exact distribution of that fee money. Again, I -- there are a lot of student conferences. I -- I know generally how the system works but don't have an in-depth knowledge of that.

Q Let me hand you what yesterday was -- was marked as George Taylor Exhibit Number 7. I've marked it today as Todd Olson Exhibit Number 7.

Page 16

Let me pass that to you.

A Uh-huh.

Q Are you familiar with this document?

A I am.

Q Okay. Did you have any part in drawing up the document?

A I did not.

Q Do you have any idea of how long the document has been in force?

A I'm not -- I believe it's in the neighborhood of 15 to 20 years, but I'm not certain.

Q Okay. Was the Palestinian Solidarity conference at Georgetown on February 17th and 19th of 2006 conducted in accordance with or was it to be conducted in accordance with this document indicated as speech and expression at Georgetown University?

A Yes.

Q I've gotten information from somebody that copies of this -- I don't think it was in this form; I think it was a pamphlet -- but copies of this were distributed. By that, I think they were on a table or a chair as people walked in, not that there -- someone

Page 17

was handing them to everybody, but distributed at the time of check-in of the participants.

Does that --

A Yes.

Q -- sound -- I take it that would be the regular operating system?

A It is a very common practice, yes.

Q Let me ask you just about a couple of things on the second page where it is indicated as limitations.

A Uh-huh.

Q Is -- in the limitations, it indicates right of free speech and expression does not include unlawful activity and a couple of other things mentioned there.

But are any of these terms in there, in this paragraph, defined in any other part of the -- of the materials handed out or any set of standard operating procedures or rules or regulations of Georgetown?

A No.

Q Okay. In the past and to the present, are

they -- these terms interpreted with their normal English meaning?

That might sound like a funny question, but being lawyers, a lot of words don't get interpreted in their normal English meaning.

Are these words interpreted by the school regularly in their regular English meaning?

A Yes.

Q Okay. I take it there was -- there was no definition of the -- the last part there it has, or activities that disrupt or obstruct the functions of the university.

A Uh-huh.

Q What, if anything, had, within your knowledge of the seven years you were at Georgetown --

A No, excuse me. Less than seven years.

Q Seven -- oh, I'm sorry.

A I arrived in 2002.

Q Oh, okay. Five -- almost five years --

A Four-and-a-half years.

Q -- I think, yeah.

What during that time do you know of that



had been viewed by the university as a disruption or obstruction of the functions of the university where somebody was operating under these rules?

A What -- can -- I'm not --

Q Yes. What -- what --

A -- quite clear of the question.

Q What, if anything, had ever been viewed -- what action of any individual had ever been viewed as a disruption or obstruction of the functions of the university?

I presume if somebody came in and started firing a gun, obviously, that would be an obstruction or disruption, but -- I'm not saying that ever happened at Georgetown --

A Right.

Q -- but what to your recollection had ever been viewed by the university as an obstruction or disruption of the functions of the university?

A Sure. I'd say a couple of different examples there.

Number one, during speeches on campus in -- especially in larger venues, higher-profile speakers,



individuals who spoke or acted in disruptive ways that prevented the speaker from speaking would be one example.

Another would be using amplified sound inside a building in an effort to disrupt. For example, using a bullhorn to create noise in an academic or administrative building that disrupted --

Q Okay.

A -- normal activities.

Q So disruptive tactics while somebody is speaking, right?

A Uh-huh.

Q Or amplification.

A Uh-huh.

Q I take it by that you -- you mean somebody bringing in a bullhorn, not using the microphone --

A Uh-huh.

Q -- provided?

A Uh-huh.

Q I assume in any good size assembly, if there was a question/answer period, a microphone would have to be provided --



A Yes.

Q -- so people would be able to hear, so --

A Right.

Q Okay. And that use of that microphone provided would not be use of amplification that would be disruptive?

A Depending on the nature of the interaction, sure.

Q Okay. The terms the functions of the university --

A Uh-huh.

Q -- that's -- that's kind of general. What --

A Uh-huh.

Q What does that mean exactly?

A That covers certainly classroom teaching and academic activities. It also covers the various meetings, conferences, events with speakers that are held on campus but by student groups and sponsored by faculty and by administration.

Q Now, were you present at the Palestinian Solidarity conference?





c61d9d30-bc6f-4ef9-afed-0df7df1e92de

Page 22

A I was.
Q Okay. And in your capacity, I take it, as an official of the university?
A In my capacity as an administrator, uh-huh.
Q Was -- would that be a normal occurrence, for you to be present at something like this where there was an activity where there's going to be discussion of some issues? I'm sure you weren't present at every softball game or something.
A Right.
Q Things like of this sort.
A Yeah. I'm frequently present at events of this sort.
Q Now, let me -- let me hand you what has -- what was marked George Taylor Exhibit Number 3 and I marked also as Todd Olson Exhibit Number 3, which is, I believe, a photograph.
A Uh-huh.
Q It's not the clearest photograph --
A Uh-huh.
Q -- but looking at you and looking at the photograph, I would -- my guesstimate would be that

Page 23

you were the person standing up speaking; is that correct?
A I was the person -- yeah, I had the microphone. I was on stage at that point.
Q Okay. When -- did -- were you acting when you are speaking there as the moderator of this or were you simply giving a welcome to Georgetown or what was your capacity then?
A In this session, I was serving as the moderator for purposes of managing our speech and expression policy.
Q Okay. There are, I think, three -- three or four students -- three, I think -- seated there at the table.
A Uh-huh.
Q Do you know those students --
A These are not --
Q -- or are they students?
A -- students. They were -- they were invited --
Q Ah, okay.
A -- speakers for the conference.

Page 24

Q Do you know who they are?
A I do.
Q Okay. Can -- perhaps you could hold it up and -- from one side to another -- if you could hold it up so the -- if you could identify from where your left hand is --
A Uh-huh.
Q -- across to the right --
A Sure.
Q -- who each one is.
A Sure. This is -- and I may have -- it's hard for me to see the two women, so I may have them mixed up. But the two women on stage were Noura Erakat --
Q Okay.
A -- and Sue Blackwell. It's hard for me, given the quality of this picture, to tell which is which, honestly.
Q Okay.
A This is Philip Farah --
Q Okay.
A -- and this is Will Youmans or Youmansien

Page 25

(ph). I'm not sure exactly how to pronounce it.
Q Okay. I take it each one of these people was a speaker at the conference?
A Right, uh-huh.
Q Okay. Was the format that these folks would speak and then, either following each presentation or maybe following all four presentations, the floor would be open for questions?
A Yes. And in this case, it was following all four presentations.
Q Okay. Tell me what you remember about -- about that -- that conference that day. I think it was the 18th --
A Right.
Q -- Saturday.
A Uh-huh. Yeah. But that was -- the conference began that morning with registration. The conference attendees were arriving and were getting registered, were coming up to Gaston Hall where this opening panel session was happening.
Because of just all the logistics of people arriving, this opening panel started a little bit

later than planned. It got underway late morning, somewhere in the neighborhood of 11:00 a.m.

Q Okay. What -- what do you recall saying to the gathering from when it started?

A Yeah. When it started, I stood up and introduced myself and just let people know that I was there to help moderate our speech and expression policy.

Q Okay. And you indicated all four of the speakers had their time and spoke --

A Uh-huh.

Q -- before it was opened up for questions.

A Uh-huh.

Q During that period when all four people were speaking, were any of the four interrupted by applause, boos, catcalls, anything?

A I believe -- I think there certainly was some applause during that time. I don't remember other interruptions.

Q Okay. Tell us what happened when -- when you got to the question and answer part, I take it you took over calling on people?



A Well, I did not take over calling on people. I was --

Q Okay.

A I -- I was there, you know, as needed. Will Youmans was the panel moderator. He's the one for the most part who was calling on the --

Q Okay. Now --

A -- questioners.

Q -- what is his function, Will Youmans?

A He was a guest. He's just the person that --

Q Right.

A -- the conference planners --

Q Okay.

A -- asked to serve as the moderator of the panel.

Q Okay. Tell us what you observed -- well, let me back up just -- does -- does this appear to be you speaking before the speakers went on or -- or at some later time?

A I'm not certain.

Q Okay. Go ahead then.



A Okay. During the question and answer period, the floor was opened up and, you know, attendees began asking questions, the panelists responded. There were a couple of disruptions that happened during that question and answer period.

Q Now, what do you mean by disruptions?

A Individuals who were talking loudly or yelling and would not cease from doing that when they were asked and warned to do so.

Q Okay. And what happened then?

A Well, it's -- that happened -- disruptions happened at three different occasions during the question and answer period. And I -- I, in my role as moderator of the speech and expression policy, asked those individuals to please stop, tell them -- let them know their opportunity to ask a question was ended. It's time to move on.

And then in the -- in the first case, I asked our Department of Public Safety personnel in the room to approach an individual and please remove that individual from the room. I believe they had a conversation with that individual. He calmed down and



desisted from what he was doing.

In the second case, the same sequence of events happened, and I asked the Department of Public Safety personnel to remove that individual from the room. They did so.

In the third case, it got to that point once again, but the individual in that third case agreed to walk out of the room on his own.

Q Okay. Let me show you what I've marked as George Taylor Exhibit Number 2 and marked Todd Olson Exhibit Number 2 as well. I'll pass that to you.

A Uh-huh.

Q Can you identify the gentleman who's standing in that photograph?

A Yeah. William Maniaci or Maniasee (ph).

Q Okay. The Plaintiff in this case --

A Yes.

Q -- in other words?

A Uh-huh.

Q What do you recall him saying, if anything, if you recall him saying anything?

A Yeah. I recall him -- and the way that the





c61d9d30-bc6f-4ef9-afed-0df7df1e92de

panel was organizing things, they had -- they were asking for several questions in a row, and then they'd respond to those questions as a group after they'd asked them.

Mr. Maniaci was one of the questioners in that group. He asked his question. I believe the question related to how the panel regarded suicide bombers and their role.

It was, I believe, Ms. Blackwell in the panel who was responding to him. During that response, Mr. Maniaci began speaking again, kept speaking, wouldn't -- you know, wouldn't stop speaking.

Q What did he say?

A I don't remember in detail. I remember that he was just continuing to talk and to ask questions when the panelist was attempting to respond. And I know that he was warned several times to stop so the presentation could continue.

Q When you say stop, stop asking questions or --

A To stop -- he -- he had left the



microphone -- this is after he had completed asking his question -- and there were people waiting to ask questions, so stop speaking -- he was doing so rather loudly -- stop speaking so that we could move on with the rest of the question and answer period.

Q But you don't recall what he said, I take it?

A I don't recall in detail.

Q Okay. How many questions did Mr. Maniaci ask before he was told to stop asking questions?

A He had his opportunity to stand at the microphone, and I believe he asked one rather complex question. I don't know that there were more than one question in there, but after that, I'm not sure whether what he was saying was more in the form of a question or a comment.

Q But you don't recall what it was, I take it?

A No.

Q Okay. Let me go through some other -- here's what has been marked Todd Olson Exhibit Number 1, and it was also George Taylor Exhibit



Number 1. I'll pass that to you.

A Uh-huh.

Q Yesterday, the policeman who was here said that he thought that the tallest of the standing individuals was an official of Georgetown, but he didn't know the name.

A Uh-huh.

Q Now, that is not a great photograph admittedly, but --

A Uh-huh.

Q -- do you know -- can you identify the person by that?

A Well, I can identify -- I believe -- again, the quality of the photo is poor --

Q Yes.

A -- so it's not certainty. I believe this individual here is David Morrell.

Q Okay. And he's the --

A Vice president for university safety.

Q Okay. And he would be the -- the person under whom would come the police chief, so to speak --

A Uh-huh.



Q -- and the police; would that be correct?

A Yes. Our Department of Public Safety, yes.

Q Okay. He'd have direct supervisory authority over the -- over the police?

A Yes.

Q In the chain of command, if you will, in Georgetown between Mr. Morrell and the president, would -- would you fit in that direct line of chain of command or would you be over to one side?

A I'd be over to one side.

Q Okay. Okay. Let me hand you what has been marked Todd Olson Exhibit Number 4. It's also George Taylor Exhibit Number 4.

And I might as well hand you Number 5 as -- as well.

A Okay.

Q In -- in those two exhibits, photographs, there are two police officers depicted. At least they appear to be clothed as police officers, I guess you'd have to say.

A Uh-huh.

Q Do you -- are you able to identify either





c61d9d30-bc6f-4ef9-afed-0df7df1e92de

one of those officers?
A No.
Q Would, in all likelihood, Mr. Morrell be able to identify those officers?
A I'm not certain.
Q Okay. He -- we were told that the size of the police force is about 50?
A Uh-huh.
Q That sound about right?
A Again, I'm not certain.
Q Okay. Okay. In those -- do those photographs depict Mr. Maniaci being removed from the room?
A They seem to.
Q Okay. Now, I noticed in the photographs, it appears everybody is still seated other than Mr. Maniaci and the police and a couple people over at the side; is that correct?
A Yeah. Most people in the room were seated.
Q Okay. Did anyone get up out of their seats when this was taking place and Mr. Maniaci was being pulled outside?



A Other than the police officers?
Q Yes.
A I believe this gentleman right here did (indicating).
Q Okay. And do you know who he is?
A I believe that's Robert Turk.
Q Okay. What did you see Mr. Turk do, if anything?
A I just saw him -- it appeared that he was just attempting to be supportive of Mr. Maniaci and just to see what was happening.
Q Okay. I take it he didn't do anything else other than stand up and walk a couple steps?
A I didn't observe anything else.
Q Okay. Did you give the instruction for Mr. Maniaci to be removed?
A I did.
Q What -- what are the procedures when that instruction is given? In other words, are there any set procedures that the police are to follow in doing that?
By the police, I mean the Georgetown



University -- maybe I better make it clear. It's Georgetown University security --
A Right.
Q -- not Metropolitan police.
A Right. Yeah. Those -- I know that I rely on them. I know they have, you know, training and -- and procedures that they use.
I'm not closely familiar with those, but I know that they, you know, in my experience in working with them, behave in a professional manner when they -- you know, when they approach an individual. I'm not closely familiar with the specific policy they may have followed.
Q Okay. When you -- you said disruptive --
A Uh-huh.
Q -- okay, but you don't recall what words were said. Did -- was there anybody in the room that started arguing with Mr. Maniaci or people jump up like there was going to be a fight or anything like that?
A No, it wasn't that there was going to be a fight. It was that Mr. Maniaci's continuing speech



was preventing the panel discussion, the question and answer session from proceeding. It was difficult to hear over him, and it was creating a disruption.
Q Now, you said he was at the microphone and had asked his question, and then somebody started -- on the panel started answering the question; is that correct?
A Let me be clear that in between there, he returned to his seat and was no longer at the microphone. Another person had stepped up and was next in line at the microphone.
Q Okay. What do you recall the person who was attempting to answer the question saying?
A I recall Sue Blackwell just talking about her views on violence against civilians being wrong in any setting.
Q Okay. And -- but you don't recall what Mr. Maniaci said in answer to that?
A I believe he continued saying something in the order of answer my question, you haven't answered my question. That's not verbatim. It's something on that order.





c61d9d30-bc6f-4ef9-afed-0df7df1e92de

Q We were given some disks last night that I haven't been able to get my computer or my disk player to recognize, but that's besides the point.
Was there -- was there somebody recording this on either videotape or videodisk, recording the conference?
A I believe there is a recording of this --
Q Okay.
A -- session.
MR. JONES: Just for the record -- I mean, I checked last night -- those were delivered to your office at 11:00 a.m. on Monday, the photos and the disks.
MR. FAY: Could be. I was the only one in the office on Monday. I think probably the door to the office was locked because of the -- no, I was the only one. That was the Monday before.
MR. JONES: It was signed by somebody named Reed?
MR. FAY: Reed. I wonder if it got delivered upstairs and that's the reason they -- but that doesn't -- I'm not making a big deal out of that.



I can't -- I can't get them to play on the thing, so we'll talk about that when this thing's over.
BY MR. FAY:
Q After Mr. Maniaci went back to his seat and then you said that the person started answering and he -- he said something else but you don't recall the words, how -- how long did he speak during this -- Mr. Maniaci speak during this period when you say you don't recall what he said?
A I would -- again, don't have specific memory. I would say it went on for -- for -- between one-and-a-half and two minutes, roughly. But again, I have no formal way of timing that.
Q Okay. Did you observe Mr. Maniaci at any time act in any way that was unlawful?
A No, I did not.
Q Did you observe him at any time act in a manner that endangered anybody?
A Not that I remember, no.
Q Did Mr. Maniaci at any point, to the best of your recollection, threaten anybody?
A No.



Q And you've indicated there wasn't any other -- there isn't any definition of disruption or obstruction in any of the standard operating procedures or general policy statements of Georgetown; is that correct?
A That's correct.
Q Was there any request to you by the person who was on the panel speaking or anyone else who was on that panel to have Mr. Maniaci removed?
A No.
Q And you were acting in your capacity as an official of Georgetown at the point where you ordered the Georgetown security to remove him?
A Yes.
Q When they went to remove him, what do you remember seeing?
A I remember that there were two officers who approached him. I could not hear -- as I was some distance away, I could not hear exactly what they said, but they spoke to him for a moment.
After that, I was -- was looking around the auditorium. I just saw that there was -- it seemed to



me that Mr. Maniaci was resisting leaving the auditorium. He just -- he was -- at first was not willing to go with them. After a moment, it seemed that he did begin leaving the auditorium.
Q At any point, was Mr. Maniaci on the floor?
A I know that it appeared to me that he sort of crumpled, sort of wanted to sit down or just let himself go down. I don't believe he was on the floor, but I know that he did -- did need to be supported, held up, by the officers.
Q Did the two officers appear to be fairly large people? But of course, you see everyone in juxtaposition to the other people that are there.
A Uh-huh.
Q Can you give me any estimate of the size of the two officers?
A I just don't have any basis on which to do that.
Q Okay. Would it be fair to say that Mr. Maniaci was substantially smaller than the two officers?
A I just -- I don't have a clear basis on





c61d9d30-bc6f-4ef9-afed-0df7df1e92de

which to make that kind of judgment. I mean, I don't know.

Q Okay. After this was over, did you have conversations at any time with any of -- anyone else, whether they were a participant of the thing, officially university, whatever, about what happened with Mr. Maniaci?

MR. JONES: I'm going to object to the extent that that question calls for privileged communications with counsel.

But other than discussions that you've had with attorneys, you can answer that question.

BY MR. FAY:

Q Yeah. I'm excluding speaking to the people here at Williams & Connolly.

A After the session, I spoke with Mr. Morrell outside of Gaston Hall, and we just spoke with one another about the fact that we had made -- as we made a decision to remove Mr. Maniaci, that we would, you know, let him know that he was not welcome to attend other sessions at this conference.

Q Okay. Did you -- when you say you would



let him know, did you then speak to him or did -- to the best of your knowledge, did Mr. Morrell speak to him?

A To the best of my knowledge, Mr. Morrell spoke with him.

Q Okay. After -- when Mr. Morrell spoke to him, did Mr. Morrell say anything to you about any injuries he observed on Mr. Maniaci?

A No.

Q Did he indicate in any way that Mr. Maniaci said anything to him when he spoke to Mr. Maniaci?

A No.

Q I take it you've not at any time had any further conversation with Mr. Maniaci?

A That's correct.

Let me clarify that. I did have -- at the InterCultural Center that day, later that day, I did have a brief conversation with Mr. Maniaci. But after that, I did not have a further conversation.

Q Okay. Could you tell me what took place in that conversation, what he said, what you said?

A I just remember that he wanted to come back



into the ongoing conference sessions which were held there. Mr. Morrell and I were there. We let him know he was not welcome to come in. And that was sort of the nature of that conversation.

Q Let me see if I have the sequence down correct. You gave a statement to the people at the conference before it started as sort of welcome to Georgetown and the usual things, I take it, that are in the welcome statement.

A Uh-huh.

Q And then the -- this fellow whose name you gave took over as the moderator.

A Uh-huh.

Q Did you say anything else, then, between then and the point where you -- when you told -- instructed the police, the Georgetown security to remove Mr. Maniaci?

A I made a brief comment once the panel presentations wrapped up and before the question and answer session began. And then, again, I gave a couple of warnings to one individual prior to the interaction with Mr. Maniaci.



Q Who was that individual? I think it was -- I'm sort of deducting that that individual was not Mr. Maniaci from the way you put it.

A That's correct.

Q Okay. What do you recall saying to that -- whoever that individual was?

A I remember warning him twice that his opportunity to speak had ended and that I then asked our public safety staff to approach him and escort him from the room.

Q Okay. Did you -- before instructing the police, do you remember saying anything to Mr. Maniaci at all?

A Before I instructed the police to remove --

Q Yes.

A -- him?

Q Yes.

A Yes. I remember warning him twice that his opportunity to ask his question had ended, and I asked him to be quiet.

Q Did Ms. Blackwell completely answer the question that Mr. Maniaci posed to her?





c61d9d30-bc6f-4ef9-afed-0df7df1e92de

A She gave a substantive answer. So in terms of completely answer it, that seems to call for some speculation about what a complete answer looks like, but she did answer his question.

Q She didn't have anything else -- at least she didn't indicate to you that she had anything to add; is that correct?

A No, she didn't indicate that.

Q Once you had instructed the Georgetown security to remove Mr. Maniaci, were the security people, then, under Mr. Morrell's tutelage, let's say, and instruction?

In other words, once you asked them to remove him, would any further instruction to them have to come from Mr. Morrell?

MR. JONES: Object to form.

You can answer, if you can.

THE WITNESS: It would come from supervisory personnel in that area of the university. Maybe Mr. Morrell, maybe other people that report to him.



BY MR. FAY:

Q By that area of the university, you mean public safety police?

A Yeah.

Q Other than Mr. Morrell, I think there's an indication that Mr. Harrison at some point -- was he present when this took place, Darryl Harrison?

A I don't specifically remember. I know he was present during the conference, but I don't know that he was in that room at that particular time. I'm not certain.

Q Was Mr. Morrell present in the room during this question by Mr. Maniaci and his subsequent removal?

A I know that Mr. Morrell was in the room very near that time, was in the vicinity. I don't -- I'm not absolutely certain he was in the room. He may have been just outside the room. He was in the vicinity.

Q Did you hear Mr. Morrell give any further instruction to the Georgetown security --

A I did not.



Q -- people?

Did Mr. Morrell afterwards indicate to you in any way that he had given any further instruction to the Georgetown security people regarding Mr. Maniaci?

A No.

Q How many occasions before this have people been removed from conferences of this type where there was speech with regard to some political topic or some topic of general interest?

MR. BUCKLEY: Objection, foundation.

BY MR. FAY:

Q How many people have been removed?

MR. JONES: You can answer, if you can.

THE WITNESS: Okay. I just -- I don't have detailed information on that. It happens a couple of times each year. It certainly happens, but not with great frequency.

BY MR. FAY:

Q Did you -- you indicated you were looking around the room after you instructed the officers -- that Georgetown security officer remove Mr. Maniaci?



A Uh-huh.

Q Are you able in any way to say whether or not in what you observed that the officers acted reasonably?

A It appeared to me from what I saw that the officers acted professionally and reasonably.

Q But I take it you -- you had limited sight, meaning you were looking -- you already indicated you were looking around the room part of the time.

A Right. Uh-huh.

MR. FAY: Okay. I don't have any other questions.

Counsel?

MR. JONES: Why don't we take a short break.

MR. FAY: Sure.

THE VIDEOGRAPHER: Going off record at 10:30:31.

(Whereupon, a short recess was taken.)

THE VIDEOGRAPHER: Back on record at 10:41:25.

MR. JONES: For the record, I don't have

Page 50

any questions of Mr. Olson.
BY MR. FAY:
Q Mr. Olson, just one other thing.
From the point where -- where Mr. Maniaci stood up and asked his question to the point where you told the Georgetown security to remove him, how much time went by?
A Several minutes. I just don't remember in detail.
Q Was there -- what did -- before people got up and gave their questions, what instructions were given them by the moderator or by anyone else or by you?
A I gave instructions that the people were to come to the microphone, that they could ask one question, please phrase their comments in the form of a question, something on the order of, you know, please be concise, that sort of thing.
Q Okay. Was there any further -- any other statement in any of the materials handed out when people showed up for the conference about questions that would be asked at the end of the presentation, do

Page 51

you remember?
A Not that I remember.
Q In comparison to any of the other conferences you've had, was this conference, this proceeding that brings us here today, unusually disruptive, or was it pretty much the run of the mill?
MR. JONES: Object to the form.
You can answer, if you can.
THE WITNESS: I'd just say we have a variety of speakers, issues, on campus. It's -- dealing with disruptions is not uncommon.
MR. FAY: Okay. I don't have any other questions.
Do you want to talk --
MR. JONES: Again, no questions.
MR. FAY: No, okay.
THE VIDEOGRAPHER: Going off record at 10:43:50.
MR. FAY: You'll probably want a copy or so forth. I won't go through -- since he's a party, I'm not going to go through that you have the right to receive a copy and sign it. You'll have an errata

Page 52

sheet and so forth.
I take it you folks do not want to waive signature?
MR. JONES: Right.
(Whereupon, signature not having been waived, the deposition concluded at 10:43 a.m.)
-oOo-

Page 53

ACKNOWLEDGEMENT OF DEPONENT

I, TODD A. OLSON, do hereby acknowledge I have read and examined the foregoing pages of testimony, and the same is a true, correct and complete transcription of the testimony given by me, and any changes and/or corrections, if any, appear in the attached errata sheet signed by me.

________________________
TODD A. OLSON

Subscribed and sworn to before me this ________ day of ________________, 2007.

________________________
Notary Public in and for the
________________________

My commission expires:





c61d9d30-bc6f-4ef9-afed-0df7df1e92de