# EXHIBIT 6

CONFIDENTIAL

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - x

WILLIAM MANIACI,                    :

    Plaintiff,                     :

vs.                                 : Case No.
                                        1:06CV01625
GEORGETOWN UNIVERSITY,              :
ET AL.,

    Defendants.                    :

- - - - - - - - - - - - - - - - x  CONFIDENTIAL

               January 11, 2007

               Washington, D.C.

VIDEO DEPOSITION OF:

               DARRYL HARRISON

Was called for examination by counsel for the Plaintiff, pursuant to notice, in the offices of, Williams & Connolly, 725 12th Street, N.W., 12th Floor, Washington, D.C., commencing at 1:14 p.m., before Carolyn Friend, a Notary Public in and for the District of Columbia, when were present on behalf of the respective parties:

### Page 2

```
1  APPEARANCES:
2       THOMAS FORTUNE FAY, ATTORNEY-AT-LAW
        CARAGH GLENN-FAY, ATTORNEY-AT-LAW
3       700 5th Street, N.W.
        Second Floor
4       Washington, D.C. 20001
        (202) 638-4535
5       COUNSEL FOR THE PLAINTIFF
6
        MALACHI B. JONES, ATTORNEY-AT-LAW
7       COLLEEN SHANAHAN, ATTORNEY-AT-LAW
        JOHN BUCKLEY, ATTORNEY-AT-LAW
8       Williams & Connolly
        725 12th Street, N.W.
9       Washington, D.C. 20005
        (202) 434-5286
10      COUNSEL FOR THE DEFENDANTS
11 ALSO PRESENT:
   Mark Guenther, Video Operator
12 Jane E. Genster
13          C O N T E N T S
14 WITNESS:        EXAMINATION BY:    PAGE:
15 Darryl Harrison      Mr. Fay        3
16          E X H I B I T S
17 NO.:     DESCRIPTION:            PAGE:
18 2        photograph                9
19 3        photograph               26
20 4-6      photographs              31
21
22 Note: Exhibits marked and retained by Counsel.
```

### Page 3

```
1           (Thereupon, a statement was
2           read by the Video Operator.)
3       MR. FAY: Thomas Fortune Fay and Caragh
4  Glenn-Fay representing William Maniaci, the
5  Plaintiff in this action.
6       MR. JONES: Malachi Jones and Colleen
7  Shanahan of Williams & Connolly representing the
8  Defendant, Georgetown University, Darryl Harrison,
9  David Morrell, Erik Smulson, Todd Olson, and George
10 Taylor. Also present is Jane Genster of Georgetown
11 University.
12      For the record, the Defendants are
13 designating this deposition as confidential pursuant
14 to the protective order that's been entered in this
15 case.
16 Whereupon:
17           DARRYL HARRISON,
18      Was called for examination, and, after being
19      duly sworn, was examined and testified as
20      follows:
21           EXAMINATION BY COUNSEL FOR
22           PLAINTIFF
```

### Page 4

```
1       BY MR. FAY:
2       Q   Could you, please, state your full name
3  and address.
4       A   Full name is Darryl K. Harrison. Address
5  is 7042 Lee Stone Street, Springfield, Virginia
6  22151.
7       Q   What is your date of birth, Mr. Harrison?
8       A   Date of birth is August 24th, 1948.
9       Q   And where were you born?
10      A   In Washington, D.C.
11      Q   Could you detail your education for us,
12 please?
13      A   My education, high school, Archbishop
14 Carroll High School in the District of Columbia,
15 American University in Washington, D.C. and numerous
16 other courses and certificates from a number of
17 different universities.
18      Q   Okay. You received a degree from
19 American University?
20      A   Received a BS in administration of
21 justice.
22      Q   Okay. And you said some other courses.
```

### Page 5

```
1  Could you sort of give us the flavor of those
2  without the whole course, content of the course?
3       A   I have a professional certificate from
4  Georgetown University. I have a number of
5  certificates from the International Association of
6  Chief of Police, a number of certificates from the
7  District of Columbia Emergency Management
8  Organization, as well as a number of other
9  certificates from a number of other colleges, one or
10 two throughout the United States.
11      Q   Could you tell us about your work
12 history?
13      A   My work history, I began with the
14 Metropolitan Police Department in 1970. I retired
15 from the Metropolitan Police Department in 1995 as a
16 commander captain of the special events branch of
17 the special operations division.
18      Q   And since then you've been with
19 Georgetown?
20      A   Subsequent to that, I spent time as a
21 independent security specialist in the area of
22 training, specifically in mass demonstrations and
```

Page 6

1  major events. I did that for five years.
2       In 1999, I was employed by Georgetown
3  University as the associate director in the
4  department of public safety.
5    Q   And you're now the director of public
6  safety?
7    A   I was selected as the director of public
8  safety in March of 2003.
9    Q   And that was your position, I take it, on
10 February 18th of 2006?
11   A   Yes.
12   Q   Let me first ask you -- there have been
13 two names that have come up of officers, Officer
14 Eddy and Officer Salley. However, nobody knew their
15 first names. Would you know the first names of
16 either of those officers?
17   A   Officer Eddy, first name is Roy.
18   Q   Okay.
19   A   Officer Salley, first name Larry.
20   Q   Okay. Is Eddy, E-D-D-I-E, just --
21   A   E-D-D-Y.
22   Q   E-D-D-Y. Okay. And Salley is

Page 7

1  S-A-L-L-E-Y?
2    A   S-A-L-L-E-Y, correct.
3    Q   Okay. Thank you. Tell me what the
4  director of public safety at Georgetown does. In
5  other words, what's your assigned area of
6  responsibility?
7    A   The responsibility for the director of
8  the department of public safety for Georgetown
9  University is to assist in developing those programs
10 that ensure the public safety of our students,
11 faculty, and staff.
12   Q   That would include everything on campus,
13 as well as buildings -- including the buildings and
14 so forth?
15   A   Yes.
16   Q   Do all of the persons who come under your
17 direction actually work for Georgetown University,
18 or are some of them contract employees? By contract
19 employees, I mean they -- they work for one of these
20 contracting security firms that provides special
21 police officers and then the -- the firm gets paid.
22   A   They are employees of the special police

Page 8

1  of that particular private security firm. During
2  the time that they're at Georgetown, they work for
3  the department of public safety.
4    Q   Okay. So they're paid by Georgetown?
5    A   The contracting company is paid by
6  Georgetown.
7    Q   In the case of Officer Eddy and Officer
8  Salley, were they actually regular employees of
9  Georgetown, or were they working for a contractor
10 with Georgetown?
11   A   Officer Eddy and Officer Salley were full
12 time employees of the department of public safety at
13 Georgetown University.
14   Q   Okay. Who is your supervisor in your
15 position as director of public safety?
16   A   My supervisor is David Morrell, Vice
17 President of university safety.
18   Q   Before February 18th of 2006, did you
19 have any knowledge whatsoever of Mr. Maniaci?
20   A   Yes.
21   Q   Okay. And tell us what -- by knowledge,
22 I don't mean just what you saw, but information that

Page 9

1  might have been obtained from any security -- other
2  security or police department or intelligence
3  department or anything of that sort.
4    A   I had knowledge of the existence of
5  Mr. Maniaci because I had spoken to him a -- a few
6  times in reference to the event that you just
7  referenced.
8    Q   The Palestinian solidarity conference?
9    A   Correct.
10   Q   Okay. When was the first -- let me ask
11 you -- before that first conversation, did you have
12 any knowledge at all of the existence of
13 Mr. Maniaci?
14   A   No, I can't say that I did.
15   Q   Okay. Now, I have a photograph here
16 that's been marked as Exhibit Number 2.
17           (Whereupon, Deposition
18           Exhibit Number 2, previously
19           marked, was Identified.)
20       BY MR. FAY:
21   Q   Can you identify the person standing in
22 that photograph?

Page 10

1  A  That person is known to me as
2  Mr. Maniaci.
3  Q  Okay. And tell me about this first
4  conversation you had with Mr. Maniaci.
5  A  I cannot remember the first conversation
6  or any -- any sequence of conversations. I had a --
7  a number of conversations with him. I'm recalling
8  maybe three.
9  Q  Okay. I take it you can't pick out words
10 you might have said in the first conversation as
11 against the last one or whatever. But can -- do you
12 recall what you discussed with him?
13 A  The general nature of our conversations
14 were the upcoming Palestinian solidarity conference
15 and the fact that Mr. Maniaci would be attending and
16 the fact that Mr. Maniaci would be attending to
17 express his opposing views to the conference.
18 Q  Okay. Opposing to -- to the people
19 sponsoring the conference you mean?
20 A  I don't recall the exact specifics of
21 where those opposing views were directed, just the
22 overall fact that -- his opposing views to the

Page 11

1  conference itself.
2  Q  Was this pursuant to a letter that
3  Mr. Maniaci wrote to Georgetown University?
4  A  That I, you know, I don't recall. I'm
5  not aware of that, as far as that having -- you
6  know, as far as any exact sequence on letters that
7  may have been written or not written.
8  Q  What do you recall Mr. Maniaci saying to
9  you and you saying in reply? And I recognize at
10 this point, unless you recorded this stuff, you
11 wouldn't remember word for word. But just tell us
12 what -- in general, summarize what the conversation
13 was about, what you said, what he said.
14 A  Well, as I indicated, the general nature
15 of our conversation was the fact that he would be
16 attending, and he -- he indicated that he would be
17 attending to protest. And he was gathering
18 information from me on procedures that we had in
19 place for protestors and that's what we discussed.
20 Q  Okay. Did you send him any written
21 materials?
22 A  No, I cannot recall sending him any

Page 12

1  written materials in our --
2  Q  Do you think -- I'm sorry. I didn't mean
3  to interrupt you.
4  A  Yeah. The nature of our contacts were
5  strictly verbal by -- by telephone.
6  Q  Okay. Did he mention any -- any policy
7  guidelines or any documents that he had obtained,
8  either by direct mail or off the internet relating
9  to Georgetown University?
10 A  I can't recall those -- the nature of
11 the -- that particular area of our conversations.
12 As I said, our conversations were mainly centered
13 around the protest and demonstration areas.
14 Q  Okay. Was there anything beyond what
15 you've just said that Mr. Maniaci said that you
16 recall?
17 A  No, nothing that I can recall.
18 Q  Anything else you said back to him that
19 you recall?
20 A  No, not that I can recall.
21 Q  Now, going to February the 18th of 2006.
22 When did you first see Mr. Maniaci on that day?

Page 13

1  A  As I recall, my initial contact with --
2  with Mr. Maniaci was on the first floor of our Healy
3  Building, classroom side, as we describe it. That
4  was my first contact with Mr. Maniaci, as I recall,
5  on the 18th.
6  Q  Okay. The Healy L Building?
7  A  Healy Building.
8  Q  Healy. Like H-I-L-L --
9  A  H -- H-E-A-L-Y.
10 Q  Oh, Healy. Okay. Is that the main
11 building over at Georgetown?
12 A  It's one of the main buildings at
13 Georgetown.
14 Q  And what did you see him doing when you
15 first saw him in -- in the Healy Building?
16 A  At the point that I initially observed
17 him, Mr. Maniaci appeared to be quite upset, quite
18 demonstrative, and that was my initial visual
19 observation of him.
20 Q  About what time was this on the 18th of
21 February 2006?
22 A  As I recall, that must have been

Page 14

1   approximately 1:00 p.m. or so.
2   Q   Okay. What did he say to you, if you
3   recall?
4   A   Well, initially -- my initial
5   conversation was not directed at -- to Mr. Maniaci.
6   Q   What do you mean? I don't quite follow
7   that.
8   A   I -- I had responded to the Healy
9   Building at the direction of my supervisor.
10   Q   Oh, okay. Well, when you got over there,
11   what did you hear Mr. Maniaci saying, whether he was
12   saying it to you specifically or -- in other words,
13   what did you overhear Mr. Maniaci saying rather than
14   what he might have said to --
15   A   I cannot recall the exact specifics of
16   his conversation, just that it was loud,
17   described -- could be described as shouting, very
18   demonstrative.
19   Q   Where is this in relation to the ICC
20   Building?
21   A   The Healy Building is approximately two
22   buildings over from ICC, a distance of approximately

Page 15

1   a football and a half, so --
2   Q   Football field and a half?
3   A   Field -- so 150 to 200 yards.
4   Q   Okay. And how -- how long did -- was --
5   was Mr. Maniaci saying anything? How long was he
6   there speaking at all?
7   A   During the time that he was at the Healy
8   Building, I would say that he was there for
9   approximately ten to fifteen minutes.
10   Q   Okay. Was -- did he seem to be speaking
11   to anybody, like giving a speech to somebody, or was
12   he in conversation with somebody or maybe just
13   talking to himself? I don't know. But could --
14   could you put it in context, in other words?
15   A   Well, he -- he -- he appeared to be
16   speaking to a number of different people.
17   Q   Do you have any idea who those people
18   were?
19   A   The present -- that I recognize was Vice
20   President Morrell, Vice President Olson, and there
21   were a group of individuals that, overall, appeared
22   to be with Mr. Maniaci.

Page 16

1   Q   You don't recall any of the words that he
2   uttered?
3   A   No, I do not.
4   Q   Do you recall anything that -- by
5   Mr. Morrell, you mean David Morrell, your boss,
6   would that be right?
7   A   David Morrell, Vice President of
8   university safety.
9   Q   And Mr. Olson would be Todd Olson?
10   A   Would be Todd Olson, Vice President of
11   student affairs.
12   Q   Okay. Do you recall what they said, just
13   in summary, you can give, if you don't remember the
14   exact words? If you remember the exact words,
15   that's great.
16   A   Well, I spoke directly to Vice President
17   Morrell and Vice President Olson at that time.
18   Q   And what did they tell you?
19   A   At that time, they indicated that
20   Mr. Maniaci had been escorted from Gaston Hall as a
21   result of being engaged in causing a disruption of
22   the event that was taking place at that time and he

Page 17

1   had been escorted to -- down to the first floor of
2   the Healy Building.
3   Q   Did they explain -- either one of them
4   explain to you further what -- what -- exactly what
5   the nature of the disruption was?
6   A   Just the fact that the disruption he had
7   been -- had disrupted the program from continuing to
8   go forward.
9   Q   Well, what I mean is, I guess somebody
10   could disrupt a program by taking their clothes off
11   or by doing handstands in the -- in the aisle or by
12   any number of things. Did they describe what
13   exactly he did to disrupt the program?
14   A   No, they did not.
15   Q   Okay. And you say this back and forth
16   was about ten minutes. After that, did Mr. Maniaci
17   move off or did you move off someplace else?
18   A   After that, as a result of my
19   conversation with Vice President Morrell and Vice
20   President Olson, Mr. Maniaci and I moved toward the
21   ICC Building.
22   Q   Okay. Did you get all the way to the ICC

**Page 18**

1  Building?
2    A    Yes, we did.
3    Q    And what happened when you got to the ICC
4  Building?
5    A    Once at the ICC Building, there was a
6  further disturbance.
7    Q    Well, what -- if you can define
8  disturbance, I would appreciate it.
9    A    Well, once at the ICC Building,
10  Mr. Maniaci attempted to enter after it had been
11  explained to him that he would not be allowed to
12  enter. There were a number of other individuals
13  that also attempted to enter. And they were also
14  not allowed entrance at that particular time.
15        There were also individuals that were
16  exiting the building, and as a result of this, after
17  further conversation and further disruption, there
18  was a consultation with the Metropolitan Police
19  Department.
20    Q    And what was the result of that
21  consultation?
22    A    After the consultation with the

**Page 19**

1  Metropolitan Police Department, Mr. Maniaci was
2  escorted from the campus of Georgetown University.
3    Q    And who was escorting him?
4    A    That was Sergeant Delese, a sergeant from
5  the Metropolitan Police Department assigned to the
6  second district of the Metropolitan Police
7  Department.
8    Q    And you said disturbance. By
9  disturbance, you mean that he went to walk into this
10  building; is that correct?
11    A    By disturbance, I mean he attempted to
12  enter the building and attempted to enter the
13  building in a disruptive manner.
14    Q    Well, what -- what could be defined
15  disruptive manner -- again, there is nothing wrong
16  with the word disruptive. It just isn't very
17  specific.
18        MR. JONES: I object to the form.
19        BY MR. FAY:
20    Q    Could you describe what you mean by the
21  word disruptive, in this context?
22    A    It had been explained to Mr. Maniaci that

**Page 20**

1  he would not be allowed entrance into ICC. And once
2  again, Vice President Morrell and Vice President
3  Olson, after several minutes of attempting to
4  explain and abide by this, as well as along with the
5  other group of individuals that were accompanying
6  Mr. Maniaci with him attempting to enter, protocol
7  had been established, in which admission to that
8  building at that time would be by admission tickets.
9        Individuals at that point attempted to
10  enter without admission tickets. Individuals inside
11  the building also attempted to bring those
12  individuals off. And also, this caused a great deal
13  of disruption at the front entrance of the ICC
14  Building.
15        And so after consultation with
16  Mr. Maniaci, Vice President Morrell, in discussions
17  with him, and asking him to leave the campus and his
18  refusal to do so at that time, there was further
19  consultation with the Metropolitan Police
20  Department.
21    Q    Now, you said it had been stated to him
22  that he could not enter the ICC Building. From what

**Page 21**

1  I understood about what you said about what was said
2  by Mr. Morrell and by Mr. Olson, in your presence, I
3  didn't hear you say anything along those lines.
4  When -- were you present when -- when you believe
5  that he was told not to enter the ICC Building?
6        MR. JONES: I object to the form.
7        BY MR. FAY:
8    Q    Go ahead and answer.
9    A    I was present.
10    Q    And where was that?
11    A    That was specifically at the ICC
12  Building. That was also prior to arriving at the
13  ICC Building.
14    Q    When you say prior to, where was -- where
15  was Mr. Maniaci when somebody said you can't go into
16  the ICC Building or words to that effect?
17    A    That was at the Healy Building as well as
18  in route to the ICC Building.
19    Q    And who said that?
20    A    I and -- I, myself, advised him of that
21  fact. Initially, Vice President Morrell and also
22  Mr. Olson after consultation indicated that he would

Page 26

1  presentation?
2  A    I was in and out of Gaston Hall a number
3  of times throughout the -- throughout that day and
4  throughout the conference.
5  Q    And --
6     MR. JONES: Just for the record, I think
7  that was Exhibit 3 that you showed him.
8     MR. FAY: Yes.
9        (Whereupon, Deposition
10          Exhibit Number 3, previously
11          marked, was Identified.)
12     BY MR. FAY:
13  Q    At any time when you were in the hall,
14  was Mr. Maniaci speaking or anything happening at
15  any -- in connection with Mr. Maniaci, other than
16  him listening to whoever was speaking?
17  A    Now, I cannot recall during the times I
18  was there if Mr. Maniaci was even present.
19  Q    Okay. I -- I am assuming, therefore, and
20  tell me if I'm correct, you were not present when
21  the officers removed Mr. Maniaci from the hall.
22  A    That is correct.

Page 27

1  Q    Okay. Now, there -- there was -- with
2  regard to the officers who were in the hall -- well,
3  let me ask you. I take it all of the officers who
4  were on the scene at -- on that date were people who
5  were in your department who would be under your
6  supervision and up above you, Mr. Morrell, would
7  that be correct?
8  A    I don't know if I fully understand your
9  question.
10  Q    In other words, all of the officers that
11  were there that day, the SPOs working for
12  Georgetown, would have been people who were under
13  your supervision and then you would be -- you
14  would and those officers also would be under
15  Mr. Morrell's supervision; is that correct?
16  A    Let me -- let me answer that by, yes, DPS
17  officers -- all of the DPS officers, commissioned
18  officers and -- are under my supervision, but there
19  were also Metropolitan police officers that were
20  present.
21  Q    Okay. As best you know, either -- well,
22  you wouldn't know from seeing it, because you didn't

Page 28

1  see, but from any documents or public reports, were
2  there any Metropolitan police officers involved in
3  bringing Mr. Maniaci and moving him from Gaston
4  Hall?
5  A    As best I know, no.
6  Q    So, presumably, it would have been only
7  officers working for you -- under your direction, I
8  mean working for -- working, of course, for
9  Georgetown, but under your direction, who would have
10  removed Mr. Maniaci from the hall?
11     MR. JONES: I object to the form.
12     BY MR. FAY:
13  Q    Is that correct?
14  A    That's correct.
15  Q    Okay. Other than -- than Mr. Morrell and
16  yourself, Officer Eddy and Officer Salley, so far as
17  officers in Gaston Hall, not in the rest of the
18  campus, but just in Gaston Hall, at any time were
19  there any others that you recall seeing that day who
20  would have been in Gaston Hall?
21  A    There -- there are a number of officers
22  that may have been in Gaston Hall.

Page 29

1  Q    Okay. How many would have been on the
2  roster for being in that area that day, if you can
3  recall?
4  A    I can't recall the specific number, but
5  there would have been anywhere -- could have been
6  anywhere from five to -- five to eight officers
7  assigned to that particular -- that particular area.
8  Q    Okay. On -- on this date, I take it,
9  other than -- than yourself and Mr. Morrell, all of
10  the other people hooked up with the Georgetown
11  University department of public safety working in
12  that department would have been wearing uniforms on
13  that date?
14  A    Yes, correct.
15  Q    In other words, you wouldn't have had any
16  people just in regular business garb or casual garb
17  in the audience or anything?
18  A    That's correct.
19  Q    Did you speak to Officer Eddy and Officer
20  Salley about what had happened inside the hall?
21  A    Yes, I did.
22  Q    We might as well take them up in turn.

Misty Klapper & Associates
703-780-9559

24ca273a-6b61-4257-a3be-72eef841bed3

Page 30

1  With regard to Officer Eddy, what do you recall him
2  saying to you?
3      A   Officer Eddy indicated that per the
4  direction of the vice president of student affairs,
5  Mr. Maniaci was escorted from Gaston Hall after
6  causing a disruption to the panel discussion.
7      Q   Okay.
8      A   And --
9      Q   What did Officer Salley say?
10     A   Officer Salley, once again, was -- was
11 basically -- provided the same information as
12 Officer Eddy.
13     Q   Okay. Did they say any -- give you any
14 further description than that?
15     A   They described that, you know, there was
16 a group of individuals that appeared to be with
17 Mr. Maniaci that initially interfered with their
18 approach to Mr. Maniaci and the request for him to
19 leave the hall.
20     Q   What do you mean by interfered with?
21     A   Interfered with by obstructing their
22 access to Mr. Maniaci as well as obstructing a

Page 31

1  working area for them to approach Mr. Maniaci.
2      Q   We have a couple of pictures here of the
3  officers. There is one bald man standing I see in
4  the pictures. Let me hand them to you. Can you
5  take a look at that?
6          MR. FAY: That's probably 4, 5, and 6
7  within the packet.
8          MR. JONES: Just check on the back and
9  read whether they're Exhibits 4, 5, and 6.
10         THE WITNESS: Exhibits 4, 5, and 6.
11         MR. JONES: Okay.
12             (Whereupon, Deposition
13             Exhibit Numbers 4 through 6,
14             previously marked, were
15             Identified.)
16         BY MR. FAY:
17     Q   I see one man I just described as a bald
18 man, and I don't know who that is, but I see one
19 bald man there. Did -- what did they describe when
20 they said interfering with? What did they say that
21 this person did?
22     A   They indicated persons --

Page 32

1      Q   Um-hmm.
2      A   -- interfered with their access to
3  Mr. Maniaci upon their initial approach to him.
4      Q   Okay. Other than the persons, did they
5  give any description of these people?
6      A   They gave general descriptions.
7      Q   You indicated, I think, that it was their
8  thought that these people were somehow connected
9  with Mr. Maniaci. What was the basis of that
10 conclusion on their part?
11     A   I -- I can't speak for what was the basis
12 of their conclusion.
13     Q   Well, did they tell you anything to
14 indicate that -- did they see them talking to
15 Mr. Maniaci or any interaction between Mr. Maniaci
16 and these people?
17     A   I can't speak to what the -- what their
18 recollections were. It was only, you know, as far
19 as their opinion that these individuals were with
20 Mr. Maniaci.
21     Q   Okay. In these pictures, do you see this
22 bald man doing anything that -- that you would

Page 33

1  classify as interference?
2      A   I see --
3          MR. JONES: Just to clarify, I see at
4  least two bald individuals in that picture.
5          THE WITNESS: Right.
6          BY MR. FAY:
7      Q   Sorry. I only noticed one. There is one
8  bald person standing --
9      A   There's a bald and there's a bald.
10     Q   -- in a white shirt. Oh. Let me see.
11 Is that Mr. Morrell over -- no -- well, I'm speaking
12 of this fellow here. I didn't notice this -- there
13 is a head, most of which is obscured by one of the
14 officers, which appears to have a cap on it, a hat
15 of some sort, and then this bald man to the -- as
16 you face the picture, to the right in the picture
17 beyond the left side.
18         The person there to your right side, as
19 you face the picture, do you see anything he's doing
20 that's interference?
21     A   Based -- with this just being a -- a
22 still picture, it -- it would be difficult for me to

Page 38

1  and I'm asking what, if anything, these pictures
2  depict this man is doing interfering with the arrest
3  that was being performed by the officer. By arrest,
4  I mean any detention of that man, Mr. Maniaci.
5      THE WITNESS: Directly --
6      MR. JONES: I would object to the use of
7  the term arrest in that form, if you are asking him
8  for a legal conclusion. To the extent you are, I'm
9  objecting to that question.
10     MR. FAY: No. I'm saying, legally, in
11 the District of Columbia, there is no question about
12 it, we have 200 years of case law that says that
13 when somebody puts their hands on somebody else and
14 holds them, it's an arrest.
15     Now, that isn't my thought. That's the
16 thought of the Court of Appeals and the legislature,
17 the Congress, and, from to time, the counsel. It
18 has nothing to do with my thoughts, but we'll go
19 beyond.
20     BY MR. FAY:
21  Q   What do you see that Mr. --
22     MR. JONES: Well, let me respond. I

Page 39

1  think, you know -- I'm not agreeing to your
2  characterization of the law. In fact, I think it's
3  incorrect, but I don't want to argue with you about
4  what the law is and it isn't.
5      I think you should just ask him questions
6  and give him a chance to respond. To the extent
7  that you're asking from -- from him for a legal
8  conclusion about what an arrest is in the District
9  of Columbia under the law, I'm going to object.
10     MR. FAY: I'm not asking for any legal
11 conclusion.
12     BY MR. FAY:
13  Q   What's he doing to interfere with the
14 officers as depicted in the picture, not what you
15 might suppose or speculate? What exactly do you
16 see?
17  A   I see him directly involved in the
18 response of an -- of an officer to an activity, to a
19 duty. I see this individual directly involved with
20 his hand extended, and just based on the picture,
21 less than six inches from the -- the officer.
22     So I, you know, I -- I -- I see direct,

Page 40

1  you know -- and as I, you know, will continue to
2  say, this is a still picture. But I see direct
3  interference with the activities of a Georgetown
4  University campus police officer.
5   Q   Does he have his hand on either one of
6  the officers?
7   A   From the still picture, I would say no.
8  But I cannot say if his hand has just left the
9  officer or if his hand is about to strike the
10 officer.
11  Q   No. I'm asking what you see in the
12 picture. From the picture, his hand is not on the
13 officer, is it?
14  A   From the picture, I see an individual
15 that is interfering with an activity of --
16  Q   Go ahead.
17  A   -- of a campus police officer.
18  Q   But that wasn't the question. The
19 question is, the picture does not depict him with
20 his hand on either of the officers, does it?
21  A   The picture does not depict him with his
22 hand on the officer at this time.

Page 41

1   Q   Okay. Now, what about the last picture
2  there?
3   A   Exhibit 6, I take it? Is that the one --
4   Q   Yeah.
5   A   -- you're speaking to?
6   Q   Yeah.
7   A   Exhibit 6.
8   Q   There -- that's kind of difficult to see
9  anything. I note that -- that everyone at this
10 point seems to be seated, other than a couple of
11 spectators along the -- it looks like an outside
12 opening and the two police officers.
13     Now, were there only two officers who
14 were involved in this whole thing? By involved, I
15 mean that you said escorted Mr. Maniaci out of
16 Gaston Hall.
17  A   From the -- the picture that appears to
18 be the case, that these two officers were involved
19 in escorting him directly from Gaston Hall.
20  Q   Okay. In those three pictures, is there
21 anyone you see that you can identify, other than
22 Officer Eddy and Officer Salley? My recollection is

Page 42

1  you actually can't even -- you actually can't even
2  see Mr. Maniaci's face in any of the pictures, so
3  you probably --
4      A   And -- and for the record, I did not
5  specifically identify Officer Eddy nor Officer
6  Salley.
7      Q   Okay. Well, looking at those pictures,
8  does it appear that that is Officer Eddy and Officer
9  Salley, Roy Eddy and Larry Salley?
10     A   I do not have a full frontal view of the
11 officer that is bald. I know Officer Eddy is bald.
12 The second officer, I do not have a full focus view
13 and I cannot identify the -- fully identify who that
14 officer is.
15     Q   Okay. We, earlier, took the deposition
16 of Officer George Taylor, whose name was given to us
17 by some witnesses. And he indicated, and I'm
18 paraphrasing now, that his duty station was at one
19 of the gates in and out of Georgetown and,
20 essentially, other than seeing people come in and go
21 out, that he really didn't have any part in any of
22 this.

Page 43

1       Do you have any information that he did
2  have any part in any of the activities that day
3  involving Mr. Maniaci?
4      A   His paraphrase is consistent with the
5  assignment that he was given on that day, and that
6  would be that he'd man the gate.
7      Q   I take it you don't have any information
8  to the contrary?
9      A   No, I do not.
10     Q   Okay. When -- let me go back to the ICC
11 Building for a moment. I take it that -- that
12 beyond -- well, did Mr. Maniaci walk in through one
13 of the doors into the building, or did he stop at
14 the door?
15     A   He initially stopped at the door.
16     Q   You say initially. What did he do then?
17     A   And then, subsequent, as the conversation
18 continued and -- he was advised that he would not be
19 able to fully enter IC -- ICC. There is a vestibule
20 that prevents one from going completely into the
21 entrance.
22         And at that point, he was allowed into

Page 44

1  the vestibule area, as the conversation and
2  consultation continued.
3      Q   Okay. And did he ever go beyond that
4  into the building in any way?
5      A   At one point, he was allowed to use the
6  restroom in the building.
7      Q   Okay. And after that, did he leave the
8  building?
9      A   Yes. He was escorted back out of the
10 building after utilizing the restroom.
11     Q   And at any point when this was going on,
12 did any of the officers have a hold of Mr. Maniaci,
13 either Georgetown University security officers or
14 MPD officers?
15     A   I cannot recall at that point any of the
16 officers having any physical hold of Mr. Maniaci.
17     Q   As far as you witnessed, as far as you
18 saw, did -- did any of the officers have a hold of
19 Mr. -- I mean, just on the arm or something like
20 that, or anything, any touching of him?
21     A   There may have been an occasion or two
22 when he may have been touched to be directed to an

Page 45

1  area to go to. But as far -- as far as any physical
2  restraint or anything along that line, I cannot
3  recall any of the officers having him.
4      Q   I take it that would be consistent with
5  any reports you got from Officer -- Officer Eddy or
6  Officer Salley as well?
7      A   Again, I don't think that --
8      Q   By consistent I mean at the ICC Building
9  now, until he left campus.
10     A   Again, I --
11         MR. JONES: Objection. I don't think
12 he's testified that Eddy and Salley were at the ICC
13 Building.
14         THE WITNESS: ICC Building, correct.
15         BY MR. FAY:
16     Q   Okay. They were never -- is that
17 consistent -- did you -- you have any further report
18 from anybody else indicating any officer had their
19 hand on or hands on Mr. Maniaci after he came out of
20 Gaston Hall?
21     A   No. No, I cannot recall any further
22 reports of that.

Page 46

1  Q   There was a point where Mr. Maniaci asked
2  permission to use the restroom facilities in the ICC
3  Building?
4  A   Excuse me. Yes, that is correct.
5  Q   At that point, did he appear to be ill or
6  not feeling well or injured in any way?
7  A   No.
8  Q   I can't recall whether you gave any
9  estimate as to Mr. Maniaci's height and weight. But
10 if you didn't, could you give us an estimate?
11 A   I would estimate -- and this is going
12 from pure recollection at that point -- that his
13 height is approximately five-eight to five-nine,
14 weight approximately 210, 215.
15 Q   Okay. Oh, did you -- did you see
16 Mr. Maniaci with a cane at any time, you know, a
17 cane to help you walk?
18 A   Yes.
19 Q   Okay. What did -- what did that look
20 like, as best you can recall?
21 A   I cannot remember the specifics of the
22 cane. I certainly cannot.

Page 47

1      MR. FAY: Okay. I don't have any other
2  questions.
3      MR. JONES: No questions.
4      BY MR. FAY:
5  Q   All of these -- yeah. I think you
6  already testified, all of these security officers at
7  Georgetown University all are special police
8  officers, commissioned from the District of
9  Columbia, I take it?
10 A   All of the officers assigned to the
11 department of public safety are commissioned special
12 police officers through the District of Columbia.
13     MR. FAY: Okay. Okay. Thank you.
14     MR. JONES: No questions.
15     VIDEO OPERATOR: Going off the record at
16 14:06:25.
17         (Whereupon, signature having
18         not been waived, at 2:06 p.m.
19         the deposition concluded.)
20
21
22

Page 48

1      CERTIFICATE OF DEPONENT
2  I, _____, do hereby certify
3  that I have read the foregoing pages, _____
4  through _____, inclusive, which contain a
5  correct transcript of the answers given by me
6  to the questions propounded to me herein,
7  except for changes, if any, duly noted on the
8  enclosed errata sheet.
9
10
11         _____
                    WITNESS
12
13
14
15 Sworn and subscribed to before me this ___ day
16 of _____, 2007.
17
18 My commission expires:     Notary Public:
19 _____     _____
20
21
22

Page 49

1          ERRATA SHEET
2  Case: Maniaci v. Georgetown University.
3  Deposition of: Darryl Harrison.
4  Taken on: January 11, 2007.
5  Page   Line   Reads     Should Read
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20         _____
21              Witness
22

13 (Pages 46 to 49)