# EXHIBIT 7

Page 1

```
              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLUMBIA


- - - - - - - - - - - - - - -x
                              :
WILLIAM MANIACI,              :
                              :
         Plaintiff,           :
                              :
     vs.                      : Case No. 1:06CV01625
                              :
GEORGETOWN UNIVERSITY, et     :
al.,                          :
                              :
         Defendants.          :
                              :
- - - - - - - - - - - - - - -x
         CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
```

Washington, D.C.

Wednesday, January 10, 2007

Videotaped Deposition of

DAVID MORRELL

a Defendant, taken on behalf of counsel for the Plaintiff in the above-entitled matter, before Denise M. Brunet, RPR and Notary Public in and for the District of Columbia, taken at the offices of Williams & Connolly, LLP, 725 Twelfth Street, Northwest, Washington, D.C., commencing at 1:20 p.m., when were present on behalf of the respective parties:

Page 2

1  APPEARANCES:
2  ON BEHALF OF THE PLAINTIFF:
3     THOMAS FORTUNE FAY, ESQUIRE
       CARAGH G. FAY, ESQUIRE
4     700 Fifth Street, Northwest
       Second Floor
5     Washington, D.C. 20001
       (202) 638-4534
6
7  ON BEHALF OF THE DEFENDANTS:
8     MALACHI B. JONES, ESQUIRE
       COLLEEN F. SHANAHAN, ESQUIRE
9     JOHN BUCKLEY, ESQUIRE
       Williams & Connolly, LLP
10    725 Twelfth Street, Northwest
       Washington, D.C. 20005
11    (202) 434-5286
12
13 ALSO PRESENT: Mark Guenther, Videographer
                    Jane E. Genster, Esquire
14
15
16
17           -oOo-
18
19
20
21
22

Page 3

1           I N D E X
2    VIDEOTAPED DEPOSITION OF DAVID MORRELL
3           JANUARY 10, 2007
4  EXAMINATION BY                    PAGE
5     Mr. Fay                          4
6
7
8
9
10
11           -oOo-
12
13
14
15
16
17
18
19
20
21
22

Page 4

1           PROCEEDINGS
2     (Thereupon, the videographer makes a
3  statement for the record.)
4  Thereupon,
5           DAVID MORRELL
6  was called for examination by counsel for the
7  Plaintiff and, after having been sworn by the Notary
8  Public, was examined and testified as follows:
9     EXAMINATION BY COUNSEL FOR THE PLAINTIFF
10    BY MR. FAY:
11 Q   Please state your full name and address.
12 A   David Morrell, 6203 Sally Ford Court,
13 Fairfax Station, Virginia.
14 Q   What is your date of birth?
15 A   July 14, 1947.
16 Q   And your place of birth?
17 A   Ross, California.
18 Q   Could you detail your education for us,
19 please.
20 A   Attended grammar school and high school in
21 northern California and attended Loyola University in
22 Los Angeles, graduated with a BS degree in economics

Page 5

1  and then had some graduate study in economics.
2  Q   And was that also at Loyola?
3  A   That was at Cal State, Los Angeles.
4  Q   I take it that did not result in a degree,
5  postgraduate; you didn't get a postgraduate degree?
6  A   Correct.
7  Q   Okay. Could you describe your work history
8  for us, please.
9  A   After I graduated from college -- it was
10 several months after college -- I got a job with
11 Standard Oil of California, stayed there for nine
12 months, began graduate school.
13    Left graduate school, shortly thereafter,
14 began employment with the United States Secret Service
15 in Los Angeles. Spent 24 years, 9 months with the
16 Secret Service, retired in 1996 and assumed the
17 position of head of security for Smithsonian
18 Institution.
19    Stayed there for approximately five years
20 and left in January of 2002 to go to Transportation
21 Security Administration, a new agency that had just
22 been created. Stayed there for I guess about two

2 (Pages 2 to 5)

Page 6

1  years and went to Georgetown in November of 2003.
2  Q    And you've been at Georgetown since then?
3  A    Correct.
4  Q    And you're still at Georgetown --
5  A    I am.
6  Q    -- is that correct?
7       And what positions have you held at
8  Georgetown?
9  A    I've held one position. It's vice
10 president for university safety.
11 Q    Does university safety include the
12 security -- Georgetown University security people?
13 A    Yes.
14 Q    Police, so to speak --
15 A    Correct.
16 Q    -- Georgetown University?
17      Are all the officers that are employed by
18 Georgetown University, do all of them hold a special
19 police officer's commission from the District of
20 Columbia?
21 A    I believe they do.
22 Q    Are there any contract people doing

Page 7

1  security at Georgetown? I'm not talking about if you
2  have some unusual event that draws a lot of people, a
3  football game or something. That doesn't draw much at
4  Georgetown anymore, but some unusual event that draws
5  a lot of people.
6       Other than that, are there ever contract
7  people employed at Georgetown University for security?
8  A    Yes, there are.
9  Q    On the date of this occurrence, the 19th of
10 February 2006, were the officers working inside the
11 hall where this occurrence took place that brings us
12 here today employees of Georgetown University,
13 direct-wage employees?
14 A    Yes, they are.
15      MR. JONES: Objection, foundation.
16      Go ahead and answer, if you can.
17      BY MR. FAY:
18 Q    Okay. I have some pictures here. Let me
19 first hand you what's been marked -- it was marked in
20 the last two exhibits (sic) -- Exhibit 1, and I'll put
21 another sticker on afterwards. I'm not going to take
22 the time now.

Page 8

1       The figure in the center, the tallest
2  figure, I thought, had -- bore some likeness to
3  yourself. Do you think that is -- that is you
4  depicted in the picture?
5  A    There are certainly some similarities.
6  Q    Okay. Were you present inside the hall --
7  was it Gaston Hall -- Gaston Hall while this
8  conference was going on at all times?
9  A    I was.
10 Q    And were you present at all times as an
11 official of Georgetown University? In other words,
12 you didn't happen to just be on the campus to pick up
13 a book or something; you were there working at the
14 time?
15 A    I was.
16 Q    Okay. Let me show you what's been marked
17 Exhibit 2 for identification.
18      Are you able to identify the man that is
19 standing there?
20 A    Yes.
21 Q    And who is that, please?
22 A    It appears to be William Maniaci.

Page 9

1  Q    Okay. Did you see him in Gaston Hall at
2  the time this conference was on?
3  A    I did.
4  Q    Okay. I'll get back to him in a moment.
5       With regard to Plaintiff's Exhibit
6  Number 3, I think the gentleman standing has already
7  been identified by Mr. Olson as himself.
8       Are the other four -- I think there are
9  four people seated there at the table -- were they
10 Georgetown students, to the best of your knowledge?
11 A    I don't believe they were students.
12 Q    Okay. Did you speak to them at all? Did
13 you have any interaction with them at all?
14 A    I don't recall any.
15 Q    Okay. At any time prior to the conference,
16 was your office or any part of the security setup at
17 Georgetown University asked to do any investigatory
18 work determining who exactly was in the Palestinian
19 Solidarity conference, who was going to participate or
20 what kind of organization that was?
21      MR. JONES: Object to the form.
22

3 (Pages 6 to 9)

Page 10

1    BY MR. FAY:
2    Q    Go ahead.
3    A    I didn't understand your question.
4    Q    Let me rephrase it, then.
5         Did -- were you asked at any point, your --
6    your office, anyone working under you, the best of
7    your knowledge, asked to do any type of what now
8    sometimes is called vetting, in other words, find out
9    who these people are and whether they're good people,
10   bad people, whatever, to expect any kind of trouble?
11        Was there any request made of your office
12   prior to this conference?
13        MR. JONES:  Object to the form.
14        THE WITNESS:  I initiated -- there was no
15   request made, no.
16        BY MR. FAY:
17   Q    Okay. I take it from what you just said,
18   you initiated --
19   A    Right.
20   Q    -- some investigation?
21   A    Right. Correct.
22   Q    Okay. Can you tell us, as best you can

Page 11

1    recall -- I take it -- maybe you did bring your
2    records along today. Did you bring any record along
3    today of that investigation?
4    A    I -- I didn't bring any records here today,
5    although there are records made.
6    Q    Okay. Okay. We'd ask that you preserve
7    them because we'll be requesting them.
8         I don't want you to guess now, but to the
9    extent you recall -- it doesn't have to be word for
10   word -- what did that investigation disclose with
11   regard to the people that were putting on the
12   Palestinian Solidarity conference at Georgetown from
13   the 17th to the 19th of February 2006?
14   A    I don't recall obtaining any what I might
15   say is derogatory information or information of
16   concern.
17   Q    Okay. Let me ask you what -- what avenues
18   you took in investigating. That is to say, in your
19   position as vice president in charge of security at
20   Georgetown, I assume you get some level of cooperation
21   from the Metropolitan Police Department and other law
22   and security agencies in the District of Columbia.

Page 12

1    What was -- what means were -- avenues were
2    utilized in doing this investigation?
3         MR. JONES:  Objection, foundation.
4         You can answer.
5         THE WITNESS:  We made an inquiry with
6    Federal Bureau of Investigation, Metropolitan Police
7    Department, the State Department and the Department of
8    Treasury.
9         BY MR. FAY:
10   Q    And none of them reported any information
11   that was a cause of concern to you so far as security
12   is concerned?
13   A    Correct.
14   Q    Did you do any, again, I'll use the word
15   vetting, but, of the organization at Georgetown known
16   as Students for Justice in Palestine?
17   A    No.
18   Q    Were you there when they were, I think
19   Mr. Olson used the term given access to benefits or it
20   sounds like recognized, but when they were recognized
21   and given access to benefits by the university, were
22   you at Georgetown at that time?

Page 13

1         MR. JONES:  Objection, foundation.
2         THE WITNESS:  I don't know when that took
3    place, so I don't -- no, I -- I have no information on
4    that.
5         BY MR. FAY:
6    Q    Did you have any actual conversation on the
7    18th of February 2006 with William Maniaci?
8    A    Certainly there was no extensive
9    conversation. There might have been an exchange of
10   one or two words, but I don't recall any extensive
11   conversation with him.
12   Q    Okay. Anything significant said in the
13   couple words exchanged? Do you even recall the exact
14   words?
15   A    I don't recall the exact words. We -- we
16   had what might be termed a very brief conversation in
17   front of the -- in the ICC building, a building on
18   campus.
19   Q    Okay. What was the purpose of the
20   conversation, engage him in a conversation? What was
21   he trying to learn from you or you trying to learn
22   from him?

Page 14

1  A   The purpose of the conversation was to
2  further inform Mr. Maniaci that he was blocking the
3  entrance into the ICC building and was asked to leave
4  the vestibule of the building and go outside.
5  Q   When you say blocking the entrance, I've
6  never seen the ICC building. Could you explain a
7  little bit more what you mean by blocking the
8  entrance?
9  A   There -- there are a number of entrances
10 into the ICC building. This particular one has two
11 sets of glass doors, and in between the two sets is a
12 small vestibule.
13      He and, as I would term, members of his
14 party were standing in there, interfering with people
15 coming and going out of that building, either
16 attending the conference, going to their offices,
17 conducting other business.
18 Q   When you say interfering, you mean somebody
19 was grabbing people coming in or they were holding
20 arms to keep people from coming in, or were they just
21 there so people coming in had to walk around them?
22 A   It was their presence. There was at least

Page 15

1  one individual in his party who was attempting to
2  engage people coming into the building through what I
3  would term as rough conversation.
4  Q   Such as -- such as what?
5  A   Such as trying to discourage -- I don't
6  recall the exact words, but trying to discourage
7  people who appeared to be coming inside to attend the
8  conference.
9  Q   Do you remember what exactly he was saying?
10 A   No, I do not.
11 Q   Okay. Do you know who that was?
12 A   I -- I don't -- don't know the gentleman's
13 name, no.
14 Q   I assume, therefore, it was not
15 Mr. Maniaci, my client?
16 A   No, it was not.
17 Q   Do you know what this gentleman's
18 connection was with Mr. Maniaci, other than that they
19 were in the physical vicinity of each other?
20 A   The appearance created in my mind is that
21 they were associates attending this conference.
22 Q   When you say associates attending this

Page 16

1  conference, you mean that they -- I don't quite
2  understand --
3  A   I assumed that they were familiar with each
4  other just by their short interaction and their
5  involvement there in this doorway.
6  Q   Okay. Any other reason for assuming that
7  they were familiar with each other?
8  A   Just by their interaction.
9  Q   Prior to February 18th of 2006, had you, to
10 the best of your recollection now, ever seen
11 Mr. Maniaci?
12 A   I don't believe so.
13 Q   Inside the building -- why don't you
14 describe -- were you inside the whole time the
15 conference was going on, inside --
16 A   Inside where?
17 Q   -- Gaston Hall?
18 A   For a majority of the -- of the events in
19 there.
20 Q   Okay. This event that had the speakers who
21 are depicted in the photograph in front of you, were
22 you in there at all times when they were speaking and

Page 17

1  the question and answer afterwards?
2  A   I was.
3  Q   Okay. Could you describe what took place
4  during that period?
5  A   People filed into the -- into Gaston Hall,
6  took seats wherever. There was a panel up on the
7  stage.
8      Once the program began, Todd Olson began
9  the program reading a statement to all the attendees
10 outlining procedural rules, protocol rules that had
11 been adopted by the university. And then the program
12 began or continued with the program people introducing
13 the panel, and the program began.
14 Q   Okay. Do you recall anything as to what
15 the speakers said?
16 A   Nothing specific, no.
17 Q   I take it you were there, let us say, in a
18 security function; you were not there in an academic
19 function as maybe a professor of political science
20 would be in the school?
21 A   That's correct.
22 Q   Okay. When was your attention first drawn

5 (Pages 14 to 17)

Page 18

1  to Mr. Maniaci?
2     A   As I recall, when he asked his first
3  question.
4     Q   Do you recall what that was -- that
5  question was about?
6     A   I don't recall the specifics of the
7  question. I believe it had something to do with
8  terrorism. But it was the length of the question.
9  The statements in the question got my attention.
10    Q   Can you tell us -- again, you probably
11 don't remember the exact words, but in summary, what
12 statements were contained in the question that got
13 your attention?
14    A   I don't recall the exact summary of the
15 statement, but clearly this individual was identifying
16 himself as someone who had an opinion on the
17 conference that was taking place and was certainly
18 interested in engaging the panel in a discussion.
19    Q   Wasn't that one of the purposes of the
20 conference?
21    A   Yes, it was.
22    Q   Okay. What else did he say, as best you

Page 19

1  can recall?
2     A   I don't recall any specifics what he said,
3  other than his -- his certain interest in getting that
4  question, those questions answered.
5     Q   Okay. What took place then?
6     A   As I recall, there was probably -- there
7  was an exchange. The panel attempted -- answered the
8  question, attempted to answer the question. The
9  program continued.
10    Q   Anything else?
11    A   I'm sorry --
12    Q   What else happened --
13    A   -- what do you mean, anything?
14    Q   What else happened in the --
15    A   During the entire program?
16    Q   Yes. Well, during this presentation that
17 was given by the four panelists --
18    A   There were other --
19    Q   -- and the questions that followed.
20    A   -- other questions asked by different
21 people in the hall. I gather the people on the panel
22 answered those questions to the extent however they

Page 20

1  wanted to answer them.
2         There was another time when Todd Olson read
3  some more protocol procedures for asking questions.
4  For people who wanted to come up to the mike and ask
5  questions, there were certain protocols. They went
6  into a position, a point where instead of asking
7  individual questions, they went to multiple questions.
8         And then this gentleman participated in
9  that and then reached a point where, although he had
10 been -- he was warned that his -- he's asked his
11 questions, he interrupted the panel. He was
12 continuing to verbalize an opinion, express a
13 question, thus interfering with this program.
14        He was asked to stop. He continued. He
15 persisted in his vocalizing, his interest of his
16 opinion and, at a point, became -- reached a point
17 where he was just disrupting the conference. And Todd
18 Olson told him that he was, after being warned a
19 number of times, to cease and desist, he continued and
20 he was told he was going to have to be escorted out of
21 the hall.
22    Q   What do you mean by disrupt the conference?

Page 21

1  Were people getting up and leaving because they didn't
2  like it or what -- what -- what --
3     A   He --
4     Q   -- does disrupt consist of?
5     A   He would call out loud out of -- out of
6  sequence, out of -- someone else was asking a
7  question, he would interrupt them. He was being
8  loudly vocal, interfering with the proceedings of the
9  conference to the extent that from when he began his
10 first question, in my mind, he was persistent in
11 interfering, disrupting the proceedings along the
12 course of time there. It was not just one question,
13 you need to answer my question, but it was a continuum
14 of interruptions and being generally disruptive.
15        There were a number of people who would ask
16 questions and sit down. This gentleman decided that
17 he was going to continue to interfere with the
18 conference, and reached a point where enough was
19 enough and he was escorted out.
20    Q   What did he say in these interruptions?
21    A   I don't recall the specifics of what he
22 said. I know he was talking about terrorism, suicide

Page 22

1  bombers.
2      Q    What did Mr. Morrell say? You use your
3  word warning, but what did he actually say to
4  Mr. Maniaci?
5      A    I'm Mr. Morrell.
6          MR. JONES: Object to the form.
7          BY MR. FAY:
8      Q    I'm sorry. What did Mr. Olson say to
9  Mr. Maniaci?
10     A    I'm sorry. Repeat your question.
11     Q    Yes. What did Todd -- you said Todd Olson
12  warned him. What did Todd Olson actually say
13  presumably to Mr. Maniaci? Or maybe -- well, when --
14  did Mr. Olson make a statement that appeared to be
15  directed particularly to Mr. Maniaci?
16     A    Mr. Olson made a statement at the beginning
17  of the conference to all attendees as to what were the
18  protocols to be followed during that specific session.
19  Everybody was made aware that these are the protocols
20  that would apply to that day.
21          When question and answering was started,
22  everyone was advised again that -- how you're supposed

Page 23

1  to form your question, and everyone was advised that
2  there would be warnings. If people decided not to
3  follow protocol, there would be substantial warnings.
4  There would be two warnings, and then you would be
5  asked to leave.
6      Q    Okay.
7      A    And it reached a point where, because of
8  Mr. Maniaci's insistence in interfering and disrupting
9  the -- the panel in that particular event that Todd
10  Olson directed that he be escorted out.
11     Q    I asked you whether he said anything
12  directly -- that seemed to be directed just to
13  Mr. Maniaci at any point.
14     A    Yes, he did.
15     Q    And what did he say?
16     A    He had a -- Todd Olson had a set of
17  protocols that he would read from, and those were
18  directed at Mr. Maniaci, directing him how to follow
19  the protocols, what he was doing wrong.
20     Q    Now, there came a point, then, where --
21  where Todd Olson requested that Mr. Maniaci be removed
22  from the room?

Page 24

1      A    Yes.
2      Q    Okay. I have a couple of pictures here
3  that show a couple of officers. Why don't you take a
4  look through those. And if you can, I'd like to find
5  out who the officers are.
6          MR. JONES: Can we just have identification
7  of what exhibits he's looking at?
8          MR. FAY: I think that's 4, 5 and 6, yeah,
9  4, 5 and 6. And I'll put exhibit numbers for
10  Mr. Morrell's deposition on the back. Yes.
11         THE WITNESS: I'm sorry?
12         BY MR. FAY:
13     Q    Yes. Can you identify the two officers --
14     A    Yes.
15     Q    -- in those photographs?
16     A    The gentleman with his back to the photo
17  without the hat on is Officer Eddy, and the gentleman
18  with the hat on is Officer Salley.
19         THE COURT REPORTER: Salley?
20         THE WITNESS: S-a-l-l-e-y.
21         BY MR. FAY:
22     Q    Do you know their full names? I take it

Page 25

1  those are their last names.
2      A    (Nods head affirmatively.)
3      Q    Okay. Do you know the first name of
4  Officer Eddy?
5      A    No. I don't recall.
6      Q    How about Officer Salley?
7      A    I don't recall.
8      Q    Okay. I take it both of them are
9  Georgetown security employees, employees of the
10  university?
11     A    They are.
12     Q    Okay. Once that instruction by Mr. Olson
13  was given, I take it that the people who carried this
14  out were the people working under your instruction.
15         Not that you gave specific instructions to
16  these two officers right at that point, but they
17  report to you or to somebody who works for you; is
18  that correct?
19         MR. JONES: Objection, foundation.
20         You can answer, if you can.
21         THE WITNESS: They report to Darryl
22  Harrison, who's the director of the Department of

7 (Pages 22 to 25)

Page 26

1  Public Safety.
2          BY MR. FAY:
3     Q    And then he reports to you, I take it?
4     A    That's correct.
5     Q    Okay. After they moved toward Mr. Maniaci,
6  from that point until the end of the day, did you give
7  them any instructions on the manner in which they were
8  to act in removing Mr. Maniaci from the room?
9     A    No, I did not.
10    Q    Did you hear any conversation either
11 officer had -- by conversation, I mean simply they
12 said something to Mr. Maniaci.
13    A    I did not.
14    Q    How close were you to the officers and
15 Mr. Maniaci when the first photograph -- the area of
16 the first photograph shows? Again, I think that's 4.
17    A    That's 4. I was in the back of the hall.
18    Q    Would -- would you have heard anything that
19 the officers said to Mr. Maniaci --
20    A    I did not --
21    Q    -- or --
22    A    I did not hear anything where I was.

Page 27

1     Q    Okay. But where you were, if something had
2  been said, would you have been able to hear it?
3          I've never seen the hall, so I don't know
4  how much distance there was. And I presume that
5  neither of the officers, nor Mr. Maniaci, was, as I
6  would say, miked up on a loud speaker.
7          So without that, would you have heard
8  whatever one of them said unless --
9     A    No.
10    Q    -- it was shouted in a very high voice?
11    A    No.
12    Q    Okay. Do you contend that Mr. Maniaci at
13 any time acted in a manner that was unlawful?
14    A    I do not contend he acted unlawful.
15    Q    Do you contend that Mr. Maniaci at any time
16 when you were observing him acted in a manner which
17 endangered anybody, physically, of course?
18    A    Not -- not knowing everyone who was in that
19 room, I don't know if someone in -- contrary to
20 Mr. Maniaci's feelings, would have had he persisted.
21 This is pure speculation, but had he persisted, would
22 someone have reacted to him physically, I don't know

Page 28

1  any way of knowing that.
2     Q    Well, in that case, wouldn't the person
3  reacting physically have been endangering people, not
4  Mr. Maniaci?
5     A    Not if they were going after Mr. Maniaci.
6     Q    Well, he would have been in danger
7  presumably.
8     A    Right.
9     Q    The person in danger would have been the
10 person going after him, wouldn't it?
11    A    I'm sorry. I don't follow you.
12    Q    Yes. The person -- the person in danger
13 with Mr. Maniaci in that situation would have been the
14 person going after him.
15    A    There could have been other innocent people
16 involved. I mean, this is -- you know, this is all
17 speculation and --
18    Q    You don't know of any -- any such person, I
19 take it, in the room at that time?
20    A    No.
21    Q    Okay. Other than the statements you've
22 made so far about what Mr. Olson said, did he say

Page 29

1  anything else that you remember directed either to
2  Mr. Maniaci individually or directed to everybody in
3  the hall which would include Mr. Maniaci?
4     A    No.
5     Q    Was Mr. Maniaci charged with anything? Was
6  he criminally charged in any way with anything, any --
7  any offense?
8     A    At this event?
9     Q    Yes.
10    A    No.
11    Q    Could you tell us what exactly you saw the
12 officers do from when they moved toward Mr. Maniaci?
13         You said something about escorting him out.
14 What does that include? Did they put hands on him?
15 Were they simply three people walking together?
16 What -- what happened?
17    A    As I recall, the officers passed in front
18 of the first row, came up the aisle, and in -- in a
19 split moment of time, Mr. Maniaci rose up out of his
20 chair. It appeared to me that the officers had a hand
21 on his elbow.
22         At that point, it appeared, as soon as he

Page 30

1  got into the aisle -- he was sitting on the aisle --
2  that he went limp on his own accord. The officers
3  then grabbed ahold of him and walked with him in front
4  of the front aisle out into the vestibule.
5    Q   Did you ever see Mr. Maniaci off his feet?
6        By off his feet, I mean down on the floor
7  or knocked --
8    A   Yes, I did.
9    Q   -- to his knees or anything?
10       And where was that?
11   A   That was out in the vestibule, outside of
12 Gaston Hall itself. The officers placed him on -- on
13 the floor outside the hall.
14   Q   Okay. When you say placed him, you mean he
15 was forced down onto the floor?
16   A   No. The -- it was clear that he was not
17 interested in standing, and so they placed him on the
18 floor. Gently deposit him on the floor.
19   Q   And what else did you -- did you see?
20 Anything else after that?
21   A   There was a lady there who was -- who we
22 asked to leave. We didn't ask her. We escorted her

Page 31

1  back into the hall. She was, you might say,
2  aggravating a situation.
3    Q   How --
4    A   She was contrary to, obviously, Mr. Maniaci
5  and started yelling at him. And so we got her out of
6  the vestibule so that nothing would happen to
7  Mr. Maniaci.
8    Q   Do you have any idea of her name?
9    A   No.
10   Q   Ever seen her before or since?
11   A   No. No.
12   Q   Okay. I take it it was not one of the
13 people that was on this panel?
14   A   No.
15   Q   Okay. Have you -- did you do an
16 investigation of the occurrence, that is, speak to
17 people who were there at the time of the occurrence
18 and take any statements?
19   A   I did not, no.
20   Q   I should have said you or somebody working
21 under your direction in your department.
22   A   I believe that the officers, Officer Eddy

Page 32

1  and Officer Salley, made statements for the incident
2  reports.
3    Q   Okay. I take it that is a Georgetown
4  University form. They were not the PD 251s, for
5  instance, because there wasn't any arrest; is that
6  correct?
7    A   That's correct.
8    Q   Okay. Is there a designate -- a number
9  designation on that form, or is it simply you sit down
10 and write it out on a piece of paper and put it in the
11 file?
12   A   I don't know if there's a designated form,
13 but there is a specific form. It's a Department of
14 Public Safety incident report. It's a standard form.
15   Q   How long are those forms kept after one is
16 compiled?
17   A   I don't know.
18   Q   We'd like to have it preserved, if you can
19 find it, and we'll be asking for that as well.
20       Did -- prior to this conference, did you do
21 any investigations of -- by investigation, I mean
22 check with FBI, Metropolitan Police, other law

Page 33

1  enforcement or security agencies -- with regard to any
2  people expected to attend the conference other than
3  the people who were actually speakers or members of
4  the Palestine -- the student group, Justice in --
5  Students for Justice in Palestine?
6    A   No, I did not.
7    Q   Did anyone -- I take it when you say no,
8  you did not, that that would include anyone working
9  for you at least by your direction or with your
10 knowledge?
11   A   With my knowledge and my direction, no.
12   Q   Was Mr. Maniaci forcibly removed from the
13 ICC building?
14   A   No, he was not.
15   Q   What officers were involved at the time
16 that he was in the ICC building where this
17 conversation took place in which you participated?
18       MR. JONES: Objection, foundation.
19       You can answer, if you can.
20       THE WITNESS: I don't recall the names of
21 the officers that were there.
22

Page 34

1  BY MR. FAY:
2  Q   Was Mr. Maniaci at any point, in your
3  consideration, in custody during that day, on the 18th
4  of February of 2006?
5  A   In custody?
6  Q   Yes.
7  A   No, he was not.
8      MR. FAY: I don't think I have any other
9  questions.
10     MR. BUCKLEY: We don't have any questions.
11     MR. FAY: Okay.
12     THE VIDEOGRAPHER: Going off record at
13 14:01:05.
14     MR. FAY: We'd like to -- I'll get you over
15 a request for documents and list those.
16     MR. JONES: Okay.
17     (Discussion held off the record.)
18     THE VIDEOGRAPHER: Back on record at
19 14:01:39.
20     MR. JONES: I just want to state for the
21 record that the Defendants are designating this
22 deposition, entire deposition, as confidential

Page 35

1  pursuant to the terms of the confidentiality order
2  that's been entered in this case. That's it.
3      MR. FAY: Okay.
4      (Whereupon, signature not having been
5      waived, the deposition concluded at
6      2:01 p.m.)
7           -oOo-

Page 36

1       ACKNOWLEDGEMENT OF DEPONENT
2  I, DAVID MORRELL, do hereby acknowledge I have
3  read and examined the foregoing pages of testimony,
4  and the same is a true, correct and complete
5  transcription of the testimony given by me, and any
6  changes and/or corrections, if any, appear in the
7  attached errata sheet signed by me.
8
9  _____
   DAVID MORRELL
10
11 Subscribed and sworn to before me this
12 _____ day of _____, 2007.
13
14 _____
   Notary Public in and for the
15 _____
16
17 My commission expires:

Page 37

1           ERRATA SHEET
2  Page:  Line:  Reads:     Should Read:     Reason:

10 (Pages 34 to 37)

Misty Klapper & Associates
703-780-9559

b7434cc1-6817-43d2-b527-7eb00a9d8c76