# EXHIBIT 8

CONFIDENTIAL

Page 1

1       CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

2         IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLUMBIA
3

4   - - - - - - - - - - - - - - -x
                                  :
5   WILLIAM MANIACI,              :
                                  :
6            Plaintiff,           :
                                  :
7       vs.                       : Case No. 1:06CV01625
                                  :
8   GEORGETOWN UNIVERSITY, et     :
    al.,                          :
9                                 :
             Defendants.          :
10                                :
    - - - - - - - - - - - - - - -x
11      CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

12                              Washington, D.C.

13                              Wednesday, July 11, 2007

14  Videotaped Deposition of

15                      ROY EDDY

16       a Witness, taken on behalf of counsel for

17  the Plaintiff in the above-entitled matter, before

18  Denise M. Brunet, RPR and Notary Public in and for the

19  District of Columbia, taken at the offices of Regus,

20  601 Pennsylvania Avenue, Northwest, Suite 900,

21  Washington, D.C., commencing at 9:28 a.m., when were

22  present on behalf of the respective parties:

CONFIDENTIAL

**Page 6**

1 from 1978 to 1983, I believe.
2    Q    Did you get out before October 23rd, 1983?
3    A    It's hard for me to say at this point.
4    Q    Okay. Did you get out before the attack in
5 the marine barracks at Beirut?
6    A    Yes, sir, I believe I did.
7    Q    What was your job in the Marine Corps?
8    A    I was a forward observer.
9    Q    In a scout platoon?
10   A    Yes, sir.
11   Q    Do you remember what battalion or regiment
12 you were in?
13   A    I served in a unit called second Anglico.
14 I was cross-trained as a communication officer as
15 well. We did liaison work with other military units
16 as well as the Army, Navy and Air Force.
17   Q    Mr. Eddy, do you consider yourself to be a
18 member of any particular religion?
19   A    Baptist.
20   Q    And you regularly attend services in that
21 religion?
22   A    Yes, sir.

**Page 7**

1    Q    Tell me about your police training.
2    A    I've been employed with Georgetown for over
3 20 years. I've taken several police classes. I've
4 been an investigator for over ten years, and I studied
5 criminal justice for, as I said earlier, approximately
6 a year and a half, two years.
7    Q    Do you hold a special police officer's
8 commission from the District of Columbia?
9    A    Not at this time, no.
10   Q    Did you hold one on February 18th of 2006?
11   A    Yes, sir, I did.
12   Q    Now, you said not at this time. Was there
13 some point where you left the employment of
14 Georgetown?
15   A    Yes, sir.
16   Q    And when was that, please?
17   A    I believe it was in October of last year.
18   Q    Okay. And what was the reason that you
19 left the employment of Georgetown?
20   A    There was a termination that was disputed
21 by the union.
22   Q    What was the -- what was the reason for --

**Page 8**

1 by reason, did they terminate -- what was the stated
2 reason for your termination?
3    A    I held a part-time employment that wasn't
4 approved by the university.
5    Q    Okay. And what was that?
6    A    I did security for a summer league
7 basketball league.
8    Q    I take it that was the subject of a
9 grievance and arbitration between the union and
10 Georgetown University?
11   A    Indeed it was.
12   Q    And I take it you and the union won or was
13 there a settlement on it before there was any
14 decision?
15   A    There was a settlement before there was a
16 decision.
17   Q    When did you become re-employed, then, by
18 the university?
19   A    I believe it was the latter part of May, if
20 I'm not mistaken.
21   Q    At the time of your separation from the
22 school, did you -- was the SPO designation set up so

**Page 9**

1 you had to essentially resign that back to the
2 District at the time?
3    A    No, sir. Generally what transpires is you
4 have a time through to renew your SPO, but you have to
5 be with an employer to renew it. You can't renew it
6 individually. At the time by me not being employed
7 with an agency, I was not able to renew it so it
8 expired.
9    Q    Have you re-applied for a special police
10 officer commission?
11   A    Indeed I have, sir.
12   Q    By re-applied, I mean with the District of
13 Columbia.
14   A    Yes, sir.
15   Q    Have you ever been employed as a special
16 police officer outside the District of Columbia?
17   A    No, sir.
18   Q    Other than the 20 years of your employment
19 with Georgetown, I take it all of that's been as a
20 special police officer or as -- in the security area
21 at Georgetown?
22   A    Yes, sir.

3 (Pages 6 to 9)

Page 10

1  Q    Other than that and the Marines, what other
2  employment did you hold?
3  A    Those are my two employers.
4  Q    Prior to February 18th of 2006, had you
5  ever heard of an organization known as the Palestinian
6  Solidarity Movement?
7  A    No, sir, I have not.
8  Q    When prior to February 18th, 2006 were you
9  given any information on the conference that was going
10 to be held at Georgetown involving the Palestinian
11 Solidarity Movement?
12 A    My knowledge of that particular conference
13 was that morning when we went into briefing. Prior to
14 that, we just told that there was a conference being
15 held on campus. It was mandatory that we work that
16 particular event, and we were given briefing the
17 morning of the event.
18 Q    And prior to February 18th of 2006 --
19     MR. FAY: Sorry, I just turned this thing
20 off.
21     BY MR. FAY:
22 Q    Prior to February 18th of 2006, had you

Page 11

1  ever heard of the Jewish Defense League?
2  A    No, sir.
3  Q    Now, why don't we start first with the
4  Palestinian Solidarity Movement. What do you recall
5  being told about that organization at this briefing on
6  February 18th of 2006?
7  A    There was little given on the groups
8  attending or what their particular involvement would
9  be. Our briefing is pretty much confined to the
10 security matters and how we are to handle certain
11 detail as they arise. We're not given any type of
12 information on the groups, what their stance are or
13 what their particular positions are.
14 Q    What were you told about the security
15 situation for that day in this briefing?
16 A    We were told that there -- the best of my
17 knowledge, that there would be a conference. There
18 would be a lecture. There would be a question and
19 answering period. And at some point, there were
20 people that were meant to disrupt the conference
21 intermingled in the crowd.
22 Q    When you said meant to disrupt, what do you

Page 12

1  mean meant to disrupt?
2  A    They just said that there will be
3  disruptance of the crowd. Nothing more was given
4  further than that.
5  Q    Was the term Jewish Defense League used in
6  that regard?
7  A    Not to my recollection.
8  Q    Where after that were you stationed to
9  begin with, after the --
10 A    I was posted outside of Gaston Hall, in the
11 lobby of Gaston Hall.
12 Q    When did you enter the hall, if at all?
13 A    We were posted -- we generally posted about
14 an hour before the lecture itself, and if memory
15 serves me, I believe that was like about 8:30. The
16 lecture was supposed to start about 9:30, if I'm not
17 mistaken.
18 Q    What supervisors were on duty then?
19 A    Sergeant Walton. Generally Sergeant
20 Douglas. Generally the department -- the department
21 in whole was at this event because it was considered a
22 major event. So it was mandatory for the majority of

Page 13

1  the department.
2  Q    How many people did that involve, then?
3  A    I can't say, sir.
4  Q    Well, is there 50 or 60 officers in the
5  thing or --
6  A    Well, I mean --
7  Q    -- three or 400?
8  A    -- we're TO'd for a total of 60 something
9  officers. Now, to say how many attended the event,
10 I'm sorry, but that's not within my knowledge or my --
11 I just attend when they tell me to come. I don't know
12 how many people are there or who attends.
13 Q    But everyone was given instructions to be
14 there?
15 A    As I said, the majority of the department.
16 There is a small contingency left because we are a
17 24-hour operation. So there has to be staffing at
18 night. So there's a small contingency that doesn't
19 have to attend, but the majority of the department is
20 generally designated to attend.
21 Q    How big is Gaston Hall in terms of seating
22 for people in the audience?

CONFIDENTIAL

Page 14

1  A   I couldn't say, sir.
2  Q   On that date, there did come a time when
3  you went inside the hall, I take it?
4  A   Yes, sir.
5  Q   How many people, as an estimate, if you can
6  estimate, were inside the hall when you went inside?
7  A   To be -- I couldn't even give you an honest
8  estimation, because I did not survey the crowd once I
9  entered.
10 Q   Were there empty seats in the audience?
11 A   Yes, I believe there were.
12 Q   Who is Dr. Jeanne Lord?
13 A   Dr. Lord is one of the vice presidents of
14 the university.
15 Q   And what is her function at the university,
16 within your understanding?
17 A   She's one of the administrators. And to my
18 understanding, that's as far as I know. She's just
19 one of the administrators of the university.
20 Q   Is she in the security area at the school;
21 in other words --
22 A   Actually, she's --

Page 15

1  Q   -- work for the police or whatever?
2  A   Well, actually, she's over -- she's overall
3  administrator meaning that security is just one of the
4  departments that come under her.
5  Q   Where would she fit in the hierarchy with
6  regard to Vice President Morrell, for instance?
7  A   I believe -- and once again, this would
8  just be a guesstimation on my part, but I believe that
9  she supersedes Vice President Morrell.
10 Q   In other words, she's on a higher level --
11 A   Yes, sir.
12 Q   -- above vice president?
13     Can you describe Dr. Jeanne Lord
14 physically? I mean, how tall, heavy?
15 A   Caucasian female, approximately five-six to
16 five-seven, blondish hair.
17 Q   Okay. About what age? And I'll ask that
18 we agree not to pass this on to Dr. Lord.
19 A   In guesstimation, I would say late 40s.
20 Q   Okay. Now, did you have words with
21 Dr. Lord before going into the hall?
22 A   Yes, sir. In the briefing -- and it's

Page 16

1  generally standard -- it's stated that if there was --
2  if we were needed in a particular point, that a
3  university official would be the person that would
4  designate that we are to take action.
5      Once we arrived at the hall, Jeanne Lord
6  was the designated person that would get us, indeed,
7  if our assistance was needed. And when we got to the
8  hall, she came in the lobby, identified herself and
9  told me what procedure will be followed if, indeed, we
10 were needed.
11 Q   And what did she say?
12 A   She said she would come out to the lobby,
13 let us know that we were needed. We were to come in
14 and she would point out the individual that need to be
15 removed.
16 Q   Now, was this instruction given before -- I
17 can't say before anyone, but before the crowd
18 generally had shown up? I'm not asking you whether
19 one person showed up at 5:00 in the morning or
20 something.
21 A   I would say generally, yes, before the
22 crowd got there.

Page 17

1  Q   Now, after -- you said you were stationed
2  in the hallway. How did --
3  A   In the lobby.
4  Q   In the lobby.
5  A   Yes, sir.
6  Q   Okay. How was it indicated that you
7  should -- in other words, who indicated that you
8  should come into the hall?
9  A   Ms. Lord.
10 Q   Okay. When you got inside the hall, you
11 said that she would designate somebody who was to be
12 removed; is that correct?
13 A   Yes.
14 Q   Okay. When you got inside the hall, did
15 she point anybody out?
16 A   When we got inside the hall, there was a
17 gentleman at the mike that she had pointed to that was
18 being disruptive at the time.
19 Q   And when you say disruptive, what was he --
20 what was he doing?
21 A   When I say disruptive, I mean he was just
22 given the title of being disruptive. We weren't to

5 (Pages 14 to 17)

Page 18

1  define that. When they said that he's being
2  disruptive, we were supposed to act on that.
3    Q   Okay. I think I mis -- I think what you're
4  saying is Ms. Lord had said this person was
5  disruptive?
6    A   Correct.
7    Q   Which meant that he was then to be removed?
8    A   Correct.
9    Q   Did you witness anything the guy was doing,
10 jumping up and down, running up and down, anything, or
11 just -- was he just standing at the microphone?
12   A   Well, he had a, I would say, verbal banter
13 with the panel on stage.
14   Q   Verbal B-A-N-T-E-R --
15   A   Yes.
16   Q   -- back and forth?
17   A   Yes.
18   Q   Do you recall --
19   A   No, sir.
20   Q   -- what was said by anyone up on the stage
21 or anybody --
22   A   No, sir.

Page 19

1    Q   -- or what he said?
2    A   No, sir.
3    Q   Okay. Can you give a description, physical
4  description of this person?
5    A   It has been such a while, I would not want
6  to try to give a description. It would probably be
7  incorrect at this point.
8    Q   Well, let me ask you: Was the person --
9  could you give the race? Was the person
10 African-American or Caucasian?
11   A   Caucasian, I could say that, yes.
12   Q   How -- approximately how tall are you?
13   A   I'm about five-five, five-six.
14   Q   When you said at the microphone, I sort of
15 assumed this person was standing with the microphone?
16   A   Yes.
17   Q   With the person standing and probably
18 didn't notice whether he was wearing shoes that
19 elevated his height or anything, but assuming regular
20 shoe wear and everything, did he seem to be
21 significantly taller than you or significantly shorter
22 than you?

Page 20

1    A   I would say taller because it's like
2  everyone is almost taller than me.
3    Q   What do they call that, horizontally
4  challenged?
5    A   Correct.
6    Q   Okay. Other than that he was a Caucasian,
7  do you have -- could you estimate at all what his age
8  might be?
9    A   No, sir.
10   Q   What about hair color and facial hair?
11   A   No, sir.
12   Q   You don't recall what --
13   A   No, sir.
14   Q   Okay. Did he stay standing at the
15 microphone?
16   A   No, sir.
17   Q   Okay. Where did he go from there?
18   A   He returned to his seat.
19   Q   How far was that away from the microphone;
20 in other words, like from here to the wall or was it a
21 long distance, like, 30, 40 yards or something?
22   A   I believe he was sitting in the rear of the

Page 21

1  hall and once we approached, he turned and walked away
2  from the mike and went back to his seat.
3    Q   Oh. Do you remember what he was wearing?
4    A   No, sir.
5    Q   What took place then?
6    A   At that point, because he had ceased to be
7  disruptive, Officer Sally and myself posted ourselves
8  in the rear of Gaston Hall and waited until we were
9  needed, if needed.
10   Q   Okay. And what happened from that point?
11   A   There came a time where there was another
12 individual who approached the mike, was told by
13 Mr. Olson, who was the vice president, that his
14 questions had become, I guess, disruptive as well.
15 The gentleman sat down and they had question/answer
16 started with a different individual.
17        Later on, the gentleman started verbalizing
18 something from his seat. At that point, Mr. Olson
19 once again informed him that his questions had been
20 addressed, asked him to cease; he did not. And at
21 that point, he had asked that security remove the
22 gentleman from the hall.

Page 22

1   Q   Okay. I take it you're paraphrasing what
2   Mr. Olson said?
3   A   Pretty much.
4   Q   Is that your best recollection --
5   A   Yes.
6   Q   -- of what he said?
7   A   Uh-huh.
8   Q   Okay. And at this point, where were you in
9   the hall?
10  A   Still at the rear of the hall.
11  Q   And at this point, when you say that this
12  person was speaking, was the person still -- was the
13  person sitting down?
14  A   Yes, sir.
15  Q   Was there anything distinctive about the
16  voice?
17  A   Not that I could say.
18  Q   I mean, you know, some people have a high,
19  shrill voice that you'd recognize again if you ever
20  heard it and some people you wouldn't recognize if you
21  heard it a thousand times.
22  A   As I said, nothing that I would

Page 23

1   distinguish.
2   Q   If I -- if I have the topography correct,
3   whoever was speaking at the time they were speaking
4   would have had their back to you and you would have
5   been behind them or --
6   A   Correct.
7   Q   Okay. And how -- how far back would that
8   be in the hall from where -- from where this person
9   was sitting to where you were standing?
10  A   I -- once again, in making a guess, I would
11  say about 15 feet, if that.
12  Q   Just 15 --
13  A   Fifteen feet, if not more. But at a
14  minimal, 15.
15  Q   How many rows of seats approximately does
16  Gaston Hall have?
17  A   I do not know, sir.
18  Q   Are these all fixed seats like you'd have
19  in a movie theater?
20  A   Yes, sir.
21  Q   They weren't collapsable chairs or
22  anything?

Page 24

1   A   They're fixed.
2   Q   Fixed seats. Okay. How did you identify
3   that the particular person was speaking rather than
4   somebody else? In other words, you were standing
5   behind him some distance --
6   A   Uh-huh.
7   Q   -- is that correct?
8   A   Yes, sir.
9   Q   How did you identify that -- since I take
10  it, then, you could not see his mouth moving --
11  A   No, sir, but I couldn't see -- you can't --
12  I mean, just by the person's general physical
13  movement, you can't tell who's speaking. I could tell
14  who it was when Mr. Olson spoke and said the gentleman
15  had to be removed. I looked at Ms. Lord, Ms. Lord
16  gave me the okay that this was the gentleman that had
17  to go there.
18      Once I got there, there was a short sort of
19  moment where the gentleman had to be identified. Once
20  he was identified, that's when I asked him to leave.
21  Q   When you say had to be identified, who was
22  it that identified him?

Page 25

1   A   Ms. Lord.
2   Q   Okay. Where was she, then, at the time
3   that you reached this person?
4   A   She was in close proximity.
5   Q   When you say identify, did she point,
6   speak? What did she do to identify?
7   A   I believe she spoke.
8   Q   Do you remember what she said?
9   A   I believe I may have turned to the wrong
10  individual. She says no, that's not the one or
11  something of that -- something to that effect to let
12  me know that the person I had first identified was not
13  the person, and then that's when I turned to the
14  second individual.
15  Q   When you turned to the second individual,
16  where was Ms. Lord?
17  A   I would say close proximity. I would say
18  within 2 to 3 feet.
19  Q   When you went over to the second
20  individual, what exactly did you say to him?
21  A   I told him that he had been identified as
22  being a disruptive force within the conference and he

Page 26

1  would have to leave.
2   Q   What did he say back, if anything?
3   A   He told me he was not leaving.
4   Q   Okay. What did you do at that point?
5   A   I said, sir, as a university official, I'm
6  asking you to leave the hall.
7   Q   Okay.
8   A   He says I'm not -- he said something to the
9  effect of I'm not going anywhere. At that point, I
10 motioned for Mr. Sally to move to the other side of
11 the gentleman and we raised him from his seat and
12 removed him from the hall.
13  Q   Now, was he holding or did he have pinned
14 on him one of these badges for admission into the
15 hall?
16  A   I did not notice.
17  Q   Did anyone claim that he was -- that he
18 should not have been in the hall; in other words, that
19 he hadn't paid his admission into the conference?
20  A   Not to my recollection.
21  Q   Did you have any reason to think that he
22 hadn't paid his admission into the conference?

Page 27

1   A   No, sir.
2   Q   Okay. Other than this dialogue when you
3  reached him, what else did you hear him say?
4   A   That's all that I can attest to.
5       MR. FAY: Could you mark each of these just
6  sequentially, and I will pass them across to
7  Mr. Jones.
8       (Thereupon, the documents were marked as
9       Eddy Deposition Exhibit Nos. 1 through 4
10      for identification.)
11      BY MR. FAY:
12  Q   Mr. Eddy, I'll hand you what's marked
13 Exhibit Number 1 for identification. Take a look at
14 that.
15      Now, first of all, does your name appear on
16 that down the lower left-hand corner? Well, not quite
17 the corner, on the lower left side.
18  A   Yes, sir.
19  Q   I notice that -- that while there appears
20 to be a signature, a scribble, something, looks like
21 somebody drew --
22  A   Yes.

Page 28

1   Q   -- a face actually.
2   A   That's Officer Schauman's signature.
3   Q   S-C-H-A-U-M-A-N. I don't see any signature
4  or initial next to your name.
5   A   I did not write the -- generally the
6  officer that is the author of the report signs it, and
7  then the approving supervisor, either -- as you see,
8  Mr. Britt signed it as signed off that he reviewed it.
9   Q   Now, reading through the text here that's
10 in box 27 where it indicates that you removed a person
11 named Rabi Machum, M-A-C-H-U-M, Schifien,
12 S-C-H-I-F-I-E-N. I guess it's Schifien. Not
13 Schifland, Schifien.
14  A   Uh-huh.
15  Q   Do you recall removing somebody by that
16 name that date?
17      MR. JONES: Object to -- object to the
18 foundation. I don't think he's testified that, you
19 know, he's ever seen this report before or has written
20 it --
21      MR. FAY: That wasn't my question.
22      MR. JONES: -- or knows anything about it.

Page 29

1       MR. FAY: My question was whether he
2  remembered removing anyone by that name on that date.
3       THE WITNESS: Sir, I did not -- been given
4  anyone that I removed from Gaston Hall that day. So I
5  do not know the name of anyone that I removed.
6       BY MR. FAY:
7   Q   Let me -- let me go now to exhibit -- well,
8  let me ask you just a couple of questions here.
9   A   Uh-huh.
10  Q   Do you recall more than one person being
11 removed from the hall during the time you were inside
12 Gaston Hall?
13  A   Yes, sir.
14  Q   Okay. And there were how many people
15 removed?
16  A   Two.
17  Q   Okay. You gave a description of one
18 person. Can you give a description of the other?
19  A   All I could say, the other was a taller
20 gentleman.
21  Q   Caucasian?
22  A   Yes, sir.

Page 34

1 all before he did up this report?
2    A    No, sir. I hadn't even known he had did
3 one actually. That's the first time me seeing that.
4    Q    Well, let me -- let me hand you Eddy
5 Exhibit Number 4 and -- did -- does your signature or
6 initials appear on that report?
7    A    Yes, sir.
8    Q    And did you -- let me ask you about the --
9 what I call the printed version, whether it was by
10 computer or by typewriter.
11        Did you type that up or print it up on the
12 computer or did somebody else?
13    A    No, I did. I'm the author of it, and I do
14 have a typewriter and a computer at my disposal. For
15 me to say which one I did this on would be kind of
16 difficult for me to say right now.
17    Q    No. But I mean did you actually do that
18 up?
19    A    Yes, sir, this is mine.
20    Q    Okay. And that -- what is the date on that
21 report?
22    A    March the 7th.

Page 35

1    Q    Okay. So that was also almost three weeks
2 afterwards. Do you recall when you were requested to
3 do up this report?
4    A    It had to be within that time frame. As I
5 said, my administrators came to me and told me they
6 needed documentation on what transpired in Gaston
7 Hall.
8    Q    When you did up this report, did you have
9 any notes you relied on in writing up the report?
10    A    This is done strictly by memory, if I'm not
11 mistaken. I don't believe I took any notes at that --
12 at that stage.
13    Q    Did you consult anything before doing up
14 the report such as looking at any videotapes or
15 anything of that sort?
16    A    No, sir.
17    Q    Did you talk to anybody?
18    A    No, sir.
19    Q    Who was it that asked you to do up the
20 report?
21    A    This one I can just say one of the
22 administrators. I can't say exactly which one. It

Page 36

1 could have been one of my sergeants. It could have
2 been one of the officials, but I was told to give a
3 written documentation of what transpired.
4    Q    Why don't you tell me what happened after
5 this conversation back and forth, short conversation
6 between you and the first person you removed?
7    A    As I said, after identifying myself as a
8 university official and told him that he would have to
9 leave the hall, the gentleman refused. As I said, I
10 motioned Officer Sally to position himself on the
11 other side of the gentleman. We lifted him from his
12 seat and we removed him from the hall.
13    Q    Where did you take him?
14    A    To the lobby.
15    Q    Did you carry him or --
16    A    Yes, sir.
17    Q    Okay. Where did you put him out in the
18 lobby?
19    A    Just in the lobby. Just outside the doors.
20    Q    And how long did that take?
21    A    Just moments.
22    Q    Did this person take a swing at you, do

Page 37

1 anything at all to impede you?
2    A    Other than being -- resistance from being
3 removed, no, he never made any attacking motions or
4 anything of that nature.
5    Q    What do you mean resistance from being
6 removed?
7    A    Instead of just voluntarily coming, he just
8 went limp to prevent from being removed from the hall
9 or make it as difficult as possible.
10    Q    I take it you'll assume that was not his
11 regular physical condition?
12    A    No, I don't believe it was.
13    Q    How many -- how long had you observed him
14 before this sequence of events started?
15    A    When you say how long did I observe him,
16 I'm not quite sure of your question.
17    Q    Well, you said this was not his regular
18 action; this wasn't due to his regular physical
19 condition. What -- how long did you observe him
20 before you picked him up?
21    A    I seen the gentleman at the mike. I
22 observed the gentleman as he came in. He was very

Page 38

1  noticeable. He was the only gentleman wearing a top
2  hat. So I mean, I did see him and noticed him when he
3  entered the hall. So no, I don't believe that was his
4  general demeanor.
5     Q    When you say top hat, what do you mean?
6     A    He had a hat. I guess what they call -- it
7  was a top hat. It was a -- I forget the particular
8  name of the hat, but he had a black hat on at the
9  time.
10    Q    What I'm trying to figure is you mean one
11 of these, I think they call them now, kepahs. They
12 used to call them something else, but -- oh. Skullcap
13 or do you mean --
14    A    No, sir. It was more along the lines of a
15 fedora.
16    Q    And nobody else there --
17    A    He was the only one with a fedora. And the
18 reason I recognize that because I had a couple of hats
19 of that nature and I admired the hat. And when he
20 walked in, I said oh, that's a nice hat. So that's
21 what made me notice him, because of that hat.
22    Q    When you got him outside into the

Page 39

1  hallway -- well, from the time when you went over to
2  him, other than what you've already related, was there
3  any conversation, any further conversation between the
4  two of you?
5     A    No, sir.
6     Q    Who was out in the hallway when you got out
7  in the hallway?
8     A    It would be difficult for me to say, sir.
9  I just know myself, Officer Sally, and we brought the
10 gentleman to the hallway. I did not, once again,
11 survey who else was in the hall or, you know, whether
12 other people were there. I just know there were a
13 number of people in that lobby.
14    Q    Do you recall where any of the other
15 Georgetown officials were at this point?
16    A    No, sir.
17    Q    Dr. Lord --
18    A    No, sir.
19    Q    -- or Mr. Morrell?
20    A    No, sir.
21    Q    Was there anything else said by Mr. Olson?
22    A    Not that I can think of right now.

Page 40

1     Q    Okay. Other than instruction from
2  Dr. Lord, was there any other reason you had for
3  picking this gentleman up and removing him from the
4  hall?
5     A    No, sir.
6     Q    Did you see this person removed, this first
7  person that was removed, do anything that was
8  unlawful?
9     A    No, sir.
10    Q    When you were given instructions
11 beforehand, did anyone talk to you about the admission
12 of people into this conference; in other words, what
13 procedure they go through and what -- whether they pay
14 money to do it or not or anything like that?
15    A    No, sir.
16    Q    After putting this person down the hall,
17 you said there was a second person, then, who was
18 removed?
19    A    Yes, sir.
20    Q    Okay. And this was the taller person?
21    A    Yes, sir.
22    Q    Okay. Tell us about that person. What

Page 41

1  happened with regard to that person?
2     A    Upon my re-entering into the hall, this
3  gentleman had also -- was engaged in a verbal banter
4  with the panel on stage. Once again, Dr. Olson
5  addressed him several times and then said, sir, you're
6  going to -- I'm going to ask security to remove you.
7        I approached the gentleman. I leaned over
8  the same way I did the first time. I said sir, I'm
9  afraid you have to come with me. The gentleman said
10 me. I said yes, sir. And he just raised up and left.
11    Q    Okay. Where did you go with him?
12    A    To the lobby as well. I escorted him to
13 the lobby, and I believe that's the extent.
14    Q    Now, after that, did you at any point from
15 then until now, essentially, see either one of these
16 gentlemen?
17    A    You mean after they were removed from the
18 hall?
19    Q    Yes, either that day or any time since.
20    A    Well, later that day, the gentleman with
21 the fedora hat, along with a group of people that I
22 believe was with his contingency, tried to enter the

Page 42

1  ICC building.
2  Q  Okay. And you were at the ICC building
3  then?
4  A  Yes, sir, I was.
5  Q  Tell us what happened at that point.
6  A  At that point, several university officials
7  had gathered, told the gentleman he was not allowed to
8  enter the building, I believe it was because of his
9  prior actions, and he wouldn't be allowed to enter.
10 Q  What happened then?
11 A  The gentleman resisted. They told him he
12 couldn't enter and pretty much that was the exchange.
13 Q  Were you still on the scene when he left?
14 A  Yes, sir.
15 Q  Where did he go from the ICC building?
16 A  He was escorted to the front of campus, off
17 the campus property, which is 37th and O Street.
18 Q  Did you have him in view as he walked to
19 37th and O?
20 A  Yes, sir.
21 Q  Since then, have you seen this person at
22 all?

Page 43

1  A  No, sir.
2  Q  What other Georgetown officials was present
3  on the scene?
4  A  Which incident, sir?
5  Q  On that day, on the 18th.
6  A  I'm saying which incident.
7  Q  Gaston Hall.
8  A  Gaston Hall?
9  Q  Yes.
10 A  As I said, Todd Olson, Jeanne Lord,
11 Mr. Morrell. Those are the top officials that come to
12 mind at this point.
13 Q  At any point, did you see the first
14 gentleman who was removed go to the bathroom, either
15 there at Gaston Hall or over at the ICC building?
16 A  I believe he went to the restroom in ICC
17 building.
18 Q  And that was while you were present?
19 A  Yes, sir.
20 Q  How long was that before he left?
21 A  He left immediately after that.
22 Q  While he was in the lavatory, do you

Page 44

1  remember whether or not the door was open?
2  A  It was ajar. It wasn't opened.
3  Q  How far ajar?
4  A  Far enough for one of the officers to put
5  their foot in. And the reason that was done because
6  that door has a deadbolt and we had concerns of the
7  gentleman deadbolting himself in. So the gentleman
8  placed his foot between the door so that it would just
9  be ajar just far enough to keep him from closing the
10 door completely.
11 Q  After you went over to him, went over to
12 the first gentleman who was removed, was he free to
13 move around as he wanted or was he within your control
14 at that point?
15 A  I'm sorry, repeat that question.
16 Q  Yes. After you went over to him, after
17 Jeanne Lord indicated he should be removed, was he
18 free to move around or was he within your control?
19 A  He was free to leave the hall.
20    MR. JONES: Object to that question to the
21 extent you're calling for a legal conclusion.
22    MR. FAY: I think it's a legal conclusion.

Page 45

1  I think he already answered it.
2     BY MR. FAY:
3  Q  What about outside, was he --
4  A  Yes.
5  Q  -- within your control?
6  A  No, sir. He was free -- no. He was free
7  to move around at that point.
8  Q  Was there anything unusual about this
9  conference different than other conferences at
10 Georgetown that you had been in the security detail
11 for?
12 A  Nothing that would strike me as different.
13    MR. FAY: Okay. I don't think I have any
14 other questions.
15    EXAMINATION BY COUNSEL FOR THE DEFENDANTS
16    BY MR. JONES:
17 Q  Officer Eddy, I just have a couple of quick
18 questions. You had used the term verbal banter.
19    What did you mean by that?
20 A  Basically being very argumentative with the
21 panel that was on stage. When I say verbal banter,
22 there was an exchange, and after being told that, you