# EXHIBIT 27

UNITED STATES DISTRICT COURT

DISTRICT OF COLUMBIA

- - -oOo- - -

WILLIAM MANIACI,                                    )

                                                    )

               Plaintiff,                           )

                                                    )

vs.                                                 )    No. 1:06-CV001625

                                                    )

                                                    )

GEORGETOWN UNIVERSITY,  DAVID                       )    ORIGINAL

MORRELL,  DARRYL K. HARRISON,                       )

ERIC SMULSON,  TODD OLSON and                       )

GEORGE W. TAYLOR,                                   )

               Defendants.

Videotaped Deposition of

LEE KAPLAN

[CONFIDENTIAL SECTIONS, PAGES 7, 93, 182-184, 206-208

BOUND SEPARATELY.]

————————————————————————

Monday, April 9, 2007

Reported by:

GEORGE SCHUMER, CSR 3326



L.A.D.
REPORTING &
DIGITAL VIDEOGRAPHY

1100 Connecticut Avenue, NW • Suite 850, Washington, D.C. 20036
Tel: 202.861.3410 • 800.292.4789 • Fax: 202.861.3425
Web: ladreporting.com • E-mail: lisa@ladreporting.com
Additional Offices: Rockville, MD • Baltimore, MD • Greenbelt, MD • McLean, VA

1 (Pages 1 to 4)

**3**

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA
---oOo---
WILLIAM MANIACI,          )
                         )
         Plaintiff,      )
                         )
vs.                      )  No. 1:06-CV001625
                         )
                         )
GEORGETOWN UNIVERSITY,  DAVID   )
MORRELL, DARRYL K. HARRISON,   )
ERIC SMULSON, TODD OLSON and   )
GEORGE W. TAYLOR,       )
         Defendants.    )


Videotaped Deposition of
LEE KAPLAN
[CONFIDENTIAL SECTIONS, PAGES 7, 93, 182-184, 206-208
BOUND SEPARATELY.]
——————————
Monday, April 9, 2007




Reported by:
GEORGE SCHUMER, CSR 3326

                                              Page
1
2  Exhibit 40 - Speech and Expression Policy,        109
        M 216-221
3
   Exhibit 41 - Diagram of injury area, 1 page       139
4
   Exhibit 42 - 3-21-06 e-mail, Kaplan to Scott,     156
5       M 50, re Metropolitan Police
6  Exhibit 43 - A through G, photos of Miniace       170
        injuries, 7 pages
7
   Exhibit 44 - The Divestment Conference at         171
8       Georgetown, 3-17-06, GTN 2518-2534
9  Exhibit 45 - Subpoena in a Civil Case, to Kaplan, 203
        2-27-07, 8 pages
10
   Exhibit 46 - Handwritten notes, 27 pages          205

**2**

1          I N D E X
2  INDEX OF EXAMINATIONS
3
4                              Page
5  EXAMINATION BY MR. JONES.................... 5
6
7  AFTERNOON SESSION................................ 117
8
9
10      EXHIBITS MARKED FOR IDENTIFICATION
11                            Page
12 Exhibit 32 - Georgetown's Jihad, 12-29-05,     82
        GTN 2389-2391
13
   Exhibit 33 - Georgetown U's Terror Conference, 85
14      1-11-06, GTN 2392-2394
15 Exhibit 34 - Stop the ISM.com, Campus Watch,   88
        1 page printout from website
16
   Exhibit 35 - e-mail string, top is 1-9-06,     94
17      Malnretin to Lacap, re Forward,
        GTN 2623-2624
18
   Exhibit 36 - 1-9-06, kaplan to ems62, re PSM   95
19      Conference, GTN 1516
20 Exhibit 37 - 1-10-06 e-mail string, Kaplan to  97
        "President" re Fadi Kiblawi,
21      GTN 1473-1475
22 Exhibit 38 - O'Reilly transcript, 2-9-06,     100
        GTN 1378-1380
23
   Exhibit 39 - Israpundit Letter to Porterfield, 104
24      Printed 2-7-06, GTN 2478-2480
25

**4**

1          Deposition of LEE KAPLAN, taken by defendants, at
2  Brooks and Ojeda, 1999 Harrison Street, Suite 680,
3  Oakland, California, commencing at 10:25 a.m. on Monday,
4  April 9, 2007, before GEORGE SCHUMER, CSR, pursuant to
5  notice.
6          --oOo--
7
8          A P P E A R A N C E S
9
10 For Plaintiff:
11      THOMAS FORTUNE FAY, ESQUIRE
        700 Fifth Street Northwest, Suite 200
12      Washington, D.C. 20001
        202-589-1300
13
14
   For Defendants:
15
        WILLIAMS & CONNOLLY
16      725 12th Street Northwest
        Washington, DC 20005
17      By: MALACHI B. JONES, ESQUIRE
        202-434-5286
18
19      Also Present:  Video by Jennifer McKay
20          - - -
21
22
23
24
25

**13**

1   Q. Front Page magazine: Is that an on-line or an
2   Internet publication?
3   A. Yes.
4   Q. Has it ever been in print?
5   A. I think it was originally in print, and then
6   it went to the Internet. That was before my time.
7   Q. How would you describe Front Page magazine to
8   someone who has never read it?
9   A. How would I describe it? It is very good;
10  political commentary. It deals with world affairs;
11  foreign policy; domestic politics -- things like that.
12  Q. Would it be fair to describe it as a
13  conservative publication?
14  A. It has been called that, yes.
15  Q. Would you agree with that? You may quibble
16  with that.
17  A. I myself -- I don't consider myself a
18  conservative. I consider myself a moderate. And the
19  publications that I have read in there -- most of them
20  are extremely well written and researched. I don't
21  really consider them conservative or liberal.
22  The ones that deal with foreign policy -- the
23  war on terror and things like that -- I have heard
24  people say that they are conservative because, you
25  know, they reflect a conservative point of view, but I

**14**

1   really don't see that. I see it more as just
2   basically research, not reflecting a conservative bent
3   or a liberal bent.
4   Q. You said that you're self-employed now as an
5   investigative reporter. What type of things do you
6   investigate?
7   A. Well, I'm self-employed as an investigative
8   journalist. I have been working on a book about the
9   ISM -- the Palestine Solidarity movement, and the war
10  on terror. And I have got a column that I write for
11  the Israel National News.
12  I'm working now -- I have a radio show I do
13  twice a week in Utah, called -- on K-TALK radio, where
14  I talk about homeland security issues. And just in
15  the last few days we're talking about putting together
16  our own radio show, with the Northeast Intelligence
17  Network.
18  Q. So you are writing a book on terrorism. Do
19  you investigate terrorism-related issues?
20  A. I don't think I said I'm writing a book on
21  terrorism. I'm writing a book about America's
22  colleges and the war on terror.
23  Q. Is that book related to the PSM?
24  A. Yes, well, the PSM and ISM are a major part of
25  the book. It is not the only thing in the book, but

**15**

1   they are a major part of the book.
2   Q. Have you ever done any freelance work for the
3   Israel National News?
4   A. Freelance work?
5   Q. Or any type of work.
6   A. You mean paid work?
7   Q. Yes.
8   A. No.
9   Q. What about volunteer work?
10  A. Volunteer work, no. I submit columns. They
11  usually will publish columns that I write; send them.
12  Q. You don't consider that work, when you write a
13  column?
14  A. Well, I mean "work" -- I would love to
15  consider it work, in the sense that I got paid for it.
16  But it is very hard to get published in there. The
17  fact that it gets published is because it is good.
18  They don't publish just everything that gets sent in.
19  (Discussion off the record)
20  MR. FAY: I know it is not the natural way
21  people talk. Most people who grow up in a big family
22  always start the answer before the question, because
23  otherwise they never get to talk.
24  But you have to just give it a couple of
25  seconds.

**16**

1   THE WITNESS: Sure.
2   (Record read)
3   MR. JONES: Q. I was going to ask you about
4   the Israel National News. About how many times have
5   you been published by that publication?
6   A. I don't know. You can go -- there is an
7   archive; you can look it up on the Internet and see
8   it.
9   Q. Would you say "dozens of times"?
10  A. No, not dozens.
11  Guessing, 10.
12  Q. And that is an on-line publication?
13  A. Yes.
14  Q. Have you also been published by the Canada
15  Free Press?
16  A. Yes.
17  Q. Is that also an on-line publication?
18  A. Yes.
19  Q. Have you been paid for work or writings that
20  you have submitted to the Canada Free Press?
21  A. No.
22  Q. About how many times have you been published
23  by the Canada Free Press?
24  A. Again, I would have to guess; there is an
25  archive. I would say at least 10.

Case 1:06-cv-01625-LFO VIDEOTAPED DEPOSITION OF JILL KAPLAN
Document 39-23 Filed 01/14/2008 Page 5 of 8
CONDUCTED ON MONDAY, APRIL 9, 2007

5 (Pages 17 to 20)

17

1  Q. Are there any other Internet publications,
2  other than Front Page magazine, Israeli National News,
3  and the Canada Free Press that have published your
4  articles?
5  A. American Thinker; Campus Watch. A lot of my
6  articles get picked up by other web sites.
7  I wrote shortly for Family Security Matters.
8  I only wrote a couple of columns; those were paid.
9  You want web sites that pay? Or just web
10  sites that --
11  Q. Both.
12  A. I gave you Campus Watch. That is all that
13  comes to mind right now. There's a lot of them that
14  would love to have my stuff for free. I just don't
15  put it out everywhere.
16  Q. Have you ever been published by any print
17  publications?
18  A. The book I'm working on, I have a literary
19  agent in New York who is -- actually, two literally
20  agents who have expressed an interest in my writing
21  the book.
22  Q. But other than that, you have never had an
23  article or any writing that has been published in
24  print?
25  A. The educational workbooks, when I was out of

18

1  college, that I wrote for Telegroup, Limited -- were
2  published. Those were workbooks to accompany college
3  courses.
4  Q. You mentioned you have a radio show in Utah
5  that's on -- how many times a week?
6  A. You could say a guest on a radio show. I'm on
7  the Jim Kirkwood show every Tuesday and Thursday night,
8  from -- West Coast time -- from 8:00 to 10:00 p.m.
9  The show is out of Utah.
10  Q. What is the topic of that show?
11  A. I talk about homeland security; I talk about
12  the articles I'm working on; things I'm writing about.
13  I also function as the communications director
14  for the Northeast Intelligence Network. I mentioned
15  that we're looking into getting our own radio show --
16  and I discuss the latest news regarding homeland
17  security that's on that web site, and what we're
18  doing. And I talk about foreign policy; the war on
19  terror. Sometimes I talk about North Korea.
20  Anything related to homeland security;
21  terrorism; national security. Those sorts of things.
22  Q. Do you have any other radio shows that you
23  appear on regularly?
24  A. Regularly?
25  Q. Yes.

19

1  A. Well, what do you consider "regularly"?
2  Q. Once a week; once a month; once every two
3  months?
4  A. From time to time I'm invited as a guest on
5  the Tovia Singer show, which is on the Israel National
6  News; been on the Tamara Yonah show.
7  Q. What radio station is that on?
8  A. Those are on the Israel National News.
9  I was once a month on the Jeff Katz show on
10  KNEW, here in the Bay Area, until his show moved to
11  North Carolina.
12  Q. When you were on the Jeff Katz show, what type
13  of topics did you discuss? Is that similar to the Jim
14  Kirkwood show?
15  A. Same kind of stuff.
16  Q. Have you appeared on any television shows?
17  A. Yes.
18  Q. I know you have appeared on the O'Reilly show.
19  Other than that, what else have you appeared on?
20  A. I appeared on Fox, on Dayside, with Linda
21  Vester.
22  Q. Anything else?
23  A. No.
24  Q. Now being an investigative journalist, when
25  you normally conduct interviews, do you tape-record

20

1  your interviews?
2  A. Sometimes.
3  Q. When you conduct interviews, do you normally
4  take notes?
5  A. Sometimes.
6  Q. What would be an occasion when you wouldn't
7  take notes, when you were interviewing somebody?
8  A. Depends on how long an article I have to come
9  out with; if it is an in-depth piece. If it is 500
10  words, usually I can get enough information just in
11  the interview.
12  Q. Do you always tell people if you are tape
13  recording them during an interview?
14  A. Yes. In a private interview, yes.
15  Q. And is there a distinction that you make with
16  a public interview?
17  A. If I go under cover, like at a PSM thing, I
18  may have a hidden recorder. But that's a public
19  thing. It is not a private interview.
20  Q. You are also involved with an organization
21  called "Defending America For Knowledge and Action" --
22  DAFKA?
23  A. Yes.
24  Q. What is your involvement with that
25  organization?

---

**145**

1    was a third; I may have said there was a third back
2    then. I don't remember clearly.
3        Q. Was the other officer a male?
4        A. They were all male.
5        Q. When you say Mr. Maniaci was pummeled, can you
6    provide any more description about that? Were they
7    kicking him; kneeing him; punching him?
8        A. Kneeing him; you know, it is like -- I would
9    use an analogy Ultimate Fighting Championships. When
10   a guy is on the ground and they are pounding on him,
11   that's what it looked like.
12       Q. Like I said --
13       A. Kneeing, punching, pounding.
14       Q. Where on his body were they kneeing and
15   punching him?
16       A. All over.
17       Q. All over his torso?
18       A. Yes.
19       Q. Did you see any blows to his head?
20       A. On the ground?
21       Q. Yes.
22       A. No.
23       Q. Was Mr. Maniaci saying anything, while this
24   pummeling was going on?
25       A. I don't think so. I don't recall anything.

---

**146**

1        Q. Was he screaming out in pain or anything?
2        A. No, I didn't hear that.
3        Q. Do you recall if he had papers in his hand?
4        A. No, he didn't have papers. I don't recall.
5        Q. Do you recall if he had his cane?
6        A. I don't remember.
7        Q. How long did this beating last?
8        A. Between -- the whole thing with Maniaci and
9    Smulson and the photographer and the whole thing -- I
10   would say about two minutes.
11       I was really indignant, and I was saying to
12   Smulson -- I was saying, "He's an old man; how can you
13   beat up an old man like that; what the heck is the
14   matter with you?" And I think I complained to him
15   about the fact that they had been abusive since I had
16   gotten there.
17       Then I moved to the left behind this table,
18   and there was a guy who is like the VP for the Police
19   Department there or something -- vice-president for
20   safety, or something like that -- and, you know, he
21   started interrogating me, and I said "Who are you?"
22   And he said, "I'm the vice-president for public
23   safety." And I said to him -- I don't know; something
24   to the effect: "You are a police officer; is that how
25   you treat people?" Or something. And he told me to

---

**147**

1    go back inside Gaston Hall.
2        Q. My question was actually just limited to how
3    long did the beating last.
4        A. One to two minutes.
5        Q. And during that time, it was the officers who
6    had thrown Mr. Maniaci through the door who were doing
7    the beating?
8        A. Yes.
9        Q. Both of them? Or perhaps three of them?
10       A. I would say two of them.
11       Q. And after the beating was done, what did those
12   officers do?
13       A. I don't know, because the VP for campus
14   safety, or whatever he's called -- ordered me to go
15   back into Gaston Hall. I had just come out of Gaston
16   Hall, because they were telling me to get out of
17   Gaston Hall. That's why I went and found Smulson --
18   to complain about it.
19       Q. Did you comply with his request to go back
20   into Gaston?
21       A. I did.
22       Q. Immediately?
23       A. Immediately.
24       Q. During the time you were out there in the
25   foyer, was Mr. Maniaci ever told he was under arrest?

---

**148**

1        A. I didn't hear either way. You mean when I was
2    out in the foyer? I didn't hear them say anything
3    like that.
4        Q. While you were out in the foyer, do you recall
5    if Maniaci was ever told he was under arrest?
6        A. I don't recall him being told he was under
7    arrest.
8        Q. Was he searched by the Georgetown officers?
9        A. I didn't see; I didn't notice.
10       Q. I take it he wasn't handcuffed.
11       A. I didn't see him handcuffed.
12       Q. No one read him his rights?
13       A. I did not hear anybody read him his rights.
14       Q. Did you see him stand up?
15       A. Not while I was out in the foyer.
16       Q. Did you come out later on, and see that he was
17   standing?
18       A. No. Well, I went back in, and listened to the
19   rest of the speaking thing in there, and then I --
20   when I came out he was already gone from the foyer; he
21   wasn't there.
22       Q. Did anybody else, other than Mr. Maniaci and
23   the officers, come out from Gaston Hall into the
24   foyer?
25       A. You mean when he went through the doors head

---

49 (Pages 193 to 196)

**193**

1   "A JDL spokesman told me..."
2      A. So it was an anonymous student.
3      Q. Do you see that "A JDL spokesman told me"?
4      A. Yes, "American Jews have had enough..."
5      Q. Who is the JDL spokesman?
6      A. That's what I'm trying to remember.
7         For some reason it sticks in my head that it
8   probably was -- might have been Bob Turk, but I'm not
9   sure.
10     Q. In any case, you remember that somebody from
11  the JDL told you: "We're putting the word out from
12  now on, any time the Palestinian Solidarity Movement
13  stages something on a US campus like this, that JDL
14  will be there; American Jews have had enough, and
15  we're not taking it anymore."
16     A. Like I said, I think he was the one who said
17  it; I'm not 100 percent positive.  I guess that is
18  like two years ago.
19        You know, what I'm doing is I've got a pad,
20  and also when I'm walking around, if I hear a quote I
21  write it down real quick, and I scribble it out.
22     Q. What happened to that pad?
23     A. Like I said, my notes are practically
24  illegible.  Once the article is finished I don't have
25  any need for it, so usually I just trash it.

**194**

1         Usually I record things.
2      Q. Were you aware that Mr. Maniaci had made a
3   complaint to the FBI regarding his treatment at the
4   PSM conference?
5      A. I remember him telling me something about
6   that.
7      Q. And what did he tell you?
8      A. He told me that they said that there
9   definitely -- that his rights were violated or
10  something.  Or he said --
11        MR. FAY:  What is this exhibit number again?
12  44?
13        MR. JONES:  44.
14        MR. FAY:  Thanks.  Sorry.
15        THE WITNESS:  I remember -- I think it was on
16  the phone at some point, and it wasn't that long ago.
17  I think he said that the FBI had said his civil rights
18  had been violated, and they recommended prosecution to
19  the US attorney, and that he wasn't following up on
20  it -- or something like that.
21        MR. JONES:  Q.  Who wasn't following up on it?
22     A. The US attorney wasn't following up on it.
23  But that happens all the time.  It doesn't -- you
24  know, it doesn't validate the merits of the case.  It
25  just means he is not pursuing it.

**195**

1      Q. Did you talk with Mr. Maniaci before he filed
2   this complaint in this case?
3      A. Yes, I told you I did that.
4      Q. Let me show you what has previously been
5   marked as Exhibit 29.  Do you recognize this as an
6   Internet article you wrote entitled "Georgetown
7   University sued for $8 million for attack on elderly
8   orthodox Jew at PSM"?
9      A. Yes.
10     Q. It is dated Friday, September 15, 2006?
11     A. Yes.
12     Q. If you go to the second page, where the
13  article begins, do you see where it says:  "This week,
14  International Solidarity Movement leaders conferred on
15  where the ISM should hold its next national conference
16  on an American university campus.  American university
17  administrators need to know what is happening to
18  Georgetown, the site of the last national conference."
19        And you go on to say that Georgetown
20  University "became the recipient this week of an $8
21  million lawsuit."  Correct?
22     A. Yes.
23     Q. And you wanted other American university
24  administrators to know that?
25     A. Yes.

**196**

1      Q. Why did you want other universities to know
2   that?
3      A. Well, I mean the ISM is a
4   terrorist-sponsoring, terrorist-enabling and
5   supporting organization.  And the fact that a Jew was
6   beaten up on campus -- this isn't the only time this
7   has happened.
8         You know, this happened at City University of
9   New York, just about a month ago.  There was a Jewish
10  student beaten up also there, at another thing.  So
11  this is becoming a trend on the campuses.
12     Q. And you said that "With legal and attorney
13  fees, the costs are expected to be much higher" --
14  meaning the cost for Georgetown University?
15     A. Yes.
16     Q. And why did you want other American
17  universities to know that Georgetown had been sued for
18  $8 million, and the costs would be more?
19     A. So they won't be as stupid as Georgetown, and
20  take a chance on having the same thing happen to them,
21  and support terrorism in the process.
22     Q. So other universities wouldn't take the risk
23  of being sued?
24     A. Yes.  Why should they suborn terrorism, and at
25  the same time take the risk of being sued?

Case 1:06-cv-01625-LFO    VIDEOTAPED DEPOSITION OF LEE KAPLAN
Document 38-29    Filed 01/14/2008    Page 8 of 8
CONDUCTED ON MONDAY, APRIL 9, 2007

50 (Pages 197 to 200)

**197**

1    Q. You also -- it appears you quote from the
2   complaint. Do you see a paragraph that says --
3   starts: "The lawsuit states that" -- and then it has
4   a quotation.
5    A. Yes, I think I was sent a copy of the
6   complaint.
7    MR. FAY: What page?
8    MR. JONES: This is on the second page.
9    THE WITNESS: I think I was sent a copy of the
10  complaint.
11   MR. JONES: Q. Were you sent a copy of the
12  complaint before it was filed?
13   A. I got -- I remember they gave me an exclusive
14  on it, and I think I got it like on Friday, and it was
15  filed on Monday or something like that.
16   Q. Was it given to you with the understanding
17  that you would write a story about it?
18   A. Yes. Well, I had asked for an exclusive on
19  it.
20   Q. Who did you ask?
21   A. I asked Mr. -- well, Mr. Maniaci and Mr. Fay.
22   Q. And they both agreed?
23   A. Yes.
24   Q. Who actually sent you the complaint that you
25  received, and used to write this article?

**198**

1    A. I don't remember which of the two sent me the
2   complaint.
3    They may have just e-mailed it to me. I think
4   they e-mailed it to me.
5    Q. Did you talk with Mr. Maniaci about the
6   complaint as well?
7    A. I'm not sure. I think I just wrote the
8   article based on the complaint. Do I have an
9   interview with him in here? Do I quote him in here?
10   Q. I'm just asking if you recall.
11   A. Let me see here. (Examining document)
12   Here -- you know, talking about refreshing the
13  memory, this refreshes my memory.
14   Q. Which page?
15   A. Page 4 of 5.
16   MR. FAY: Fourth paragraph down.
17   THE WITNESS: You asked me when Maniaci went
18  to Walter Reed, and I said I thought it was Saturday,
19  but he must have entered on Sunday, because "the next
20  day Maniaci blacked out on a public street." Which I
21  told you he blacked out on a public street.
22   So he must have done this while I was away at
23  the intelligence summit on Sunday. You asked me if I
24  interviewed him for this article. I have to look at
25  the article and see if I quoted him in here. If I

**199**

1   quoted him in here, then I interviewed him for the
2   article. If I didn't quote him in here, then I
3   probably went by the text of the complaint.
4    I write a lot of articles. Not everything
5   gets into print, even. So sometimes I don't remember
6   the specifics of each article.
7    Q. I just want to refer you back to the second
8   page. You list individual defendants.
9    A. In the $8 million thing?
10   Q. Yes, including Eric Smulson and a campus
11  police officer.
12   A. Where are you? "In addition to Georgetown
13  University being named as a defendant" --
14   Q. You don't have to read the whole thing. My
15  question is, you list individual defendants, including
16  Eric Smulson and a campus police officer, G. Taylor;
17  correct?
18   A. Yes.
19   Q. And then if you can go to Page 3, the last
20  paragraph at the bottom, there's a sentence there:
21  "Maniaci was accosted by two muscular campus police
22  officers, including Officer Taylor."
23    Do you see that?
24   A. Yes.
25   Q. And you got that from the complaint?

**200**

1    A. It is possible I was going by my memory back
2   then, when I wrote it.
3    Q. Then that paragraph continues over to the next
4   page, and there's a line there: "It was at that time
5   that several witnesses, including this writer, asked
6   Georgetown's communication director, Eric Smulson, to
7   stop the attack." And you said instead that he was
8   trying to block a photographer; is that correct?
9    A. Yes, which is what I said before.
10   Q. Do you know that Mr. Maniaci has filed to have
11  Mr. Taylor -- Officer Taylor -- dropped from this
12  lawsuit?
13   A. I'm unaware of it.
14   Q. Do you know that Officer Taylor has been sued
15  in error?
16   A. I'm unaware of it. If I used the name in the
17  article -- it was either in the complaint -- I think
18  it was in the complaint, or it was given to me by
19  Mr. Maniaci at the time.
20   Q. Do you know that Mr. Maniaci has also moved to
21  have Mr. Smulson removed as a defendant?
22   A. I'm unaware of it. He shouldn't be, but
23  that's -- you know, I'm sure he has his reasons, if
24  that's the case.
25   Q. Are you aware of any other PSM conferences