# EXHIBIT 54

Case 1:06-cv-01625-LFO    Document 39-60    Filed 01/14/2008    Page 1 of 10

Case 1:06-cv-01625-LFO  Document 39-60  Filed 01/14/2008  Page 2 of 10

May 2, 2007   Michael A. Smith   Maniaci v. Georgetown
Washington, D.C.

Page 1

```
 1           IN THE UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF COLUMBIA
 3
 4   WILLIAM MANIACI,            )
 5              Plaintiff,       )
 6         vs.                   ) Case No.
 7   GEORGETOWN UNIVERSITY, et al.) 06-CV-1625 (CKK)
 8              Defendants.      )
 9              -    -    -    -    -
10        VIDEOTAPED DEPOSITION OF MICHAEL A. SMITH
11                    Washington, D.C.
12                  Wednesday, May 2, 2007
13   The deposition of MICHAEL A. SMITH was convened
14   on Wednesday, May 2, 2007, commencing at 10:08
15   a.m., at the offices of Williams & Connolly LLP,
16   725 Twelfth Street, N.W, Washington, D.C.,
17   before Karen K. Brynteson, Registered Merit
18   Reporter, Certified Realtime Reporter, and
19   Notary Public.
20
21              -    -    -    -    -
22
```

**CONDENSED**

Case 1:06-cv-01625-LFO   Document 39-60   Filed 01/14/2008   Page 3 of 10

May 2, 2007　　　　Michael A. Smith　　　Maniaci v. Georgetown
　　　　　　　　　　Washington, D.C.

Page 10

1　Q.　Okay. And what did you do after that?
2　A.　I worked for Phillips Protection
3　Systems, which is a security agency.
4　Q.　Okay. Were you a security guard?
5　A.　Yes.
6　Q.　Okay. Were you armed?
7　A.　No.
8　Q.　Okay.
9　A.　Not with a firearm.
10　Q.　Okay. Like you carried a knife or a
11　flashlight or --
12　A.　No, they gave us a baton and pepper
13　spray.
14　Q.　Did you undergo any training for that
15　job?
16　A.　Just in-house training.
17　Q.　Okay. And where did you work?
18　A.　Where they got contracts.
19　Q.　All over the country?
20　A.　Well, all over the Annapolis and
21　Maryland area.
22　Q.　Okay. How long did you work as a

Page 11

1　security guard?
2　A.　Off and on almost up until the point I
3　became a policeman.
4　Q.　Okay. You said you became a policeman
5　in 1981?
6　A.　Yes.
7　Q.　And that was with MPD?
8　A.　Yes.
9　Q.　Did you work with any other police
10　departments prior to that?
11　A.　No.
12　Q.　Okay. You went through the academy
13　for MPD?
14　A.　Yes.
15　Q.　And now your current rank is
16　lieutenant?
17　A.　Yes.
18　Q.　How long have you been a lieutenant?
19　A.　Since 1994.
20　Q.　Okay. And prior to that, what was
21　your rank?
22　A.　Sergeant.

Page 12

1　Q.　And when were you promoted to
2　sergeant?
3　A.　1989.
4　Q.　And prior to that, what was your rank?
5　A.　I was an investigator.
6　Q.　And when were you promoted to
7　investigator?
8　A.　Well, it is not a promotion, it is an
9　assignment.
10　Q.　Okay.
11　A.　But I wanted to make the distinction
12　between patrol officer and investigator.
13　Q.　Okay. That's a fair point. When did
14　you become an investigator?
15　A.　About 1986.
16　Q.　Okay. And from '81 to '86, you were a
17　patrol officer?
18　A.　Yes.
19　Q.　Okay. When you were a patrol officer,
20　what district were you in?
21　A.　Sixth District.
22　Q.　And did you just do normal patrol

Page 13

1　duties in a police cruiser? Did you have any
2　special assignments?
3　A.　Up until 1984 or '85, I was a standard
4　patrol officer. From there I was assigned to
5　the tactical operations branch of the Sixth
6　District, which also housed the auto theft unit,
7　of which I became an auto theft investigator in
8　that unit.
9　Q.　In 1986 when you became an
10　investigator?
11　A.　Yes.
12　Q.　Okay. And the entire time you were an
13　investigator, did you investigate auto thefts or
14　did you get other assignments?
15　A.　Exclusively auto thefts.
16　Q.　Okay. And when you were promoted to
17　sergeant in 1989, were you still in 6-D?
18　A.　No, I was first assigned to the Fourth
19　District.
20　Q.　Okay.
21　A.　And then I was later assigned -- a
22　couple months later, I was later assigned to the

Case 1:06-cv-01625-LFO   Document 39-60   Filed 01/14/2008   Page 4 of 10

May 2, 2007                Michael A. Smith           Maniaci v. Georgetown
                           Washington, D.C.

Page 26

1  assault being committed?
2     A.  Well, I can take action, make an
3  arrest, depending on what my knowledge is of the
4  circumstances at the time.  Sometimes there is
5  something that needs to be investigated further
6  and give people the benefit of the doubt, you
7  have conflicting stories, you didn't actually
8  see the actual assault.  So in those cases, it
9  is a lot better, rather than just yanking
10 somebody to jail, to investigate it.
11    Q.  When you are off-duty and you are in
12 the District of Columbia, are you required to
13 take action if you think you see a crime being
14 committed?
15    A.  Yes, if the crime is committed in your
16 presence and you have the personal knowledge.
17    Q.  Even when you are off-duty?
18    A.  Even when you are off-duty.
19    Q.  Do you normally carry a weapon when
20 you are off-duty?
21    A.  Yes.
22    Q.  Usually carry your service-issued gun?

Page 27

1     A.  Either my issued weapon or my off-duty
2  weapon, which is approved by the Department.
3     Q.  Okay.  And where do you usually carry
4  it?
5     A.  I normally carry it in a holster on my
6  belt.
7     Q.  And you usually have your badge with
8  you even when you are off-duty?
9     A.  Yes.
10    Q.  Do you know what an SPO is?
11    A.  Yes.
12    Q.  Special police officers?
13    A.  Yes.
14    Q.  Okay.  Do you know, is the procedure
15 that an SPO is supposed to follow when they
16 arrest someone, is that any different from the
17 procedure that an MPD officer follows?
18    A.  Yes.
19    Q.  How is it different?
20    A.  Well, first of all, SPOs can't take
21 offense reports, which is R-PD-251.  So when
22 we're called to a scene of an incident, say, an

Page 28

1  SPO arrests someone for various of what we call
2  part 1 offenses, okay, there is an offense
3  report has to be done, that's the 251, SPO can't
4  fill it out, mainly because his badge number is
5  not in our system.  Same thing with our booking
6  process.  When an SPO makes an arrest, we don't
7  book the arrest to the SPO, we book it to an MPD
8  officer.
9     Q.  Okay.  Well, aside from the paperwork,
10 would an SPO follow the same procedure as far as
11 advising the person they are under arrest,
12 handcuffing them, searching them?
13    A.  Yes, technically.  Some SPOs might not
14 be trained -- different SPOs go through
15 different training.  We have a special officer
16 management branch that actually manages the
17 officers, ensures that their commission is
18 up-to-date.  And I don't know what kind of
19 training that they have to go through.
20    Q.  Do MPD officers have authority over
21 SPOs?
22    A.  It depends on the situation.

Page 29

1  Campuses, for instance, unless a campus officer,
2  and we specifically don't call them SPOs in this
3  situation, we call them campus police,
4  Georgetown, for instance, Howard University, for
5  instance, the policy is unless we're invited to
6  take police action on their campus, we normally
7  don't.
8     Q.  Now, when you went through the MPD
9  police academy, you received use of force
10 training?
11    A.  Yes.
12    Q.  And as a police officer, you have had
13 updates on that training?
14    A.  Limited.
15    Q.  Okay.  When you say limited, how often
16 have you had updated use of force training?
17    A.  For instance, our use of force for
18 deadly force, it is very good.  We go to what we
19 call qualifications twice a year, bi-annually.
20 That goes through the entire gamut of use of
21 force, and also goes through the use of force
22 continuum on each level, okay?  Where it starts

Case 1:06-cv-01625-LFO   Document 39-60   Filed 01/14/2008   Page 5 of 10

May 2, 2007    Michael A. Smith    Maniaci v. Georgetown
Washington, D.C.

Page 30

1  out with verbal commands and it ends up with
2  deadly force. And everything in between is the
3  use of nonlethal force and, you know, placing
4  your hands, using hand controls, using pepper
5  spray, using impact weapons.
6       However, as far as hand-to-hand
7  combat, since the academy, we have had
8  absolutely no recertification, no training with
9  the exception of the use of the carotid neck
10 restraint, which has since been outlawed. For a
11 period, they were training us and the training
12 was very intense on the use of this just one
13 hold, this one restraint. And then they decided
14 not to use it.
15      At one point, we had the use of
16 Tasers. The training was very good. All civil
17 disturbance unit members received that training,
18 in the sense that the Tasers are no longer used.
19 As a civil disturbance unit, we also train on
20 special weapons and chemical weapons, which is
21 not given to the regular troops.
22      Q.  Okay. Have you ever instructed other

Page 31

1  MPD officers on the use of force?
2       A.  Not instruction.
3       Q.  Okay. Have you done something else?
4       A.  Well, we have -- we do counseling as a
5  manager, and my sergeants as supervisors, you
6  know, if we investigate a use of force, the
7  officer may do something or even say something
8  that might not be within department policy,
9  might not be appropriate, even if it is in
10 department policy, and we have to counsel them
11 on that.
12      Q.  Okay. But you haven't done any
13 training?
14      A.  No.
15      Q.  Okay. Have you written any of the MPD
16 use of force training materials?
17      A.  No.
18      Q.  Okay. You mentioned the use of force
19 continuum. Is that what guides officers on what
20 levels of escalating force they can use in
21 response to a threat?
22      A.  Yes.

Page 32

1       Q.  Okay. And as part of the force
2  continuum, what is considered passive
3  resistance?
4       A.  Like somebody sits down, they might
5  pull away. You know, they might not comply.
6  That's passive resistance.
7       Q.  Would noncompliance with a verbal
8  command, would you consider that passive
9  resistance?
10      A.  Yes.
11      Q.  For example, if you ordered someone to
12 turn around and put their hands behind their
13 back for handcuffing him, and they said no,
14 would that be passive resistance?
15      A.  Yes.
16      Q.  What level of force is reasonable for
17 a person who is passively resisting?
18      A.  Well, it could be anywhere from more
19 authoritative voice to actual hand controls.
20      Q.  Okay. And when you say hand controls,
21 that's putting your hands on someone and
22 grabbing them?

Page 33

1       A.  Yes.
2       Q.  Okay. What if someone was -- well,
3  let me ask you, what if someone pulled away from
4  you, would you consider that active resistance?
5       A.  Yes.
6       Q.  And what level of force is appropriate
7  if someone is actively resisting?
8       A.  Depending on how much force that they
9  are using to pull away from you. Sometimes, you
10 know, you grab somebody's arm to put it behind
11 them, they will squirm a little bit, but, you
12 know, you don't change the use of force or the
13 amount of force that you are using, and then
14 they said, oh, we just give up.
15      Sometimes they will fight to push you
16 away, they will try to push you down, run over
17 top of you, okay, that's a little bit more
18 active.
19      Q.  Okay. Have you had specific training
20 on the uses of forces in a crowd control
21 situation?
22      A.  Yes.

Case 1:06-cv-01625-LFO   Document 39-60   Filed 01/14/2008   Page 6 of 10

May 2, 2007    Michael A. Smith    Maniaci v. Georgetown
               Washington, D.C.

**Page 130**

1   A. Yes.
2   Q. Did you ever tell Darrell Harrison why
3   you were at the campus?
4   A. I don't recall if I had -- I had very
5   limited conversation with Mr. Harrison.
6   Q. So after speaking with Sergeant
7   DeLisi, what did you do?
8   A. I waited around.
9   Q. Okay. Waited around for what?
10  A. For intelligence officers to get
11  there.
12  Q. Okay. You waited where the MPD detail
13  was waiting?
14  A. I waited there. I went to the front
15  gate. I asked them if anybody from the MPD
16  intelligence had checked in. I checked in with
17  the various posts, like the post that was
18  manning the magnetometer, if any intelligence
19  people had came through there. I checked with a
20  lot of different people.
21  Q. Okay. And did anybody from MPD
22  intelligence ever arrive?

**Page 131**

1   A. No.
2   Q. Okay. So at some point in time, did
3   members of the JDL arrive?
4   A. Yes.
5   Q. And now, you met with them?
6   A. Yes.
7   Q. And you told them what you had been
8   able to find out so far?
9   A. Which was nothing.
10  Q. Okay.
11  A. But that I was working on it, and that
12  I was having them paged and that I had expected
13  that they would call me any minute.
14  Q. Okay. Did you attend any of the
15  events of the conference?
16  A. Yes.
17  Q. Okay. What event did you attend
18  first?
19  A. Well, there was the -- where they had
20  all the tables set up for the vending, and the
21  handouts and information displays. So I walked
22  around to all the different displays and saw

**Page 132**

1   what they had to offer and to include the JDL
2   display.
3       I went over to the conference and I
4   watched the conference from the back, you know,
5   watched what was going on. And at one point, I
6   left the conference, came back to the
7   conference, not sure at what point, but it was
8   at one point where I actually left and came
9   back. Sat in the back of the conference a
10  little bit more.
11      There was another member of the campus
12  police I was talking to in the back of the
13  conference about whether he had seen any
14  intelligence people come up there, so I could go
15  home.
16  Q. Okay. I want to go back. You said
17  you went to the part of the campus where there
18  were tables set up.
19  A. Yes.
20  Q. Okay. Do you know what that building
21  was called?
22  A. No, but it was north of the main hall

**Page 133**

1   where the conference was.
2   Q. Okay. Have you ever heard of the ICC
3   building or intercultural center?
4   A. I have heard of the intercultural
5   center and I believe that might be it.
6   Q. Okay. So if I refer to that building
7   where the tables were as the ICC, we're on the
8   same wavelength?
9   A. We will be on the same wavelength and
10  I will assume that it is the same building.
11  Q. Fair enough. And the JDL had a table
12  in that building?
13  A. Yes.
14  Q. George Haas was at that table?
15  A. Yes.
16  Q. Okay. Were you aware that the JDL had
17  registered for that table under a different
18  name?
19  A. No.
20  Q. Okay. Were you aware that they had
21  registered under the name Palestinians Are
22  People Too?

Case 1:06-cv-01625-LFO   Document 39-60   Filed 01/14/2008   Page 7 of 10

May 2, 2007                Michael A. Smith              Maniaci v. Georgetown
                           Washington, D.C.

**Page 158**

1  Q. He walked over to the area where
2  Mr. Maniaci was sitting?
3  A. Yes.
4  Q. Do you recall Mr. Finberg walking over
5  to that area as well?
6  A. Yes.
7  Q. And do you recall Mr. Nutting walking
8  over to that area as well?
9  A. It is just very hard for me to recall
10 if Mr. Nutting was there. I think he was there.
11 Q. Prior to the conference, had there
12 been any discussion between JDL members about
13 what to do if Georgetown tried to remove a JDL
14 member?
15 A. No.
16 Q. Did two DPS officers come into the
17 aisle next to Mr. Maniaci?
18 A. Two uniformed officers, yes.
19 Q. From Georgetown DPS?
20 A. Yes.
21 Q. And I have been saying DPS. Do you
22 understand when I say DPS --

**Page 159**

1  A. Department of Public Safety.
2  Q. You have understood that all along?
3  A. Yes.
4  Q. Okay. Just wanted to be clear. Can
5  you describe what they looked like, other than
6  they were in uniform?
7  A. Well, one was a heavy-set, bald or
8  shaved-head, clean shaven, black male, shorter
9  than the other, both African-Americans. The
10 other one was taller. And I just don't remember
11 too much about him. I actually had talked to
12 the other one on a couple of times, including
13 right after, immediately after this incident.
14 Q. Which one do you mean, the other one?
15 A. The short one with the bald head.
16 Q. Okay. Had you -- you had spoken to
17 him before?
18 A. Yeah, um-hum.
19 Q. About what?
20 A. Well, first, I was asking him where
21 the MPD intelligence people were, where the MPD
22 officers were, you know, where they were going

**Page 160**

1  to meet. I had talked to him about that.
2  Q. And what did he say?
3  A. He didn't have too much information.
4  Q. Were these two DPS officers the same
5  two officers who came into the aisle and went
6  and followed the Orthodox rabbi?
7  A. I don't recall.
8  Q. Do you recall what happened when the
9  two DPS officers got near Mr. Maniaci?
10 A. Mr. Maniaci was sitting down, and this
11 was after they said, "officers, escort this man
12 out." They walked up, there was conversation
13 going back and forth between Mr. Maniaci and the
14 DPS officers. And the DPS officers, everybody
15 had their voices down really low, so I was in
16 the back and couldn't hear exactly what was
17 being said. But it sounded like something to
18 the effect of, well, you know, you have got to
19 leave, and Mr. Maniaci, well, all I wanted them
20 to do was answer my questions. And this went
21 back and forth maybe two or three times.
22      And then they just picked him up by

**Page 161**

1  the shoulders and dragged him out.
2  Q. Could you tell -- I understand you
3  couldn't hear everything in the conversation,
4  but could you at least tell that Mr. Maniaci was
5  making clear that he didn't want to leave?
6  A. It seemed like it to me, yes.
7  Q. And then how did they grab him?
8  A. By the shoulders or the upper arms,
9  should I say?
10 Q. Okay. Each DPS officer on one arm?
11 A. Yes.
12 Q. And then they lifted him out of the
13 seat?
14 A. Yes.
15 Q. And then was Mr. Maniaci thrown to the
16 ground?
17 A. Not that I have seen.
18 Q. Okay.
19 A. Not anywhere inside the hall.
20 Q. Did he fall on the ground?
21 A. Not that I saw.
22 Q. What happened when the officers lifted

Case 1:06-cv-01625-LFO  Document 39-60  Filed 01/14/2008  Page 8 of 10

May 2, 2007          Michael A. Smith          Maniaci v. Georgetown
                     Washington, D.C.

Page 162

1  him out of the seat?
2     A.  Well, by that time, there are seats
3  and other people between me and obstructing my
4  view.  But they went ahead, ahold of each arm by
5  the upper arm, and they walked down the aisle.
6  And Mr. Maniaci's feet was dragging, he wasn't
7  making any effort to walk, or I don't know if he
8  wasn't making an effort or just couldn't.  But
9  they went down towards the stage, hooked to the
10 left, and then hooked another left up to the
11 door and then they went out the door.
12    Q.  Do you remember what Mr. Turk was
13 doing as Mr. Maniaci was being carried out?
14    A.  I think he was following him.
15    Q.  Do you recall Mr. Turk saying
16 anything?
17    A.  At that point, it was just too much
18 noise, you know, with this commotion, other
19 people were talking around me.  And I couldn't
20 hear what was going on at that point.
21    Q.  While Mr. Maniaci was in his seat, did
22 you see either the DPS officers kick him?

Page 163

1     A.  No.
2     Q.  Did you see either of the DPS officers
3  punch Mr. Maniaci while he was still in his
4  seat?
5     A.  No.
6     Q.  What about after they had lifted him
7  up out of the seat, did you see either of the
8  DPS officers kick him?
9     A.  No.
10    Q.  After they had lifted Mr. Maniaci up
11 out of his seat, did you see either of the DPS
12 officers punch or strike Mr. Maniaci?
13    A.  No.
14    Q.  In Gaston Hall, did you see the two
15 DPS officers do anything other than just grab
16 him by the shoulders and just carry him out?
17    A.  I just saw him grab him by the
18 shoulders and carry him out.  And that's the
19 best I -- from my view, that I could see.
20    Q.  And there was nothing inappropriate
21 about the manner that they lifted him up and
22 carried him out, was there?

Page 164

1     A.  Well, they probably should have
2  carried him out.  If he refused to walk, they
3  should have dragged him back first instead of
4  face first.  That's what we used to do.  It
5  would be less risk to injury, particularly if he
6  fell down, it would be less risk of him striking
7  his face or banging up his knees, and it would
8  be easier to control.
9     Q.  But --
10    A.  But that's the only thing, from what I
11 actually personally observed.
12    Q.  But, I mean, you would agree that in
13 the use of force situations, sometimes things
14 develop quickly and you just have to do the best
15 that you can do at that time, right?
16    A.  Split-second decisions.
17    Q.  I mean, that's what being a police
18 officer is all about, isn't it?
19    A.  That's it.
20    Q.  And it is tough to second-guess those
21 split-second decisions?
22    A.  I try not to.

Page 165

1     Q.  And I'm sure you didn't appreciate it
2  when those people sued you alleging excessive
3  force for your split-second decisions, correct?
4     A.  Yeah, well, some of those cases, there
5  was a significant force used, so I can
6  understand why the lawsuits came.
7     Q.  You can understand why the lawsuits
8  came?
9     A.  Yeah.  I mean, one person was
10 permanently disfigured.  Another person was
11 dead, you know, so it is very understandable
12 what goes through their minds, being on their
13 side.  Part of being a police officer is trying
14 to be empathetic to how the people feel, and we
15 can better deal with the decisions, that's why I
16 am so popular where I am at, because I can read
17 people like that, and I can deal with them.
18    Q.  But in any case, you would agree that
19 it is tough to second-guess a split-second
20 decisions that an officer makes during a use of
21 force situation?
22    A.  That's correct.

42 (Pages 162 to 165)

Case 1:06-cv-01625-LFO   Document 39-60   Filed 01/14/2008   Page 9 of 10

May 2, 2007          Michael A. Smith          Maniaci v. Georgetown
                     Washington, D.C.

Page 170

1   A.  Yes, um-hum.
2   Q.  Do you recall an Orthodox Jew trying
3   to ask a question as Mr. Maniaci was being
4   removed?
5   A.  No.
6   Q.  Okay.  Let me ask you, once you got
7   outside, after the person let you out of Gaston
8   Hall, what do you recall seeing?
9   A.  Would you like me to back up to our
10  conversation to start with?  Do you want me to
11  start with the conversation with the person who
12  stopped me first?
13  Q.  Yeah, you can.
14  A.  Well, while we were going back and
15  forth on this conversation, I could clearly hear
16  Lee Kaplan, he has got a very distinctive voice,
17  he was in the hallway, which was just on the
18  other side of the door.  And he was saying
19  something like: "It is just an old man, it is
20  just an old man, he is just an old man."
21  Something to that effect.  So it took me a few
22  seconds to identify myself to the usher and get

Page 171

1   out the door.
2       By the time I got out the door,
3   everything seemed to be over that quick, and I
4   hadn't even known what had happened.  And the
5   only reason I know what happened, or think what
6   was happening is from the allegations that were
7   made.
8   Q.  About how long did it take you to get
9   past the person who wouldn't let you out of the
10  door?
11  A.  I don't know.  I was fumbling with
12  that badge, maybe ten seconds, 15 seconds.  It
13  was a long -- it seemed like a long time.
14  Q.  Okay.  But in any case, by the time
15  you got out, you said it seemed like things were
16  pretty much over?
17  A.  Yeah.  You know, I just -- I didn't
18  want any confrontation with the usher.  I wanted
19  him to understand who I was.  And I was afraid
20  if I just pushed him out of the way, then I
21  would be the offender, so I just wanted to make
22  it very clear that I was in the police and I

Page 172

1   just was trying to exit into the hallway.
2   Q.  Now, when you got outside, when was
3   the first time you realized that Mr. Maniaci was
4   the person who had been removed?
5   A.  Well, actually, it was before he went
6   out the door, I realized it was him, as they
7   were taking him out.  When they first grabbed
8   him, I guess I really didn't realize it was him
9   until he was almost at the end of the stage, and
10  then I could look across and I recognized who it
11  was.
12  Q.  Okay.  And so when you came out of
13  Gaston Hall, where was Mr. Maniaci?
14  A.  He was in the hallway, I think he was
15  on the floor just getting up.  There were some
16  people helping him up, and I don't recall who
17  the people were.
18  Q.  Did you identify yourself to anyone as
19  an MPD officer?
20  A.  Well, the DPS already knew I was from
21  my previous conversations with them.  It was the
22  DPS officer who was in casual clothes, the tall

Page 173

1   white guy that was in the back, he knew I was a
2   police officer, so it wasn't any need for me to
3   make any announcement to the group.  At that
4   point, I was just on the sidelines trying to
5   figure out what was going on.
6   Q.  Were the two DPS officers who had
7   removed Mr. Maniaci still there?
8   A.  Yes.
9   Q.  What were they doing?
10  A.  Just standing there, as far as I can
11  recall.
12  Q.  Did anybody search Mr. Maniaci?
13  A.  Not that I recall.
14  Q.  They didn't handcuff him?
15  A.  No.
16  Q.  They didn't tell him he was under
17  arrest?
18  A.  No.
19  Q.  They didn't do anything indicating
20  that he was under arrest that you saw?
21  A.  Not that I saw.
22  Q.  Did any university administrator speak

Case 1:06-cv-01625-LFO    Document 39-60    Filed 01/14/2008    Page 10 of 10

May 2, 2007 · Michael A. Smith · Maniaci v. Georgetown
Washington, D.C.

**Page 190**

1  Q. Was Sergeant DeLisi around at that
2  point in time?
3  A. At the ICC, yes.
4  Q. When you arrived, he was already
5  there?
6  A. Yes. And to tell you the truth, I
7  might have called DeLisi myself. Now, he wasn't
8  already there when I got there. I think I
9  called DeLisi and told him what was going on.
10 And I might have done that at the request of one
11 of the DPS officers.
12 Q. The DPS officer that came and spoke to
13 you and said he was glad that you were there,
14 was that one of the two officers that removed
15 Mr. Maniaci?
16 A. Yes, sir.
17 Q. Okay. What about the tall
18 African-American officer who helped remove
19 Mr. Maniaci, was he at the ICC building?
20 A. I don't recall.
21 Q. What happened with Mr. Maniaci once he
22 got to the ICC building?

**Page 191**

1  A. There was like a little foyer when you
2  first go in the door. And he leaned up against
3  the wall for a while, and he kept on saying that
4  he had to use the restroom. And finally they
5  let him use the restroom, but they stood there
6  and held the door open to the restroom.
7  Q. When you say he leaned up against the
8  wall, what do you mean?
9  A. He leaned up against the wall with his
10 back up against the wall and was just standing
11 there. And there were several DPS officers
12 standing around him. I don't know why, but they
13 were standing around him like he was being
14 detained, but I don't think he was actually
15 being detained. I think he was free to leave
16 the campus, but nobody actually at that point
17 told him to leave the campus. It was a few
18 minutes later that they say, well, you just got
19 to get off the campus.
20 Q. And you said he was leaning up against
21 the wall?
22 A. Yes, sir.

**Page 192**

1  Q. Was any DPS officer pushing him up
2  against that wall?
3  A. Not that I recall.
4  Q. Okay. And you said at that point in
5  time, you thought that he was free to leave, but
6  you didn't hear anybody tell him that?
7  A. Yeah, it was -- I am not sure what his
8  perception was, because they were all standing
9  around them like, no, you are not free to leave,
10 but they never said: Hey, you are being
11 detained, you are in our custody, you are under
12 arrest, you can't leave, anything like that. I
13 think there was just a lot of confusion on what
14 they were going to do.
15 Q. And as he was leaning against the
16 wall, what was Mr. Maniaci saying?
17 A. He was saying, I don't feel good, I
18 have got to use the bathroom. At first I
19 thought he just wanted to puke, but then he said
20 he had to urinate. So that made it clear that
21 it wasn't physically going to puke, that he just
22 had to urinate.

**Page 193**

1  Q. And was he allowed to use the
2  bathroom?
3  A. Yes.
4  Q. At any point in time, did someone tell
5  him that he couldn't use the bathroom?
6  A. Yes.
7  Q. Who told him that?
8  A. It was one of the DPS officers.
9  Q. Okay. Did they say why?
10 A. No.
11 Q. How long was it before he was allowed
12 to use the bathroom?
13 A. Maybe two or three minutes. It wasn't
14 long at all.
15 Q. Were you standing in the actual foyer
16 area at that time?
17 A. Yes, I was between the foyer and the
18 main hall.
19 Q. So you were in the same enclosed space
20 that Mr. Maniaci was in?
21 A. Yes.
22 Q. Okay. So you could hear everything he