# EXHIBIT 57

Case 1:06-cv-01625-LFO   Document 39-64   Filed 01/14/2008   Page 2 of 12

June 28, 2007        Dr. Suzanne Gillern        Maniaci v. Georgetown
                         Washington, D.C.

Page 1

1                UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF COLUMBIA

3     - - - - - - - - - - - - - - - - -X

4     WILLIAM MANIACI,                  :

5                  Plaintiff,            :

6     v.                                 :     Case No.

7     GEORGETOWN UNIVERSITY, et al.,     :     06-cv-1625 (CKK)

8                  Defendants.           :

9     - - - - - - - - - - - - - - - - -X

10                VIDEOTAPED DEPOSITION OF

11                DR. SUZANNE GILLERN

12                Washington, D.C.

13                Thursday, June 28, 2007

14

15           The videotaped deposition of DR. SUZANNE

16    GILLERN, was convened on Thursday, June 28, 2007,

17    commencing at 9:10 a.m., at the offices of Williams &

18    Connolly, 725 12th Street, Northwest, Washington,

19    D.C., before Cynthia R. Simmons, Registered Merit

20    Reporter, Certified Realtime Reporter, and Notary

21    Public.

22

CONDENSED

Case 1:06-cv-01625-LFO   Document 39-64   Filed 01/14/2008   Page 3 of 12

June 28, 2007                Dr. Suzanne Gillern              Maniaci v. Georgetown
                             Washington, D.C.

Page 14

1  that's it.
2      Q  The battlefield injuries?
3      A  Yeah.
4      Q  Okay. Let me ask you, when someone comes
5  into the ER at Walter Reed, what typically happens
6  with the patient?
7      A  They will come into our triage nurse -- or
8  I think it's a nurse who runs that area, and they
9  will say what their chief complaint is and fill out
10 some forms, as well as write down a list of their
11 medications, medical problems. I think, at that
12 time, they have a set of vitals that are done.
13     At that time, depending on what the wait
14 is and if there's a room available and how sick they
15 are, they'll be put into a room, at which time,
16 vitals will be taken again, and then the chart's put
17 out, and a doctor, usually an intern, will go in
18 first and see the patient.
19     Q  And who takes the vitals? Is that done by
20 a nurse?
21     A  I think it's done by a nurse, but I'm not
22 sure. It might be -- there might be techs there who

Page 15

1  also -- I'm not 100 percent sure if the tech or a
2  nurse who does it, but it's not us.
3      Q  And who does the initial intake, is that
4  also a nurse?
5      A  I think it has to be a nurse who does the
6  triage.
7      Q  Okay.
8      A  But I'm not 100 percent sure.
9      Q  And then you said, at some point, the
10 chart is put out, and then a doctor, usually an
11 intern, will come by?
12     A  Uh-huh.
13     Q  And then what happens when --
14     A  We'll go in, talk to the patient, get
15 their basic medical history, meds, allergies, social
16 history, and then get the story of, you know, find
17 out what their complaint is, what's going on and then
18 do a physical exam. At that time, we usually will go
19 discuss it with -- as an intern, I go discuss it with
20 the attending, and we then decide that if anything
21 need -- labs or orders need to be done.
22     At that time, usually, the attending would

Page 16

1  come to see the patient, or they would wait for the
2  lab results to come see the patient, and then after
3  those came back, we would go from there and come up
4  with a plan.
5      Q  Come up with a plan for treatment?
6      A  Yes, for treatment and dispo, yes.
7      Q  And I guess, and part of that plan for
8  treatment would be whether the patient was going to
9  be discharged or admitted to the hospital?
10     A  Correct.
11     Q  Let me show you what's been previously
12 marked as deposition Exhibit 20.
13         MR. FAY: Could I take a look at that
14 first?
15         MR. JONES: Well, I've got a copy for you.
16 BY MR. JONES:
17     Q  This is a document which is, at the top
18 says, "Emergency Care and Treatment Walter Reed AMC,"
19 Army Medical Center. It's dated 19 February, 2006.
20 Do you recognize this document?
21     A  Yes.
22     Q  And in February 2006, was that the time

Page 17

1  you were doing your rotation in the emergency room at
2  Walter Reed?
3      A  Yes.
4      Q  And on this document, do you recognize
5  your handwriting and your signature?
6      A  Yes.
7      Q  And do you see that this document is an
8  emergency room record for a Mr. William Maniaci?
9      A  Yes.
10     Q  And from looking at this document, does
11 this indicate that you were the intern that treated
12 Mr. Maniaci on that date?
13     A  Yes.
14     Q  Do you have a specific recollection, aside
15 from this document, of treating Mr. Maniaci?
16     A  No.
17     Q  Let me ask you, at the top of the document
18 there's some information indicating the arrival time,
19 how the person was transported to the hospital, that
20 the history was obtained from the patient. Who takes
21 that information?
22     A  I believe it's a triage nurse.

Case 1:06-cv-01625-LFO   Document 39-64   Filed 01/14/2008   Page 4 of 12

June 28, 2007          Dr. Suzanne Gillern          Maniaci v. Georgetown
                       Washington, D.C.

### Page 22

1  A  I think -- I mean, we do. It doesn't
2  necessarily happen, you know, at the drop of a hat.
3  It kind of depends on timing and how long ago the
4  records were. I mean, it's available to us, I just
5  don't -- it's not necessarily something that we could
6  do, get right that second. It just depends on who
7  we're calling and what's getting done.
8      Q  Is that done commonly when you're in the
9  ER, to call up someone's VA medical records?
10     A  I don't know if I would say, "commonly,"
11 but it -- I mean, I only spent four weeks there, but
12 I've seen it -- I mean, it happened several times.
13     Q  Do you recall doing it for Mr. Maniaci?
14     A  No.
15     Q  Do you see, in the top -- well, not the
16 top right, but on the right side, about halfway down,
17 where there's indication of medical history?
18     A  Yes.
19     Q  Okay. Did that medical history come from
20 Mr. Maniaci?
21     A  Yes.
22     Q  And what was the, what is the medical

### Page 23

1  history that you recorded?
2      A  CHF, congestive heart failure, COPD, which
3  is chronic obstructive pulmonary disease, stroke,
4  which I think I had two MO, months ago, and in
5  parentheses, it looked like I wrote TIA.
6      Q  And what is TIA?
7      A  That's a transient ischemic attack, which
8  is a -- basically, a shortened -- I mean, it's a
9  short -- it's a similar stroke episode, but it lasts
10 for a short period of time.
11     Q  Okay. And when you say, "a short period
12 of time," what's the typical period of time?
13     A  I don't know the exact -- what qualifies
14 as, it but I know it's like several hours, I think
15 it's maybe less than 12 or less than a day, I'm not
16 sure exactly, but it's short-term, and all your
17 symptoms, all the symptoms resolve within a certain
18 period of time, so it's just transient, which is --
19     Q  Okay. Does this indicate to you that
20 Mr. Maniaci reported that he had a TIA episode
21 approximately two months ago?
22     A  It looks like he said either stroke or

### Page 24

1  TIA, so that's why I wasn't -- sometimes, it's hard
2  for patients, I mean, to differentiate, you know, one
3  doctor will tell them they had a stroke, one said he
4  had a TIA, so I can't really tell if he had a stroke
5  or TIA which, based on how I wrote it, it seems like
6  he wasn't sure.
7      Q  Okay. And then did you also get a
8  surgical history from the patient?
9      A  It appears so, yes.
10     Q  And what was the surgical history?
11     A  It looks like a cervical spine surgery,
12 six or seven years ago, tib/fib repair, and then a
13 cholecystectomy.
14     Q  And that last one, what does that --
15     A  Oh, that's removal of the gallbladder.
16         THE COURT REPORTER: Say it again?
17         THE WITNESS: Removal of the gall bladder.
18 BY MR. JONES:
19     Q  And did you also get a social history from
20 the patient?
21     A  Yes, so saw that he had a tobacco history,
22 a sixty-pack year history and occasional alcohol use.

### Page 25

1      Q  Did he say when his last drink was?
2      A  I didn't write that down, so I don't know.
3      Q  Okay. And in that same box in the top
4  left-hand corner, it appears that you wrote 64 year
5  old male?
6      A  Yes.
7      Q  And there's a paragraph description, what
8  is that paragraph?
9      A  Do you want me to read it?
10     Q  Well, I'll ask you to read it in a minute.
11     A  Oh, that's, that's basically my shortened
12 presentation of his illness, so it's just basically
13 his description of, you know, how he's been feeling.
14 It's subjective. This is what, you know, this is the
15 subjective part of the exam, what the patient tells
16 us is going on.
17     Q  Okay. And what did Mr. Maniaci tell you
18 was going on with him?
19     A  So I wrote, "64 year old male, kicked and
20 dragged, suffering several injuries, swollen sore
21 ankle, difficult to put pressure on. Patient also
22 complains of some lower back pain. Son also noticed

Case 1:06-cv-01625-LFO   Document 39-64   Filed 01/14/2008   Page 5 of 12

June 28, 2007         Dr. Suzanne Gillern         Maniaci v. Georgetown
                       Washington, D.C.

Page 26

1  subtle drop in eye. This afternoon, the patient had
2  an episode of dizziness and collapsed. No LOC,"
3  which stands for a loss of consciousness.
4      Q  Okay. You started out, you mentioned that
5  the 64 year old male, and it says, "kicked and
6  dragged," in parentheses, is that right?
7      A  Yes.
8      Q  And does that indicate that those were his
9  words, that he was kicked and dragged?
10     A  Yes.
11     Q  Okay. Do you remember him giving any more
12 detail about who kicked him and dragged him?
13     A  I'm sorry, I don't remember.
14     Q  Do you remember anything else about the
15 circumstances of him being kicked and dragged that he
16 reported?
17     A  No specifics.
18     Q  Do you remember at any point in time
19 whether police officers were called to interview
20 Mr. Maniaci?
21     A  Not that I remember.
22     Q  Is that something that commonly would

Page 27

1  happen in the ER, that police officers would come to
2  interview a patient?
3      A  I --
4      MR. FAY: You mean, in the ER at Walter
5  Reed, an ER in a civilian hospital?
6      MR. JONES: Good point.
7      MR. FAY: Because they're different
8  situations.
9      MR. JONES: Good point.
10 BY MR. JONES:
11     Q  In your time in the ER at Walter Reed, do
12 you remember police officers ever coming to interview
13 any patients?
14     A  No.
15     Q  And you note that he reported that he was
16 suffering several injuries, including a swollen
17 ankle?
18     A  Yes.
19     Q  And some lower back pain?
20     A  Yes.
21     Q  Did he report any other -- or did he
22 complain of any other injuries at that time?

Page 28

1      A  I don't remember, so I'm just going off of
2  what I wrote down.
3      Q  If he had been complaining of other
4  injuries, would you have noted that?
5      A  Usually, yes.
6      Q  Yeah. You also stated that his son said
7  something about a droop in his eye?
8      A  Yes.
9      Q  Do you recall that he was with someone who
10 you thought was his son?
11     A  I don't remember the actual patient
12 encounter, so I just have to go off of what I wrote.
13     Q  Okay. And then you indicated that the
14 patient noted that he had an episode of dizziness and
15 collapsed?
16     A  Yes.
17     Q  Did Mr. Maniaci say when that episode of
18 dizziness and collapse had occurred?
19     A  I don't remember, sorry.
20     Q  Did he give -- provide any details of what
21 happened during that episode of dizziness and
22 collapse?

Page 29

1      A  I don't remember, so I just have
2  "dizziness and collapse" written down.
3      Q  Okay. That's fair enough, that's fair
4  enough. You can only testify as to what you
5  remember. And then you have, "no loss of
6  consciousness," was that what was reported by
7  Mr. Maniaci?
8      A  Yes. In this section, it would be based
9  on what he told me.
10     Q  Did Mr. Maniaci mention that he had been
11 stuttering or had been confused?
12     A  I don't remember, but I didn't write it.
13 I think so, I could assume that he didn't, but I'm
14 not 100 percent sure.
15     Q  Did you notice whether Mr. Maniaci was
16 stuttering?
17     A  Based on the next section, "physical
18 exam," I don't note it, and that's where we would
19 note a slurring of speech, and also, there's a
20 mention in -- I think the attending note, where she
21 says speech is normal or something, I'm pretty sure,
22 speech clear, but that's all I can go off of.

Case 1:06-cv-01625-LFO   Document 39-64   Filed 01/14/2008   Page 6 of 12

June 28, 2007          Dr. Suzanne Gillern          Maniaci v. Georgetown
                       Washington, D.C.

Page 30

1  Q  Okay. Well, let's -- after the patient
2  tells you what's going on with him, then you do an
3  examination yourself?
4  A  Yes.
5  Q  Okay. And is that written a little bit
6  farther down in that section?
7  A  Yes, in the PE.
8  Q  Okay. If we could just go through that?
9  And when you're -- if we could sort of read it
10 section-by-section, and I'll ask you questions about
11 that. What is the first line, where it says, "PE"?
12 A  That stands for physical exam, and then I
13 have "GEN," which is general, and I wrote, "NAD,"
14 which is no apparent distress.
15 Q  And what does no apparent distress mean?
16 A  Patient didn't look like they were, you
17 know, suffering or in a lot of pain at the time.
18    MR. FAY: Not about to die?
19    THE WITNESS: Exactly. That's basically
20 it. It's just our quick and easy way of
21 differentiating someone -- looks like they're sick or
22 not sick.

Page 31

1  BY MR. JONES:
2  Q  Okay. Is there any lower indication than
3  no apparent distress?
4     MR. FAY: What does that mean?
5  BY MR. JONES:
6  Q  Well, I guess no indication -- no apparent
7  distress is an indication of, you know, the patient's
8  comfort level, is that correct?
9  A  Correct.
10 Q  Okay. So if someone was in a lot of pain,
11 what would you say?
12 A  I would just describe if, basically, a
13 patient was writhing in pain, or patient sick
14 appearing, patient ill appearing, I mean, just kind
15 of general, my assessment of what they looked like at
16 the time, so no apparent distress is a general term
17 for saying someone is sitting there and not looking
18 like they're in any pain. They're just sitting there
19 like you or I would be sitting.
20 Q  Okay. And then what's the next section?
21 A  It says, "HEENT," which is head, eye, ear,
22 nose, and throat examine, and so I wrote, subtle

Page 32

1  changes of left eye -- or "subtle drop of left eye,"
2  sorry, and then it says, "PERLA," which is pupils are
3  equal and reactive to light and accommodation.
4     THE COURT REPORTER: Say it again?
5     THE WITNESS: Sorry. Pupils are equal and
6  reactive to light and accommodation.
7  BY MR. JONES:
8  Q  And what does that mean?
9  A  That's when we flash a light in somebody's
10 eye, that just tests their reflexes, their pupil, and
11 if, for instance, if you flash a light in the eye,
12 and the eye -- the pupils should shrink, that means
13 it's reacting appropriately.
14 Q  So Mr. Maniaci's reaction to that was
15 normal?
16 A  Yes.
17 Q  Okay. And then what's next?
18 A  "EOM intact," which is extra ocular eye
19 movements intact, which is just another test to make
20 sure that their eyeball is kind of moving in all
21 directions, which is another test of their cranial
22 node.

Page 33

1  Q  So Mr. Maniaci was normal for that?
2  A  Yes.
3  Q  And then what's next?
4  A  "Full ROM of neck," which stands for full
5  range of motion of neck.
6  Q  Okay. The subtle droop of left eye that
7  you noted, what could that have been caused by?
8  A  Some people just, I mean, some people have
9  a slight drop in the lower left eye. It could have
10 been a result from his previous stroke or TIA. I
11 mean, it's a neural -- it could be caused by some
12 type of neurologic, if he had nerve injury to his
13 face, long-term or something. There's a bunch of
14 different things.
15 Q  And as part of this, part of the physical
16 exam, do you actually examine the head for any
17 injuries?
18 A  We'll look at the scalp or something, yes.
19 Q  And if you had noticed any injuries or
20 bruising, you would have noted it?
21 A  Yes.
22 Q  What's the next section of the physical

Case 1:06-cv-01625-LFO   Document 39-64   Filed 01/14/2008   Page 7 of 12

June 28, 2007          Dr. Suzanne Gillern          Maniaci v. Georgetown
                       Washington, D.C.

Page 34

1  exam?
2      A  I have, "CV," which is cardiovascular and
3  it's RRR, which is regular rate and rhythm, which is
4  normal.
5          MR. FAY:  Where is that?
6          THE WITNESS:  It's right under the HEENT,
7  it says, "CV: RRR."  Right there.
8          MR. FAY:  Oh, okay.  Thank you.
9  BY MR. JONES:
10     Q  And then to the left, there's something
11 regarding the back?
12     A  Right.  I wrote, "back," and then, "no
13 tenderness to palp," which is palpation.
14     Q  Meaning you --
15     A  Meaning I touched the spine's processes --
16 or the spine going down in the back to localize any
17 area that might be tender.  Per my report, there was
18 no tenderness.
19     Q  Okay.  What's the next part of the
20 physical exam?
21     A  Lungs.
22     Q  Okay.

Page 35

1      A  And then I wrote, "diffuse bronchi," which
2  are just a kind of coarse type of breath sound, and
3  then, "breath sounds are present."
4      Q  Okay.  And what might that be caused by?
5      A  That, I mean, he has COPD, I noted in the
6  medical history, so that, I mean, that can be caused
7  by that, a long history of smoking.
8      Q  Okay.  What's the next part of the
9  physical exam?
10     A  "ABD," which is abdomen, and I wrote,
11 "soft, NT," which is nontender, "ND," which is
12 nondistended, and then, "positive BS," which is
13 positive bowel sounds, which is a normal exam.
14     Q  Okay.  And then what's next, extremities?
15     A  Yeah, "EX" stands for extremities, I
16 wrote, "5 out of 5 strength, sensation intact.
17 Swelling of right ankle, nontender to palpation,
18 right foot," and then I wrote, "neurovasc intact,"
19 which is neurovascularly intact, which means it had a
20 good pulse, good range of motion, it basically just
21 means it was normal.
22     Q  And when you say, "nontender to

Page 36

1  palpation," that means you touch his ankle, and
2  there's no pain?
3      A  And he didn't have pain at the time, yes.
4      Q  Okay.  What's the next part of the
5  physical exam?
6      A  And then I wrote, "neuro," which -- and
7  then I have CN 2 through 12, which stands for cranial
8  nerves 2 through 12, which I wrote as being intact,
9  and then I wrote, "nonfocal," which means there's no
10 focal deficits in his neuro exam, and once again, I
11 wrote, "5 out of 5, strength and sensation intact."
12     Q  Okay.  And when you do this, the
13 neurological exam, how do you actually do that?
14     A  Well, part of it is actually the pupils,
15 is one of the cranial nerves, extra ocular eye
16 movements is another one of the cranial nerves,
17 there's a whole list of things.  We test the face
18 muscles by asking them to smile and lift their
19 forehead.  They have to lift their shoulders up,
20 stick out their tongue.  It's a series of different
21 tests you do to test each of the cranial nerves.
22     Q  So everything was normal?

Page 37

1      A  Yes.
2      Q  Okay.  And after you complete the physical
3  exam, what happens next with -- well, what happened
4  next with Mr. Maniaci?
5      A  Then I assume that I went out and talked
6  to my attending, and we decided to do -- I wrote down
7  some orders, a CT noncon of the head.
8      Q  And is that in the vital sign section you
9  write the orders?
10     A  That's right underneath the vital signs,
11 it says, "orders," and then underneath there.
12     Q  Okay.
13     A  And then I also ordered a CBC, which is a
14 blood test, a CMP, which looks at his electrolytes,
15 and then a coag, which looks at is his blood is thin
16 or not thin, and then I also wrote for ankle
17 three-view x-ray.
18     Q  Okay.  Now, the CT noncon head?
19     A  Yes.
20     Q  What is that?
21     A  That's a CT of the head without using any
22 contrast, which is what we normally do to work up a

Case 1:06-cv-01625-LFO   Document 39-64   Filed 01/14/2008   Page 8 of 12

June 28, 2007          Dr. Suzanne Gillern         Maniaci v. Georgetown
                       Washington, D.C.

**Page 38**

1  questionable brain -- the first step in something
2  looking at the head, in the brain.
3      Q   And why did you order that?
4      A   Based, I would believe, just going off of
5  my note, probably based on the fact that he had an
6  episode of trauma based on the kicking and dragging
7  and also an episode of dizziness and collapse.
8      Q   Okay. So based on what the patient --
9      A   What he told me, yes, based on the
10 patient's report.
11     Q   Okay. And then you ordered that these
12 things be done. And were they completed?
13     A   Yes.
14     Q   Okay. And is there some indication on
15 here of what the results were of these various tests?
16     A   In the middle of the page, under my
17 paragraph, the initial paragraph, I have a box with
18 the lab results in it, and then I also have another
19 box slightly below that, that shows CT scan of the
20 head, no acute changes, and right ankle, no
21 fractures.
22     Q   And if you could just briefly summarize

**Page 39**

1  what the lab results are in that box that says,
2  "CBC"? You don't have to read every number.
3      A   Sure. So --
4      MR. FAY: Where is that again?
5      THE WITNESS: Right here, sir.
6      MR. FAY: Okay. Thanks.
7      THE WITNESS: So CBC, so 8.9 represents
8  his white blood cell count, which would be like
9  looking at infection, and then 13.9 and 40.3 are kind
10 of his blood levels as far as like hematic rate or
11 hemoglobin hematic rate, if he was anemic or not,
12 those are all normal. And then 205 is his platelet
13 count, which is normal. And then the 142, 3.7, and
14 so on, that little graph --
15     THE COURT REPORTER: You need to slow
16 down, please.
17     THE WITNESS: I'm sorry. So then the 142,
18 3.7, 106, 27, 15, 1.2, and then 102, those are all
19 his electrolytes, which are all -- those are just
20 like sodium, potassium, chloride, creatinine, those
21 are all normal. And then next to that, his alk phos,
22 AST, LAT, T belly are his liver function tests, which

**Page 40**

1  do not seem to be abnormal. And then underneath
2  that, I wrote, "coags," and that meant measures, if
3  his blood is -- like if he's taking a blood thinner,
4  if his blood is thin or if he's had a high likelihood
5  of bleeding, and those are normal.
6  BY MR. JONES:
7      Q   So Mr. Maniaci's liver function came back
8  normal?
9      A   Yes.
10     Q   Okay. And his blood chemistry came back
11 normal?
12     A   I don't see anything too wrong with it,
13 no.
14     Q   Okay. And what about the results of the
15 CT scan of his head?
16     A   Yeah. So I wrote, "no acute changes," so
17 we didn't see anything based on that, no.
18     Q   So you didn't see any head trauma or
19 trauma to his brain?
20     A   No, based on that, no.
21     Q   Okay. And then what about the right ankle
22 x-ray?

**Page 41**

1      A   I just wrote, "no fractures," so that
2  meant there was no fracture.
3      Q   Okay. So after the, these tests come
4  back, what happens next?
5      A   Well, basically, I think we were -- then
6  we decide on the plan, on if we're going to admit the
7  patient, not admit the patient, and what kind of care
8  he needs, you know, if we need to give him any
9  medication or send him with any other assistance.
10     Q   Okay.
11     A   Or if more tests need to be done. In this
12 case, we didn't do any more tests.
13     Q   Okay. And you indicated earlier that
14 there was a, there's a note on this page from the
15 attending physician?
16     A   Yes.
17     Q   Okay. And that's in the bottom right-hand
18 corner?
19     A   Yeah, yes.
20     Q   Okay. So that's a section that's not your
21 handwriting?
22     A   Correct.

Case 1:06-cv-01625-LFO   Document 39-64   Filed 01/14/2008   Page 9 of 12

June 28, 2007          Dr. Suzanne Gillern          Maniaci v. Georgetown
                       Washington, D.C.

Page 42

1  Q  But are you able to read what the
2  attending physician wrote?
3  A  I'm able to read some of it. It says --
4  Q  Well, before you start reading it, do you
5  recall who the attending was?
6  A  I don't, actually.
7  Q  Is there a signature there? Are you able
8  to read that?
9  A  There is a signature there, and I,
10 unfortunately, can't read it or remember -- recollect
11 who it was.
12 Q  Okay. If you could just read that
13 paragraph as best able?
14 A  Sure. It says, "64 year old male, status
15 post physical assault at PLO conference at Georgetown
16 University yesterday, complains of head pain and
17 right ankle pain, no LOC."
18    MR. FAY: Loss of consciousness, is that
19 what that means?
20    THE WITNESS: Yes, sir, yes, no loss of
21 consciousness. I can't really read that next line.
22 So going down, it says, "no pain," with something,

Page 43

1  I'm sorry, I can't read that, and then I wrote -- it
2  says, "NAD," which is the no apparent distress.
3  BY MR. JONES:
4  Q  Okay.
5  A  Don't know what that next little thing is,
6  and then it says, "CN 2 through 12," which is cranial
7  nerves 2 through 12, "intact, speech clear. Right
8  ankle edema," and they wrote, "TTP," so they wrote
9  tenderness to palpation.
10 Q  Okay. For the right ankle?
11 A  Yes.
12 Q  Okay. And then underneath there, there's
13 something written. Is that your handwriting?
14 A  Yeah, that's part of my instructions to
15 the patient.
16 Q  Oh, okay. And would the, would the
17 attending physician have examined Mr. Maniaci?
18 A  Yes.
19 Q  Okay. And then the attending physician
20 would have written this brief description?
21 A  Yes.
22 Q  And who usually spends more time with the

Page 44

1  patient, you or the attending?
2  A  It depends. I mean, I can't -- I mean, I
3  guess maybe the intern because we see -- we usually
4  go back and see the patient with the attending as
5  well, but.
6  Q  Okay. And in this instance with
7  Mr. Maniaci, who do you think spent more time with
8  Mr. Maniaci?
9  A  I can't definitely say.
10 Q  Okay.
11 A  I mean, they write that note, and it's
12 just kind of saying that they agree with my note, and
13 this is just their kind of little blurb.
14 Q  Okay. And is there some part on here
15 where you write what the plan of treatment is?
16 A  Yes. Just kind of to the left of that, I
17 have, "IMP/plan," which is my impression and plan,
18 and I wrote, "64 year old male with right ankle pain
19 and episode of lightheadedness status post trauma,"
20 so my plan at that time was to do a CT noncon of the
21 head, labs were pending and ankle x-ray pending, and
22 then after that, I have another dash that says,

Page 45

1  "patient likely with concussion and right ankle" --
2  "right ankle sprain." Sorry.
3  Q  Okay. So you concluded that the patient
4  likely has a concussion?
5  A  Yes.
6  Q  And what is the basis of that?
7  A  Just based on his -- we didn't see
8  anything specific on a CT scan, but based on his
9  history, it could be consistent with a concussion.
10 Q  Based on what he told you?
11 A  Correct.
12 Q  Okay. But there was nothing physical that
13 you observed that would indicate that he had a
14 concussion?
15 A  No. And kind of, at least as far as I
16 know, nothing specific, normally, it indicates
17 concussion, there's no specific test for a
18 concussion, it's just kind of based on history and --
19 yeah.
20 Q  Okay. And what were your instructions to
21 the patient?
22 A  So we gave the patient some Naprosyn,

Case 1:06-cv-01625-LFO    Document 39-64    Filed 01/14/2008    Page 10 of 12

June 28, 2007                 Dr. Suzanne Gillern         Maniaci v. Georgetown
                              Washington, D.C.

Page 46

1  which is a pain medication, as well as some Percocet,
2  and gave them -- gave him, sorry, information on
3  concussion and ankle sprain and also gave him
4  crutches and an Ace wrap for his ankle.
5      Q   And in the section, where it says, "vital
6  signs"?
7      A   Yes.
8      Q   There's also some writing there
9  underneath, where it indicates that there's going to
10 be an x-ray on his ankle. What is that writing?
11     A   It says, "right ankle, posterior"
12 something, it might be like his type of splint or
13 something like that, I'm not really sure. Actually,
14 I don't think that's my writing, but -- I'm not, I
15 don't know.
16     Q   Okay.
17     A   But it seems to me, it's some type of --
18 we sometimes give people with sprains splints or Ace
19 wraps or -- just to help immobilize it a little bit.
20     Q   Okay. And does it indicate -- what does
21 "DC" indicate?
22     A   That's discharge, so once we are finished,

Page 47

1  it's an indication to the nurse that the patient can
2  go home.
3      Q   Okay. And is that what the ultimate
4  conclusion was for Mr. Maniaci, that he could be
5  discharged?
6      A   Yes.
7      Q   Okay. Is there some indication on here on
8  when he was discharged?
9      A   I don't think so.
10     Q   Okay. When -- would the patient be
11 discharged after he's given instructions?
12     A   Yes.
13     Q   Okay. And the pages attached to this
14 front page, are these the discharge instructions?
15     A   Yes.
16     Q   And at the bottom of that, does it have,
17 at the bottom left-hand corner, does it have a date
18 and time?
19     A   Yes.
20     Q   And what is the date and time?
21     A   2/19/06, 23:59.
22     Q   So does that indicate that these

Page 48

1  instructions were printed out just prior to midnight?
2      A   Yes.
3      Q   And shortly after that, you would have
4  given them to the patient?
5      A   I would assume, yeah.
6      Q   And the discharge instructions, I'm on the
7  second page of this document, the first discharge
8  instructions are for concussion syndrome?
9      A   Yes.
10     Q   Okay. And then at the bottom, it
11 indicates, "Return promptly or contact your doctor if
12 you have any of the following occur."
13     A   Yes.
14     Q   And it indicates several symptoms. Are
15 these all symptoms of a concussion injury?
16     A   Well, those are symptoms that, you know,
17 you're -- something is not right up in the brain, and
18 you do want to seek medical care to be further
19 evaluated.
20     Q   Okay. And are these -- well, let me ask
21 you, repeated vomiting, was there any history of that
22 from Mr. Maniaci?

Page 49

1      A   No.
2      Q   What about severe or worsening headache?
3      A   Not when he presented, no.
4      Q   Severe or worsening dizziness when he
5  presented?
6      A   Just his report of having dizziness and
7  collapse, but nothing that he was experiencing at the
8  time.
9      Q   Unusual drowsiness or unable to awaken as
10 usual, did you observe that when he presented?
11     A   Not per my note. I don't remember.
12     Q   Confusion or change in behavior or speech,
13 did you notice that when he presented?
14     A   Not per my note.
15     Q   Unequal pupils, did you notice that when
16 he presented?
17     A   No.
18     Q   Convulsion or seizure, did you notice that
19 when he presented?
20     A   No.
21     Q   Increasing scalp or face swelling, did you
22 notice that when he presented?

Case 1:06-cv-01625-LFO   Document 39-64   Filed 01/14/2008   Page 11 of 12

June 28, 2007          Dr. Suzanne Gillern          Maniaci v. Georgetown
                       Washington, D.C.

Page 50

1    A   Not per my note.
2    Q   Redness, warmth, or pus from the swollen
3  area, did you notice that when he presented?
4    A   No, at least not per my physical.
5    Q   Okay. And then there's also -- going
6  ahead, I guess, three pages, there's discharge
7  instructions for contusion.
8    A   Uh-huh.
9    Q   And then going forward a couple more
10 pages, are these prescriptions for the medications?
11   A   Yes.
12   Q   And it indicates, in the top left-hand
13 corner, the provider, and that's your name listed
14 there?
15   A   Yes.
16   Q   Okay. Did the patient -- or did
17 Mr. Maniaci mention that he was thrown through a
18 door?
19   A   I don't remember. I just can go off of
20 what I have written here, so I don't remember.
21   Q   Okay. That's fair enough. Did he mention
22 being thrown to the ground?

Page 51

1    A   I don't know.
2    Q   Okay. Do you think if he had mentioned
3  that he had been thrown head first through a door,
4  that's something you would have written down?
5    A   I mean, I think, maybe, unless -- I'm not
6  sure. I mean, we try and keep it, you know,
7  succinct, but I think, if it was significant enough,
8  I would have written it, but I'm not sure.
9    Q   Now, Mr. Maniaci's report of an episode of
10 dizziness and collapse, let me ask you, could that
11 have been caused by having a TIA or a mini-stroke?
12   A   Sometimes -- it's not one of the likely
13 symptoms, but sometimes, you do get dizziness, and
14 you could have a loss of consciousness.
15       MR. FAY: I would object in the sense
16 that, obviously, it could be any number of causes. I
17 think whether the doctor has an opinion it was caused
18 by such a thing is something different, but.
19       MR. JONES: Well, she's not giving an
20 expert opinion, this is just from her treatment, so
21 I'm just asking her about her treatment.
22       MR. FAY: Well, yeah, but that's not

Page 52

1  asking about the treatment. If you ask whether
2  something could be caused by, you know, it's totally
3  speculative.
4        MR. JONES: Well, she's not speculating,
5  but your objection is noted.
6        MR. FAY: What do you mean, "she's not
7  speculating"?
8  BY MR. JONES:
9    Q   You indicated here --
10       MR. FAY: Your question was could it be,
11 it's not a question of -- that's obvious speculation.
12       MR. JONES: No, it's not, but I'm just
13 going to move forward.
14       MR. FAY: If you think not, fine. Go
15 ahead.
16 BY MR. JONES:
17   Q   Under medications, one of the medications
18 you noted he was on was morphine?
19   A   Yes.
20   Q   Okay. Can morphine cause dizziness in
21 patients?
22   A   Yes, it can cause lightheadedness.

Page 53

1    Q   What about Vicodin, can that cause
2  lightheadedness?
3    A   Yes.
4    Q   Trazodone, can that cause
5  light-headedness?
6    A   It's a -- I think it's used for sleep, so
7  I have to assume it could cause lightheadedness, but
8  I'm not 100 percent sure.
9    Q   If someone has congestive heart failure,
10 can that cause light-headedness or dizziness?
11   A   Yes.
12   Q   Now, anywhere on this emergency room
13 record, did you note that Mr. Maniaci had suffered
14 any bruising?
15   A   Not on my exam at all.
16   Q   Do you recall whether he mentioned, you
17 know, pain anywhere else, other than his right ankle?
18   A   I can't recall, so I could just go off of
19 what I wrote down.
20   Q   Do you recall observing any bruising on
21 Mr. Maniaci's body?
22   A   I don't remember seeing the patient, so I

14 (Pages 50 to 53)

Case 1:06-cv-01625-LFO   Document 39-64   Filed 01/14/2008   Page 12 of 12

June 28, 2007   Dr. Suzanne Gillern   Maniaci v. Georgetown
Washington, D.C.

Page 54

1  didn't write it in my physical, so I can't say I did.
2      Q  If there was some bruising, would you have
3  recorded that?
4      A  I mean, usually, we note if they have
5  bruises anywhere.
6      Q  Let me show you a series of photographs
7  which have been previously marked as Exhibit 23-A
8  through H. And we'll just look at these --
9          MR. FAY:  Those aren't very clear.
10 BY MR. JONES:
11     Q  -- one at a time.
12         MR. FAY:  Those aren't very clear. Here's
13 some clearer ones.
14         MR. JONES:  Okay. Well, why don't we mark
15 those --
16         MR. FAY:  Why don't we mark those -- just
17 mark them in order, starting with the one on top.
18         MR. JONES:  Well, I was just going to show
19 her the ones of the injuries. Can we mark these as
20 81 --
21         MR. FAY:  You might as well mark all of
22 them now because I want to ask some questions in this

Page 55

1  order. Just mark that one on top and then the
2  others.
3          (Deposition Exhibit Numbers 81-A to 81-G
4  were marked for identification.)
5  BY MR. JONES:
6      Q  Okay. Dr. Gillern, I'm handing you a
7  series of photographs marked as Exhibit 81-A through
8  81-G, and we'll just look at these one at a time,
9  starting with Exhibit 81-A. Do you recall observing
10 any bruising like this to Mr. Maniaci's -- well,
11 let's -- first of all, let me ask you, do you see any
12 bruising in this picture on the knee?
13     A  Yes.
14     Q  Okay. And did you observe any injury like
15 this to Mr. Maniaci during the time that you treated
16 him?
17     A  I don't remember seeing Mr. Maniaci, so I
18 can't really say. All I could go off of is I didn't
19 mark seeing any bruises on my note, but that's -- I
20 don't -- so I can't say. I don't remember seeing
21 him, so --
22     Q  Okay.

Page 56

1      A  Sorry.
2      Q  And do you recall whether he complained of
3  any injuries to his knee?
4      A  I don't remember.
5      Q  If we could go to the next one, and is
6  that 81-B?
7      A  Yes.
8      Q  And did you notice any bruising to
9  Mr. Maniaci's torso during the time that you treated
10 him?
11     A  I didn't document it, so I can't say -- I
12 don't remember seeing any, but I can only go off of
13 what I documented, so that's all.
14     Q  And in this picture, 81-B, do you see a
15 bruise to this person's, I guess, right torso?
16     A  Yes.
17     Q  Or how would you describe this part of the
18 body where that bruise is?
19     A  Yeah, it's like the flank, upper flank
20 side of the chest.
21     Q  And if you observed an injury like that,
22 would you have written it down in the record?

Page 57

1      A  I mean usually, I can't say 100 percent I
2  would, you know, I would think I would have, but I
3  don't know.
4      Q  Okay. And do you recall Mr. Maniaci
5  complaining of any pain or injury to his right flank?
6      A  I don't recall.
7      Q  If he was complaining of that, would you
8  have noted that in your record?
9      A  Usually, I write where they're complaining
10 of pain.
11     Q  If you go to the next picture, 81-C.
12     A  Yes.
13     Q  In this -- well, do you see some type of
14 mark on this person's arm?
15     A  Yes.
16     Q  Okay. And does that look like a bruise
17 or --
18     A  Yes.
19     Q  Okay. And did you notice any bruising to
20 Mr. Maniaci's right arm, where this bruise is, during
21 the time you treated him?
22     A  I guess I don't remember seeing him, so I