# EXHIBIT 59

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| WILLIAM MANIACI | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Docket No. 06 CV 01625 |
| | ) | |
| GEORGETOWN UNIVERSITY, et al. | ) | Judge Kollar-Kotelly |
| | ) | |
| Defendants. | ) | |

## AFFIDAVIT OF CHARLES J. KEY, SR.

I, Charles J. Key, Sr., make the following statements under the penalty of perjury:

1.

I am over the age of eighteen and have personal knowledge of the matters contained herein.

2.

I am the retired Commanding Officer of the Firearms Training Unit of the Baltimore, Maryland Police Department, a position which I held for ten years. I have evaluated uses of force for over thirty years. I was a supervisor in the Baltimore Police Department for over twenty-one years. In that role I sat as a member of various tribunals in numerous Administrative Hearings;

1

investigated dozens of uses of less than lethal force; assisted the Internal Investigation Division in evaluating/investigating hundreds of police involved shootings; and assisted in writing the Departmental General Order governing the use of force.

During my career with the Baltimore Police Department, I acquired substantial experience and developed significant expertise in the area of law enforcement officer supervision and training. As part of my duties, I developed and evaluated numerous operational guidelines and officer training programs, both for the department and for other law enforcement agencies. I personally authored the draft of the regulations regarding firearms training for law enforcement officers within the State of Maryland. Additionally, I developed and wrote, or assisted in writing, literally hundreds of other operational protocols, supervisory memoranda, and training related documents, including, but not limited to: the general order pertaining to the resolution of sniper/hostage/barricade situations; the general order pertaining to police officer use of force; the special weapons and tactics team's (hereinafter SWAT) training program, operational protocols, and selection standards and protocol; numerous other training guidelines, policy directives, and officer training lesson plans.

My involvement with police officer training took place on several different levels. While assigned to the Tactical Section, I was responsible for the selection, training, and operational performance of SWAT personnel. After being assigned as the Commanding Officer of the Firearms Training Unit, I was personally responsible for the training of several thousand police officers in issues including proper use of force, officer survival techniques and firearms use. I also developed and conducted numerous instructor-level courses in which police instructors were themselves taught how to develop and implement effective training programs.

2

My experience and training as a supervisor with the Baltimore Police Department also allowed me to develop broad expertise in basic law enforcement techniques as well as in the supervision and direction of individual police officers. During the course of my career with the Department, I directly supervised and/or managed hundreds of individual police officers. In my various supervisory capacities, including Quick Response Team (SWAT) Supervisor and Primary Instructor, District Shift Commander and District Operations Commander, I supervised the resolution of thousands of emergency or crisis situations, including demonstrations and crowd control events, and investigated, or supervised the investigation of, well over a thousand successfully-prosecuted violent felonies.

As a result of this experience and training in law enforcement, I gained extensive personal familiarity with the proper methods of police officer training as well as with the proper methods of implementing policies and procedures to direct and guide individual officers in the effective performance of their duties.

3.

I am currently employed as an independent consultant and expert witness in police misconduct litigation. In this capacity, I have reviewed numerous cases involving alleged police misconduct, for both plaintiffs' and defendants' counsel. In such cases I have evaluated various factors in order to determine if the conduct of the law enforcement personnel and/or agencies involved in the case violated legal, ethical and/or constitutional standards of conduct. Those factors include, but are not limited to: the conduct of individual law enforcement officers, the adequacy of the training and supervision received by such officers, and the adequacy and appropriateness of police department policies and procedures.

4.

I have previously been held qualified as an expert witness as to police officer use of force in thirty-four (34) courts (thirty-one [31] state courts and three [3] federal courts); police training in thirty-nine (39) courts (thirty-four [34] state courts and five [5] federal courts); defensive skills in eighteen (18) courts (fifteen [15] state courts and three [3] federal courts); and have been held qualified as an expert as to police policies and procedures in thirty-six (36) courts (thirty [31] state courts and five [5] federal courts). My relevant training, experience, educational background, and history of court qualifications and depositions are set forth in more detail in the résumé/Curriculum Vitae attached to this Affidavit as 'Exhibit A.'

5.

I have been retained by Defendants to render an expert opinion concerning the following specific issue: As to whether or not the conduct of Georgetown University Security Officers in the removal of Mr. William Maniaci from a meeting hall on the Georgetown University Campus was objectively reasonable and consistent with accepted standards of police practices, policies, and training.

6.

In reaching my conclusions and opinions as to these issues, I have relied upon my extensive personal experience and training in the field of law enforcement, which I have developed as a law enforcement officer, administrator, trainer, and as an expert witness and consultant in police-related matters. I have also reviewed various documents and materials in forming my opinions in this specific case including, but not limited to: 1) Video of PSM by

4

Quest Productions (CD G 0007-0008); 2) Deposition of William Maniaci; 3) Photographs from Plaintiff Maniaci; 4) Video by *Al Arabiya Georgetown* (CD G 0009); 5) Report by Officer Larry Salley (GTN 001722); 6) Report by Officer Roy Eddy (GTN 001723-5); 7) Civil Complaint; 8) Transcript of Recording of a Portion of PSM Panel Video; 9) Section 22-3302, Title 22, Subtitle I, Chapter 33, Lexis District of Columbia Code, 2001 Edition.

7.

## INCIDENT SYNOPSIS[1]

According to the Civil Complaint, Plaintiff Maniaci entered the main campus of Georgetown University on February 18, 2006 to attend the Palestinian Solidarity Conference as a registered participant. During the proceedings, he asked a question regarding whether the panelist approved or disapproved of the use of suicide bombers to murder Israeli citizens. Mr. Maniaci alleged that the panelist avoided answering the question and that the faculty staff adviser pointed to the next person for the next question. Mr. Maniaci protested that his question had not been answered. Defendant Todd Olson, Vice President for Student Affairs, attempted to move on with other questions, but Mr. Maniaci repeated his statement that his question had not been answered. Mr. Maniaci was told three times that he was being disruptive and Mr. Olson directed

---

[1] Synopsis taken from Plaintiff's Civil Complaint, his deposition, the reports of Officers Eddy and Salley, and the two videos depicting Mr. Maniaci's removal from the hall.

5

the Georgetown Public Safety Officers to escort Mr. Maniaci from the auditorium.[2]

---

[2] Number of times Mr. Maniaci was told that he was being disruptive or was interrupting was taken from Transcript of Recording of a Portion of PSM Panel Video and Video of PSM by Quest Productions.

According to the videos, Public Safety Officers Roy Eddy and Larry Salley approached Mr. Maniaci and requested that he leave and/or come with them. Mr. Maniaci asked them if he were being arrested. According to the officers, he refused.[3] Plaintiff was then lifted from his seat by the officers. Officer Salley held him under his right arm and Officer Eddy held him under his left arm. Once he was in the aisle, he went limp and slumped toward the floor. He was stood upright and carried backwards through the exit door. The door was opened prior to Officer Salley's reaching it. Officer Salley was in front. Mr. Maniaci was between Officers Salley and Eddy. During the event, Mr. Maniaci neither lost control of his cane nor his folder of papers. After Mr. Maniaci was removed from the auditorium, Officer Eddy is shown on the video tape reappearing in the doorway three seconds later. Officer Salley is shown seven seconds later returning to the auditorium.

In his Civil Complaint Mr. Maniaci reported that his head hit the aisle floor and other objects as he was being dragged out of the auditorium. Further, he alleges that his head hit the concrete floor when he was thrown through the door of the auditorium. His complaint alleges that, after he was ejected from the auditorium, he was allowed to use a restroom in another building, but that an officer kept the door open and watched him as he was urinating.

8.

## OPINIONS

After careful consideration of the facts in this case, I have reached an opinion in my

---

[3]Reports from Officers Eddy and Salley

capacity as an expert as to whether the actions of Officers Eddy and Salley were objectively reasonable and consistent with standard police policies, procedures and training. In particular, and as set forth in more detail below, it is my opinion that the actions of the officers in this case were objectively reasonable and consistent with accepted standards of police practices, policies, and training.

9.

**BASIS OF OPINION**

The videos reveal that Mr. Maniaci was told on three occasions that he was being disruptive. Despite this, he continued to shout out his allegation that his question had not been answered by the panel. The officers were told to escort him out by an individual whom the officers recognized as an official of Georgetown University, Mr. Todd Olson. Mr. Maniaci admits that he heard those statements. Further, one of the videos shows Officer Eddy talking to Mr. Maniaci, and Mr. Maniaci is recorded in the video asking the officer if he is being arrested. Additionally, the officers reported in their written statements that Mr. Maniaci refused to leave. These events would lead a reasonable officer to conclude that Mr. Maniaci was put on notice that he was no longer legally permitted to be on the premises;[4] thus, reasonable officers possessing this information would believe that they could use necessary force to remove him.

Further, Mr. Maniaci had to be removed quickly. The potential for a violent

---

[4] See Section 22-3302, Title 22, Subtitle I, Chapter 33, Lexis District of Columbia Code, 2001 Edition.

8

confrontation would have escalated if he were allowed to remain. Security was on heightened alert because of information the University had received regarding the potential for disruptive behavior. The potential for conflict between pro-Israeli and pro-Palestinian elements has been well documented for fifty plus years. The officers had no way of knowing whether Mr. Maniaci's conduct was the beginning of a larger effort by disruptive elements to instigate conflict. Additionally, Mr. Maniaci was armed with a cane, which, in the hands of a skilled person, can be a lethal weapon. Even an unskilled person can inflict serious injuries with a cane. Since the officers did not know Mr. Maniaci or his intentions, his immediate removal was objectively reasonable and necessary.

In his deposition[5] Mr. Maniaci correctly relates some of the types of force which may be used by officers in removing someone who is passively resisting. By refusing to get up and leave with the officers, Mr. Maniaci was passively resisting. Further, Mr. Maniaci was also passively resisting by going limp once he had been lifted from his seat. According to his testimony, pain compliance techniques can be utilized. Pain compliance techniques include: pressure point control stimulation, joint manipulation, and pepper spray. All of these may be used to force a passively resisting person from an area in which he/she is no longer legally permitted to be.

This was the circumstance which confronted Officers Salley and Eddy. They opted to carry Mr. Maniaci out of the hall rather than use the types of force that officers are trained to use in such circumstances. Officers are trained to use pain compliance techniques rather than carry

---

[5]Maniaci Deposition, Pages 64 - 70.

someone, because carrying an individual has the potential for causing back, joint, muscle, and ligament injuries to the officers. Humans don't have handles, and the dead weight of an adult who has gone limp presents unique challenges. Plaintiff's photographs of his injuries are the types of bruises that are to be expected when a person has to be carried out. As stated above, humans don't have handles. When an officer is forced to carry someone, he/she must grab clothing. That means, occasionally, the skin of the person being carried will also be grabbed. The bruise depicted under the right arm of Mr. Maniaci is typical of being grabbed at that location. It should be noted that such bruising is, also, quite prevalent on officers who undergo crowd control and defensive skills training.

Had the officers used pain compliance techniques on Mr. Maniaci the results might have been more severe for him than mere bruising. Depending on the age, health, and level of resistance of an individual, pain compliance techniques can result in strained and/or torn ligaments, muscles, and, rarely, broken bones. By opting to carry Mr. Maniaci, the officers jeopardized their own health and chose a less painful and injurious methodology for removing him from the hall.

Mr. Maniaci complains of his having been struck/kneed after he was violently jerked from his seat. His civil complaint also alleges: he was thrown onto the aisle floor; dragged down the aisle; his head and limbs were banged into objects as he was being dragged; and that he was lifted off the floor and thrown through the doors onto a concrete floor. The videos of this event do not support these allegations. Mr. Maniaci is shown throughout the videos, as are the officers. At no time was Mr. Maniaci's head viewed below the waists of the officers. As they

carried Plaintiff through the doors, Officer Salley was between Mr. Maniaci's body and the doors. The doors are opened prior to their going through them and Mr. Maniaci is being carried, not thrown. Additionally, the photographs provided by Plaintiff do not show any injuries to his head. In my experience in handling hundreds of assault cases as a police officer, my review of hundreds of uses of force as a police supervisor and consultant, and my training in defensive skills, advanced first aid, and blunt trauma injuries, I don't recall a single incident in which a human head came forcefully into contact with concrete or other hard objects that did not result in, at least, a visible abrasion. No injuries to Mr. Maniaci's head were documented by Plaintiff's photographs.

After being carried out of the auditorium, Mr. Maniaci alleged that an officer watched him as he urinated in the bathroom of another building. Mr. Maniaci's conduct had already established that he was potentially disruptive to the orderly operation of a Georgetown University event. As a consequence, he had been told to leave University property. A reasonably trained officer would have been derelict in his/her duties if Mr. Maniaci were not observed until he left the property. The courtesy extended to Mr. Maniaci in allowing him to use the restroom did not obviate the need to keep him under observation.

10.

I reserve the right to amend my opinions as expressed in this report when or if further facts, materials, reports, and/or any other evidence is submitted/presented for my review.

11.

I have published no articles in the last ten years.

12.

I am being compensated at the rate of $200.00/hour for consultation and review, and $275.00/hour for appearing in court, deposition, and/or submitting an expert report/affidavit. A minimum payment for four hours is required for appearing in court, deposition, and/or submitting an expert report/affidavit.

I declare under the penalty of perjury that the foregoing is true and correct.

| May 25, 2007 | _[signature]_ |
|---|---|
| DATE | CHARLES J. KEY |