## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**WILLIAM MANIACI,**

    **Plaintiffs,**

    **v.**

                           **Civil Action No.: 1:06cv01625**

**GEORGETOWN UNIVERSITY, et al.,**                    **(CKK/JMF)**

    **Defendants.**


## PLAINTIFF, WILLIAM MANIACI, MEMORANDUM IN OPPOSITION TO DEFENDANTS, GEORGETOWN UNIVERSITY, ET AL., MOTION FOR SUMMARY JUDGMENT

The Plaintiff, William Maniaci, respectfully requests that the court deny the Defendant's Motion for Summary Judgment. Georgetown University, et al., is not entitled to summary judgment, pursuant to Federal Rules of Civil Procedure, Rule 56, because there are genuine issues of material facts.

**I.      FACTS**

A.      On Saturday, February 18, 2006 at 10:00 a.m. William Maniaci, a sixty four year old man properly attired in a business suit and hat and walking with a cane, entered the Georgetown University campus through the main pedestrian entrance, and proceeded to the ground floor of a large building where he registered for the Palestinian Solidarity Conference.

B.      At the registration desk, Mr. Maniaci provided his name, biographical information, identification, and paid the ten dollar fee charged by

Georgetown University as a condition of registration as a participant in the Palestinian Solidarity Conference in cash. He was given a badge, which he pinned on his left lapel, and a document entitled "Speech and Expression at Georgetown University" explaining the rights to which he was entitled in accordance with the license to participate in the Palestinian Solidarity Conference which he had just purchased.

C.    The "Speech and Expression at Georgetown University" document provided as "Limitations" on "free speech and expression" only a ban on "unlawful activity, actions that endanger or imminently threaten others, or activities that disrupt or obstruct the functions of the University."

D.    Mr. Maniaci then proceeded through the screening area and took the elevator to the third floor and entered Gaston Hall. This event was to be a presentation by four panelists regarding divestment by Georgetown University of investments connected in some manner with Israel. It was advertised as open to the public.

E.    The event started at approximately 11:15 a.m. The presentations lasted for thirty to forty minutes, after which the panel took questions from the audience, which they called the question and answer period.

F.    At this time, Mr. Maniaci stood up, as fourth in line, in front of the microphone to ask a question.

G.    Mr. Maniaci waited his turn and then asked his question. Mr. Maniaci asked the panel: "My name is Bill Maniaci and I have one question for

you and it's a policy question- ah- I'd like to know your position on

suicide bombing, if you would renounce suicide bombing, and the

murder of innocent Israeli women and children, as a viable venue for

you to accomplish your goals and given that that is terrorism, and no

one can deny blowing themselves up on a bus and killings innocents is

not terrorism...(interrupted by moderator)...I would like to answer

either affirmative or negative whether you do support terrorism or not."

Quoted exactly from the recordings provided.

H.    The panelists avoided answering the question and the faculty staff

advisor pointed for the next question.

I.    Finally, one of the speakers, Sue Blackwell, addresses Maniaci's

question by stating: "I would like to address the question on suicide

bombings, I hope you don't get this answer repeated twenty different

ways because that happens sometimes at meetings. I am speaking on

behalf of myself when I'm saying this. I'm not speaking on behalf of

any organization. Okay. My personal view, if other people want to give

their personal views that's up to them. Umm. I've gone on the record

about this many times and I unreservatively condemn all acts of

terrorism, not all violence because I'm not a passivist, I believe in self

defense. I unreservatively condemn all act of terrorism by which I

mean acts or threats of violence against unarmed civilians for political

ends and that applies… (applause)… that applies to suicide bombers in

pizza parlors in Israel. It also applies to F-16's dropped… ah… fired on

civilians in Gaza. So I condemn equally and unreservatively the terrorism of groups like Hamas and Islamic Jihad when they targeted civilians. I also unreservatively condemn the state terrorism of Tony Blair, Ariel Shalom, and George Bush, all of whom, each of whom, has more blood on his two hands alone than whole of Hamas and Islamic Jihad together."

J.      The Moderator, Will Youmans, then stated "Thank You. We only have time for one more round of three questions."

K.      At such time, Mr. Maniaci raised his hand and said: "Excuse me, but you did not answer the question. I asked for a policy statement from you and you haven't answered my question."

L.      The Moderator then stated "Thank You but your disrupting, we can talk about this afterwards." Todd Olson then stated "You've asked your question and your opportunity has ended."

M.      At such time the moderator asked for the next question and Maniaci stated "You haven't answered my question." The moderator the states "I'm sorry sir please don't interrupt you already asked your question."

N.      Mr. Maniaci stated "But you didn't answer my question." The moderator responds with "She did, she addressed your question." Maniaci responded with "I asked for your policy statement and she gave a …" The moderator interrupts with "there is no policy".

O.      Mr. Olson then states "you don't have the opportunity to speak any longer. I'd like to ask our staff to escort this gentleman from this room,

he is creating a significant disruption."

P.      The moderator moves on to the next person to ask a question.

Q.      Officers Eddy and Salley approached the aisle next to Maniaci's seat from the back of the room.

R.      There is absolutely no possible way of interpreting exactly what the Officer and Maniaci state to one another on the video recording. There is a person asking a question and the moderator talking at the same time.

S.      The two campus police officers violently grabbed Mr. Maniaci and jerked him from his seat. He did not resist at all.

T.      As the officers pulled at Mr. Maniaci, he felt a blow to his right side, taking his breath away and causing him to gasp for air.

U.      He was thrown onto the aisle floor and dragged down the aisle. His limbs and head bumping into objects while being dragged. Mr. Maniaci was then lifted off the floor, thrown through the doors into the hallway on the concrete floor. Mr. Maniaci again hit his head as he hit the floor and bent his cane. (Man. Dep. Pg. 268:17-269:11) Maniaci was not placed gently on the floor. (Man. Dep. Pg 269:13)

V.      Maniaci did not have the chance to cooperate or to resist. (Man. Dep. Pg. 266:16-19) Maniaci did not know they were going to attempt to remove him from the auditorium. (Man. Dep. Pg 267:1-2)

W.      Mr. Maniaci could not get up off the floor and he saw the room spinning. (Man. Dep. Pg 270:4-6) After waiting several minutes, Mr.

Maniaci tried to get up, but lost his balance and started to fall when Robert Turk and Matt Finberg helped him up.(Man. Dep. Pg 270:8-9 and pg. 289:10-11) When Mr. Maniaci looked around there was a crowd around him taking pictures. A University official tried to block the cameras. At this time none of the Georgetown University faculty, officials or campus police helped him. A University official approached Maniaci. Maniaci stating that he was leaving, he took the elevator downstairs, while his friend, Bob Turk helped him walk. (Man. Dep. 290:3-7) "We walked out front. And we paused outside and – where I could catch my breath. It was Bob Turk and myself. Nobody else. And then we decided that we would walk to the other building where we had tables rented, because I wanted to get something to eat, and I was feeling uneasy. And I wanted to be able to sit down and rest and go to the bathroom as well." (Man. Dep. Pg 290:8-16, rephrased again at pg 294:5-15)

X.      Maniaci's bruises are documented by pictures in Exhibit # , by his deposition, and by the medical records and deposition of Dr. Gillern. Maniaci's cane had been bent during the altercation. (Maniaci Dep. Pg. 35:16-21) Maniaci did not feel as though he violated any of Georgetown University's policies. (Ex.#14, pg. 167:5-7) Maniaci was under the impression that the question and answer period included "dialogue", a free exchange of ideas, and conversation between individuals. (Ex. #14. pg. 170:7-10, pg.170:17-18, pg. 173:4-10, pg.

173:16-19)

Y.     Mr. Maniaci and Robert Turk then approached the Inter-Cultural

Center where vendor tables had been set up. In the foyer Mr. Maniaci

was pushed against a glass window by one of the same officers that

removed him from the auditorium. (Man. Dep. Pg 296:6-10 and pg

298:10-15) Mr. Maniaci asked if he was being arrested, in which they

responded with "no." (Man. Dep. Pg 298:17-18) Mr. Maniaci was

blocked and was told not to go anywhere. (Man. Dep. Pg 298:20-299:4)

At that time Mr. Maniaci told the officers that he was not feeling well,

he needed to rest, and he needed to go to the restroom. Mr. Maniaci

informed the officers that he has a medical condition, in which he uses

the restroom often. (Man. Dep. Pg 299:4-7)  Mr. Maniaci continued to

ask to use the restroom. After much time had passed, an officer agreed

to allow Mr. Maniaci to go to the bathroom. But the officer kept the

door to the bathroom (which was single enclosed room) wide open and

watched Mr. Maniaci urinate.(Man. Dep. Pg 299:8-13)

Z.     Maniaci was escorted back to the foyer area of the ICC Building. (Man.

Dep. Pg 301:21-22) Then the chief of campus police, identified as

David F. Morrell, Vice President for Campus Safety, approached Mr.

Maniaci and told him that he was being barred from the conference.

Matt Feinberg (who was with Mr. Maniaci) asked to speak to the

University Provost, but his request was denied. (Man. Dep. Pg 302:2-5)

Robert Turk and Matt Feinberg were still helping Mr. Maniaci to stand

and get around. Mr. Maniaci was then approached by an officer from the D.C. Metropolitan Police Department in the foyer of the Inter-Cultural Center. The officer had been called by the University to escort Mr. Maniaci off of the campus. (Man. Dep. Pg 302:6-11)

AA.    The next morning, Sunday, February 19, 2006, Mr. Maniaci blacked out on the street. (Man. Dep. Pg 306:18-21 and 308:11-13) At that time Maniaci went back to his hotel and sat down. (Man. Dep. Pg 307:10-11) That night his friend, Bob Turk, took him to Walter Reed Army Medical Center, where he was told he had suffered a concussion, sprain of the right ankle, contusions to the right abdomen, right upper arm, right wrist, and abrasions to the legs. (Man. Dep. Pg 317:3-12 and pg 324:8-10)

## II. Introduction

Although the Defendants assert to the contrary, the Plaintiff, William Maniaci, attended the Palestinian Solidarity Conference for the exact purpose in which Georgetown University states that it held the conference. William Maniaci attended the conference to protest, to state his dissenting views of the conference in a non-violent, respectful manner. Georgetown University states in their speech and expression policy that they encourage a free flow of ideas no matter how controversial. William Maniaci had no plan to disrupt, only to express his opposing views. William Maniaci never acted in an illegal, violent, disrespectful manner. William Maniaci did interrupt the question and answer period of a particular part of the conference, not to protest, but because the panel and the organization did not answer his question.

The fact is that Georgetown University singled out William Maniaci and others that seemed to be near him because they simply did not want him at the conference. Security had already decided to keep close attention to William Maniaci and the persons with him. The Georgetown University staff had already made the decision to remove William Maniaci from the conference before he asked a question, with absolutely no provocation. If Georgetown University actually believe in the "free expression of ideas" this lawsuit would never had been filed because Georgetown would have welcomed Mr. Maniaci's opinions and he would not have been attacked.

Georgetown claims that the speech and expression policy permits and invites individuals to address the community, regardless of the content of their speech. But any activity that disrupts or obstructs the functions of the University is not permissible under the policy. "Making it impossible for others to speak or be heard or seen, or in any way obstructing the free exchange of ideas, is an attack on the core principles the University lives by and may not be tolerated." Protest is affirmatively allowed as long as the right of free speech is not violated. Maniaci read, understood and then distributed this policy to all other members of the JDL, who planned to attend the conference. Maniaci attended the conference with full understanding and intent not to violate this policy. Maniaci had written and spoke to Georgetown University staff before the conference to inform them of the JDL's attendance and to receive all relevant materials that they should be aware of before attending the conference. As a matter of fact, University staff called Maniaci, in his hotel room, the day before the conference.  Maniaci was targeted by Georgetown security immediately after being admitted to the conference. Georgetown University was not following their own speech and expression policy in that they did not allow opposing

views and stopped the free exchange of ideas.

There are two relevant facts that are definitely disputed, William Maniaci was never asked to leave the conference until MPD arrived at the scene (so he could not have refused to leave, as Defendants claim), and William Maniaci never resisted. Those are two extremely important facts which should be decided by a jury.

The Defendant repeated points to the videos of the first exchange in the Gaston Building, in which William Maniaci asked his question. This video is very important and the Plaintiff encourages the court, and a jury to view these videos. These videos do not clear show that Maniaci was asked to leave the conference, nor that Maniaci resisted at any time.

William Maniaci claims that he repeatedly stated that the panelist "did not answer my question", because they did not answer his question. He claims that Georgetown staff asked that he be escorted after being warned one time by Todd Olson. The Georgetown policy states that persons interrupted would be asked to leave after being given two warnings. William Maniaci claims that when security came to the area where he was sitting, they did not ask him to leave, they simply stood near him and after a lady, Dr. Jeanne Lord instructed security to remove him, and he was suddenly jerked from his seat and felt a blow to his side, which took his breath away. Maniaci was not resisting, he was in pain. When he attempting to stand, security simply dragged him to the door, picked him up as they went through the doors and dropped him on the floor in the hallway. William Maniaci was in fact injured, he did in fact have bruises on his side, hands, knees, and head. See Exhibit #

## II.    Summary Judgment.

Summary judgment is only appropriate when a party is unable to show a genuine issue of material fact on which that party will bear the burden of proof at trial, so long as judgment against that party is appropriate as a matter of law. *Beard v. Banks,* 126 S.Ct. 2572 (2006), *Department of Commerce v. U.S. House of Representatives*, 525 U.S. 316 (1999), *Nebraska v. Wyoming*, 507 U.S. 584 (1993), *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) The Supreme Court has emphasized that summary judgment is not to be viewed as a disfavored technical shortcut, but rather as an integral component of the Federal Rules. *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986).

"A material fact is one that 'might affect the outcome of the suit under the governing law.'" *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Canderm Pharmacal, Ltd. v. Elder Pharms., Inc.,* 862 F.2d 597, 601 (6th Cir. 1988) (quoting Fed. R. Civ. P. 56(c)).

In order to defeat the motion for summary judgment, the nonmoving party must present probative evidence that supports the complaint. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-50, 106 S. Ct. 2505, 2510-11, 91 L. Ed. 2d 202 (1986). The non-moving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor. *Liberty Lobby,* 477 U.S. at 255, 106 S. Ct. at 2513. The court determines whether the evidence requires submission to a jury or whether one party must

prevail as a matter of law because the issue is so one-sided. *Liberty Lobby,* 477 U.S. at

251-52, 106 S. Ct. at 2512.

"Although a court should draw all inferences from the supporting records

submitted by the nonmoving party, the mere existence of a factual dispute, by itself, is

not sufficient to bar summary judgment." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 248, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986). "To be material, the factual assertion

must be capable of affecting the substantive outcome of the litigation; to be genuine, the

issue must be supported by sufficient admissible evidence that a reasonable trier-of-fact

could find for the nonmoving party." *Laningham v. U.S. Navy,* 259 U.S. App. D.C. 115,

813 F.2d 1236, 1242-43 (D.C. Cir. 1987); *Liberty Lobby*, 477 U.S. at 251, 106 S. Ct.

2505

### III.    Defendant Is Not Entitled to Summary Judgment on Count III (42 U.S.C. § 1983).

To state claim for relief in action under 42 USCS § 1983, plaintiffs must establish

that (1) they were deprived of right secured by Constitution or laws of United States, and

(2) alleged deprivation was committed under color of state law. American Mfrs. Mut. Ins.

Co. v Sullivan (1999) 526 US 40, 143 L Ed 2d 130, 119 S Ct 977, 99 CDOS 1577, 99

In Count III of the Plaintiff's Amended Complaint the Plaintiff claims as follows:

"The Georgetown University Public Safety Officers, including Officers Roy Eddy and
Larry Salley, committed a violation of  42 U.S.C. § 1983, in that, under the color of the
laws of the District of Columbia (D.C. Code § 5-129.02), the Georgetown University
Safety Officers deprived Mr. Maniaci of his First Amendment rights to freedom of
speech in a public forum, freedom of association, freedom from physical harm and
freedom from arrest except upon probable cause, in the following particulars:
    (a)  Accosting William Maniaci;
    (b)  Assaulting William Maniaci;

(c)  Falsely arresting by deprivation of freedom to move or leave, William Maniaci;

(d)  Preventing William Maniaci from using the restroom;

(c)  Preventing William Maniaci from participating in the Palestinian Conference, for which he had registered and paid a fee;

(d)  Conducting forceful actions and excessive force towards William Maniaci;

(e)  Failing to act and stop the Officers from applying excessive force towards William Maniaci;

(g)  Harassing, humiliating and embarrassing William Maniaci in the presence of his peers;

(h)  Defendant, Todd Olson, Vice President of Georgetown University, acting in his official capacity, as a policymaker, but not limited to only policymaker, including authority over officers of the Georgetown University Police Department, instructed Defendants Officers Eddy and Salley to physically remove William Maniaci to prevent him from speaking in the exercise of his free speech rights for which he had paid an admission fee, notwithstanding his admission that Mr. Maniaci did nothing unlawful;

(i)  Defendant, David Morrell, Vice President of Georgetown University for Public Safety, acting in his official capacity, as a policymaker, but not limited to only policymaker, including supervision of the Georgetown University Police Department, was requested by bystanders to stop the actions of Defendants Eddy and Salley but would not do so and permitted the officers to place hands upon William Maniaci and drag him from the Healy Building, notwithstanding Mr. Morrell's admission that Mr. Maniaci did not act in an unlawful manner at any time.

(j)  Defendant, Darryl K. Harrison, Director of Public Safety of Georgetown University, functioning as the police chief of the Georgetown University Police Department, as a policymaker, but not limited to only policymaker, notwithstanding the Plaintiff's purchase of a license to exercise his free speech rights, directed and participated in preventing Mr. Maniaci from staying on the Georgetown University Campus and exercising those rights.

(k)  Defendant, Georgetown University, functioning as the institution or municipality, in implementing policy that tolerated and permitted a practice of unjustified, unreasonable, and unlawful harassment and deprivation of liberty without due process of the law.

(19) As a direct and proximate consequence of the reckless and excessive conduct of the Defendant Georgetown University's employees and/or agents, including Officers Roy Eddy and  Larry Salley, which is implied by law to the Defendants, Georgetown University, David F. Morrell, Darryl K. Harrison, and Todd Olson, the William Maniaci suffered physical injuries, including damage to concussion, sprain of the right ankle, contusions to the right abdomen, right upper arm, right wrist, and abrasions to the legs and which have been accompanied by great pain and suffering, fear, humiliation and embarrassment, and deprivation of his rights pursuant to United States law and the Plaintiff has sustained damages in the amount of one million dollars."

### A. Plaintiff's First Amendment Claim.

Defendant is correct in asserting that, as a general matter, there is no First Amendment right to picket or protest on private property. Defendant quotes *Hudgens v. Nat'l Labor Relations Bd.,* 424 U.S. 507, 521 (1976), *Lloyd Corp. v. Tanner*, 407 U.S. 551 (1972), and *Nat'l Org. for Women v. Operation Rescue*, 37 F.3d 646 (D.C. Cir. 1994). The problem with this argument is that this general rule and the cases to support do not apply to this situation, in that the conference being held at Georgetown was "open to the public", and Maniaci was allowed to protest and enter the premises. Maniaci registered to come to the conference, had called and written to university officials and staff concerning his attendance, paid the required fee thus purchasing a license to enter and participate and was given the impression at every point that this conference was "open to the public". The Plaintiff is not claiming an absolute right to enter private property, to wit, the campus. In brief he purchased a contract that was in written form in the materials distributed, which was violated when the special police that Georgetown University employs and were directed to remove him from the conference. When they did so they were acting "under the color of the law".

Further Defendant uses the case of *Gay Rights Coalition of Georgetown Univ. Law Center* v. *Georgetown University*, 536 A.2d 1, asserting that Georgetown is not under any kind of constitutional restriction banning the imposition of content based restrictions on speech. In this situation Georgetown was arguing for their own First Amendment right in not recognizing a gay student organization. Plaintiff finds this

interesting in that Georgetown is not arguing their own First Amendment right and is claiming that they did not remove Maniaci from their campus because of the content of his question. Further, Georgetown stated in their press release states the following:

> Georgetown University is committed to standards promoting speech and expression that foster the maximum exchange of ideas and opinions. All members of the Georgetown University academic community, including students, faculty and administrators, enjoy the right to freedom of speech and expression. This freedom includes the right to express points of view on the widest range of public and private concerns and to engage in the robust expression of ideas. The ability to invite speakers or host events does not imply university endorsement of the speakers or their views.

See Exhibit #

The Court ruled that Georgetown is not under such constitutional restrictions in that particular case, because Georgetown is a private institution. But in this situation, Georgetown allowing protesters of this conference to attend and then directed their special police to remove them at the direction of university officials. The special police were acting "under the color of the law", therefore causing a constitutional violation.

"[W]hen private individuals or groups are endowed by the State with powers or functions governmental in nature, they become agencies or instrumentalities of the State and subject to its constitutional limitations." *Stokes v. Northwestern Memorial Hospital*, 1989 U.S. Dist. LEXIS 8543 (1989); *Evans v. Newton,* 382 U.S. 296, 299 (1966). "State action can arise when a state delegates to a private party a power 'traditionally exclusively reserved to the state.'" *Hinman v. Lincoln Towing Service, Inc.,* 771 F.2d 189, 193 (7th Cir. 1985), *citing Jackson v. Metropolitan Edison Co.,* 419 U.S. 345 (1974).

**B. Reasonable Time, Place, and Manner Restrictions.**

Georgetown alleges that even if Plaintiff had a First Amendment right,

Defendants action in barring him from the conference was a valid enforcement of a reasonable time, place and manner restriction. Defendant claims that university officials excluded Plaintiff, not for the content of speech, but for "shouting at least eight times, disregarding numerous requests to desist from his disruptive behavior." (Quoted directly from Defendants Memorandum in Support of the Motion for Summary Judgment, pg. 19.)

The video recording of the incident fails to indicate that Mr. Maniaci shouted eight times. In fact it displays a quiet, elderly gentleman attempting to speak. Even though this specific part of the event occurred on video and is clearly shown, the Defendants contend that something other than that clearly demonstrated on the recording in fact occurred.

Georgetown University did have a policy as to how to handle interruptions, which states exactly what Todd Olson stated. But the policy calls for two warnings and then if there is an interruption after the two warnings the person is to be asked to leave.

As stated at the start of this seminar and again at the beginning of the question and answer period. There is a question and answer period "during which you may ask questions and *engage in dialogue*." (Facts #) Mr. Maniaci followed all other directions, he did not interrupt any of the speakers or panelist, he asked his question only at the question and answer period, he asked one single question, and he responded by stating that they did not answer his question, which they did not. William Maniaci asked for a policy statement regarding whether they condemn acts of terrorism, his answer was Susan Blackwell's (a panelist/speaker) personal view, she "was not speaking on behalf of any organization". (Facts #) Mr. Maniaci assumed that he was allowed to respond to Ms.

Blackwell, because Mr. Olson stated that they could "*engage in dialogue*".

The Plaintiff also points out that while watching the entire video, the first person to ask a question, who was clearly Jewish, like the Plaintiff, was interrupted twice while asking his question, and when he responded to the panelist/speakers answer to his question with calling her a liar, Mr. Olson asked the staff to escort him from the room, except, the officers did not actually escort him from the room. But the Defendant claims that Mr. Maniaci was not removed because of the content of his speech.

> "The test to be applied when confronted with the conflict between a student exercising his First Amendment rights and the regulations adopted by a university were first enunciated by this court in Burnside. The Supreme Court later adopted the Burnside test in Tinker when it stated that a student may exercise his First Amendment rights:
>
> > . . . if he does so without "materially and substantially (interfering) with the requirements of appropriate discipline in the operation of the school" and without colliding with the rights of others. *Burnside v. Byars*, supra, 363 F.2d at 749. But conduct by the student, in class or out of it, which for any reason whether it stems from time, place, or type of behavior materially disrupts class work or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech. Cf. *Blackwell v. Issaquena County Board of Education*, 363 F.2d 749 (C.A. 5th Cir. 1966).
>
> *Tinker*, supra, 393 U.S. at 513, 89 S. Ct. at 740."
>
> Quoted from *Shamloo v. Mississippi State Bd. of Trustees*, 620 F.2d 516 (5th Cir. 1980)

The Defendant goes on to describe Maniaci's behavior as disruptive and compares this case to *Norse v. City of Santa Cruz,* No. C 02-01479 RMW, 2007 WL 951854 (N.D. Cal. Mar. 28, 2007). But in terms of disruptive behavior the case of *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969), is more similar in that it involves the regulation of speech. The Tinker case

involves 3 teenagers who wore black armbands to school to protest the Vietnam War. The Supreme Court held that the student's actions did not cause a significant interruption in the regular course of education by the institution. There was no threat or act of violence. The "apprehension of disturbance is not enough to overcome the right to freedom of expression." Where there is no proof that the action would "materially and substantially interfere" with the work of the school or impinge upon the rights of other students.

The issue of whether Maniaci caused a significant disruption as to cause him to be barred from the conference, assaulted and battered by the special police is a matter for decision by a trier of fact to decide, in this case, a jury.

## B. Safety Officers Acting Under the Color of the Law.

In the Court's last opinion, the Court ruled that the claim that the Georgetown Public Safety Officers, if commissioned special police under D.C. Code §§ 5-129.02, 23-582(a), were acting under the color of the law by exercising their state-granted authority to arrest.

Defendant cites to the most recent case in the District of Columbia on Special Police, *Limpuangthip v. U.S.,* 932 A.2d 1137 (D.C. 2007). Contrary to the Defendants analyses the Court ruled that the Special Police in the *Limpuangthip* cases were not acting as state actors at the time of the search of a students dormitory simply because they were not enforcing criminal laws and by way of analysis pointed to three factors in deciding there an action was private or public. First, the *Limpuangthip* ruling was due to circumstances in which the special police did not actually do anything, but watch – hardly the case here. Second, an administrative official from George Washington

University, not the District of Columbia licensed special police officers, actually searched and took evidence from the student's room. Finally, the point of the court's discussion in this case was "what is required to create a nexus with the state where the SPO has not made an arrest." There is a further analysis of each of the applicable special officer cases. "For instance, although an arrest took place in *Lucas v. United States,* 411 A.2d 360, 362 (D.C. 1980), we determined whether SPOs were public officers by focusing broadly on whether they were performing their "police" functions." *Limpuangthip v. U.S.,* 932 A.2d 1137 (D.C. 2007)

In *United States v. McDougald,* 350 A.2d 375, 378 (D.C. 1976), the court decided the SPO was acting was acting as a private citizen on behalf of his private employer when he told a witness not to communicate with the defense attorney in a case. In *Alston v. United States,* 518 A.2d 439, 441 (D.C. 1986), the facts rendered the Special Officer an instrument of the state: "(1) the SPOs had made an arrest, (2) one of the SPOs carried the suspect's bag from the place of arrest back to the store, (3) there was "no indication that the private officer searched the bag solely on her own initiative," and (4) the private officer conducted the search "in the presence of at least three SPOs, including her supervisor."" *Limpuangthip v. U.S.,* 932 A.2d 1137 (D.C. 2007) In *Williams v. United States,* 341 U.S. 97, 71 S. Ct. 576, 95 L. Ed. 774 (1951) the court found that the Special Officer was acting under the color of the law when he questioned suspects, beat them, and flashed a badge, all in the presence of a regular police officer. In *Griffin v. Maryland,* 378 U.S. 130 (1964), the officer simply acting in the same manner in which a regular officer would act, in arresting black patrons of an amusement park for trespass, after being asked to leave the premises due to segregation. In *Williams v. United States,* 341

U.S. 97 (1951), the Supreme Court held that defendant, a private detective who was also a special police officer and who in his official capacity as a special police officer used force to obtain confessions from suspects believed to have robbed a private corporation which employed the defendant, was acting "under color" of law.

In this case, the officer did actual perform an action, although under the direction of the university officials to do so, they jerked Maniaci out of his seat using force and then dragged him to the door, pick him up through the doors and dropped him on the ground in the hallway. After this incident, Maniaci walked to the ICC Building in which the officers restrained him in the vestibule or foyer area, by standing in front of him and restricted his freedom of movement. The officers did this because the university officials told them to remove Maniaci because he was causing a disruption. It is a well settled rule that an arrest amounts to a seizure of the person, it is a restriction of the freedom of movement, meaning the persons reasonably does not feel that he or she has the freedom to walk away. *Terry v. Ohio*, 392 U.S. 1 (1968) Whenever an officer restrains the freedom of a person to walk away, he has seized that person. *Brower* v. *County of Inyo,* 489 U.S. 593 (1989)

Defendant relies on the case of *In re E.A.H.,* 612 A.2d 836 (D.C. 1992), in forming the argument that a an arrest did not occur because the court in *In re E.A.H.* "declined to find an arrest had occurred despite the fact that fourteen-year-old E.A.H. was "obviously seized."" of *In re E.A.H.,* 612 A.2d 836 (D.C. 1992) "Since *Miranda,* the Court has narrowed the definition of custodial interrogation to include only those cases in which there has been a "formal arrest or restraint on freedom of movement *of the degree associated with a formal arrest."'*" *In re E.A.H.,* 612 A.2d 836 (D.C. 1992), *quoting*

*California v. Beheler,* 436 U.S. 1121, 1125 (1983) Further E.A.H. was at his home with the freedom to leave in this particular situation. Contrary to the Defendants argument, there simply no time limitation on a seizure which would be the deciding factor in whether it is actually an arrest or not.

"Actions that would otherwise be deemed "private" may be so "impregnated with a governmental character" as to be limited by the constitutional restrictions on state action. "That is to say, when private individuals or groups are endowed by the state with powers or functions governmental in nature, they become agencies or instrumentalities of the state and subject to its constitutional limitations."" *Evans* v. *Newton*, 382 U.S. 296, 299, 86 S. Ct. 486, 488, 15 L. Ed. 2d 373 (1965).

### C.  Plaintiff's Fourth Amendment Claim.

Defendant claims that Plaintiff conceded that he was not arrested. This assertion is not correct. William Maniaci testified that at the ICC building, when they had him cornered in the entryway and not allowed to either leave or go into the ICC building, he asked the officers if he was under arrest and was told by the officers "No." (See SOF JJ) The Plaintiff has never conceded that he was not arrested, held against his will, detained, or restriction of his freedom to move. Defendant is assuming facts that are clearly disputed by the Plaintiff. Defendant quoted Olson's statement, which does not ask Maniaci to leave and furthermore if this statement was a *final warning* then it was just that *a final warning*, not an expression to leave immediately. Second, there is clearly disputed testimony in the depositions and reports as to what words were expressed between Maniaci and the officer.(See SOF AA)

In the ICC building, officer Eddy did not testify, nor did he write in his report,

that prior to arriving at the ICC building, Maniaci was asked to leave Georgetown

property. Mr. Morrell did not testify as such either. The only testimony stating such fact

is Mr. Harrison, who also claims that he told Maniaci to leave the campus three times and

he claims that he walked with Mr. Maniaci to the ICC building, which clearly did not

happen according to officer Eddy's Report. (See exhibit #6)

Plaintiff has not alleged that he was asked to leave *Georgetown's campus*.

Plaintiff was asked to leave the Gaston Hall after being removed and dropped in the

hallway. Plaintiff then walked out the main entrance *of Gaston Hall*. In the delineation of

events this is quite clear. According to all other testimony, other than Mr. Harrison,

Maniaci was never barred from the conference or asked to leave the Georgetown campus

until after the incident at the ICC building.

As stated before, case law clearly shows, an arrest is when a person's freedom of

movement has been impinged.

"An arrest is the seizing of a person and detaining him in the custody of the
law. The term arrest may be applied to any case where a person is taken into custody or
restrained of his full liberty, or where the detention of a person in custody is continued
for even a short period of time. The United States Supreme Court has held that a
restriction of liberty of movement can constitute an arrest"

See *Maniaci v. Georgetown University, et al.,* 510 F. Supp. 2d 50 (D.C. 2007);

*Coleman v. United States*, 111 U.S. App. D.C. 210, 295 F.2d 555, 563-64 (D.C. Cir.

1961) *Long v. Ansell*, 69 F.2d 386, 389 (D.C. Cir. 1934)) *Henry v. United States*, 361

U.S. 98, 103, 80 S. Ct. 168, 4 L. Ed. 2d 134 (1959).

"[I]n order for there to be an arrest it is not necessary that there be an application

of actual force, or manual touching of the body, or physical restraint which may be

visible to the eye, or a formal declaration of arrest." *Maniaci v. Georgetown University,*

*et al.,* 510 F. Supp. 2d 50 (D.C. 2007);*United States v. Smith*, 31 F.R.D. 553, 563

(D.D.C. 1962) (quoting *Coleman*, 111 U.S. App. D.C. 210, 295 F.2d 555, 563-64).

In William Maniaci's situation there are two separate incidents, the assault at

Gaston Hall and the arrest at the ICC building. In the incident at Gaston Hall, Maniaci

was clearly touched by the officers. The officers jerked Maniaci, an elderly man, out of

his seat, kneed or kicked him in the rib cage, dragged him down the aisle, out the doors,

and then dropped him on the floor of the hallway. (See SOF BB, CC, DD, EE, FF, GG)

The incident at the ICC building consists of the officers, six of whom surrounded

Maniaci, pushing him against the window, trapping him in the entryway/foyer/vestibule

area and essentially holding him there. He was not allowed to leave, he was not allowed

to go into the building either. As stated in Officer Eddy's report, he was being held until

university officials decided whether to allow him access or not. (See SOF JJ, KK, LL,

MM, NN)

In both situations, Maniaci's freedom of movement was restrained. But the ICC

incident was a detention or an arrest simply because that was the officers intent, to hold

him in that area, that entryway until the university officials made a decision as to what

to do with him.

"A citizen who alleges that he or she has been subjected to an unreasonable

search or seizure, or excessive force in the course of an arrest or seizure in violation of

the Fourth Amendment, may seek redress under Section 1983." *Steele v. D.C. Hous.

Auth.*, 2006 U.S. Dist. LEXIS 8239 (D.C. 2006), cited from *Graham v. Connor*, 490

U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)

The case of *Steele v. D.C. Housing Authority* clearly points out that there are two

requirements from such an action to survive a motion for summary judgment. First, the Plaintiff must establish that the officer actually employed excessive force during a reasonable arrest. Second, the Plaintiff must establish liability of the municipality Defendant. Plaintiff "must show a course deliberately pursued by the city, as opposed to an action taken unilaterally by a nonpolicymaking municipal employee,' and an affirmative link between the [city's] policy and the particular constitutional violation alleged.'" *Carter v. Dist. of Columbia*, 254 U.S. App. D.C. 71, 795 F.2d 116, 122 (D.C. Cir. 1986) (quoting *Oklahoma City v. Tuttle*, 471 U.S. 808, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985)).

In the *Steele* case the special officer received information from a third person, who was accusing the Plaintiff of assaulting her, domestic violence. In Maniaci's situation, he was an elderly man that needs to walk with a cane, was not threatening any kind of act of violence on any person, and none of the officials, or officers had simply asked Maniaci to leave. There is no clear indication that Maniaci was asked to stand up and leave Gaston Hall. Instead the officers jerked him out of his seat, kneed or kicked him, dragged him down the aisle, through the doors, and dropped him on the floor. In this particular situation, handling an elderly man in this way was not reasonable and certainly not necessary. Georgetown University deliberately pursued their actions of abusing Maniaci because they had called for the officers to manhandle Maniaci again at the ICC building.

Contrary to the Defendants argument that the video (DVD recordings) of the event supports their argument as to what happened, three different views do not show anything in support of this contention. The video does not show the officers "carefully"

placing their arms under the Plaintiffs armpits. It clearly demonstrates both officers simply grabbing Plaintiff and jerking him up and out of his seat. The video does not show the Plaintiff getting kneed or kicked by the officers because the auditorium seats are blocking any kind of view of the Plaintiff getting pulled into the aisle. Further, the video does not show the officers straining to support the Plaintiff, or the Plaintiff attempting to trip the officers with his cane, as the Defendant claims.

There is one fact that Defendant still disputes, that is clearly evident, the Plaintiff had bruises, when to Walter Reed and was treated by Dr. Gillern for a contusion and ankle sprain. Dr. Gillern's testimony never indicated that there were no bruises, contusion, or ankle sprain. Dr. Gillern simply stated that she does not know how any of it was actually incurred and she did not note the bruises in the papers, but there had to be bruises because that is what a contusion is, and that is what she diagnosed. See Exhibit #12, 13, and 15. (See SOF OO) Defendant claims that even the Plaintiff's colleagues testified that they did not see the officer's knee or kick Maniaci. That would be because they were not in the immediate area to have seen it. According to the video, the only persons that were in that immediate area to have seen a knee or kick were Maniaci, the two officers, and Robert Turk. Robert Turk did testify that he saw a knee or kick making contact with Maniaci and the only person it could have possibly been is one of the officers. (See SOF CC and DD).

### D.  Defendants Eddy and Salley Are Not Entitled to Summary Judgment on Plaintiffs 42 U.S.C. § 1983 Claim in Count III.

Defendant claims that officer Eddy and Salley are entitled to Summary Judgment, because they are entitled to qualified immunity. There is not a single case in the District

of Columbia in which the court has ruled that special police officers are entitled to qualified immunity. Officers Salley and Eddy are special police officers commissioned by the District of Columbia to protect private property within the District.

"To prevail, the arresting officer need not prove probable cause in the constitutional sense, but rather must prove that he had a reasonable good faith belief that the suspect committed the offense." *Safeway Stores,* 448 A.2d at 862

> "In determining whether an officer who is alleged to have used excessive force in making an arrest is entitled to qualified immunity from suit for this alleged violation of the arrestee's rights under the Federal Constitution's Fourth Amendment, the question of qualified immunity is not so intertwined with the question whether excessive force was used as to require that these be treated as one question, to be resolved by the trier of fact, but instead requires an analysis not susceptible of fusion with the question of unreasonable force; under this analysis concerning qualified immunity, (1) the first inquiry must be whether the facts alleged, taken in the light most favorable to the party asserting injury, show that the officer's conduct violated a federal constitutional right, with a negative answer eliminating any need for further inquiry, and (2) if a violation can be made out on a favorable view of the parties' submissions, then the next sequential step is to ask whether the constitutional right was clearly established, an inquiry that must be undertaken in light of the specific context of the case, rather than as a broad and general proposition; if an officer's mistake as to what the law requires, with respect to the force used to make an arrest, is reasonable, then the officer is entitled to the defense of qualified immunity**,** which operates (1) to protect officers in the sometimes hazy border between excessive and acceptable force, and (2) to insure that before officers are subjected to suit, they are on notice that their conduct is unreasonable."

Saucier v. Katz, 533 U.S. 194  (2001)

Under this analysis of qualified immunity, in a light most favorable to Maniaci, the officers in fact violated Maniaci's First and Fourth Amendment rights. Maniaci had followed all of Georgetown's rules and regulations. Georgetown officials announced a questions and answer period in which they could *engage in dialogue* and promoted a *free expression of ideas.* Georgetown imposed a Speech and Expression Policy, further expressing the idea of a free expression of ideas. (See Exhibit #9) Instead, the officers

assaulted Maniaci for expressing his ideas, when the university officials ordered the officers to remove Maniaci. Then they imposed a false arrest on Maniaci when they detained or held him in the entryway of the ICC building.

### E. The Administrator Defendants Are Not Entitled to Summary Judgment on Plaintiffs 42 U.S.C. § 1983 Claim in Count III.

As indicated above, this is not a case of mere inattentiveness on the part of Georgetown Administrators. As demonstrated in their depositions they were on the scene in active initiation of the actions which resulted in the harm to William Maniaci. Moreover, this Court in ruling on the Motion For Judgment On The Pleadings has already ruled on thos point and that ruling establishes the rule in the case.

### F.  Defendant Georgetown Is Not Entitled to Summary Judgment on Plaintiffs 42 U.S.C. § 1983 Claim in Count III.

Private corporations are not shielded from vicarious liability when their employees commit 42 USCS § 1983 violation while acting within scope of their employment. *Hutchison* v *Brookshire Bros., Ltd.* (2003, ED Tex) 284 F Supp 2d 459. Every corporation acts through its officers. Here the supervisors were not mere non-commissioned officers of the Defendant, Georgetown, but its executive suite occupants. Todd Olson is the Vice President for Student Affairs. David Morrell is the Vice President for Student Safety. Darrell Harrison is the Director of Public Safety. Clearly when coporate officers on this level act, by definition, it is a corporate policy.

### G.  Defendants Are Not Entitled to Summary Judgment on Plaintiff's Assault and Battery Claim in Count I.

As clearly indicated on the video recording the action of the campus police

officers was at the direction of Todd Olson, Vice President of the University. Again, by definition, that action constitutes a policy. Contrary to the thoughts of Defense Counsel, the Constitution recognizes no "first bite" rule for corporate Vice Presidents.

**H.  Defendants are Not Entitled to Summary Judgment on Plaintiff's False Arrest Claim in Count II.**

When Georgetown's policemen at the direction of Georgetown's Vice President laid hands upon Mr. Maniaci and deprived him of his freedom, a false arrest had occurred.

**I.  Defendants Are Not Entitled to Summary Judgment on Plaintiff's Claim for Punitive Damages.**

The contention of the Defendants amounts to an argument that so long as the law is transgressed in a manner which might be due to mere ignorance punitive damages may not be awarded. This was not a transgression initiated by ignorance but by an earnest desire to earn the money donated by supporters of Hamas. The hierarchy of Georgetown University was not present by accident at this event and the removal of Mr. Maniaci and suppression of his purchased rights to expression was no accident.

**J.  Conclusion**

In conclusion, the Plaintiff is requesting that the Court, in consideration of the above stated issues, deny the Defendants Motion for Summary Judgment.

2/11/2008                                    Respectfully Submitted,

                                             *Thomas Fortune Fay*
                                             **Thomas Fortune Fay**

                                             *Caragh Glenn Fay*
                                             **Caragh Glenn Fay**

                                             **Thomas Fortune Fay, P.A.**
                                             **700 Fifth Street, NW #200**
                                             **Washington, DC 20001**
                                             **202-589-1300**
                                             **Counsel for Plaintiffs**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 11th day of February, 2008, I served

a copy of the foregoing by electronically through the ECF system upon:

John J. Buckley, Jr.
Malachi B. Jones
Colleen F. Shanahan
Williams & Connelly, LLP
725 Twelfth Street, NW
Washington, DC 20005

                                             *Thomas Fortune Fay*
                                             **Thomas Fortune Fay**