Case 1:06-cv-01625-LFO    Document 45-25    Filed 02/12/2008    Page 1 of 12

March 29, 2007  William Maniaci  Maniaci vs. Georgetown
Washington, D.C.

Page 142

1  demonstrations. He was there as a interested
2  observer.
3  Q  Did he register for the conference?
4  A  I don't know.
5  Q  Did Mr. Bailey register for the
6  conference?
7  A  I don't know.
8  Q  But you distinguished between
9  Mr. Smith's attendance and Mr. Bailey's
10 attendance?
11 A  Mr. Bailey was with us. He was -- he
12 attended the -- he attended the lecture. So if
13 he attended the lecture, he had to register or
14 he couldn't have gotten in the lecture.
15 Q  Okay. I think you didn't mention the
16 name Mr. Turk. But obviously Mr. Turk was there
17 as well.
18 A  Yes, he was.
19 Q  Okay.
20 A  So was Mr. Finberg and so was
21 Mr. Nutting.
22 Q  Okay. So the JDL would have paid for

Page 143

1  their expenses; that is, yours, Mr. Nutting,
2  Mr. Finberg, Mr. Haas and Mr. Turk?
3  A  As far -- the registration?
4  Q  Yes.
5  A  Probably.
6  Q  And also the transportation and meals,
7  lodging, when you were here?
8  A  It's not fair to say the meals because
9  I -- we took meals out of our pocket.
10 Q  Okay. But it's fair to say the
11 transportation and the lodging --
12 A  Yes, sir.
13 Q  Those expenses were paid for by JDL?
14 A  Yes.
15 Q  Okay. What is Operation Gideon?
16 A  That was a -- that was a name that we
17 gave the operation for Georgetown.
18 Q  Who gave it that name?
19 A  I don't recall.
20 Q  Why did you call it Gideon?
21 A  No particular reason.
22 Q  What is the Biblical significance of

Page 144

1  Gideon?
2  A  It brings to mind the sort of Gideon.
3  Gideon was a heroic figure.
4  Q  In the Bible, what did Gideon do?
5  A  I don't remember.
6  Q  Are you familiar with Gideon's
7  trumpet?
8  A  It could be. Yeah.
9  Q  What happen to the walls of Jericho?
10 A  They came tumbling down.
11 Q  They certainly did.
12    MR. FAY: The only Gideon I know was
13 the guy that was in the case.
14    MR. BUCKLEY: I didn't think I could
15 beat you on the Old Testament.
16    THE WITNESS: I think it was referring
17 to -- Gideon, as I recall, was a film called the
18 Sword of Gideon. Do you remember that? And
19 that was an operation by the Israeli Mossad. So
20 that was called the Sword of Gideon. So maybe
21 we picked -- picked the name up from that.
22 BY MR. BUCKLEY:

Page 145

1  Q  What was that operation?
2  A  It's probably still classified. I'm
3  not sure.
4  Q  You would have access to classified
5  information relating to the activities of the
6  Mossad?
7  A  No. I don't have any access.
8  Q  Well, tell me what you know then.
9  A  I don't know anything.
10 Q  Well, you mentioned this operation by
11 the Mossad.
12 A  It was a movie. There was a movie
13 called --
14 Q  Oh, it was a movie? I see.
15 A  There was a movie called Operation of
16 Mossad.
17 Q  Excuse me. When did the movie come
18 out?
19 A  It's been 10 years ago. Ten, 15 years
20 ago.
21 Q  Okay. I'll have to rent it.
22 A  You'd enjoy it, I'm sure.

37 (Pages 142 to 145)

Case 1:06-cv-01625-LFO  Document 45-25  Filed 02/12/2008  Page 2 of 12

March 29, 2007 — William Maniaci, Washington, D.C. — Maniaci vs. Georgetown

### Page 146

1  Q   So the -- the activities of JDL in
2  connection with the conference held at
3  Georgetown that was referred to by JDL was
4  Operation Gideon?
5  A   Initially, yeah.
6  Q   Okay.
7  A   And then we just, it -- yeah. We gave
8  it a name. But then it didn't really mean
9  anything.
10 Q   Who led the planning for the JDL
11 activities in relation to the conference?
12 A   Myself and Mr. Turk were the primary.
13 Q   What did your plans entail, broadly
14 speaking?
15 A   To find out what was being said. We
16 wanted to attend the conference. We wanted to
17 collect -- my intention was to collect
18 intelligence, to find out who the speakers were,
19 what they were saying, to have our people attend
20 the seminars and find out what was being said
21 and what was going on, so that we could -- we
22 could counter the information that was being --

### Page 147

1  you know, the false information that was being
2  espoused. We wanted to be able to know our
3  enemy, in other words.
4      We also planned to demonstrate
5  peacefully outside of the hall where these --
6  these events were being held.
7      And there were signs and Israeli flags
8  being waved. And it was an expression of
9  support for Israel and support for the United
10 States. Because these people were blaming the
11 United States for all the ills in the world,
12 along with Israel.
13 Q   Did you disagree with the aim of the
14 conference?
15 A   Yes. The aim of the conference was
16 divestment from Israel. Of course we disagree
17 with that.
18 Q   Explain what divestment from Israel
19 means.
20 A   Divestment from Israel means a
21 withdrawal of any financial support or
22 investment in Israel. Israeli businesses,

### Page 148

1  Israeli-made products. Whatever business
2  relationship an institution may have with the
3  State of Israel or an Israeli business,
4  divestment means to end that relationship.
5  Q   And you understood that the objective
6  of the Palestine Solidarity Movement was
7  divestment from Israel?
8  A   That's one of their -- yes, sir, I
9  did.
10 Q   And did you desire to protest that
11 objective?
12 A   We desired to show our support for the
13 State of Israel and for the United States.
14 Q   But did you intend to protest the
15 message of the conference; that is, the
16 Palestinian student -- or I should say the
17 Palestinian Solidarity Movement's objective of
18 divesting from Israel?
19 A   Was that our intent?
20 Q   Yes, to protest that.
21 A   A peaceful protest, yes.
22 Q   And how were you going to protest?

### Page 149

1  A   Outside like -- like exactly what was
2  done. A show of Israeli and American flags.
3  Q   How about inside the conference
4  itself. What was your plan?
5  A   To gather information. To listen.
6  There was a question and answer period. And I
7  took that opportunity to answer -- to ask a
8  question. But I had no idea that there was
9  going to be a question and answer period.
10     (Maniaci Exhibit No. 7 was marked for
11 identification.)
12 BY MR. BUCKLEY:
13 Q   Okay. Let me show you what's been
14 marked as Defendants' Exhibit Number 7, which is
15 a document that you produced. It's Bates
16 stamped M 83 through M 86. It's entitled, on
17 the first page, JDL, Operation Gideon.
18     Does this refer to the JDL's plans in
19 connection with the Palestinian Solidarity
20 conference held at Georgetown.
21 A   I believe so. But if you allow me a
22 minute, I would like to read the document.

Case 1:06-cv-01625-LFO   Document 45-25   Filed 02/12/2008   Page 3 of 12

March 29, 2007 William Maniaci Maniaci vs. Georgetown
Washington, D.C.

Page 150

1   Q   Sure. Please do.
2       Are you familiar with this document?
3   A   Yes.
4   Q   Did you author it?
5   A   Yes.
6   Q   Did anyone else contribute to the
7  wording of the document?
8   A   I -- I'm sure I did some research.
9  And I don't know if I extracted the work of
10 other people and quoted them in this article or
11 not. But I did -- I was the author of this
12 article.
13  Q   Okay.
14  A   I remember it.
15  Q   When did you write it?
16  A   It was written before the conference.
17 I don't remember the date.
18  Q   For what purpose was it written?
19  A   It was a handout to people who would
20 be attending the conference on our behalf.
21  Q   Did you send it out beforehand to any
22 of the other members of JDL who were -- who

Page 151

1  would be attending, for example, Mr. Turk and
2  Mr. Haas and Mr. Nutting and Mr. Finberg?
3   A   I may have sent it by E-mail. I don't
4  recall.
5   Q   Who typed it?
6   A   I did.
7   Q   That's right. You took computer
8  science.
9   A   Yes, I did.
10  Q   You can type.
11  A   And I had a computer crash. And I
12 lost all of this stuff.
13  Q   Okay. Well, we got this from you. So
14 you did retain this, this document.
15      Did you or others on behalf of JDL
16 pass out copies of this document at the
17 conference?
18  A   We passed out -- we had some fliers
19 that we handed out. But I don't think this was
20 a handout. This was just given to -- to our
21 members, I think, that were going to
22 participate. I don't think this was a general

Page 152

1  handout to the public.
2   Q   Do you know whether or not it was
3  handed out to the public?
4   A   I don't know. It could have been.
5   Q   Who would have been -- who would have
6  been responsible for handing it out if it was
7  handed out?
8   A   Everybody had access to these fliers
9  that we had.
10  Q   Okay. Looking at the second page of
11 the document, in the middle of the page, there's
12 a reference to Jewish Defense League contacts in
13 Washington, D.C. And then it refers to
14 Mr. Turk's name and his cellular telephone
15 number and you and your cellular telephone
16 number.
17  A   Right.
18  Q   So you were the two -- you and
19 Mr. Turk were the two main contacts --
20  A   Uh-huh.
21  Q   -- for the JDL in connection with the
22 conference?

Page 153

1   A   Yes. We were here before the other
2  people arrived.
3   Q   Uh-huh. And then -- looking again at
4  the first page, you refer to the event as part
5  of a continuing psychological warfare attack on
6  the United States perpetrated by IslamoNazis,
7  so-called Palestinians; is that correct?
8   A   Yes.
9   Q   And that accurately reflects your view
10 of the sponsors of the conference --
11  A   Yes.
12  Q   -- and the groups who were appearing
13 to speak at the conference?
14  A   Yes.
15  Q   You regard them as IslamoNazis?
16  A   I regard the people that are behind
17 these conferences, the international solidarity
18 movement as enemies of the state of Israel and
19 the United States.
20  Q   You refer to the international
21 solidarity movement. But they're not -- they
22 were not listed as a sponsor of the conference,

Case 1:06-cv-01625-LFO   Document 45-25   Filed 02/12/2008   Page 4 of 12

March 29, 2007 | William Maniaci | Maniaci vs. Georgetown
Washington, D.C.

Page 154

1  correct?
2  A  The international solidarity movement
3  is the mother organization of the off shoot
4  student organization in support of Palestine.
5  Q  Turn to page 3 of the document.
6  Directing yourself -- your attention,
7  rather, to the first paragraph, you state,
8  quote, we suspect that Georgetown University
9  will attempt to prohibit members of this
10 organization or other supporters of Israel from
11 having an opportunity to be heard and to
12 verbally interact with attendees of this
13 conference for the purpose of refuting the lies
14 which will be spoon-fed to impressionable
15 students and others attending the conference,
16 end quote.
17 Again, you wrote that?
18 A  I think so, yeah.
19 Q  And what was the basis for your
20 assertion that Georgetown University would
21 attempt to prohibit the JDL and other supporters
22 of Israel from having an opportunity to be heard

Page 155

1  and verbally interact with the attendees of the
2  conference?
3  A  There have been a history of -- for
4  example, are you familiar with Daniel Pipes?
5  Have you ever heard the name Daniel Pipes?
6  Q  Yes.
7  A  He has been at universities trying to
8  speak.  And he has been drowned out by members
9  of Palestinian support groups.  And universities
10 have taken no action whatsoever to stop this.
11 And it was our -- our belief that,
12 since Georgetown was allowing this conference to
13 be on -- you know, at the university, that they
14 wouldn't take any action that would be fair or
15 balanced with regard to the message the
16 Palestinian student association was trying to
17 put out.
18 Q  Prior to February 2006, had you ever
19 attended -- strike that.
20 Prior to February 2006, had you ever
21 been on the campus of Georgetown University?
22 A  No, sir, I have not.

Page 156

1  Q  Do you have any personal familiarity
2  with Georgetown University's past experience,
3  for example, in allowing the free exchange of
4  ideas at conferences held at the university?
5  A  I read their -- their policies
6  regarding the free exchange of information.
7  Q  Okay.  But my question is:  Did you
8  have any personal knowledge of what had
9  transpired in any prior conferences at
10 Georgetown University respective of what groups
11 were sponsoring the conferences?
12 A  No.
13 Q  Were you personally aware of any
14 instance where Georgetown University had
15 prohibited, say, members of the JDL from having
16 an opportunity to be heard?
17 A  No.
18 Q  Were you, per se, familiar with any
19 instance in which Georgetown University had at
20 any other conferences prevented anybody from
21 having an opportunity to be heard?
22 A  No.

Page 157

1  Q  Directing your attention, again, to
2  page 3, you wrote in the third paragraph, quote:
3  We suspect that Georgetown University will
4  attempt to cause our members and supporters who
5  attempt to participate in the conference to be
6  arrested for trespassing and other false and
7  trumped up charges, unquote.
8  Again, you wrote that?
9  A  Yes, I did.  I think --
10 Q  What was your basis for suspecting
11 that Georgetown would attempt to have JDL
12 members arrested for trespassing?
13 A  I think I was having a psychic moment.
14 Q  At the time, did you have any
15 knowledge that Georgetown University had ever
16 caused anyone to be arrested for trespassing or
17 arrested on any other false -- so-called false
18 or trumped up charges for participating in a
19 conference held at Georgetown?
20 A  No.
21 Q  When you registered at the conference,
22 you made clear that you were connected with JDL,

Case 1:06-cv-01625-LFO   Document 45-25   Filed 02/12/2008   Page 5 of 12

March 29, 2007         William Maniaci         Maniaci vs. Georgetown
                       Washington, D.C.

Page 158

1  correct?
2    A    I believe so.
3    Q    And so did the other members of JDL.
4  They all made known their affiliations with JDL?
5    A    I wasn't present when they signed it.
6  I don't know.
7    Q    Was there a plan to hide the fact that
8  any member of JDL was in fact a member of JDL?
9    A    No. No. We --
10   Q    Okay.
11   A    We -- we made frequent contacts with
12 the University officials and tried to dialogue
13 and have a peaceful relationship.
14   Q    Right. So you were not denied the
15 right to participate in the conference because
16 you were associated with JDL, correct?
17   A    Not directly.
18   Q    And you weren't arrested for trespass
19 because you attempted to attend the conference,
20 correct?
21   A    No. But I could call your
22 attention --

Page 159

1    Q    Directing your attention --
2    A    I could call your attention to other
3  incidents that took place on the campus that
4  were tantamount to harassment by the campus
5  police.
6    Q    I'm talking about, at the time you
7  wrote this document, you had no knowledge that
8  Georgetown had ever arrested anybody from
9  attending a conference at Georgetown.
10   A    No. But I have --
11   Q    That's my question.
12       MR. FAY: Wait.
13       THE WITNESS: I have general
14 knowledge.
15       MR. FAY: You asked a question. Let
16 him answer it.
17       THE WITNESS: I have general knowledge
18 of what takes place on college campuses during
19 protests. And in particular protests that are
20 not popular with the administration.
21       There are standard procedures that the
22 universities use which I am familiar with. And

Page 160

1  I drew upon my knowledge and my experience, my
2  life experience, my knowledge of law enforcement
3  and my beliefs as to what would happen on this
4  campus.
5        And as I said, I might have been
6  having a psychic moment but it seems that I was
7  pretty accurate with what I wrote.
8  BY MR. BUCKLEY:
9    Q    Have you ever met the president of
10 Georgetown University?
11   A    No, sir, I haven't.
12   Q    Dr. Jack DeGioia.
13   A    No.
14   Q    Do you know anything about him?
15   A    No. Other than the fact that he
16 accepted with glee $20 million from Saudi
17 Arabia.
18   Q    Directing your attention to the bottom
19 of page 3 of Exhibit Number 7. You refer in the
20 last full paragraph -- I should say the
21 penultimate paragraph to the Georgetown
22 University speech and expression policy, which

Page 161

1  you indicate is attached. Is that correct?
2    A    I believe we did attach it.
3    Q    I think I have the attachment. Let me
4  show you that document. Is it 9? Yeah. Okay.
5  Let me show you what we're going to mark as
6  Exhibit Number 9.
7        MS. SHANAHAN: It's actually
8  Exhibit 8.
9        MR. BUCKLEY: Exhibit 8. Excuse me.
10 Exhibit 8.
11       (Maniaci Exhibit No. 8 was marked for
12 identification.)
13 BY MR. BUCKLEY:
14   Q    I've handed you a document that's been
15 Bates stamped M 92 through M 101, which
16 indicates that your counsel produced it on your
17 behalf.
18       On the first page there's a
19 handwritten note that says, quote, mission
20 statement and info summarized by W. Maniaci and
21 other JDL persons prior to 2/18/06 to provide to
22 other JDL protesters, unquote.

Case 1:06-cv-01625-LFO   Document 45-25   Filed 02/12/2008   Page 6 of 12

March 29, 2007 | William Maniaci | Maniaci vs. Georgetown
Washington, D.C.

Page 162

```
 1        Can you identify that handwriting?
 2   A    No, sir, I cannot.
 3   Q    Is that your handwriting?
 4   A    No, it's not.
 5        MR. BUCKLEY: Mr. Fay, can you
 6   enlighten me whose handwriting that is?
 7        MS. CARAGH FAY: Yes. It's mine.
 8   BY MR. BUCKLEY:
 9   Q    Okay. Is that an accurate statement
10   of what the document is?
11        MR. FAY: You mean the handwritten
12   statement?
13        MR. BUCKLEY: Yes.
14        MR. FAY: On the first page?
15        MR. BUCKLEY: The first page, that's
16   all.
17        MR. FAY: Yes.
18   BY MR. BUCKLEY:
19   Q    Again, is that an accurate statement
20   on the first page of Exhibit Number 8 as to what
21   the document is?
22   A    Well, I don't know. It says this is a
```

Page 163

```
 1   mission statement. But I don't know what's
 2   underneath this stack -- this first page without
 3   looking at the pages.
 4   Q    Why don't you turn the first page
 5   then.
 6   A    That's --
 7   Q    Would you read back the question,
 8   please.
 9        (The reporter read the record as
10   requested.)
11        THE WITNESS: No.
12   BY MR. BUCKLEY:
13   Q    In what respect is it inaccurate?
14   A    This document is a copy of Georgetown
15   University's policies regarding free speech and
16   assembly. And it's not a mission statement.
17   It's not our mission statement. It was merely
18   furnished to our participants so that they would
19   know how Georgetown University feels about these
20   topics.
21   Q    Well, look at Exhibit Number 7 again,
22   which you said you typed.
```

Page 164

```
 1   A    That's this one here?
 2   Q    Right.
 3   A    What page --
 4   Q    And look at exhibit --
 5   A    -- would you like me to look at?
 6   Q    Look -- just look at the typeface on
 7   that document.
 8   A    Yeah.
 9   Q    And look at the typeface on
10   Exhibit Number 8, beginning at Bates stamp M 93.
11   A    Yeah.
12   Q    The typeface is the same, correct?
13   A    Right. It was cut and pasted from the
14   Georgetown University Web site into Microsoft
15   Word. And that was the typeface that I was
16   using?
17   Q    Okay. So you prepared the typed
18   script portion of Exhibit Number 8, correct?
19   A    Yes.
20        MR. FAY: What do you mean by
21   prepared?
22        MR. BUCKLEY: Caused it to be created.
```

Page 165

```
 1        THE WITNESS: I copied it from the
 2   Georgetown University Web site.
 3   BY MR. BUCKLEY:
 4   Q    Right. But you downloaded -- then you
 5   converted into your font and your type script?
 6   A    Yes. It's a copy of their -- of what
 7   they had on their Web site.
 8   Q    Right.
 9   A    Just in a different font, is all.
10   Q    Right. You added -- for example, at
11   the top you added the term Jewish Defense
12   League, correct?
13   A    Yes.
14   Q    Looking at page M 93.
15   A    Uh-huh.
16   Q    And, in fact, at each subsequent page,
17   you added that at the top of the page. And you
18   also added the same thing, Jewish Defense
19   League, at the bottom of the page --
20   A    Uh-huh.
21   Q    -- correct?
22   A    Uh-huh.
```

Case 1:06-cv-01625-LFO   Document 45-25   Filed 02/12/2008   Page 7 of 12

March 29, 2007          William Maniaci          Maniaci vs. Georgetown
                        Washington, D.C.

Page 166

```
 1    Q   And you also caused certain portions
 2  of the policy to be bolded.
 3    A   Apparently.
 4    Q   Why did you -- first of all, why did
 5  you bold certain portions of the policy?
 6    A   Well, at the time, I may have thought
 7  that those were important.
 8    Q   Do you recall now why you believe
 9  those particular --
10    A   No.
11    Q   -- portions were important?
12    A   I don't -- I don't recall.  No, I
13  don't.
14    Q   Okay.  Tell me why you prepared this
15  document.
16    A   So everybody that was participating
17  would be aware of the free speech expression
18  policies espoused by Georgetown University.
19    Q   Why did you want them to be aware of
20  it?
21    A   So that there wouldn't be any mistakes
22  made.
```

Page 167

```
 1    Q   What types of mistakes were you
 2  concerned about?
 3    A   Violation of Georgetown University's
 4  policies.
 5    Q   Did you want to comply with the
 6  University's policies?
 7    A   Yes.
 8    Q   You didn't want to violate them?
 9    A   That's correct.
10    Q   Let's go back to Exhibit Number 7,
11  again, if you will.
12    A   Okay.
13    Q   Looking at the bottom of the page,
14  again, on page 3, which is Bates stamped M 85.
15        MR. FAY:  This is 7, is it?
16        MR. BUCKLEY:  Yes.  That's correct.
17  Exhibit Number 7.
18        MR. FAY:  Okay.
19  BY MR. BUCKLEY:
20    Q   The Bates stamped page M 85, page 3 of
21  4.
22    A   Uh-huh.
```

Page 168

```
 1    Q   Here you refer to the portion of the
 2  policy that states that free speech in the
 3  constitutional sense will be limited by and only
 4  by reasonable and nondiscriminatory
 5  considerations of, quote, time, place and
 6  manner, unquote.  Do you see that?
 7    A   Yes.
 8    Q   Do you acknowledge that Georgetown
 9  University had a right to limit the time when a
10  speaker could speak?
11    A   Yes.
12    Q   And the place where the speaker could
13  speak.
14    A   Yes.
15    Q   And the manner in which a speaker
16  could speak.
17    A   Yes.
18    Q   So, for example, if Georgetown
19  University were to say, you can't shout when you
20  ask questions, would that be, in your view, a
21  limitation that Georgetown University had a
22  right to impose on a speaker?
```

Page 169

```
 1    A   Yes.  It would be reasonable.
 2    Q   And if Georgetown University said that
 3  this is not the time for you, as a speaker, to
 4  speak, did Georgetown University, in your view,
 5  have that right?
 6    A   It depends on the circumstance.
 7    Q   If Georgetown University said to you,
 8  this is not the time for you to speak, did
 9  Georgetown University have the right to impose
10  that limitation?
11    A   It would depend on the circumstance.
12    Q   Did Georgetown University, in your
13  view, have the right to say, you may ask one
14  question as opposed to, say, several questions.
15    A   Yes.  If that was imposed on everyone
16  fairly, yes.
17    Q   Well, did Georgetown University have
18  the right to say that anything you say must be
19  put in the form of a question?  Would that be
20  within the right of the University?
21    A   Probably.
22    Q   Did Georgetown University have the
```

Case 1:06-cv-01625-LFO   Document 45-25   Filed 02/12/2008   Page 8 of 12

March 29, 2007 | William Maniaci | Maniaci vs. Georgetown
Washington, D.C.

Page 170

1  right to say that you should not interfere with
2  someone else's right to speak?
3  A  Yes.
4  Q  Did Georgetown University have the
5  right to say that you should not interrupt
6  somebody else when the other person is speaking?
7  A  It depends on the circumstance. If
8  there's free dialogue, two people conversing and
9  exchanging ideas, those questions need not
10 apply.
11 Q  Where are you coming up with this?
12 What's the basis for these statements as to what
13 you believe are limitations on Georgetown's
14 ability to limit the time, place and manner of
15 speech?
16 A  If -- if they say that there's going
17 to be dialogue and free exchange of ideas, that,
18 to me, means a conversation between individuals.
19 Q  If Georgetown University says there's
20 going to be only questions, not dialogue, just a
21 question, and you're limited to one question,
22 did Georgetown University have the right --

Page 171

1  A  Yes.
2  Q  -- to impose that limitation?
3  A  Yes.
4  Q  Okay. Turning to the same document,
5  again, Exhibit 7, page M 86, and page -- looking
6  at the top half of the page, down to numbered
7  paragraph number 10.
8  A  I've got M 84.
9  Q  M 86.
10 A  Oh, yeah. Okay.
11 Q  Page 4 of 4.
12 A  Okay.
13 Q  On Exhibit number 7 looking at the top
14 half of the page. There are a number of
15 paragraphs.
16 A  Uh-huh.
17 Q  Each numbered. And then looking at
18 paragraph 10, again, listing the limitations on
19 speech, it refers to, quote, making it
20 impossible for others to speak, unquote.
21 Do you recognize that as an
22 appropriate limitation that the University could

Page 172

1  impose on persons attending the conference; that
2  is, that they should not make it impossible for
3  others to be -- to speak?
4  A  This is part of their -- their policy,
5  their free -- this is an item of their entire
6  free speech policy.
7  Q  Well, do you agree that Georgetown
8  University had a right to make that policy?
9  MR. FAY:  Could you rephrase the
10 question. I say that because it sounds like
11 you're asking whether Georgetown had a right to
12 make it impossible for others to speak.
13 MR. BUCKLEY:  No.
14 MR. FAY:  And I don't think that's
15 what you meant.
16 BY MR. BUCKLEY:
17 Q  I think I -- I thought I made it clear
18 that one of the things that Georgetown
19 University was prohibiting was activities of
20 persons who sought to make it impossible for
21 others to speak.
22 Do you acknowledge that Georgetown had

Page 173

1  the right to prohibit attempts by persons
2  attending the conference to interfere with the
3  right of others to speak?
4  A  It depends on the circumstance. If
5  there's a free exchange of dialogue, and you or
6  I disagree with one other, one of us may talk
7  over the other one. And I don't think that
8  there's any law or rule that specifies that we
9  can't do that in the -- in the free exchange of
10 ideas.
11 Q  Is it Georgetown University that
12 decides whether it's going to be a free
13 dialogue, a back-and-forth, or whether it's
14 going to be simply a question and answer period
15 where you're limited to one question?
16 A  If they say that there's going to be a
17 question followed by dialogue and then change
18 the rule in the middle of the game, I don't
19 think this would apply.
20 Q  Is that a legal opinion?
21 A  No, it's my opinion.
22 Q  That's your personal opinion?

Case 1:06-cv-01625-LFO    Document 45-25    Filed 02/12/2008    Page 9 of 12

March 29, 2007                William Maniaci           Maniaci vs. Georgetown
                              Washington, D.C.

Page 174

1   A   Yes, it is.
2   Q   And does Georgetown University have to
3   agree with you and conduct its conference the
4   way --
5   A   No.
6   Q   -- you want it to be conducted?
7       MR. FAY: Objection. That's absurd.
8       THE WITNESS: Is this a legal opinion?
9   This is not a legal opinion either. This is a
10  policy. Policies are not law. They're not
11  etched in stone. Policies are guidelines. This
12  is a policy.
13  BY MR. BUCKLEY:
14  Q   Okay. Was it you or Georgetown
15  University that had the right to interpret its
16  own policy?
17  A   If a policy is published and made
18  public, anybody that reads it can make their own
19  interpretation.
20  Q   Was it Georgetown University or you
21  that had the right to make the ground rules for
22  the conference?

Page 175

1   A   Their conference. They can make the
2   ground rules.
3   Q   And it was your obligation to abide by
4   their ground rules, correct?
5   A   It depends on the circumstance.
6   Q   Wasn't it your obligation as an
7   attendee to abide by the ground rules that
8   Georgetown imposed on the conference?
9   A   It depends on the circumstance.
10  Q   Are you reserving the right to violate
11  Georgetown's ground rules?
12  A   It depends on the circumstance.
13  Q   Well are you or are you not? Are you
14  reserving --
15  A   I can't answer that question.
16  Q   Why can't you answer it?
17  A   Because I believe I have answered it.
18  It depends on the circumstance and the
19  situation.
20  Q   So you're reserving a right when you
21  so choose to violate Georgetown's ground rules?
22      MR. FAY: He didn't say that.

Page 176

1   BY MR. BUCKLEY:
2   Q   Are you?
3   A   You're putting words in my mouth.
4   Q   Are you --
5       MR. FAY: He didn't say that. Come
6   on.
7       MR. BUCKLEY: It's a question. Are
8   you reserving the right --
9       MR. FAY: No. No. You're haranguing
10  him now.
11      THE WITNESS: You're harassing me.
12      MR. FAY: You've got no -- you asked
13  about five times --
14      THE WITNESS: There's no reason for
15  this.
16      MR. FAY: We're going to be here until
17  midnight.
18  BY MR. BUCKLEY:
19  Q   Are you reserving the right to violate
20  Georgetown's ground rules when you believe it's
21  appropriate?
22  A   It depends on the circumstance.

Page 177

1   Q   Are there some circumstances where you
2   believe you have a right to violate Georgetown's
3   ground rules?
4   A   There are some situations where I
5   believe their ground rules may not apply.
6   Q   Directing your attention again to
7   Exhibit Number 7, page M 86, looking at, again,
8   at the penultimate paragraph, I just want to
9   address your attention to -- or direct your
10  attention to a portion of what's written there
11  where you wrote, quote, the terrorist who will
12  be addressing the public during the three
13  days --
14  A   I don't see where you're --
15      MR. FAY: I'm sorry.
16      MR. BUCKLEY: It's the penultimate
17  paragraph right here.
18      MR. FAY: What page is that?
19      MR. BUCKLEY: Page M 86.
20      MR. FAY: Okay.
21  BY MR. BUCKLEY:
22  Q   Do you see that?

Case 1:06-cv-01625-LFO   Document 45-25   Filed 02/12/2008   Page 10 of 12

March 29, 2007  William Maniaci  Maniaci vs. Georgetown
Washington, D.C.

Page 178

1  A  The paragraph begins with what?
2  Q  It begins with the words "our
3  mission."
4  A  Okay.
5  Q  Okay. Directing your attention down
6  three lines to the clause that begins, quote,
7  the terrorists.
8     Do you see that?
9     MR. FAY: The next to the last
10 paragraph?
11    THE WITNESS: And the terrorists who
12 will be addressing the public....
13    MR. FAY: Yeah, he's talking about
14 this.
15    THE WITNESS: I see.
16 BY MR. BUCKLEY:
17 Q  Let me read that. You wrote this.
18 You wrote, quote, the terrorists who will be
19 addressing the public during the three days of
20 the Palestinian Solidarity conference at
21 Georgetown University, end quote.
22    Which terrorists were you referring

Page 179

1  to?
2  A  It's my belief that the people who
3  were preaching divestment from Israel were
4  supporting terrorism.
5  Q  Well, you refer to them as terrorists.
6  A  If you support terrorism, you're a
7  terrorist.
8  Q  Okay. So the people at the conference
9  who were supporting divestment from Israel were,
10 in your view, terrorists?
11 A  Yes. The speakers, in my view, were
12 terrorists insofar as the definition of a
13 terrorist can -- doesn't necessarily have to be
14 someone who is violent. Terrorism can be
15 psychological.
16 Q  Okay. But in your view, applying your
17 definition, for example, Sue Blackwell, one of
18 the speakers at the conference you attended, is
19 a terrorist.
20 A  Sue Blackwell supported the --
21 supports the use of suicide bombings and
22 violence against Israeli civilians, and that's

Page 180

1  terrorism.
2  Q  Let's just talk about her opinion with
3  respect to divestment, okay.
4  A  No. I look at her as an individual
5  and what she supports. If she supports
6  terrorists, she's a terrorist.
7  Q  Are people who support divestment from
8  Israel terrorists?
9  A  Some are.
10 Q  Is supporting divestment from Israel
11 supporting terrorism?
12 A  No.
13 Q  Was Mr. Youmans, who was a moderator
14 at the panel you attended, was he a terrorist?
15 A  I don't know.
16 Q  Looking again at this page M 86, you
17 say in the last paragraph, quote, our mission is
18 to cause Georgetown University to allow
19 supporters of Israel to speak and to be heard or
20 suffer the ramifications and the consequences of
21 their refusal or inability fairly to enforce
22 their policies and support the First Amendment

Page 181

1  rights of all, unquote.
2     You wrote that?
3  A  I believe so.
4  Q  What did you mean when you said that
5  Georgetown University was going to suffer the
6  ramifications and consequences?
7  A  Well, if they -- if they refused to
8  abide by their own policies, we would make that
9  a matter of public record on Web sites and in
10 newspapers and by talking to journalists. And
11 basically causing that adverse publicity to
12 become public record, public knowledge.
13 Q  Is this lawsuit that you filed against
14 Georgetown University part of your mission to
15 cause it to suffer the ramifications and
16 consequences?
17 A  No, sir.
18    MR. FAY: What are we looking at
19 timewise? It's about 20 of 1:00, now.
20    MR. BUCKLEY: Oh, we should take a
21 break for lunch then.
22    MR. FAY: It doesn't seem likely this

Case 1:06-cv-01625-LFO   Document 45-25   Filed 02/12/2008   Page 11 of 12

March 29, 2007          William Maniaci           Maniaci vs. Georgetown
                        Washington, D.C.

Page 182

1  is going to get over at a time where we wouldn't
2  eat lunch.
3       MR. BUCKLEY: No.
4       MR. FAY: Outside of some European
5  countries that are more civilized than we are.
6       THE VIDEO OPERATOR: Shall we go off
7  the record?
8       MR. BUCKLEY: Yes, please.
9       THE VIDEO OPERATOR: We're going off
10 the record at 12:41.
11      (Whereupon, at 12:41 p.m., the
12 deposition was recessed, to be reconvened at
13 1:45 p.m. this same day.)

Page 183

1       AFTERNOON SESSION  (1:50 p.m.)
2       THE VIDEO OPERATOR: We're back on the
3  record at 1:50.
4  Whereupon,
5       WILLIAM MANIACI
6  having been previously duly sworn, was examined
7  and testified further as follows:
8       EXAMINATION (Continued)
9  BY MR. BUCKLEY:
10      Q  Mr. Maniaci, would you look at the
11 Exhibit Number 8 again and turn to the page
12 that's been Bates stamped M 95. Again, we're
13 looking at your recreation in different
14 typescript of Georgetown University's policy on
15 speech and expression, correct?
16      A  Yes, sir.
17      Q  Looking now at that page, which is
18 page 3 of 9, M 95, and looking again at the
19 bottom of the page to paragraph number 1. It
20 states that the right of free speech and
21 expression does not include. And then it goes
22 on to list a number of activities.

Page 184

1       And I direct your attention to the
2  last paragraph, or I should say the last clause
3  where it says, quote, any activity that disrupts
4  or obstructs the functions of the university, or
5  imminently threatens such disruption or
6  obstruction, end quote.
7       When you went to Georgetown University
8  to attend the conference, did you understand
9  that the right of free speech and expression did
10 not include any activity that disrupts or
11 obstructs the functions of the university, or
12 that imminently threatens such disruption or
13 obstruction?
14      A  Certainly.
15      Q  And did you believe and understand
16 that Georgetown University had a right to impose
17 that limitation?
18      A  Of course.
19      Q  Who is Bill Levinson?
20      A  I've heard the name. I can't put a
21 face with the name.
22      Q  Is he a member of JDL?

Page 185

1       A  No. Not to my knowledge.
2       Q  Have you ever received any E-mails
3  from him?
4       A  I think so. The name is familiar. I
5  believe he's involved in Jewish activism. But I
6  don't -- I wouldn't recognize him if he were
7  sitting next to me.
8       Q  Do you know where he resides?
9       A  No, sir.
10      Q  Have you ever spoken to him?
11      A  I may have through the course of my
12 duties with these organizations, but I don't
13 recall any conversation.
14      Q  Do you remember communicating with him
15 in any way, by E-mail or otherwise, in relation
16 to this Georgetown event?
17      A  It's very possible. If he is an
18 activist with a different organization, it's
19 very possible that I did.
20      Q  Uh-huh. Before you referred to Rabbi
21 Shifren; is that correct?
22      A  Rabbi Shifren was there, yes.

Case 1:06-cv-01625-LFO   Document 45-25   Filed 02/12/2008   Page 12 of 12

March 29, 2007                William Maniaci            Maniaci vs. Georgetown
                              Washington, D.C.

Page 186

1  Q  Yes. Okay. What is his first name?
2  A  Nachum.
3  Q  Okay.
4  A  N-A-C-H-U-M.
5  Q  Was he a member of the JDL at the time
6  of the event?
7  A  Yes.
8  Q  Is he a member of B'nai Elim?
9  A  Yes.
10 Q  What is your relationship with him?
11 A  I know him as a rabbi. We -- I have
12 no direct relationship other than the fact that
13 he's a member and he's a rabbi and we belong to
14 the same organization.
15 Q  Does he hold any -- or did he hold any
16 position in JDL?
17 A  Other than being a spiritual advisor,
18 no.
19 Q  How about in the current organization?
20 A  Same role. He's a spiritual -- he's a
21 rabbi. He writes his interpretation of the
22 Parsha, Weekly Torah Portion. And we publish

Page 187

1  that usually. That's handled through our Web
2  site.
3  Q  Did you coordinate with him in terms
4  of attending the event in Georgetown in February
5  of 2006?
6  A  I'm sure we discussed his attendance.
7  Q  Do you know where he lives?
8  A  He lives in Southern California in the
9  Los Angeles area. I think he's known as the
10 surfing rabbi, so it's somewhere close to the
11 ocean.
12     MR. FAY: Only in California.
13 BY MR. BUCKLEY:
14 Q  Did JDL pay his expenses to come to
15 the conference?
16 A  I believe it was taken out of the
17 funds that we had available, yeah.
18 Q  Okay. When did you first communicate
19 with Georgetown University regarding your desire
20 to attend the conference?
21 A  I don't remember.
22 Q  Do you remember how you communicated

Page 188

1  with Georgetown?
2  A  I communicated with them by telephone,
3  and via E-mail.
4  Q  Do you recall which you did first?
5  A  I think I called the security office
6  and -- just to see who I should speak with.
7  Q  And did you wind up speaking with
8  somebody?
9  A  Yeah. I spoke first with somebody
10 that answered the phone. And we had a
11 conversation. I let him know why I was calling.
12 And --
13 Q  What did you say when you explained
14 the purpose of your call?
15 A  I said I'm looking -- you know, that
16 we intend to demonstrate or protest the
17 solidarity conference. And I wanted to know
18 what parameters there were so we wouldn't be
19 breaking any of their rules. And I asked them
20 to send me whatever they could. They did send
21 me either E-mail -- I think they E-mailed me
22 copies of their speech policy. And I had a

Page 189

1  discussion -- amiable discussion with Darryl --
2  what's his last name?
3  Q  Harrison?
4     MR. FAY: Harrison.
5     THE WITNESS: Right. At the time I
6  didn't know he was the chief of police. But I
7  was given him on the line as the person to talk
8  to. And we had a very nice conversation.
9  BY MR. BUCKLEY:
10 Q  Tell me what you recall about that
11 conversation.
12 A  I recall that we agreed to have a cup
13 of coffee together when I arrived in Georgetown.
14 Q  Do you recall anything else about the
15 conversation?
16 A  Not really, except that I -- I really
17 don't. I recall it was friendly. It was a
18 friendly conversation. And I know that I told
19 him that we're not there to cause any trouble or
20 break any laws. We wanted to do whatever we do
21 completely within the parameters established by
22 the university for this type of event.