March 29, 2007                    William Maniaci                    Maniaci vs. Georgetown
                                 Washington, D.C.

Page 190

1    Q    Did you visit the Georgetown
2  University Web site and look at the policy
3  regarding speech and expression?
4    A    I'm sure I did.
5         MR. BUCKLEY: Are we up to Exhibit
6  Number 9?
7         MS. SHANAHAN: Yes. Although I've
8  already marked these previous ones.
9         MR. BUCKLEY: Okay. Well, hold it. I
10  don't want to mess up your whole marking system
11  here. Sorry. Thanks.
12         (Maniaci Exhibit Number 9 was marked
13  for identification.)
14  BY MR. BUCKLEY:
15    Q    Let me give you a document which I've
16  marked as Exhibit Number 9, which I will
17  represent to you was taken from the Georgetown
18  University Web site and is the speech and
19  expression policy at Georgetown as it appeared
20  in February 2006, and as it appears today.
21         Actually, this is a document that your
22  counsel produced, M 153 to 155. So we did not

Page 191

1  take this, that is, we, Williams & Connolly, did
2  not take this off the Web site. You actually
3  produced it.
4         MR. FAY: I think that's correct.
5  BY MR. BUCKLEY:
6    Q    Okay. So -- and it's dated January 3,
7  2006 on the last page.
8         So, again, looking at Exhibit Number
9  9, this would be the Georgetown University
10  speech and expression policy as you read it and
11  viewed it and understood it in February 2006,
12  correct?
13    A    I'm not sure if it's been changed
14  between that time and now. This is --
15    Q    No. I said -- I said in
16  February 2006. This is a document that you
17  produced.
18    A    I -- evidently. If you say so.
19    Q    Well, it has a Bates stamp M 153,
20  which your counsel affixed to the document.
21    A    Right. But I'm not sure that I
22  produced this document. I don't know where this

Page 192

1  document came from.
2    Q    It's a document that your counsel
3  produced on your behalf. That's why it has a
4  Bates stamp M.
5    A    If counsel says so, yeah.
6         MR. FAY: I think the date at the
7  bottom is the date of the last promulgation of
8  these by Georgetown, which, since that would
9  have been only five days before the event, it
10  seems unlikely that they amended them after
11  that. But....
12         MR. BUCKLEY: Yeah. I think we're all
13  on the same page here.
14  BY MR. BUCKLEY:
15    Q    This is Georgetown's speech and
16  expression policy as it existed when you
17  attended the conference --
18    A    Okay.
19    Q    -- in February 2006. Do you have any
20  reason to doubt that?
21    A    No, I don't.
22    Q    Okay. So you read it and you

Page 193

1  understood it.
2    A    Yes.
3    Q    Okay.
4    A    Particularly the part about suspending
5  or limiting discourse --
6    Q    Okay.
7    A    -- is contrary to the university's
8  nature.
9         (Maniaci Exhibit Number 10 was marked
10  for identification.)
11  BY MR. BUCKLEY:
12    Q    Have a look at what I've now marked as
13  Exhibit Number 10, which is a document with the
14  Bates stamp GTN 1030 to 1033. And it begins
15  with an E-mail from you sent on Thursday,
16  February 9, 2006.
17    A    Okay.
18    Q    Just take a moment to look at this
19  document.
20    A    Okay.
21    Q    Is that an E-mail that you wrote and
22  sent to Georgetown University on February 9,

49 (Pages 190 to 193)

March 29, 2007          William Maniaci          Maniaci vs. Georgetown
Washington, D.C.

Page 194

1  2006?
2  A    Yes, sir.
3  Q    And -- are its contents accurate in
4  that they express your views and understanding
5  at the time?
6  A    Yes.
7  Q    And looking again at the first page of
8  the document, you state that you represent the
9  Jewish Defense League and that, quote, our group
10  will protest the Palestinian Solidarity
11  Conference, unquote.
12       And that's a correct statement, right?
13  A    Yes.
14  Q    You further state that you initially
15  contacted Sam Samonte.
16  A    I believe that's the name of the
17  gentleman that I spoke to who answered the phone
18  at the campus security office.
19  Q    And that he eventually directed you to
20  the Office of Student Affairs?
21  A    Apparently so.
22  Q    And is that the course of events that

Page 195

1  brought about this E-mail to Mr. Olson, who's
2  the Vice President for Student Affairs and Dean
3  of Students?
4  A    Right.  He apparently advised me to
5  contact the Office of Student Affairs with my
6  questions.
7  Q    Okay.
8  A    And that prompted this E-mail.
9  Q    And you wanted to know what the limits
10  were on your protest.
11  A    As stated in this E-mail.
12  Q    That's correct?
13  A    I had several questions listed here.
14  Q    Okay.  Turn to page 2, where you state
15  in the middle of the page, quote, obviously we
16  are a Jewish, religious and Zionist
17  organization, unquote.
18       What do you mean by Zionist
19  organization?
20  A    We believe that Israel belongs to the
21  Jewish people, and that we encourage immigration
22  from all countries in the world of all Jews to

Page 196

1  Israel.
2  Q    You further state, clearly, our
3  viewpoint and ideology clash head-on with the
4  agenda of the conference participants, end
5  quote.
6       Would you explain that?
7  A    It's obvious that the -- the
8  conference is -- was one for divestment from
9  Israel, and to condemn Israel for its presumed
10  treatment of the Palestinians, who really have
11  no claim to Israel anyway.
12  Q    Was it your design to make sure the
13  conference did not achieve its goal in terms of
14  promoting divestment --
15  A    No.
16  Q    -- from Israel?
17  A    No.  It was our goal to prevent --
18  present a counter viewpoint.
19  Q    You signed this at the bottom, Bill
20  Maniaci, Deputy Chairman, Chief, Intelligence
21  and Security, Jewish Defense League.  Again,
22  those were your positions at the time?

Page 197

1  A    Uh-huh.
2  Q    Okay.  Turn to the next page.  There
3  are a number of quotations.  And some of the
4  quotations are cut off.  But there's one or two
5  I want to ask you about.
6       Looking down, again, on page 3 of 4,
7  that's Bates stamped GTN 1032.  And directing
8  your attention to the top of the page, you'll
9  see the fourth quote says, quote, all warfare is
10  based on deception, unquote.  And the quotation
11  is attributed to Sun Tzu.  Why do you have that
12  as part of the standard quotations that you
13  attach to your E-mails?
14  A    It was just there.  It was just
15  something that we put in.
16  Q    What did you mean by that, that all
17  warfare is based on deception?
18  A    You have to read Sun Tzu to understand
19  that.
20  Q    I don't have the time this afternoon.
21  So why don't you tell me what you understand
22  that quote means?

50 (Pages 194 to 197)

March 29, 2007          William Maniaci          Maniaci vs. Georgetown
Washington, D.C.

Page 198

1   A   It's difficult.  You'd have to read
2   War and Peace to have an understanding.  I can't
3   explain to you what deception and warfare means
4   sitting here at this table.  I think you should
5   know that.
6   Q   I don't think Sun Tzu wrote War and
7   Peace.
8   A   No, he didn't.
9   Q   Do you believe this quote?  Do you
10  believe what's stated there?
11  A   Based upon my military experience,
12  yes, absolutely.
13       MR. FAY:  How is this relevant?
14       MR. BUCKLEY:  I'm not going to engage
15  in a colloquy with you.
16       MR. FAY:  Well, I know.  But it's a
17  quote from somebody on a sheet of paper.  You're
18  asking him what the quote means.  How is it
19  relevant to anything in the case?
20  BY MR. BUCKLEY:
21  Q   It's a quote that you chose, correct?
22  A   The quote had been on our

Page 199

1   communications for some time.
2   Q   And you continued it?
3   A   Sure.
4   Q   Okay.
5       MR. FAY:  How is it relevant?  What's
6   the difference?
7       MR. BUCKLEY:  I'm not going to engage
8   in a colloquy with you over relevance.
9       MR. FAY:  Well, if we're going to ask
10  a lot of irrelevant questions --
11       MR. BUCKLEY:  I'm not.
12       MR. FAY:  -- I'm going to object to
13  it.
14       MR. BUCKLEY:  This is not.
15       MR. FAY:  We've spent enough time here
16  going over things in huge depth.
17       MR. BUCKLEY:  Look, I'm not going to
18  debate with you the relevance of my questions.
19       MR. FAY:  I don't want you to debate.
20  I want you to ask relevant questions.  That's
21  what I want.
22       MR. BUCKLEY:  I am asking relevant

Page 200

1   questions.
2       MR. FAY:  And asking the meaning of a
3   quote by Sun Tzu about warfare --
4       MR. BUCKLEY:  It's his quote.
5       MR. FAY:  Come on.  It's not his
6   quote.
7       MR. BUCKLEY:  No, it's the JDL's
8   quote.
9       MR. FAY:  It's Sun Tzu's quote.
10       MR. BUCKLEY:  It's the JDL's quote.
11  They put it on there.  I'm not going to engage
12  in a debate with you.  It's wasting time.  It's
13  not proper.
14       MR. FAY:  So what?
15  BY MR. BUCKLEY:
16  Q   Directing your attention further in
17  that page, you say:  Never forget the murderers
18  of our Jewish Defense League brothers and
19  sisters.  And then you list Rabbi Kahane, Irv
20  Rubin?
21  A   Meir Kahane.
22  Q   Oh, Meir Kahane.  That's how it's

Page 201

1   pronounced?  Irv Rubin.  Rabbi Kahane.  Is he
2   related to the other --
3   A   That was Rabbi Meir Kahane's son.
4   Q   I see.
5   A   And his wife, who were ambushed and
6   murdered in Israel.
7   Q   And Earl Krugel you list as well?
8   A   That's correct.
9   Q   Can you help me with the quotation,
10  the third one down.  It's the one that's
11  attributed to George Orwell.  It says, quote, We
12  sleep safe in our beds because rough men stand
13  ready in the night to visit violence -- I
14  believe it says violence -- on those who would
15  do us harm, unquote.
16  A   Correct.
17  Q   And do you believe in that quote?
18  A   Yeah, I do.  Yeah.  We sleep safely in
19  our beds because we have a viable police
20  department protecting us.  And they're rough
21  men, believe me.
22  Q   That's not what Orwell was referring

51 (Pages 198 to 201)

March 29, 2007                    William Maniaci         Maniaci vs. Georgetown
                                 Washington, D.C.

---

Page 202

1  to, was it?
2      A   I don't know what was in Orwell's
3  mind.
4          MR. FAY:  Are we going to be in a
5  debate now about Orwell?  Come on.
6  BY MR. BUCKLEY:
7      Q   Did you receive a response to your
8  E-mail to Mr. Olson?
9      A   I may have.  If I did, I don't recall.
10     Q   Did Mr. Harrison call you after you
11 sent the E-mail to Mr. Olson?
12     A   I remember a conversation I had with
13 Mr. Harrison.  He called me when we were in our
14 hotel here in Georgetown -- in Washington, D.C.
15     Q   Was that after you sent this E-mail?
16     A   It was just before the event, yes.
17     Q   Okay.  Let me show you what's been
18 marked as Exhibit Number 11.
19         (Maniaci Exhibit Number 11 was marked
20 for identification.)
21 BY MR. BUCKLEY:
22     Q   This is a document that's Bates

Page 203

1  stamped GTN 968 through 977.
2      A   Uh-huh.
3      Q   And it is an E-mail from you, Bill
4  Maniaci, that is dated February 10, 2006.
5      A   Uh-huh.
6      Q   And it's sent to The Hoya.
7          Do you recognize this E-mail?
8      A   Uh-huh.
9      Q   Is it one you in fact sent on or about
10 that date to The Hoya?
11     A   I believe so.
12     Q   Is The Hoya the student newspaper?
13     A   Yes.
14     Q   Let me ask about your E-mail address.
15 Your E-mail address here is listed as
16 maccabee@charter.net.
17     A   Yes.
18     Q   Is there an organization that's called
19 Maccabee?
20     A   I chose the name Maccabee because it's
21 one that's dear to my heart.
22     Q   Why is it dear to your heart?

Page 204

1      A   The Maccabees have something -- it's
2  directly related to the story of Hanukkah.  And
3  in a nutshell, the -- Judah Maccabee was the
4  leader of an insurrection against the Greeks.
5  And he freed the Jews and the Jewish temple from
6  Greek domination.  And that was over the miracle
7  of Hanukkah, which is celebrated yearly.
8      Q   Is there now an organization that is
9  called the Maccabee group or --
10     A   No.
11     Q   No?
12     A   No.
13     Q   Okay.  I want to direct your attention
14 to the cc line on page 1.  And it indicates that
15 a copy was sent to the treasurer, stroke,
16 controller of JDL, who was Richard Miller; is
17 that correct?
18     A   Yeah, at that time.
19     Q   And then a copy was sent to Ian
20 Sigel --
21     A   Uh-huh.
22     Q   -- who was identified as the chairman

Page 205

1  of the JDL.  Is it your recollection that he was
2  then the chairman?
3      A   Could have been.
4      Q   Okay.  And of course it refers to
5  Mr. Turk as the director of the eastern region
6  of the JDL; and that's correct?
7      A   Uh-huh.
8      Q   It further refers to Mr. Nutting as
9  the director of the western region; and that's
10 correct?
11     A   That's right.
12     Q   And then it refers to Mr. Finberg,
13 who's JDL corporate counsel.
14     A   That's right.  Mr. -- when I stepped
15 down -- now, let me go back.  Ian Sigel took
16 over for a while before we put Matt Finberg in.
17 So Ian was chairman for a short period of time.
18 And Ian is now the treasurer.
19     Q   Okay.  What was the purpose of this
20 E-mail?
21     A   I don't know.  I haven't read it yet.
22     Q   Why don't you familiarize yourself

52 (Pages 202 to 205)

March 29, 2007          William Maniaci          Maniaci vs. Georgetown
Washington, D.C.

---

Page 206

1  with it.
2      A   It's part of a document that was
3  E-mailed to The Hoya during an exchange of what
4  they would accept as a paid ad in The Hoya
5  newspaper.
6      Q   Okay.  Did you write the ad which is
7  attached or is part of the E-mail?
8      A   I believe so.
9      Q   It begins on the third page of the
10 document with the words:  If you are an
11 American, please read.  If you are Jewish, this
12 message is vital?
13     A   Yes.
14     Q   And you wrote the text?
15     A   I did write that, yes.
16     Q   If you go to two pages later, there's
17 a Star of David with a fist.  Is that the symbol
18 of the JDL?
19     A   Yes.  That's the JDL logo.
20     Q   Okay.  And going back to the first
21 page of the proposed ad, it says that it's an
22 invitation to protest; is that correct?

Page 207

1      A   Uh-huh.  I think that's a common
2  activity on a college campus, isn't it?
3      Q   And then you say further in the first
4  full paragraph that the Palestinians, which you
5  put in quotation marks -- why did you put that
6  term in quotation marks?
7      A   Because there's no such thing as a
8  Palestinian.
9      Q   Okay.  You say that they are a show
10 for a bunch of terrorists who hate our
11 democratic non-Muslim country as much as they
12 hate Israel.  Is that correct?
13     A   Yes.
14     Q   Were you referring to the organizers
15 of the conference?
16     A   Let me reread this and I'll tell you.
17 No.  You took that out of context.  That wasn't
18 the meaning of that particular phrase.
19     Q   Turn back to the second page of the
20 document.  It refers to the quotation, I guess
21 from -- well, strike that.
22         It refers to something called a Chayah

Page 208

1  Squad or Chayah Squads.
2      A   Chayah Squad.
3      Q   Chayah Squad?
4      A   Uh-huh.
5      Q   What is the purpose of referring to
6  the Chayah Squads?
7          MR. FAY:  What page are you on?
8          MR. BUCKLEY:  Page 2.
9          THE WITNESS:  What's the purpose?
10 BY MR. BUCKLEY:
11     Q   Yes.
12     A   The purpose of any quote.  To --
13 education.
14     Q   Did The Hoya respond to your proposed
15 ad?
16     A   I had several responses from The Hoya.
17 Initially they agreed to run our ad.  They took
18 our credit card number.  And we had several
19 exchanges of -- where they requested the -- that
20 the copy be changed and there, which we
21 complied with.  And we believed the ad was going
22 to be run.  And then at the very last minute,

Page 209

1  they notified us that they decided not to run
2  the ad.
3      Q   Do you have any of those E-mails?
4      A   No, I don't.  They were on a computer
5  that crashed.
6      Q   When did it crash?
7      A   Oh, a month ago maybe.
8      Q   A month ago?
9      A   Yeah.  Do you want the hard drive?
10 I'll be glad to let you take the information off
11 of it.
12     Q   What kind of a computer is it?
13     A   A Dell.
14     Q   And what do you mean it crashed?
15     A   The hard drive crashed.  It was
16 unformattable.  I couldn't recover any data.  So
17 I took the hard drive out and put a new hard
18 drive in and reinstalled Windows and I'm back up
19 and running.
20     Q   What happened to the old hard drive?
21     A   It's on the floor in my office.
22     Q   Did you give it to anyone to try to

53 (Pages 206 to 209)

Page 210

1  see if any of the data could be restored?
2      A   It couldn't be restored.  I have
3  enough experience knowing that it can't be --
4  it's beyond repair or I would have tried to
5  restore it.  You may be able to do it, but it
6  will cost several thousand dollars to do it.
7      Q   Do you have an explanation as to what
8  happened?
9      A   I have no explanation.  It was old.
10  It had been used constantly for several years.
11      Q   Uh-huh.
12      A   Hard drives crash.
13      Q   And does that mean you lost all your
14  E-mails --
15      A   Yes.
16      Q   -- from before that point in time?
17      A   That's right.
18      Q   That happened a month or so ago?
19      A   Yeah.  I didn't -- yeah.  About a
20  month or so ago I put in a new hard drive.
21      Q   But it just -- it crashed.
22      A   It stopped working.  The computer

Page 211

1  stopped working.  And I could not -- I could not
2  reformat the hard drive.  I could not extract
3  any data from that hard drive.  It ceased to
4  function.  I bought a new hard drive, installed
5  it.  Now the computer works fine.
6      Q   Okay.  Looking at page 1 of this
7  document 11.  It indicates that you're using
8  your credit card?
9      A   Page 1 of what?
10      Q   Of this Exhibit 11.  It indicates
11  you're using your credit card, a Visa.  And the
12  name that appears on the card is Richard Miller,
13  of the Jewish Defense League.
14      A   Okay.
15      Q   So is this a debit card or is this --
16  that you referred to, or is this some different
17  type card?
18      A   I don't know.  It must have been the
19  debit card that Richard was using on our account
20  that we had then.  He was in Denver, Colorado.
21  I was in Reno.
22      Q   Okay.

Page 212

1          (Maniaci Exhibit Number 12 was marked
2  for identification.)
3  BY MR. BUCKLEY:
4      Q   Let me show you what's been marked as
5  Exhibit Number 12, which is a document Bates
6  stamped GTN 1124.  And in this E-mail, which is
7  from Robert Murray at Georgetown, he is printing
8  a posting by Bill Levinson on a Web site called
9  Israpundit.com.  Have you ever heard of
10  Israpundit.com?
11      A   Yeah, I have.
12      Q   What is it?
13      A   It's a Web site where I guess Bill
14  Levinson puts his ideas and whatever else he
15  wants to put on his Web site.
16      Q   Is it a Web site that at the time you
17  would visit?
18      A   I have seen his Web site.  I don't
19  recall how it's structured.  And I don't have
20  time to visit his Web site.
21      Q   You'll notice that the E-mail refers
22  to a backup plan called Crimson Sky.

Page 213

1      A   I have no idea what this is referring
2  to.  This is nothing that I had any knowledge
3  of.
4      Q   Well, he's referring to an event
5  involving the ISM/PSM, which would be the
6  Palestine Solidarity Movement, correct?
7      A   It could be.
8      Q   Do you recall any discussion of doing
9  what he proposes in here, which is to use
10  helium-filled advertising dirigibles and
11  balloons to fly over Georgetown University, I
12  presume --
13      A   No.
14      Q   -- as part of the protest of the
15  event.
16      A   I don't recall.  I don't know who
17  Robert Michael Murray is.
18      Q   He is just somebody who printed this
19  out.
20      A   The "from" --
21      Q   From Israpundit.
22      A   Okay.  I don't know the "from" or the

54 (Pages 210 to 213)

March 29, 2007              William Maniaci          Maniaci vs. Georgetown
Washington, D.C.

Page 214

1  "to" here.
2      Q    Okay.
3      A    So I've never seen this document.
4          MR. FAY:  This -- I take it Mr. Murray
5  works in the -- is director of technology,
6  strategy and development at Georgetown.  And he
7  was sending this to two other people at
8  Georgetown.
9          MR. BUCKLEY:  Right.  I think it's
10 obvious what it is.  It's a printout of what was
11 on a Web site.
12         THE WITNESS:  Not my Web site.  I had
13 nothing to do with that.
14         MR. BUCKLEY:  Okay.  Let's look at the
15 next document, which is Exhibit Number 13.
16         (Maniaci Exhibit Number 13 was marked
17 for identification.)
18         THE WITNESS:  Okay.  I recognize this.
19 BY MR. BUCKLEY:
20     Q    This is a document that your counsel
21 produced.  It's Bates stamped M 131 through 135.
22 Can you identify this for us?

Page 215

1      A    Yes, I can.
2      Q    What is it?
3      A    This is the response that I received
4  after registering for the conference.
5  Apparently this is an E-mail that they send to
6  every paid registrant that's planning on
7  attending.
8      Q    Uh-huh.  It indicates that you
9  registered as a representative of a media
10 outlet.
11     A    Wait a minute.  Oh, no.  This is a
12 media outlet.  No, I didn't register as a media
13 outlet.  I registered as an individual.  So I
14 don't know where this document came from.
15     Q    Well, it was -- again, it was produced
16 by your counsel.
17     A    Well, I -- I may have been in
18 possession of this information, but I didn't --
19     Q    Do you know what SquirrelMail is?
20     A    Who?
21     Q    SquirrelMail?
22     A    SquirrelMail?

Page 216

1      Q    Yeah.  You'll see at the top of the
2  page in the right-hand corner --
3      A    No.
4      Q    -- there's the phrase SquirrelMail.
5  At the bottom of the page.
6      A    No idea.
7          MR. FAY:  You know what that is.
8  That's regular mail.  That's what all the kids
9  her age call regular mail.
10         MR. BUCKLEY:  You're more in tune with
11 the younger people than I am.
12 BY MR. BUCKLEY:
13     Q    So how did you come into possession of
14 this document?
15     A    I don't know.  There's a lot of
16 documents laying around.
17     Q    Did anyone from the JDL register as a
18 representative of a media outlet?
19     A    Yes.
20     Q    Who?
21     A    Matt Finberg.  He was a legitimate
22 representative of a newspaper in -- one of the

Page 217

1  newspapers in Colorado, and had press
2  credentials.
3      Q    And what did that entitle him to?
4      A    I don't know.
5      Q    Was he attending as a journalist or
6  member of the media?
7      A    He was attending as a member of the
8  media.  And they -- I believe they denied --
9  denied him.  Wouldn't let him in as a member of
10 the media.  I don't know.  You have to talk to
11 Mr. Finberg about that.
12     Q    Did he ever publish any article --
13     A    I don't know.
14     Q    -- for the newspaper?
15     A    I think he has.  I'm not sure.  That's
16 in Colorado, not in Nevada.
17         MR. FAY:  I don't know where we got
18 this thing.  It's addressed to somebody by the
19 name of nadeem_muaddi@yahoo.com.
20         MS. CARAGH FAY:  It's to and from that
21 person.
22         MR. FAY:  It doesn't make any sense.

55 (Pages 214 to 217)

March 29, 2007 — William Maniaci — Maniaci vs. Georgetown
Washington, D.C.

Page 218

1      THE WITNESS: Or Bayann Hamid or
2  something down here. I have no idea.
3      MR. FAY: I don't know.
4  BY MR. BUCKLEY:
5      Q    Did the JDL have a table at the ICC on
6  the Georgetown University campus?
7      A    I wasn't allowed to go into the ICC.
8  So I couldn't testify to the fact that they had
9  a table or not.
10     Q    Were you advised that the JDL had a
11  table there?
12     A    Yes. I was advised that they had a
13  table.
14     Q    Who arranged the --
15     A    George -- Dr. Haas.
16     Q    Dr. Haas arranged for the table?
17     A    Yes.
18     Q    And how did he arrange for that table?
19     A    I guess he paid for it with his credit
20  card.
21     Q    And did he disclose that it was a
22  table for the JDL?

Page 219

1      A    You have to ask Dr. Haas.
2      Q    Uh-huh. Are you aware that the person
3  who registered for the table in the ICC
4  registered under the name of an organization or
5  group called Palestinians Are People, Too?
6      A    Could have.
7      Q    Have you heard of that group before?
8      A    I didn't -- no.
9      MR. FAY: Bill, you should stay in one
10  place.
11     THE WITNESS: I'm sorry, my neck was
12  hurting.
13     MR. FAY: The young man with the
14  camera here is going to go crazy. Sorry.
15  BY MR. BUCKLEY:
16     Q    You were answering.
17     A    I'm sorry. Where was I?
18     Q    You were talking about whether you had
19  heard of the group or heard of the phrase before
20  Palestinians Are People, Too?
21     A    Yeah. I have. Dr. Haas mentioned
22  that.

Page 220

1      Q    Mentioned what?
2      A    I heard him say something about
3  Palestinians Are People, Too.
4      Q    What did he say about it?
5      A    I don't recall his words. Why don't
6  you ask him?
7      Q    Did he -- I'm trying to get your
8  knowledge.
9      A    I don't have direct knowledge.
10     Q    Did he say he registered under that
11  name, Palestinians Are People, Too?
12     A    The only thing I was certain of is
13  that he had -- he told me he had gotten two
14  tables for us in the ICC. And that was fine.
15     Q    Okay. Let me hand you what's been
16  marked as Exhibit Number 14.
17     (Maniaci Exhibit Number 14 was marked
18  for identification.)
19  BY MR. BUCKLEY:
20     Q    This is a document that your counsel
21  produced on your behalf. It's Bates stamped
22  M 110 through M 125. Can you identify it?

Page 221

1      A    This appears to be a handout that was
2  given. It could have been a conference -- media
3  information packet. I can identify it because
4  it says it's a Palestinian Solidarity Movement
5  information packet.
6      Q    Well, can you explain how you received
7  this since it's a media packet and you said you
8  didn't register as media?
9      A    It could have been sent to
10  Mr. Finberg. Mr. Finberg could have made
11  copies. He could have laid it around where we
12  were convening. That's probably what happened.
13     But I'm -- it's supposition. I have
14  no idea.
15     Q    Okay.
16     MR. FAY: We sent this to you folks.
17  You asked for everything we had from the
18  conference. We didn't mark things as somebody
19  came in -- a number of people came in who had
20  been at the conference. It was probably picked
21  up from somewhere. But we don't know where it
22  came from.

56 (Pages 218 to 221)

March 29, 2007          William Maniaci          Maniaci vs. Georgetown
                        Washington, D.C.

Page 222

1  BY MR. BUCKLEY:
2      Q    Did you read it at the time?
3      A    I may have looked at it.
4      Q    Okay.
5      A    I don't know if I did or not.  It's
6  addressed to the media.  I don't know if I read
7  it or not.
8          If this was a handout at the beginning
9  of the conference, I'm sure I didn't have an
10 opportunity to read it because all the paperwork
11 that I had was knocked out of my hands when I
12 was assaulted.  So....
13     Q    Why don't you turn to the third page
14 of the document.  It's page 3 of 16.  It's Bates
15 stamped M 112.  You'll see it refers to the
16 events on Saturday, February 18th.  And you'll
17 note that there was scheduled at 9:30 a.m. a
18 speaker panel.  And the topic was, quote, the
19 status of the divestment movement, unquote.  Is
20 that the session that you attended?
21     A    Yes, it is.
22     Q    Turn to page 5 of 16.  You'll see on

Page 223

1  that page a paragraph that's entitled Conference
2  Code of Conduct.  Do you see that?
3      A    Uh-huh.
4      Q    Looking at the second paragraph below
5  that heading, you'll see it states, quote, by
6  registering for the Fifth Annual PSM Conference,
7  I agree not to engage in disruptive behavior,
8  visibly, physically or audibly, by obstructing
9  the space of the sessions, standing in the way
10 of the conference registrants or speakers,
11 shouting over others, or attempting to derail
12 productive movement-building conversation with
13 hate speech, unquote.
14         Did you agree to abide by that rule?
15     A    I don't know.  I don't know if I
16 signed such a document.  This was in a media
17 packet.
18     MR. FAY:  This is the conference's
19 statement.  At least that's what it says on the
20 front.
21     THE WITNESS:  This is a handout.
22     MR. FAY:  Georgetown, not his.

Page 224

1      THE WITNESS:  I paid my money and
2  signed in.
3      MR. BUCKLEY:  Pardon?  You're arguing
4  with me, which I don't want.  I'm asking
5  questions of the witness.
6      MR. FAY:  Yeah.
7      MR. BUCKLEY:  I don't want to argue
8  with you over the meaning of the document.
9      MR. FAY:  How can he answer about what
10 the meaning is of this when he didn't do it?
11     MR. BUCKLEY:  You know better than to
12 argue.
13     MR. FAY:  It was put out by somebody
14 else.  Come on.
15     MR. BUCKLEY:  You're arguing over the
16 questions.  That's improper.
17     MR. FAY:  No, it isn't improper.
18     MR. BUCKLEY:  It is improper.
19     MR. FAY:  You're permitted to ask
20 relevant questions, Mr. Buckley.  That's it.
21     MR. BUCKLEY:  This is relevant.  Very
22 relevant.

Page 225

1      MR. FAY:  Explain how, then.
2      MR. BUCKLEY:  I'm not going to get
3  into a colloquy with you.  That's improper.
4  It's improper to invite --
5      MR. FAY:  Well, if we continue on with
6  stuff -- look.  On the front of this, it
7  indicates that it comes from the Palestinian
8  Solidarity Movement.
9      MR. BUCKLEY:  You're arguing.  I don't
10 want you to be coaching the witness.  I don't
11 want you to be arguing about the document.
12     MR. FAY:  Okay.  I'm going to instruct
13 him not to answer any more questions about the
14 meaning of something published by the
15 Palestinian Solidarity Movement unless he says
16 he knows what it is.
17     MR. BUCKLEY:  He acknowledged that he
18 may have read the document at the time.  You
19 produced it.
20     MR. FAY:  That --
21     MR. BUCKLEY:  I can ask questions
22 about it.

57 (Pages 222 to 225)

Case 1:06-cv-01625-LFO    Document 45-26    Filed 02/12/2008    Page 10 of 12

March 29, 2007          William Maniaci          Maniaci vs. Georgetown
Washington, D.C.

Page 226

1    MR. FAY: That doesn't mean he can
2  interpret what the heck's in here.
3    MR. BUCKLEY: This is not 20 years
4  ago. You can't come into a deposition today and
5  obstruct it.
6    MR. FAY: No one is obstructing
7  anything. We've been here now for what, four
8  hours all together?
9    MR. BUCKLEY: Assuming --
10    MR. FAY: We haven't even gotten to
11  the event yet.
12    MR. BUCKLEY: You're suing Georgetown
13  for millions and millions of dollars. I have a
14  right to ask my questions. Let me move on and
15  use the time productively.
16    MR. FAY: Well, go ahead and do it.
17  Let's get off this stuff.
18    MR. BUCKLEY: No. I'm going to stick
19  to my topic, and I'll ask the questions.
20    MR. FAY: Well, look --
21  BY MR. BUCKLEY:
22    Q    Directing your attention to page 5 of

Page 227

1  16 again, you'll see there's a last line that
2  states, quote, those in violation of the above
3  statement will be asked to leave the conference,
4  end quote.
5    A    Yes.
6    Q    In your view, did Georgetown have a
7  right to impose that requirement?
8    A    On who?
9    MR. FAY: This isn't a Georgetown
10  document.
11  BY MR. BUCKLEY:
12    Q    Did the sponsor --
13    MR. FAY: It says right on the front.
14  BY MR. BUCKLEY:
15    Q    Let me ask you then, did the sponsors
16  of the conference have the right to impose that
17  requirement, in your view?
18    A    I don't know. It depends on the
19  circumstance.
20    MR. FAY: You're asking for a legal
21  conclusion.
22    MR. BUCKLEY: I'm asking for his

Page 228

1  understanding, which is how I phrased the
2  question.
3    MR. FAY: How is that relevant?
4    MR. BUCKLEY: Again, you're -- you're
5  way over the -- over the line.
6    MR. FAY: No, I'm not. The rule says
7  relevant questions. We've been very patient
8  with all this.
9    MR. BUCKLEY: It says questions
10  calculated to lead to the discovery of relevant
11  evidence.
12    MR. FAY: Every place he worked.
13  Every place he lived.
14    MR. BUCKLEY: It's all relevant.
15    MR. FAY: Come on. I mean, you've had
16  a full, wide range. But asking him to --
17  questions about the interpretation of something
18  published by the Palestinian Solidarity Movement
19  is, to put it bluntly, ridiculous.
20  BY MR. BUCKLEY:
21    Q    What day did you arrive in town before
22  the conference?

Page 229

1    A    A couple of days before. I don't
2  recall the date, the exact day or date.
3    Q    Now, did you meet with Mr. Harrison
4  before the conference?
5    A    No.
6    Q    You mentioned one conversation you had
7  with him on the telephone where you discussed
8  the possibility of having a cup of coffee with
9  him.
10    A    That was early on.
11    Q    Okay. Did you have another
12  conversation with him prior to the conference?
13    A    He called me in my hotel room.
14    Q    And do you understand how he knew you
15  were at that particular hotel?
16    A    I think I told -- we were totally
17  upfront with them. We told them where we would
18  be staying. Practically told him what we would
19  be wearing, you know.
20    Q    Do you recall what day he called you?
21    A    Probably -- if the event was on a --
22  on a Saturday, he probably called me on a

58 (Pages 226 to 229)

March 29, 2007          William Maniaci          Maniaci vs. Georgetown
Washington, D.C.

Page 230

1   Friday. I'm not sure.
2       Q    What do you recall about that
3   conversation?
4       A    I recall that his demeanor was totally
5   different than it was the first time we spoke.
6   Instead of being friendly, he was more
7   confrontational. And I do recall telling him
8   verbatim, I told him that we're here to build
9   bridges, not to burn them. I told him that we
10  were there in the spirit of mutual cooperation.
11  And all we wanted to do is what was within the
12  legal parameters.
13      Q    Okay.
14      A    I think I mentioned that we would
15  be -- I was concerned because we would be -- we
16  knew we'd have some very elderly people being
17  bused in. And I was concerned because the
18  weather was cold. And I knew that they would be
19  in need of restroom facilities. And I received
20  his assurance that they would be allowed to use
21  the restroom while they were on the campus.
22      Q    Did he say --

Page 231

1       A    It turns out they were refused
2   restroom privileges.
3       Q    Did he say anything else?
4       A    I don't remember.
5       Q    Okay. Let's turn to Saturday,
6   February 18th. You were staying at the Wyndham
7   Hotel on, was it M Street and 14th --
8       A    Yes.
9       Q    -- Northwest?
10          How did you get from there to the
11  Georgetown University campus?
12      A    Rode in Bob Turk's rental car.
13      Q    Okay. Had you done anything else that
14  morning?
15      A    Excuse me?
16      Q    Had you gone anything else that
17  morning?
18      A    I probably had breakfast.
19      Q    Had you gone to services that day?
20      A    No. No. As a matter of fact, it's
21  not required as long as we pray ourselves, which
22  I did.

Page 232

1       Q    Okay. What time did you arrive on the
2   Georgetown University campus?
3       A    I don't remember.
4       Q    What did you do once you arrived?
5       A    Proceeded to whatever the hall that
6   was, where the registration was, paid my fee.
7   Signed up. Went through their security. Went
8   upstairs and found a seat and sat down.
9       Q    Who was with you when you came in and
10  registered and went upstairs to the hall?
11      A    Keith Bailey may have been with me. I
12  think maybe he was alongside of me. But I'm not
13  sure.
14      Q    Mr. Turk was with you?
15      A    I went in -- no, Mr. Turk wasn't with
16  me at that particular time.
17      Q    Uh-huh.
18      A    I had intended to -- I had registered
19  for the conference. And I was intent on sitting
20  down and hearing what the participants were
21  saying.
22      Q    So Mr. Turk drove you over.

Page 233

1       A    Yes.
2       Q    But he did not go with you to the
3   registration line?
4       A    He was on campus. He could have been
5   next to me. He could have been walking behind
6   me. I don't know exactly when he registered. I
7   know he did register.
8       Q    Before entering Gaston Hall, did you
9   see Mr. Smith?
10      A    I don't know who Mr. Smith is. Who's
11  Mr. Smith? Oh, that Mr. Smith. Are you
12  speaking of the officer?
13          MR. FAY: D.C. police --
14  BY MR. BUCKLEY:
15      Q    If I call him Lieutenant Mike Smith?
16          MR. BUCKLEY: You can't talk.
17  BY MR. BUCKLEY:
18      Q    Lieutenant Mike Smith?
19      A    Did I see him that morning? I don't
20  remember.
21      Q    Did you see him before you entered the
22  hall?

59 (Pages 230 to 233)

March 29, 2007          William Maniaci          Maniaci vs. Georgetown
Washington, D.C.

Page 234

1      A   I don't recall. I don't know if I did
2  or not. I wasn't looking for him. I was intent
3  on getting through their security, getting
4  upstairs and having a seat.
5      Q   Okay. Do you recall how many rows
6  back you sat from the stage?
7      A   Probably -- I wasn't too far from the
8  stage. I was probably five or six rows back
9  from the stage on the -- as you're facing the
10 stage, I would be on the left-hand side.
11     Q   Where was the microphone positioned in
12 relation to where you were sitting?
13     A   Behind me a couple rows.
14     Q   Okay. What do you recall -- first of
15 all, what time do you recall the session
16 beginning?
17     A   It was late. I think it was scheduled
18 to begin at -- I'm not sure of the time anymore.
19 But I know they made a couple of announcements
20 apologizing because the conference was late due
21 to some traffic problems, parking problems,
22 apparently.

Page 235

1          (Maniaci Exhibit Number 15 was marked
2  for identification.)
3  BY MR. BUCKLEY:
4      Q   Okay. Let me show you what I've
5  marked as Exhibit Number 15. It's just a rough
6  sketch. And looking at the top of the document,
7  that's -- there's a box there. And that
8  represents the stage.
9      A   Uh-huh.
10     Q   And to the left-hand side is just a
11 hallway outside Gaston Hall.
12     A   Uh-huh.
13     Q   You can see the doors, the two double
14 doors there are drawn leading from the hallway
15 or the foyer into Gaston Hall.
16     A   I don't think they're in the right
17 place, but that's okay.
18     Q   Okay. Can you tell me approximately
19 where you were sitting, to the best of your
20 recollection?
21     MR. FAY: Can you identify -- by the
22 box you mean up at the top?

Page 236

1      MR. BUCKLEY: Yes.
2      MR. FAY: Where it says 300A and
3  there's a --
4      MR. BUCKLEY: Yeah. That's the stage
5  area, if you will.
6      THE WITNESS: This is the stage.
7  BY MR. BUCKLEY:
8      Q   Right.
9      A   Right?
10     Q   Right.
11     A   And the panel was sitting up here at a
12 table.
13     Q   All right.
14     A   And I was sitting probably right about
15 here. And the microphone -- the podium that
16 they put up was right about here.
17     Q   Okay.
18     MR. FAY: Why don't you hold that up
19 so he can see it on the TV?
20     THE WITNESS: I'm sorry.
21 BY MR. BUCKLEY:
22     Q   Why don't you point to where the stage

Page 237

1  was.
2      A   This is the stage here. I was sitting
3  approximately in this position, a few rows back
4  from the stage. And when they set up the podium
5  with the microphone for the people that were
6  going to ask questions, it was behind me a
7  couple of rows, towards the rear of the
8  auditorium.
9      Q   Okay. Were you sitting in the aisle
10 seat?
11     A   Yes.
12     Q   And Mr. Bailey was to your left?
13     A   Yes. He wasn't right next to me, but
14 he was nearby.
15     Q   Was there an empty seat next to you?
16     A   I think there was. Yeah, there was an
17 empty seat.
18     Q   And then was Mr. Bailey sitting in the
19 seat after that, so it would be the third seat
20 in?
21     A   I believe so.
22     Q   What do you recall happening when the

60 (Pages 234 to 237)

BRYNTESON REPORTING, INC.
(703) 768-8122    www.bryntesonreporting.com   Fax: (703) 768-8921