Case 1:06-cv-01625-LFO   Document 45-29   Filed 02/12/2008   Page 1 of 13

March 29, 2007   William Maniaci   Maniaci vs. Georgetown
Washington, D.C.

Page 334

1  Mr. Murray at Georgetown printed out. It comes
2  from the Israpundit Web site.
3      A   Mr. Eric Smulson.
4      Q   Right. He printed it out. That's all
5  that means. If you look down at the body of the
6  document --
7      A   Okay. What have I got to do with the
8  Israpundit?
9      Q   Huh? It's a printout from the
10 Israpundit Web site.
11     A   Okay.
12     Q   And, apparently, it's an article by
13 Mr. Levinson entitled, quote, Palestinian
14 Solidarity Movement Routed at Georgetown.
15     A   Where do you see that?
16     Q   Unquote. Right here. At the top of
17 the page.
18     A   Okay.
19     Q   Are you familiar with this publication
20 called Front Page?
21     A   Front Page?
22     Q   Yes.

Page 335

1      A   Are you talking about Front Page
2  magazine?
3      Q   I don't know.
4      A   That's the only Front Page that I'm
5  aware of.
6      Q   Okay. Is that something that
7  Mr. Kaplan runs?
8      A   No.
9      Q   Or he works for?
10     A   Front Page magazine is -- is not run
11 by Mr. Kaplan. He's submitted articles there, I
12 believe. But he's not employed by them.
13     Q   What type of publication is that,
14 Front Page?
15     A   I don't know. They have their own Web
16 site. They have their own viewpoints. It is, I
17 think, a very conservative Web site.
18     Q   Just looking at the first paragraph in
19 Mr. Levinson's article, he says, quote,
20 Civilization's defenders, including
21 representatives of the Jewish Defense League,
22 Stop the ISM, and Hillel, won an overwhelming

Page 336

1  and decisive public relations victory over the
2  Palestinian Solidarity Movement at Georgetown
3  University during the past weekend.
4          The first-time use of aggressive and
5  proactive tactics damaged the PSM's credibility
6  and indeed the commitment of its members so
7  badly that it is unlikely that this organization
8  will ever again hold another annual conference
9  in North America again, unquote.
10     A   From your mouth to God's ears.
11     Q   Do you agree that the JDL used
12 aggressive and proactive tactics at the
13 conference?
14     A   Again, you're asking me for a
15 definition of aggressive. Your definition and
16 mine may be entirely different.
17         I think that what they're talking
18 about there as aggressive and proactive are the
19 fact that we had 100 senior citizens out there
20 waving American and Israeli flags. I think that
21 is what is meant by aggressive and proactive.
22     Q   If you look further down that page to

Page 337

1  a numbered paragraph, he refers to
2  counterdemonstrations. He further refers to,
3  quote, humiliating and embarrassing questions to
4  the PSM speakers, unquote. Do you agree that
5  members of the JDL asked humiliating and
6  embarrassing questions to the PSM speakers?
7      A   Not that I heard.
8      Q   Did you ask any humiliating and
9  embarrassing questions?
10     A   No. I asked a question that could
11 have been answered with a yes or a no.
12     Q   Did you intend your question to be
13 provocative?
14     A   Not really. I wanted to see if they
15 would admit their involvement in suicide
16 bombing.
17     Q   Who is they?
18     A   Their support. I asked -- it was a
19 question where I wanted to know what their
20 policy was. It was a very simple question. And
21 they didn't answer the question. They spun it
22 over to Republicans, George Bush, United States

Case 1:06-cv-01625-LFO   Document 45-29   Filed 02/12/2008   Page 2 of 13

March 29, 2007 · William Maniaci · Maniaci vs. Georgetown
Washington, D.C.

**Page 338**

1  and Israel dropping bombs on children. It had
2  nothing to do with my question.
3  Q  Didn't they also say that Ariel Sharon
4  was a terrorist?
5  A  I don't know. I don't remember that.
6  Q  Okay. Turn to the second page of this
7  document. Look at the penultimate paragraph on
8  that page, where it says we must also exploit
9  the situation. Okay?
10  A  Where is this located?
11  Q  The second page of the document.
12  A  Okay.
13     MR. FAY: How many paragraphs down?
14     MR. BUCKLEY: I said penultimate.
15     MR. FAY: Penultimate.
16     THE WITNESS: Where?
17     MR. BUCKLEY: Next to the last.
18     MR. FAY: Whew.
19  BY MR. BUCKLEY:
20  Q  The one that begins, we must also
21  exploit.
22  A  Okay. This was written by whom?

**Page 339**

1  Q  Mr. Levinson.
2  A  Okay.
3  Q  Okay.
4  A  I haven't seen this document.
5  Q  Okay. I just want to ask you about
6  one sentence. It's the sentence that appears in
7  the fourth line. It says, quote, the PSM must
8  be attacked repeatedly and aggressively, and in
9  every possible forum and on every possible
10  issue, end quote. Do you agree with that?
11  A  It depends on what you mean by
12  attacked. I think he's saying attacked in the
13  sense that they need to be challenged.
14  Q  Is that what you thought you were
15  doing?
16  A  What's that?
17  Q  Challenging the PSM.
18     MR. FAY: Does Georgetown really want
19  to be in the position of defending the
20  Palestinian Solidarity Movement?
21     MR. BUCKLEY: I just asked the
22  question.

**Page 340**

1     MR. FAY: Oh, that's fine.
2     THE WITNESS: Would you restate the
3  question.
4     MR. FAY: I'm kind of amazed.
5  BY MR. BUCKLEY:
6  Q  Is that what you thought you were
7  doing, aggressively attacking the PSM?
8  A  No.
9  Q  When did you first go to see Mr. Fay?
10  A  When did I first go to see Mr. Fay?
11  Q  Yes. Yes.
12  A  Before I left to go back to Nevada.
13  Q  Who referred you to him?
14     MR. FAY: He's not going to get into
15  any questions about the attorney-client
16  relationship. Forget it.
17     MR. BUCKLEY: I'm not asking --
18     MR. FAY: I'm instructing him not to
19  answer any of those questions about the
20  attorney-client relationship.
21     THE WITNESS: Then I'm not going to
22  answer the question.

**Page 341**

1  BY MR. BUCKLEY:
2  Q  Did you go to his office?
3  A  I'm not answering that question.
4     MR. FAY: Oh, come on. You know
5  that's out.
6     MR. BUCKLEY: I've got photographs
7  that you produced from your office.
8     MR. FAY: Well, what does that have to
9  do with what he came -- did and came to my
10  office?
11     MR. BUCKLEY: I'm not asking about
12  that. I'm asking whether he went to your
13  office. Is that a privileged communication,
14  whether he went to your office of not?
15     MR. FAY: You can ask him whether the
16  photograph was taken at my office. I don't care
17  about that.
18     MR. BUCKLEY: That's a different
19  question.
20     MR. FAY: Yeah, it is a different
21  question. That's right. If you want to ask the
22  question, ask it. Let's get this thing done.

Case 1:06-cv-01625-LFO   Document 45-29   Filed 02/12/2008   Page 3 of 13

March 29, 2007    William Maniaci    Maniaci vs. Georgetown
Washington, D.C.

Page 342

1  (Maniaci Exhibit Number 23 was marked
2  for identification.)
3  BY MR. BUCKLEY:
4     Q   Let me show you several photographs
5  that were marked as Deposition Exhibit 23A
6  through H.
7        Were these photographs taken at
8  Mr. Fay's office?
9     A   I believe so. Yes.
10   Q   On what day?
11   A   I don't -- it was --
12   Q   Do you recall whether it was the
13 Monday or the Tuesday?
14   A   Just a second, please. The conference
15 itself was terminated on Sunday. And Monday
16 would have been the first day I would have seen
17 Mr. Fay. So probably Monday.
18   Q   Had you previously known Mr. Fay?
19   A   No.
20   Q   Did Mr. Finberg know Mr. Fay?
21   A   I don't know.
22   Q   Mr. Turk?

Page 343

1     A   I don't know.
2     Q   Mr. Bailey?
3     A   I don't know.
4     Q   Okay. Who took these photographs?
5     A   Someone in Mr. Fay's office.
6     Q   Okay. There's a woman shown in some
7  of these photographs. Can you tell me who she
8  is?
9        MR. FAY: I don't see any woman.
10 Maybe you have a photograph -- oh, wait a
11 minute. Okay. Okay. He's talking about that
12 one in the picture. I should hold it up so you
13 can -- the picture right there. The hair
14 depicted right there.
15       THE WITNESS: Okay.
16 BY MR. BUCKLEY:
17   Q   Do you know who that is?
18   A   Not definitively.
19   Q   Who do you believe it is?
20   A   I believe it's Ms. Devorah.
21   Q   How did she come to go to Mr. Fay's
22 office?

Page 344

1        MR. FAY: How can he possibly answer
2  that?
3        MR. BUCKLEY: If he knows. If he
4  knows.
5        MR. FAY: Conversations?
6  BY MR. BUCKLEY:
7     Q   Did you invite her to go or ask her to
8  go? You're looking at Mr. Fay. He doesn't have
9  the answer. Only you would know.
10   A   I'm looking at Mr. Fay because --
11       MR. FAY: In fact I'm the only one
12 that has the answer. Ms. Devorah's brother and
13 sister-in-law and I think one of the children
14 were murdered by Palestinian terrorists of the
15 Hamas group which is one of the supporters of
16 Palestinian Solidarity Movement. I -- my
17 practice, other than this, is almost all
18 representation of American victims of terrorism.
19 BY MR. BUCKLEY:
20   Q   Okay. Look at 23A. Can you tell me
21 what you're pointing to there? Which knee is
22 that and what you're pointing to.

Page 345

1     A   I think that must have been, I skinned
2  my knees.
3     Q   Which knee is that, right or left?
4     A   Well, probably my left knee.
5     Q   Okay. How about --
6     A   It could have been the right knee,
7  though. I'm not sure from that angle.
8     Q   Okay. How about 23B. Is that you?
9     A   Yes. That's me.
10   Q   Only you would know for sure. Maybe
11 others would know.
12   A   I know that's me.
13   Q   23C is you again?
14   A   23 which?
15   Q   23C is you?
16   A   A, B, C. Yes.
17   Q   How about 23D, what are you pointing
18 to there?
19   A   A bruise on my right arm.
20   Q   Now, there's a Band-Aid and a piece of
21 gauze on your right arm. Is that where they
22 took blood at Walter Reed?

Case 1:06-cv-01625-LFO    Document 45-29    Filed 02/12/2008    Page 4 of 13

March 29, 2007     William Maniaci     Maniaci vs. Georgetown
Washington, D.C.

Page 346

```
 1    A    This picture looks like it was taken
 2  in the hospital.
 3    Q    At Walter Reed?
 4    A    Yeah.
 5    Q    Did they draw --
 6    A    That must have been where they either
 7  drew blood or had an IV or something. I think
 8  they drew blood or something in there.
 9    Q    Did Ms. Devorah go with you to --
10    A    No. I don't -- no, she wasn't at the
11  hospital. I went just with Bob Turk.
12    Q    Who took this picture?
13    A    Bob Turk.
14    Q    Bob Turk took this picture. I see.
15  Okay. Did he take the pictures at Mr. Fay's
16  office as well?
17    A    Excuse me?
18    Q    Did he take the pictures at Mr. Fay's
19  office as well?
20    A    I don't know. You'll have to ask
21  Mr. Fay who took the picture.
22    Q    Okay. Look at E. Are we back at
```

Page 347

```
 1  Mr. Fay's office?
 2    A    Yes.
 3    Q    What are you pointing to there?
 4    A    A bruise on my right wrist.
 5    Q    Okay. Look at F. What are we looking
 6  at there?
 7    A    Skinned knee.
 8    Q    Is that at Mr. Fay's office?
 9    A    Yes.
10    Q    Okay. And G, is that at Mr. Fay's
11  office?
12    A    Yes.
13    Q    And what is being illustrated there?
14    A    I have no idea. Maybe that's an
15  accidental photograph. I don't know.
16    Q    Just a clenched fist or something?
17    A    I don't know what it's there for.
18         MR. FAY: I don't know.
19  BY MR. BUCKLEY:
20    Q    And H. What's being shown there?
21    A    My sprained ankle.
22    Q    That's your right foot?
```

Page 348

```
 1    A    Yes.
 2    Q    And is that at Mr. Fay's office?
 3    A    Yes. Same rug.
 4    Q    Do you bruise easily?
 5    A    Not really. I haven't had a bruise
 6  like that on my abdomen since or before.
 7    Q    Okay. Now, which of these are from
 8  the fall that you experienced on Sunday, and
 9  which of these are from whatever happened at
10  Gaston Hall on Saturday?
11    A    The only thing that's from the fall
12  could be the skinned knees, because the -- I had
13  the sprained ankle and I had the other injuries
14  as a result of the confrontation or the assault
15  at Georgetown.
16    Q    Did you take any medication for the
17  sprained ankle on Saturday?
18    A    No. What medication would be for
19  sprained ankles? Bengay maybe.
20    Q    Did you report the incident at
21  Georgetown to any law enforcement agencies?
22    A    Yes.
```

Page 349

```
 1    Q    Which law enforcement agencies?
 2    A    I started out with the Metropolitan
 3  Police Department. As a matter of fact, as I
 4  was being walked off campus by Sergeant DeLisi,
 5  I informed Sergeant DeLisi that I wanted to make
 6  a complaint for battery against the special
 7  police officers on the university campus.
 8         And he said that they don't -- they
 9  don't take complaints. He didn't take
10  complaints against them. And I asked him who
11  did. And he told me that they did, pointing to
12  the officers that had assaulted me. So he was
13  telling me to complain to the same people.
14         (Maniaci Exhibit Number 24 was marked
15  for identification.)
16  BY MR. BUCKLEY:
17    Q    Look at Exhibit Number 24.
18    A    Uh-huh.
19    Q    Can you tell me what that is?
20    A    That looks like a statement that I
21  wrote.
22    Q    It's Bates stamped M 195 and 196.
```

88 (Pages 346 to 349)

Case 1:06-cv-01625-LFO   Document 45-29   Filed 02/12/2008   Page 5 of 13

March 29, 2007   William Maniaci   Maniaci vs. Georgetown
Washington, D.C.

Page 350

1   A   Yeah.
2   Q   What does it relate to?
3   A   Let me read it.
4       MR. FAY: What number is this?
5       THE WITNESS: 24.
6       MR. FAY: Okay.
7       THE WITNESS: What's your question?
8   BY MR. BUCKLEY:
9   Q   Can you tell us what this is? It's a
10  statement you made to whom?
11  A   That was a statement that I believe I
12  may have given to the Metropolitan Police
13  Department in support of a complaint.
14  Q   Did you file a formal complaint with
15  the Metropolitan Police Department?
16  A   Yes, I did. I don't know -- I
17  remember the statement. This is -- this is
18  discussing an event and discussion that I had
19  with Detective Scott Emmons.
20  Q   Did you attempt to have any of the
21  Georgetown employees arrested?
22  A   By attempt to have them arrested do

Page 351

1   you mean did I sign a -- I want to sign a
2   criminal complaint against them?
3   Q   Yes.
4   A   I tried to sign a criminal complaint
5   and Sergeant DeLisi refused to take the report.
6   Q   Okay.
7   A   And I finally got a report initiated.
8   And subsequently, I wrote a large complaint and
9   sent it to several -- many law enforcement
10  agencies.
11  Q   But did you pursue trying to file a
12  criminal complaint with the MPD?
13  A   Yeah.
14  Q   What was the result of that?
15  A   They opened an investigation.
16  Q   I'm talking about the Metropolitan
17  Police Department now.
18  A   Yes.
19  Q   Okay. Were you told the result of
20  that investigation?
21  A   I was called by someone in IAD who
22  asked me if I wanted to pursue charges against

Page 352

1   Sergeant DeLisi. And my response was I didn't
2   want to ruin Sergeant DeLisi's career. I just
3   thought he needed a good butt-chewing.
4   Q   Was your complaint directed at
5   Sergeant DeLisi as opposed to, say, Georgetown
6   University employees?
7   A   Sergeant DeLisi was -- although he
8   didn't in my estimation respond properly when
9   requested that I have medical attention, the
10  persons that needed to be listed as subjects on
11  a report of investigation were the two officers
12  from Georgetown University.
13  Q   Okay. Well, did the MPD conduct an
14  investigation of the two public safety officers
15  of Georgetown?
16  A   I don't think they did.
17  Q   Were you formally advised of the
18  results of the investigation by MPD?
19  A   I received notification from MPD. I'm
20  not certain, I don't recall exactly what they
21  said. But it was something referring the case
22  to other agencies or something.

Page 353

1   Q   Do you have a copy of that
2   communication?
3   A   No, I don't.
4   Q   What happened to it?
5   A   Probably -- if I got it by E-mail, it
6   was on the crashed computer.
7   Q   Do you know you got it by E-mail as
8   opposed to --
9   A   I don't know offhand. I don't know.
10      (Maniaci Exhibit Number 25 was marked
11  for identification.)
12  BY MR. BUCKLEY:
13  Q   Look at Exhibit Number 25. Can you
14  tell me what that is? Again this is a document
15  Bates stamped M 40.
16  A   It's an E-mail from me to Lieutenant
17  Eaves, E-A-V-E-S. Okay. This is a guy that I
18  just -- I told you, that got ahold of me and we
19  talked about Sergeant DeLisi.
20  Q   Now, didn't you pursue this with
21  Lieutenant Mike Smith since he was an MPD
22  officer?

Case 1:06-cv-01625-LFO  Document 45-29  Filed 02/12/2008  Page 6 of 13

March 29, 2007  William Maniaci  Maniaci vs. Georgetown
Washington, D.C.

Page 354

1  A  No.
2  Q  Didn't you try to give him the
3  criminal complaint?
4  A  I asked Lieutenant Smith what I should
5  do, because I told -- in fact, this was again at
6  the Jewish delicatessen.
7  Q  I'm going to visit that place.
8  A  You should. And I told Lieutenant
9  Smith that I had attempted to make a complaint.
10  And I outlined the circumstances. And he said
11  just a moment, and he got on the radio, and he
12  called, and an MPD officer came and took my
13  complaint.
14  Q  Okay. Now, did you ask Sergeant
15  DeLisi why he didn't intervene on Saturday since
16  he was there at Gaston Hall?
17  A  He wasn't there at Gaston Hall.
18  Q  Sergeant Mike Smith?
19  A  You said Sergeant DeLisi.
20  Q  Excuse me. Let me begin again. Did
21  you ask Lieutenant Mike Smith why he didn't
22  intervene on Saturday?

Page 355

1  A  No. It would have been a stupid
2  question. It's not his jurisdiction.
3  Q  He's an MPD officer.
4  A  But that's -- it's not his
5  jurisdiction. He was there as an observer. He
6  was there for his own reasons. He was not on
7  duty. And they have their own commissioned
8  police officers. They were the ones that were
9  misbehaving. So it wasn't in his purview to
10  interfere.
11  (Maniaci Exhibit Number 26 was marked
12  for identification.)
13  BY MR. BUCKLEY:
14  Q  Look at Exhibit Number 26, which is a
15  letter dated March 6, 2006, from you to the
16  Federal Bureau of Investigation. Can you tell
17  me what this document is? It's Bates stamped
18  GTN 1663.
19  A  What would you like to know?
20  Q  What is it?
21  A  It's a copy of a letter that was
22  addressed to the Federal Bureau of

Page 356

1  Investigation, signed by myself.
2  Q  Okay. Did you later file a criminal
3  complaint or a document entitled criminal
4  complaint?
5  A  Yes.
6  (Maniaci Exhibit Number 27 was marked
7  for identification.)
8  BY MR. BUCKLEY:
9  Q  Let me show you what's been marked as
10  Exhibit Number 27. Can you tell me what this
11  document is?
12  A  It appears to be a copy of the
13  document that I initiated.
14  Q  And who prepared this document?
15  A  I did.
16  Q  Did you have any assistance in
17  preparing it?
18  A  No, I did not.
19  Q  Was it reviewed by anyone else before
20  it was submitted to the FBI?
21  A  No, it was not.
22  Q  Did any lawyer review it?

Page 357

1  A  Negative.
2  Q  Did you ever sign this statement?
3  A  Did I ever sign it?
4  Q  Yes.
5  A  I assume that I signed the cover
6  letter that went out with -- accompanying this
7  document.
8  Q  Did any representative of the FBI ever
9  contact you?
10  A  Yeah. Excuse me. I was contacted by
11  a couple of FBI representatives.
12  Q  Do you recall their names?
13  A  No, I don't. It was -- it was one
14  lady and one man.
15  Q  Were you ever advised of the result of
16  their investigation?
17  A  Initially, I was told that they
18  intended to prosecute and take it before a grand
19  jury. That -- I was told by one agent that
20  there was an egregious misconduct on the part of
21  the MPD -- not the MPD, but the Georgetown
22  officers. And I was led to believe that it

Case 1:06-cv-01625-LFO   Document 45-29   Filed 02/12/2008   Page 7 of 13

March 29, 2007         William Maniaci          Maniaci vs. Georgetown
                       Washington, D.C.

Page 358

1  would go before a grand jury.
2       The next thing I heard is that the
3  investigation -- that the US Attorney had
4  decided not to pursue the matter. I'm assuming
5  it was done for political purposes.
6       Q   How were you advised of this?
7       A   Advised of what?
8       Q   Of the results, that they were going
9  to decline.
10      A   I was -- I was sent a short message,
11 letter -- I think it was either a letter or
12 E-mail, I think it was a letter, saying that
13 they were going to decline prosecution.
14      Q   You haven't produced a copy of the
15 letter to us.
16      A   I don't have it.
17      Q   You don't have it. What happened to
18 it?
19      A   I don't know what happened. I just
20 couldn't find it.
21      Q   Did you make a complaint to any other
22 law enforcement agency?

Page 359

1       A   I made a complaint to every agency --
2  I sent a copy of this to every agency that is
3  addressed in the "to" and "cc" on this document.
4       Q   Did you hear from any of them?
5       A   I heard from a few. Some of them I
6  didn't hear from.
7       Q   What other agencies did you hear from
8  besides the FBI?
9       A   The United States Senate. The House
10 of Representatives. My congressional
11 delegation, I heard from.
12      Q   What was the nature of their response?
13      A   It was personal.
14      Q   I'm sorry?
15      A   It was private.
16      Q   What do you mean?
17      A   It was addressed to me. It was a
18 personal response to this. I don't recall the
19 verbiage from Senator Ensign or Senator Reid.
20      Q   Do you have copies of their
21 correspondence?
22      A   I can look for it. I'm not sure I can

Page 360

1  find it.
2       Q   Did you hear back from anyone else,
3  any other addressees?
4       A   The Metropolitan Police Department --
5  this went to several different entities within
6  that police department. And to the best of my
7  knowledge, it was all combined into one
8  investigation. In other words, nothing was ever
9  done.
10          (Maniaci Exhibit Number 28 was marked
11 for identification.)
12 BY MR. BUCKLEY:
13      Q   Okay. Let me show you Exhibit
14 Number 28.
15      A   Okay.
16      Q   This is an E-mail that Mr. Smulson at
17 Georgetown received. Do you recognize the
18 e-mail address of the sender,
19 homeworkeditor@cox.net?
20      A   Never heard of it. I have no idea.
21      Q   Let me read the text of it: Eric, I
22 hope to get the chance to meet you soon. When I

Page 361

1  do, I'm going to pinch your nose really hard
2  (only kidding, heehee) because I can't stand
3  pukes like you who line up with those who want
4  to murder us and stick your face in their laps
5  in hopes of being liked. You're scum of the
6  lowest order and shouldn't consider yourself an
7  American. Mike. Unquote.
8       A   It has nothing to do with me.
9       Q   Do you have any idea who sent this?
10      A   I have no idea.
11      Q   Did you give Mr. Kaplan a copy of your
12 complaint in this matter before you filed it?
13      A   I may have cc'd him a copy. But I
14 didn't run it by anyone else for anyone else's
15 opinion before I dropped them in the mail.
16          (Maniaci Exhibit Number 29 was marked
17 for identification.)
18 BY MR. BUCKLEY:
19      Q   Let me show you what's been marked as
20 Exhibit Number 29. Have you seen this article
21 before? It's an article by Mr. Kaplan entitled,
22 quote, Georgetown University sued for $8 million

Case 1:06-cv-01625-LFO   Document 45-29   Filed 02/12/2008   Page 8 of 13

March 29, 2007          William Maniaci          Maniaci vs. Georgetown
                        Washington, D.C.

Page 362

1  for attack on elderly orthodox Jew at PSM, end
2  quote.
3     A   Good article.
4     Q   Have you seen it before?
5     A   Yeah.
6     Q   And this article is a result of your
7  sending him a copy of your complaint?
8     A   Mr. Kaplan talked to me on the
9  telephone. I had a long conversation with
10 Mr. Kaplan.
11    Q   Now, if you look at the date of the
12 article, you'll see on the second page it is
13 September 15th, 2006.
14    A   Uh-huh.
15    Q   And your complaint wasn't filed until
16 September 20th, 2006.
17    A   I don't know when it was actually
18 filed, the complaint.
19    Q   I'm advising you it was filed
20 September 20th.
21    A   Which complaint are you talking about?
22    Q   The action you filed here, the one

Page 363

1  that brings us together today, the one that's
2  described in Mr. Kaplan's article.
3     A   Okay. Fine.
4     Q   Would it be fair to say you gave
5  Mr. Kaplan an advance copy of your complaint
6  five days before it was filed at least?
7     A   Of this complaint --
8     Q   Yeah.
9     A   -- that I wrote?
10    Q   No, no. The complaint in this action.
11    A   This complaint. I had --
12        MR. FAY: No, no. He's using
13 "complaint" in the technical sense to mean the
14 document filed to initiate suit in court.
15 Right?
16        MR. BUCKLEY: Yeah. Let me show you.
17        THE WITNESS: I didn't have a copy to
18 give to Mr. Kaplan.
19 BY MR. BUCKLEY:
20    Q   Pardon me?
21    A   I didn't have a copy to give to
22 Mr. Kaplan.

Page 364

1     Q   Do you know how he got a copy of it
2  five days before it was filed?
3     A   I don't know. He's a good reporter.
4     Q   Now, this article was by Lee Kaplan
5  and the Stop the ISM Team. Are you a member of
6  the Stop the ISM Team?
7     A   No, sir.
8     Q   Do you recognize that group?
9     A   No, sir. I don't know who belongs to
10 it.
11    Q   Have you ever heard of it before?
12    A   Stop the ISM?
13    Q   Yeah.
14    A   Oh, yeah, I've heard that term. It's
15 a group that Lee Kaplan runs.
16    Q   Do any of your colleagues there in JDL
17 also belong to Stop the ISM?
18    A   No. That's his organization, not
19 ours.
20        (Maniaci Exhibit Number 30 was marked
21 for identification.)
22 BY MR. BUCKLEY:

Page 365

1     Q   Let me show you what's been marked as
2  Exhibit Number 30, which is a copy of the
3  complaint in this civil action that you filed.
4     A   Okay.
5     Q   Mr. Kaplan's article describes the
6  contents of this document. Do you have any
7  explanation for how he got a copy, at least of
8  the draft of the complaint, before it was filed?
9     A   I don't know. I could have discussed
10 it with him.
11    Q   That's possible, huh?
12    A   Yeah. It's possible.
13    Q   How did you come to sue Officer George
14 Taylor at Georgetown?
15    A   Pardon me?
16    Q   How did you come to sue Officer George
17 Taylor at Georgetown?
18    A   I didn't identify any particular
19 people at Georgetown. George Taylor? I gave
20 descriptions of the individuals that --
21    Q   Looking at --
22    A   I didn't give the names of the

Case 1:06-cv-01625-LFO   Document 45-29   Filed 02/12/2008   Page 9 of 13

March 29, 2007         William Maniaci          Maniaci vs. Georgetown
                       Washington, D.C.

Page 366

```
 1  officers because I didn't know their names.
 2      Q   Looking at your complaint, you sued
 3  initially Officer George Taylor.
 4      A   Well, perhaps Officer Taylor was
 5  misidentified by my legal counsel.
 6      Q   All right. Do you ever recall dealing
 7  with, encountering, speaking to any person at
 8  Georgetown on February 18th, who was identified
 9  to you by any means as being George Taylor?
10      A   I don't recall.
11      Q   So you don't know how he wound up as a
12  defendant in the lawsuit?
13      A   I have no idea.
14      Q   Are you -- okay. Are you aware that
15  he's now being dropped from the lawsuit?
16      A   Excuse me?
17      Q   Are you aware that he's now being
18  dropped as a defendant?
19          MR. FAY: You mean you're now
20  consenting to my motion? Well, it's not fair to
21  say are you aware he's being dropped from the
22  lawsuit, because obviously, if you're opposing
```

Page 367

```
 1  the motion, and the judge likes you folks better
 2  than us, he isn't dropped from the lawsuit.
 3          MR. BUCKLEY: Well, let's not get
 4  bogged down.
 5  BY MR. BUCKLEY:
 6      Q   Are you aware --
 7          MR. FAY: It's not bogged down. It's
 8  not a technicality. It's a fact.
 9  BY MR. BUCKLEY:
10      Q   Are you aware that on your behalf your
11  counsel has filed a pleading saying Mr. Taylor
12  was sued in error?
13      A   No. I wasn't aware of that.
14      Q   Okay. Let's go back to your
15  interrogatory answers, which I think is
16  Exhibit 1. You'll have to go back,
17  unfortunately, to the bottom of the pile, as
18  will I, to retrieve your interrogatory answers.
19          Let me direct your attention to page 2
20  and your response to question number 2, or
21  interrogatory number 2.
22      A   I'm still trying to find it here.
```

Page 368

```
 1      Q   Okay.
 2          MR. FAY: Here's a copy here.
 3          THE WITNESS: Okay. And your
 4  question?
 5  BY MR. BUCKLEY:
 6      Q   All right. You were asked to identify
 7  all the persons whom you believe have personal
 8  knowledge of any fact alleged in the complaint,
 9  or upon whom you intend to rely to support a
10  position you have taken or intend to take in the
11  action.
12          And I want to ask about some of these
13  names. Not all of them, but just some of them.
14  Directing your attention to the second name
15  listed on page 2.
16      A   Uh-huh.
17      Q   Mikhail Alterman. Can you tell me who
18  he is and what relevant knowledge he has?
19          MR. FAY: He's listed as an attendee
20  at the thing. We haven't -- as you can see from
21  my address, we've never been able to locate him.
22  I have no idea what he has to say. But you
```

Page 369

```
 1  folks asked for the names of anyone who might
 2  have information. And that's what we've
 3  provided.
 4  BY MR. BUCKLEY:
 5      Q   Okay. Let me just ask the witness.
 6  Do you know who this person is?
 7      A   No.
 8      Q   Okay. Fred ?? at
 9  taubf@boycottwatch.org? Do you know who that
10  person is?
11      A   No.
12      Q   Greg Bristol, who is he?
13      A   I don't know.
14      Q   Special Agent FBI. Is he one of the
15  ones you communicated with --
16      A   He's probably one of the ones that I
17  had talked to.
18          MR. FAY: He's conducting the
19  investigation. That is still open for
20  presentation to a D.C. jury as opposed to a
21  federal jury in D.C.
22  BY MR. BUCKLEY:
```

Case 1:06-cv-01625-LFO   Document 45-29   Filed 02/12/2008   Page 10 of 13

March 29, 2007 — William Maniaci — Maniaci vs. Georgetown
Washington, D.C.

Page 370

1  Q  Okay. Turn to page 3. There's a
2  reference to a David Brenner. Can you tell me
3  who he is?
4  A  The name is familiar. I think I met
5  David Brenner at the conference. But not a
6  friend. Not somebody that I've talked to since
7  that time.
8  Q  Okay. The next name is Rabbi
9  Herzfeld.
10 A  Rabbi Herzfeld I met after the
11 conference was over. And he's the rabbi at the
12 National Synagogue in Washington, D.C.
13 Q  Was he at the conference?
14 A  Yes, he was.
15 Q  Was he in Gaston Hall at the time that
16 you were removed?
17 A  I don't know. But I subsequently
18 discovered that he had been accosted and
19 mistreated by Georgetown security.
20 Q  Who is Rabbi Mintz?
21 A  He was accompanying Rabbi Herzfeld.
22 He's from New York.

Page 371

1  Q  Was he at the conference?
2  A  He was with Rabbi Herzfeld.
3  Q  Was he in Gaston Hall at the time?
4  A  I don't know.
5  Q  Bottom of the page, Bill Jersey, who
6  is he?
7  A  I don't know. Quest Productions. He
8  was the guy that was filming a documentary for
9  the Discovery Channel or the History Channel or
10 one of those.
11     MR. FAY:  Somebody hired him to film.
12 Who hired him, I don't know.
13     THE WITNESS:  I got his name when I
14 was there.
15 BY MR. BUCKLEY:
16 Q  Okay. The next page, page 4, the
17 first name is Gennadiy Faybyshenko. You
18 discussed him. Do you know if he was in Gaston
19 Hall at the time of the incident?
20 A  Yes. I think he was, as a matter of
21 fact.
22 Q  Have you spoken to him?

Page 372

1  A  I saw him talking to a coed there
2  while he was in the audience, concentrating more
3  on what she looked like than what was going on.
4  Q  Okay. Have you spoken to him
5  recently?
6  A  No. Not recently.
7  Q  Who's Officer Hunter at the DoD
8  police?
9  A  Officer Hunter was the officer that
10 responded to the ER at Walter Reed Hospital
11 and -- to discuss my injuries and how I had come
12 by them.
13     And Officer Hunter said, although they
14 had no jurisdiction in the matter, that they
15 were going to make a report just so it would be
16 a matter of record.
17 Q  Okay. Do you contend that you are now
18 suffering any ailment or residual effect of
19 whatever happened at Georgetown University in
20 February '06?
21 A  No.
22     MR. BUCKLEY:  Let's take a break now.

Page 373

1  He has to change the tape.
2      THE VIDEO OPERATOR:  This ends
3  videotape number 3. We're going off the record
4  at 4:49.
5      (Recess.)
6      THE VIDEO OPERATOR:  This begins
7  videotape number 4. We're back on the record at
8  4:58.
9      (Maniaci Exhibit Number 31 was marked
10 for identification.)
11 BY MR. BUCKLEY:
12 Q  Mr. Maniaci, I'm going to show you
13 what's been marked as Exhibit Number 31. It has
14 some highlighted portions, but I'm going to
15 attach a nonhighlighted portion to the record
16 here as well.
17     It does consist of some statements
18 that were downloaded from your B'nai Elim Web
19 site. I just want to direct your attention to
20 the first page, to the reference to the Maccabee
21 Group.
22     It says that the organization was

Case 1:06-cv-01625-LFO   Document 45-29   Filed 02/12/2008   Page 11 of 13

March 29, 2007 | William Maniaci | Maniaci vs. Georgetown
Washington, D.C.

Page 374

1 founded by the Maccabee Group. I just wanted to
2 get your comment on that, since I asked you
3 about the Maccabee Group before.
4     A    Maccabee Group. Oh, okay. We were
5 unable, by the terms of the settlement of the
6 suit involving the Jewish Defense League versus
7 us that you referred to before --
8     Q    Yes.
9     A    -- we were prohibited from using the
10 word Jewish Defense League. So we substituted
11 Maccabee Group for Jewish Defense League.
12    Q    Okay. Are you a founder, then, of the
13 B'nai Elim?
14    A    I'm one of the founders.
15    Q    Mr. Turk would be another?
16 Mr. Finberg, too?
17    A    All of us are founders -- founding
18 members.
19    Q    And do you charge dues?
20    A    We're supposed to, yeah.
21    Q    And how is your funding provided?
22    A    Out of pocket.

Page 375

1     Q    During the time you were a police
2 officer, was there ever a complaint for
3 excessive or unreasonable force filed against
4 you?
5     A    Probably.
6     Q    What do you recall about that?
7     A    Nothing.
8     Q    Why do you say probably?
9     A    Well, I was a police officer in
10 different areas for over 30 years. And I'm sure
11 that I had complaints filed against me for
12 excessive force. But do I remember what they
13 were? No. Most of them were, I'm sure,
14 frivolous.
15    Q    But, again, you're saying you're sure
16 you had them filed. Why --
17    A    I'm not sure I had them filed. I said
18 I wouldn't be surprised if there were some in a
19 30-year career.
20    Q    Uh-huh. Now, you said that you didn't
21 bring your firearm to Georgetown University --
22    A    That's correct.

Page 376

1     Q    -- in February --
2     A    That's right.
3     Q    -- 2006, on either day, either --
4     A    That's right.
5     Q    -- Saturday or Sunday. But that's a
6 concealed weapon. So you can conceal it on
7 yourself and no one would know.
8     A    That's right. But I didn't do that.
9     Q    Like, today, for example, we don't
10 know where you have -- if you, in fact, have a
11 weapon, where it's concealed.
12    A    That's right.
13    Q    Would you display your weapon?
14    A    Is that necessary?
15    Q    It is.
16    A    Tom.
17        MR. FAY: Why do you want to see --
18        MR. BUCKLEY: It's a concealed weapon.
19 I want to see the weapon so I can determine how
20 it's concealed.
21        MR. FAY: What does that have to do
22 with the litigation?

Page 377

1         MR. BUCKLEY: I want to know --
2         THE WITNESS: I'll be glad to show you
3 my permit if you'd like. I don't consider it
4 proper to brandish a firearm under any
5 circumstances.
6 BY MR. BUCKLEY:
7     Q    Uh-huh. But is it concealed in the
8 fashion that no one would know you had a weapon
9 just looking at you? I mean, looking at you
10 now, I don't observe you to have a weapon. But
11 is it concealed such that --
12    A    I'll let you make the judge of that.
13 You be the judge.
14        MR. FAY: What does that have to do
15 with the litigation?
16        MR. BUCKLEY: I want to know whether
17 he had a -- in fact had a weapon on the campus
18 of Georgetown University.
19        MR. FAY: Fine. You already asked --
20 answered that. You asked it.
21        THE WITNESS: I told you I did not.
22        MR. FAY: He answered it. The subject

95 (Pages 374 to 377)

Case 1:06-cv-01625-LFO   Document 45-29   Filed 02/12/2008   Page 12 of 13

March 29, 2007  William Maniaci  Maniaci vs. Georgetown
Washington, D.C.

Page 378

1  has been covered.
2      MR. BUCKLEY: But it's concealed, so
3  how would we know whether he had it or not.
4      MR. FAY: Oh, for God's sake.
5      THE WITNESS: You have to take my word
6  for it. If you doubt my word, well, then, if
7  you have X-ray vision, go ahead and use it.
8  This is ridiculous.
9      MR. FAY: Come on. You think, by
10 looking at whether or not he has a weapon with
11 him and what kind of weapon today, you will be
12 able to tell whether a year ago in another place
13 he had a weapon.
14 BY MR. BUCKLEY:
15     Q  Let me ask you this question.
16     MR. FAY: You're really seriously
17 contending that's relevant in some sway.
18 BY MR. BUCKLEY:
19     Q  Let me ask you this question.
20     MR. FAY: How?
21 BY MR. BUCKLEY:
22     Q  Why did you bring a weapon to this

Page 379

1  deposition?
2      A  I carry a weapon every place I go now.
3      Q  Well, you didn't bring it to
4  Georgetown University.
5      A  I didn't want to take it on to
6  Georgetown University.
7      Q  Why did you bring it to the offices of
8  Williams & Connolly?
9      A  Because I always carry a weapon. If
10 you prefer I'm not here, I'll be glad to leave.
11     MR. FAY: Do you want to see his
12 license?
13     THE WITNESS: Would you like me to
14 leave because I'm armed? If you think I'm
15 armed, I'll be happy to leave. I don't want to
16 be here anyway. If it bothers you, I'll leave.
17 BY MR. BUCKLEY:
18     Q  Otherwise --
19     A  Otherwise, let's move on.
20     Q  Otherwise you'll always have a weapon
21 with you?
22     A  Yes.

Page 380

1      Q  Do you agree that Georgetown
2  University had a right to ask you to leave the
3  auditorium if you were disruptive?
4      A  Depending on the circumstances.
5      Q  Yes, if you were disruptive, you could
6  be removed?
7      A  I said depending upon the
8  circumstances. If it was a matter of conjecture
9  as far as the disruption is concerned, if I were
10 having a dialogue with someone, it would be an
11 individual determination of what is disruptive
12 and what isn't. I don't know what's disruptive.
13     Q  Did Mr. Olson ever indicate that
14 questioners would be able to have a dialogue
15 with the panelists --
16     A  Yes.
17     Q  -- as opposed to simply asking a
18 question?
19     A  Yes, he did.
20     Q  What did he say?
21     A  He said that you will be able to ask
22 questions and dialogue with the panel.

Page 381

1      Q  He used the word dialogue?
2      A  Yes, he did. And I saw that on the
3  tape that you furnished us, by the way.
4      Q  Did he say you have to ask just one
5  question?
6      A  I think that was in there somewhere.
7  We've covered this before.
8      MR. BUCKLEY: I have nothing further.
9      MR. FAY: It's after 5:00. I don't
10 have any questions.
11     THE VIDEO OPERATOR: This ends
12 videotape number 4. We're going off the record.
13     MR. FAY: Hang on a minute. Hang on.
14     MS. CARAGH FAY: You're fine. You can
15 go off the record.
16     THE VIDEO OPERATOR: Okay. Going off
17 the record at 5:05.
18     (Discussion off the record.)
19     THE VIDEO OPERATOR: We're back on the
20 record at 5:05.
21     (Maniaci Exhibit Number 32 was marked
22 for identification.)

Case 1:06-cv-01625-LFO   Document 45-29   Filed 02/12/2008   Page 13 of 13

March 29, 2007 | William Maniaci | Maniaci vs. Georgetown
Washington, D.C.

Page 382

```
 1  BY MR. BUCKLEY:
 2    Q   I'm going to show you Exhibit 32,
 3  which is a document Bates stamped M 216 through
 4  M 221.  Can you identify that?
 5    A   This is something that you showed me
 6  before.
 7    Q   No.  I didn't show you --
 8    A   Yes, you did.  This was part of a
 9  previous exhibit.  I recognize it.
10        MR. FAY:  Let me take a look.
11        THE WITNESS:  It is.
12  BY MR. BUCKLEY:
13    Q   Parts of it were in another one.
14    A   It was part of a previous exhibit.
15    Q   No.  This is more than I showed you
16  before.  I showed you part of the policy before.
17  This is the entire policy.
18    A   No.  I think the entire policy is
19  buried in here somewhere.  I recall looking at
20  it.
21    Q   But you know that you saw the entire
22  policy and you made a copy of it?
```

Page 383

```
 1    A   Excuse me?
 2    Q   You saw Georgetown's entire policy and
 3  made a copy of it?
 4    A   I believe I did, yes.
 5        MR. BUCKLEY:  Okay.  Nothing further.
 6        THE WITNESS:  Okay.
 7                EXAMINATION
 8  BY MR. FAY:
 9    Q   The only question is, when you went on
10  to the Georgetown campus, do you recall
11  whether -- or into the building, do you recall
12  whether you had to go through a metal detector?
13    A   Yes.  I was wanded.
14    Q   Okay.  And did that satisfy whoever
15  was running the --
16    A   The officer that conducted the test
17  with his metal detector was satisfied that I was
18  fine to go in.
19        MR. FAY:  No other questions.
20        MR. BUCKLEY:  That --
21        THE WITNESS:  Maybe you should install
22  a metal detector on your doors.
```

Page 384

```
 1        MR. FAY:  This ends videotape
 2  number 4.  We're going off the record at 5:07.
 3        (Whereupon, signature having not been
 4  waived, at 5:07 p.m., the deposition was
 5  concluded.)
```

Page 385

```
        ACKNOWLEDGMENT OF DEPONENT
     IN THE UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF COLUMBIA

    MANIACI vs GEORGETOWN UNIVERSITY, et al.
         DEPOSITION OF WILLIAM MANIACI
                March 29, 2007
```

    I do hereby acknowledge that I have read and examined the foregoing pages 1 through 386, inclusive, of the transcript of my deposition and that:
    (Check appropriate box):
    ( ) The same is a true, correct and complete transcription of the answers given by me to the questions therein recorded.
    ( ) Except for the changes noted in the attached errata sheet, the same is a true, correct and complete transcription of the answers given by me to the questions therein recorded.

    _____    _____
       DATE               SIGNATURE