June 28, 2007     Dr. Suzanne Gillern     Maniaci v. Georgetown
Washington, D.C.

## Page 2

```
 1            APPEARANCES
 2  ON BEHALF OF THE PLAINTIFF:
 3      THOMAS FORTUNE FAY, ESQ.
 4      CARAGH GLENN FAY, ESQ.
 5      Law Office of Thomas Fortune Fay, P.A.
 6      700 5th Street, N.W., #200
 7      Washington, D.C. 20001
 8      (202) 589-1300
 9
10  ON BEHALF OF THE DEFENDANTS:
11      MALACHI JONES, ESQ.
12      COLLEEN SHANAHAN, ESQ.
13      Williams & Connolly LLP
14      725 12th Street, N.W.
15      Washington, D.C. 20005
16      (202) 434-5000
17
18
19  ALSO PRESENT: Chris Bossard, Videographer
20
21
22
```

## Page 3

```
 1            CONTENTS
 2  DR. SUZANNE GILLERN         EXAMINATION
 3  By Mr. Jones                Page 5
 4  By Mr. Fay                  Page 61
 5  By Mr. Jones                Page 78
 6  By Mr. Fay                  Page 79
 7
 8            EXHIBITS
 9  DEPOSITION EXHIBIT NO:      PAGE NO:
10  81-A  Picture               55
11  81-B  Picture               55
12  81-C  Picture               55
13  81-D  Picture               55
14  81-E  Picture               55
15  81-F  Picture               55
16  81-G  Picture               55
17
18
19
20
21
22
```

## Page 4

```
 1            PROCEEDINGS
 2            - - - - -
 3      THE VIDEOGRAPHER: This begins the
 4  videotaped deposition of Dr. Suzanne Gillern, being
 5  taken in the case entitled William Maniaci versus
 6  Georgetown University, et al., the case is filed
 7  before the United States District Court for the
 8  District of Columbia. It's being held today in the
 9  law offices of Williams & Connolly, 725 12th Street,
10  Northwest, Washington, D.C. Today is June 28, 2007.
11  The time is currently 9:10.
12      The court reporter today is Cynthia Ott,
13  the videographer, Chris Bossard, both here from
14  Brynteson Reporting. I will now ask counsel to
15  please identify themselves for the record.
16      MR. JONES: Malachi Jones and Colleen
17  Shanahan of Williams & Connolly, representing the
18  Defendants.
19      MR. FAY: Thomas Fortune Fay and Caragh
20  Glenn Fay, representing the Plaintiff, Mr. Maniaci.
21      THE VIDEOGRAPHER: The court reporter will
22  now swear in the doctor.
```

## Page 5

```
 1  Whereupon--
 2      DR. SUZANNE GILLERN
 3  a witness, called for examination, having been duly
 4  sworn, was examined and testified as follows:
 5      EXAMINATION BY COUNSEL FOR THE DEFENDANTS
 6  BY MR. JONES:
 7      Q  Good morning.
 8      A  Good morning.
 9      Q  Could you just introduce yourself, state
10  your name, and spell your last name, please?
11      A  Sure, my name is Suzanne Gillern,
12  G-i-l-l-e-r-n.
13      Q  And what is your home address?
14      A  10157 Sutherland Road, Silver Spring,
15  Maryland, 20901.
16      Q  And where do you currently work?
17      A  Walter Reed Army Medical Center.
18      Q  Okay. And you're employed there as a
19  physician?
20      A  A resident, yes.
21      Q  Okay. Let me ask you, have you ever been
22  deposed before?
```

Case 1:06-cv-01625-LFO   Document 45-30   Filed 02/12/2008   Page 2 of 10

June 28, 2007        Dr. Suzanne Gillern        Maniaci v. Georgetown
                     Washington, D.C.

Page 6

1   A  No.
2   Q  Okay. Do you understand that the person
3   to your left is a court reporter, and she's recording
4   everything that's being stated?
5   A  Yes.
6   Q  Okay. So it's important for you to
7   verbally answer, rather than with a head nod or a
8   head shake, because it's difficult for her to record
9   that. Do you understand that?
10  A  Yes.
11  Q  Okay. And also it's important that we
12  don't talk over each other because she can't write
13  down what two people are saying at the same time, do
14  you understand that?
15  A  Yes.
16  Q  You also understand that this deposition
17  is being videotaped here today?
18  A  Yes.
19  Q  If at any time you want to take a break,
20  just let me know, and I'll accommodate you. Do you
21  have any questions before we begin?
22  A  No.

Page 7

1   Q  Okay. Let me ask you, where did you
2   graduate high school?
3   A  Shawnee High School, in Medford, New
4   Jersey.
5   Q  And where did you complete your
6   undergraduate education?
7   A  Villanova University.
8   Q  And when did you graduate?
9   A  1997.
10  Q  Okay. And after Villanova, did you go
11  straight into medical school?
12  A  No.
13  Q  Okay. What did you do?
14  A  I worked at a pharmaceutical -- not a
15  sales place, but it kind of worked on the packaging
16  and the manufacturing of different clinical trials.
17  It was called Quintiles.
18  Q  Okay. And how long did you work for that
19  company?
20  A  I guess three, four years.
21  Q  Okay. And what did you do for them?
22  A  I was a project manager.

Page 8

1   Q  And after that, you decided to go to
2   medical school?
3   A  Yes, when I got into medical school.
4   Q  Okay. And where did you go to medical
5   school?
6   A  Uniformed Services University of Health
7   Sciences.
8   Q  And that's a medical school for doctors in
9   the military?
10  A  Uh-huh.
11  Q  Is that a yes?
12  A  Yes, sorry.
13  Q  Okay. And so at some point in time, you
14  joined the military?
15  A  You -- I was not in the military until
16  when I decided to go to that medical school. You are
17  commissioned as an officer before going there.
18  Q  Okay. And what service are you in?
19  A  I'm in the U.S. Army.
20  Q  And what's your current rank?
21  A  Captain.
22  Q  Okay. And when did you graduate from the

Page 9

1   Uniformed Services Medical School?
2   A  In 2005, May.
3   Q  Okay. And do you have a commitment to the
4   Army, since they sent you to medical school?
5   A  Yes. After I finish my residency, I'm in
6   a six-year residency, but after that, I owe seven
7   years.
8   Q  Okay. And what are you doing now at
9   Walter Reed?
10  A  I'm a general surgery resident.
11  Q  Okay. And in your first year out of
12  medical school, were you also at Walter Reed?
13  A  Uh-huh. Yes, sorry.
14  Q  Yes? And what were you doing at that
15  point in time?
16  A  Well, I was a general surgery intern.
17  Q  Okay. And as part of your general surgery
18  internship, did you do rotations through different
19  departments in the hospital?
20  A  Yes.
21  Q  Okay. And do you recall like what
22  departments those were?

Case 1:06-cv-01625-LFO   Document 45-30   Filed 02/12/2008   Page 3 of 10

June 28, 2007          Dr. Suzanne Gillern          Maniaci v. Georgetown
                       Washington, D.C.

Page 10

1    A  ER, marrow surgery, orthopedics,
2  cardiothoracic surgery, general surgery -- there's
3  some more, but I can't remember them.
4    Q  Okay. And how long did you do a rotation
5  in the ER?
6    A  Four weeks.
7    Q  Okay. And when you were doing your
8  rotation in the ER, what were the length of your
9  shifts, typically?
10   A  We worked 10-hour shifts -- actually,
11  12-hour shifts. I'm sorry.
12   Q  Okay. Would you be 12 hours on and 12
13  hours off, or how did that work?
14   A  It just varied. The shifts were 8:00 to
15  8:00, 10:00 to 10:00, 12:00 to 12:00, so you worked
16  depending, you know, within the 80-hour workweek,
17  certain amount of shifts per week. Sometimes, you
18  worked more, and sometimes, you worked less. It all
19  averaged out though.
20   Q  And how many residents or interns were
21  there normally staffed in the ER?
22   A  At any given -- it depends on what time of

Page 11

1  day, during the like primary time of 8:00 to 8:00,
2  there are at least three interns, but it could be as
3  many as five interns and, then there's always an
4  intern between the hours of 8:00 and midnight, but
5  then other than that, there's anywhere from three
6  to -- one to three or four staff with the interns --
7  staff, ER doctors.
8    Q  You mean attending physicians?
9    A  Attending physicians, yes.
10   Q  Okay. And what would your
11  responsibilities be when you were an intern in the
12  ER?
13   A  I would see patients, discuss their
14  treatment with the attendings, and implement the
15  plan.
16   Q  Okay. From your experience in medical
17  school or as a resident, do you have experience in
18  treating brain trauma?
19   A  I mean, we, in medical school, we do learn
20  about the workup of trauma patients, and in general
21  surgery internship and residency, as well as in the
22  ER, you deal with, you know, those type -- I mean, we

Page 12

1  don't have any specific training on that, but we did
2  a rotation in neurosurgery, and we do see patients in
3  the ER in which their learning is geared towards
4  that.
5    Q  Have you ever held any teaching positions?
6    A  No.
7    Q  Okay. Since you graduated from medical
8  school, have you done any additional medical
9  education?
10   A  No.
11   Q  Okay. Are you a member in any
12  professional societies?
13   A  No.
14   Q  Okay. Since you graduated from medical
15  school, have you done any research?
16   A  Just clinical research at Walter Reed.
17   Q  Okay. What type of clinical research was
18  that?
19   A  It basically dealt with different
20  battlefield injuries of our soldiers and just looking
21  back at what kind of treatments they received,
22  specifically in patients with open abdomens coming

Page 13

1  back from Iraq and Afghanistan and other types of
2  like rectal injuries -- different types of injuries,
3  nothing specifically with the head, but mainly the
4  abdomen and the rectum.
5    Q  Okay. Any other clinical research other
6  than that, that you've done?
7    A  Not since graduating medical school; I did
8  some prior to that, but.
9    Q  When you were in medical school?
10   A  Prior to going to medical school.
11   Q  Okay. What type of clinical research?
12   A  Just dealing -- I mean, that was just
13  laparoscopic surgery type stuff.
14   Q  Okay. Have you had any publications in
15  any medical journals?
16   A  Yes.
17   Q  Related to what?
18   A  Related to the use of laparoscopy in
19  staging for cancers.
20   Q  Anything other than that?
21   A  I have a couple -- two abstracts pending
22  right now for the injuries for the OIF soldiers, but

Case 1:06-cv-01625-LFO   Document 45-30   Filed 02/12/2008   Page 4 of 10

June 28, 2007              Dr. Suzanne Gillern        Maniaci v. Georgetown
                           Washington, D.C.

Page 14

1  that's it.
2      Q  The battlefield injuries?
3      A  Yeah.
4      Q  Okay. Let me ask you, when someone comes
5  into the ER at Walter Reed, what typically happens
6  with the patient?
7      A  They will come into our triage nurse -- or
8  I think it's a nurse who runs that area, and they
9  will say what their chief complaint is and fill out
10 some forms, as well as write down a list of their
11 medications, medical problems. I think, at that
12 time, they have a set of vitals that are done.
13         At that time, depending on what the wait
14 is and if there's a room available and how sick they
15 are, they'll be put into a room, at which time,
16 vitals will be taken again, and then the chart's put
17 out, and a doctor, usually an intern, will go in
18 first and see the patient.
19     Q  And who takes the vitals? Is that done by
20 a nurse?
21     A  I think it's done by a nurse, but I'm not
22 sure. It might be -- there might be techs there who

Page 15

1  also -- I'm not 100 percent sure if the tech or a
2  nurse who does it, but it's not us.
3      Q  And who does the initial intake, is that
4  also a nurse?
5      A  I think it has to be a nurse who does the
6  triage.
7      Q  Okay.
8      A  But I'm not 100 percent sure.
9      Q  And then you said, at some point, the
10 chart is put out, and then a doctor, usually an
11 intern, will come by?
12     A  Uh-huh.
13     Q  And then what happens when --
14     A  We'll go in, talk to the patient, get
15 their basic medical history, meds, allergies, social
16 history, and then get the story of, you know, find
17 out what their complaint is, what's going on and then
18 do a physical exam. At that time, we usually will go
19 discuss it with -- as an intern, I go discuss it with
20 the attending, and we then decide that if anything
21 need -- labs or orders need to be done.
22         At that time, usually, the attending would

Page 16

1  come to see the patient, or they would wait for the
2  lab results to come see the patient, and then after
3  those came back, we would go from there and come up
4  with a plan.
5      Q  Come up with a plan for treatment?
6      A  Yes, for treatment and dispo, yes.
7      Q  And I guess, and part of that plan for
8  treatment would be whether the patient was going to
9  be discharged or admitted to the hospital?
10     A  Correct.
11     Q  Let me show you what's been previously
12 marked as deposition Exhibit 20.
13         MR. FAY: Could I take a look at that
14 first?
15         MR. JONES: Well, I've got a copy for you.
16 BY MR. JONES:
17     Q  This is a document which is, at the top
18 says, "Emergency Care and Treatment Walter Reed AMC,"
19 Army Medical Center. It's dated 19 February, 2006.
20 Do you recognize this document?
21     A  Yes.
22     Q  And in February 2006, was that the time

Page 17

1  you were doing your rotation in the emergency room at
2  Walter Reed?
3      A  Yes.
4      Q  And on this document, do you recognize
5  your handwriting and your signature?
6      A  Yes.
7      Q  And do you see that this document is an
8  emergency room record for a Mr. William Maniaci?
9      A  Yes.
10     Q  And from looking at this document, does
11 this indicate that you were the intern that treated
12 Mr. Maniaci on that date?
13     A  Yes.
14     Q  Do you have a specific recollection, aside
15 from this document, of treating Mr. Maniaci?
16     A  No.
17     Q  Let me ask you, at the top of the document
18 there's some information indicating the arrival time,
19 how the person was transported to the hospital, that
20 the history was obtained from the patient. Who takes
21 that information?
22     A  I believe it's a triage nurse.

Case 1:06-cv-01625-LFO   Document 45-30   Filed 02/12/2008   Page 5 of 10

June 28, 2007          Dr. Suzanne Gillern          Maniaci v. Georgetown
                       Washington, D.C.

Page 18

1   Q   So that's from the initial intake?
2   A   Right.
3   Q   And then it also indicates that there's a
4   chief complaint, it lists, "LBP/right ankle
5   swelling." Do you see that?
6   A   Yes.
7   Q   And what does LBP mean?
8   A   Lower back pain.
9   Q   And who would gather that information
10  about what the chief complaint is?
11  A   The nurse, the triage nurse.
12  Q   Then near the top left, there's a box that
13  says, "vital signs."
14  A   Uh-huh.
15  Q   Do you see that?
16  A   Yes.
17  Q   And those are vital signs that would be
18  taken by the nurse?
19  A   Yes.
20  Q   Okay. And it indicates a time, 1945, when
21  those vitals are taken?
22  A   Uh-huh.

Page 19

1   Q   Is that correct?
2   A   Yes.
3   Q   And reviewing those vital signs, do those
4   appear to be normal?
5   A   Yes. I mean, the diastolic blood pressure
6   is a little high, but, yeah, nothing majorly
7   aberrant.
8   Q   Okay. Let me ask you, about how long does
9   it normally take until someone is seen at the ER by a
10  doctor after they arrive, does it depend on the
11  severity of their --
12  A   It depends on the severity, it depends on
13  how busy they are, it just depends on a bunch of
14  different things, how many people are in the ER at
15  the time.
16  Q   Okay. Is there somewhere in this document
17  when it indicates when a physician would actually see
18  the patient?
19  A   Actually, the 20:45, the time seen, up in
20  the right-hand side.
21  Q   Okay. Is that when you would have seen
22  the patient?

Page 20

1   A   Yes.
2   Q   Okay. To the right of the vital signs,
3   there's a box which indicates medications?
4   A   Uh-huh.
5   Q   And can you read what that indicates?
6   A   HCTZ, that's a diuretic, and morphine, and
7   I don't -- I can't read what I wrote for the last
8   one.
9       MR. FAY: Where was that time again on
10  the --
11      THE WITNESS: Up in the right-hand corner,
12  second box down, right under the third party's
13  payer --
14      MR. FAY: Log, log --
15      THE WITNESS: Under log number, then under
16  that, it has third party's payer, and then it has
17  time seen.
18      MR. FAY: Oh, okay. 20:45, which is 8:45.
19  Okay. Fine, got it. Thank you.
20      THE WITNESS: Yes, yes.
21  BY MR. JONES:
22  Q   All right. Back to the medication, that's

Page 21

1   your handwriting?
2   A   Yes.
3   Q   Okay. And is most of the writing on this
4   document your handwriting?
5   A   Yes, except for a little piece that's
6   written by my staff.
7   Q   Okay. We'll get to that. And then
8   there's a box to the right of medication regarding
9   allergies?
10  A   Yes.
11  Q   And what does it indicate in that box?
12  A   Well, I wrote "sulfa." Before that, I
13  say, "no allergies documented," and then usually,
14  when I ask a patient what medications or what
15  allergies they had, he had he must have said sulfa,
16  which I don't know if he didn't mention it to the
17  person before or it wasn't in our record, but.
18  Q   Okay. Do you get a medical history from
19  the patient?
20  A   Yes.
21  Q   Do you have the ability, if someone is a
22  veteran, to call up their VA medical records?

6 (Pages 18 to 21)

Case 1:06-cv-01625-LFO   Document 45-30   Filed 02/12/2008   Page 6 of 10

June 28, 2007          Dr. Suzanne Gillern          Maniaci v. Georgetown
                       Washington, D.C.

Page 22

1   A   I think -- I mean, we do.  It doesn't
2   necessarily happen, you know, at the drop of a hat.
3   It kind of depends on timing and how long ago the
4   records were.  I mean, it's available to us, I just
5   don't -- it's not necessarily something that we could
6   do, get right that second.  It just depends on who
7   we're calling and what's getting done.
8       Q   Is that done commonly when you're in the
9   ER, to call up someone's VA medical records?
10      A   I don't know if I would say, "commonly,"
11  but it -- I mean, I only spent four weeks there, but
12  I've seen it -- I mean, it happened several times.
13      Q   Do you recall doing it for Mr. Maniaci?
14      A   No.
15      Q   Do you see, in the top -- well, not the
16  top right, but on the right side, about halfway down,
17  where there's indication of medical history?
18      A   Yes.
19      Q   Okay.  Did that medical history come from
20  Mr. Maniaci?
21      A   Yes.
22      Q   And what was the, what is the medical

Page 23

1   history that you recorded?
2       A   CHF, congestive heart failure, COPD, which
3   is chronic obstructive pulmonary disease, stroke,
4   which I think I had two MO, months ago, and in
5   parentheses, it looked like I wrote TIA.
6       Q   And what is TIA?
7       A   That's a transient ischemic attack, which
8   is a -- basically, a shortened -- I mean, it's a
9   short -- it's a similar stroke episode, but it lasts
10  for a short period of time.
11      Q   Okay.  And when you say, "a short period
12  of time," what's the typical period of time?
13      A   I don't know the exact -- what qualifies
14  as, it but I know it's like several hours, I think
15  it's maybe less than 12 or less than a day, I'm not
16  sure exactly, but it's short-term, and all your
17  symptoms, all the symptoms resolve within a certain
18  period of time, so it's just transient, which is --
19      Q   Okay.  Does this indicate to you that
20  Mr. Maniaci reported that he had a TIA episode
21  approximately two months ago?
22      A   It looks like he said either stroke or

Page 24

1   TIA, so that's why I wasn't -- sometimes, it's hard
2   for patients, I mean, to differentiate, you know, one
3   doctor will tell them they had a stroke, one said he
4   had a TIA, so I can't really tell if he had a stroke
5   or TIA which, based on how I wrote it, it seems like
6   he wasn't sure.
7       Q   Okay.  And then did you also get a
8   surgical history from the patient?
9       A   It appears so, yes.
10      Q   And what was the surgical history?
11      A   It looks like a cervical spine surgery,
12  six or seven years ago, tib/fib repair, and then a
13  cholecystectomy.
14      Q   And that last one, what does that --
15      A   Oh, that's removal of the gallbladder.
16          THE COURT REPORTER:  Say it again?
17          THE WITNESS:  Removal of the gall bladder.
18  BY MR. JONES:
19      Q   And did you also get a social history from
20  the patient?
21      A   Yes, so saw that he had a tobacco history,
22  a sixty-pack year history and occasional alcohol use.

Page 25

1       Q   Did he say when his last drink was?
2       A   I didn't write that down, so I don't know.
3       Q   Okay.  And in that same box in the top
4   left-hand corner, it appears that you wrote 64 year
5   old male?
6       A   Yes.
7       Q   And there's a paragraph description, what
8   is that paragraph?
9       A   Do you want me to read it?
10      Q   Well, I'll ask you to read it in a minute.
11      A   Oh, that's, that's basically my shortened
12  presentation of his illness, so it's just basically
13  his description of, you know, how he's been feeling.
14  It's subjective.  This is what, you know, this is the
15  subjective part of the exam, what the patient tells
16  us is going on.
17      Q   Okay.  And what did Mr. Maniaci tell you
18  was going on with him?
19      A   So I wrote, "64 year old male, kicked and
20  dragged, suffering several injuries, swollen sore
21  ankle, difficult to put pressure on.  Patient also
22  complains of some lower back pain.  Son also noticed

Case 1:06-cv-01625-LFO   Document 45-30   Filed 02/12/2008   Page 7 of 10

June 28, 2007          Dr. Suzanne Gillern          Maniaci v. Georgetown
                       Washington, D.C.

Page 26

1  subtle drop in eye. This afternoon, the patient had
2  an episode of dizziness and collapsed. No LOC,"
3  which stands for a loss of consciousness.
4      Q  Okay. You started out, you mentioned that
5  the 64 year old male, and it says, "kicked and
6  dragged," in parentheses, is that right?
7      A  Yes.
8      Q  And does that indicate that those were his
9  words, that he was kicked and dragged?
10     A  Yes.
11     Q  Okay. Do you remember him giving any more
12 detail about who kicked him and dragged him?
13     A  I'm sorry, I don't remember.
14     Q  Do you remember anything else about the
15 circumstances of him being kicked and dragged that he
16 reported?
17     A  No specifics.
18     Q  Do you remember at any point in time
19 whether police officers were called to interview
20 Mr. Maniaci?
21     A  Not that I remember.
22     Q  Is that something that commonly would

Page 27

1  happen in the ER, that police officers would come to
2  interview a patient?
3      A  I --
4      MR. FAY: You mean, in the ER at Walter
5  Reed, an ER in a civilian hospital?
6      MR. JONES: Good point.
7      MR. FAY: Because they're different
8  situations.
9      MR. JONES: Good point.
10 BY MR. JONES:
11     Q  In your time in the ER at Walter Reed, do
12 you remember police officers ever coming to interview
13 any patients?
14     A  No.
15     Q  And you note that he reported that he was
16 suffering several injuries, including a swollen
17 ankle?
18     A  Yes.
19     Q  And some lower back pain?
20     A  Yes.
21     Q  Did he report any other -- or did he
22 complain of any other injuries at that time?

Page 28

1      A  I don't remember, so I'm just going off of
2  what I wrote down.
3      Q  If he had been complaining of other
4  injuries, would you have noted that?
5      A  Usually, yes.
6      Q  Yeah. You also stated that his son said
7  something about a droop in his eye?
8      A  Yes.
9      Q  Do you recall that he was with someone who
10 you thought was his son?
11     A  I don't remember the actual patient
12 encounter, so I just have to go off of what I wrote.
13     Q  Okay. And then you indicated that the
14 patient noted that he had an episode of dizziness and
15 collapsed?
16     A  Yes.
17     Q  Did Mr. Maniaci say when that episode of
18 dizziness and collapse had occurred?
19     A  I don't remember, sorry.
20     Q  Did he give -- provide any details of what
21 happened during that episode of dizziness and
22 collapse?

Page 29

1      A  I don't remember, so I just have
2  "dizziness and collapse" written down.
3      Q  Okay. That's fair enough, that's fair
4  enough. You can only testify as to what you
5  remember. And then you have, "no loss of
6  consciousness," was that what was reported by
7  Mr. Maniaci?
8      A  Yes. In this section, it would be based
9  on what he told me.
10     Q  Did Mr. Maniaci mention that he had been
11 stuttering or had been confused?
12     A  I don't remember, but I didn't write it.
13 I think so, I could assume that he didn't, but I'm
14 not 100 percent sure.
15     Q  Did you notice whether Mr. Maniaci was
16 stuttering?
17     A  Based on the next section, "physical
18 exam," I don't note it, and that's where we would
19 note a slurring of speech, and also, there's a
20 mention in -- I think the attending note, where she
21 says speech is normal or something, I'm pretty sure,
22 speech clear, but that's all I can go off of.

Case 1:06-cv-01625-LFO   Document 45-30   Filed 02/12/2008   Page 8 of 10

June 28, 2007            Dr. Suzanne Gillern            Maniaci v. Georgetown
                         Washington, D.C.

Page 30

1  Q  Okay. Well, let's -- after the patient
2  tells you what's going on with him, then you do an
3  examination yourself?
4  A  Yes.
5  Q  Okay. And is that written a little bit
6  farther down in that section?
7  A  Yes, in the PE.
8  Q  Okay. If we could just go through that?
9  And when you're -- if we could sort of read it
10 section-by-section, and I'll ask you questions about
11 that. What is the first line, where it says, "PE"?
12 A  That stands for physical exam, and then I
13 have "GEN," which is general, and I wrote, "NAD,"
14 which is no apparent distress.
15 Q  And what does no apparent distress mean?
16 A  Patient didn't look like they were, you
17 know, suffering or in a lot of pain at the time.
18     MR. FAY:  Not about to die?
19     THE WITNESS:  Exactly. That's basically
20 it. It's just our quick and easy way of
21 differentiating someone -- looks like they're sick or
22 not sick.

Page 31

1  BY MR. JONES:
2  Q  Okay. Is there any lower indication than
3  no apparent distress?
4     MR. FAY:  What does that mean?
5  BY MR. JONES:
6  Q  Well, I guess no indication -- no apparent
7  distress is an indication of, you know, the patient's
8  comfort level, is that correct?
9  A  Correct.
10 Q  Okay. So if someone was in a lot of pain,
11 what would you say?
12 A  I would just describe if, basically, a
13 patient was writhing in pain, or patient sick
14 appearing, patient ill appearing, I mean, just kind
15 of general, my assessment of what they looked like at
16 the time, so no apparent distress is a general term
17 for saying someone is sitting there and not looking
18 like they're in any pain. They're just sitting there
19 like you or I would be sitting.
20 Q  Okay. And then what's the next section?
21 A  It says, "HEENT," which is head, eye, ear,
22 nose, and throat examine, and so I wrote, subtle

Page 32

1  changes of left eye -- or "subtle drop of left eye,"
2  sorry, and then it says, "PERLA," which is pupils are
3  equal and reactive to light and accommodation.
4     THE COURT REPORTER:  Say it again?
5     THE WITNESS:  Sorry. Pupils are equal and
6  reactive to light and accommodation.
7  BY MR. JONES:
8  Q  And what does that mean?
9  A  That's when we flash a light in somebody's
10 eye, that just tests their reflexes, their pupil, and
11 if, for instance, if you flash a light in the eye,
12 and the eye -- the pupils should shrink, that means
13 it's reacting appropriately.
14 Q  So Mr. Maniaci's reaction to that was
15 normal?
16 A  Yes.
17 Q  Okay. And then what's next?
18 A  "EOM intact," which is extra ocular eye
19 movements intact, which is just another test to make
20 sure that their eyeball is kind of moving in all
21 directions, which is another test of their cranial
22 node.

Page 33

1  Q  So Mr. Maniaci was normal for that?
2  A  Yes.
3  Q  And then what's next?
4  A  "Full ROM of neck," which stands for full
5  range of motion of neck.
6  Q  Okay. The subtle droop of left eye that
7  you noted, what could that have been caused by?
8  A  Some people just, I mean, some people have
9  a slight drop in the lower left eye. It could have
10 been a result from his previous stroke or TIA. I
11 mean, it's a neural -- it could be caused by some
12 type of neurologic, if he had nerve injury to his
13 face, long-term or something. There's a bunch of
14 different things.
15 Q  And as part of this, part of the physical
16 exam, do you actually examine the head for any
17 injuries?
18 A  We'll look at the scalp or something, yes.
19 Q  And if you had noticed any injuries or
20 bruising, you would have noted it?
21 A  Yes.
22 Q  What's the next section of the physical

Case 1:06-cv-01625-LFO    Document 45-30    Filed 02/12/2008    Page 9 of 10

June 28, 2007     Dr. Suzanne Gillern     Maniaci v. Georgetown
Washington, D.C.

Page 34

1  exam?
2      A   I have, "CV," which is cardiovascular and
3  it's RRR, which is regular rate and rhythm, which is
4  normal.
5      MR. FAY: Where is that?
6      THE WITNESS: It's right under the HEENT,
7  it says, "CV: RRR." Right there.
8      MR. FAY: Oh, okay. Thank you.
9  BY MR. JONES:
10     Q   And then to the left, there's something
11 regarding the back?
12     A   Right. I wrote, "back," and then, "no
13 tenderness to palp," which is palpation.
14     Q   Meaning you --
15     A   Meaning I touched the spine's processes --
16 or the spine going down in the back to localize any
17 area that might be tender. Per my report, there was
18 no tenderness.
19     Q   Okay. What's the next part of the
20 physical exam?
21     A   Lungs.
22     Q   Okay.

Page 35

1      A   And then I wrote, "diffuse bronchi," which
2  are just a kind of coarse type of breath sound, and
3  then, "breath sounds are present."
4      Q   Okay. And what might that be caused by?
5      A   That, I mean, he has COPD, I noted in the
6  medical history, so that, I mean, that can be caused
7  by that, a long history of smoking.
8      Q   Okay. What's the next part of the
9  physical exam?
10     A   "ABD," which is abdomen, and I wrote,
11 "soft, NT," which is nontender, "ND," which is
12 nondistended, and then, "positive BS," which is
13 positive bowel sounds, which is a normal exam.
14     Q   Okay. And then what's next, extremities?
15     A   Yeah, "EX" stands for extremities, I
16 wrote, "5 out of 5 strength, sensation intact.
17 Swelling of right ankle, nontender to palpation,
18 right foot," and then I wrote, "neurovasc intact,"
19 which is neurovascularly intact, which means it had a
20 good pulse, good range of motion, it basically just
21 means it was normal.
22     Q   And when you say, "nontender to

Page 36

1  palpation," that means you touch his ankle, and
2  there's no pain?
3      A   And he didn't have pain at the time, yes.
4      Q   Okay. What's the next part of the
5  physical exam?
6      A   And then I wrote, "neuro," which -- and
7  then I have CN 2 through 12, which stands for cranial
8  nerves 2 through 12, which I wrote as being intact,
9  and then I wrote, "nonfocal," which means there's no
10 focal deficits in his neuro exam, and once again, I
11 wrote, "5 out of 5, strength and sensation intact."
12     Q   Okay. And when you do this, the
13 neurological exam, how do you actually do that?
14     A   Well, part of it is actually the pupils,
15 is one of the cranial nerves, extra ocular eye
16 movements is another one of the cranial nerves,
17 there's a whole list of things. We test the face
18 muscles by asking them to smile and lift their
19 forehead. They have to lift their shoulders up,
20 stick out their tongue. It's a series of different
21 tests you do to test each of the cranial nerves.
22     Q   So everything was normal?

Page 37

1      A   Yes.
2      Q   Okay. And after you complete the physical
3  exam, what happens next with -- well, what happened
4  next with Mr. Maniaci?
5      A   Then I assume that I went out and talked
6  to my attending, and we decided to do -- I wrote down
7  some orders, a CT noncon of the head.
8      Q   And is that in the vital sign section you
9  write the orders?
10     A   That's right underneath the vital signs,
11 it says, "orders," and then underneath there.
12     Q   Okay.
13     A   And then I also ordered a CBC, which is a
14 blood test, a CMP, which looks at his electrolytes,
15 and then a coag, which looks at is his blood is thin
16 or not thin, and then I also wrote for ankle
17 three-view x-ray.
18     Q   Okay. Now, the CT noncon head?
19     A   Yes.
20     Q   What is that?
21     A   That's a CT of the head without using any
22 contrast, which is what we normally do to work up a

Case 1:06-cv-01625-LFO   Document 45-30   Filed 02/12/2008   Page 10 of 10

June 28, 2007          Dr. Suzanne Gillern          Maniaci v. Georgetown
                       Washington, D.C.

Page 38

1  questionable brain -- the first step in something
2  looking at the head, in the brain.
3     Q  And why did you order that?
4     A  Based, I would believe, just going off of
5  my note, probably based on the fact that he had an
6  episode of trauma based on the kicking and dragging
7  and also an episode of dizziness and collapse.
8     Q  Okay.  So based on what the patient --
9     A  What he told me, yes, based on the
10 patient's report.
11    Q  Okay.  And then you ordered that these
12 things be done.  And were they completed?
13    A  Yes.
14    Q  Okay.  And is there some indication on
15 here of what the results were of these various tests?
16    A  In the middle of the page, under my
17 paragraph, the initial paragraph, I have a box with
18 the lab results in it, and then I also have another
19 box slightly below that, that shows CT scan of the
20 head, no acute changes, and right ankle, no
21 fractures.
22    Q  And if you could just briefly summarize

Page 39

1  what the lab results are in that box that says,
2  "CBC"?  You don't have to read every number.
3     A  Sure.  So --
4        MR. FAY:  Where is that again?
5        THE WITNESS:  Right here, sir.
6        MR. FAY:  Okay.  Thanks.
7        THE WITNESS:  So CBC, so 8.9 represents
8  his white blood cell count, which would be like
9  looking at infection, and then 13.9 and 40.3 are kind
10 of his blood levels as far as like hematic rate or
11 hemoglobin hematic rate, if he was anemic or not,
12 those are all normal.  And then 205 is his platelet
13 count, which is normal.  And then the 142, 3.7, and
14 so on, that little graph --
15       THE COURT REPORTER:  You need to slow
16 down, please.
17       THE WITNESS:  I'm sorry.  So then the 142,
18 3.7, 106, 27, 15, 1.2, and then 102, those are all
19 his electrolytes, which are all -- those are just
20 like sodium, potassium, chloride, creatinine, those
21 are all normal.  And then next to that, his alk phos,
22 AST, LAT, T belly are his liver function tests, which

Page 40

1  do not seem to be abnormal.  And then underneath
2  that, I wrote, "coags," and that meant measures, if
3  his blood is -- like if he's taking a blood thinner,
4  if his blood is thin or if he's had a high likelihood
5  of bleeding, and those are normal.
6  BY MR. JONES:
7     Q  So Mr. Maniaci's liver function came back
8  normal?
9     A  Yes.
10    Q  Okay.  And his blood chemistry came back
11 normal?
12    A  I don't see anything too wrong with it,
13 no.
14    Q  Okay.  And what about the results of the
15 CT scan of his head?
16    A  Yeah.  So I wrote, "no acute changes," so
17 we didn't see anything based on that, no.
18    Q  So you didn't see any head trauma or
19 trauma to his brain?
20    A  No, based on that, no.
21    Q  Okay.  And then what about the right ankle
22 x-ray?

Page 41

1     A  I just wrote, "no fractures," so that
2  meant there was no fracture.
3     Q  Okay.  So after the, these tests come
4  back, what happens next?
5     A  Well, basically, I think we were -- then
6  we decide on the plan, on if we're going to admit the
7  patient, not admit the patient, and what kind of care
8  he needs, you know, if we need to give him any
9  medication or send him with any other assistance.
10    Q  Okay.
11    A  Or if more tests need to be done.  In this
12 case, we didn't do any more tests.
13    Q  Okay.  And you indicated earlier that
14 there was a, there's a note on this page from the
15 attending physician?
16    A  Yes.
17    Q  Okay.  And that's in the bottom right-hand
18 corner?
19    A  Yeah, yes.
20    Q  Okay.  So that's a section that's not your
21 handwriting?
22    A  Correct.