**Deposition of Darryl Harrison**

**Plaintiff's Opposition to Summary Judgment**

**EXHIBIT #16**

1    major events.  I did that for five years.

2             In 1999, I was employed by Georgetown

3    University as the associate director in the

4    department of public safety.

5        Q    And you're now the director of public

6    safety?

7        A    I was selected as the director of public

8    safety in March of 2003.

9        Q    And that was your position, I take it, on

10   February 18th of 2006?

11       A    Yes.

12       Q    Let me first ask you -- there have been

13   two names that have come up of officers, Officer

14   Eddy and Officer Salley.  However, nobody knew their

15   first names.  Would you know the first names of

16   either of those officers?

17       A    Officer Eddy, first name is Roy.

18       Q    Okay.

19       A    Officer Salley, first name Larry.

20       Q    Okay.  Is Eddy, E-D-D-I-E, just --

21       A    E-D-D-Y.

22       Q    E-D-D-Y.  Okay.  And Salley is

Page 7

1    S-A-L-L-E-Y?

2         A    S-A-L-L-E-Y, correct.

3         Q    Okay. Thank you. Tell me what the
4    director of public safety at Georgetown does. In
5    other words, what's your assigned area of
6    responsibility?

7         A    The responsibility for the director of
8    the department of public safety for Georgetown
9    University is to assist in developing those programs
10   that ensure the public safety of our students,
11   faculty, and staff.

12        Q    That would include everything on campus,
13   as well as buildings -- including the buildings and
14   so forth?

15        A    Yes.

16        Q    Do all of the persons who come under your
17   direction actually work for Georgetown University,
18   or are some of them contract employees? By contract
19   employees, I mean they -- they work for one of these
20   contracting security firms that provides special
21   police officers and then the -- the firm gets paid.

22        A    They are employees of the special police

Page 8

1    of that particular private security firm.  During
2    the time that they're at Georgetown, they work for
3    the department of public safety.
4        Q    Okay.  So they're paid by Georgetown?
5        A    The contracting company is paid by
6    Georgetown.
7        Q    In the case of Officer Eddy and Officer
8    Salley, were they actually regular employees of
9    Georgetown, or were they working for a contractor
10   with Georgetown?
11       A    Officer Eddy and Officer Salley were full
12   time employees of the department of public safety at
13   Georgetown University.
14       Q    Okay.  Who is your supervisor in your
15   position as director of public safety?
16       A    My supervisor is David Morrell, Vice
17   President of university safety.
18       Q    Before February 18th of 2006, did you
19   have any knowledge whatsoever of Mr. Maniaci?
20       A    Yes.
21       Q    Okay.  And tell us what -- by knowledge,
22   I don't mean just what you saw, but information that

Page 43

1        Do you have any information that he did
2  have any part in any of the activities that day
3  involving Mr. Maniaci?
4      A   His paraphrase is consistent with the
5  assignment that he was given on that day, and that
6  would be that he'd man the gate.
7      Q   I take it you don't have any information
8  to the contrary?
9      A   No, I do not.
10     Q   Okay. When -- let me go back to the ICC
11 Building for a moment. I take it that -- that
12 beyond -- well, did Mr. Maniaci walk in through one
13 of the doors into the building, or did he stop at
14 the door?
15     A   He initially stopped at the door.
16     Q   You say initially. What did he do then?
17     A   And then, subsequent, as the conversation
18 continued and -- he was advised that he would not be
19 able to fully enter IC -- ICC. There is a vestibule
20 that prevents one from going completely into the
21 entrance.
22       And at that point, he was allowed into

24ca273a-6b61-4257-a3be-72eef841bed3

Page 44

1  the vestibule area, as the conversation and
2  consultation continued.
3      Q    Okay. And did he ever go beyond that
4  into the building in any way?
5      A    At one point, he was allowed to use the
6  restroom in the building.
7      Q    Okay. And after that, did he leave the
8  building?
9      A    Yes. He was escorted back out of the
10 building after utilizing the restroom.
11     Q    And at any point when this was going on,
12 did any of the officers have a hold of Mr. Maniaci,
13 either Georgetown University security officers or
14 MPD officers?
15     A    I cannot recall at that point any of the
16 officers having any physical hold of Mr. Maniaci.
17     Q    As far as you witnessed, as far as you
18 saw, did -- did any of the officers have a hold of
19 Mr. -- I mean, just on the arm or something like
20 that, or anything, any touching of him?
21     A    There may have been an occasion or two
22 when he may have been touched to be directed to an

1  area to go to. But as far -- as far as any physical
2  restraint or anything along that line, I cannot
3  recall any of the officers having him.
4      Q    I take it that would be consistent with
5  any reports you got from Officer -- Officer Eddy or
6  Officer Salley as well?
7      A    Again, I don't think that --
8      Q    By consistent I mean at the ICC Building
9  now, until he left campus.
10     A    Again, I --
11          MR. JONES: Objection. I don't think
12 he's testified that Eddy and Salley were at the ICC
13 Building.
14          THE WITNESS: ICC Building, correct.
15          BY MR. FAY:
16     Q    Okay. They were never -- is that
17 consistent -- did you -- you have any further report
18 from anybody else indicating any officer had their
19 hand on or hands on Mr. Maniaci after he came out of
20 Gaston Hall?
21     A    No. No, I cannot recall any further
22 reports of that.

Page 46

1  Q  There was a point where Mr. Maniaci asked
2  permission to use the restroom facilities in the ICC
3  Building?
4  A  Excuse me. Yes, that is correct.
5  Q  At that point, did he appear to be ill or
6  not feeling well or injured in any way?
7  A  No.
8  Q  I can't recall whether you gave any
9  estimate as to Mr. Maniaci's height and weight. But
10 if you didn't, could you give us an estimate?
11 A  I would estimate -- and this is going
12 from pure recollection at that point -- that his
13 height is approximately five-eight to five-nine,
14 weight approximately 210, 215.
15 Q  Okay. Oh, did you -- did you see
16 Mr. Maniaci with a cane at any time, you know, a
17 cane to help you walk?
18 A  Yes.
19 Q  Okay. What did -- what did that look
20 like, as best you can recall?
21 A  I cannot remember the specifics of the
22 cane. I certainly cannot.

1          MR. FAY:  Okay.  I don't have any other
2    questions.
3          MR. JONES:  No questions.
4          BY MR. FAY:
5    Q     All of these -- yeah.  I think you
6    already testified, all of these security officers at
7    Georgetown University all are special police
8    officers, commissioned from the District of
9    Columbia, I take it?
10   A     All of the officers assigned to the
11   department of public safety are commissioned special
12   police officers through the District of Columbia.
13         MR. FAY:  Okay.  Okay.  Thank you.
14         MR. JONES:  No questions.
15         VIDEO OPERATOR:  Going off the record at
16   14:06:25.
17                         (Whereupon, signature having
18                         not been waived, at 2:06 p.m.
19                         the deposition concluded.)
20
21
22