Deposition of David Morrell

Plaintiff's Opposition to Summary Judgment

EXHIBIT #20

Case 1:06-cv-01625-LFO    Document 45-33    Filed 02/12/2008    Page 1 of 11

Page 6

1  years and went to Georgetown in November of 2003.
2  Q     And you've been at Georgetown since then?
3  A     Correct.
4  Q     And you're still at Georgetown --
5  A     I am.
6  Q     -- is that correct?
7        And what positions have you held at
8  Georgetown?
9  A     I've held one position.  It's vice
10 president for university safety.
11 Q     Does university safety include the
12 security -- Georgetown University security people?
13 A     Yes.
14 Q     Police, so to speak --
15 A     Correct.
16 Q     -- Georgetown University?
17       Are all the officers that are employed by
18 Georgetown University, do all of them hold a special
19 police officer's commission from the District of
20 Columbia?
21 A     I believe they do.
22 Q     Are there any contract people doing

1        What was -- what means were -- avenues were
2   utilized in doing this investigation?
3            MR. JONES:  Objection, foundation.
4            You can answer.
5            THE WITNESS:  We made an inquiry with
6   Federal Bureau of Investigation, Metropolitan Police
7   Department, the State Department and the Department of
8   Treasury.
9            BY MR. FAY:
10       Q    And none of them reported any information
11  that was a cause of concern to you so far as security
12  is concerned?
13       A    Correct.
14       Q    Did you do any, again, I'll use the word
15  vetting, but, of the organization at Georgetown known
16  as Students for Justice in Palestine?
17       A    No.
18       Q    Were you there when they were, I think
19  Mr. Olson used the term given access to benefits or it
20  sounds like recognized, but when they were recognized
21  and given access to benefits by the university, were
22  you at Georgetown at that time?

1         MR. JONES: Objection, foundation.

2         THE WITNESS: I don't know when that took

3  place, so I don't -- no, I -- I have no information on

4  that.

5         BY MR. FAY:

6    Q    Did you have any actual conversation on the

7  18th of February 2006 with William Maniaci?

8    A    Certainly there was no extensive

9  conversation. There might have been an exchange of

10 one or two words, but I don't recall any extensive

11 conversation with him.

12   Q    Okay. Anything significant said in the

13 couple words exchanged? Do you even recall the exact

14 words?

15   A    I don't recall the exact words. We -- we

16 had what might be termed a very brief conversation in

17 front of the -- in the ICC building, a building on

18 campus.

19   Q    Okay. What was the purpose of the

20 conversation, engage him in a conversation? What was

21 he trying to learn from you or you trying to learn

22 from him?

1   A   The purpose of the conversation was to
2   further inform Mr. Maniaci that he was blocking the
3   entrance into the ICC building and was asked to leave
4   the vestibule of the building and go outside.
5   Q   When you say blocking the entrance, I've
6   never seen the ICC building. Could you explain a
7   little bit more what you mean by blocking the
8   entrance?
9   A   There -- there are a number of entrances
10  into the ICC building. This particular one has two
11  sets of glass doors, and in between the two sets is a
12  small vestibule.
13      He and, as I would term, members of his
14  party were standing in there, interfering with people
15  coming and going out of that building, either
16  attending the conference, going to their offices,
17  conducting other business.
18  Q   When you say interfering, you mean somebody
19  was grabbing people coming in or they were holding
20  arms to keep people from coming in, or were they just
21  there so people coming in had to walk around them?
22  A   It was their presence. There was at least

1   the question and answer afterwards?
2   A   I was.
3   Q   Okay.  Could you describe what took place
4   during that period?
5   A   People filed into the -- into Gaston Hall,
6   took seats wherever.  There was a panel up on the
7   stage.
8       Once the program began, Todd Olson began
9   the program reading a statement to all the attendees
10  outlining procedural rules, protocol rules that had
11  been adopted by the university.  And then the program
12  began or continued with the program people introducing
13  the panel, and the program began.
14  Q   Okay.  Do you recall anything as to what
15  the speakers said?
16  A   Nothing specific, no.
17  Q   I take it you were there, let us say, in a
18  security function; you were not there in an academic
19  function as maybe a professor of political science
20  would be in the school?
21  A   That's correct.
22  Q   Okay.  When was your attention first drawn

```
 1   those are their last names.
 2       A     (Nods head affirmatively.)
 3       Q     Okay.  Do you know the first name of
 4   Officer Eddy?
 5       A     No.  I don't recall.
 6       Q     How about Officer Salley?
 7       A     I don't recall.
 8       Q     Okay.  I take it both of them are
 9   Georgetown security employees, employees of the
10   university?
11       A     They are.
12       Q     Okay.  Once that instruction by Mr. Olson
13   was given, I take it that the people who carried this
14   out were the people working under your instruction.
15             Not that you gave specific instructions to
16   these two officers right at that point, but they
17   report to you or to somebody who works for you; is
18   that correct?
19             MR. JONES:  Objection, foundation.
20             You can answer, if you can.
21             THE WITNESS:  They report to Darryl
22   Harrison, who's the director of the Department of
```

1  Public Safety.

2      BY MR. FAY:

3    Q    And then he reports to you, I take it?

4    A    That's correct.

5    Q    Okay. After they moved toward Mr. Maniaci,

6  from that point until the end of the day, did you give

7  them any instructions on the manner in which they were

8  to act in removing Mr. Maniaci from the room?

9    A    No, I did not.

10   Q    Did you hear any conversation either

11 officer had -- by conversation, I mean simply they

12 said something to Mr. Maniaci.

13   A    I did not.

14   Q    How close were you to the officers and

15 Mr. Maniaci when the first photograph -- the area of

16 the first photograph shows? Again, I think that's 4.

17   A    That's 4. I was in the back of the hall.

18   Q    Would -- would you have heard anything that

19 the officers said to Mr. Maniaci --

20   A    I did not --

21   Q    -- or --

22   A    I did not hear anything where I was.

b7434cc1-6817-43d2-b527-7eb00a9d8c76

Page 27

1   Q   Okay. But where you were, if something had
2   been said, would you have been able to hear it?
3       I've never seen the hall, so I don't know
4   how much distance there was. And I presume that
5   neither of the officers, nor Mr. Maniaci, was, as I
6   would say, miked up on a loud speaker.
7       So without that, would you have heard
8   whatever one of them said unless --
9   A   No.
10  Q   -- it was shouted in a very high voice?
11  A   No.
12  Q   Okay. Do you contend that Mr. Maniaci at
13  any time acted in a manner that was unlawful?
14  A   I do not contend he acted unlawful.
15  Q   Do you contend that Mr. Maniaci at any time
16  when you were observing him acted in a manner which
17  endangered anybody, physically, of course?
18  A   Not -- not knowing everyone who was in that
19  room, I don't know if someone in -- contrary to
20  Mr. Maniaci's feelings, would have had he persisted.
21  This is pure speculation, but had he persisted, would
22  someone have reacted to him physically, I don't know

Page 32

1  and Officer Salley, made statements for the incident
2  reports.
3      Q    Okay. I take it that is a Georgetown
4  University form. They were not the PD 251s, for
5  instance, because there wasn't any arrest; is that
6  correct?
7      A    That's correct.
8      Q    Okay. Is there a designate -- a number
9  designation on that form, or is it simply you sit down
10 and write it out on a piece of paper and put it in the
11 file?
12     A    I don't know if there's a designated form,
13 but there is a specific form. It's a Department of
14 Public Safety incident report. It's a standard form.
15     Q    How long are those forms kept after one is
16 compiled?
17     A    I don't know.
18     Q    We'd like to have it preserved, if you can
19 find it, and we'll be asking for that as well.
20          Did -- prior to this conference, did you do
21 any investigations of -- by investigation, I mean
22 check with FBI, Metropolitan Police, other law

1  enforcement or security agencies -- with regard to any
2  people expected to attend the conference other than
3  the people who were actually speakers or members of
4  the Palestine -- the student group, Justice in --
5  Students for Justice in Palestine?
6     A    No, I did not.
7     Q    Did anyone -- I take it when you say no,
8  you did not, that that would include anyone working
9  for you at least by your direction or with your
10 knowledge?
11    A    With my knowledge and my direction, no.
12    Q    Was Mr. Maniaci forcibly removed from the
13 ICC building?
14    A    No, he was not.
15    Q    What officers were involved at the time
16 that he was in the ICC building where this
17 conversation took place in which you participated?
18         MR. JONES:  Objection, foundation.
19         You can answer, if you can.
20         THE WITNESS:  I don't recall the names of
21 the officers that were there.
22