UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**WILLIAM MANIACI,**

     **Plaintiffs,**

     **v.**

                      **Civil Action No.: 1:06cv01625**

**GEORGETOWN UNIVERSITY, et al.,**         **(CKK/JMF)**

     **Defendants.**

**<u>PLAINTIFF'S STATEMENT OF GENUINE ISSUES SETTING FORTH ALL
MATERIAL FACTS IN OPPOSITION TO DEFENDANT'S STATEMENT OF
MATERIAL FACTS NOT IN DISPUTE
REGARDING THE MOTION OF DEFENDANT FOR SUMMARY JUDGMENT</u>**

1. Plaintiff William B. Maniaci is a resident of Nevada. Dep. of William Maniaci (Ex. 1) at 5-6.

     **RESPONSE: Admit.**

2. Plaintiff is a retired police officer. Ex. 1 (Maniaci Dep.) at 8-10.

     **RESPONSE:  Admit.**

3. At all relevant times, Plaintiff was an active member of and served as the "chief of security and intelligence" for the Jewish Defense League ("JDL") which Plaintiff has described as a Zionist organization. Ex. 1 (Maniaci Dep.) at 103, 114, 195.

     **RESPONSE:  Deny. As Mr. Maniaci explained in his deposition (Dep. P. 81, L. 15 to P. 88, L. 14) he separated from the Jewish Defense League, beginning in 2004. Pages 113 and 114 of his deposition contain no statements as to Zionism. Mr. Maniaci's only statement as to "Zionist" is found at page 195, line 18 to page 196, line 1 in which he defines "Zionist" in terms of his**

**belief as "We believe that Israel belongs to the Jewish people, and … we encourage immigration from all countries in the world of all Jews to Israel."**

4.A report by the United States Federal Bureau of Investigation ("FBI") on terrorism in 2000-2001 described the JDL as "a violent extremist organization." Ex. 1 (Maniaci Dep.) at 97-98; Terrorism 2000/200 1, http://www.fbi.gov/publications/ terror/terror 2000_2001.pdf.

**RESPONSE:  Deny. Plaintiff denies that this fact is "material". If this fact is "material", then the full context of this report should be stated. First this report was not published for any regulation or necessary FBI procedure, and the Jewish Defense League is not mentioned in the "Annual Terrorism Report" for 2000-2001, and William Maniaci's name is not mentioned in any FBI reports or documents. This report notes "[t]he FBI investigates terrorism-related matters without regard to race, religion, national origin, or gender. Reference to individual members of any political, ethnic, or religious group in this report is not meant to imply that all members of that group are terrorists. Terrorists represent a small criminal minority in any larger social context." The actual section of this report that mentioned the Jewish Defense League stated as follows:**

**"DECEMBER 11, 2001**

**Planned Bombing**

**Los Angeles, California**

*(Prevention of one act of Domestic Terrorism)*

On December 11, 2001, Irving David Rubin and Earl Leslie Krugel were arrested by the Los Angeles Joint Terrorism Task Force for conspiring to build and place improvised explosive devices (IEDs) at the King Fahd Mosque in Culver City, California, and the local office of Congressman Darrell Issa. Rubin and Krugel were subsequently charged with conspiracy to destroy a building by means of an explosive, as well as possession of a destructive device during and in relation to a crime of violence. Rubin and Krugel were active members of the Jewish Defense League (JDL), a violent extremist Jewish organization. Statements by Rubin and Krugel indicated that they had planned the attack against the mosque to demonstrate the militancy of the JDL. Krugel further indicated that the attack was planned to provide a "wake up call" to the Muslim community. It was determined that Rubin and Krugel had already acquired the necessary components to build an IED, including pipes, fuses, and smokeless powder."

This was listed in the "Prevention" section, which is "is a documented instance in which a violent act by a known or suspected terrorist group or individual with the means and a proven propensity for violence is successfully interdicted through investigative activity."

www.FBI.gov/publications/terror/terror2000_2001.htm

Further, the Plaintiff denies any and all involvement and knowledge as to this occurrence before it was discovered by law enforcement. In fact, William Maniaci resigned from the JDL because of this occurrence. (Ex. 14, pg.97:8-19)

5.The Southern Poverty Law Center had, as of 2006, designated the JDL as a hate group. Ex. 1 (Maniaci Dep.) at 98-99; Dep. of Jim Nutting (Ex. 2) at 79; Active U.S. Hate Groups in 2006, http://www.splcenter.org/intel/map/hate jsp?T=34&m=5.

> **RESPONSE:  Deny. Plaintiff denies that this fact is "material". Further the Southern Poverty Law Center is not a law enforcement agency, and is not a reliable source of information. The Washington Post has labeled SPLC as  "a controversial, liberal organization".**

6.From about 1995 through 2002, Plaintiff also served as "deputy chairman" and "chief of security" of the JDL under Chairman Irv Rubin. Ex. 1 (Maniaci Dep.) at 82-84. In 2002, Chairman Rubin and his JDL associate Earl Krugel, were arrested and indicted for conspiring to bomb the office of Arab-American Congressman Darrell Issa and the King Fahd Mosque in Los Angeles. Ex. 1 (Maniaci Dep.) at 88, 91, 97. Mr. Krugel pleaded guilty to the charges and Mr. Rubin died before trial. Id. at 91-93.

> **RESPONSE:  Deny. Plaintiff denies that this fact is "material". Defendant is implying that because the Plaintiff was serving as "deputy chairman" and "chief of security" under Chairman Rubin that he is somehow implicated as involved in the criminal occurrence in which Rubin participated. There is absolutely no record that William Maniaci was in any way involved in the criminal occurrence of Irv Rubin.**

7.Plaintiff is a federally licensed firearms dealer. Ex. I (Maniaci Dep.) at 1213. He owns a firearms business called Macabbee Arms. Id; Ex. 2 (Nutting Dep.) at 36-37. A picture of the Plaintiff from his Macabbee Arms website is attached as Exhibit 3.

**RESPONSE:  Deny. Plaintiff denies that this fact is "material".**

8.Plaintiff arrived at the law offices of Defendants' counsel armed with a concealed .45 caliber handgun which he kept on his person during the course of his deposition. Ex. 1 (Maniaci Dep.) at 12-13. He testified that he "always carr[ies] a weapon." Id. at 12-13, 379.

> **RESPONSE:  Deny. Plaintiff denies that this fact is "material". William Maniaci has a license from the federal government to carry a concealed weapon in all fifty states and the District of Columbia. (Ex.#14 Pg 12:9-11) Maniaci is a licensed firearms dealer for Reno, Nevada. (Ex.#14 Pg. 14:11-15:7) Maniaci did not have a firearm when he was on Georgetown campus in February of 2006. (Ex.#14 Pg. 15: 20-22, pg 16:14-18, pg 17:18-20, and pg. 383:9-18)**

9.With respect to the events that occurred at Georgetown University on February 18, 2006, Plaintiff acted in close coordination with several other JDL officers, members and/or sympathizers who also attended those events. Ex. 1 (Maniaci Dep.) at 138-42.

> **RESPONSE:  Deny. Defendant's statement is too vague. The transcript, P. 138-142, does not so indicate. Defendants have not indicated any act of Mr. Maniaci at the Georgetown University which was coordinated with anyone. Mr. Maniaci was not acting in close coordination with "sympathizers". Defendant does not specify what actions he is speaking of. Plaintiff testified that the JDL had planned to protest the Palestinian Solidarity Conference. Maniaci had planned to go to the Palestinian Solidarity Conference "[to find out what was being said. We wanted to attend the conference. We wanted to**

collect – my intention was to collect intelligence, to find out who the speakers were, what they were saying, to have our people attend the seminars and find out what was being said and what was going on, so that we could – we could counter the information that was being – you know, the false information that was being espoused. We wanted to be able to know our enemy, in other words. We also planned to demonstrate peacefully outside of the hall where these – these events were being held." (Ex. 14, pg. 146:15- pg. 147:6) Maniaci has repeated stated his intent to peaceful protest of the conference. (Ex. 14, pg. 148:21, pg 328:20-329:2) The members of the JDL that attended the conference with Maniaci were Robert Turk, Mr. Bailey, Matthew Finberg, and Mr. Haas. When Maniaci attended the event in which he was removed, he entered with Mr. Bailey.

10. One of these JDL officers, Robert Turk, who at all relevant times held the position of Eastern Regional Director of the JDL, also attended his deposition with a concealed semi-automatic weapon on his person. Dep. of Robert Turk (Ex. 4) at 13-15; 31-32.

> **RESPONSE: Admit. As indicated in Mr. Turk's testimony he has a license to carry a pistol in Connecticut, the place of the deposition. Plaintiff denies that this fact is "material".**

11. Defendant Georgetown University ("Georgetown" or the "University") is a private non-profit university incorporated under the laws of the District of Columbia. Act of June 10, 1844, 6 Stat. 912, amended by Act of Oct. 4, 1966, Pub L. No. 89-631, 80 Stat. 877.

> **RESPONSE: Admit.**

12. Defendant Todd Olson is an employee of Georgetown and at all relevant times held the position of Vice President of Student Affairs. Dep. of Todd Olson (Ex. 5) at 6. He has been employed by Georgetown since 2002. Id. at 6.

> **RESPONSE:  Admit if this is intended to refer to the date of the occurrence, February 18, 2006.**

13. Defendant Darryl Harrison is an employee of Georgetown and at all relevant times held the position of Director of Public Safety. Dep. of Darryl Harrison (Ex. 6) at 6. He has been employed by Georgetown since 1999. Id. at 6. Before coming to Georgetown, Mr. Harrison spent twenty five years as a member of the Metropolitan Police Depai anent ("MPD"); he held the position of Captain Commander of the Special Events Branch of the Special Operations Division when he retired. Id. at 5.

> **RESPONSE:  Admit.**

14. Defendant David Morrell was until early 2007, an employee of Georgetown and at all relevant times held the position of Vice President for University Safety. Dep. of David Morrell (Ex. 7) at 5-6. He came to Georgetown in 2003. Id. Before coming to Georgetown, Mr. Morrell spent twenty four years with the United States Secret Service and also served as the head of security for the Smithsonian Institution. Id. at 5.

> **RESPONSE:  Admit.**

15. Defendant Roy Eddy is an employee of Georgetown and at all relevant times he was an officer in the Department of Public Safety. Dep. of Roy Eddy (Ex. 8) at 7-9. At all relevant times, Safety Officer Eddy was commissioned as a special police officer pursuant to District of Columbia law. Id at 7; D.C. Code § 5-129.02.

> **RESPONSE:  Admit.**

16. Defendant Larry Salley was until April 2006 an employee of Georgetown and at all

relevant times he was an officer in the Depai ment of Public Safety. Decl. of Larry Salley

(Ex. 9) 11. At all relevant times, Safety Officer Salley was commissioned as a special

police officer pursuant to District of Columbia law. Id 12; D.C. Code § 5-129.02.

**RESPONSE:  Deny. Plaintiff has no knowledge of the facts regarding Mr.**

**Salley. Plaintiff was not provided an opportunity to depose Larry Salley.**

**Larry Salley failed to appear for a deposition on July 11, 2007. The attorneys**

**for the defendant, Larry Salley, claimed to have no contact with Larry**

**Salley. His declaration then appeared in which he gives no address. Plaintiff**

**objects to the use of such declaration of Larry Salley, Plaintiff should be**

**provided the opportunity to depose Larry Salley.**

17. The Palestine Solidarity Movement Conference (the "PSM Conference") took place

on February 17-19, 2006. See PSM Conference Agenda ("PSM Agenda") (Ex. 10);

Jewish Defense League Handout ("JDL Handout") (Ex. 11).

**RESPONSE:  Admit.**

18. Students for Justice in Palestine ("SJP") is a student group at Georgetown. Dep. of

Daniel Porterfield (Ex. 12) at 7-8; Ex. 5 (Olson Dep.) at 9.

**RESPONSE:  Admit. It should be noted that no persons identified as**

**Georgetown students have been indicated as present at the occurrence.**

19. SJP sponsored the PSM Conference. Ex. 12 (Porterfield Dep.) at 7-8; Ex. 5 (Olson

Dep.) at 9; Georgetown Statement on SJP Conference ("Georgetown Stmt.") (Ex. 13).

**RESPONSE: Admit. Georgetown University collected the fees paid for**

**attendance at the event. See Maniaci Deposition, P. 232, Line 6.**

20. The stated mission of the Palestine Solidarity Movement ("PSM") is to "support the struggle of Palestinians against Israeli occupation" by "tak[ing] a principled stand against the human rights abuses of the Israeli government." PSM Conference Information Packet ("PSM Packet") (Ex. 14) at GTN000961. A primary focus of the PSM Conference was to "promote divestment from' 'Israel. Id.

> **RESPONSE:  Deny. Defendant's exhibit 14 does not state that this statement is "the mission of the Palestine Solidarity Movement", as Defendant is stating.**

21. Georgetown did not sponsor the PSM Conference. Palestine Solidarity Movement Conference Frequently Asked Questions ("PSM FAQs") (Ex. 15) at GTN00062.

> **RESPONSE:  Deny. Defendant's exhibit 15 shows that the "conference is sponsored by a Georgetown student organization with access to university benefits, Students for Justice in Palestine, in accordance with University rules and policies." The use of Georgetown's facilities "does not apply *acceptance or endorsement* by the University." Technically Georgetown University is *sponsoring* the PSM Conference.**

22. Georgetown has a practice of extending University benefits such as use of its facilities to any of its student organizations in accordance with its "broad educational mission." Ex. 5 (Olson Dep.) at 8-9; Ex. 13 (Georgetown Stmt.).

> **RESPONSE:  Admit.**

23. Consistent with this practice, Georgetown made its facilities available to SJP for the Conference. Ex. 5 (Olson Dep.) at 8-9. Among the facilities which Georgetown made available for Conference activities were an auditorium in Healy Hall called Gaston Hall

as well a's a number of rooms in another building called the Bunn Intercultural Center

("ICC"). Id. Ex. 10 (PSM Agenda); Ex. 11 (JDL Handout).

> **RESPONSE:  Admit.**

24. Georgetown allows individual student groups to decide whether a particular event

will be open only to the University community or to the public at large. Ex. 5 (Olson

Dep.) at 13-14. SJP made the decision to open the Conference up to members of the

public at large. Id.

> **RESPONSE:  Admit.**

25. Georgetown itself does not support the mission or the goal of the PSM;

University President John J. DeGioia explicitly stated that Georgetown does not support

PSM's objective of divestment from Israel. Ex. 15 (PSM FAQs) at GTN 000067; DeGioia

Statement on Divestment from Israel ("DeGioia Stmt.") (Ex. 16). President DeGioia's

comments are excerpted below:

> Some people have asked me if Georgetown will consider the
> [Palestine Solidarity Movement's] call for divestment from Israel.
> The answer to that question is no. I do not support divestment from Israel.
> It is clear there are a wide range of opinions on the conflict in the Middle East and
> that the appropriate way for Georgetown University to address the situation is
> through dialogue, research, and intellectual discovery.
>
> **RESPONSE:  Deny. By offering its facilities to the PSM Georgetown**
>
> **University is, by definition, supporting that organization. By doing so**
>
> **Georgetown, in the words of its Vice President, Todd Olson, gave (Olson**
>
> **Deposition, P. 8, Line 8 to Page 12, Line 7) "access to benefits"(Page 8, Line**
>
> **8) and did so with no investigation (Page 12, Lines 1-10).  In the absence of**
>
> **any investigation, Georgetown could not claim that it "does not support the**

**mission or goal of the PSM" when it professed ignorance on what the mission or goal of PSM might be.**

26. In this spirit of addressing conflict through dialogue and the "free and open exchange of ideas," Georgetown made its facilities available to SJP for the Conference even though the ideas expressed "may be difficult or objectionable" to the University itself. Ex. 13 (Georgetown Stmt.); Ex. 12 (Porterfield Dep.) at 41; Ex. 15 (PSM FAQs) at GTN000076.

**RESPONSE:  Deny. See the response to item 25 above.**

27. PSM Conferences had previously been held at four different university campuses including Duke University ("Duke"), the University of Michigan, Ohio State University, and the University of California at Berkeley. Ex. 13 ("Georgetown Stmt.").

**RESPONSE:  Admit.**

28. Several months prior to the Conference, a team of Georgetown administrators including Erik Smulson, David Morrell, Jeanne Lord and Martha Swanson traveled to Duke to discuss the university's experience in hosting the Palestine Solidarity Movement Conference in 2005. Duke Visit Memorandum ("Duke Memo") (Ex. 17) at GTN000790; Dep. of Erik Smulson (Ex. 18) at 13 ("we worked to learn about what happened at past conferences, as we prepared our plan to help respond to the conference at Georgetown").

**RESPONSE:  Deny. Plaintiff has no knowledge as to this fact. There is no testimony on the record that specifies that a team of administrators traveled to Duke to discuss the university's experience in hosting the past Palestine Solidarity Conference, other than Defendant's exhibit 17, which does not specify who was in attendance or when that trip had occurred.**

29. The Georgetown Administrators wished to ensure that Georgetown would be prepared to "balance the free-speech of both the sponsors of the event and those wishing to offer counter programming or protest in a safe and respectful manner." Ex. 17 (Duke Memo) at GTN000790.

> **RESPONSE:  Deny. The exact wording is: "This event has proved to be a challenge at each institution as it tries to balance the free-speech of both the sponsors of the event and those wishing to offer counter programming or protest in a safe and respectful manner." In fact as indicated in the video recording of the event, no dissent from the Palestinian position was permitted.**

30. The Georgetown team learned from their Duke counter-parts that based on Duke's past experience, they could expect a number of challenges from persons and organizations opposed to the PSM's policy goals and opposed to the University's plan to allow the PSM Conference to be held on its premises. These challenges included:

> a. unsubstantiated claims that the Palestine Solidarity Movement has ties to terrorism;

> b. security threats including bomb threats and/or death threats on university officials;

> c. a misinformation campaign by groups trying to disrupt the conference;

> d. attendance by individuals claiming to be journalists who work for organizations opposed to the conference;

> e. demonstrations and protests.

Ex. 17 (Duke Memo) at GTN000790-791; Ex. 18 Smulson Dep. at 13-14.

**RESPONSE:  Deny. The exact wording from the "Duke Memo" is that "[c]laims that the Palestinian Solidarity Movement has ties to terrorism. Duke University inquired with Federal officials who told them this was not true. *While the group does not endorse terrorism, it does not condemn it.*"**

31. Based in part on what the administrators learned from Duke, Georgetown took a number of measures to balance the free speech interests of the Conference organizers with

the interests of those wishing to offer counter-programming and to protest.

a. Creating a website to respond to inquiries and provide relevant information, including Georgetown's policy on speech and expression. Olson campuswide email (Jan. 23, 2006) ("Olson Email") (Ex. 19).

b. Developing a comprehensive Security Operations Plan with an emphasis on the Free Speech and Expression Policy. Security Operations Plan ("Sec. Op. Plan") (Ex. 20) at GTN000577.

c. Designating demonstration areas, separated by organization, where protesters could demonstrate safely and peacefully. Ex. 20 (Sec. Op. Plan.) at GTN 000577.

d. Mandating attendance at the event by the majority of the Department of Public Safety. Ex. 8 (Eddy Dep.) at 10, 12-13; Department of Public Safety Briefing Updating (Jan. 10, 2006) (Ex. 21) at GTN000428.

e. Supporting a full schedule of "Pro-Israel" alternative programming sponsored by the Georgetown Israel Alliance. Alternative Programming Memorandum (Feb. 14, 2006) (Ex. 22).

**RESPONSE:  Admit. None of the above is material to the occurrence.**

32. Georgetown also confirmed with the FBI, the United States State Department, the United States Treasury Department and the Metropolitan Police Department ("MPD") that the PSM and the speakers scheduled to participate in the Conference had no terrorist affiliation. Ex. 7 (Morrell Dep.) at 10-12; Ex. 12 (Porterfield Dep.) at 11-13.

> **RESPONSE: Deny. There was no investigation as to the speakers scheduled to participate at the Conference. There is no testimony or any other evidence on the record that shows that any names of persons speaking or participating in the conference were provided to the FBI, State Department, Treasury Department, or the Metropolitan Police Department for investigation. Georgetown "made an inquiry with the Federal Bureau of Investigation, Metropolitan Police Department, the State Department and the Department of Treasury." (See Morrell Deposition, Ex. 20, pg 12:5-8) According to Georgetown's correspondence they may have contacted the FBI and local MPD but they never provided any specific names of the speakers that would be in attendance. See Exhibit #2 Mr. Morrell testified that there was no investigation, or check with FBI. Metropolitan Police, other law enforcement or security agencies with regard to any of the persons expected to attend the conference.(Ex. 20, pg. 32:20-33:6)**

33. Georgetown is committed to "promoting free speech and expression to foster the maximum exchange of ideas and opinions among its students and faculty." Speech and Expression at Georgetown University (Ex. 23) at M000153. It recognizes that "discourse,

discussion, debate: the untrammeled expression of ideas" is central to the nature and life

of the university. Id. In furtherance of this commitment, in 1989 Georgetown developed

and adopted a Speech and Expression Policy. Id.

>**RESPONSE:  Deny. Discourse, discussion, and debate were not served by the**
>
>**action of Georgetown when William Maniaci was immediately removed from**
>
>**the conference when he attempted to ask a question. See Maniaci deposition,**
>
>**Page 247 -261.**

34. The policy begins with the following statement:

[A]11 members of the Georgetown University academic community, which comprises

students, faculty and administrators, enjoy the right to freedom of speech and expression.

This freedom includes the right to express points of view on the widest range of public an

private concerns and to engage in the robust expression of ideas. The University

encourages a balanced approach in all communications and the inclusion of contrary

points of view. As is true with the society at large, however, this freedom is subject to

reasonable restrictions of time, place, and manner, as described herein, although such

restrictions shall be applied without discrimination toward the content of the view being

expressed or the speaker.

Speech and Expression Policy (Ex. 24) at M000217.

>**RESPONSE:  Admit.**

35. The exercise of speech and expression is not absolute and the policy clearly indicates

that "cutting off discourse" and "[m]aking it impossible for others to speak or be heard or

seen, or in any way obstructing the free exchange of ideas, is an attack on the core

principles the University lives by and [will] not be tolerated." Ex. 24 (Speech and

Expression Policy) at M000217. Specifically, the Speech and Expression Policy provides that the right of free speech and expression does not include:

> [U]nlawful activity or activity that endangers or imminently threatens to endanger the safety of any member of the community or any [of] the community's physical facilities, or any activity that disrupts or obstructs the functions of the University or imminently threatens such disruption or obstruction. .. An individual or group wishing to protest at an event may do so as long as any speaker's right to free speech and the audience's right to see and to hear a speaker are not violated.

Id. at M000217-18 (emphasis added).

> **RESPONSE:  Admit**.

36. Furthermore, "the use of the University forum [does] not imply acceptance or endorsement by the University of the views expressed." Ex. 24 (Speech and Expression Policy) at M000218.

> **RESPONSE:  Admit.**

37. The Speech and Expression Policy was developed by the University's Committee on Speech and Expression. Ex. 24 (Speech and Expression Policy) at M000216. This Committee, comprised of four faculty members and four undergraduate students, is responsible for advising the Vice President for Student Affairs on matters relating to speech and expression. Id. at M000216, M00022 1. The Vice President for Student Affairs and the Committee on Speech and Expression, acting together, are jointly authorized to "consider and implement revisions and improvements to the [guidelines enumerated in the Speech and Expression Policy] in a manner consistent with the ideals

articulated in [it]." Id. at M000221. The Vice President for Student Affairs has no

unilateral authority to deviate from the Speech and Expression Policy as indicated in

Paragraph 41.

> **RESPONSE:  Deny. There is no wording in the Speech and Expression**
>
> **Policy that states that the Vice President for Student Affairs has no unilateral**
>
> **authority to deviate from the Speech and Expression Policy. According to the**
>
> **Speech and Expression Policy:**
>
> > **The Vice President of Student Affairs has the responsibility for administering these guidelines. Only in extreme cases of violation of these guidelines can the Vice President prohibit speech and expression before it occurs.**

38. The Speech and Expression Policy applied to the Conference events and activities.

Ex. 12 (Porterfield Dep.) at 16; Ex. 5 (Olson Dep.) at 16.

> **RESPONSE:  Admit.**

39. The response of Georgetown's Department of Public Safety during the Conference

was "guided by" the Speech and Expression Policy. Ex. 20 (Sec. Op. Plan) at

GTN000577.

> **RESPONSE:  Admit.**

40. Mr. Olson, in his role of Vice President for Student Affairs, was responsible

for "administering" the Speech and Expression Policy. Ex. 24 (Speech and Expression

Policy) at M000216.

> **RESPONSE:  Admit.**

41. None of the individuals named Defendants had authority to deviate from or amend

Georgetown's Speech and Expression Policy. Decl. of Todd Olson (Ex. 25) ¶¶ 8-9); Decl.

of Darryl Harrison (Ex. 26) ¶ 4-5). Nor did they have authority to create a new policy in its place. Id.

> **RESPONSE:  Deny. There is no wording in the Speech and Expression Policy that states that the named Defendants have no authority to deviate from or amend the Speech and Expression Policy. Please see #37 of these responses.**

42. Georgetown has a policy that requires all members of the DPS to employ only reasonable force in the performance of their duties. Ex. 26 (Harrison Decl.) ¶ 6.

> **RESPONSE:  Admit.**

43. None of the individuals named as Defendants had authority to deviate from or amend Georgetown's policy requiring the use of reasonable force or to create a new policy in its place that permitted the use of excessive force. Ex. 26 (Harrison Decl.) ¶ 8; Ex. 25 (Olson Decl.) ¶ 10.

> **RESPONSE:  Deny.  There is no wording in any Georgetown University Publication produced by the Defendants that specifies who had authority and who does not to deviate from Georgetown's policy requiring reasonable force.**

44. JDL first learned that the 2006 PSM Conference was scheduled to take place at Georgetown from JDL sympathizer Lee Kaplan. Ex. 4 (Turk Dep.) at 40, 69-70.

> **RESPONSE:  Deny. Robert Turk testified that he thought the JDL first learned of the 2006 PSM Conference at Georgetown from Lee Kaplan. There is no other testimony to substantiate that fact. Plaintiff denies that this fact is "material".**

45. Mr. Kaplan, who has described himself as a self-employed "investigative journalist," supports the JDL's goals. Dep. of Lee Kaplan (Ex. 27) at 14. He has, in his words, "infiltrate[ed]" a number of prior PSM Conferences, sometimes by "disguising [himself] as a Pakistani" or "taking notes and photographs with hidden equipment." Ex. 28 ("The Divestment Conference at Georgetown") at GTN0002518-19; Ex. 27 (Kaplan Dep.) at 20.

> **RESPONSE:  Deny. Lee Kaplan is not a JDL member, nor a friend of**
> **William Maniaci's. Plaintiff denies that this fact is "material".**

46. According to JDL Chairman Finberg, the JDL's goal in attending the Conference was to force Georgetown to "suffer ... public humiliation [and] degradation," and "to make it so that no other university would ever host something like this again in such a manner." Dep. of Matthew Finberg (Ex. 29) at 77-78.

> **RESPONSE:  Deny. The exact statement from Mr. Finberg was "I was**
> **hoping that we would get real media coverage of the fact that we were being**
> **denied the opportunity to present opposing views at an event sponsored by a**
> **publicly funded university, although private, receiving federal funds, in**
> **connection with a very sensitive subject in the world today and that the**
> **university should suffer whatever public humiliation, degradation, should**
> **issue apologies, or we also wanted to make it so that no other university**
> **would ever host something like this again in such a manner." (Defendants**
> **exhibit 29, pg 77:22- pg 78:9) This statement was Mr. Finberg's opinion, not**
> **William Maniaci's, nor the goal of the JDL. Plaintiff denies that this fact is**
> **"material".**

47. Plaintiff testified that he and the JDL viewed the Conference organizers as their "enemy," and that Plaintiff believes that "there's no such thing as a Palestinian." Ex. 1 (Maniaci Dep.) at 145-47, 207. Plaintiff and his JDL colleagues called their planned activities in connection with the Conference "Operation Gideon." Id. at 143.

> **RESPONSE:  Deny. Maniaci had planned to go to the Palestinian Solidarity Conference "[to find out what was being said. We wanted to attend the conference. We wanted to collect – my intention was to collect intelligence, to find out who the speakers were, what they were saying, to have our people attend the seminars and find out what was being said and what was going on, so that we could – we could counter the information that was being – you know, the false information that was being espoused. We wanted to be able to know our enemy, in other words. We also planned to demonstrate peacefully outside of the hall where these – these events were being held." (Ex. 14, pg. 146:15- pg. 147:6) Maniaci has repeated stated his intent to peaceful protest of the conference. (Ex. 14, pg. 148:21, pg 328:20-329:2)**

48. The name "Operation Gideon" was Plaintiff's idea. Ex. 29 (Finberg Dep.) at 71. He testified that the name refers to an operation by the Israeli Mossad (Israel's intelligence agency) that was the subject of a film, called "The Sword of Gideon." Ex. 1 (Maniaci Dep.) at 144. That film is about the actions of a Mossad execution squad. See Film Overview, http://movies.nytimes.com/movie/48217/Sword-of-Gideon/overview.

> **RESPONSE:  Deny. Mr. Finberg testified that he thought Mr. Maniaci wanted to call the Georgetown thing Operation Gideon, not that Maniaci had come up with the idea and the name. (Defendants exhibit 29, pg. 71:12-15)**

**Mr. Maniaci testified that he does not recall who came up with the name Operation Gideon. (Defendant's exhibit 1, pg 143:18-19) Plaintiff denies that this fact is "material".**

49. A pamphlet that Plaintiff authored and distributed in connection with Operation Gideon identified Plaintiff and Mr. Turk as the JDL contacts for the Conference. Operation Gideon Pamphlet ("Op. Gideon. Pamphlet") (Ex. 30) at M000084.

**RESPONSE:  Admit. Plaintiff denies that this fact is "material".**

50. The pamphlet authored by Plaintiff described the Conference as "part of a continuing physiological warfare attack . . . perpetrated by IslamoNazis." Ex. 30 (Op. Gideon Pamphlet) at M00083 (underlining in original).

**RESPONSE:  Admit. Plaintiff denies that this fact is "material".**

51. The pamphlet authored by Plaintiff also described Operation Gideon's objective as follows.

Our Mission is to make the public and the Jewish Communities in the United States aware of, and to respond to lies being spread by the Muslim Students Association (MSA), their affiliates, and the terrorists who will be addressing the public during the three days of the "Palestinian" Solidarity Conference, at Georgetown University.

Id. at M00086 (emphasis added) (quotation marks in original).

**RESPONSE:  Admit. Plaintiff denies that this fact is "material".**

52. Plaintiff attended the Conference as a registered participant on behalf of the JDL. Ex. 1 (Maniaci Dep.) at 106 ("We were there as the [JDL]"), 141.

**RESPONSE:  Admit.**

53. Plaintiff was joined by four other JDL members and/or sympathizers, Matthew Finberg, Jim Nutting, Robert Turk, George Haas and Keith Bailey. Ex. 1 (Maniaci Dep.) at 141-42.

**RESPONSE:  Deny. Plaintiff was joined by these four other members throughout his trip to Washington, D.C. to the PSM Conference, but Plaintiff was not joined by these four other members during all relevant times.**

**(Defendant's exhibit 1, pg 141-142)**

54. JDL paid for the registration, lodging and transportation expenses that Plaintiff and other JDL sympathizers incurred in connection with the Conference. Ex. 1 (Maniaci Dep.) at 124-26, 143.

**RESPONSE:  Admit.**

55. At all relevant times Mr. Finberg served as JDL's Chairman and Attorney. Ex. 29 (Finberg Dep.) at 48, 152-53. Mr. Turk was the JDL's Eastern Regional Director. Ex. 4 (Turk Dep.) at 31-32; Jan. 18, 2006 Letter from Turk to Georgetown ("Turk Letter") (Ex. 31).

**RESPONSE:  Admit. If Defendant implies that "all relevant times", as being February of 2006.**

56. The JDL delegation also met with Mr. Kaplan the day before the Conference; Mr. Turk shared a hotel room with him. Ex. 4 (Turk Dep.) at 41.

**RESPONSE:  Deny. There is no testimony that the JDL delegation met with Mr. Kaplan before the PSM conference. Mr. Turk testified that he first met Mr. Kaplan a day before the conference because he needed a hotel room and he did not have enough funds so he invited him to stay in his room.**

**(Defendants exhibit 4, pg. 41:11-20)**

57. In addition to sending officers and members to the Conference, JDL also solicited protestors via emails like the "Call to Action" distributed by JDL Chairman Finberg on

January 30, 2006, submitted as Exhibit 32. JDL planned to bus these protesters into Washington D.C. Ex. 4 (Turk Dep.) at 73-75.

**RESPONSE:  Deny. Defendant provides no testimony from the record that in January of 2006 this e-mail was distributed and to whom it was distributed.**

58. In their "Call to Action," the JDL described the Conference as an attempt by PSM to "appear intellectual when their goal is that of the Nazis." Ex. 32 (Call to Action) at GTN 000797.

**RESPONSE:  Admit. Plaintiff denies that this fact is "material".**

59. Another aspect of JDL's "Operation Gideon" was to deceptively register for the PSM Conference under an assumed name "Palestinians Are People Too" in order to obtain permission to place an information table in the ICC (one of the University buildings where the Conference was to be held). Ex. 4 (Turk Den.) at 1_ 1_8; Ex. I (Maniaci Dep.) at 21_8-20; E_x_. 2 (Nutting Dep.) at 146-47.

**RESPONSE:  Deny. JDL never planned to "deceptively" register their table in the ICC Building under the name "Palestinians Are People Too". Robert Turk and James Nutting testified that George Haas was in charge of reserving the table and they figured that if they registered a table under the name JDL they would be denied, but they became aware of this after the tables were registered. (Defendant's exhibit 2, pg. 146:15- 147:1)**

**(Defendant's exhibit 4, pg. 118:15- pg. 119:6) Further Maniaci testified that he does not have direct knowledge as to what name George Haas registered the tables in the ICC Building under. (Defendant's exhibit 1, pg 218: 10- pg. 220:14)**

60. Prior to attending the Conference, Plaintiff contacted Georgetown and informed

university officials of the JDL's intent to protest the Conference. Ex. 1 (Maniaci Dep.)

at 195-97; Feb. 9, 2006 Maniaci Email (Ex. 33) at GTN1030 ("I represent the Jewish

Defense League and I am contacting you so that we may be on firm footing of mutual

understanding. Our group will protest the [Conference]").

> **RESPONSE:  Admit.**

61. Plaintiff also had a telephone conversation with Mr. Harrison, Georgetown's Director

of Public Safety, regarding protest and demonstration areas at the Conference. Ex. 6

(Harrison Dep.) at 10-12; Ex. I (Maniaci' Dep.) at 188-89.

> **RESPONSE:  Deny. The day before the conference, Darryl Harrison called**
>
> **William Maniaci when he arrived in his hotel room. (Ex.#14, Pg. 202:12-16**
>
> **and pg. 229:6-231:4) "I recall that his demeanor was totally different than it**
>
> **was the first time we spoke. Instead of being friendly, he was more**
>
> **confrontational. And I do recall telling him verbatim, I told him that we're**
>
> **here to build bridges, not burn them. I told him that we were there in the**
>
> **spirit of mutual cooperation. And all we wanted to do was within the legal**
>
> **parameters." (Ex.#14, Pg. 230:4-12) Darryl Harrison testified that the**
>
> **general nature of his conversations with Maniaci simply involved the**
>
> **Palestinian Conference, his attendance, and his opposing views of the**
>
> **conference. (Ex. 16, pg 10:13-17)**

62. Georgetown officials directed Plaintiff to Georgetown's Speech Policy. Ex. 1

(Maniaci Dep.) at 188.

**RESPONSE:  Admit.**

63. Plaintiff reviewed Georgetown's Speech Policy prior to attending the Conference. Ex.

1 (Maniaci Dep.) at 188-90.

**RESPONSE:  Admit.**

64. Despite Plaintiff's identification as a JDL member and an opponent of the

Conference, Georgetown did not discourage him from registering for or attending the

Conference. Ex. 1 (Maniaci Dep.) at 157-58.

> **RESPONSE:  Deny. On February 18, 2006, William Maniaci was**
>
> **discouraged from attending the Conference, after he was removed from the**
>
> **campus by Metropolitian Police Officer Delisi.**

65. Plaintiff and members of the JDL delegation met freelance photographer Carrie

Devorah at a deli in Washington, D.C. on Friday February 17, 2006, the day before the

Conference. Ex. 1 (Maniaci Dep.) at 271-72. They told her that they were going to a press

conference related to the PSM Conference and recruited her to come along and take

pictures. Id.; Dep. of Came Devorah (Ex. 34) at 33.

> **RESPONSE:  Deny. William Maniaci testified that he had met Ms. Carrie**
>
> **Devorah the day before a press conference on the street outside a kosher deli**
>
> **in Washington, D.C. They engaged in a brief conversation in which Maniaci**
>
> **learned that she was a freelance photojournalist and she was going to be**
>
> **covering the conference. (Defendant's exhibit 1, pg 271:15- pg. 273:19)**
>
> **Carrie Devorah testified that she had learned of the PSM Conference from**
>
> **"day books" before she met Mr. Maniaci and did not testify as to the**

**specifics of her conversation with Mr. Maniaci. (Defendant's exhibit 34, pg 31:16- pg. 33:17)**

66. Before serving his initial Complaint on Georgetown, Plaintiff sent a copy of the Complaint to Mr. Kaplan and "gave [him] an exclusive" interview on his planned lawsuit. Ex. 27 (Kaplan Dep.) at 196-98.

**RESPONSE:  Deny. Mr. Kaplan did not say that he interviewed either Mr. Maniaci or his attorney. In fact, he could not remember an interview with either. He said only that he had an "exclusive" which was not further explained. (Defendant's exhibit 27, pg 196-198) Plaintiff denies that this fact is "material".**

67. Mr. Kaplan's resulting article titled "Georgetown University sued for $8 million dollars for attack on elderly Orthodox Jew at PSM," submitted as Exhibit 35 was published on September 15, 2006 in the Canadian Free Press. This article was published almost a week before Plaintiff filed the Complaint in this action and before Georgetown was served with the summons and Complaint or otherwise received notice of the lawsuit. See Docket in Maniaci v. Georgetown Univ., 06-1625(CKK) (Complaint was filed on Sept. 20, 2006 and Georgetown was served the next day).

**RESPONSE:  Admit.**

68. Mr. Kaplan's purpose in writing this article was to prevent other universities from hosting PSM Conferences. Ex. 27 (Kaplan Dep.) at 195-98. Mr. Kaplan wrote the article publicizing Plaintiff's lawsuit against Georgetown and its administrators and employees so that other universities would not "be as stupid as Georgetown, and take a chance on

the same thing happening to them, and support terrorism in the process." Id. at 195-98

(emphasis added).

**RESPONSE:  Admit. These are Mr. Kaplan's opinions which have no**

**bearing on this lawsuit. Plaintiff denies that this fact is "material".**

69. On February 20, 2006, the day after the Conference concluded, JDL Chairman

Finberg published an article indicating he and other JDL members who attended the

Conference in order to "disrupt" it "were successful in interfering with several of their

seminars." What Really Happened at the Georgetown PSM Conference (Ex. 36) at

GTN000486. The JDL accomplished this by "g[etting] the cameras and microphones off

the speakers and on [the JDL] many times." Id. He also wrote in another related article

that "the PSM Conference [was] a Flop, thanks to the [JDL]." PSM Conference a Flop,

thanks to the Jewish Defense League (Ex. 37) at GTN000496.

**RESPONSE:  Admit. These are Mr. Finberg's opinions which have no**

**bearing on this lawsuit. Mr. Maniaci did not disrupt anything and he has**

**repeated stated his intent to peaceful protest of the conference. (Ex. 14, pg.**

**148:21, pg 328:20-329:2). There is nothing in the record which indicates**

**what, if anything, happened at any seminar.[1] Plaintiff denies that this fact is**

**"material".**

70. Another JDL sympathizer, Bill Levinson, also wrote an article shortly after the PSM

Conference concluded, submitted as Ex. 38, which congratulated the JDL for their

---

[1] A "seminar" is defined by The Free Dictionary, online, as "a prearranged meeting for consultation or
exchange of information or discussion (especially one with a formal agenda)."  What happened at
Georgetown on February 18, 2006, does not fit the definition.

"overwhelming and decisive public relations victory over the [PSM] at [Georgetown] during the past weekend." Id. at GTN0001062. When questioned about this article at his deposition, Plaintiff engaged in the following exchange with Defendants' counsel.

> Q   Just looking at the first paragraph in Mr. Levinson's article, he says, quote ... The first-time use of aggressive and proactive tactics damaged the PSM's credibility and indeed the commitment of its members so badly that it is unlikely that this organization will ever again hold another annual conference in North America again, unquote.
>
> A   From your mouth to God's ears.

Ex. I (Maniaci Dep.) at 335-36.

**RESPONSE:  Deny. Defendant defines Bill Levinson as a "JDL sympathizer", Plaintiff never testified that he even knows who Bill Levinson is, or that he has ever seen the article. Plaintiff objects to the Defendants use of the text of their own question to imply a fact. Plaintiff denies that this fact is "material".**

71. In addition to publicizing his suit against Georgetown, Plaintiff also filed a complaint against the University with the FBI. Ex. 1 (Maniaci Dep.) at 356. In the cover letter to his complaint, submitted as Exhibit 39, Plaintiff alleged that he "was beaten for asking a question during an open panel discussion." The United States Department of Justice summarily declined to take any prosecutorial action based on the FBI's investigation of the complaint and confirmed that it had closed its investigation on November 8, 2006. U.S. Dep't of Justice Notice to Close Legal Case File (Ex. 40).

**RESPONSE:  Admit. Plaintiff denies that this fact is "material".**

72. On Saturday, February 18, 2006, Plaintiff entered the main campus of Georgetown University and registered with the SJP for the PSM Conference. Ex. 1 (Maniaci Dep.) at 231-32.

**RESPONSE:  Admit.**

73. Plaintiff paid a registration fee of ten dollars that was collected by the SJP, the student group that invited the PSM to hold the Conference. Compl. ¶ 2; Ex. 5 (Olson Dep.) at 14. The fee was not collected by Georgetown and was not paid to Georgetown. Id.

**RESPONSE:  Deny. As Mr. Olson testified, the student group then pays the University. (Defendant's exhibit 5, pg. 14:13- pg. 15:3)**

74. Registrants received a packet of information that included a copy of Georgetown's Speech and Expression Policy. Ex. 5 (Olson Dep.) at 16-17.

**RESPONSE:  Admit.**

75. Plaintiff produced a document in discovery captioned Media Information Packet, submitted as Exhibit 41 which was also distributed at the Conference and which Plaintiff acknowledged that he may have "looked at." Ex. 1 (Maniaci Dep.) at 222-23. This Packet included the following Code of Conduct that participants were required to abide by.

> *By registering for the 5th Annual PSM Conference, I agree not to engage in disruptive behavior- visibly, physically or audibly - by obstructing the space of the sessions, standing in the way of the conference registrants or speakers, shouting over others, or attempting to derail productive movement-building conversation with hate speech.* Those in violation of the above statement will be asked to leave the conference.

Ex. 41 (PSM Media Info. Packet) at M0001 14 (emphasis in original).

**RESPONSE:  Admit.**

76. After registering, Plaintiff entered Gaston Hall on the third floor of Healy Hall where a seminar entitled "The Status of the Divestment Movement" ("Divestment Seminar") was scheduled to begin at 9:30 AM. Ex. 1 (Maniaci Dep.) at 233-34; Ex. 10 (PSM Agenda) at M000127.

> **RESPONSE:  Admit.**

77. Plaintiff sat in the fifth or sixth row in the center aisle seat. Ex. I (Maniaci Dep.) at 234, 237. A diagram of the Gaston Hall auditorium is submitted as Exhibit 42. This diagram was introduced as Exhibit 15 to Plaintiff's deposition and during the deposition Plaintiff marked to diagram to indicate where he was sitting. Id.; Ex. 1 (Maniaci Dep.) at 235-37.

> **RESPONSE:  Admit.**

78. The Divestment Seminar began later than scheduled due to logistical difficulties. Ex. 5 (Olson Dep.) at 25-26. It did not begin until approximately eleven o'clock. Id.

> **RESPONSE:  Admit.**

79. Portions of three video recordings that were taken during Divestment Seminar by members of the registered media and the SJP are submitted as Exhibit 43 ("AA Video"), Exhibit 44A ("Quest Video"), and Exhibit 45 ("SJP Video").

> **RESPONSE:  Deny. Defendant does not clearly label which video is exhibit 43, 44A, and 45.**

80. The AA Video was taken by representatives of an Arabic language news network called Al Aribiya, the Quest Video was taken by a company called Quest Productions as part of a PBS/WETA documentary, and the SJP Video was taken by SJP member Katherine Pitsch. Ex. 46 (List of Registered Media).

**RESPONSE: Deny. Plaintiff has not been provided with any record of who and what companies actually took the video recordings. The Defendant refers to exhibit 46, which does not list Al Aribiya, the AA video, and Katherine Pitsch.**

81. These video recordings truly and accurately depict the events that transpired during the Divestment Seminar in Gaston Hall on February 18, 2006. Ex. 25 (Olson Decl.) 15.

**RESPONSE: Deny. These three video may depict the events that transpired on February 18, 2006, but none of the videos were close enough or have the quality to depict what happened to William Maniaci. Due to the positioning, the background noise, and the fixed seats in the room the videos do not show all of the events that transpired.**

82. In addition to the video recordings themselves, a transcript of key portions of the Quest Video and SJP Video ("Video Tr.") is also submitted as Exhibit 47.

**RESPONSE: Deny. Defendant provides no documentation as to how these transcriptions were taken. It is simply impossible to see and hear exactly who said what in these videos. The videos constitute the only recording on the scene of what happened.**

83. In order to assist the Court, two additional versions of the Quest Video are submitted as Exhibits 44B and 44C. In Exhibit 44B, key portions of the Video Transcript have been synchronized with the video in order to highlight what is being said. And in Exhibit 44C, two still frames identifying key individuals depicted in the video have been inserted. All three versions of the Quest Video are of an identical length and the citations to the timestamp in the Quest video that follow are applicable to all three versions.

**RESPONSE: Deny. Defendant provides no documentation as to how these transcriptions were taken. It is simply impossible to see and hear exactly who said what in these videos.**

84. Mr. Olson, as the Vice President for Student Affairs, was present at the Divestment Seminar "[t]n a_rti_culate" Georgetown's standards "for the conduct _duct of free speech_ and expression" and also "if necessary, to advise [participants and visitors] that their behavior was out of line with [Georgetown's] speech and expression policy." Ex. 12 (Porterfield Dep.) at 9; Ex. 5 (Olson Dep.) at 23.

**RESPONSE: Admit.**

85. Mr. Morrell, the Vice President for University Safety was also present in Gaston Hall during the Divestment Seminar. Ex. 7 (Morrell Dep.) at 8-9. He was stationed in the back of the auditorium. Id. at 26.

**RESPONSE: Admit.**

86. At the outset of the panel discussion portion of the Seminar in Gaston Hall, Mr. Olson informed the audience that they would have an opportunity to ask questions of the panelists after the panel discussion session. Ex. 47 (Video Tr.) at 1; Ex. 7 (Morrell Dep.) at 22. Specifically, he indicated that (1) each audience member would be limited to one question, and that (2) any comments from audience members must be phrased in the form of a question. Ex. 47 (Video Tr.) at 1. Mr. Olson stated:

> Please be sure to phrase your comments in the form of a question. In the interest of time we ask each person to be concise and ask only one question. Thank you.

*Id.*

**RESPONSE: Admit.**

87. After Mr. Olson's announcement, a panel discussion was held that lasted

approximately one hour. Ex. 44A (Quest Video) at 18:05:00-18:55:30 (this extended

portion of the video has not been submitted).

>**RESPONSE:  Deny. Defendant's claim that the panel had a "discussion" for**
>
>**approximately an hour. It was actually a lecture by each of the four panelist.**

88. After the panel discussion, Mr. Olson again repeated the ground rules for audience

members who wished to ask questions and a question and answer session was held

between the audience and the panelists. Ex. 5 (Olson Dep.) at 50; Ex. 29 (Finberg Dep.)

at 110; Ex. 7 (Morrell Dep.) at 22-23. He again stated:

Please be sure to phrase your comments in the form of a question. In the interest
of time we ask each person be concise and ask only one question. Thank you. Ex. 47
(Video Tr.) at 2.

>**RESPONSE:  Deny. Defendants neglects to include Mr. Olson's full**
>
>**statement. Mr. Olson states that "this begins our designated question and**
>
>**answer period, during which you may ask questions and engage in dialogue."**

89. Will Youmans, one of the co-founders of SJP who served as the moderator during the

Divestment Seminar, further explained how the question and answer period would be

structured. He stated:

>You may line up at the microphone if you have a question. First come, first
>served. Please make them succinct. We have about 10 minutes for questions, then
>we have an important announcement to make before you get up and leave. So
>please remember: ask in the form of a question, no rhetorical questions. Okay, so
>I think we're ready for the first question. Please introduce yourself before you ask
>your question.
>
>Ex. 47 (Video Tr.) at 2 (emphasis added).

>**RESPONSE:  Admit.**

90. Due to time constraints, the seminar organizers adjusted the format of the question

and answer period so that after three audience members asked their questions

successively, the panelists would address all three questions in the order they were asked.

Ex. 1 (Maniaci Dep.) at 241; Ex. 5 (Olson Dep.) at 29-30; Ex. 7 (Morrell Dep.) at 20.

> **RESPONSE:  Deny. There is no testimony as to why the panelists changed the format and that they would be addressing the questions in the order they were received. On the actual videos, it sounds as if Mr. Youman states that the panelists will address each question if it applies to them. See videos.**

91. Plaintiff admitted at his deposition that Georgetown had the right to impose precisely the types of restrictions that were enunciated by Messrs. Olson and Youmans. Ex. 1 (Maniaci Dep.) at 168-75, 183-84. Plaintiffs relevant testimony is excerpted below.

> Q   Do you acknowledge that Georgetown .... had a right to limit the time when a speaker could speak?
> A   Yes.
> Q   And the place where the speaker could speak.
> A   Yes.
> Q   And the manner in which a speaker could speak.
> A   Yes.
> Q   So, for example, if [Georgetown] were to say, you can't shout when you ask questions, would that be, in your view, a limitation that Georgetown University had a right to impose on a speaker?
> A   Yes. It would be reasonable. Id. at 168-69.
> Q   Did Georgetown University, in your view, have the right to say, you may ask one question as opposed to, say, several questions?
> A   Yes. If that was imposed on everyone fairly, yes.
> Q   Well, did Georgetown University have the right to say that anything you say must be put in the form of a question? Would that be within the right of the University?
> A   Probably.
> Q   Did Georgetown University have the right to say that you should not interfere with someone else's right to speak?
> A   Yes.
> *Id.* at 169-70.
> Q   If Georgetown University says there's going to be only questions, not dialogue, just a question, and you're limited to one question, did Georgetown University have the right -
> A   Yes.
> Q   -- to impose that limitation? A Yes.

*Id.* at 170-71.

> Q   Was it Georgetown University or you that had the right to make the ground rules for the conference?
> A   Their conference. They can make the ground rules. Id. at 174-75.
> Q   Looking now at [Georgetown's Speech and Expression Policy]. It states that the right of free speech and expression does not include. And then it goes on to list a number of activities. And I direct your attention to the last paragraph, or I should say the last clause where it says, quote, any activity that disrupts or obstructs the functions of the university, or imminently threatens such disruption or obstruction, end quote. When you went to [Georgetown] to attend the conference, did you understand that the right of free speech and expression did not include any activity that disrupts or obstructs the functions of the university, or that imminently threatens such disruption or obstruction?
> A   Certainly..
> Q   And did you believe and understand that Georgetown University had a right to impose that limitation?
> A   Of course.
> *Id.* at 183-84.

**RESPONSE:  Admit.**

92. Plaintiff lined up at the microphone along with other audience members. Ex. 1

(Maniaci Dep.) at 242. When it was his turn at the microphone, Plaintiff stated his name

and asked the panelists:

> I have one question for you and it's a policy question. Uh, I'd like to know your position on suicide bombing. If you would renounce suicide bombing and the murder of innocent Israeli women and children, as a viable, uh, venue for you to accomplish your goals. And given that that is terrorism, and no one can deny blowing himself up on a bus and killing innocents is not terrorism .... I would like you to answer either affirmative or negative whether you do support terrorism or not. Thank you.

Ex. 47 (Video Tr.) at 4; Ex. 1 (Maniaci Dep.) at 243.

**RESPONSE:  Deny. Plaintiff is interrupted in the middle of his question by**

**Mr. Youmans. See videos.**

93. Plaintiff's question was the third question in a group of three. Ex. 44A (Quest Video)

at 18:59:27-19:02:05.

**RESPONSE: Admit.**

94. After asking his question, Plaintiff returned to his seat. Ex. 44A (Quest Video) at

19:02:14-19:02:21; Ex. 5 (Olson Dep.) at 37.

**RESPONSE: Admit.**

95. Panelist Susan Blackwell[2], a professor at the University of Birmingham in

England, responded to Plaintiff's question. She stated:

> I'd like to address the question on suicide bombing. I hope we won't get this
> question repeated twenty different ways because that, that can happen sometimes
> at meetings. I'm speaking for myself when I say this, I'm not speaking on behalf
> of any organization, okay. My personal view and if other people want to give their
> own personal views, that's up to them.
> Um, I have gone on the record about this many, many times. And I unreservedly
> condemn all acts of terrorism, not all violence because I'm not a pacifist, I believe
> in self-defense. I unreservedly condemn all acts of terrorism by which I mean acts
> or threats of violence, against unarmed civilians for political ends. And that
> applies ... That applies to suicide bombs in pizza parlors in Israel. It also applies
> to F-16s dropped, uh, uh, firing on civilians in Gaza. So I condemn ... I condemn
> equally and unreservedly the terrorism of, of groups like Hamas and Islamic Jihad
> when they target innocent civilians. I also unreservedly condemn the state
> terrorism of Tony Blair, Ariel Sharon and George Bush, all of whom ... Each of
> whom has more blood on his two hands alone than the whole of Hamas and
> Islamic Jihad together.

Ex. 44A (Video Tr.) at 6 (emphasis added).

**RESPONSE: Admit. The footnote however is inaccurate. Mr. Maniaci stated**

**the "Sue Blackwell supports the use of suicide bombings and violence against**

**Israeli civilians, and that's terrorism." Deposition, P. 179, L. 20 to P. 180, L.**

**1.**

96. After Dr. Blackwell had completed her response, Moderator Youmans indicated "We

only have time for one more round of three questions." Ex. 47 (Video Tr.) at 6.

---

[2] Plaintiff testified at his deposition that in his view, Dr. Blackwell, like any speaker who
supported divestment from Israel, was a terrorist. Ex. 1 (Maniaci Dep.) at 178-79.

**RESPONSE:  Admit.**

97. At this point, Plaintiff cut Mr. Youmans off, shouting from his seat: "You didn't answer my question." Ex. 47 (Video Tr.) at 6; Ex. 3C (Finberg Dep.) at 121-22.

> **RESPONSE:  Deny. At such time, Mr. Maniaci raised his hand and said: "Excuse me, but you did not answer the question. I asked for a policy statement from you and you haven't answered my question." (Ex. #14 Pg. 254:7-14) See videos.**

98. Mr. Youmans began to respond: "Thank you. . ." but was again interrupted by the Plaintiff. Ex. 47 (Video Tr.) at 6; Ex. 44A (Quest Video) at 19:07:25-19:07:27.

> **RESPONSE:  Deny. At such time, Mr. Maniaci raised his hand and said: "Excuse me, but you did not answer the question. I asked for a policy statement from you and you haven't answered my question." (Ex. #14 Pg. 254:7-14) See videos.**

99. Plaintiff shouted: "I asked for a policy statement from you." Ex. 47 (Video Tr.) at 6; Ex. 44A (Quest Video) at 19:07:27-19:07:29.

> **RESPONSE:  Deny. At such time, Mr. Maniaci raised his hand and said: "Excuse me, but you did not answer the question. I asked for a policy statement from you and you haven't answered my question." (Ex. #14 Pg. 254:7-14) See videos.**

100. Mr. Youmans tried to respond again, barely managing to get out the words "Would you. .." before he was interrupted for the third time by the Plaintiff. Ex. 47 (Video Tr.) at 6; Ex. 44A (Quest Video) at 19:07:28-19:07:30.

> **RESPONSE:  Deny. See videos.**

101. Plaintiff again interrupted for the fourth time, shouting: "You haven't answered my question." Ex. 47 (Video Tr.) at 6; Ex. 44A (Quest Video) at 19:07:29-19:07:31.

**RESPONSE:  Deny. See videos.**

102. Mr. Youmans attempted to respond for a third time and this time was able to state: "Thank you, but you are disrupting. Please, we can talk about this afterwards." Ex. 47 (Video Tr.) at 6 (emphasis added); Ex. 44A (Quest Video) at 19:07:30-19:07:34.

**RESPONSE:  Admit.**

103. Mr. Olson also addressed the Plaintiff, stating "You have had an opportunity to ask your question. Your opportunity has ended." Ex. 47 (Video Tr.) at 6 (emphasis added); Ex. 44A (Quest Video) at 19:07:33-19:07:36.

**RESPONSE:  Admit.**

104. Mr. Youmans attempted to resume the question and answer period. He addressed the audience members still waiting in line at the microphone: "[P]lease introduce yourself before you ask a question. Three more questions." Ex. 47 (Video Tr.) at 6; Ex. 44A (Quest Video) at 19:07:37-19:07:42.

**RESPONSE:  Admit.**

105. Before the next person in line could speak, Plaintiff interrupted for the fifth time, shouting: "You didn't answer my question." Ex. 47 (Video Tr.) at 6; Ex. 44A (Quest Video) at 19:07:41-19:07:44.

**RESPONSE:  Deny. See videos**.

106. Mr. Youmans again addressed the audience members in line: "Please go ahead with the question." Ex. 47 (Video Tr.) at 6; Ex. 44A (Quest Video) at 19:07:42-19:07:44.

**RESPONSE:  Admit.**

107. The next person in line, a woman who identified herself as "Noelle," asked another question of the panel. Ex. 47 (Video Tr.) at 6; Ex. 44A (Quest Video) at 19:07:44-19:07:59.

**RESPONSE:  Admit.**

108. As soon as Noelle had finished asking her question, and the next questioner, Rabbi Weiss (a member of the Neteuri Karta sect, see Paragraph 123, infra) looked at the panel and opened his mouth to speak, Plaintiff interjected for a sixth time, shouting from his seat: "Are you for or against. .." Ex. 47 (Video Tr.) at 6; Ex. 44A (Quest Video) at 19:08:06-19:08:09.

**RESPONSE:  Deny. See video.**

109. Mr. Youmans responded: "I'm sorry sir, please don't interrupt. You've already asked your question. Thank you." Ex. 47 (Video Tr.) at 6-7 (emphasis added); Ex. 44A (Quest Video) at 19:08:08-19:08:12.

**RESPONSE:  Deny. See video.**

110. Plaintiff continued to engage Mr. Youmans, interjecting for a seventh time, and preventing Rabbi Weiss from speaking by shouting: "But you didn't answer my question." Ex. 47 (Video Tr.) at 7; Ex. 44A (Quest Video) at 19:08:11-19:08:14.

**RESPONSE:  Deny. See video.**

111. Mr. Youmans responded: "She did, she addressed your question." (referring to Dr. Susan Blackwell, see Paragraph 95, supra) Ex. 47 (Video Tr.) at 7 (emphasis added); Ex. 44A (Quest Video) at 19:08:14-19:08:15.

**RESPONSE:  Deny. See video.**

112. Plaintiff was not dissuaded, but instead shouted: "No, I asked for your policy statement and she gave a personal ..." Ex. 47 (Video Tr.) at 7; Ex. 44A (Quest Video) at 19:08:15-19:08:19. This was the eighth shouting interruption by Plaintiff.

   **RESPONSE:  Deny. See video.**

113. Mr. Youmans began to respond: "There is no policy, I don't know..." Ex. 47 (Video Tr.) at 7; Ex. 44A (Quest Video) at 19:08:15-19:08:20.

   **RESPONSE:  Deny. See video.**

114. At this point, Plaintiff had interjected eight times since Dr. Blackwell responded to his question and had ignored what in substance amounted to five requests by Mr. Olson and Mr. Youmans to desist so that the question and answer session to continue and others in line could have an opportunity to ask their questions. See Paragraphs 96-113, supra.

   **RESPONSE:  Deny. See video.**

115. Based on his disruptive conduct (see Paragraphs 96-113, supra) Plaintiff was clearly in violation of Georgetown's Policy on Speech and Expression since his "continuing speech was preventing ... the question and answer session from proceeding. It was difficult to hear over him, and it was creating a disruption." Ex. 5 (Olson Dep.) at 36-37.

   **RESPONSE:  Deny. See videos.**

116. As a result, Mr. Olson advised the Plaintiff:

   Sir, you do not have the opportunity to speak any longer. I would like to ask our staff to escort this gentleman from the room. He is creating a significant disruption.

Ex. 47 (Video Tr.) at 7 (emphasis added); Ex. 44A (Quest Video) at 19:08:20-19:08:28.

   **RESPONSE:  Admit.**

117. Mr. Olson did not instruct anyone to use physical force to remove the Plaintiff nor did he ask anyone to arrest Plaintiff or take him into custody. Ex. 47 (Video Tr.) at 7 (emphasis added); Ex. 44A (Quest Video) at 19:08:20-19:08:28.

> **RESPONSE:  Deny. This fact can not be substantiated by the record including the videos.**

118. Georgetown Safety Officers Roy Eddy and Larry Sally responded to Mr. Olson's request. They approached the Plaintiff from the back of the auditorium. Ex. 43 (AA Video) at 00:00:03-00:00:11; Ex. 44A (Quest Video) at 19:08:37-19:08:41.

> **RESPONSE:  Admit.**

119. Plaintiff ignored and disobeyed Mr. Olson's instruction to leave the auditorium, instead remaining seated. He was uncooperative and made no effort to getup. Ex. 43 (AA Video) at 00:00:15-00:00:45; Ex. 44A (Quest Video) at 19:08:32-19:08:4 1.

> **RESPONSE:  Deny. This fact can not be substantiated by the record.**

120. As the two Safety Officers walked towards the Plaintiff, two of Plaintiff's JDL colleagues and participants in JDL's Operation Gideon, Matthew Finberg and Jim Nutting, immediately moved towards him, positioning themselves in the aisle and in close proximity to Plaintiff and the two officers. Ex. 44A (Quest Video) at 19:08:30-19:08:37; Ex. 48 (Photograph of Finberg and Nutting moving to the aisle in Gaston Hall)[3]. Messrs. Finberg and Nutting interfered with the officers' activities. Ex. 6 (Harrison Dep.) at 30-31, 39-40.

---

[3] This photograph was taken by Carrie Devorah on February 18, 2006 and was produced with demonstrative markings by Plaintiff's counsel. It was also Exhibit 16 H to Plaintiff's deposition.

**RESPONSE:  Deny. The proximity of Finberg and Nutting can not be substantiated by the record. The officers still positioned themselves in the aisle to remove the Plaintiff. See videos. The videos do not show either Mr. Finberg nor Mr. Nutting interfering at any time.**

121. When Safety Officers Eddy and Salley reached Plaintiff's seat, Mr. Eddy leaned over to speak with Plaintiff. Ex. 43 (AA Video) at 00:00:35-00:00:45; Ex. 44A (Quest Video) at 19:08:58-19:09:10; Ex. 5 (Olson Dep.) at 40.

**RESPONSE:  Admit.**

122. Mr. Eddy testified that he identified himself as a "university official" and "told [Plaintiff] that he would have to leave the hall" but that Plaintiff "refused" and remained seated. Ex. 8 (Eddy Dep.) at 25-26, 36; Ex. 9 (Salley Decl.) ¶ 11; Deposition of Michael Smith (Ex. 54) at 160-61.

**RESPONSE:  Deny. There is absolutely no possible way of interpreting exactly what the Officer and Maniaci state to one another on the video recording. There is a person asking a question and the moderator talking at the same time. See Exhibit #17,18,19. Officer Eddy states in his statement that he said "Sir, I afraid your going to have to come with me." And officer Eddy states that Maniaci refused and officer Eddy responded "Sir, as a university official I'm going to have to ask you to come with me." Again Maniaci refused and the officers claim they gently removed Maniaci from the hall. See Exhibit #6. Mr. Maniaci testified in his deposition that the officers did not ask him to leave. "I recall a… police officer…leaning over and putting his hand on my arm. And I recall telling him that I haven't done**

**anything wrong. And that's about as far as it got before I flew out of my seat." (Ex.#14, Pg. 259:10-16) When asked if the officers asked Maniaci to arise from his seat and leave, Maniaci said "No". (Ex.#14, Pg. 259:17-20) When asked if Maniaci refused to leave, Maniaci responded "[n]o. I said I haven't done anything wrong. That's all I got out of my mouth." I didn't refuse to stand up and leave the room." (Ex.#14, Pg.259:21- pg. 260:9) Maniaci did not understand that he was being asked to leave the room, nor did anybody actually ask him to leave the room. (Ex.#14 Pg.260:13-261:12) Maniaci did not engage in passive resistance. (Ex.#14 Pg.261:18-22) Maniaci has testified that he does not remember the officer saying anything to him. (Ex.#14, Pg 284:9-17 and pg. 288:12-15)**

123. While this was going on, Rabbi Weiss,[4] the next audience member in line attempted to ask his question, but JDL Chairman Finberg stood in front of him in order to block his view of the panel and prevent him from speaking. Ex. 44A (Quest Video) at 19:08:51-19:09:05.

> **RESPONSE:  Admit that Mr. Finberg was momentarily in the aisle. There is no evidence as to any intention on Mr.  Finberg's part prevent Rabbi Weiss from speaking. The video was taken from the side and it is impossible to see if Rabbi Weiss's view of the panel is obstructed. See videos.**

124. Mr. Finberg explained his reason for blocking Rabbi Weiss:

> I stood in front of him. I knew he couldn't use the microphone because it was the

---

[4] Rabbi Weiss is a member of Neteuri Karta, a group within the Jewish faith that holds views contrary to the JDL. Ex. 29 (Finberg Dep.) at 104; Ex. 2 (Nutting Dep.) at 177; Ex. I (Maniaci Dep.) at 331-32.

> [S]abbath ... I don't like him and I didn't think he should be there and I think he's dangerous to my people ... I said, I don't like you. He said, Get out of my way. I said, No. And nobody could see him. It was beautiful.

Ex. 29 (Finberg Dep.) at 115-16.

> **RESPONSE: Admit.**

125. After it became apparent that Plaintiff would not cooperate, would not voluntarily leave, and would not alight from his seat, Safety Officers Eddy and Salley carefully lifted Plaintiff up out of his seat, gripping him under his armpits, and carried him into the aisle, a distance of less than three feet from his seat. Ex. 43 (AA Video) at 00:00:45-00:00:55; Ex. 44A (Quest Video) at 19:09:12-19:09:38; Ex. 8 (Eddy Dep. at 26, 36); Ex. 9 (Salley Decl.) ¶¶ 12-13.

> **RESPONSE: Deny. The two campus police officers violently grabbed Mr. Maniaci and jerked him from his seat. He did not resist at all. "They got me out of the chair by using brute force. And what they grabbed, I don't know. They grabbed me. They knocked the wind out of me. And I couldn't resist." (Ex.#14, Pg 262:22-263:3)**

126. At first the Safety Officers tried to stand Plaintiff up in the aisle, but Plaintiff continued to resist by refusing to stand up and instead going limp, forcing them to carry him from the auditorium. Ex. 8 (Eddy Dep.) at 37; Ex. 7 (Morrell Dep.) at 29-30; Ex. 9 (Salley Decl.) ¶ 13; Ex. 44A (Quest Video) at 19:09:12-19:09:38; Ex. 43 (AA Video) at 00:00:4500:01:00.

> **RESPONSE: Deny. As the officers pulled at Mr. Maniaci, he felt a blow to his right side, taking his breath away and causing him to gasp for air. "All I**

**remember, and for the last time, all I remember is being grabbed. And there was a swift progression of events after being grabbed. I was jerked from my chair. I was struck in the right side. I lost my wind. And I was concentrating on trying to breathe because I had the wind knocked out of me. I was gasping for breath." (Ex.#14, Pg 266:2-9) Robert Turk testified that he saw one of the officers kick Maniaci. (Ex. 22, pg 148:5-149:12)**

127. At the time, Plaintiff weighed approximately 220 pounds. Medical Records (Ex. 52) at VA000441, VA000445. Plaintiff used his own dead weight to resist the officers' efforts to remove him from the auditorium.

> **RESPONSE:  Deny. As the officers pulled at Mr. Maniaci, he felt a blow to his right side, taking his breath away and causing him to gasp for air. "All I remember, and for the last time, all I remember is being grabbed. And there was a swift progression of events after being grabbed. I was jerked from my chair. I was struck in the right side. I lost my wind. And I was concentrating on trying to breathe because I had the wind knocked out of me. I was gasping for breath." (Ex.#14, Pg 266:2-9) Robert Turk testified that he saw one of the officers kick Maniaci. (Ex. 22, pg 148:5-149:12)**

128. Plaintiff continued to resist by placing his cane between Officer Salley's legs as he was carried out of the auditorium. Ex. 9 (Salley Decl.) ¶ 13; Ex. 44A (Quest Video) at 19:09:10-19:09:38; Ex. 43 (AA Video) at 00:01:00-00:01:10. Plaintiff did this in an attempt to trip Safety Officer Salley.

> **RESPONSE: Deny. As the officers pulled at Mr. Maniaci, he felt a blow to his right side, taking his breath away and causing him to gasp for air. "All I**

**remember, and for the last time, all I remember is being grabbed. And there was a swift progression of events after being grabbed. I was jerked from my chair. I was struck in the right side. I lost my wind. And I was concentrating on trying to breathe because I had the wind knocked out of me. I was gasping for breath." (Ex.#14, Pg 266:2-9) Robert Turk testified that he saw one of the officers kick Maniaci. (Ex. 22, pg 148:5-149:12) He was thrown onto the aisle floor and dragged down the aisle. His limbs and head bumping into objects while being dragged. "And all I remember is bumping into elbows and shoes. I remember seeing shoes on the floor and the rug going by and bumping into chairs and hitting the concrete pavement outside." (Ex.#14, Pg 262:11-15).**

129. Plaintiff's removal from Gaston Hall lasted only thirty seconds. Plaintiff was carried less than forty-five feet from where he was originally seated to the foyer outside Gaston Hall. Ex. 44A (Quest Video) at 19:09:10-19:09:38; Ex. 43 (AA Video) at 00:00:45-00:01:10.

**RESPONSE: Admit.**

130. Someone held the auditorium doors open as the Safety Officers carried Plaintiff out of Gaston Hall into the adjacent hallway and foyer. Ex. 43 (AA Video) at 00:01:00-00:01:15; Ex. 44A (Quest Video) at 19:09:33-19:09:42.

**RESPONSE: Deny. See videos. Mr. Maniaci was then lifted off the floor, thrown through the doors into the hallway on the concrete floor. Mr. Maniaci again hit his head as he hit the floor and bent his cane. (Ex.#14 Pg. 268:17-269:11) Maniaci was not placed gently on the floor. (Ex. #14, Pg 269:13)**

131. After carrying him out of Gaston Hall, Safety Officers Eddy and Salley gently

placed Plaintiff on the floor in the foyer outside the auditorium. Ex. 8 (Eddy Dep.) at 36;

29 (Finberg Dep.) at 135 (the officers sat Plaintiff down, he was not thrown to the

ground); Ex. 7 (Morrell Dep.) at 29-30 (the officers "gently deposit[ed] Plaintiff on the

floor."); Decl. of Erik M. Smulson (Ex. 49) ¶ 7 (the officers "gently placed" Plaintiff on

the floor and did not have "any other physical contact" with Plaintiff.).

> **RESPONSE:  Deny. Maniaci was not placed gently on the floor. (Ex. #14, Pg
> 269:13)**

132. The Safety Officers' purpose in removing Plaintiff from Gaston Hall was to enforce

Georgetown's private policies; they did not invoke the law enforcement powers granted

to them by the District of Columbia. Ex. 9 (Salley Decl.) ¶ 22.

> **RESPONSE:  Deny. The safety officers are commissioned special police
> officers by the District of Columbia. They were working for Georgetown
> University in their capacity as a special police officer. They were in
> attendance as special police officers. They were wearing uniforms of the
> Georgetown special police officers. They safety officers placed the hands on
> William Maniaci. They grabbed him from his seat and removed him from
> the auditorium. See videos.**

133. Approximately fifteen seconds after removing the Plaintiff to the foyer, Officer

Salley re-entered Gaston Hall. Ex. 44A (Quest Video) at 19:09:38-19:09:48. Officer

Eddy had also re-entered Gaston Hall within three minutes of removing Plaintiff to the foyer. Id. at 19:09-38-19:12:46; Ex. 43 (AA Video) at 00:00:15-00:00:50.[5]

**RESPONSE: Admit.**

134. In sum, the video recordings of the Divestment Seminar contradict Plaintiff's deposition testimony as well as the allegations in the Second Amended Complaint in numerous material respects.

a. Plaintiff testified that Susan Blackwell "didn't address my question." Ex. 1 (Maniaci Dep.) at 248. The video recordings demonstrate that panelist Susan Blackwell answered Plaintiff's question at length. Ex. 47 (Video Tr.) at 6.

b. Plaintiff testified that he was removed after he "raised [his] hand and [he] said excuse me, but you haven't answered my question" a "couple of times." Ex. 1 (Maniaci Dep.) at 252. The video recordings demonstrate that Plaintiff interjected no less than eight times, interrupting both Moderator Youmans and audience member Rabbi Weiss. Ex. 44A (Quest Video) at 19:07:20-19:08:30. Plaintiff did not raise his hand or say "excuse me." Id.

c. Plaintiff testified that Mr. Olson " pointed to [him]" and "said [the] words -he said remove that man." Ex. 1 (Maniaci Dep.) at 257. The video recordings show that after Plaintiff had been requested to decease from disrupting the Divestment Seminar at least five times, Mr. Olson stated "I would like to ask our staff to escort this gentleman from the room." Ex. 47 (Video Tr.) at 7 (emphasis added). Mr. Olson did not point to Plaintiff and say "remove that man." Id.

---

[5] There is a break in the AA Video. However, the amount of time that has passed can be calculated by reference to the Quest Video.

d. Plaintiff testified that the Safety Officers "grabbed" him and that he "flew out of [his] seat." Ex. 1 (Maniaci Dep.) at 259-60. The video recordings show how Officers Eddy and Salley calmly approached Plaintiff, leaned over to speak to him, and then after several moments had passed, carefully lifted him from his seat. Ex. 44A (Quest Video) at 19:09:00-19:09:3 8.

e. Plaintiff testified the Safety Officers "kneed [him] in the rib cage" while he was between his seat and the aisle which "knocked all [his] wind out." Ex. 1 (Maniaci Dep.) at 261-62, 264. The video recordings which show the events from two different angles, demonstrate the Plaintiff was not kneed or struck in any manner. Ex. 44A (Quest Video) 19:09:00-19:09:38; Ex. 43 (AA Video) at 00:0014-00:01:14.

f. Plaintiff alleges that he "dropped [his] papers" but "managed to hold on to [his] cane." Ex. 1 (Maniaci Dep.) at 262. The video recordings show that Plaintiff gripping the notebook in his hand during his removal from the auditorium. Ex. 44A (Quest Video) 19:09:00-19:09:38.

g. Plaintiff testified that he "remember[s] [] bumping into elbows and shoes. [He] remember[s] seeing shoes on the floor and the rug going by and bumping into chairs and hitting the concrete pavement outside." Ex. 1 (Maniaci Dep.) at 262. The video recordings show that Plaintiff did not hit the floor and that Officers Eddy and Salley carried him carefully out of the auditorium without incident. Ex. 44A (Quest Video) at 19:09:00-19:09:38; Ex. 43 (AA Video) at 00:0014-00:01:14. He did not bump against anything else as he was carried out of the auditorium.

h. Plaintiff alleged in his complaint that he "was then lifted off the floor, hitting his head, and then thrown through the doors into the hallway on the concrete floor."

Compl. 14. Yet at his deposition, Plaintiff testified that he "[didn't] know if [he] was [thrown through the doors] or not." Ex. 1 (Maniaci Dep.) at 268. Thus, the Complaint's allegation is unsubstantiated. In any event, the video recordings show that an unidentified individual held the auditorium doors open while Officers Eddy and Salley carefully carried Plaintiff into the foyer outside. Ex. 44A (Quest Video) at 19:09:33-19:09:42; Ex. 43 (AA Video) at 00:0014-00:01:14. Plaintiff was not thrown through the doors.

i. Plaintiff testified that he was "pounced upon" after being placed in the foyer, yet could not identify who pounced upon him or even say that it was a University employee. Ex. 1 (Maniaci Dep.) at 269. The video recordings show both Safety Officers standing peacefully in the hallway moments after removing Plaintiff from Gaston Hall. They also show that both Safety Officers reenter Gaston Hall almost immediately: Officer Salley reenters the auditorium within fifteen seconds and Officer Eddy within three minutes. Ex. 44A (Quest Video) at 19:09:38-19:12:48; Ex. 43 (AA Video) at 00:01:1000:01:50.

**RESPONSE: Deny.  a. Deny.  b. Deny   c. Deny.   d. Deny.   e. Deny.   f. Deny. g. Deny.    h. Deny.  i. Deny. See these responses to Defendants Statement of Undisputed Facts #92 through 133. See videos.**

135. Plaintiff's allegations are similarly contradicted by the testimony of many witnesses, including some of his JDL colleagues as indicated Paragraphs 136 through 139 below.

**RESPONSE: Deny. See Plaintiff's responses to Defendants Statement of Undisputed Facts #136 through #139.**

136. Keith Bailey, another JDL sympathizer, sat next to Plaintiff at the Divestment Seminar. Dep. of Keith Bailey ("Bailey Dep.") (Ex. 50) at 146-47; Photograph of Mr.

Bailey in Gaston Hall (Ex. 51).[6] From this vantage point, Mr. Bailey closely observed

Plaintiff's removal and testified that he did not see the officers punch or kick Plaintiff and

did not see Plaintiff's head hit any objects as he was carried out.

Q. Okay. When they were moving him down the aisle towards the stage, did you see
them punch or kick him?

A. I didn't see that.

Q. Okay. When they were moving him down the aisle towards the stage, did you see Mr.
Maniaci's head hit any objects?

A. I didn't see that either.

Ex. 50 (Bailey Dep.) at 149-50.

> **RESPONSE: Admit that Mr. Bailey was not in a vantage point in which he**
>
> **could see if Mr. Maniaci was kicked or punched. Mr. Bailey simply testified**
>
> **that he did not see it happen, he did not testify that it did not happen. See**
>
> **videos.**

137. As described in Paragraph 120, JDL Chairman Finberg quickly moved into the aisle

near Plaintiff after Mr. Olson asked the Safety Officers to escort Plaintiff from the room.

Photographs produced by Plaintiff's counsel, submitted as Exhibits 48 and 51, show Mr.

Finberg within inches of Plaintiff while he was being removed. Mr. Finberg testified that

it was appropriate to remove Plaintiff at that time and that he did not see the Security

Officers punch, kick, or knee Plaintiff.

> Q. You said that they went to lift him by his shoulder. Prior to doing that, did they
> -- did you see a campus security guard try to punch Mr. Maniaci?
> A. No.

---

[6] This photograph, also taken by Ms. Devorah on February 18, 2006, was produced with
demonstrative markings by Plaintiff's counsel. It was also Exhibit 16G to Plaintiff's
deposition.

Q. Did you see a campus security guard try to kick or knee Mr. Maniaci? A. No.

Ex. 29 (Finberg Dep.) at 126-27.

Q. Okay. Do you think that it was appropriate to have Mr. Maniaci removed at that point in time?

A. Yes.
Q. Because he was being disruptive?

A. Yes.

*Id.* at 142.

**RESPONSE:  Deny. Mr. Finberg was standing in front of Rabbi Weiss. Mr. Finberg simply testified that he did not see it happen, he did not testify that it did not happen. As stated in his testimony and shown in the videos. He was asked if he disagreed with the manner in which Mr. Maniaci was removed and he said that he did. Finberg Deposition P.142.**

138. Metropolitan Police Department Lieutenant Michael Smith, another JDL sympathizer, was also present at the Divestment Seminar. Ex. 54 (Smith Dep.) at 132. Mr. Smith, a seasoned police investigator with extensive training regarding the use of force, also saw the Security Officers remove Plaintiff from Gaston Hall. Id. at 12-13, 29-30, 159-60. Mr. Smith testified that he did not see Plaintiff fall on the ground nor did he see the officers punch, kick or strike Plaintiff.

Q. And then was Mr. Maniaci thrown to the ground?

A. Not that I have seen.

Q. Okay.

A. Not anywhere inside the hall.

Q. Did he fall on the ground?

A. Not that I saw.

Id. at 161-62.

Q. While Mr. Maniaci was in his seat, did you see either the DPS officers kick him?

A. No.

Q. Did you see either of the DPS officers punch Mr. Maniaci while he was still in his seat?

A. No.

Q. What about after they had lifted him up out of the seat, did you see either of the DPS officers kick him?

A. No.

Q. After they had lifted Mr. Maniaci up out of his seat, did you see either of the DPS officers punch or strike Mr. Maniaci?

A. No.

*Id.* at 162-63.

**RESPONSE:  Deny. Michael Smith was not in close proximity to Maniaci at the time he was grabbed by the officers.  See videos. Mr. Smith never testified that he was close enough to see it happen or that it simply did not happen.**

139. Erik M. Smulson, then the Assistant Vice President for Communications, was in the hallway outside Gaston Hall when Safety Officers Eddy and Salley carried Plaintiff out and placed him gently on the floor. Ex. 49 (Smulson Decl.) ¶¶ 6-7. He too has indicated that the Safety Officers did not "pounce" upon, strike or knee Plaintiff. Id. ¶¶ 8-9.

**RESPONSE:  Deny. Mr. Smulson's declaration states that he was in the hallway at the time of the occurrence, therefore it would be impossible for**

**him to see Mr. Maniaci get kneed or kicked in the auditorium from the**

**hallway. See videos. (defendants exhibit 49)**

140. In the foyer, Plaintiff was not handcuffed or otherwise restrained, arrested, detained, or taken into custody. Ex. 7 (Morrell Dep.) at 32, Ex. 9 (Salley Decl.) ¶ 23. Indeed, at his deposition, Plaintiff testified that he was not arrested. Ex. 1 (Maniaci Dep.) at 158. To the contrary, Officers Salley and Eddy left him free to leave the building as he pleased. Id. at 289; Ex. 8 (Eddy Dep.) at 44.

**RESPONSE:  Admit.**

141. Shortly after being placed in the foyer, Plaintiff stood up and pictures that were taken by Ms. Devorah,[7] submitted as Exhibits 53-A through 53-C, show him in no apparent distress, with no visible bruises, talking to his JDL colleagues.

**RESPONSE:  Deny. Maniaci's bruises are documented by pictures in Exhibit #13, by his deposition (Exhibit #14), by the medical records (Exhibit 12) and deposition of Dr. Gillern (Exhibit #15). Maniaci's cane had been bent during the altercation. (Ex.#14 Pg. 35:16-21)**

142. At about one o'clock in the afternoon, after Plaintiff had been removed, Mr. Harrison arrived at Healy Hall as well. Ex. 6 (Harrison Dep.) at 13-14. He observed Plaintiff talking with a number of people, including Mr. Olson and Mr. Morrell. Id. at 14-15.

**RESPONSE:  Admit.**

---

[7] These photographs were produced with demonstrative markings by Plaintiff's counsel and were Exhibits 17 A through 17 C to Plaintiff's deposition.

143. Mr. Olson and Mr. Morrell decided to inform Plaintiff that due to his violation of the Georgetown's Speech and Expression Policy, he was "no longer welcome to attend the other sessions at [the] Conference." Ex. 5 (Olson Dep.) at 42.

> **RESPONSE: Deny. Mr. Olson and Mr. Morrell did not actually inform Plaintiff at this time. Their testimony indicates that they spoke about it but neither of them actually told Mr. Maniaci that he was no longer welcome at the conference. (Defendants exhibit 5, pg 42)**

144. Mr. Morrell approached Plaintiff and asked him to leave. Ex. 1 (Maniaci Dep.) at 289-90; Compl. 15. Plaintiff was told he was "banned" for violating Georgetown's Speech and Expression Policy. Ex. 29 (Finberg Dep.) at 136-37.

> **RESPONSE: Deny. Plaintiff was not asked to leave at this point. Plaintiff testifies that "I know I said we were leaving." (Defendants exhibit 1, pg. 289:14-15)**

145. Plaintiff responded that he was leaving, and he and Mr. Turk walked out of Healy Hall. Ex. 1 (Maniaci Dep.) at 289-90.

> **RESPONSE: Deny.  See Plaintiff's response to Defendant's Statement of Undisputed Facts #144.**

146. Plaintiff did not request or seek any medical attention. Ex. 4 (Turk Dep.) at 169-70.

> **RESPONSE: Admit, assuming that this statement refers to Georetown University Campus on February 18, 2006.**

147. Disregarding Mr. Morrell's instruction to leave the campus and contrary to

his own promise to comply, Plaintiff instead walked over to the ICC, another

Georgetown building, where additional Conference workshops were proceeding. Ex. 1

(Maniaci Dep.) at 293; Ex. 41 (Media Packet) at M000112-113. The ICC is located

approximately 150 yards from Healy Hall. Ex. 1 (Maniaci Dep.) at 294; Ex. 6 (Harrison

Dep.) at 14-15.

> **RESPONSE: Deny. There is no testimony from the record that indicates that**
>
> **Mr. Morrell instructed Maniaci to leave the entire campus in the hallway of**
>
> **Gaston Hall, further there is no testimony from the record that indicates that**
>
> **Maniaci promised to comply with an instruction to leave the campus.**

148. As indicated in Paragraph 58, supra, as part of Operation Gideon, JDL

members deceptively registered under the assumed name "Palestinians are People Too" in

order to obtain permission to place information tables in the ICC.

> **RESPONSE:  Deny. See Plaintiff's response to Defendant's Statement of**
>
> **Undisputed Facts #58.**

149. Mr. Harrison walked along with him and advised Plaintiff that he would not be

permitted to enter the ICC and asked him to leave the Campus. Ex. 6 (Harrison Dep.) at

1718,20-21.

> **RESPONSE: Deny.  There is no other testimony, other than Mr. Harrison's,**
>
> **that Mr. Harrison walked along with Maniaci over to the ICC Building.**
>
> **After the occurrence in Gaston Hall Maniaci testified that "[w]e walked out**
>
> **front. And we paused outside and – where I could catch my breath. It was**
>
> **Bob Turk and myself. Nobody else. And then we decided that we would walk**
>
> **to the other building where we had tables rented, because I wanted to get**

**something to eat, and I was feeling uneasy. And I wanted to be able to sit**

**down and rest and go to the bathroom as well." (Ex. #14, Pg 290:8-16,**

**rephrased again at pg 294:5-15) Further, neither of the officers reports state**

**that Mr. Harrison walked with Maniaci to the ICC building.**

150. When he arrived at the ICC, Messrs. Morrell and Olson and a number of

Georgetown Safety Officers were also present. They again told him that he was not

permitted to enter the ICC building and again asked him to leave. Ex. 1 (Maniaci Dep.) at

296; Ex. 7 (Morrell Dep.) at. 13-14; Ex. 6 (Harrison Dep.) at 43-44; Ex. 5 (Olson Dep.) at

43-44.

**RESPONSE:  Deny. Mr. Maniaci and Robert Turk then approached the**

**Inter-Cultural Center where vendor tables had been set up. As he**

**immediately entered the doorway Mr. Maniaci was pushed against a glass**

**window by one of the same officers that removed him from the auditorium.**

**(Ex. #14, Pg 296:6-10 and pg 298:10-15) Maniaci was told that he is not**

**allowed to enter the ICC. (See Officer Eddy Report- Ex. 6) Six Officers**

**surrounded the area of the entryway. Mr. Maniaci asked if he was being**

**arrested, in which they responded with "no." (Ex. #14, Pg 298:17-18)**

**Maniaci "was informed that would not be allowed entry into the building**

**until a university official ok his entry." (Ex. 6) Mr. Maniaci was blocked and**

**was told not to go anywhere. (Ex. #14, Pg 298:20-299:4) At that time Mr.**

**Maniaci told the officers that he was not feeling well, he needed to rest, and**

**he needed to go to the restroom. Mr. Maniaci informed the officers that he**

**has a medical condition, in which he uses the restroom often. (Ex. #14, Pg**

**299:4-7) Mr. Maniaci continued to ask to use the restroom. Robert Turk testified that the officers trapped Maniaci in the hallway (entryway) (Ex. 22, pg 181:19), they boxed him in him in (Ex. 22, pg 182:15), they sort of pushed him into a corner where he couldn't get in or out (Ex. 22, pg 184:1-2). "Not with their hands, but he gave a body blow." (Ex. 22, pg. 184:5-6) "Like when you're using your chest to enforce, you know – you're pushing someone with your chest, a body blow without using your hands." (Ex. 22, pg 184:10-12)**

151. Officer Eddy was also present at the ICC at that time. Ex. 8 (Eddy Dep.) at 41-42.

> **RESPONSE: Admit.**

152. The Safety Officers did not use any force against Plaintiff at the ICC as many of Plaintiffs JDL colleagues testified. This testimony is described in Paragraphs 153 though 155 below.

> **RESPONSE: Deny. See Plaintiff's response to Defendant's Statement of Undisputed Fact #150.**

153. JDL Chairman Finberg walked with Plaintiff from Gaston Hall to the ICC. Ex. 29 (Finberg Dep.) at 150. Mr. Finberg testified that the Security Officers did not push Plaintiff against a wall at the ICC.

Q. Do you remember him -- campus security guards pushing Mr. Maniaci? A. No, no. He was treated very civilly after that. Ex. 29 (Finberg Dep.) at 151 (emphasis added).

> **RESPONSE: Deny. See Plaintiff's response to Defendant's Statement of Undisputed Fact #150.**

154. MPD Lieutenant Smith, a JDL sympathizer, testified that he observed the ICC incident and that Plaintiff "leaned up against the wall with his back up against the wall and was just standing there"; no officer pushed Plaintiff. Ex. 54 (Smith Dep.) at 191-92.

> **RESPONSE: Deny. See Plaintiff's response to Defendant's Statement of Undisputed Fact #150.**

155. Jim Nutting, another JDL sympathizer, who trained at the Reserve Police Officers Academy and works as a security officer for the Metropolitan Transit system in San Diego, has both training and experience in the use of force. Ex. 2 (Nutting Dep.) at 7, 8, 21-22. Mr. Nutting testified that he did not see the officers push or grab Plaintiff at the ICC.

Q. Were they grabbing Mr. Maniaci? A. I don't remember seeing that. Q. Were they pushing Mr. Maniaci?

A. I didn't see that. I don't remember it.

Ex. 2 (Nutting Dep.) at 223.

> **RESPONSE:  Deny. See Plaintiff's response to Defendant's Statement of Undisputed Fact #150.**

156. After being advised that he was not under arrest, Plaintiff insisted on entering the ICC. Ex. 1 (Maniaci Dep.) at 298.

> **RESPONSE:  Deny. See Plaintiff's response to Defendant's Statement of Undisputed Fact #150.**

157. When the Plaintiff asked to use the bathroom facilities, he was permitted to do so. Ex. I (Maniaci Dep.) at 299 (testifying that he threatened to wet the Safety Officer's leg if

he was not permitted to use the bathroom). A Safety Officer placed his foot in the door

holding it ajar because Georgetown officials feared that Plaintiff may attempt to lock

himself inside the restroom. Ex. 8 (Eddy Dep.) at 43-44.

> **RESPONSE:  Deny. After much time had passed, an officer agreed to allow**
>
> **Mr. Maniaci to go to the bathroom. But the officer kept the door to the**
>
> **bathroom (which was single enclosed room) wide open and watched Mr.**
>
> **Maniaci urinate.(Ex. #14, Pg 299:8-13) "He was escorted into the building,**
>
> **and they embarrassed him and held the door open while he was peeing." (Ex.**
>
> **22, pg 187:11-13 and stated again at pg 189:9-190:7)**

158. Once Plaintiff had used the bathroom, he was escorted back to the foyer of the ICC.

Ex. I (Maniaci Dep.) at 301-02. Shortly thereafter, Georgetown officials requested the

assistance of Metropolitan Police Department Sergeant Sam DeLisi. Sgt. DeLisi arrived

and escorted Plaintiff off of the campus to his car. Id. at 302-03; Dep. of Sam DeLisi (Ex.

55) at 3739; 45-46.

> **RESPONSE:  Deny. Maniaci was escorted back to the foyer area of the ICC**
>
> **Building. (Ex. #14, Pg 301:21-22) Then the chief of campus police, identified**
>
> **as David F. Morrell, Vice President for Campus Safety, approached Mr.**
>
> **Maniaci and told him that he was being barred from the conference.**
>
> **Harrison testified that Maniaci was causing a disturbance and therefore**
>
> **escorted from the campus. "By disturbance, I mean he attempted to enter the**
>
> **building and attempted to enter the building in a disruptive manner." (See**
>
> **Harrison Deposition, Ex. 16, pg 19:8-13) Matt Feinberg (who was with Mr.**
>
> **Maniaci) asked to speak to the University Provost, but his request was**

**denied. (Ex. #14, Pg 302:2-5) Robert Turk and Matt Feinberg were still**

**helping Mr. Maniaci to stand and get around. Mr. Maniaci was then**

**approached by an officer from the D.C. Metropolitan Police Department in**

**the foyer of the Inter-Cultural Center. The officer had been called by the**

**University to escort Mr. Maniaci off of the campus. (Ex. #14, Pg 302:6-11)**

**See Exhibit #4.**

159. Plaintiff was not handcuffed by the Security Officers at the ICC or at any other point

during the Conference. Ex. 2.(Nutting Dep.) at 192-93; Ex. 55 (DeLisi Dep.) at 45; Ex.

27 (Kaplan Dep.) at 148; Ex. 29 (Finberg Dep.) at 136; Ex. 54 (Smith Dep.) at 173; Ex. 9

(Salley Decl.) ¶ 23.

**RESPONSE:  Admit.**

160. Plaintiff was not in DPS custody at any point during the ICC incident. Ex. 7

(Morrell Dep.) at 34. Indeed, Plaintiff has conceded that the Safety Officers verbally

confirmed that he was not under arrest at the ICC. Ex. 1 (Maniaci Dep.) at 298-99. As is

apparent from the events described in Parts C through E, Georgetown wanted Plaintiff to

leave the campus, not to arrest him.

**RESPONSE:  Deny. See Plaintiff's response to Defendant's Statement of**

**Undisputed Fact #150.**

161. After he left the campus, rather than seek medical attention, Plaintiff satin a car for

several hours. Ex. 1 (Maniaci Dep.) at 295. That evening, he went out to dinner with

several JDL colleagues for a hamburger and a beer. Id. at 296-297. Plaintiff then returned

to his hotel room, again without seeking any medical attention. Id.

**RESPONSE:  Admit.**

162. The next day, Sunday February 19, 2006, Plaintiff walked out to a traffic circle near the Wyndham hotel in downtown Washington D.C. to direct buses carrying demonstrators to the hotel. Ex. I (Maniaci Dep.) at 305-06.

> **RESPONSE:  Admit.**

163. While waiting for the buses, Plaintiff suddenly fell down. Ex. 1 (Maniaci Dep.) at 305-06; Ex. 50 (Bailey Dep.) at 211-12. This occurred at about eleven o'clock. Ex. 1 (Maniaci Dep.) at 306-07.

> **RESPONSE:  Admit.**

164. Plaintiff got back up and walked to the hotel to sit down. Ex. 1 (Maniaci Dep.) at 309-10. He did not seek any medical treatment at this time. Ex. 50 (Bailey Dep.) at 216-17. The buses showed up shortly thereafter and Plaintiff went with them to Georgetown's campus. Ex. 1 (Maniaci Dep.) at 310.

> **RESPONSE:  Admit.**

165. When he arrived at Georgetown, Plaintiff had an Israeli flag with him and he took it to the main gate of the University and stood there for approximately 20-30 minutes. Ex. 1 (Maniaci Dep.) at 312-13, 315. Photographs of Plaintiff standing with the Israeli flag are submitted as Exhibits 56-A, and 56-13.[8] Then Plaintiff went to the back the car and sat down for a little while. Id. at 315. After a few minutes he returned to the main gate with his Israeli flag and stood for another 20-30 minutes. Id. Plaintiff continued to cycle between standing at the main gate with his flag and sitting in the car for at least two hours between noon and two or three o'clock. Id.

> **RESPONSE:  Admit.**

---

[8] These photographs were taken by Charles Nailen of Georgetown. They were exhibits 19A and 19E to Plaintiff's deposition.

166. Later that evening, after Plaintiff and his JDL colleagues had returned to

their hotel, Plaintiff's colleagues told him to visit the hospital because he began stuttering,

slurring his words, and mistakenly referring to Mr. Turk as "Jim-Bob." See Ex. 1

(Maniaci Dep.) at 316-17.

     **RESPONSE:  Admit.**

167. Plaintiff arrived at the emergency room at Walter Reed Medical Center a few

minutes after eight o'clock on Sunday evening. Ex. 1 (Maniaci Dep.) at 318.

     **RESPONSE:  Admit.**

168. Dr. Suzanne Gillern examined and treated the Plaintiff. See Dep. of Suzanne Gillern

(Ex. 57) at 17. Plaintiff complained of lower back pain, an episode of dizziness, and right

ankle swelling. Ex. 57 (Gillern Dep.) at 25-26.

     **RESPONSE:  Admit.**

169. Dr. Gillern recorded Plaintiff's medical history which included congestive heart

failure, chronic obstructive pulmonary disease and a recent stroke or short-term stroke

referred to as a TIA. Ex. 57 (Gillern Dep.) at 22-23; Gillern Treatment Notes (Ex. 58);

Ex. 1 (Maniaci Dep.) at 19-40.

     **RESPONSE:  Admit.**

170. At the time, Plaintiff had already experienced a TIA prior to the PSM Conference,

which involved a very similar episode of stuttering and slurring of his words during

which he mistakenly referred to Mr. Turk as "Jimbo" on the telephone. Ex. 1 (Maniaci

Dep.) at 23-28; 320-321.

     **RESPONSE:  Admit.**

171. Dr. Gillern's physical examination of Plaintiff revealed no head injuries, no back tenderness, no ankle pain, and no bruising. Ex. 57 (Gillern Dep.) at 33-36, 45-48, 53-54. She noted that Plaintiff did not appear to be "suffering or in a lot of pain." Id. at 30. She also noted that Plaintiff did not report any loss of consciousness. Id. at 28-29.

> **RESPONSE:  Deny. Mr. Maniaic was told at Walter Reed that he had suffered a concussion, sprain of the right ankle, contusions to the right abdomen, right upper arm, right wrist, and abrasions to the legs. (Ex. #15 pg. 45:1-19) (Ex. #14, Pg 317:3-12 and pg 324:8-10) According to Dr. Gillern, it is not likely and there is no indication that Maniaci received the injuries from anything but what he has claimed. (See Exhibit # 12 and 15) Pictures of Maniaci's injuries are documented in Exhibit #13. Maniaci does not bruise easily. (Ex. #14, Pg 348:4-6) (Ex. 15 pg 74:15-17). The discharge summary at the end of the records indicates instructions on the fourth page of the exhibit that indicates a "contusion," in plain words, a bruise (P. 61-62, Dr. Gillern Deposition). It should be noted that Defense Counsel was present at the deposition and heard Dr. Gillern asked: "Under what circumstances would the hospital give a discharge instruction with regard to contusion, meaning a bruise with swelling, if there was no bruise with swelling?" Defense Counsel then heard her say "If there was a bruise." Despite this testimony the defense continues to insist that there was no bruise.**

172. Dr. Gillern ordered a CT scan and blood tests; both came back normal. Ex. 57 (Gillern Dep.) at 38-40. She also conducted a neurological exam of the Plaintiff and that was normal as well. Id. at 36-37.

**RESPONSE:  Admit.**

173. Dr. Gillern concluded that Plaintiff had a sprained ankle and may have suffered a concussion. Ex. 57 (Gillern Dep.) at 44-45. Her conclusion regarding the concussion was not based on any physical evidence; it was based solely on Plaintiff's statements about his fall earlier that day. Id. at 45.

> **RESPONSE:  Deny. Dr. Gillern concluded that the patient likely has a concussion. (Defendant's exhibit 57, pg. 45:3-5) There is no specific test for a concussion, it's based on history. (Defendant's exhibit 57, pg. 45:15-18).**

174. Plaintiff was discharged the same evening. Ex. 57 (Gillern Dep.) at 47.

> **RESPONSE:  Admit.**

175. Dr. Gillern referred Plaintiff to his primary care doctor for follow-up, but he did not seek any further medical care because he soon "felt okay" and "had no further symptomology." Ex. 1 (Maniaci Dep.) at 321-22.

> **RESPONSE:  Admit.**

176. Plaintiff violated Georgetown's policy on Speech and Expression by (1) disrupting the seminar by shouting from his seat and (2) interfering with other speaker's right to speak and the audience's ability to hear other speakers. See Paragraphs 96-116, supra.

> **RESPONSE:  Deny.  1. Deny  2. Deny. See Plaintiff's responses to Defendant's Statement of Undisputed Facts #96 through #116.**

177. Plaintiff violated two ground rules enunciated by Vice President of Student Affairs, Todd Olson, (1) that audience members limit themselves to a single question and (2) that they phrase their comments in the form of a question. See Paragraphs 96 -116, supra. He

also violated repeated instructions from Mr. Olson and Mr. Youmans to cease speaking and allow the session to proceed.

**RESPONSE:  Deny.  1. Deny 2. Deny. See Plaintiff's responses to Defendant's Statement of Undisputed Facts #96 through #116.**

178. Plaintiff interrupted the question and answer session eight times by shouting at the panelists and the moderator. See Paragraph 114, supra.

**RESPONSE:  Deny. See videos.**

179. Plaintiff ignored and disobeyed five requests to cease his disruptive behavior. See Paragraph 114, supra.

**RESPONSE:  Deny. See videos.**

180. Plaintiff refused to leave Gaston Hall despite being asked to do so. See Paragraphs 116, 119, and 122, supra.

**RESPONSE:  Deny. See videos and Plaintiff's Response to Defendant's Statement of Undisputed Facts #116, 119, and 122.**

181. Plaintiff refused to alight from his seat. Plaintiff also refused to stand up and walk out of Gaston Hall on his own and instead resisted by going limp and using his body as a dead weight. See Paragraphs 119, 125-126, supra.

**RESPONSE:  Deny. See videos and Plaintiff's Response to Defendant's Statement of Undisputed Facts #119, 125, and 126.**

182. Plaintiff further resisted Safety Officer Eddy and Salley's attempt to carry him from the auditorium by attempting to trip Officer Salley with his cane. See Paragraphs 128, supra.

> **RESPONSE:  Deny. See videos and Plaintiff's Response to Defendant's Statement of Undisputed Facts #128.**

183. Plaintiff disobeyed Vice President of University Safety, David Morrell's instruction to leave the Conference. See Paragraphs 143 -144, supra.

> **RESPONSE:  Deny. See videos and Plaintiff's Response to Defendant's Statement of Undisputed Facts #143 and 144.**

184. Plaintiff ignored Director of Public Safety, Darryl Harrison's warning that Plaintiff would not be permitted to enter the ICC. See Paragraphs 149-150, supra.

> **RESPONSE:  Deny. See videos and Plaintiff's Response to Defendant's Statement of Undisputed Facts #149 and 150.**

185. Mr. Olson was present in Gaston Hall and remained there while Plaintiff was removed to the foyer. Ex. 25 (Olson Decl.) ¶ 7.

> **RESPONSE:  Admit.**

186. Mr. Olson did not direct Safety Officers Eddy and Salley to physically remove Plaintiff from Gaston Hall. Ex. 47 (Video Tr.) at 7. He asked them to escort Plaintiff from the room. After he made his request, Mr. Olson lacked authority to instruct or supervise the officers; such authority was vested in members of the Department of Public Safety, not Mr. Olson. Ex. 5 (Olson Dep.) at 46-47.

> **RESPONSE:  Deny. The meaning of escort is to accompany another person. It is clear from both of the officers testimony that Mr. Olson was notifying the officers that he wants them to physically remove the Plaintiff from the room. (See Plaintiff's exhibit 5 and 6) According to Mr. Olson's testimony he had the authority to instruct and supervise the officers and he used such**

**authority. (See Plainitff's exhibit 21, pg 6) Further, Mr. Olson testified that**

**"It appeared to me from what I saw that the officers acted professionally and**

**reasonably" in removing Plaintiff from the auditorium. Defendant's Ex. 5**

**(Olson Dep.) at 49.**

187. The purpose of Mr. Olson's request to Safety Officers Salley and Eddy to escort

Plaintiff from Gaston Hall was to enforce Georgetown's Speech and Expression Policy

which prohibits disruptive behavior. Ex. 25 (Olson Decl.) ¶ 6. Mr. Olson's purpose was

not to enforce criminal laws regarding trespass, and he did not ask the officers to arrest

Plaintiff pursuant to their SPO law enforcement powers. Id. ; Ex. 47 (Video Tr. ) at 7.

Moreover Mr. Olson testified that "It appeared to me from what I saw that the officers

acted professionally and reasonably" in removing Plaintiff from the auditorium. Ex. 5

(Olson Dep.) at 49. The video recordings confirm this.

> **RESPONSE:  Deny. The speech and expression policy also protects the free**
>
> **exchange of ideas, expression, which is "central to the life of the University".**
>
> **(See Plaintiff's exhibit #9.) The policy only prohibits disruptive behavior that**
>
> **disrupts or obstructs the functions of the University. (See Plaintiff's exhibit**
>
> **#9.) Maniaci did not disrupt or obstruct any function of Georgetown**
>
> **University.**

188. Mr. Olson did not instruct the Safety Officers to use excessive force against, hit, or

strike Plaintiff. Ex. 47 (Video Tr.) at 7.

> **RESPONSE:  Deny. Mr. Olson instructed the officers to remove Maniaci.**
>
> **Although he did not specify at that moment that he wanted the officers to use**

**excessive force, hit, or strike the Plaintiff, does not mean that it did not**

**happen.**

189. Mr. Olson had a conversation with the Plaintiff in front of the ICC during which he and Mr. Morrell informed Plaintiff that he was not permitted to enter the building. Ex. 5 (Olson Dep.) at 43-44.

> **RESPONSE:  Deny. This occurred in the doorway of the ICC building. After**
>
> **they had trapped the Plaintiff in the doorway and held him against his will.**
>
> **Mr. Olson and Mr. Morrell did not allow the Plaintiff to move.**

190. Mr. Olson does not have the authority to unilaterally deviate from or change Georgetown's existing Speech and Expression Policy. Ex. 25 (Olson Decl.) ¶ 8.

> **RESPONSE:  Deny. Mr. Olson was Vice President of Student Affairs at all**
>
> **relevant times. (See Plainitff's exhibit # 21, pg. 6)**

191. Mr. Olson does not have the authority to make final policy for Georgetown relating to the use of only reasonable force. Ex. 25 (Olson Decl.) ¶ 10.

> **RESPONSE:  Deny. Mr. Olson was Vice President of Student Affairs at all**
>
> **relevant times. (See Plainitff's exhibit # 21, pg. 6)**

192. Prior to the Conference, Mr. Harrison provided Plaintiff with information regarding the procedures that Georgetown had put in place to accommodate protestors such as the location of the protest and demonstration areas. Ex. 6 (Harrison Dep.) at 10-12.

> **RESPONSE:  Deny. Prior to the Conference, Maniaci had contacted the**
>
> **Department of Public Safety which in response sent Maniaci a copy of the**
>
> **Speech and Expression Policy. No procedures to accommodate protestors**
>
> **were sent to Maniaci. (See Plaintiff's exhibit #14, pg 187:18- pg. 189:22)**

193. Mr. Harrison was not present at Healy Hall when Plaintiff was removed from Gaston Hall. Ex. 6 (Harrison Dep.) at 13-14, 26-27.

**RESPONSE:  Admit.**

194. Mr. Harrison walked with Plaintiff over to the ICC. Ex. 6 (Harrison Dep.) at 17-18, 20-21. He did not observe or receive any reports of use of force against Plaintiff at the ICC. Ex. 6 (Harrison Dep.) at 45-46.

**RESPONSE:  Deny. See Plaintiff's Response to Defendant's Statement of Undisputed Facts #149.**

195. Mr. Harrison does not have the authority to make final policy for Georgetown relating to speech and expression. Ex. 26 (Harrison Decl.) ¶ 4.

**RESPONSE:  Deny. In Mr. Harrison's deposition at page 7 he indicates that his area of authority is to "assist in developing those programs that ensure the public safety…."**

196. Mr. Harrison does not have the authority to unilaterally deviate from or change Georgetown's policy requiring only the use of reasonable force to authorize the use of excessive force. Ex. 26 (Harrison Decl.) ¶ 8. He did not authorize the use of excessive force with respect to the Plaintiff. Id. ¶ 9.

**RESPONSE:  Deny. See above.**

197. Mr. Morrell was present in the back of Gaston Hall during the Divestment Seminar. Ex. 7 (Morrell Dep.) at 26.

**RESPONSE:  Deny. It is unclear from Mr. Morrell's deposition where he was located at any particular time. At some point he was in the back of Gaston Hall.**

198. Mr. Morrell did not direct or instruct the conduct of Officer Eddy or Officer Salley in Gaston Hall. Ex. 7 (Morrell Dep.) at 26.

**RESPONSE: Deny. He had the power to do so. Mr. Olson directly instructed Eddy and Salley.**

199. Mr. Morrell had a brief conversation with Plaintiff in front of the ICC during which Plaintiff was told to leave the ICC. Ex. 7 (Morrell Dep.) at 13-14.

**RESPONSE: Deny**. **Mr. Morrell testified on deposition that he had no conversation with Mr. Maniaci beyond "one or two words" and he did not "recall the exact words…." Deposition P. 13.**

200. Mr. Morrell does not have the authority to make final policy for Georgetown relating to speech and expression. Ex. 25 (Olson Decl.) ¶ 9.

**RESPONSE: Deny. There is no indication of any determination on this question by the Georgetown Board of Directors.**

201. Mr. Morrell did not have the authority to deviate from or change Georgetown's policy requiring only the use of reasonable force to authorize the use of excessive force. Ex. 26 (Harrison Decl.) at ¶ 8.

**RESPONSE: Deny. The Georgetown University Police acted under Mr. Morrell's command. (Morrell Deposition, P. 6-7).**

202. Officer Eddy approached Plaintiff at the direction of Mr. Olson. Ex. 8 (Eddy Dep.) at 17-18.

**RESPONSE: Deny. Officer Eddy did not so indicate although other witnesses, including Mr. Olson, indicated that Mr. Olson gave the instruction. See Eddy deposition.**

203. Officer Eddy asked Plaintiff to leave Gaston Hall, and when he refused to comply, he along with Officer Salley carried Plaintiff out of the auditorium and placed him on the floor in the foyer. Ex. 8 (Eddy Dep.) at 26, 36.

> **RESPONSE:  Deny. Mr. Maniaci testified that he complied with all instructions he heard Officer Eddy set forth. Maniaci deposition, P. 261.**

204. Officer Eddy did not strike or knee Plaintiff while removing him from Gaston Hall or at any time while Plaintiff was on Georgetown's campus. See Paragraphs 118122, 125-131, 134-138, 152-160.

> **RESPONSE:  Deny. See Maniaci deposition P. 261.**

205. Officer Eddy observed Plaintiff's interaction with the Georgetown administrators at the ICC. Ex. 8 (Eddy Dep.) at 41-42.

> **RESPONSE: Deny. "Interaction" is defined by the internet dictionary as "a mutual or reciprocal action." This description does not match or even approximate the testimony of any witness on the subject.**

206. Officer Eddy does not have the authority to make final policy for Georgetown relating to speech and expression. Ex. 26 (Harrison Decl.) ¶ 5.

> **RESPONSE:  Admit.**

207. Officer Eddy does not have the authority to make final policy for Georgetown relating to the use of only reasonable force. Ex. 26 (Harrison Decl.) ¶ 7.

> **RESPONSE:  Deny. This is a question of law and not of Georgetown University policy.**

208. Officer Eddy was unarmed at all relevant times; he did not carry a weapon of any kind including a baton. Ex. 26 (Harrison Deci.) ¶ 10.

**RESPONSE: Deny. There is no testimony relating to this subject. In the video, Officer Eddy's clothing obscures whatever was attached to his belt.**

209. Officer Eddy did not handcuff or arrest Plaintiff. See Paragraphs 140, 159

160.

**RESPONSE: Deny**. **Officer Eddy did not handcuff Mr. Maniaci. The video clearly shows that Officer Eddy had his arms around Mr. Maniai's arm which is an arrest. See <u>Standardized Civil Jury Instructions For The District Of Columbia</u>, §18.01; <u>Giles</u> v. <u>United States</u>, 400 A. 2d 1051(D.C. 1979).**

210. Officer Salley, along with Officer Eddy, carried Plaintiff out of Gaston Hall and placed him on the floor in the foyer. Ex. 9 (Salley Decl.) ¶¶ 12-13.

**RESPONSE: Deny. See video which shows Mr. Maniaci being dragged by Officers Salley and Eddy..**

211. Officer Salley did not strike or knee Plaintiff while removing him from Gaston Hall or at any time while Plaintiff was on Georgetown's campus. See Paragraphs 118122, 125-131, 134-138; Ex. 9 (Salley Decl.) ¶¶ 14-17.

**RESPONSE: Deny. See Maniaci deposition P. 261.**

212. Officer Salley immediately returned to Gaston Hall and had no further interaction with Plaintiff. Ex. 9 (Salley Decl.) ¶¶ 16-17.

**RESPONSE: Deny. Officer Salley was missing at the time of his scheduled deposition and the Plaintiff has had no opportunity to question him on this point.**

213. Officer Salley was not present at the ICC. Ex. 9 (Salley Decl.) ¶¶ 20.

**RESPONSE: Admit.**

214. Officer Salley does not have the authority to make final policy for Georgetown relating to speech and expression. Ex. 26 (Harrison Decl.) ¶ 5.

   **RESPONSE:  Admit.**

215. Officer Salley does not have the authority to make final policy for Georgetown relating to the use of only reasonable force. Ex. 26 (Harrison Decl.) 17.

   **RESPONSE:  Deny. This is a question of law and not of Georgetown**

   **University policy.**

216. Officer Salley was unarmed at all relevant times; he did not carry a weapon of any kind including a baton. Ex. 26 (Harrison Decl.) at ¶ 10; Ex. 9 (Salley Decl.) ¶¶ 21.

   **RESPONSE:  RESPONSE:  Deny. There is no testimony relating to this**

   **subject.**


**March 4, 2008**

                              **Respectfully Submitted,**


                              *__Thomas Fortune Fay___*
                              **Thomas Fortune Fay**
                              *_Carag Glenn Fay____*
                              **FAY LAW, PA**
                              **700 Fifth Street, NW #200**
                              **Washington, DC 20001**
                              **202-589-1300**
                              **Counsel for Plaintiffs**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 4th  day of  March, 2008, I served a

copy of the foregoing elecronically through the ECF system, by first class U.S. Mail to:

John J. Buckley, Jr.
Malachi Jones
Richa Dasgupta
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, NW
Washington, DC 20005
*Counsel for Defendants*


***Thomas Fortune Fay***
**Thomas Fortune Fay**