UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**WILLIAM MANIACI,**

    **Plaintiffs,**

    v.

                                             Civil Action No.: 1:06cv01625

**GEORGETOWN UNIVERSITY, et al.,**                             (CKK/JMF)

    **Defendants.**

**STATEMENT OF PLAINTIFF OF MATERIAL FACTS
AS TO WHICH THERE IS NO GENUINE ISSUE
REGARDING THE MOTION OF DEFENDANT FOR SUMMARY JUDGMENT**

    A.    A student organization, named Students for Justice in Palestine gained permission to host a Palestinian Solidarity Movement Conference at Georgetown University. The Palestine Solidarity Movement is a group that has been accused of supporting terrorism and being anti-Israel. Shortly before allowing the group to host the conference, Georgetown University accepted a twenty million dollar grant from Saudi Arabian Prince Alwaleed bin Talal. (See Exhibit #1) This conference was open to the public. (See Exhibit #11)

    B.    Georgetown "made an inquiry with the Federal Bureau of Investigation, Metropolitan Police Department, the State Department and the Department of Treasury." (See Morrell Deposition, Ex. 20, pg 12:5-8) According to Georgetown's correspondence they may have contacted the FBI and local MPD but they never provided any specific names of the speakers that would be in attendance. See Exhibit #2 Mr.

        Morrell testified that there was no investigation, or check with FBI. Metropolitan Police, other law enforcement or security agencies with regard to any of the persons expected to attend the conference.(Ex. 20, pg. 32:20-33:6)

C.        On February of 2006, Maniaci was a member of the Jewish Defense League. But shortly thereafter, Maniaci and other members formed the B'nai Elim. (See Maniaci Deposition, Ex. 14, pg. 104:2-22) "It was final – the break with the Jewish Defense League was final about a year ago. And it was because we – we couldn't accept the actions of Mr. Rubin and Mr. Krugel and the publicity that that generated and the bad press that the Jewish Defense League received as a result of Mr. Krugel and Mr. Rubin's actions." (Ex. 14, pg. 88:7-14) The actions of Mr. Rubin and Mr. Krugel are the direct result of the FBI Report in 2000-2001 that described the JDL as an extremist organization. "Because of the – the stigma left behind by Mr. Rubin. And the accusations made against him and Mr. Krugel were 180 degrees away from anything that I wanted to be associated with. And the same held true with the rest of our membership, at least the board of directors." (Ex. 14, pg. 97:10-15) JDL was also on the Southern Poverty list as a hate group, which Maniaci stated "it is not accurate. We're not a hate group." (Ex. 14, pg. 99:7)

D.        Maniaci "had not been familiar with the Palestinian Solidarity Movement until we heard about the conference at Georgetown

2

University as a result of the $20 million donation from the Saudi Prince." (Ex. 14, pg. 135:2-6) "[W]e believed that the Palestinian Solidarity Conference held at Georgetown was significant due to the contribution of $20 million from Saudi Arabia to Georgetown University. And we felt that the University allowed this to happen as a direct result of that contribution." (Ex. 14, pg. 137:15-21)

E. The name given by the JDL for the operation of attending the Palestinian conference was called Operation Gideon. This name was used for no particular reason. (Ex. 14, pg. 143:15-21) (See Ex. #10)

F. Maniaci had planned to go to the Palestinian Solidarity Conference "[to find out what was being said. We wanted to attend the conference. We wanted to collect – my intention was to collect intelligence, to find out who the speakers were, what they were saying, to have our people attend the seminars and find out what was being said and what was going on, so that we could – we could counter the information that was being – you know, the false information that was being espoused. We wanted to be able to know our enemy, in other words. We also planned to demonstrate peacefully outside of the hall where these – these events were being held." (Ex. 14, pg. 146:15- pg. 147:6) Maniaci has repeated stated his intent to peaceful protest of the conference. (Ex. 14, pg. 148:21, pg 328:20-329:2)

G. Before the Conference Mr. Maniaci had contacted many different officials at Georgetown University to inform them that he would be

3

        coming to the conference and many other Jewish Defense League members. (Ex. #14 Pg. 158:11-13, pg. 187:18- pg. 189:22, pg. 194:14- pg. 195:12) Maniaci created some materials which included the Georgetown speech and expression policy to provide to other JDL members before attending the conference. (Ex. #14, Pg. 163:14-20 and pg. 166:14-22) In the guidelines Maniaci points out that they are there to protest, but no one is to violate the law, cause an arrest. The "point will be made simply by showing ourselves, and acting only within the rule of law. Everyone will comply with lawful orders given by law enforcement. If civil disobedience is deemed necessary and appropriate, it will be, in all instances, passive and non-violent – you will not resist arrest." See Exhibit #3

H.    The day before the conference, Darryl Harrison called William Maniaci when he arrived in his hotel room. (Ex.#14, Pg. 202:12-16 and pg. 229:6-231:4) "I recall that his demeanor was totally different than it was the first time we spoke. Instead of being friendly, he was more confrontational. And I do recall telling him verbatim, I told him that we're here to build bridges, not burn them. I told him that we were there in the spirit of mutual cooperation. And all we wanted to do was within the legal parameters." (Ex.#14, Pg. 230:4-12) Darryl Harrison testified that the general nature of his conversations with Maniaci simply involved the Palestinian Conference, his attendance, and his opposing views of the conference. (Ex. 16, pg 10:13-17)

4

I.   On Saturday, February 18, 2006 at 10:00 a.m. William Maniaci, a sixty four year old man properly attired in a business suit and hat and walking with a cane, entered the Georgetown University campus through the main pedestrian entrance, and proceeded to the ground floor of a large building where he registered for the Palestinian Solidarity Conference. (Ex.#14 Pg. 232:4-8)

J.   At the registration desk, Mr. Maniaci provided his name, biographical information, identification, and paid the ten dollar fee charged by Georgetown University as a condition of registration as a participant in the Palestinian Solidarity Conference in cash. He was given a badge, which he pinned on his left lapel, and a document entitled "Speech and Expression at Georgetown University" explaining the rights to which he was entitled in accordance with the license to participate in the Palestinian Solidarity Conference which he had just purchased.

K.   The "Speech and Expression at Georgetown University" document provided as "Limitations" on "free speech and expression" only a ban on "unlawful activity, actions that endanger or imminently threaten others, or activities that disrupt or obstruct the functions of the University." See exhibit #9.

L.   Mr. Maniaci then proceeded through the screening area and took the elevator to the third floor and entered Gaston Hall. This event was to be a presentation by four panelists regarding divestment by Georgetown University of investments connected in some manner with Israel. It was

|     | |
| --- | --- |
|     | advertised as open to the public. |
| M.  | Officer Salley and Eddy received a transmission to keep close observation on a white male, bald head, wearing a long black coat. See Exhibit #5 and 6. |
| N.  | The event started at approximately 11:15 a.m. The presentations lasted for thirty to forty minutes, after which the panel took questions from the audience, which they called the question and answer period. |
| O.  | Todd Olson stood in front of the stage and stated "just briefly, this begins our question and answer period during which you may ask questions and *engage in dialogue*. Please be sure to phrase your comments in the form of a question, in the interest of time we ask each person to be concise and ask only one question. Thank you." (Transcribed from the video records.) Todd Olson's statements were verbatim from protocol. See Exhibit #7 and 8. |
| P.  | The first person to ask as question was Rabbi Shifren, he did not state his question in the microphone because it was Sabbath. The moderator, Will Youmans interrupted the Rabbi twice. Susan Blackwell, a speaker/panelist responded to his question. The Rabbi called her a liar. Todd Olson appeared on the stage and stated that "your opportunity to ask your question has completed. Your opportunity to ask your question has ended. We'll move onto the next question. I will now ask our staff to escort this man from the room." The Rabbi walked directly up the aisle to the back of the room and sat down. Officers Eddy and |

       Salley walked up the aisle to the back of the room and then stood in the back of the room. They did not remove Rabbi Shifren. See Video Exhibits #17, 18, and 19.

Q.    Mr. Maniaci was in line to ask a question, he waited his turn and then asked his question. Mr. Maniaci asked the panel: "My name is Bill Maniaci and I have one question for you and it's a policy question- ah- I'd like to know your position on suicide bombing, if you would renounce suicide bombing, and the murder of innocent Israeli women and children, as a viable venue for you to accomplish your goals and given that that is terrorism, and no one can deny blowing themselves up on a bus and killings innocents is not terrorism…(interrupted by moderator)…I would like to answer either affirmative or negative whether you do support terrorism or not." Quoted exactly from the recordings provided. See Exhibits #17,18, and 19.

R.    The panelists avoided answering the question and the faculty staff advisor pointed for the next question. See Exhibits 17, 18, 19.

S.    Finally, one of the speakers, Sue Blackwell, addresses Maniaci's question by stating: "I would like to address the question on suicide bombings, I hope you don't get this answer repeated twenty different ways because that happens sometimes at meetings. I am speaking on behalf of myself when I'm saying this. I'm not speaking on behalf of any organization. Okay. My personal view, if other people want to give their personal views that's up to them. Umm. I've gone on the record

7

|   | |
|---|---|
|   | about this many times and I unreservatively condemn all acts of terrorism, not all violence because I'm not a passivist, I believe in self defense. I unreservatively condemn all act of terrorism by which I mean acts or threats of violence against unarmed civilians for political ends and that applies… (applause)… that applies to suicide bombers in pizza parlors in Israel. It also applies to F-16's dropped… ah… fired on civilians in gaza. So I condemn equally and unreservatively the terrorism of groups like Hamas and Islamic Jihad when they targeted civilians. I also unreservatively condemn the state terrorism of Tony Blair, Ariel Shalon, and George Bush, all of whom, each of whom, has more blood on his two hands alone than whole of Hamas and Islamic Jihad together." See Exhibits #17,18,19. |
| T. | The Moderator, Will Youmans, then stated "Thank You. We only have time for one more round of three questions." See Exhibits #17, 18, and19. |
| U. | At such time, Mr. Maniaci raised his hand and said: "Excuse me, but you did not answer the question. I asked for a policy statement from you and you haven't answered my question." (Ex. #14 Pg. 254:7-14) |
| V. | The Moderator then stated "Thank You but your disrupting, we can talk about this afterwards." Todd Olson then stated "You've asked your question and your opportunity has ended." See Exhibits #17, 18, 19. |
| W. | At such time the moderator asked for the next question and Maniaci stated "You haven't answered my question." The moderator the states |

      "I'm sorry sir please don't interrupt you already asked your question." See Exhibits 17, 18,19.

X. Mr. Maniaci stated "But you didn't answer my question." The moderator responds with "She did, she addressed your question." Maniaci responded with "I asked for your policy statement and she gave a …" The moderator interrupts with "there is no policy". See Exhibits 17, 18,19.

Y. Mr. Olson then states "you don't have the opportunity to speak any longer. I'd like to ask our staff to escort this gentleman from this room, he is creating a significant disruption." See Exhibits #17,18,19.

Z. The moderator moves on to the next person to ask a question.

AA. Officers Eddy and Salley received an order to remove Maniaci from the Hall. See Exhibit #5 and 6. The Officers were told that "if an attendee became disruptive a university official would make the determination as to weather that individual would be removed from the hall and upon that determination Public Safety would be informed." See Exhibit #6.

BB. There is absolutely no possible way of interpreting exactly what the Officer and Maniaci state to one another on the video recording. There is a person asking a question and the moderator talking at the same time. See Exhibit #17,18,19. Officer Eddy states in his statement that he said "Sir, I afraid your going to have to come with me." And officer Eddy states that Maniaci refused and officer Eddy responded "Sir, as a university official I'm going to have to ask you to come with me."

9

        Again Maniaci refused and the officers claim they gently removed Maniaci from the hall. See Exhibit #6. Mr. Maniaci testified in his deposition that the officers did not ask him to leave. "I recall a… police officer…leaning over and putting his hand on my arm. And I recall telling him that I haven't done anything wrong. And that's about as far as it got before I flew out of my seat." (Ex.#14, Pg. 259:10-16) When asked if the officers asked Maniaci to arise from his seat and leave, Maniaci said "No". (Ex.#14, Pg. 259:17-20) When asked if Maniaci refused to leave, Maniaci responded "[n]o. I said I haven't done anything wrong. That's all I got out of my mouth." I didn't refuse to stand up and leave the room." (Ex.#14, Pg.259:21- pg. 260:9) Maniaci did not understand that he was being asked to leave the room, nor did anybody actually ask him to leave the room. (Ex.#14 Pg.260:13-261:12) Maniaci did not engage in passive resistance. (Ex.#14 Pg.261:18-22) Maniaci has testified that he does not remember the officer saying anything to him. (Ex.#14, Pg 284:9-17 and pg. 288:12-15)

CC.     The two campus police officers violently grabbed Mr. Maniaci and jerked him from his seat. He did not resist at all. "They got me out of the chair by using brute force. And what they grabbed, I don't know. They grabbed me. They knocked the wind out of me. And I couldn't resist." (Ex.#14, Pg 262:22-263:3)

DD.     As the officers pulled at Mr. Maniaci, he felt a blow to his right side,

taking his breath away and causing him to gasp for air. "All I remember, and for the last time, all I remember is being grabbed. And there was a swift progression of events after being grabbed. I was jerked from my chair. I was struck in the right side. I lost my wind. And I was concentrating on trying to breathe because I had the wind knocked out of me. I was gasping for breath." (Ex.#14, Pg 266:2-9)

EE. Robert Turk testified that he saw one of the officers kick Maniaci. (Ex. 22, pg 148:5-149:12)

FF. He was thrown onto the aisle floor and dragged down the aisle. His limbs and head bumping into objects while being dragged. "And all I remember is bumping into elbows and shoes. I remember seeing shoes on the floor and the rug going by and bumping into chairs and hitting the concrete pavement outside." (Ex.#14, Pg 262:11-15).

GG. Mr. Maniaci was then lifted off the floor, thrown through the doors into the hallway on the concrete floor. Mr. Maniaci again hit his head as he hit the floor and bent his cane. (Ex.#14 Pg. 268:17-269:11) Maniaci was not placed gently on the floor. (Ex. #14, Pg 269:13)

HH. Maniaci did not have the chance to cooperate or to resist. (Ex. #14, Pg. 266:16-19) Maniaci did not know they were going to attempt to remove him from the auditorium. (Ex. #14, Pg 267:1-2)

II. Mr. Maniaci could not get up off the floor and he saw the room spinning. (Ex. #14, Pg 270:4-6) After waiting several minutes, Mr. Maniaci tried to get up, but lost his balance and started to fall when

11

|    |    |
|----|----|
|    | Robert Turk and Matt Finberg caught him. (Ex. #14, Pg 270:8-9 and pg. 289:10-11 When Mr. Maniaci looked around there was a crowd around him taking pictures. A University official tried to block the cameras. At this time none of the Georgetown University faculty, officials or campus police helped him. A University official approached Maniaci. Maniaci stating that he was leaving, he took the elevator downstairs, while his friend, Bob Turk helped him walk. (Ex. #14, 290:3-7) "We walked out front. And we paused outside and – where I could catch my breath. It was Bob Turk and myself. Nobody else. And then we decided that we would walk to the other building where we had tables rented, because I wanted to get something to eat, and I was feeling uneasy. And I wanted to be able to sit down and rest and go to the bathroom as well." (Ex. #14, Pg 290:8-16, rephrased again at pg 294:5-15) |
| JJ. | Maniaci's bruises are documented by pictures in Exhibit #13, by his deposition (Exhibit #14), by the medical records (Exhibit 12) and deposition of Dr. Gillern (Exhibit #15). Maniaci's cane had been bent during the altercation. (Ex.#14 Pg. 35:16-21) Maniaci did not feel as though he violated any of Georgetown University's policies. (Ex.#14, pg. 167:5-7) Maniaci was under the impression that the question and answer period included "dialogue", a free exchange of ideas, conversation between individuals. (Ex.#14 pg. 170:7-10, pg.170:17-18, pg. 173:4-10, pg. 173:16-19) |

KK. Mr. Maniaci and Robert Turk then approached the Inter-Cultural Center where vendor tables had been set up. As he immediately entered the doorway Mr. Maniaci was pushed against a glass window by one of the same officers that removed him from the auditorium. (Ex. #14, Pg 296:6-10 and pg 298:10-15) Maniaci was told that he is not allowed to enter the ICC. (See Officer Eddy Report- Ex. 6) Six Officers surrounded the area of the entryway. Mr. Maniaci asked if he was being arrested, in which they responded with "no." (Ex. #14, Pg 298:17-18) Maniaci "was informed that would not be allowed entry into the building until a university official ok his entry." (Ex. 6) Mr. Maniaci was blocked and was told not to go anywhere. (Ex. #14, Pg 298:20-299:4) At that time Mr. Maniaci told the officers that he was not feeling well, he needed to rest, and he needed to go to the restroom. Mr. Maniaci informed the officers that he has a medical condition, in which he uses the restroom often. (Ex. #14, Pg 299:4-7)  Mr. Maniaci continued to ask to use the restroom.

LL. Darryl Harrison testified that at this point Maniaci was in the vestibule area, "it prevents one from going completely into the entrance." (Ex. 16, pg 43:19-21) "There may have been an occasion or two when he may have been touched to be directed to an area to go to." (Ex. 16, pg 44:21-45:1)

MM. Robert Turk testified that the officers trapped Maniaci in the hallway (entryway) (Ex. 22, pg 181:19), they boxed him in him in (Ex. 22, pg

13

|     | |
| --- | --- |
|     | 182:15), they sort of pushed him into a corner where he couldn't get in or out (Ex. 22, pg 184:1-2). "Not with their hands, but ha gave a body blow." (Ex. 22, pg. 184:5-6) "Like when you're using your chest to enforce, you know – you're pushing someone with your chest, a body blow without using your hands." (Ex. 22, pg 184:10-12) |
| NN. | After much time had passed, an officer agreed to allow Mr. Maniaci to go to the bathroom. But the officer kept the door to the bathroom (which was single enclosed room) wide open and watched Mr. Maniaci urinate.(Ex. #14, Pg 299:8-13) "He was escorted into the building, and they embarrassed him and held the door open while he was peeing." (Ex. 22, pg 187:11-13 and stated again at pg 189:9-190:7) |
| OO. | Maniaci was escorted back to the foyer area of the ICC Building. (Ex. #14, Pg 301:21-22) Then the chief of campus police, identified as David F. Morrell, Vice President for Campus Safety, approached Mr. Maniaci and told him that he was being barred from the conference. Harrison testified that Maniaci was causing a disturbance and therefore escorted from the campus. "By disturbance, I mean he attempted to enter the building and attempted to enter the building in a disruptive manner." (See Harrison Deposition, Ex. 16, pg 19:8-13) Matt Feinberg (who was with Mr. Maniaci) asked to speak to the University Provost, but his request was denied. (Ex. #14, Pg 302:2-5) Robert Turk and Matt Feinberg were still helping Mr. Maniaci to stand and get around. Mr. Maniaci was then approached by an officer from the D.C. Metropolitan |

14

|    | |
|----|-|
|    | Police Department in the foyer of the Inter-Cultural Center. The officer had been called by the University to escort Mr. Maniaci off of the campus. (Ex. #14, Pg 302:6-11) See Exhibit #4. |
| PP. | The next morning, Sunday, February 19, 2006, Mr. Maniaci blacked out on the street. (Ex. #14, Pg 306:18-21 and 308:11-13) At that time Maniaci went back to his hotel and sat down. (Ex. #14, Pg 307:10-11) That night his friend, Bob Turk, took him to Walter Reed Army Medical Center, where he was told he had suffered a concussion, sprain of the right ankle, contusions to the right abdomen, right upper arm, right wrist, and abrasions to the legs. (Ex. #15 pg. 45:1-19) (Ex. #14, Pg 317:3-12 and pg 324:8-10) According to Dr. Gillern, it is not likely and there is no indication that Maniaci received the injuries from anything but what he has claimed. (See Exhibit # 12 and 15) Pictures of Maniaci's injuries are documented in Exhibit #13. Maniaci does not bruise easily. (Ex. #14, Pg 348:4-6) (Ex. 15 pg 74:15-17) |
| QQ. | William Maniaci has a license by the federal government to carry a concealed weapon in all fifty states and the District of Columbia. (Ex.#14 Pg 12:9-11) Maniaci is a licensed firearms dealer for Reno, Nevada. (Ex.#14 Pg. 14:11- 15:7) Maniaci did not have a firearm when he was on Georgetown campus in February of 2006. (Ex.#14 Pg. 15: 20-22, pg 16:14-18, pg 17:18-20, and pg. 383:9-18) Maniaci health is not perfect. He has chronic obstructive pulmonary disease with emphysema (Ex.#14, pg.21:15-16), has incurred transient ischemic |

15

attacks (mini strokes)(Ex.#14, pg.22:8- 23:5), and has chronic bronchitis and asthma (Ex.#14 pg.31:1-2). Maniaci has broken his tibia, fibula, right knee, right leg, right ankle, rotator cuff, and cervical spine. (See Maniaci Deposition, Exhibit #14, pg. 31:19, pg. 32:10-11, pg. 33:2-5, pg. 34:16-18) As a result, he has arthritis and uses a cane to steady himself while walking. (Ex.#14, Pg.35:16-21 and pg. 37:1-17) Maniaci has suffered from hearing loss from explosions while in the military, he has tinnitus in both ears. (Ex. #14, Pg. 39:19- pg.41:10) "I have hearing aids but I don't—I don't wear them. I don't think – you know, as long as I'm conversing with someone, if you see me looking at your mouth, that supplements my – my hearing loss. And I – I can understand pretty easily that way." (Ex.#14 pg. 40:4-9) Maniaci is a one hundred percent disabled veteran (Ex.#14 pg. 44:2) and a retired police officer (Ex.#14, pg. 10:3-13)

RR. Darryl Harrison was the Georgetown University director of public safety on 2/18/2006. (Ex. 16, pg 6:5-11) His responsibility "is to assist in developing those programs that ensure the public safety of our students, faculty, and staff." (Ex. 16, pg 7:7-11) Mr. Harrison was at the conference as a university official.

SS. David Morrell was the vice president for university safety. (Ex. 20, pg 6:9-10) David Morrell was present at the conference as a university official, in a security function. (Ex. 20, pg 17:17-18) Mr. Morrell testified that Maniaci did not act in a manner that was unlawful. (Ex.

16

|     |     |
| --- | --- |
|     | 20, pg 27:12-14) Mr. Morrell testified that he had a conversation with Maniaci at the ICC Building in which he was asked to leave the vestibule of the building and go outside, (Ex. 20, pg 13:19-14:4) |
| TT. | Todd Olson was the vice president of student affairs. (Ex. 21, pg 6:7-11) Mr. Olson was present at the conference as a university official. (Ex. 21, pg 22:2-4) At the conference, Olson was serving as moderator for purposes of managing our speech and expression policy. (Ex. 21, pg. 23:5-11) Mr. Olson testified that he did not observe Maniaci act unlawful at any time. (Ex. 21, pg 39:14-16) Mr. Olson was acting in his capacity as an official of Georgetown when he asked security to remove Maniaci. (Ex. 21. pg 40:11-14) Mr. Olson also testified that he had had a conversation with Mr. Morrell in that they decided that Maniaci would not be allowed to attend other sessions at the conference. Mr. Olson thought that Mr. Morrell had actually told Maniaci of this. (Ex. 21, pg 42:16- 43:5) |
| UU. | "All of the officers assigned to the department of public safety are commissioned special police officers through the District of Columbia." (Ex.16, pg 47:10-12) |
| VV. | Officer Salley and Eddy were regular full time employees of the department of public safety at Georgetown University. (Ex. 16, pg 8:7-13), (Ex. 20, pg. 25:8-11) |

**March 4, 2008**

                                          **Respectfully Submitted,**

                                          _**Thomas Fortune Fay**_
                                          **Thomas Fortune Fay**
                                          **Thomas Fortune Fay, P.C.**
                                          **700 Fifth Street, NW #200**
                                          **Washington, DC 20001**
                                          **202-589-1300**
                                          **Counsel for Plaintiffs**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 4th day of March, 2008, I served a copy of the foregoing by first class U.S. Mail to:

    John J. Buckley, Jr.
    Malachi Jones
    Richa Dasgupta
    WILLIAMS & CONNOLLY LLP
    725 Twelfth Street, NW
    Washington, DC 20005
    *Counsel for Defendants*

                                          _**Thomas Fortune Fay**_
                                          **Thomas Fortune Fay**