Case 1:06-cv-01625-LFO   Document 47-27   Filed 03/04/2008   Page 1 of 12

March 29, 2007     William Maniaci     Maniaci vs. Georgetown
Washington, D.C.

Page 46

1 else?
2    A   My wife. I've -- I've let people know
3 that I'm coming here for a deposition. But I
4 haven't discussed my testimony.
5    Q   Uh-huh. Who have you advised that you
6 were coming here for a deposition?
7    A   My friend Bob Turk knew that I was
8 coming. And my attorney, of course. Some of my
9 friends in Reno knew that I was leaving town and
10 what for. And I called my friend Mike Smith
11 that's here and told him I would be in town.
12 Maybe we can have dinner together. And we
13 haven't been able to do that.
14      And Mr. Keith Bailey had lunch with me
15 yesterday. He's an old friend.
16    Q   Did you discuss the events that
17 transpired at Georgetown in February 2006 with
18 him?
19    A   Yes.
20    Q   During lunch?
21    A   Yes, I did.
22    Q   What was the nature of your

Page 47

1 discussion?
2    A   He was recalling what he remembered
3 because he -- he was there. He told me what he
4 recalled of the event.
5    Q   Did that help to refresh your
6 recollection of the events?
7    A   No. I had a pretty good recollection
8 before that.
9    Q   Have you spoken to anyone else about
10 your appearance here today, other than the
11 persons you've mentioned?
12    A   I may have. But I don't recall.
13    Q   Did you advise Matthew Finberg that
14 your deposition was being taken?
15    A   No. I haven't talked to Matthew
16 Finberg.
17    Q   When was the last time you spoke with
18 Mr. Finberg?
19    A   Probably October 31st of last year.
20    Q   That was --
21    A   No, no, no. Wait. I've spoken to him
22 on the phone a couple times since then. But I

Page 48

1 haven't seen him in person since then.
2    Q   What happened on October 31st, 2006?
3    A   He was in Reno, Nevada. And we were
4 talking. And we had a -- in fact, we had a
5 meeting in Reno.
6    Q   A meeting. Who had a meeting?
7    A   An organization that I belong to.
8    Q   What is the name of the organization?
9    A   B'nai Elim.
10    Q   Okay. So you said about two or three
11 times you've spoken to him since then on the
12 phone?
13    A   Yes, sir.
14    Q   How recently, in terms of the last
15 conversation you had with him?
16    A   Probably a month.
17    Q   What did you discuss at that time?
18    A   We were discussing items that weren't
19 related to this. It was related to the B'nai
20 Elim, our organization.
21    Q   Before that, when did you speak with
22 him?

Page 49

1    A   I don't recall the exact date.
2    Q   Since, say, October 2006, to the
3 present, have you discussed with Mr. Finberg the
4 events of February 2006 at Georgetown
5 University?
6    A   No.
7    Q   Have you advised or did you advise
8 Mr. Nutting that you were coming here for a
9 deposition?
10    A   Yes, I did.
11    Q   When did you speak with him?
12    A   Within the last week, on the
13 telephone.
14    Q   What did you discuss with him at that
15 time?
16    A   I don't recall the gist of our
17 conversation. He's a friend of mine and we talk
18 frequently. We discuss things that are going on
19 in Israel, things that are going on in Southern
20 California with the -- of interest to our
21 organization.
22    Q   Did you discuss with him, when you

13 (Pages 46 to 49)

Case 1:06-cv-01625-LFO   Document 47-27   Filed 03/04/2008   Page 2 of 12

March 29, 2007 | William Maniaci | Maniaci vs. Georgetown
Washington, D.C.

Page 50

1  last spoke with him, the events at Georgetown in
2  February 2006?
3      A   Not other than telling him that I was
4  coming to -- for a deposition. He told me that
5  he was giving his deposition in the near future
6  as well.
7      Q   Okay. And before this last
8  conversation, when did you previously talk to
9  Mr. Nutting?
10     A   I don't recall the exact times. I
11 don't -- I don't take notes when I talk to my
12 friends. I don't know.
13     Q   When did you last see him?
14     A   I last saw Mr. Nutting in Las Vegas.
15     Q   When was that?
16     A   Probably in November. November.
17     Q   November of 2006?
18     A   Yes.
19     Q   Okay. Do you speak with him
20 frequently?
21     A   Yeah.
22     Q   And by that, how often do you mean?

Page 51

1      A   At least once a week, maybe twice.
2      Q   Okay. All right. Have you reviewed
3  any documents in preparation for your deposition
4  that refreshed your recollection?
5      A   Yes, sir. I read the complaint that I
6  wrote regarding the series of incidents that I
7  sent to the various law enforcement agencies.
8      Q   Okay. Did you review anything else
9  that refreshed your recollection?
10     A   I watched the video presentations of
11 the depositions that you had done prior to my
12 arrival.
13     Q   When you say "that you had done," are
14 you referring to your counsel, Mr. Fay? Because
15 we, the defense --
16     A   Yes.
17     Q   -- have not taken any depositions.
18     A   Yeah, the -- yes, the depositions.
19         MR. FAY: Yeah.
20 BY MR. BUCKLEY:
21     Q   So which video depositions did you
22 watch?

Page 52

1      A   Oh, I watched four or five yesterday.
2  And I don't recall the names of the people.
3  Mr. Morrell, I think. Darryl -- I can't think
4  of his last name.
5      Q   Harrison?
6      A   Right. And if you'll refresh my
7  memory, I can tell you.
8      Q   Todd Olson.
9      A   Yes. That was one.
10     Q   Eric Smulson?
11     A   Yes.
12     Q   Anyone else?
13     A   No. I think that was it.
14     Q   Okay. Did you view any other videos?
15     A   Yes, I did.
16     Q   What other videos had you viewed?
17     A   A video on how to prepare yourself to
18 take a deposition.
19     Q   Oh, really. Okay. Who was the
20 presenter?
21     A   It was a video. And Mr. Fay had that
22 in his office. I don't recall who the presenter

Page 53

1  was.
2      Q   Was Mr. Fay starring in the video?
3      A   No. No. It probably would have been
4  more interesting if he had.
5          MR. FAY: We tried to get somebody
6  more charming. It was difficult.
7  BY MR. BUCKLEY:
8      Q   Okay. Do you recall who made the
9  video?
10     A   No.
11     Q   How long was that video?
12     A   20 minutes maybe.
13     Q   Okay. Did you view any other videos?
14     A   No.
15     Q   Have you viewed any videos of the
16 conference in Georgetown that was held in
17 February of 2006?
18     A   Yes. Yesterday I saw a video that the
19 quality wasn't -- it was poor. And depicted a
20 brief -- a period of time that I was in the --
21 in the auditorium. It showed the speakers that
22 were on the stage. And it showed a part of the

Case 1:06-cv-01625-LFO    Document 47-27    Filed 03/04/2008    Page 3 of 12

March 29, 2007          William Maniaci          Maniaci vs. Georgetown
                        Washington, D.C.

Page 54

1  question when I raised -- the question that I
2  asked at the microphone.  And that's about all
3  that was discernible.
4      Q   Were you advised to prepare the video?
5  Or who made the video?
6      A   It may have been mentioned.  I think
7  it came from -- I don't know what the exact
8  source was.  I think it was delivered to his --
9  to my lawyer's office by your office.
10         MR. FAY:  Yeah.  The videos we
11 received from you.
12         MR. BUCKLEY:  Which ones?
13         MR. FAY:  There were -- there was a
14 video that was on a regular recording device --
15 or playing device.  It was kind of fuzzy.  I
16 mean, you can make out people but it just wasn't
17 very good quality.
18         And part of it was the lighting.
19         MR. BUCKLEY:  Yeah.
20         MR. FAY:  Incidentally, if you have an
21 attachment on your computer and play it on the
22 computer, it comes over much better.  I don't

Page 55

1  know why that is.  But it does.
2          And then there were a couple -- when I
3  say two, I think they were on one disk.  But it
4  looked like there were -- it was taken from two
5  things, as though in the middle of the thing,
6  whoever was taking the video had to put a new
7  disk or a new tape in and start over again.
8  Because there's a noticeable sort of jump.  You
9  know, one time the person was here and then the
10 next frame, over there.
11 BY MR. BUCKLEY:
12     Q   Okay.  Did you watch the entire video
13 as described by your counsel?
14     A   No.
15     Q   Did you just watch portions of it?
16     A   Uh-huh.
17     Q   Was anyone with you when you were
18 watching the video?
19     A   Keith Bailey was in our office.  "Our
20 office" meaning Mr. Fay's office.  And Mr. Fay
21 was there part of the time, as was his daughter.
22     Q   Okay.  How many hours did you spend

Page 56

1  with Mr. Bailey yesterday?
2      A   Probably six -- he was with us around
3  six hours, I think.
4      Q   Six hours?
5      A   Uh-huh.
6      Q   Okay.  Who determined which portions
7  of the video you viewed?
8      A   Mr. Fay and his daughter were showing
9  the videos.  And they made the determination of
10 what was relevant.
11     Q   Were any of the portions of the video
12 replayed?
13     A   No.
14     Q   Just watched it once?
15     A   That's correct.
16     Q   How much time did you spend watching
17 the videos?
18     A   20 minutes of the video of what was
19 going on, what transpired at Georgetown.
20     Q   Yeah.
21     A   And the other videos, there were five
22 of them, and they ranged in -- in length from, I

Page 57

1  think, 15 minutes to 20, 25 minutes.
2      Q   You're referring to the videos of the
3  depositions?
4      A   That's correct.
5      Q   Just focusing on the videos of the
6  Georgetown events, how much time did you spend
7  looking at those videos?
8      A   20 minutes.
9      Q   20 minutes.  And you didn't replay
10 them?
11     A   No, sir.
12     Q   Just watched them once?
13     A   That's right.
14     Q   Were you shown any transcripts of what
15 was being depicted on the video at Georgetown?
16     A   No.
17     Q   Okay.  Was that the first time you had
18 seen the videos?
19     A   Yes.
20     Q   Okay.  Let me ask you some questions
21 about your background in law enforcement.  When
22 you were with the Yerington, Nevada police

15 (Pages 54 to 57)

Case 1:06-cv-01625-LFO   Document 47-27   Filed 03/04/2008   Page 4 of 12

March 29, 2007 | William Maniaci | Maniaci vs. Georgetown
Washington, D.C.

Page 58

1  department, how many arrests did you effect?
2      A   Hundreds over an 11-year period.
3      Q   Hundreds of arrests?
4      A   (Nodding head.)
5      Q   Okay. What was the routine that you
6  followed when you arrested a person?
7      A   Standard procedure depending upon the
8  nature of the arrest. Whether it was a arrest
9  for DUI, there was a procedure. If there was an
10 arrest for other -- other offenses, there were
11 procedures. It depended upon the circumstances
12 as to what procedure was followed.
13     Q   How do you place a person under
14 arrest?
15     A   Place your hand on the person, tell
16 him he's under arrest.
17     Q   And then what do you do?
18     A   Depending upon the nature of the
19 offense, he's usually handcuffed and placed into
20 a vehicle, taken to the sheriff's department,
21 and you go through a booking procedure.
22     Q   Do you read the person his rights, so

Page 59

1  to speak --
2      A   Yes.
3      Q   -- so-called Miranda warning?
4      A   That's right.
5      Q   That's part of the procedure?
6      A   That's correct.
7      Q   So you put your hand on the person.
8  You advise the person that the person is under
9  arrest, correct?
10     A   That's correct.
11     Q   Then you handcuff the person?
12     A   Yes, that's....
13     Q   What's the standard manner in which
14 the person is handcuffed --
15     A   Behind his back.
16     Q   Behind his back?
17     A   That's correct.
18     Q   Okay. And then the person is advised
19 of his or her Miranda rights?
20     A   Not necessarily at that time.
21     Q   Okay.
22     A   Only if we -- it's not necessary to

Page 60

1  advise a person of Miranda unless you intend to
2  question that person.
3      Q   Okay. And then the person is taken
4  into custody; that is, taken to the police
5  station for booking?
6      A   That's right.
7      Q   And what happens at the police
8  station?
9      A   At the -- we booked our arrestees into
10 the sheriff's department in the county jail.
11 And the prisoner is turned over to the deputies
12 and they continue the booking process.
13     Q   What does the booking process consist
14 of?
15     A   Fingerprinting, photographing and so
16 on.
17     Q   Okay. As the arresting officer, when
18 does your role end? Is it when you bring the
19 person to the police station?
20     A   My role ends when my reports are
21 finished and turned in. And then that role is
22 not continued unless there's a prosecution and

Page 61

1  I'm called to testify.
2      Q   What reports do you have to prepare in
3  connection with an arrest?
4      A   There's always an arrest report, a
5  criminal, a -- a -- an incident report. No one
6  is arrested without a report.
7      Q   When you were within the military and
8  exercising the power of arrest there, did the
9  procedure differ from the procedure you just
10 described? In any material respect.
11     A   No. Not in any material respect.
12 Terminology was different. Basic procedures
13 were basically the same.
14     Q   Okay. When you arrested a person,
15 again, referring to when you were an officer
16 with the Yerington Police Department, did you
17 also search the person?
18     A   Yes, sir.
19     Q   What did the search consist of?
20     A   Again, depending upon the offense and
21 type of arrest it was, it usually consisted of a
22 pat-down search before placing a person in your

Case 1:06-cv-01625-LFO   Document 47-27   Filed 03/04/2008   Page 5 of 12

March 29, 2007        William Maniaci        Maniaci vs. Georgetown
                      Washington, D.C.

Page 62

1  vehicle.
2  Q  Is that after handcuffing?
3  A  Uh-huh.
4  Q  So the sequence of events, first you
5  put your hand on the person. And then -- you're
6  nodding your head a little bit. Maybe I've
7  gotten the order of events wrong. You first put
8  your hand on the person, advise the person, the
9  person is under arrest; is that right?
10 A  In most cases.
11 Q  Okay. And then you -- you handcuff
12 the person with the person's arms behind his
13 back.
14 A  In most cases.
15 Q  Okay. And then -- and then you search
16 the person?
17 A  Not necessarily. Usually the
18 person -- the person is searched before they're
19 handcuffed in some instances.
20 Q  Okay.
21 A  In some instances, after that. It all
22 depends upon the circumstances.

Page 63

1  Q  Okay. But one way or the other, you
2  do search the person obviously.
3  A  Yes.
4  Q  Pat-down for weapons?
5  A  That's correct.
6  Q  Okay. Are you familiar with the force
7  continuum?
8  A  No. I've heard the term but I can't
9  recall what the explanation is.
10 Q  Have you ever heard the force
11 continuum used to describe the progression of
12 escalating levels of force that an officer can
13 use reasonably in response to noncompliance to a
14 verbal command?
15 A  Yes. We didn't call it force
16 continuum. But I understand what you're saying.
17 Q  What did you call it?
18 A  Escalation of force, use of force. We
19 had....
20 Q  Would you explain that?
21 A  Only -- only the force necessary could
22 be used to effect an arrest.

Page 64

1  Q  Are you familiar with the term passive
2  resistance?
3  A  Yes.
4  Q  What does that mean?
5  A  Someone that does not actively resist
6  but refuses to cooperate.
7  Q  And what escalating levels of force
8  are appropriate when you have a person who is
9  engaged in passive resistance, say, for example,
10 by going limp?
11 A  Again, only -- it would depend on the
12 circumstance and the individual that we're
13 dealing with. Pain compliance would be a
14 method. Only that force necessary to -- to take
15 the person into custody, if that was your
16 intent.
17 Q  And what levels of force would you or
18 could you appropriately use in that instance?
19 A  Again, only what was necessary to
20 bring the person under control.
21 Q  What techniques are available to you
22 to bring a person under control where the person

Page 65

1  is engaged in passive resistance?
2  A  Pain compliance usually works.
3  Q  What does pain compliance mean?
4  A  Pain compliance is a wrist lock, a
5  thumb hold, something that would not cause any
6  permanent injury but would cause a person to --
7  to comply with your request because he's --
8  obviously he's in pain. He's uncomfortable.
9  That's what pain compliance is.
10 Q  How do you effect that? How do you --
11 is this like manipulation of joints?
12 A  Joints, wrists, arms.
13 Q  Okay. Suppose you have a person who
14 you, as an officer, have directed to move.
15 Let's say the person, instead, lies down on the
16 sidewalk and refuses to move. What techniques
17 could you reasonably use as an officer to effect
18 compliance with your verbal command that the
19 person depart from the premises?
20    MR. FAY: This is if the person is
21 under arrest or not or what?
22    MR. BUCKLEY: No. I'm just -- don't

Case 1:06-cv-01625-LFO    Document 47-27    Filed 03/04/2008    Page 6 of 12

March 29, 2007    William Maniaci    Maniaci vs. Georgetown
Washington, D.C.

Page 66

1 add to my questions.
2     THE WITNESS: Again, if I was unable
3 to control the individual, and he's being
4 passive and laying on the ground, I would
5 probably call for some assistance, because I
6 wouldn't be able to lift the person by myself.
7 BY MR. BUCKLEY:
8   Q   All right. So you call for
9 assistance. Another officer comes. Then what
10 do you do in terms of removing the person?
11   A   Whatever is necessary to get the
12 person -- if he's committed a crime, it's
13 different. If the person hasn't committed a
14 crime --
15   Q   Right.
16   A   -- and I have no intention of
17 arresting the person, I'll leave him there.
18 Again, it --
19   Q   Let's suppose --
20   A   The circumstance -- the circumstance
21 fits the --
22   Q   Let's assume you have no intention of

Page 67

1 arresting the person, but, for various reasons
2 the person has to be removed. What levels of
3 force could reasonably be used to effect his
4 removal?
5   A   Verbal commands.
6   Q   And if that does not work, what do you
7 do next?
8   A   If he is breaking the law and he
9 refuses to comply with verbal commands, then
10 I'll arrest him.
11   Q   Let's assume --
12   A   And then the force would escalate as
13 necessary after the arrest had been effected.
14   Q   Let's assume that an arrest is not
15 intended or desired. You just want to remove
16 the person. Would using force to lift the
17 person or move the person from where the person
18 is resting be an appropriate use of force?
19   A   If the person had not committed a
20 crime, I wouldn't use any force against the
21 person.
22     If the person were committing a crime

Page 68

1 such as trespass, and I ordered him to leave the
2 premises and he refused, then an arrest would be
3 appropriate, and appropriate force could be
4 applied.
5   Q   Have you ever been in situations where
6 you're dealing with protesters and the plan is
7 simply to remove the protesters who are creating
8 a disturbance and not to arrest them? Have you
9 ever been in that situation before?
10   A   Not personally.
11   Q   Are you aware of such situations?
12   A   Yes.
13   Q   Are you aware of situations in which
14 the police, in the context of a protester that's
15 being disruptive, will use force in the form of
16 simply lifting the person or moving the person
17 from the premises as a way to end the
18 disturbance? Are you familiar with that
19 situation?
20   A   I'm familiar with what you're
21 describing. But that also results in an arrest
22 and a booking.

Page 69

1   Q   Well, it's assault. Let's suppose it
2 didn't. That the desire was simply to remove
3 the person, not to arrest the person.
4   A   That would have been a policy that I'm
5 not familiar with.
6   Q   Is this beyond your personal
7 experience?
8   A   That's correct. I would like to
9 excuse myself for a moment. I need to go to the
10 restroom. Thank you.
11     THE VIDEO OPERATOR: We're going off
12 the record at 10:38.
13     (Recess.)
14     THE VIDEO OPERATOR: We're back on the
15 record at 10:46.
16 BY MR. BUCKLEY:
17   Q   Okay. Let's assume it's a situation
18 where you want to arrest the person and the
19 person is not complying with your verbal
20 command. The person is seated in a chair and
21 will not get up and go with you. What force can
22 you reasonably use to effect compliance with

18 (Pages 66 to 69)

Case 1:06-cv-01625-LFO   Document 47-27   Filed 03/04/2008   Page 7 of 12

March 29, 2007  William Maniaci  Maniaci vs. Georgetown
Washington, D.C.

Page 70

1  your verbal command in that setting?
2   A   Assuming the person is going to be
3  arrested?
4   Q   Yes.
5   A   Then you -- you -- the force escalates
6  as to what -- whatever is necessary to effect
7  that arrest. And I -- like I said before, pain
8  compliance. If this person sitting in a chair,
9  a wrist lock probably would suffice.
10  Q   That is, the person would experience
11  the pain and then would comply --
12  A   Yes.
13  Q   -- with your verbal command?
14  A   That's right.
15  Q   Let's assume that didn't work or for
16  some reason you didn't want to use pain
17  compliance, what can you do to remove the
18  person?
19  A   You can use the physical force
20  necessary to remove the person.
21  Q   What would that consist of?
22  A   Personal contact.

Page 71

1   Q   You mean lifting the person up?
2   A   Yes, sir.
3   Q   Suppose the person just went limp.
4   A   Then you call for additional officers
5  to help you remove the person.
6   Q   You can carry the person out?
7   A   Yes.
8   Q   Okay. When you were a police officer,
9  did you ever use deadly force?
10  A   Yes, sir.
11  Q   How many times?
12  A   Once.
13  Q   When was that?
14  A   Nineteen -- probably '96.
15  Q   What happened?
16  A   The person was killed.
17  Q   Did you shoot the person?
18  A   Yes, I did.
19  Q   What was the situation?
20  A   A man with a gun. Suicide by cop.
21  Where you're put in a position -- that's the
22  terminology. Where you're put in a position

Page 72

1  where you have an armed person who has the
2  ability to take your life and refuses to drop
3  the gun. You're -- you're given hard choices.
4   Q   What happened in this situation?
5   A   This person was shot and killed.
6   Q   Did he refuse to comply with a verbal
7  command?
8   A   That's right.
9   Q   What was the verbal command?
10  A   Drop the gun.
11  Q   What was the name of the person?
12  A   I don't recall.
13  Q   Where was the gun being pointed?
14  A   The gun was like this, with his finger
15  on the trigger and the hammer back.
16  Q   The gun was pointed in the air?
17  A   That's right.
18  Q   It was not pointed at you?
19  A   No.
20  Q   And you fired at the person?
21  A   Yes, I did.
22  Q   Did someone instruct you to do so?

Page 73

1   A   That's right.
2   Q   Who did?
3   A   The chief of police.
4   Q   And you discharged your firearm?
5   A   I did.
6   Q   What firearm was that?
7   A   A Beretta 92 9-millimeter. I shot the
8  person in his ankle with the intent of blowing
9  his ankle out. And it was my intent that that
10  was the amount of force that was necessary under
11  those circumstances.
12  Q   Where did the bullet land?
13  A   It had went in his ankle.
14  Q   Was he killed?
15  A   He was killed by gun fire from other
16  officers.
17  Q   How many other officers were firing?
18  A   I think probably four other officers
19  fired.
20  Q   And how many times was he hit?
21  A   I don't know the exact -- the exact
22  number of wounds that the individual had. I

19 (Pages 70 to 73)

Case 1:06-cv-01625-LFO    Document 47-27    Filed 03/04/2008    Page 8 of 12

March 29, 2007        William Maniaci         Maniaci vs. Georgetown
                      Washington, D.C.

Page 74

1  know he was hit with double-aught buckshot and
2  rounds from handguns.
3     Q   How do you know that your shot hit him
4  in the ankle?
5     A   Because I hit what I shoot at.
6     Q   Aren't you --
7     A   And I saw -- I saw the hit.
8     Q   Aren't you trained to fire at the
9  center of mass?
10    A   Yes.
11    Q   So why didn't you do what you were
12 trained to do; that is, to fire at the center of
13 mass?
14    A   Because, under this particular
15 circumstance, I was unaware that other officers
16 were going to fire. And I thought that I didn't
17 want to kill anybody else. And I didn't think
18 that, under that circumstance, that I would have
19 to kill the person. I thought he -- he could be
20 brought under control with a lesser amount of
21 force.
22    Q   Had the person broken any law?

Page 75

1     A   Yes.
2     Q   What law was that?
3     A   Initial stop was for DUI. And then
4  the person fled the scene. And when the vehicle
5  became immobile, he exited the vehicle with the
6  firearm.
7     Q   Uh-huh. And what was the command he
8  was given that he didn't comply with that
9  resulted in his killing?
10    A   Drop the gun.
11    Q   He didn't drop the gun?
12    A   No, sir.
13    Q   How many times was he told to drop the
14 gun?
15    A   Hundreds, over a period of an hour.
16    Q   How far away from you were you when
17 you -- well, how far away from you was he when
18 you fired your gun?
19    A   A distance probably of 15 feet.
20    Q   Did you feel that your use of deadly
21 force was justified?
22    A   Yes.

Page 76

1     Q   Why?
2     A   He was a danger to myself, other
3  officers and himself.
4     Q   Was there a civil lawsuit filed as a
5  result of his death?
6     A   No. There was not. And it was a
7  coroner's inquest and it was ruled suicide.
8     Q   Were you ever sued because of that
9  incident?
10    A   No, sir.
11    Q   Was any money paid to the decedents'
12 estate or to his parents because of the
13 shooting?
14    A   Not to my knowledge.
15        MR. BUCKLEY: Okay. Let's mark as
16 Exhibit Number 1 a document entitled Plaintiff's
17 Answer to Defendants' First Set of
18 Interrogatories.
19        Let me give you a copy of that.
20        MR. FAY: Sure.
21        MR. BUCKLEY: And give the witness a
22 copy of that document.

Page 77

1        (Maniaci Exhibit No. 1 was marked for
2  identification.)
3        MR. BUCKLEY: All right. Let's mark
4  as Exhibit Number 2 --
5        MR. FAY: Is this the original that I
6  have, or is this just the copy?
7        MS. SHANAHAN: No. There are two
8  marked sets. So that's for you.
9        MR. FAY: Oh, okay. Okay.
10       MR. BUCKLEY: No, we're going to give
11 you a set that's been marked so you don't have
12 to put your own numeric identification on it.
13       I will ask you some questions about
14 Exhibit Number 1. But let me move on, for now,
15 to what I'm going to mark as Exhibit Number 2.
16       (Maniaci Exhibit No. 2 was marked for
17 identification.)
18 BY MR. BUCKLEY:
19    Q   Okay. I'll give you a copy. I'll
20 give your counsel a copy. Let me ask you to
21 look first at what we've marked as Defendants'
22 Exhibit Number 2, which is a document entitled

Case 1:06-cv-01625-LFO   Document 47-27   Filed 03/04/2008   Page 9 of 12

March 29, 2007     William Maniaci     Maniaci vs. Georgetown
Washington, D.C.

Page 78

1  Complaint and Jury Demand in a matter brought by
2  Roxanne Marie Koff.
3      A    Uh-huh.
4      Q    Against a number of individuals,
5  including you, William Maniaci, individually and
6  in your official capacity as police officer.
7      If you look at the document, does this
8  appear to relate to the shooting incident, the
9  homicide that you just described?
10    A    It wasn't a homicide.
11    Q    Okay.
12    A    Yes.
13    Q    What is a homicide?
14    A    A homicide is an unlawful killing.
15    Q    Okay. This was a lawful killing?
16    A    That's correct.
17    Q    So how do you -- what term do you use
18 to describe a lawful killing?
19    A    It was a -- it was necessary and it
20 was deemed necessary by a court of law.
21    Q    Okay. Does this complaint,
22 Exhibit Number 2, relate to the incident that

Page 79

1  you just described?
2     A    Yes, sir. It seems to.
3     Q    Okay. Will you now agree that you
4  were in fact sued as a result of the incident?
5     A    This suit was defended by the city.
6  And I was never a part of this lawsuit. I
7  didn't even remember this as happening.
8     Q    Do you agree the document indicates
9  that you were named as a defendant?
10    A    Yes, I see my name there.
11    Q    Does that refresh your recollection
12 that you were in fact named as a defendant in a
13 lawsuit that was brought as a result of the
14 incident that we have been discussing?
15    A    Apparently so.
16    Q    And the name of the decedent was David
17 Koff.
18    A    Yes.
19    Q    K-O-F-F.
20    A    Yes. I remember that name -- that
21 name.
22    Q    Okay.

Page 80

1     (Maniaci Exhibit No. 3 was marked for
2  identification.)
3  BY MR. BUCKLEY:
4     Q    Okay. Let me hand you know what I
5  have marked as Defendants' Exhibit Number 3.
6  This will speed things up. We'll skip the step
7  of marking that for you and tell you what it is.
8     This is a document that's entitled
9  Report of Investigation. And it's dated in
10 1994. And it relates to the case involving
11 David Koff; is that correct?
12    A    Yes.
13    Q    Have you seen this document before?
14    A    I don't recall ever seeing this
15 document.
16    Q    Okay. Let me now show you what we're
17 going to mark as Defendants' Exhibit Number 4.
18    (Maniaci Exhibit No. 4 was marked for
19 identification.)
20 BY MR. BUCKLEY:
21    Q    And this is a docket sheet from the
22 Koff case. And I just want to direct your

Page 81

1  attention to the third page from the end. It's
2  marked as page 11.
3     You'll see at the bottom of the page,
4  there's an entry for August 11th, 1998 that
5  indicates that the case was settled as a result
6  of the payment of $175,000 made on behalf of the
7  defendants to the plaintiff. Do you see that?
8     A    Yes.
9     Q    Does that refresh your recollection
10 that the defense paid money to the plaintiffs in
11 order to settle the case?
12    A    No. I didn't know -- I had no
13 recollection and no knowledge of this
14 settlement.
15    Q    Okay. Let me turn to another topic,
16 which is the Jewish Defense League.
17    A    Uh-huh.
18    Q    Are you still a member of the Jewish
19 Defense League?
20    A    No.
21    Q    During what years were you a member?
22    A    Probably from around 1992 through

Case 1:06-cv-01625-LFO   Document 47-27   Filed 03/04/2008   Page 10 of 12

March 29, 2007          William Maniaci          Maniaci vs. Georgetown
                        Washington, D.C.

Page 82

1  last -- last summer sometime we officially left
2  the organization.
3     Q   The summer of 2006?
4     A   Uh-huh.
5     Q   Okay. Why did you join the JDL?
6     A   Because Antisemitism was on the rise
7  and rampant and I wanted to do something and do
8  my part, do something proactive against bigotry
9  and Antisemitism.
10    Q   What was the mission of the JDL?
11    A   The -- the JDL didn't have a mission
12 statement at that time. The --
13    Q   Is it --
14    A   -- slogan -- they had a slogan. The
15 slogan was "never again."
16    Q   What did that refer to?
17    A   It refers to the Holocaust.
18    Q   Did the JDL eventually have a mission
19 statement?
20    A   I don't recall a specific mission
21 statement from the Jewish Defense League.
22    Q   What positions did you hold within the

Page 83

1  JDL?
2     A   I was under Irv Rubin. I was their
3  chief of security.
4     Q   What position did Irv Rubin hold?
5     A   He was the chairman. And I was his
6  second in command or deputy chairman.
7     Q   During what period of time?
8     A   From about 1995 through the time that
9  Irv Rubin was incarcerated.
10    Q   What year was that?
11    A   Was it 2002?
12    Q   What were your responsibilities as
13 deputy chairman?
14    A   Mostly publicity. I was decent in
15 writing. Press releases. I would accompany
16 Irv -- Irv lived in Los Angeles. I lived in
17 Reno. We didn't have a whole lot of direct
18 contact. We kept in touch via the telephone.
19       And it was my job to organize, you
20 know, logistics when we were going somewhere and
21 made sure we had the hotel reservations and
22 proper equipment and liaison with agencies that

Page 84

1  we would be in contact with.
2     Q   You said you were deputy chairman and
3  you were also chief of security.
4     A   Right. That was just a title. This
5  was no security to perform.
6     Q   I'm sorry.
7     A   There was no security necessary. It's
8  just a title that he gave me.
9     Q   Okay. Was that the complete title or
10 was it longer?
11    A   Yeah.
12    Q   Chief of security?
13    A   Yeah.
14    Q   Okay. Did you receive any
15 compensation --
16    A   None.
17    Q   -- for your services -- again, let me
18 finish the question.
19       Did you receive any compensation for
20 your services as deputy chairman or chief of
21 security?
22    A   No.

Page 85

1     Q   Did the JDL have any offices?
2     A   No.
3     Q   Did you ever become chairman of the
4  JDL?
5     A   Yes.
6     Q   When was that?
7     A   When Irv Rubin was incarcerated, I
8  took over as acting chairman.
9     Q   How long did you serve as chairman or
10 acting chairman, I should say?
11    A   Approximately 2 years.
12    Q   And when did you cease being acting
13 chairman?
14    A   I stepped down when we had a
15 leadership conference. And because I wanted to
16 spend more time with my family. I was retired.
17 And for health reasons. And that's when Matt
18 Finberg took over as chairman.
19    Q   What year was that?
20    A   About 3 years ago. I think. Yeah,
21 about 3 -- 3 years ago. Two or 3 years.
22    Q   2004, approximately?

22 (Pages 82 to 85)

Case 1:06-cv-01625-LFO   Document 47-27   Filed 03/04/2008   Page 11 of 12

March 29, 2007     William Maniaci     Maniaci vs. Georgetown
Washington, D.C.

Page 86

```
 1    A    Approximately, yeah.  I think.
 2    Q    Were you always acting chairman or did
 3  you ever become just chairman?
 4    A    Well, when Irv Rubin died, I was the
 5  chairman and retained that position until the
 6  conference that we had.  And I stepped aside and
 7  we elected Matt Finberg.
 8    Q    Where was the conference held?
 9    A    At -- in Reno, Nevada, at the Atlantis
10  Hotel.
11    Q    And after you stepped down as
12  chairman, did you continue as chief of security?
13    A    Yes.
14    Q    And did you assume any other position,
15  such as deputy chairman or any other title?
16    A    No.  No.  I was chief of security.
17  The -- was slash -- security/intelligence.  And
18  that involved keeping track of various nefarious
19  groups, Nazi groups, neo-Nazis, anti-Semitic
20  activities, and funneling that information to
21  the proper -- proper sources.
22    Q    When did you resign from the JDL?
```

Page 87

```
 1    A    We left en mass as a result of the
 2  conference that we had in Reno, the same
 3  conference that Matt Finberg was elected
 4  chairman.  We left en mass after that.
 5         Let me digress for a second.  If
 6  you're interested in the history of the JDL, I
 7  would be glad to tell you why there was a break
 8  between the JDL and the present organization.
 9    Q    Okay.  I'm going to ask you that
10  question.  But I would just like to get the
11  sequence of events down first.
12         You said that you ceased being
13  chairman of JDL in approximately 2004?
14    A    That's right.
15    Q    And that Mr. Finberg succeeded you --
16    A    That's right.
17    Q    -- in that position?
18    A    That's right.
19    Q    And this was as a result of a
20  conference that was held in Reno, Nevada, at the
21  time?
22    A    That's right.
```

Page 88

```
 1    Q    But something else happened in 2006
 2  that caused you to leave the organization; is
 3  that right?
 4    A    Not -- not -- the phraseology is not
 5  correct.
 6    Q    Okay.  Did you leave en mass in 2004?
 7    A    It was final -- the break with the
 8  Jewish Defense League was final about a year
 9  ago.  And it was because we -- we couldn't
10  accept the actions of Mr. Rubin and Mr. Krugel
11  and the publicity that that generated and the
12  bad press that the Jewish Defense League
13  received as a result of Mr. Krugel and
14  Mr. Rubin's actions.
15    Q    How long had you known Mr. Rubin?
16    A    Since 1992.
17    Q    Since 1992.  Did he sort of recruit
18  you into the JDL?
19    A    We -- sort of.  In fact, I called
20  them.  I called them on the telephone and asked
21  them if there was a position for someone like
22  myself.  And I said -- they said, why?  And I
```

Page 89

```
 1  said I would like to -- I would like to get
 2  involved and fight bigotry and Antisemitism and
 3  do it in whatever way I can that's within the
 4  law.
 5         And Mr. Rubin was very receptive.  We
 6  became friends, long-distance friends.  He
 7  visited me a couple of times in Reno, stayed at
 8  my home.
 9         We traveled to Coeur d'Alene, Idaho on
10  a couple of occasions, where we actively
11  confronted the Aryan Nations.
12    Q    Were you an admirer of Mr. Rubin?
13    A    I was a friend of Mr. Rubin's, not an
14  admirer, no.
15    Q    But you were a good friend of his.
16    A    I was a friend.  As close as you can
17  be at a distance.  We had a working
18  relationship.
19    Q    How frequently did you communicate
20  with him when say he was the chairman and you
21  were the deputy chairman?
22    A    Several times a week.  We would talk
```

Case 1:06-cv-01625-LFO   Document 47-27   Filed 03/04/2008   Page 12 of 12

March 29, 2007     William Maniaci     Maniaci vs. Georgetown
Washington, D.C.

Page 90

1 on the phone about things that were happening in
2 the communities across the country. We talked
3 about things that were going on in Israel.
4    Q   How often did you see him?
5    A   Sporadically. As the needs arose, as
6 I had time, we would get together. Like, for
7 example, if we went to Idaho.
8    Q   Did you socialize with him?
9    A   No.
10    Q   So when you would meet, it would be
11 always be related to business or activities of
12 JDL?
13    A   That's right.
14    Q   Who is Mr. Krugel?
15    A   Mr. Krugel is a person that I had only
16 met on one occasion. And he was described as
17 having a close relationship to Mr. Rubin. He
18 had been with the JDL for a number of years.
19 But that was down in Los Angeles. So I had no
20 contact with him.
21    Q   Did he hold a position within JDL, a
22 title?

Page 91

1    A   According to the press he did. And
2 according to what I knew he never had a
3 position.
4    Q   Are you aware that in December of 2001
5 Mr. Rubin and Mr. Krugel were arrested by the
6 federal government on charges of conspiring to
7 blow up the King Fahd Mosque in Los Angeles, as
8 well as the office of an Arab-American
9 Congressman, Darrell Issa?
10    A   Yes. I'm aware of that.
11    Q   Were you ever interviewed by any law
12 enforcement officials in connection with the
13 charges against Mr. Rubin and Mr. Krugel?
14    A   No.
15    Q   No?
16    A   No. Not to my recollection. I -- no.
17 There was never any official interview that I
18 can recall.
19    Q   Do you agree that blowing up a mosque
20 would be a terrorist act?
21    A   Absolutely.
22    Q   Do you agree that blowing up the

Page 92

1 office of an Arab-American Congressman would be
2 a terrorist act?
3    A   Yes, I do.
4      MR. FAY: Republican or democrat?
5 Scratch that.
6      MR. BUCKLEY: I don't think it's a
7 laughing matter.
8      MR. FAY: No.
9 BY MR. BUCKLEY:
10    Q   Mr. Krugel eventually plead guilty to
11 the charges?
12    A   That's what the newspaper said.
13    Q   And he was later murdered in prison.
14    A   That's right.
15    Q   Do you know how that came about, who
16 killed him?
17    A   I -- after he was murdered, I think it
18 was in Phoenix, Arizona, I wrote the US
19 Department of Prisons, under the, what is it,
20 Freedom of Information Act, requesting, you
21 know, information about the incident.
22      I received a letter back from them

Page 93

1 saying that the request was denied. That the
2 matter was still under investigation.
3      Subsequent to that, the investigation
4 I think now has been closed. It was discovered
5 that he was murdered while in the prison yard.
6 He was hit in the back of the head with a
7 concrete block which crushed his skull. And the
8 perpetrator was a white supremacist.
9    Q   Now, Mr. Rubin died in jail before he
10 went to trial on the charges; is that correct?
11    A   Yes, sir. No, he didn't die in jail.
12 He died in the hospital.
13    Q   He died in the hospital. Was it a --
14 was he free? That is to say, he died in a
15 hospital. Wasn't he incarcerated after he was
16 arrested?
17    A   Yes, he was. But he was hospitalized.
18 It wasn't in a prison. After the incident in
19 the Los Angeles County Jail, I think it was.
20 I'm not sure. I wasn't there. But I was told
21 by his wife what had happened.
22    Q   What were you told?