**Deposition of Todd Olson**

**Plaintiff's Opposition to Summary Judgment**

**EXHIBIT #21**

1  work during my master's degree.  I worked at my first

2  professional position at the University of Denver

3  beginning in 1986.  I worked at that institution for

4  16 years at nine different job titles, all in the

5  student affairs area.  I'm not sure if you want all of

6  that detail.

7         But then in 2002, moved to Georgetown

8  University.  The first year here was in the role of

9  associate vice president for student affairs.  After

10  that, I was asked to move into the role of vice

11  president of student affairs beginning in 2003.

12     Q     Perhaps you should describe what vice

13  president for student affairs, what that term means.

14  In our more liberal society, I'm sure there are a lot

15  of jokes made about student affairs, but what is --

16  what is entailed?

17     A     Student affairs at Georgetown, as at most

18  other universities, is a rather broad area that

19  encompasses a lot of student life, student activities

20  and services for students in their life outside the

21  classroom.

22         So at Georgetown, it involves management

c61d9d30-bc6f-4ef9-afed-0df7df1e92de

1      A     I was.

2      Q     Okay.  And in your capacity, I take it, as

3   an official of the university?

4      A     In my capacity as an administrator, uh-huh.

5      Q     Was -- would that be a normal occurrence,

6   for you to be present at something like this where

7   there was an activity where there's going to be

8   discussion of some issues?  I'm sure you weren't

9   present at every softball game or something.

10     A     Right.

11     Q     Things like of this sort.

12     A     Yeah.  I'm frequently present at events of

13  this sort.

14     Q     Now, let me -- let me hand you what has --

15  what was marked George Taylor Exhibit Number 3 and I

16  marked also as Todd Olson Exhibit Number 3, which is,

17  I believe, a photograph.

18     A     Uh-huh.

19     Q     It's not the clearest photograph --

20     A     Uh-huh.

21     Q     -- but looking at you and looking at the

22  photograph, I would -- my guesstimate would be that

c61d9d30-bc6f-4ef9-afed-0df7df1e92de

Page 23

1   you were the person standing up speaking; is that

2   correct?

3        A      I was the person -- yeah, I had the

4   microphone.  I was on stage at that point.

5        Q      Okay.  When -- did -- were you acting when

6   you are speaking there as the moderator of this or

7   were you simply giving a welcome to Georgetown or what

8   was your capacity then?

9        A      In this session, I was serving as the

10  moderator for purposes of managing our speech and

11  expression policy.

12       Q      Okay.  There are, I think, three -- three

13  or four students -- three, I think -- seated there at

14  the table.

15       A      Uh-huh.

16       Q      Do you know those students --

17       A      These are not --

18       Q      -- or are they students?

19       A      -- students.  They were -- they were

20  invited --

21       Q      Ah, okay.

22       A      -- speakers for the conference.

Misty Klapper & Associates
703-780-9559

c61d9d30-bc6f-4ef9-afed-0df7df1e92de

Page 39

1    I can't -- I can't get them to play on the thing, so

2    we'll talk about that when this thing's over.

3            BY MR. FAY:

4        Q    After Mr. Maniaci went back to his seat and

5    then you said that the person started answering and

6    he -- he said something else but you don't recall the

7    words, how -- how long did he speak during this --

8    Mr. Maniaci speak during this period when you say you

9    don't recall what he said?

10       A    I would -- again, don't have specific

11   memory.  I would say it went on for -- for -- between

12   one-and-a-half and two minutes, roughly.  But again, I

13   have no formal way of timing that.

14       Q    Okay.  Did you observe Mr. Maniaci at any

15   time act in any way that was unlawful?

16       A    No, I did not.

17       Q    Did you observe him at any time act in a

18   manner that endangered anybody?

19       A    Not that I remember, no.

20       Q    Did Mr. Maniaci at any point, to the best

21   of your recollection, threaten anybody?

22       A    No.

c61d9d30-bc6f-4ef9-afed-0df7df1e92de

Page 40

1      Q      And you've indicated there wasn't any

2   other -- there isn't any definition of disruption or

3   obstruction in any of the standard operating

4   procedures or general policy statements of Georgetown;

5   is that correct?

6      A      That's correct.

7      Q      Was there any request to you by the person

8   who was on the panel speaking or anyone else who was

9   on that panel to have Mr. Maniaci removed?

10     A      No.

11     Q      And you were acting in your capacity as an

12  official of Georgetown at the point where you ordered

13  the Georgetown security to remove him?

14     A      Yes.

15     Q      When they went to remove him, what do you

16  remember seeing?

17     A      I remember that there were two officers who

18  approached him.  I could not hear -- as I was some

19  distance away, I could not hear exactly what they

20  said, but they spoke to him for a moment.

21            After that, I was -- was looking around the

22  auditorium.  I just saw that there was -- it seemed to

c61d9d30-bc6f-4ef9-afed-0df7df1e92de

Page 42

1    which to make that kind of judgment.  I mean, I don't

2    know.

3        Q    Okay.  After this was over, did you have

4    conversations at any time with any of -- anyone else,

5    whether they were a participant of the thing,

6    officially university, whatever, about what happened

7    with Mr. Maniaci?

8            MR. JONES:  I'm going to object to the

9    extent that that question calls for privileged

10   communications with counsel.

11           But other than discussions that you've had

12   with attorneys, you can answer that question.

13           BY MR. FAY:

14       Q    Yeah.  I'm excluding speaking to the people

15   here at Williams & Connolly.

16       A    After the session, I spoke with Mr. Morrell

17   outside of Gaston Hall, and we just spoke with one

18   another about the fact that we had made -- as we made

19   a decision to remove Mr. Maniaci, that we would, you

20   know, let him know that he was not welcome to attend

21   other sessions at this conference.

22       Q    Okay.  Did you -- when you say you would

c61d9d30-bc6f-4ef9-afed-0df7df1e92de

Page 43

1    let him know, did you then speak to him or did -- to

2    the best of your knowledge, did Mr. Morrell speak to

3    him?

4        A    To the best of my knowledge, Mr. Morrell

5    spoke with him.

6        Q    Okay.  After -- when Mr. Morrell spoke to

7    him, did Mr. Morrell say anything to you about any

8    injuries he observed on Mr. Maniaci?

9        A    No.

10       Q    Did he indicate in any way that Mr. Maniaci

11   said anything to him when he spoke to Mr. Maniaci?

12       A    No.

13       Q    I take it you've not at any time had any

14   further conversation with Mr. Maniaci?

15       A    That's correct.

16            Let me clarify that.  I did have -- at the

17   InterCultural Center that day, later that day, I did

18   have a brief conversation with Mr. Maniaci.  But after

19   that, I did not have a further conversation.

20       Q    Okay.  Could you tell me what took place in

21   that conversation, what he said, what you said?

22       A    I just remember that he wanted to come back

c61d9d30-bc6f-4ef9-afed-0df7df1e92de