IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

)
WILLIAM MANIACI             )     Docket No. 06 CV 01625
)
          Plaintiff,         )     Judge Kollar-Kotelly
)
          v.               )     **Oral Argument Requested**
)
GEORGETOWN UNIVERSITY, et al.   )
)
        Defendants.      )
_____)


**REPLY MEMORANDUM IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

John J. Buckley, Jr., D.C. Bar No. 925081
Malachi B. Jones, D.C. Bar No. 455555
Richa S. Dasgupta, D.C. Bar No. 500509
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
jbuckley@wc.com
(202) 434-5051
(202) 434-5058 (fax)

*Of Counsel:*
Jane E. Genster, D.C. Bar No. 939850
Vice President and General Counsel
Georgetown University
37th & O Streets, N.W.
Washington, D.C. 20057
(202) 687-6500
(202) 687-6527 (fax)

March 18, 2008

*Attorneys for Defendants Georgetown
University, David F. Morrell, Darryl K.
Harrison, Todd Olson, Roy Eddy and
Larry Salley*

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Austin v. Paramount Parks, Inc.*, 195 F.3d 715 (4th Cir. 1999) ...................................22

*Bar-Navon v. School Board of Brevard County*, No. 6:06-cv-1434, 2007 WL 3284322 (M.D. Fla. Nov. 5, 2007) ......................................................................................10

*Burke v. North Dakota Deparment of Corrections & Rehabilitation*, 294 F.3d 1043 (8th Cir. 2002) ...........................................................................................................22

*Canady v. Bossier Parish School Board*, 240 F.3d 437 (5th Cir. 2001).......................10

*Canton v. Harris*, 489 U.S. 378 (1989)..........................................................................21

*Cooper v. First Government Mortgage & Investors Corp.*, 238 F. Supp. 2d 50 (D.D.C. 2002) ...................................................................................................................13

*DeVargas v. Mason & Hanger-Silas Mason Co.*, 844 F.2d 714 (10th Cir. 1988)........22

*Evans v. Newton*, 382 U.S. 296 (1966) .............................................................................7

*Harvey v. Harvey*, 949 F.2d 1127 (11th Cir. 1992) .......................................................22

*Hinman v. Lincoln Towing Service, Inc.*, 771 F.2d 189 (7th Cir. 1985)...........................7

*Hudgens v. National Labor Relations Board*, 424 U.S. 507 (1976)............................5, 6

*Hutchison v. Brookshire Bros., Ltd.*, 284 F. Supp.2d 459 (E.D. Tex 2003) .................22

*Jackson v. Ill. Medi-Car, Inc.*, 300 F.3d 760 (7th Cir. 2002) .......................................22

*Lloyd Corp. v. Tanner*, 407 U.S. 551 (1972) ..............................................................5, 6

*Martin v. Malhoyt,* 830 F.2d 237 (D.C. Cir. 1987)........................................................19

*McClelland v. Facteau*, 610 F.2d 693 (10th Cir. 1979).................................................21

*Morse v. Frederick*, 127 S. Ct. 2618 (2007) .................................................................10

*National Organization for Women v. Operation Rescue*, 37 F.3d 646 (D.C. Cir. 1994) ...........5, 6

*Norse v. City of Santa Cruz*, No. C 02-01479, 2007 WL 951854 (N.D. Cal. Mar. 28, 2007) ...................................................................................................................20

*Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986)....................................................22

*Pounds v. Katy Independant School District*, 517 F. Supp. 2d 901 (S.D. Tex. 2007)...................10

*Robinson v. District of Columbia*, Nos. 03-1455, 1456, 2006 WL 2714913 (D.D.C. Sept. 22, 2006) ...............................................................................................................................19

*Rojas v. Alexander's Department Store, Inc.*, 924 F.2d 406 (2d Cir. 1990).................................22

*Scott v. District of Columbia,* 101 F.3d 748 (D.C. Cir. 1996) .......................................................19

*Scott v. Harris*, 127 S. Ct. 1769 (2007) ........................................................................................18

*Slusher v. Samu*, No. 04-cv-02187, 2006 WL 3371636 (D. Colo. Nov. 21, 2006) .......................21

*Smith v. Wade*, 461 U.S. 30 (1983)................................................................................................25

*St. Louis v. Praprotnik*, 485 U.S. 112 (1988) ...............................................................................22

*Steele v. District of Columbia*, No. Civ. A 02–1240, 2006 WL 335770 (D.D.C. Feb. 14, 2006) ...........................................................................................................................................19

*Stokes v. Northwestern Memorial Hospital*, No. 89 C 2352, 1989 WL 84584 (N.D. Ill. July 24, 1989)...........................................................................................................................7, 8

*Tesoro v. Zavaras*, 46 F. Supp. 2d 1118 (D. Colo. 1999)............................................................21

*Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969) ................10

*Young v. Prince George's County*, 355 F.3d 751 (4th Cir. 2004) .................................................12

## STATE CASES

*Brown v. Argenbright Sec. Inc.*, 782 A.2d 752 (D.C. 2001)..........................................................24

*Gay Rights Coalition of Georgetown University Law Center v. Georgetown University*, 536 A.2d 1 (D.C. 1987) ....................................................................................................6, 7, 20

*In re E.A.H.*, 612 A.2d 836 (D.C. 1992) .......................................................................................12

*Jonathan Woodner Co v. Breeden*, 665 A.2d 929 (D.C. 1995) ....................................................25

*Kotsch v. Dist. of Columbia*, 924 A.2d 1040 (D.C. 2007) ............................................................14

*Limpuangthip v. United States*, 932 A.2d 1137 (D.C. 2007)..................................................13, 20

*Person v. Children's Hosp. Nat'l Med. Ctr.*, 562 A.2d 648 (D.C. 1989) ................................23, 24

*Safeway Stores, Inc. v. Kelly*, 448 A.2d 856 (D.C. 1982)............................................................20

**STATUTES**

42 U.S.C. § 1983.................................................................................................. passim

**OTHER AUTHORITIES**

Restatement (Second) of Torts (1965).........................................................................23

*Webster's II New College Dictionary* 335 (3d ed. 2005)..................................................9

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................... 1

I.      Plaintiff Had No First Amendment Right To Disrupt the PSM Conference ..................... 4

    A.      Plaintiff Had No First Amendment Right to Free Expression on
    Georgetown's Private Property ............................................................................ 4

    B.      Georgetown Enforced Reasonable Time, Place, and Manner
    Restrictions ......................................................................................................... 7

II.     Georgetown's Safety Officers Did Not Act Under Color of Law. .................................. 11

    A.      Georgetown's Safety Officers Did Not Arrest Plaintiff ...................................... 11

    B.      The Safety Officers Performed a Private Function In Enforcing
    Georgetown's Private Policies ............................................................................ 13

III.    The Safety Officers Had Probable Cause to Arrest Plaintiff and Used
    Reasonable Force In Excluding Him From Gaston Hall and the ICC ............................. 14

    A.      The Safety Officers Had Probable Cause to Arrest Plaintiff ............................... 14

    B.      The Safety Officers Used Reasonable Force ....................................................... 15

        1.      Gaston Hall Incident ............................................................................... 15

        2.      ICC Incident ........................................................................................... 19

IV.     The Safety Officers Are Entitled to Qualified Immunity ............................................... 19

V.      Plaintiff Fails To Demonstrate Any Basis for the Administrator Defendants'
    Liability Pursuant to Section 1983 Claim (Count III) .................................................... 20

VI.     Plaintiff Fails To Demonstrate Any Basis for Georgetown's Liability Pursuant
    to Section 1983 (Count III) ........................................................................................... 22

VII.    Defendants Are Entitled to Summary Judgment on Plaintiff's Assault and
    Battery Claim in Count I ............................................................................................... 23

VIII.   Defendants Are Entitled to Summary Judgment on Plaintiff's False Arrest
    Claim in Count II .......................................................................................................... 24

IX.     Plaintiff Fails To Demonstrate Any Basis for Punitive Damages (Count IV) ................. 25

## <u>INTRODUCTION</u>

In light of the conclusive video recordings made from two separate vantage points and the eyewitness testimony of his own JDL colleagues refuting his version of the events, Plaintiff plainly realized that he faced an insurmountable burden in responding to Defendants' Motion for Summary Judgment. His desperation is apparent in his submission of an opposition replete with misrepresentations of the factual record, unsubstantiated factual assertions, mischaracterizations of the holdings of legal precedent, and even a baseless accusation that Defendants' submitted doctored video evidence. Plaintiff's unsupported denials and deplorable diversionary tactics fail to create any genuine issue as to the material facts relevant to his claims. Defendants set forth below seven key facts as to which there remains no genuine dispute.

First, Plaintiff did interrupt and disrupt the Palestine Solidarity Movement ("PSM") Conference in violation of Georgetown University's ("Georgetown" or the "University") Free Speech and Expression Policy and the guidelines enunciated by Vice President for Student Affairs, Todd Olson. The uncontroverted record evidence demonstrates that after his question was answered, Plaintiff shouted and interjected no less than <u>eight</u> times and ignored no less than <u>five</u> requests by Mr. Olson and moderator Will Youmans to desist so that the question-and-answer session could continue and others in line could have an opportunity to ask their questions. *See* Def. Reply to Pl. Statement of Genuine Issues Setting Forth All Material Facts In Opp'n to Def. Statement of Facts Not In Dispute ("Def. Reply Facts") ¶¶ 86-116; Def. Response to Pl. Statement of Material Facts As to Which There Is No Genuine Issue ("Def. Response Facts") ¶¶ U-Z. Plaintiff has conceded as much in his opposition brief. *See* Pl. Mem. in Opp'n to Def. Motion for Summ. J. ("Pl. Opp'n") at 13 (conceding that "William Maniaci **did interrupt** the question and answer period") (emphasis added).

Second, Plaintiff's description of his removal from Gaston Hall is thoroughly refuted by video recordings taken from two different angles. *See* Def. Reply Facts ¶¶ 118–138; Def. Response Facts ¶¶ BB–II. Plaintiff was not, as he asserts, "violently jerked" from this seat, "thrown on the aisle floor," dragged down the aisle with his limbs and head bumping into objects, thrown through the doors into the hallway, and thrown onto the floor. *See, e.g.*, Pl. Opp'n at 10. To the contrary, the video recordings show that Safety Officers Roy Eddy and Larry Salley carefully lifted Plaintiff up out of his seat by gripping him under his armpits and carried him into the aisle. *See* Def. Reply Facts ¶¶ 118–122, 125–26; Def. Response Facts ¶ CC-II. Plaintiff did not hit the floor and did not bump against anything as he was carried out of the auditorium. *See* Def. Reply Facts ¶¶ 134-38; Def. Response Facts ¶ FF-GG. Furthermore, the video recordings confirm that the auditorium doors were held open while Safety Officers Eddy and Salley carefully carried Plaintiff into the foyer outside and placed him on the floor. *See* Def. Reply Facts ¶¶130-31; Def. Response Facts ¶ GG.

Third, the Safety Officers did not knee or kick Plaintiff in the course of carrying him out of Gaston Hall. The testimony of Robert Turk, a fellow Jewish Defense League ("JDL") member and Plaintiff's best friend, fails to create any genuine dispute as to this fact. Mr. Turk's testimony that the officers "kicked" Plaintiff in "the side of the chest" as he lay "on his back on the ground" in the area "between the seats" is demonstrably false (indeed, perjurious) as shown by the video recordings which depict the incident from two different angles. Def. Reply Facts ¶¶ 126; 136–37; Def. Response Facts ¶¶ CC-II. Moreover, the video evidence clearly shows that Mr. Turk was in the front of the room, separated from Plaintiff by at least three rows of seats, at the moment when he asserts that Plaintiff was kicked. *See* Def. Reply Facts ¶ 126; Def. Response Facts ¶ EE. Furthermore, JDL member Keith Bailey and JDL Chairman Matthew Finberg (who were much closer to the Plaintiff), and Metropolitan Police Department ("MPD")

Lieutenant Michael Smith (another JDL sympathizer) all testified that the officers did not kick or knee Plaintiff.  *See* Def. Reply Facts ¶¶ 126; 136–37; Def. Response Facts ¶ EE.

Fourth, Plaintiff refused to leave Gaston Hall on his own despite having had ample opportunity to cooperate with Defendants' requests.  Plaintiff's self-serving denial that he was asked to leave is thoroughly discredited by irrefutable videotape evidence corroborated by sworn testimony.  The precise order of events is set forth in greater detail in Defendants' statements of facts.  *See* Def. Reply Facts ¶¶ 116–122, 125–28; Def. Response Facts ¶¶ BB–HH. Plaintiff was advised by Mr. Olson that he would be "escort[ed] from the room" in light of the fact that he was creating a significant disturbance and in addition, was thereafter requested to leave by Safety Officer Eddy.  Rather than cooperate, Plaintiff remained seated, continued to shout, and resisted the Safety Officers' attempts to first escort, and then to carry him out of the auditorium.  *See* Def Reply Facts ¶¶ 118–122, 125–139; Def. Response Facts ¶¶ BB–HH.

Fifth, there is insufficient evidence to allow a jury to find that Plaintiff was pushed against a window or wall or restrained from leaving the ICC entrance.  *See* Def. Reply Facts ¶¶ 150–56; Def. Response Facts ¶ MM.  Indeed, three of Plaintiff's JDL colleagues and/or sympathizers, JDL Chairman Matthew Finberg, Lt. Michael Smith, and Jim Nutting, who witnessed the events testified to the contrary.  Chairman Finberg testified that Plaintiff was treated "very civilly" at the ICC.  Def. Reply Facts ¶ 153; Def. Response Facts ¶ MM.  Similarly, Lt. Smith testified Plaintiff "leaned up against the wall with his back up against the wall and was just standing there"; no officer pushed him.  Def. Reply Facts ¶ 154; Def. Response Facts ¶ MM. Mr. Nutting also testified that he did not see any safety officers "grabbing" or "pushing" Plaintiff at the ICC.  Def. Reply Facts ¶ 155; Def. Response Facts ¶ MM.

Sixth, Georgetown administrators, including Darryl Harrison, asked Plaintiff to leave the Conference and told him that he would not be permitted inside the ICC.  *See* Def.

Reply Facts ¶¶ 144, 149–50; Def. Response Facts ¶ II; Pl. Compl. at ¶ 5 ("University official approached him and told him to leave").  Plaintiff ignored Mr. Harrison and proceeded to the ICC where he insisted that he be permitted to enter, leaving only when MPD Sergeant Sam DeLisi intervened.  *See* Def. Reply Facts ¶¶ 156–58; Def. Response Facts ¶ II-KK.

Seventh and finally, there is no medical evidence in the record that Plaintiff suffered any injury as a result of being carried out of Gaston Hall.  The uncontradicted evidence is that Plaintiff, who suffered from a long list of pre-existing medical conditions including a prior mini-stroke, *see* Pl. Opp'n at 5, was never diagnosed with or treated for contusions to the right abdomen, right upper arm, right wrist, and abrasions to the legs, *see* Def. Reply Facts ¶ 141; Def. Response Facts ¶¶ JJ, PP.  Moreover, Plaintiff's physical examination at Walter Reed revealed no head injuries, no back tenderness, no ankle pain, and no bruising.  *See* Def. Reply Facts ¶ 141; Def. Response Facts ¶¶ JJ, PP.  Plaintiff sought no medical attention after he left the Georgetown Campus on Saturday, February 18, 2006.  *See* Pl. Statement of Genuine Issues Setting Forth All Material Facts In Opp'n to Def. Statement of Material Facts Not in Dispute ("Pl. Response Facts") ¶¶ 146, 161 (that evening Plaintiff went out for a hamburger and beer).  He went to Walter Reed on the evening of Sunday February 19, 2006, the day **after** he attended the PSM Conference, and only after he fell in the street and later experienced symptoms similar to those he had experienced during a prior mini-stroke.  *See id.* ¶ 166.

## ARGUMENT

## I.    Plaintiff Had No First Amendment Right To Disrupt the PSM Conference

### A.    Plaintiff Had No First Amendment Right to Free Expression on Georgetown's Private Property

The essence of Plaintiff's First Amendment claim is that Georgetown "sold" him a license to disrupt the PSM Conference and that the University ought to be required to "provide what it sold him."  Pl. Opp'n at 16.  Plaintiff's pseudo-contract theory of the First Amendment is

without merit.  Even if Plaintiff's payment of a nominal $10.00 registration fee to the SJP (the student group, not the University) could have created a contract between Plaintiff and Georgetown (which it did not),[1] his First Amendment claim against Georgetown would still fail.

Indeed, Plaintiff concedes that ordinarily there is no First Amendment right to picket or protest on private property.  Furthermore, he does not contend that Georgetown's campus was a public forum.  *See* Pl. Opp'n at 16, 20-21.  Nevertheless, Plaintiff suggests that the precedents found in *Hudgens v. Nat'l Labor Relations Bd.*, 424 U.S. 507 (1976), *Lloyd Corp. v. Tanner*, 407 U.S. 551 (1972), and *National Organization for Women v. Operation Rescue*, 37 F.3d 646 (D.C. Cir. 1994), "do not apply to this situation, in that the conference being held at Georgetown was 'open to the public' and Maniaci was allowed to protest and enter the premises."  Pl. Opp'n at 20.  To the contrary, *Hudgens*, *Lloyd*, and *Operation Rescue* are directly on point as all three decisions address the very limited circumstances under which the First Amendment may apply to expression on private property.  Moreover, all three decisions reinforce Defendants' position that Plaintiff had no First Amendment right on Georgetown's private property.

In *Lloyd*, the Supreme Court addressed the question of whether a privately-owned shopping mall could bar the distribution of anti-war handbills on its property.  The Court concluded that the plaintiffs had no First Amendment right to distribute handbills in the privately-owned mall.  *See Lloyd*, 407 U.S. at 570.  In so deciding, the Court noted that the invitation for public use of the shopping mall was not "open ended" or for "any and all

---

[1] Plaintiff concedes that he paid his registration fee to SJP and not Georgetown.  *See* Pl. Response Facts ¶ 73.  Nevertheless, he contends that because SJP was required to pay a nominal clean up or rental fee to Georgetown for the use of its facilities, that his registration fee created a contract between Plaintiff and Georgetown.  *See id.* (after collecting the fee, "the students group then pays Georgetown").  Plaintiff's theory has no merit.  And in any event, Plaintiff has not pleaded, nor has he proven, any of the other elements of valid contract claim.  Obviously, a common law contract claim would not give rise to a claim under 42 U.S.C. § 1983.

purposes." *Id.* at 565–66.  In addition, the Court emphasized the fact that there were adequate alternative means of communication because there were public areas directly outside the mall that were available for distribution of handbills.  *See id.*  The present case is light years away from *Lloyd* because, to begin with, Georgetown is not a shopping mall.  It is a not-for-profit private university and it does not invite the public onto its grounds and buildings for the purpose of selling them commercial goods or services.  In any event, the uncontradicted record shows that Georgetown did not invite the public to use Georgetown's campus for "any and all purposes." [2]  Moreover, Georgetown set aside ample demonstration areas on its own private property where opponents of the Conference could safely express their views.  *See* Def. Reply Facts ¶¶ 31, 61, 74-75.  In *Hudgens*, the Supreme Court reinforced *Lloyd*'s holding by finding that union members had no First Amendment right to enter a privately-owned shopping center in order to protest their employer.  *Hudgens*, 424 U.S. 521–22 ("[T]he constitutional guarantee of free expression has no part to play in a case such as this.").  Similarly, the District of Columbia Circuit's decision in *Operation Rescue* also emphasized *Lloyd's* holding, observing that there is no "First Amendment right to trespass on private property."  37 F.3d at 655.

Also on point is *Gay Rights Coalition of Georgetown University Law Center v. Georgetown University*, 536 A.2d 1 (D.C. 1987), which Plaintiff unsuccessfully tries to distinguish.  Defendants agree with Plaintiff's observation, *see* Pl. Opp'n at 21, that in *Gay Rights Coalition*, the District of Columbia Court of Appeals indicated *not only* that, as a private university, Georgetown is not subject to the First Amendment's prohibition on content-based restrictions on speech, but *also* held that the University has an independent First Amendment

---

[2] Participation in the PSM Conference was at all times conditioned on compliance with Georgetown's Free Speech and Expression Policy which he admits he was aware of, and agrees was reasonable.  *See* Pl. Opp'n at 16; Pl. Response Facts ¶ 91; Def. Response Facts ¶ A.

right to withhold official recognition from student groups whose purpose and activities are inconsistent with the University's Jesuit affiliation. *See Gay Rights Coal.*, 536 A.2d at 26. Thus, the District of Columbia Court of Appeals' holding supports Georgetown, not the Plaintiff.

Finally, none of the cases that Plaintiff relies on, *Stokes v. Northwestern Memorial Hospital*, No. 89 C 2352, 1989 WL 84584 (N.D. Ill. July 24, 1989), *Evans v. Newton*, 382 U.S. 296, 299 (1966), or *Hinman v. Lincoln Towing Service, Inc.*, 771 F.2d 189, 193 (7th Cir. 1985), aids his claim. Not one of these decisions addresses the First Amendment, much less the limited application of the First Amendment on private property. As a result, these decisions, which also are distinguishable on their facts, add nothing to the First Amendment analysis.[3]

### B.    Georgetown Enforced Reasonable Time, Place, and Manner Restrictions

Plaintiff concedes, as he must, that Georgetown was entitled to enforce reasonable time, place, and manner restrictions with respect to the conduct of participants at the PSM Conference and that the guidelines enunciated by Todd Olson at that outset of the Divestment Panel were appropriate restrictions. *See* Pl. Opp'n at 22–23; Pl. Response Facts ¶ 91. Plaintiff also concedes that he "read [and] understood" Georgetown's Speech and Expression policy prior to attending the PSM Conference. Pl. Opp'n at 16. Plaintiff even concedes that he "**did**

---

[3] First, in *Evans*, the City of Macon transferred title to a publicly maintained park to private trustees for the purpose of permitting racial segregation in the park. *See Evans*, 382 U.S. at 296–97. The Supreme Court held that the transfer of title did not divest the park of its municipal character and the Fourteenth Amendment would continue to apply. *Id.* at 301 (observing that the park "[f]or years . . . was an integral part of the City of Macon's activities" and that the city "swept, manicured, watered, patrolled, and maintained" it as a public facility). Here there is no allegation that the University was ever owned or maintained by the government as a public facility; therefore, *Evans* is inapposite. Second, in *Hinman* the Seventh Circuit concluded that the plaintiff could not maintain a Section 1983 action against a private towing company because its action in towing her car was not fairly attributable to Illinois and therefore, **state action was lacking**. *See Hinman*, 771 F.2d at 193. Thus, *Hinman* actually supports Georgetown's position, and in any event, is not controlling on this Court. Third, in *Stokes*, the Northern District of Illinois held, on a motion to dismiss, that the Plaintiff had sufficiently alleged state action for the purposes of her Section 1983 claim against a private hospital where two armed guards arrested

**interrupt the question and answer period**." *Id*. at 13 (emphasis added). Plaintiff's

concessions (necessitated by the undisputed facts in the record) foreclose his First Amendment

claim against all Defendants. Neither Plaintiff's suggestion that his interruption was a permitted

"dialogue", his reference to Rabbi Nachum Shifrin's disruptive conduct, nor his incredible

suggestion that no students were present at the PSM Conference, can rehabilitate his claim.

      First, to justify his interruptions, Plaintiff relies on Mr. Olson's statement that

members of the audience "may ask questions and engage in dialogue." Pl. Opp'n at 23. Plaintiff

ignores, however, the context of Mr. Olson's statement in announcing what he explicitly stated

was a "designated question and answer period." Pl. Response Facts ¶ 86. In the very next

sentence, Mr. Olson spelled out the precise parameters within which "dialogue" was permitted.

Specifically, audience members were required to phrase their comments in the form of a

question, to be concise, and to ask only one question. *See id*. Furthermore, Plaintiff was

indisputably aware that the PSM Conference was conducted in accordance with Georgetown's

Speech and Expression Policy which also prohibits "any activity that disrupts or obstructs the

functions of the University" as well as conduct that would violate "any speaker's right to free

speech" or "the audience's right to see and to hear a speaker." *Id*. ¶¶ 35, 63; Pl. Opp'n at 16

(conceding that Plaintiff "read and understood . . . the policy").

      Although he attempts to mislead the Court by conveniently omitting the relevant

statements from his statement of facts, *see* Def. Response Facts ¶¶ U–Z, Plaintiff cannot

genuinely dispute the video evidence demonstrating that he repeatedly interrupted the moderator

Mr. Youmans or that his disruptive conduct interfered with the ability of other audience

members to ask their questions, *see* Def. Facts ¶¶ 97-110. Indeed, while Plaintiff suggests that

---

her at the hospital and forced her to ride with them in their car until they released her at her
home. *See Stokes*, 1989 WL 84584, at *3–4. There are no comparable allegations in this case.

he was interrupted in his statement of facts, *see* Pl. Facts ¶ Q, Plaintiff plainly admits that he, in fact, "**did interrupt the question and answer period**," in the introduction to his opposition brief[4], *see* Pl. Opp'n at 13 (emphasis added); *Webster's II New College Dictionary* 335 (3d ed. 2005) (defining "disrupt" as "to **interrupt** or impede the usual course or harmony of") (emphasis added).  Accordingly, there is no genuine dispute that Plaintiff's conduct violated Georgetown's reasonable time, place and manner restrictions.

   Second, it is unclear what point Plaintiff is attempting to make by asserting (without reference to the record) that Rabbi Shifrin was removed from Gaston Hall after creating a second disruption and was not removed after creating an earlier disruption.  *See*  Pl. Opp'n at 23.  The facts regarding Rabbi Shifrin, however, are clear.  *See* Def. Response Facts ¶ P.  Rabbi Shifrin disrupted the Gaston Hall Seminar twice.  Shifrin's first disruption occurred when he tried to use his opportunity to ask a question as an opportunity instead to shout down the panelists, calling Susan Blackwell a "liar and a fraud" after she attempted to respond to his comment.  *See id.*  Like Plaintiff, Rabbi Shifrin was warned that he must cease his disruptive behavior at least two times before Mr. Olson requested the Safety Officers to escort him from the room.  *See id.*  Before Safety Officers Eddy and Salley reached Rabbi Shifrin, he manifested his intention to cease his disruptive behavior by yielding the microphone and walking back to his seat.  *See id.*  Therefore, it became unnecessary to remove him at that time.  Nevertheless, when Shifrin later created a second disruption by shouting loudly from his seat, and like Plaintiff, refused to desist, the Safety Officers Eddy and Salley did escort him out of Gaston Hall.  *See id.*

---

[4] Plaintiff also attempts to portray himself as a "quiet, elderly gentleman attempting to speak," Pl. Opp'n at 22, when in fact he shouted so loudly that he can be heard on the video without the aid of a microphone, *see* Def. Ex. 44A (Quest Video) at 19:07:10–19:09:10.

Unlike Plaintiff however, Rabbi Shifrin agreed to walk out of the auditorium on his own and therefore did not need to be carried. *See* Def. Ex. 44A (Quest Video) at 18:58:50–18:59:30.[5]

Accordingly, Rabbi Shifrin's example reinforces the fact that Defendants treated the disrupters similarly by issuing multiple warnings and then seeking their compliance in leaving the auditorium. The Safety Officers were required to carry Plaintiff from Gaston Hall because he did not manifest any intention to cease his disruptive behavior or to leave on his own, not because of his viewpoint or the content of his speech. Indeed, Plaintiff expressly argues elsewhere in his opposition brief that Georgetown "had already made the decision to remove [him] . . . ***before*** he asked a question." Pl. Opp'n at 15 (emphasis added). Thus, even on Plaintiff's own theory, Georgetown's decision to eject Plaintiff was not based on the content of his speech.[6]

Finally, Plaintiff's assertion that "Georgetown has been unable to identify even a single Georgetown student who played any part in the conference" is irrelevant. *See* Pl. Opp'n at 14. It is undisputed that Georgetown's Speech and Expression Policy applies to all events on University property that are conducted pursuant to the policy and, by its own terms, it is not

---

[5] The professional manner in which Safety Officers Eddy and Salley interacted with Rabbi Shifrin belies Plaintiff's assertion that he was not afforded the opportunity to leave voluntarily.

[6] Plaintiff's reference to *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969), does nothing to salvage his claim. Pl. Opp'n at 23–25. *Tinker*, which addressed the constitutionality of school administrators' decision to prohibit students from wearing black armbands to protest the Vietnam War in public high schools, is inapposite. Not only does *Tinker* relate solely to student speech in a *public* high school as opposed to adult, non-student speech at a private university, the restriction at issue in *Tinker* was viewpoint-hostile. *See, e.g., Morse v. Frederick*, 127 S. Ct. 2618, 2626 (2007) (distinguishing *Tinker* as applying only to suppression of an unpopular viewpoint) (quotations omitted); *Canady v. Bossier Parish Sch. Bd.*, 240 F.3d 437, 441-44 (5th Cir. 2001) (*Tinker* standard applies only to *viewpoint-hostile* regulation of *student speech*); *Bar-Navon v. Sch. Bd. of Brevard County*, No. 6:06-cv-1434, 2007 WL 3284322, at *6 (M.D. Fla. Nov. 5, 2007) (same); *Pounds v. Katy Indep. Sch. Dist.*, 517 F. Supp. 2d 901, 914 (S.D. Tex. 2007) (same). Furthermore, even if *Tinker* provided the appropriate standard, Defendants contend that Plaintiff's disruptive behavior would qualify. *See* Def. Mem. at 8; Def. Reply Facts ¶¶ 176-82.

limited to disruptions of students. *See* Pl. Response Facts ¶ 34-36; Def. Ex. 24 (Speech and Expression Policy) at M000216 (policy applies to the "Main Campus of Georgetown University"); M000217 (policy also encompasses faculty and administrators). Furthermore, Defendants did in fact identify many students who are believed to have planned, organized and attended the Conference. *See* Def. Reply Facts ¶ 18. Plaintiff's failure to take any discovery from these individuals cannot aid his First Amendment claim.

**II.    Georgetown's Safety Officers Did Not Act Under Color of Law**

    **A.    Georgetown's Safety Officers Did Not Arrest Plaintiff**

        Plaintiff's arguments regarding the state action requirement and his Fourth Amendment claim both rest on his contention that he was **arrested**. *See* Pl. Opp'n at 26-29. Again, Plaintiff attempts to support this theory by arguing merely that he was momentarily seized. *Id*. at 29 (arguing that "[w]henever an officer restrains the freedom of a person to walk away, he has <u>seized</u> that person") (emphasis added). This theory fails once again for the reasons already explained in detail in Defendants' opening brief; a momentary non-custodial seizure does not constitute an arrest. *See* Def. Mem. at 22–24.

        Despite Plaintiff's unsupported denials, the following facts material to the question of whether Plaintiff was arrested are not in genuine dispute. First, Plaintiff did in fact testify that he was not arrested at the PSM Conference. *See* Def. Ex. 1 at 158 (answering "no" to the question of whether he was arrested at Georgetown); 298–99 (claiming that the Safety Officers kept him at the ICC "**without arresting** [him]") (emphasis added). Second, Plaintiff was not handcuffed at any time and the Safety Officers were unarmed. *See* Pl. Response Facts ¶¶ 140, 159; Def. Reply Facts ¶¶ 208, 216. Third, as Plaintiff has conceded, his removal from Gaston Hall lasted no more than thirty-seconds and took him less than forty-five feet from where he was seated. Pl. Response Facts ¶ 129. Fourth, neither of the two video recordings – shot

from two different angles – corroborates Plaintiff's allegation that the Safety Officers kneed or kicked him. *See* Def. Reply Facts 125–28; 134–38; Def. Response Facts ¶¶ CC– II. Fifth, Plaintiff **concedes** that he was not "restrained, arrested, detained or taken into custody" in the foyer of Gaston Hall. Pl. Response Facts ¶ 140. Sixth, putting aside the fact that Plaintiff's account of the ICC incident is thoroughly refuted by the overwhelming weight of the deposition testimony, even Plaintiff testified that the only physical contact the officers made with him was to "push [him] against a glass window." Pl. Facts ¶ KK.

Thus, the irrefutable facts show that Plaintiff was, *at best*, momentarily seized in Gaston Hall and at the entrance to the ICC and that any such seizures were the result of Defendants' efforts to **expel** Plaintiff from Georgetown's campus, not to detain him. Moreover, courts have routinely declined to find that an arrest took place where a suspect was detained much longer than Plaintiff and where much greater force was applied. *See e.g., Young v. Prince George's County*, 355 F.3d 751, 753-56 (4th Cir. 2004); *In re E.A.H.*, 612 A.2d 836, 839 (D.C. 1992). This Court's decision on Defendants' Motion for Judgment on the Pleadings ("Op."), which held that Plaintiff's Amended Complaint satisfied the minimal pleading requirements of Federal Rule Civil Procedure 8(a), does not alter the result. *See* Op. at 21. Unable to provide any meaningful opposition to Defendants' argument, Plaintiff is content simply to **misstate the facts** of *In re E.A.H. See id*. at 28 ("E.A.H. was at his home with the freedom to leave in this particular situation."). To the contrary, the District of Columbia Court of Appeals unmistakably determined that fourteen-year-old E.A.H. was **not** free to leave, stating that "[a]rmed officers guarded all of the exits, and E.A.H. was obviously 'seized' and **not** free to leave." *In re E.A.H.*, 612 A.2d at 837 (emphasis added). Nonetheless the court held that E.A.H. was not arrested. 612 A.2d at 839.

**B.    The Safety Officers Performed a Private Function In Enforcing Georgetown's Private Policies**

Plaintiff's suggestion that this Court already "ruled" that "commissioned [SPOs] were acting under the color of law by exercising their state-granted authority to arrest," *see* Pl. Opp'n at 26, demonstrates a fundamental misunderstanding of the legal standards governing a motion for judgment on the pleadings as compared to motions for summary judgment.  As this Court emphasized in its prior decision, at that "early stage in the proceedings, Plaintiff need[ed] only [to] satisfy the **minimal requirements** of Rule 8(a) in order to overcome [Defendants'] Rule 12(c) motion." Op. at 21 (emphasis added).  By contrast, merely meeting the requirements of Rule 8(a) is inadequate at the summary judgment stage.  Plaintiff may no longer "rely solely on allegations or conclusory statements.  Rather [Plaintiff] must present specific facts that would enable a reasonable jury to find in [his] favor." *Cooper v. First Gov't Mortg. & Investors Corp.*, 238 F. Supp. 2d 50, 53-54 (D.D.C. 2002) (citations omitted).  Plaintiff has failed to do so.

Moreover, this Court issued its prior decision on Defendants' Motion for Judgment as a Matter of Law before the District of Columbia Court of Appeals decided *Limpuangthip v. United States*, 932 A.2d 1137 (D.C. 2007).  *Limpuangthip* makes clear that an arrest does not constitute state action *per se*.  932 A.2d at 1143 (a court should not "focus[] on the fact of an arrest alone").  After *Limpuangthip*, the relevant question for determining whether an SPO acted under color of state law, is whether he performed a public or a private function by examining (a) who initiated the challenged action, (b) whether the SPO purported to act under the state's authority, and (c) what the purpose of the SPO's action was.  *See* Def. Mem. at 21–22.

Plaintiff does not dispute any of the facts relevant to this analysis, namely, that (a) Georgetown administrators initiated the challenged actions with respect to both the Gaston Hall and ICC incidents, *see* Pl. Response Facts  ¶¶ 103, 116, 118; Def. Reply Facts ¶¶ 143–44,149, (b) the Safety Officers were unarmed and never purported to act as state officials, *see* Def. Reply

13

Facts ¶ 122, 208, 216, and (c) the Safety Officers' purpose was solely to enforce Georgetown's private policies, not to enforce criminal laws, *see* Pl. Opp'n at 28 (conceding that the safety officers were told to remove Plaintiff "because he was causing a disruption"); Def Reply Facts ¶¶ 117, 122, 187. No reasonable jury could conclude that the Safety Officers performed a public function on these facts.

## III.    The Safety Officers Had Probable Cause to Arrest Plaintiff and Used Reasonable Force In Excluding Him From Gaston Hall and the ICC

### A.    The Safety Officers Had Probable Cause to Arrest Plaintiff

As explained in Part II, *supra*, and in Defendants' opening memorandum, Plaintiff was not arrested, s*ee* Def. Mem. at 22-24. Nevertheless, even if he had been arrested, Plaintiff's Fourth Amendment claim would fail because any arrest was clearly supported by probable cause. "One who lawfully enters a building may be guilty of a misdemeanor by refusing to leave after being ordered to do so." *Kotsch v. Dist. of Columbia*, 924 A.2d 1040, 1045 (D.C. 2007). Plaintiff does not dispute that this is the law but contends that he did not refuse to leave the PSM Conference or Georgetown's campus. *See* Pl. Opp'n at 29-30. Predictably, Plaintiff offers only his own inconsistent and utterly discredited testimony, *see* Def. Mem. at 30-32, in support of this claim. The uncontradicted facts on the record refute Plaintiff's account.

There can be no serious dispute that the Safety Officers had probable cause to arrest Plaintiff in Gaston Hall. *See* Def. Mem. at 28-30. Plaintiff concedes that Mr. Olson stated "Sir, you do not have the opportunity to speak any longer. I would like to ask our staff to escort this gentleman from the room," Pl. Opp'n at 9, which indisputably put Plaintiff on notice that he was required to leave the room. Despite Mr. Olson's statement, Plaintiff did not manifest any intent to comply and instead remained seated and continued to shout "freedom of speech is for the terrorist" until Safety Officers Eddy and Salley approached him. Def. Ex. 44A (Quest Video)

at 19:08:30–19:08:40; *see also* Def. Ex. 69A (Certified Quest Video Tr.) at 17.  No reasonable jury could conclude that Plaintiff was not requested to leave on these facts.

With respect to the ICC incident, Plaintiff strenuously asserts that he was not asked to leave Georgetown's campus and was not barred from the PSM Conference prior to arriving at the ICC, yet he adduces not one shred of evidence to support his assertion.  Pl. Opp'n at 30.  Indeed, Plaintiff alleges in the Second Amended Complaint that "A University official approached him and told him to leave and walked with him out to the main entrance [of Healy Hall]." Compl. ¶ 5.  Moreover, Mr. Harrison's testimony that he told Plaintiff that he would not be permitted to enter the ICC and asked him to leave campus stands unrebutted.  *See* Def. Reply Facts ¶ 149.  Mr. Harrison's testimony is bolstered by testimony from Mr. Olson and JDL Chairman Finberg indicating that Plaintiff was indeed banned from the PSM Conference before he left the Healy Building.  *See id.* ¶¶ 143-44.  Plaintiff does not dispute that a university official approached him in the foyer of Healy Hall; he simply claims not to recall what that official told him.  *See* Def. Response Facts ¶ II.[7]  Thus, there is no genuine dispute that Plaintiff refused to comply with multiple requests to leave the campus and to refrain from entering the ICC.

**B.    The Safety Officers Used Reasonable Force**

**1.    Gaston Hall Incident**

Plaintiff has narrowed his claim to the events that took place in Gaston Hall and no longer contends that any Georgetown employee "pounced" on him in the hallway outside the

---

[7] Plaintiff's observation that Officer Eddy's incident report does not mention Mr. Harrison's conversation with Plaintiff en route to the ICC is unremarkable given that Eddy was not present during the conversation.  *See* Def. Response Facts ¶ 149.  Moreover, the same report clearly indicates that "[w]hen [Plaintiff] reached the front of the [ICC], he was informed that he would not be allowed entry into the building" and that Plaintiff insisted that "he had a table set up in the ICC and he was going to enter."  Pl. Ex. 6 (Eddy Statement) at GTN 001725.  Plaintiff also misleadingly suggests that Safety Officer Eddy's Report indicates that Plaintiff was "being held," Pl. Opp'n at 23, when in fact there is no such suggestion anywhere in the report.

auditorium.[8]  As a result, the entire course of events that form the basis of Plaintiff's narrowed

claim have been captured on multiple video recordings.  *See generally*, Def. Facts ¶¶ 72-139.

These recordings along with substantial deposition testimony thoroughly discredit Plaintiff's

version of the events.  *See* Def. Mem. at 30–35.  In an obvious attempt to obfuscate the facts that

are depicted on the video recordings, Plaintiff falsely accuses Defendants of doctoring them.  *See*

Pl. Opp'n at 33.

    Plaintiff's accusation that Defendants' video recordings were "doctored" to

depict the events out of sequence is false.[9]  The video clip of the Quest Video in Defendants'

Exhibit 44A, which is presented in the same <u>unaltered form</u> as Defendants received it, clearly

shows that Plaintiff asked his question several minutes before the Safety Officers carried him out

of Gaston Hall.  *See* Def. Ex. 44A (Quest Video) at 19:01:40–19:02:10 (Plaintiff asks a question)

and 19:09:15–19:09:37 (Plaintiff is carried from Gaston Hall).  Furthermore, Defendants fully

apprised the Court of the demonstrative elements that were added to Defendants' Exhibits 44B,

44C.[10]  *See* Def. Statement of Material Facts Not In Dispute ("Facts") ¶ 83.  In addition to being

false, Plaintiff's allegation is surprising given that Plaintiff has, **without any explanation**,

---

[8] There is no reference to this allegation in any of Plaintiff's opposition papers, much less
citation to any evidence in the record.  *See* Def. Mem. at 10, 32-34.

[9] Indeed, in his response to Defendants' Statement of Material Facts Not In Dispute, Plaintiff
actually concedes that the video recordings "depict events that transpired on February 18, 2006"
and in his opposition brief Plaintiff asserts that the video recordings "**clearly show** that
Georgetown failed to request him to leave."  *See* Def. Reply Facts ¶ 81 (emphasis added).

[10] Plaintiff objects to Defendants' transcript of the videos, yet he submits his own transcriptions
without any attribution.  *See* Pl. Facts ¶ O-BB; Pl. Op. at 7–9.  In order to alleviate any concerns
regarding Defendants' transcript, Defendants have submitted transcripts of the video recordings
certified by a court reporter which contain no material differences.  *See* Def. Exs. 69A-B.

submitted as Plaintiff's Exhibit 19, a video clip in which he has clearly **spliced together the Quest and Al Ariybia ("AA") videos** and presented that to the Court as a single recording.[11]

Plaintiff's false accusations fail to create a genuine dispute as to the facts that are plainly and irrefutably presented by the video recordings.  In particular, there is absolutely no merit to Plaintiff's assertion that he did not resist the officers' attempt to carry him from the auditorium; Plaintiff visibly went limp and attempted to trip Salley with his cane.  *See* Def. Reply Facts ¶ 128; Def. Response Facts ¶ HH.  The recordings similarly undermine the testimony of Mr. Turk, Plaintiff's loyal "best friend" and JDL's Eastern Regional Director.  *See* Def. Response Facts ¶ EE; Pl. Response Facts ¶ 10.  Mr. Turk testified that he saw a "bald-headed" officer kick Plaintiff "in the side of the ribs" while Plaintiff was "lying on his back" between the aisle and the seats.  *See* Def. Ex. 70 (Turk Dep.) at 147–49.  None of the video recordings depict events remotely consistent with Mr. Turk's testimony.  *See* Def. Response Facts ¶ EE; Pl. Opp'n at 33 (conceding that "[t]he video does not show the Plaintiff getting kneed or kicked by the officers").  Moreover, it is clear from the Al Aribiya ("AA")Video that, in blatant contrast to his testimony, Mr. Turk was not even in Plaintiff's vicinity when the Safety Officers lifted Plaintiff from his seat.  *See* Def. Response Facts ¶ EE.

The irrefutable video evidence shows that Mr. Turk was actually standing in the front of the lecture hall, with at least three rows of seats separating him from Plaintiff and did not walk towards the Safety Officers and Plaintiff until the trio was well on its way up the aisle.  *See* Def. Response Facts ¶ EE; Def. Reply Facts ¶ 126.  Indeed, Keith Bailey (who testified that he was sitting next to Plaintiff) and JDL Chairman Michael Finberg (who also testified that he was

---

[11] The fact that Plaintiff's Exhibit 19 is a combination of the Quest Video and Al Aribiya Video is obvious from the fact that at timestamp 19:08:34:11 the video clip fades from the Quest Video into the rear-view angle depicted in the AA video and the timestamp from the Quest Video is no longer present on the screen.  *See* Pl. Ex. 19.

standing next to Plaintiff and the officers) were positioned much closer to Plaintiff and the officers than Mr. Turk.  *See* Def. Facts ¶¶ 135–37; Def. Reply Facts ¶¶ 126; 135–37; Def. Response Facts ¶ EE.  Unsurprisingly, both Messrs. Bailey and Finberg testified that they did not see the Safety Officers punch, knee, or kick Plaintiff.  *See* Def. Response Facts ¶ EE.

Finally, Plaintiff fails to point to any evidence in the record to establish that he suffered bruises or contusions to the right abdomen, right upper arm, right wrist, and abrasions to the legs at Georgetown.  Neither Dr. Gillern's treatment notes, *see* Pl. Ex. 13, nor Dr. Gillern's testimony, *see* Pl. Ex. 15, link the photographs in Plaintiff's exhibit 12 to the events at Georgetown on February 18, 2006.  Indeed, it is undisputed that the photographs were taken at least twenty-four hours after Plaintiff left Georgetown's campus on February 18, 2006.  *See* Def. Reply Facts ¶¶ 141, 171; Def. Response Facts ¶¶ JJ, PP.  Furthermore, Dr. Gillern clearly testified that if she had observed any bruising or contusions on Plaintiff's body, she would have indicated these observations in her notes.  Def. Ex. 57 (Gillern Dep.) at 33–36, 45–48, 53–54. Yet Dr. Gillern's treatment notes are devoid of any such reference.  *See* Def. Reply Facts ¶¶ 141, 171; Def. Response Facts ¶¶ JJ, PP.  Finally, Dr. Gillern did not testify that the only reason Plaintiff would have been given discharge instructions for a soft-tissue contusion was if he suffered bruises.  Rather, she plainly testified that those instructions were consistent with the diagnosis for a sprained ankle.  Def. Reply Facts ¶ 171.

Thus, when the facts are properly viewed in the light depicted by the video recordings, it is clear that the Safety Officers used only reasonable force in lifting Plaintiff from his seat and carefully carrying Plaintiff out of Gaston Hall.  *See Scott v. Harris*, 127 S. Ct. 1769, 1776 (2007) (granting summary judgment where plaintiff's testimony was utterly discredited by video evidence).

18

### 2.    ICC Incident

Plaintiff's evidence with respect to the ICC incident is similarly thin.  Indeed, there is insufficient evidence to allow a reasonable jury to find that *any* force was applied on Plaintiff at the ICC entrance.  *See* Def. Mem. at 35; Def. Response Facts ¶¶ KK–OO; Def. Reply Facts ¶¶ 150–56.  In any event, even Plaintiff's account of the events —simply that he was pushed against a wall or window — demonstrates that the Safety Officers' actions did not rise to the level of unreasonable force for the reasons explained in Defendants' opening memorandum. *See* Def. Mem. at 36; *Robinson v. Dist. of Columbia*, Nos. 03-1455, 1456, 2006 WL 2714913, at *4 (D.D.C. Sept. 22, 2006) (reasonable for officers to shove suspect onto the hood of a car and handcuff him tightly enough to cause swelling and abrasions); *Steele v. Dist. of Columbia*, No. Civ. A 02-1240, 2006 WL 335770, at *7 (D.D.C. Feb. 14, 2006) (Kollar-Kotelly, J.) (reasonable for officers to twist a disabled suspect around and slam him against a wall).  *See also Scott v. Dist. of Columbia,* 101 F.3d 748, 759–60 (D.C. Cir. 1996) (no excessive force where arresting officers grabbed suspect by the pants, forced him to the ground, and handcuffed him); *Martin v. Malhoyt,* 830 F.2d 237, 262 (D.C. Cir. 1987) (no excessive force even where arresting officer grabbed driver by waist, threw him back into the driver's seat, and slammed the door on his legs).

## IV.    The Safety Officers Are Entitled to Qualified Immunity

While adamantly insisting on liability based on the Safety Officers' SPO commissions, at the same time Plaintiff seeks to deny them the qualified immunity defense that every other state law enforcement officer enjoys.  Plaintiff offers no case law and no analysis to support his illogical and unfair assertion.  To the contrary, as explained more fully in Defendants' opening memorandum, *see* Def. Mem. at 36–40, and Parts I – III, *infra*, Safety Officers Eddy and Salley are entitled to qualified immunity.  In short, Plaintiff suffered no constitutional injury.  Even if he had, there is ample legal precedent to allow Safety Officers

Eddy and Salley to reasonably conclude they had probable cause to arrest Plaintiff, that they used objectively reasonable force, and that they were performing a private function such that their actions did not constitute state action. *See e.g.*, *Gay Rights Coal.*, 536 A.2d at 20 n.15 (Georgetown not subject to the restrictions of the First Amendment); *Norse v. City of Santa Cruz*, No. C 02-01479, 2007 WL 951854 (N.D. Cal. Mar. 28, 2007) (upholding ejection and arrest of man who disrupted city council meeting); *Limpuangthip*, 932 A.2d at 1143–48 (finding that SPOs who assisted in searching a student's dorm room for drugs did not act under color of state law); *Safeway Stores, Inc. v. Kelly*, 448 A.2d 856, 858 (D.C. 1982) (store security guards had probable cause to arrest plaintiff who defied management's request to leave the store).

**V.   Plaintiff Fails To Demonstrate Any Basis for the Administrator Defendants' Liability Pursuant to Section 1983 Claim (Count III)**

Plaintiff again contends that the Court "has already ruled" on the Administrator Defendants' liability.  Pl. Opp'n at 35–36.  As explained in Part II.B, *supra*, this Court previously ruled Plaintiff's **allegations** met the "**minimal requirements** of Rule 8(a)." *See* Op. at 21 (emphasis added).  At the summary judgment stage, Plaintiff must come forward with specific facts that would enable a jury to find in his favor.  Plaintiff has clearly failed to do so.

Having offered no opposition other than the incorrect assertion that "the Court has already ruled on this issue," *see* Pl. Opp'n at 36, Plaintiff apparently concedes that his Section 1983 claims against Messrs Olson and Morrell are official capacity claims that are duplicative of his claim against Georgetown, s*ee* Def. Mem. at 40–41.  Accordingly Messrs. Olson and Morrell are entitled to summary judgment on Plaintiff's Section 1983 claims in Count III.

Even apart from Plaintiff's apparent concession, he fails to adduce a single fact establishing an affirmative link between the Administrator Defendants and the challenged conduct.  Instead, Plaintiff asserts (without citation to legal authority or to the record) that the Administrator Defendants were "on the scene in active initiation of the actions which resulted in

20

the harm to [Plaintiff]" and that they failed to prevent the harm that Plaintiff allegedly suffered.

Pl. Opp'n at 35-37.  Plaintiff's assertion is thoroughly contradicted by the record as explained in

detail in Defendants' opening memorandum.  *See* Def. Mem. at 42–45.

   Moreover, Plaintiff's reliance on *McClelland v. Facteau*, 610 F.2d 693 (10th Cir.

1979) is misplaced.  As an initial matter, Plaintiff **misstates the holding** of *McClelland*.  The

Tenth Circuit did not "impose[] liability" in that case, *see* Pl. Opp'n 37.  Rather, the Court

merely denied summary judgment, *see McClelland*, 610 F.2d at 697-98.  Furthermore, that

decision, which has been called into question by a number of courts,[12] addresses the liability of

supervisors for inaction due to their failure to train or to supervise their subordinates to <u>prevent</u>

<u>future harm</u> despite having notice of <u>repeated prior offenses</u>.  *Id*. at 697 ("In order to establish a

breach here, plaintiff must show that the defendant was adequately put on notice of <u>prior</u>

<u>misbehavior</u>.") (emphasis added); Op. at 21 ("Supervisors or governing bodies are typically

liable for inaction only if they <u>ignore repeated offenses</u> perpetrated by those under their

supervision") (emphasis added).  Yet Plaintiff insists that his claim is not premised on such

inaction.  *See* Pl. Opp'n at 35; Op. at 21 (noting that Plaintiff has not alleged a failure to train).

And in any event, the record is wholly devoid of evidence that the Administrator Defendants had

notice of prior First and Fourth Amendment offenses committed by the Safety Officers which

they deliberately ignored.

   Finally, Plaintiff suggests for the first time, that unidentified administrators

ordered Safety Officers Eddy and Salley to "watch or be warned of a man with a black jacket and

description somewhat of Maniaci."  Pl. Opp'n at 37.  The undisputed evidence in the record,

---

[12] *See Tesoro v. Zavaras*, 46 F. Supp. 2d 1118, 1124 n.10 (D. Colo. 1999) (observing that
*McClelland* as "outdated and unpersuasive" due to its statement of personal participation which
was refined in *Canton v. Harris*, 489 U.S. 378 (1989)); *Slusher v. Samu*, No. 04-cv-02187, 2006
WL 3371636, at *12 (D. Colo. Nov. 21, 2006) ("[T]he continued vitality of [McClelland] was
called into doubt long ago.").

however, is clear that the man with the "long black coat" referenced in the officers' incident statements was Robert Turk, **not Plaintiff**.  Pl. Ex. 5 (Salley Statement); Pl. Ex. 6 (Eddy Statement).[13]  Thus, there can be no dispute that Plaintiff's assertion is false.  And in any event, as Plaintiff concedes, there is no evidence that this instruction was given by any of the Administrator Defendants.  *See* Pl. Opp'n at 37.  Nor is there any evidence to support Plaintiff's bald assertion they "were the <u>only</u> administrators in the position to make such orders."  *Id*. (emphasis added).

## VI.    Plaintiff Fails To Demonstrate Any Basis for Georgetown's Liability Pursuant to Section 1983 (Count III)

Plaintiff all but concedes that Georgetown is entitled to summary judgment on Plaintiff's Section 1983 claim.  His sole argument in support of Georgetown's liability — that the acts of "corporate officers" at the level of the Administrator Defendants, "by definition" constitute Georgetown's final policy,[14] *see* Pl. Opp'n at 37-38 — is flatly incorrect, *see e.g., Pembaur v. City of Cincinnati*, 475 U.S. 469, 481–82 (1986) ("The fact that a particular official — even a policy-making official — has discretion in the exercise of particular functions does

---

[13] In their statements, both officers indicated that they encountered the man with the long black coat while attempting to approach the first individual who caused a disruption, Rabbi Shifrin. *See* Pl. Ex. 5 (Salley Statement) ("the individual in the long black coat  . . . tried to block my way"); Pl. Ex. 6 (Eddy Statement) ("As Officer Salley and I approached the disruptive individual, the person identified earlier, white male, balding and black coat, positioned himself between the disruptive individual and myself.").  The video recordings clearly depict this interaction between Mr. Turk and the officers as they walk towards Rabbi Shifrin.  *See* Ex. 44A (Quest Video) at 18:58:45–18:59:31.

[14]    Plaintiff cites *Hutchison v. Brookshire Bros., Ltd*., 284 F. Supp.2d 459, 472-73 (E.D. Tex 2003) for support that private corporations are not shielded from vicarious liability.  *Hutchison*, however, espouses the minority view that *Monell* does not apply to private institutions.  This view has overwhelmingly been rejected.  *See DeVargas v. Mason & Hanger-Silas Mason Co.*, 844 F.2d 714, 722–23 (10th Cir. 1988); *Jackson v. Ill. Medi-Car, Inc*., 300 F.3d 760, 766 (7th Cir. 2002)*; Burke v. N. D. Dep't of Corr. & Rehab.*, 294 F.3d 1043, 1044 (8th Cir. 2002) (per curiam); *Austin v. Paramount Parks, Inc*., 195 F.3d 715, 729 (4th Cir. 1999); *Harvey v. Harvey*, 949 F.2d 1127, 1129–30 (11th Cir. 1992); *Rojas v. Alexander's Dep't Store, Inc*., 924 F.2d 406, 408–09 (2d Cir. 1990).

not, without more, give rise to municipal liability"); *St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) ("When an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departures from them, are the act of the municipality."). Plaintiff does not, nor could he, cite any authority to support his novel interpretation of Section 1983. Moreover, the undisputed evidence demonstrates that Messrs. Olson, Morrell, and Harrison did not have final policymaking authority with respect to Georgetown's Free Speech and Expression policy or its policy requiring only the use of reasonable force. *See* Def. Mem. 46-50; Def. Reply Statement ¶¶ 186, 190 (Olson), 195, 196 (Harrison), 200-01 (Morrell).

Plaintiff also fails to show that any of the Administrator Defendants actually performed or ratified an unlawful action. Having failed to even address the ICC incident, he apparently concedes that Georgetown's liability cannot be premised on that event. *See* Pl. Opp'n at 37–39. Even with respect to the Gaston Hall incident, Plaintiff baldly asserts that "all of the head administrators were present or nearby (Harrison) and had already instructed the special officers that they would be making a determination to remove individuals," that Olson "had a protocol on how to handle the situation . . . and the other two administrators were in the crowd observing and directing the officers." *Id.* at 38–39. Not only are these assertions untrue, *see* Part V, *supra*; Pl. Response Facts ¶¶ 142,193, they are irrelevant. Plaintiff neither alleges nor provides any evidence demonstrating that these actions were unlawful.

## VII.    Defendants Are Entitled to Summary Judgment on Plaintiff's Assault and Battery Claim in Count I

As explained in Defendants' opening brief, the Safety Officers were entitled to forcibly remove Plaintiff from Gaston Hall, which is Georgetown's private property. *See Person v. Children's Hosp. Nat'l Med. Ctr.*, 562 A.2d 648, 650 (D.C. 1989); Def. Mem. at 51. Plaintiff

does not meaningfully dispute that all three requirements of Section 77 of the Restatement (Second) of Torts (1965) are present in this case.

There is no dispute that Mr. Olson indicated that Plaintiff was going to be "escort[ed] from the room" — an unmistakable indication that Plaintiff was no longer welcome in Gaston Hall. Def. Response Facts ¶ Y. There is no genuine dispute that the Safety Officers spoke to Plaintiff prior to removing him, that Plaintiff manifested no intention to comply, and that Plaintiff instead protested that "I haven't done anything wrong." Ex. 1 (Maniaci Dep.) at 259–60. Nor is there any genuine dispute that Plaintiff engaged in acts of passive resistance, including attempting to trip Safety Officer Salley. *See* Def. Response Facts ¶ HH. In light of these facts, it is clear that Georgetown revoked Plaintiff's privilege to remain in Gaston Hall and that when Plaintiff rebuffed Defendants' repeated requests to leave Gaston Hall, the Safety Officers were justified in believing that Plaintiff's intrusion could be terminated only by the use of reasonable force. *See Person*, 562 A.2d at 650–51.

In the absence of any actionable conduct on the part of the Safety Officers, their conduct cannot form the basis for supervisory liability. And in any event, Plaintiff does not dispute that Messrs. Harrison and Morrell played no role in the Safety Officers' actions. Nor can he dispute that Mr. Olson did not instruct anyone to forcefully remove Plaintiff or that Mr. Olson lacked any further authority to direct the Safety Officers' actions. *See* Def. Reply Facts ¶ 186. Plaintiff's sole argument on this issue—that actions taken at Mr. Olson's direction "by definition . . . constitute[] a policy"—is both false and utterly irrelevant. Pl. Opp'n at 39.

## VIII.    Defendants Are Entitled to Summary Judgment on Plaintiff's False Arrest Claim in Count II

Plaintiff's argument on his false arrest claim is all of one sentence long. *See* Pl. Opp'n at 39. In that single sentence, Plaintiff fails to demonstrate any genuine dispute as to whether – contrary to being confined at Georgetown — he was repeatedly directed to leave and

informed that he was banned from attending the Conference. Plaintiff's own testimony establishes that he was **not willing to leave**, instead insisting that he should be allowed to remain in Gaston Hall and to enter the ICC. *See* Def. Ex. 1 (Maniaci Dep.) at 260 (Plaintiff protested "I haven't done anything wrong"); 298 ("I told him, well, if I'm not under arrest, I'm going to the bathroom."). Indeed, it defies logic that Defendants would expend the time and energy to carry Plaintiff from Gaston Hall and to call on Sergeant Sam DeLisi to escort Plaintiff away from campus if Plaintiff was truly prepared to leave on his own. In the absence of any detention or confinement, Defendants are entitled to summary judgment on Plaintiff's false arrest claim. Moreover, even if Plaintiff was confined or detained, the Safety Officers had probable cause to arrest Plaintiff and therefore their actions were justified as explained in Part III.A, *supra*.

## IX.    Plaintiff Fails To Demonstrate Any Basis for Punitive Damages (Count IV)

Plaintiff's opposition flatly ignores the legal standard for obtaining punitive damages pursuant to Section 1983 and District of Columbia law. *See* Pl. Opp'n at 28. Whether or not Defendants' alleged actions were "accident[al]" or due to "mere ignorance", *id*, is not the test. Rather, Plaintiff must demonstrate that Defendants' conduct was "motivated by evil motive or intent" or that it involved "reckless or callous indifference to" his federally protected rights. *Smith v. Wade*, 461 U.S. 30, 56 (1983).[15] Plaintiff has failed to do so. *See* Def. Mem. at 55.

For the foregoing reasons, Defendants' Motion for Summary Judgment should be granted.

---

[15] The standard is nearly identical under District of Columbia law. *See Jonathan Woodner Co v. Breeden*, 665 A.2d 929, 938 (D.C. 1995) (requiring ill will, recklessness, or willful disregard under D.C. law).

Respectfully submitted,

March 18, 2008                                     _____/s/_____.
                                                  John J. Buckley, Jr., D.C. Bar No. 925081
                                                  Malachi B. Jones, D.C. Bar No. 455555
                                                  Richa S. Dasgupta, D.C. Bar No. 500509

                                                  WILLIAMS & CONNOLLY LLP
                                                  725 Twelfth Street, N.W.
                                                  Washington, D.C. 20005
                                                  jbuckley@wc.com
                                                  (202) 434-5051
                                                  (202) 434-5058 (fax)

                                                  *Of Counsel:*
                                                  Jane E. Genster, D.C. Bar No. 939850
                                                  Vice President and General Counsel
                                                  Georgetown University
                                                  37th & O Streets, NW
                                                  Washington, DC 20057
                                                  (202) 687-6500
                                                  (202) 687-6527 (fax)

                                                  *Attorneys for Defendants Georgetown*
                                                  *University, David F. Morrell, Darryl K.*
                                                  *Harrison, Todd Olson, Roy Eddy and Larry  Salley*

## CERTIFICATE OF SERVICE

I certify that the foregoing (a) Reply Memorandum in Support of Defendants' Motion for Summary Judgment, (b) Defendants' Response to Statement of Plaintiff of Material Facts As To Which There Is No Material Dispute Regarding the Motion for Summary Judgment, (c) Defendants' Reply to Plaintiff's Statement of Genuine Issues Setting Forth All Material Facts in Opposition to Defendant's Statement of Material Facts Not In Dispute Regarding the Motion for Summary Judgement, and (d) corresponding exhibits were filed with the Court on the 18th day of March, 2008, and that service was made via ECF to:

> Thomas Fortune Fay, Esq.
> 601 Pennsylvania Avenue, NW
> #900 – South Building
> Washington, D.C. 20004


> _____/s/_____.
> John J. Buckley, Jr.