**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| WILLIAM MANIACI, | ) |
|  | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| v. | ) |
|  | ) |
| GEORGETOWN UNIVERISTY, et al., | ) |
|  | ) |
| Defendants. | ) |
|  | ) |

Civil Action No. 06–01625 (CKK)

**Oral Argument Requested**

**DEFENDANTS' RESPONSE TO STATEMENT OF PLAINTIFF
OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE
REGARDING THE MOTION OF DEFENDANT FOR SUMMARY JUDGMENT**

John J. Buckley, Jr., D.C. Bar No. 925081
Malachi B. Jones, D.C. Bar No. 455555
Richa S. Dasgupta, D.C. Bar No. 500509
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
jbuckley@wc.com
(202) 434-5051
(202) 434-5058 (fax)

*Of Counsel:*
Jane E. Genster, D.C. Bar No. 939850
Vice President and General Counsel
Georgetown University
37th & O Streets, N.W.
Washington, D.C. 20057
(202) 687-6500
(202) 687-6527 (fax)

*Attorneys for Defendants Georgetown
University, David F. Morrell, Darryl K.
Harrison, Todd Olson, Roy Eddy and
Larry Salley*

March 18, 2008

Defendants Georgetown University, David F. Morrell, Darryl K. Harrison, Todd Olson, Roy Eddy and Larry Salley, through undersigned counsel, hereby submit their response to the Statement of Plaintiff of Material Facts As To Which There Is No Genuine Issue Regarding The Motion of Defendant For Summary Judgment ("Pl. Facts"). Not one of Plaintiff's assertions is sufficient to raise a genuine dispute as to the material facts at issue.

A.    **DENIED**. It is undisputed that the Students for Justice in Palestine ("SJP") is a student organization at Georgetown University ("Georgetown" or the "University") and that Georgetown permitted the SJP to use the University's facilities in connection with the Palestine Solidarity Movement ("PSM") Conference.

Plaintiff fails, however, to provide any citation to the record supporting his assertion that the PSM is a group that has been accused of being anti-Israel. In addition, the irrefutable evidence in the record demonstrates that Duke University administrators informed Georgetown that they had inquired with federal officials who told them that the PSM does not endorse terrorism. *See* Def. Ex. 17 (Duke Memo) at GTN000790–91. Georgetown officials also made independent inquiries regarding the PSM with the Federal Bureau of Investigation, Metropolitan Police Department, the State Department and the Department of Treasury. These agencies confirmed that the PSM is not a terrorist organization and is not associated with terrorism. *See* Def. Ex. 15 (PSM FAQs) at GTN000077 ("Federal law enforcement officials have told Georgetown that the Palestine Solidarity Movement is not a terrorist organization"); Def. Ex. 7 (Morrell Dep.) at 10–12; Def. Ex. 73 (Porterfield Dep.) at 11–13.

The record is equally devoid of any evidence supporting Plaintiff's spurious assertion that there is a link between Saudi Arabian Prince Alwaleed bin Talal's donation to Georgetown and the PSM Conference. Rather, the undisputed testimony of Georgetown Vice President Daniel Porterfield was that there was no such connection. *See* Def. Ex. 12 (Porterfield

Dep.) at 34–37; *see also* http://www.news.harvard.edu/gazette/daily/2005/12/13–islamic_gift.html (Harvard University received a similar gift and hosted no PSM Conference). Mr. Porterfield's deposition testimony stands unrebutted.  In any event, Prince Alwaleed bin Talal donation to Georgetown is wholly irrelevant to Plaintiff's claims.

Finally, Defendants do not dispute that members of the general public were invited to participate in the PSM Conference.  However, participation was conditioned on proper registration and compliance with Georgetown's Speech and Expression Policy.  Def. Ex. 15 (PSM FAQs) at GTN 000065; Def. Ex. 41 (PSM Media Info Packet) at M000114 (warning that those violating the code of conduct will be asked to leave the Conference).

B.    **DENIED**.  Defendants do not dispute that Georgetown made inquires with the Federal Bureau of Investigation, Metropolitan Police Department, the State Department and the Department of Treasury in order to confirm that the PSM had no terrorist affiliation.  *See* Paragraph A, supra.

Plaintiff fails, however, to provide any citation to the record supporting his assertion that Georgetown never provided any specific names of the speakers that would be in attendance.  The January 4, 2006 e–mail exchange cited by Plaintiff took place more a month before the PSM Conference and simply indicates that Georgetown did not have the names of the speakers as of that date.  *See* Pl. Ex. 2.  Indeed, the e–mail exchange and confirms the FBI's intention to do a "complete threat assessment."  *Id*.  The irrefutable evidence in the record demonstrates that the FBI's assessment was completed since Georgetown ultimately confirmed with those agencies that the PSM Conference participants had no terrorist affiliation.  *See* Def. Ex. 7 (Morrell Dep.) at 10–12; Def. Ex. 12 (Porterfield Dep.) at 11–13.

C.    **DENIED**.  Defendants do not dispute that in February of 2006, Plaintiff was a member of the Jewish Defense League and that later Plaintiff and other members of the

JDL formed the B'nai Elim.  Plaintiff's self–serving attempt to distance himself from the JDL

and Irv Rubin and Earl Krugel, however, is both misleading and is contradicted by Plaintiff's

own deposition testimony.  Plaintiff testified that he and other former members of the JDL

founded B'nai Elim only after settling a lawsuit filed by Irv Rubin's widow, Shelley Rubin, over

the JDL trademark.  *See* Def. Ex. 1 (Maniaci Dep.) at 104–06; Def. Ex. 74 (Finberg Dep.) at 61–

64.  That break did not occur until **<u>after</u>** the PSM Conference in February 2006 and more than

four years after Messrs. Rubin and Krugel were arrested.  *See* Def. Ex. 1 (Maniaci Dep.) at 104–

06; Pl. Response Facts ¶ 52 (admitting that he attended the PSM Conference on behalf of the

JDL).  Furthermore, in an e–mail to Georgetown University, Plaintiff identified Messrs. Rubin

and Krugel as martyrs.  *See* Def. Ex. 33 (Feb. 9, 2006 Maniaci Email) at GTN001032 ("Never

forget the murders of our Jewish Defense League Leaders, Brothers, and Sisters  . . . Irv Rubin . .

. Earl Krugal [sic] . . . .").

       Finally, while Plaintiff testified that the JDL is not a hate group, he acknowledges

that the Southern Poverty Law Center found otherwise.  *See* Active U.S. Hate Groups in 2006,

http://www.splcenter.org/intel/ map/hate.jsp?T=34&m=5.   Plaintiff also acknowledges that the

FBI has called the JDL a "violent extremist organization."  *See* Terrorism 2000/2001,

http://www.fbi.gov/publications/ terror/terror 2000_2001.pdf.

       D.    **DENIED**.  Defendants do not dispute how Plaintiff found out about the

PSM Conference or that Plaintiff "believed that the [PSM] Conference held at Georgetown was

significant due to the contribution of $20 million from Saudi Arabia to Georgetown."  Pl. Facts ¶

D.  Plaintiff's belief is both irrelevant and refuted by the evidence in the record.  *See* Paragraph

A, *supra* (there is no connection between the PSM Conference and Prince Alwaleed bin Talal's

donation).

       E.    **DENIED**.  Defendants do not dispute that the name given by the JDL for

the operation of attending and protesting the PSM Conference was Operation Gideon.  Plaintiff's

self–serving assertion that this name was used for no particular reason is contradicted by his own

deposition testimony and the testimony of JDL Chairman, Matthew Finberg.   Chairman Finberg

testified that the name "Operation Gideon" was Plaintiff's idea.  Def. Ex. 29 (Finberg Dep.) at

71.  Furthermore, Plaintiff has himself testified that the name refers to an operation by the Israeli

Mossad (Israel's intelligence agency) that was the subject of a film, called "The Sword of

Gideon."  Def. Ex. 1 (Maniaci Dep.) at 144 (I think it was referring to — Gideon, as I recall, was

a film called the Sword of Gideon.  Do you remember that?  And that was an operation by the

Israeli Mossad.  So that was called the Sword of Gideon.  So maybe we picked  — picked up the

name from that.").  That film is about the actions of a Mossad execution squad sent out kill the

Palestinians responsible for the 1972 Munich Olympic attack.  *See* Film Overview,

http://movies.nytimes.com/movie/48217/Sword–of–Gideon/overview;

http://us.imdb.com/title/tt0092038.

       F.      **DENIED**.  Defendants do not dispute the accuracy of Plaintiff's quotation

to his deposition transcript in this paragraph.  Nevertheless, the irrefutable evidence in the record

demonstrates that the JDL's goal in attending the Conference was to force Georgetown to "suffer

. . . public humiliation [and] degradation," and "to make it so that no other university would ever

host something like this again in such a manner."  Dep. of Matthew Finberg (Def. Ex. 29) at 77–

78.  Furthermore, as Plaintiff himself concedes, he and the JDL viewed the Conference

organizers as their "enemy."   Def. Ex. 1 (Maniaci Dep.) at 145–47.

       In addition, Plaintiff admits, *see* Pl. Response Facts ¶ 69, that February 20, 2006,

the day after the Conference concluded, JDL Chairman Finberg published an article indicating he

and other JDL members who attended the Conference in order to "disrupt" it "were successful in

interfering with several of their seminars."  (Def. Ex. 36) (*What Really Happened at the*

*Georgetown PSM Conference)* at GTN000486.  The JDL accomplished this by "g[etting] the cameras and microphones off the speakers and on [the JDL] many times."  *Id.*

       G.     **DENIED**.  Defendants do not dispute that Plaintiff contacted Georgetown officials prior to attending the PSM Conference and informed them of his intent to protest the conference.  Defendants also do not dispute that Plaintiff authored a handout which included portions of Georgetown's Speech and Expression Policy to provide to other JDL members before attending the conference.  *See* Def. Ex. 30 (Operation Gideon Pamphlet); Def. Ex. 1 (Maniaci Dep.) at 149–50; Pl. Response Facts ¶¶ 49–50.  As is evident from the face of the document, Plaintiff's handout does not (contrary to his present assertion) admonish JDL members to "comply with lawful orders given by law enforcement" or "not to resist arrest."  Pl. Facts ¶ G; Def. Ex. 30

       Plaintiff fails to provide any citation to the record supporting his assertion that he authored Plaintiff's Exhibit 3, an undated and unidentified document purporting to set forth guidelines for attending the PSM Conference.  Indeed, the origins of Pl. Ex. 3 are unknown.  Defendants have no records of it being produced in discovery.  To the extent that it is relevant, it should have been produced.

       H.     **DENIED**.  Defendants do not dispute that Darryl Harrison spoke with Plaintiff several times prior to the PSM conference by telephone.  Def. Ex. 6 (Harrison Dep.) at 10–12.  Mr. Harrison, however, was not unfriendly or confrontational and, in any event, Mr. Harrison's demeanor on the phone is not material to any of Plaintiff's claims.  The irrefutable evidence in the record demonstrates when Plaintiff informed Mr. Harrison that he would be attending to protest, Mr. Harrison, rather than attempting to dissuade him, provided Plaintiff with information on what procedures Georgetown had in place for protesters and the location of the protest and demonstration areas.  *Id.*  Mr. Harrison's deposition testimony stands unrebutted.

I.      **ADMITTED.**

J.      **DENIED**.  Paragraph J is devoid of even a single citation to the record.
Defendants do not dispute, however, that Plaintiff provided his name, identification and
biographical information at the registration desk or that he paid the ten dollar registration fee to
the SJP.  Defendants also do not dispute that Plaintiff received a badge and a copy of
Georgetown's Speech and Expression Policy or that Plaintiff pinned the badge on his lapel.

Nevertheless, the irrefutable evidence in the record demonstrates that the
registration fee was paid to and collected by the SJP, <u>not</u> Georgetown.  *See* Def. Ex. 5 (Olson
Dep.) at 14–15; Pl. Response Facts ¶ 73 (acknowledging that the SJP collected the fee).
Plaintiff's assertion that Georgetown's Speech and Expression Policy thereby created certain
rights on his part or that he purchased a license from Georgetown are legal arguments which do
not require a response and in any event, are addressed in Defendants' reply brief.  *See* Def. Reply
at 3-7.

K.      **DENIED**.  Plaintiff's quotation of the Speech and Expression Policy is
incomplete and his characterization of its limitations is misleading.  The policy clearly indicates
that "cutting off discourse" and "[m]aking it impossible for others to speak or be heard or seen,
or in any way obstructing the free exchange of ideas, is an attack on the core principles the
University lives by and [will] not be tolerated."  Def. Ex. 24 (Speech and Expression Policy) at
M000217.  In addition, the Speech and Expression Policy provides that the right of free speech
and expression **<u>does not include</u>**:

> [U]nlawful activity or activity that endangers or imminently threatens to endanger
> the safety of any member of the community or any [of] the community's physical
> facilities, *or any activity that disrupts or obstructs the functions of the University
> or imminently threatens such disruption or obstruction* . . . An individual or group
> wishing to protest at an event may do so *as long as any speaker's right to free
> speech and the audience's right to see and to hear a speaker are not violated.*

*Id*. at M000217–18 (emphasis added).

L.     **DENIED**.  Paragraph L is devoid of even a single citation to the record. Defendants do not dispute, however, that after registering, Plaintiff entered Gaston Hall on the third floor of Healy Hall.  Plaintiff's assertion that the topic of seminar he attended was divestment by Georgetown University of investments connected with Israel is false.  The irrefutable evidence in the record demonstrates that the seminar was entitled "The Status of the Divestment Movement" ("Divestment Seminar").  Def. Ex. 10 (PSM Agenda) at M000127. During the seminar panelists discussed the "diverse calls for Divestment emanating from local, national, international, and Church–based supporters of Palestinian rights."  *Id*.  Furthermore, University President John J. DeGioia explicitly stated that Georgetown does not support PSM's objective of divestment from Israel.  *See* Def. Ex. 15 (PSM FAQs) at GTN 000067; Def. Ex. 16 (DeGioia Statement on Divestment from Israel) ("DeGioia Stmt.").  Finally, Defendants do not dispute that members of the general public were invited to participate in the PSM Conference. Nevertheless, participation in the PSM Conference was conditioned on proper registration and compliance with Georgetown's Speech and Expression Policy.  Def. Ex. 15 (PSM FAQs) at GTN 000065.

M.     **ADMITTED**.

N.     **DENIED**.  Paragraph N is devoid of even a single citation to the record. Defendants do not dispute, however, that the panelists' presentations lasted for thirty to forty minutes, or that after these presentations, there was a question and answer period during which the panelists took questions from the audience.  Nevertheless, the Divestment Seminar did not begin with panelists presentations.  Prior to the panelists' presentations, Todd Olson, Georgetown's Vice President for Student Affairs, informed the audience that they would have an opportunity to ask questions of the panelists after the panel discussion session.  *See* Def. Ex. 45 (SJP Video) at 00:00–00:18; Def. Ex. 7 (Morrell Dep.) at 22.  Mr. Olson stated:

Please be sure to phrase your comments in the form of a question.  In the interest
of time we ask each person to be concise and ask only one question.  Thank you.

Def. Ex. 45 (SJP Video) at 00:00–00:18; *see also* Def. Ex. 47 (SJP Video Tr.) at 1; Def. Ex. 69B

(Certified SJP Video Tr.) at 2.

O.    **DENIED**.  It is undisputed that at after the panel discussion, Mr. Olson

again repeated the ground rules for audience members who wished to ask questions:  "Please be

sure to phrase your comments in the form of a question.   In the interest of time we ask each

person be concise and ask only one question.  Thank you."  Def. Ex. 44A (Quest Video) at

18:56:05-18:56:20; *see also* Def. Ex. 47 (Quest Video Tr.) at 1; Def. Ex. 69A (Certified Quest

Video Tr.) at 2.  Nevertheless, as is obvious from the face of the documents, Mr. Olson's

statement was not verbatim from what Plaintiff terms the "protocol[s]" in Plaintiff's Exhibit 7

and Exhibit 8.  Furthermore, there is no evidence that Mr. Olson was required to read the

statements in Plaintiff's Exhibits 7 and 8 verbatim.

P.    **DENIED**.  Defendants do not dispute that Rabbi Nachum Shifrin was the

first person to ask a question.  *See* Def. Ex. 44A at 18:57:18–18:59:30; *see also* Def. Ex. 47

(Quest Video Tr.) at 2; Def. Ex. 69A (Certified Quest Video Tr.) at 3.  Nevertheless, Plaintiff's

unsupported assertion that Mr. Youmans interrupted Rabbi Shifrin is clearly refuted by the Quest

Video.  Although Shifrin asked a lengthy, rambling, argumentative, and rhetorical question, he

was allowed to complete it.  Without interruption, Rabbi Shifrin stated:

What does the comparison of Jews, of demographic problems of Jews in New
York have to do with the demographic problems from Israel, because the Jews in
America want nothing better than to be good Jews; whereas the Palestinians in
Israel want nothing to do – want nothing better than to turn Israel into Palestine.  I
don't understand your phrasure.

Def. Ex. 44A (Quest Video) at 18:57:12–18:57:45; *see also* Def. Ex. 47 (Quest Video Tr.) at 2–

3; Def. Ex. 69A (Certified Quest Video Tr.) at 3–4.

Panelist Susan Blackwell responded: "I have to say, I don't really understand the question, so there's mutual incomprehension here.  I was drawing an analogy."  Def. Ex. 47 (Quest Video Tr.) at 2; Def. Ex. 69A (Certified Quest Video Tr.) at 4; Def. Ex. 44A (Quest Video) at 18:57:44–18:57:55.

Despite having asked his question and received a response from Ms. Blackwell, Rabbi Shifrin continued to interject.  He stated:

> Let me put it on more time.  The Jews in this country want nothing better to do than assimilate and be good Americans.  The Palestinians that I know and Israeli – I also live in the west bank, by the way, and I use that Trans–Israel Highway all the time.  It's a great road.  You should try it.

Def. Ex. 44A (Quest Video) at 18:57:54–18:58:25; *see also* Def. Ex. 47 (Quest Video Tr.) at 2; Def. Ex. 69A (Certified Quest Video Tr.) at 4.  It was only at this point, when Rabbi Shifrin continued to speak, that Mr. Youmans asked him to stop and give the panel an opportunity to answer his question, stating "Okay, thank you.  You have made your question.  Let her respond please."  Def. Ex. 44A (Quest Video) at 18:58:10–18:58:20; *see also* Def. Ex. 47 (Quest Video Tr.) at 2; Def. Ex. 69A (Certified Quest Video Tr.) at 4.  As soon as panelist Sue Blackwell attempted to answer, Shifrin interrupted her multiple times and shouted, "You're a liar, you're a stinking liar."   Def. Ex. 47 (Quest Video Tr.) at 3; Def. Ex. 69A (Certified Quest Video Tr.) at 5; Def. Ex. 44A (Quest Video) at 18:58:35–18:58:50.

At that point, Mr. Olson warned Rabbi Shifrin, "[y]our opportunity to ask your question has been completed."  Def. Ex. 44A (Quest Video) at 18:58:50–18:59:10; *see also* Def. Ex. 47 (Quest Video Tr.) at 3; Def. Ex. 69A (Certified Quest Video Tr.) at 6.  But Rabbi Shifrin continued to disrupt the question and answer period and Ms. Blackwell's attempts to respond, shouting "that's a crock" or "that's a fraud."  Def. Ex. 44A (Quest Video) at 18:58:50–18:59:10;

*see also* Def. Ex. 47 (Quest Video Tr.) at 3; Def. Ex. 69A (Certified Quest Video Tr.) at 6.  Mr.

Olson again warned Rabbi Shifrin, "your opportunity to ask your question has now ended."  Def.

Ex. 44A (Quest Video) at 18:58:50–18:59:10; *see also* Def. Ex. 47 (Quest Video Tr.) at 3; Def.

Ex. 69A (Certified Quest Video Tr.) at 6.

      Rabbi Shifrin continued his disruptive behavior, shouting, "she's a liar."  Def. Ex.

44A (Quest Video) at 18:58:50–18:59:10; *see also* Def. Ex. 47 (Quest Video Tr.) at 3; Def. Ex.

69A (Certified Quest Video Tr.) at 6.  Mr. Olson then stated, "I will now ask our staff to escort

this gentleman from the room."  Def. Ex. 44A (Quest Video) at 18:58:50–18:59:11; *see also* Def.

Ex. 47 (Quest Video Tr.) at 3; Ex. 69A (Certified Quest Video Tr.) at 6.

      Safety Officers Eddy and Salley walked up the aisle towards Rabbi Shifrin, who

stopped shouting and retreated to the rear of the room.  *See* Def. Ex. 44A (Quest Video) at

18:59:10–18:59:30; Def. Ex. 8 (Eddy Dep.) at 20–21.  Safety Officers Eddy and Salley did not

remove Rabbi Shifrin at that point in time because he had ceased being disruptive and

manifested an intention to comply with Mr. Olson's admonitions by walking back to his seat.

Def. Ex. 8 (Eddy Dep.) at 20–21.  When Rabbi Shifrin again became disruptive later, however,

Safety Officers Eddy and Sally escorted him out of Gaston Hall at Mr. Olson's request.  *Id.* at

40–41; Def. Ex. 43 (Al Aribiya ("AA") Video) at 1:16–1:55.

      Q.    **DENIED**.  Defendants do not dispute the text of Plaintiff's question.  Mr.

Youmans did not, however, interrupt Plaintiff's question.  It was only after Plaintiff had already

asked "I'd like to know your position on suicide bombing, if you would renounce suicide

bombing" and began presenting his own views on terrorism rather than phrasing his comments in

the form of a question that moderator Youmans told him "Okay, I think you have made your

question clear." Def. Ex. 44A (Quest Video) at 19:01:25–19:02:05; *see also* Def. Ex. 47 (Quest Video Tr.) at 4; Def. Ex. 69A (Certified Quest Video Tr.) at 9.

R.     **DENIED**. The panelists did not avoid answering Plaintiff's question. The irrefutable evidence in the record demonstrates that, due to time constraints, the seminar organizers adjusted the format of the question and answer period so that after three audience members asked their questions successively, the panelists would address all three questions in the order they were asked. Plaintiff has himself testified "I think that there was more people than they expected that wanted to ask questions. So that's when they said, okay, we're going to limit you to one question apiece. Ask your question. Have a seat. And the panel will address your questions in the order in which they were asked." Ex. 1 (Maniaci Dep.) at 241; *see also* Ex. 5 (Olson Dep.) at 29–30; Ex. 7 (Morrell Dep.) at 20. Moreover the video recordings clearly confirm that Plaintiff's question was the third question in a group of three. Ex. 44A (Quest Video) at 18:59:27–19:02:05. After panelists addressed the first two questions, panelist Susan Blackwell responded to Plaintiff's question at length, as Plaintiff admits in the next paragraph. Ex. 44A (Quest Video) at 19:05:55–19:07:25; Ex. 47 (Quest Video Tr.) at 4–6; Def. Ex. 69A (Certified Quest Video Tr.) at 13–14.

S.     **DENIED**. Defendants do not dispute the substance of Ms. Blackwell's answer to Plaintiff's question. Plaintiff's transcription, however, has several spelling errors. Defendants have offered more accurate transcriptions. Def. Ex. 47 (Quest Video Tr.) at 6; Def. Ex. 69A (Certified Quest Video Tr.) at 13–14.

T.     **ADMITTED**.

U.     **DENIED**. Plaintiff's misleading description of his exchange with Messrs. Youmans and Olson in the following six paragraphs cleverly obscures the fact that Plaintiff

repeatedly interrupted Mr. Youmans and disrupted the seminar.  Def. Ex. 44A (Quest Video) at

19:07:25–19:08:50; *see also* Pl.'s Opp'n at 8 (Plaintiff conceding "William Maniaci **did**

**interrupt** the question and answer period of a particular part of the conference") (emphasis

added).  As the video recordings irrefutably demonstrate, Plaintiff cut Mr. Youmans off,

shouting from his seat: "You didn't answer my question."  Def. Ex. 44A (Quest Video) at

19:07:27–19:07:29; *see also* Def. Ex. 47 (Quest Video Tr.) at 6; Def. Ex. 69A (Certified Quest

Video Tr.) at 15; Def. Ex. 3 (Finberg Dep.) at 121–22.

   Mr. Youmans began to respond: "Thank you . . ." but was again interrupted by

Plaintiff who shouted: "I asked for a policy statement from you."  Def. Ex. 44A (Quest Video) at

19:07:27–19:07:29; *see also* Def. Ex. 47 (Quest Video Tr.) at 6; *see also* Def. Ex. 69A (Certified

Quest Video Tr.) at 15.

   Mr. Youmans tried to respond again, barely managing to get out the words

"Would you . . ." before he was interrupted for the third time by the Plaintiff shouting "You

haven't answered my question."  Def. Ex. 44A (Quest Video) at 19:07:28–19:07:31; *see also*

Def. Ex. 47 (Quest Video Tr.) at 6; Def. Ex. 69A (Certified Quest Video Tr.) at 15.

   V.  **DENIED**.  Defendants do not dispute the substance of the quoted

statements, but Plaintiff's transcription has errors.  As the video recordings irrefutably

demonstrate, Mr. Youmans attempted to respond for a third time and this time was able to state:

"**Thank you, but you are disrupting**.  Please, we can talk about this afterwards."  Def. Ex. 44A

(Quest Video) at 19:07:30–19:07:34; *see also* Def. Ex. 47 (Quest Video Tr.) at 6 (emphasis

added); Def. Ex. 69A (Certified Quest Video Tr.) at 15 (emphasis added).   Mr. Olson then

addressed the Plaintiff, stating "**You have had an opportunity to ask your question.  Your**

**opportunity has ended**."  Def. Ex. 44A (Quest Video) at 19:07:33–19:07:36; *see also* Def. Ex.

47 (Quest Video Tr.) at 6 (emphasis added); Def. Ex. 69A (Certified Quest Video Tr.) at 15 (emphasis added).

        **W.**    **DENIED**.  Plaintiff's transcription is incomplete and misleading.  Again, Plaintiff's description cleverly obscures the fact that Plaintiff repeatedly was interrupting moderator Youmans.  However, as the video recordings irrefutably demonstrate, at this point in time Mr. Youmans attempted to resume the question and answer period.  Mr. Youmans addressed the audience members still waiting in line at the microphone: "[P]lease introduce yourself before you ask a question.  Three more questions."  Def. Ex. 44A (Quest Video) at 19:07:37–19:07:42; *see also* Def. Ex. 47 (Quest Video Tr.) at 6; Def. Ex. 69A (Certified Quest Video Tr.) at 15.

        Before the next person in line could speak, Plaintiff interrupted for the fifth time, shouting: "You didn't answer my question."  Def. Ex. 44A (Quest Video) at 19:07:41–19:07:44; *see also* Def. Ex. 47 (Quest Video Tr.) at 6; Def. Ex. 69A (Certified Quest Video Tr.) at 15.

        Mr. Youmans again addressed the audience members in line: "Please go ahead with the question."  Def. Ex. 44A (Quest Video) at 19:07:42–19:07:44; *see also* Def. Ex. 47 (Quest Video Tr.) at 6; Def. Ex. 69A (Certified Quest Video Tr.) at 15.

        The next person in line, a woman who identified herself as "Noelle," asked another question of the panel.  Def. Ex. 44A (Quest Video) at 19:07:44–19:07:59; Def. Ex. 47 (Quest Video Tr.) at 6; Def. Ex. 69A (Certified Quest Video Tr.) at 16.  As soon as Noelle had finished asking her question, and the next questioner, Rabbi Weiss looked at the panel and opened his mouth to speak, Plaintiff interjected for a sixth time, shouting from his seat: "Are you for or against . . ." Def. Ex. 44A (Quest Video) at 19:08:06–19:08:09; Def. Ex. 47 (Quest Video Tr.) at 6; Def. Ex. 69A (Certified Quest Video Tr.) at 16.

Mr. Youmans responded: "**I'm sorry sir, please don't interrupt**.  You've already asked your question.  Thank you."  Def. Ex. 44A (Quest Video) at 19:08:08–19:08:12; *see also* Def. Ex. 47 (Quest Video Tr.) at 6–7 (emphasis added); Def. Ex. 69A (Certified Quest Video Tr.) at 16 (emphasis added).

X.    **DENIED**.  Defendants do not dispute the substance of the quoted statements but Plaintiff grossly mischaracterizes the exchange to present himself as the person being interrupted.  At this point in time, Plaintiff continued to engage Mr. Youmans, interjecting for a seventh time, and preventing Rabbi Weiss from speaking by shouting: "But you didn't answer my question."  Def. Ex. 44A (Quest Video) at 19:08:11–19:08:14; *see also* Def. Ex. 47 (Quest Video Tr.) at 7; Def. Ex. 69A (Certified Quest Video Tr.) at 16.

Mr. Youmans responded: "**She did, she addressed your question**."  Def. Ex. 44A (Quest Video) at 19:08:14–19:08:15 (referring to Dr. Susan Blackwell, *see* Paragraph S, *supra*); *see also* Def. Ex. 47 (Quest Video Tr.) at 7 (emphasis added); Def. Ex. 69A (Certified Quest Video Tr.) at 16 (emphasis added).

Plaintiff was not dissuaded, but instead shouted: "No, I asked for your policy statement and she gave a personal . . ." Def. Ex. 44A (Quest Video) at 19:08:15–19:08:19; *see also* Def. Ex. 47 (Quest Video Tr.) at 7; Def. Ex. 69A (Certified Quest Video Tr.) at 16.  This was the eighth shouting interruption by Plaintiff.

Mr. Youmans began to respond: "There is no policy, I don't know. . ."  Def. Ex. 44A (Quest Video) at 19:08:15–19:08:20; *see also* Def. Ex. 47 (Quest Video Tr.) at 7; Def. Ex. 69A (Certified Quest Video Tr.) at 16.

By this point, Plaintiff had interjected <u>eight</u> times since Dr. Blackwell responded to his question and had ignored what in substance amounted to <u>five</u> requests by Mr. Olson and

Mr. Youmans to desist so that the question and answer session to continue and others in line could have an opportunity to ask their questions.

Y.      **ADMITTED**.

Z.      **ADMITTED**.  Defendants note however, that Paragraph Z is devoid of even a single citation to the record.

AA.      **DENIED**.  Defendants do not dispute that Georgetown Safety Officers Roy Eddy and Larry Sally were told that "if an attendee became disruptive a university official would make the determination as to [whether] that individual would be removed from the hall and upon that determination Public Safety would be informed."  Pl. Ex. 6 (Eddy Incident Statement) at GTN001723.

Safety Officers Eddy and Salley did not, however, receive an order to remove Plaintiff from Gaston Hall.  As the video recordings irrefutably demonstrate, Mr. Olson advised the Plaintiff:  "Sir, you do not have the opportunity to speak any longer.  I would like to ask our staff to **_escort_** this gentleman from the room.  He is creating a significant disruption."  Def. Ex. 44A (Quest Video) at 19:08:20–19:08:28; _see also_ Def. Ex. 47 (Quest Video Tr.) at 7 (emphasis added); Def. Ex. 69A (Certified Quest Video Tr.) at 16–17.  Mr. Olson did <u>not</u> instruct anyone to use physical force to remove the Plaintiff nor did he ask anyone to arrest Plaintiff or take him into custody.

Safety Officers Eddy and Sally responded to Mr. Olson's request.  They approached the Plaintiff from the back of the auditorium.  Def. Ex. 43 (AA Video) at 00:00:03–00:00:11; Def. Ex. 44A (Quest Video) at 19:08:37–19:08:41.

BB.      **DENIED**.  Plaintiff asserts three inconsistent positions in the same paragraph, none of which are sufficient to create a genuine issue of material fact.  Plaintiff

15

asserts that (a) Officer Eddy spoke to Plaintiff, but "there is absolutely no possible way of interpreting exactly what the Officer and Maniaci state to one another on the video recording", (b) "he does not remember the officer saying anything to him" and (c) that nobody "ask[ed] him to leave the room." Pl. Facts ¶ BB. The first two assertions are directly contradictory.

Plaintiff's assertions are also thoroughly discredited by the irrefutable video evidence and substantial deposition testimony. Mr. Olson clearly asked Plaintiff to leave by addressing him: "Sir, you do not have the opportunity to speak any longer. I would like to ask our staff to escort this gentleman from the room." Def. Ex. 44A (Quest Video) at 19:08:20–19:08:28; *see also* Def. Ex. 47 (Quest Video Tr.) at 7; Def. Ex. 69A (Certified Quest Video Tr.) at 16–17.

In addition, Mr. Eddy testified that he identified himself as a "university official" and "told [Plaintiff] that he would have to leave the hall" but that Plaintiff "refused" and remained seated. Ex. 8 (Eddy Dep.) at 25–26, 36; Ex. 9 (Salley Decl.) ¶ 11. The video recordings corroborate Eddy's testimony as they show Safety Officers Eddy bending over Plaintiff for at least twenty–five seconds with his head and lips moving prior to any attempt to physically move Plaintiff. Def. Ex. 44A (Quest Video) at 19:08:50–19:09:15.

During that time, Plaintiff makes no effort to get up and Plaintiff's head can be seen turned up and looking at Eddy. Def. Ex. 43 (AA Video) at 00:15–00:50. Finally, Metropolitan Police Department Lt. Michael Smith also corroborates what is seen on the video.

> They walked up, there was conversation going back and forth between Mr.
> Maniaci and the DPS officers. And the DPS officers, everybody had their voices
> down really low, so I was in the back and couldn't hear exactly what was being
> said. But it sounded like something to the effect of, well, you know, you have got
> to leave, and Mr. Maniaci, well, all I wanted them to do was answer my questions.

Ex. 54 (Smith Dep.) at 160–61.

CC.     **DENIED**.  Plaintiff's self–serving testimony that he was violently jerked out of his seat and did not resist is thoroughly discredited by the irrefutable video evidence and substantial deposition testimony.  As the irrefutable video recordings demonstrate, after it became apparent that Plaintiff would not cooperate, would not voluntarily leave, and would not alight from his seat, Safety Officers Eddy and Salley carefully lifted Plaintiff up out of his seat, gripping him under his armpits, and carried him into the aisle, a distance of less than three feet from his seat.  Def. Ex. 43 (AA Video) at 00:00:45–00:00:55; Def. Ex. 44A (Quest Video) at 19:09:12–19:09:38; Def. Ex. 8 (Eddy Dep. at 26, 36); Def. Ex. 9 (Salley Decl.) ¶¶ 12–13.

At first the Safety Officers tried to stand Plaintiff up in the aisle, but Plaintiff continued to resist by refusing to stand up and instead going limp, forcing them to carry him from the auditorium.  *See* Def. Ex. 8 (Eddy Dep.) at 37; Def. Ex. 7 (Morrell Dep.) at 29–30; Def. Ex. 9 (Salley Decl.) ¶ 13; Def. Ex. 44A (Quest Video) at 19:09:12–19:09:38; Def. Ex. 43 (AA Video) at 00:00:45–00:01:00.  Notably, just moments before, Plaintiff stood in the aisle for over 5½ minutes waiting to ask his question.  *See* Def. Ex. 44A (Quest Video) at 18:56:30–19:02:04.

DD.     **DENIED**.  Plaintiff's self–serving testimony that he felt a blow to his side as he was lifted from his seat is thoroughly discredited by the irrefutable video evidence and substantial deposition testimony.  The video recordings show how Officers Eddy and Salley calmly approached Plaintiff, leaned over to speak to him, and then after several moments had passed, carefully lifted him from his seat.  *See* Def. Ex. 44A (Quest Video) at 19:09:00–19:09:38.  Plaintiff was not kneed or struck in any manner.  *See id.*; Def. Ex. 43 (AA Video) at 00:0014–00:01:14; *see also* Pl. Opp'n at 33 (**conceding that "[t]he video does not show the Plaintiff getting kneed or kicked by the officers**") (emphasis added).

EE.    **DENIED**.  Mr. Turk's testimony is demonstrably false given the videotape evidence showing the event from two angles.  Turk testified that Plaintiff was "kicked" in "the side of the chest" as he lay "on his back on the ground" in the area "between the seats."  Def. Ex. 70 (Turk Dep.) at 147–49.  The video recordings clearly demonstrate that Plaintiff was lifted out of his seat into the aisle and never fell down in the area between the seats.  Def. Ex. 44A (Quest Video) at 19:09:00–19:09:38; Def.  Ex. 43 (AA Video) at 00:0014–00:01:14.  Indeed, the videotape recordings show that Plaintiff never hit the floor in the aisle either, but was carefully carried out of Gaston Hall.  Def. Ex. 44A (Quest Video) at 19:09:00–19:09:38; Def. Ex. 43 (AA Video) at 00:0014–00:01:14; *see also* Pl. Opp'n at 33 (conceding that "[t]he video does not show the Plaintiff getting kneed or kicked by the officers").

Moreover, when Plaintiff was lifted from his seat, the video recordings show that Mr. Turk was in the front of the room, separated from Plaintiff by at least 3 rows of seats and, thus, unable to see what was occurring in between the seats.  Def.  Ex. 43 (AA Video) at 00:00:45–00:00:52.  JDL member Keith Bailey and JDL Chairman Matthew Finberg, who were much closer to Plaintiff and the officers, both testified that the officers did not kick or knee Plaintiff.  Def. Ex. 50 (Bailey Dep.) at 149–50; Def. Ex. 29 (Finberg Dep.) at 126–27.

Likewise, Metropolitan Police Department Lt. Michael Smith, another JDL sympathizer, was also present at the Divestment Seminar.  Ex. 54 (Smith Dep.) at 132.  Mr. Smith, a seasoned police investigator, *see id*. at 12–13, with extensive training regarding the use of force, *see id*. at 29–30, also saw the Security Officers remove Plaintiff from Gaston Hall, *see id*. at 159–60.  Mr. Smith testified that he did not see Plaintiff fall on the ground nor did he see the officers punch, kick or strike Plaintiff.  *Id*. at 161–63.

FF.    **DENIED**.  Again, the video recordings irrefutably demonstrate from two angles that Plaintiff did not hit the floor and that he did not bump against anything else as he was carried out of the auditorium.  *See* Def. Ex. 44A (Quest Video) at 19:09:00–19:09:38; Def. Ex. 43 (AA Video) at 00:0014–00:01:14.

GG.    **DENIED**.  Plaintiff's assertion that he was thrown through the doors into the hallway is contradicted by his own deposition testimony and the irrefutable evidence in the record.  At his deposition, Plaintiff testified that he "[didn't] know if [he] was [thrown through the doors] or not."  Def. Ex. 1 (Maniaci Dep.) at 268.  Furthermore, the video recordings irrefutably demonstrate from two angles that an unidentified individual wearing a scarf and a dark coat held the auditorium doors open while the Safety Officers carefully carried Plaintiff into the foyer outside.  *See* Def. Ex. 44A (Quest Video) at 19:09:33–19:09:42; Ex. 43 (AA Video) at 00:0014–00:01:14.   After carrying him through the doors, the Safety Officers gently placed Plaintiff on the floor outside of Gaston Hall.  Ex. 8 (Eddy Dep.) at 36; 29 (Finberg Dep.) at 135 (the officers sat Plaintiff down, he was not thrown to the ground); Ex. 7 (Morrell Dep.) at 29–30 (the officers "gently deposit[ed] Plaintiff on the floor."); Smulson Decl. (Ex. 49) ¶ 7 (the officers "gently placed" Plaintiff on the floor and did not have "any other physical contact" with Plaintiff.).

HH.    **DENIED**.  The irrefutable video recordings demonstrate that Plaintiff was given every opportunity to cooperate by leaving Gaston Hall and instead chose to resist.  The video recordings show that after Plaintiff had been requested to desist from disrupting the Divestment Seminar at least <u>five</u> times, Mr. Olson stated "I would like to ask our staff to <u>escort</u> this gentleman from the room."  Def. Ex. 44A (Quest Video) at 19:08:20–19:08:28; *see also* Def. Ex. 47 (Quest Video Tr.) at 7 (emphasis added); Def. Ex. 69A (Certified Quest Video Tr.) at 16–17.

The video recordings similarly show how Safety Officers Eddy and Salley calmly approached Plaintiff, leaned over to speak to him, and then after several moments had passed, carefully lifted him from his seat. *See* Paragraph CC, *supra*. At first the Safety Officers tried to stand Plaintiff up in the aisle, but Plaintiff continued to resist by refusing to stand up and instead going limp, forcing them to carry him from the auditorium. *Id.* At the time, Plaintiff weighed approximately 220 pounds. *See* Def. Ex. 52 (Medical Records) at VA000441, VA000445. Plaintiff used his own dead weight to resist the officers' efforts to remove him from the auditorium.

Plaintiff continued to resist by placing his cane between Safety Officer Salley's legs as he was carried out of the auditorium. *See* Def. Ex. 9 (Salley Decl.) ¶ 13; Def. Ex. 44A (Quest Video) at 19:09:10–19:09:38; Def. Ex. 43 (AA Video) at 00:01:00–00:01:10. Plaintiff did this in an attempt to trip Safety Officer Salley. *See* Def. Ex. 9 (Salley Decl.) ¶ 13.

II.     **DENIED**. Plaintiff fails to provide any citation to the record supporting his assertions that "there was a crowd around him taking pictures" or that a "University official tried to block the cameras." Pl. Facts ¶ II. Indeed, Plaintiff produced in discovery a number of photographs taken by Carrie Devorah, in the foyer outside of Gaston Hall demonstrating that her camera was not blocked. *See* Def. Exs. 53 A–C; Ms. Devorah's photographs also demonstrate that shortly after being placed in the foyer, Plaintiff stood up on his own and was in no apparent distress, with no visible bruises, talking to his JDL colleagues. *See id*; Def. Ex. 1 (Maniaci Dep.) at 290–93. No medical assistance was offered to Plaintiff because he did not request any. *See* Pl. Response Facts ¶ 146 (admitting that he did not seek medical assistance); Def. Ex. 4 (Turk Dep.) at 169–70.

It is undisputed that a University official approached Plaintiff in the Healy Building. Nevertheless, Plaintiff's assertions in Paragraph II are misleading because Plaintiff omits the fact that the University Official (Mr. Morrell) informed Plaintiff he was "no longer welcome to attend the other sessions at [the] Conference" and asked him to leave. Ex. 5 (Olson Dep.) at 42; Ex. 1 (Maniaci Dep.) at 289–90; Compl. ¶ 5. Disregarding Mr. Morrell's instruction to leave the campus, Plaintiff instead walked over to the ICC, another Georgetown building, where additional Conference workshops were proceeding. *See* Ex. 1 (Maniaci Dep.) at 293; Ex. 41 (PSM Media Info. Packet) at M000112–113. Mr. Harrison walked along with him and advised Plaintiff that he would not be permitted to enter the ICC and asked him to leave the Campus. Def. Ex. 6 (Harrison Dep.) at 17–18, 20–21.

JJ.    **DENIED**. Plaintiff fails to provide any citation to the record linking the injuries depicted in Plaintiff's Exhibit 13 to the events that took place on Georgetown's campus on February 18, 2006. It is undisputed that none of the photographs in Plaintiff's Exhibit 13 were taken at Georgetown on February 18, 2006. Plaintiff recalled that they were taken by Ms. Devorah in Plaintiff's counsel's office on February 20, 2006, the Monday after the PSM Conference, and perhaps one photograph by Mr. Turk at Walter Reed on February 19, 2006. *See* Pl. Ex. 14 at 341–46.

It is also undisputed that Plaintiff did not seek any medical attention for over 30 hours after the events at Georgetown. *See* Pl. Response Facts ¶ 146 (admitting that he did not seek medical attention); ¶ 161 (same); Def. Ex. 1 (Maniaci Dep.) at 318 (Plaintiff arrived at the emergency room at Walter Reed Medical Center a few minutes after eight o'clock on Sunday evening). Dr. Gillern examined Plaintiff at Walter Reed and she testified that she did not remember seeing any bruising on Plaintiff and that she did not record any bruising in her notes. *See* Gillern Dep. (Ex. 57) at 17, 53–54. Dr. Gillern also testified that she did not recall seeing,

and accordingly did not record, any of the bruising depicted in the photographs that are part of Plaintiff's Exhibit 13. Pl. Ex. 15 at 55–61. Dr. Gillern further testified that Plaintiff only complained of lower back pain, an episode of dizziness, and right ankle swelling. Ex. 57 (Gillern Dep.) at 25–26. Her physical examination of Plaintiff revealed no head injuries, no back tenderness, no ankle pain, and no bruising. *Id.* at 33–36, 45–48, 53–54.

Plaintiff's self–serving testimony that he did not feel as though he violated any of Georgetown University's policies is contradicted by his concession that he "**did interrupt** the question and answer period." Pl. Opp'n at 13 (emphasis added); *see also* Def. Ex. 44A (Quest Video) at 19:07:25–19:09:00.

KK.     **DENIED**. It is undisputed that Plaintiff and Mr. Turk approached the ICC and Plaintiff was told he was not allowed to enter. *See* Def. Ex. 7 (Morrell Dep.) at. 13–14; Def. Ex. 6 (Harrison Dep.) at 43–44; Def. Ex. 5 (Olson Dep.) at 43–44. It is also undisputed that Plaintiff was informed that he was not under arrest at the ICC and that when Plaintiff asked to use the restroom, he was permitted to do so. *See* Def. Ex. 1 (Maniaci Dep.) at 299 (testifying that he threatened to wet the Safety Officer's leg if he was not permitted to use the bathroom); Def. Ex. 29 (Finberg Dep.) at 150 ("He wanted to go to the bathroom, and they let him."); Def. Ex. 54 (Smith Dep.) at 193.

Plaintiff's remaining assertions are thoroughly discredited by overwhelming deposition testimony including testimony of Plaintiff's JDL colleagues. JDL Chairman Finberg who walked with Plaintiff from Gaston Hall to the ICC, *see* Def. Ex. 29 (Finberg Dep.) at 150, testified that the Security Officers did not push Plaintiff against a wall at the ICC.

Q. Do you remember him — campus security guards pushing Mr. Maniaci?

A. **No, no. He was treated very civilly after that**.

*Id*. at 151 (emphasis added).

JDL sympathizer and MPD Lieutenant Michael Smith testified that he observed the ICC incident and that Plaintiff "leaned up against the wall with his back up against the wall and was just standing there"; no officer pushed Plaintiff.  Def. Ex. 54 (Smith Dep.) at 191–92.

JDL sympathizer Jim Nutting, who trained at the Reserve Police Officers Academy and works as a security officer for the Metropolitan Transit System in San Diego, has both training and experience in the use of force.  Def. Ex. 2 (Nutting Dep.) at 7, 8, 21–22.  Mr. Nutting testified that he did not see the officers push or grab Plaintiff at the ICC.

Q.  Were they grabbing Mr. Maniaci?

A.  I don't remember seeing that.

Q.  Were they pushing Mr. Maniaci?

A.  I didn't see that.  I don't remember it.

*Id*. at 223.

LL.    **ADMITTED**.  Plaintiff's quotation of Mr. Harrison's testimony, however, is incomplete.  Mr. Harrison testified that: "There may have been an occasion or two when he may have been touched to be directed to an area to go to.  **But as far as – as far as any physical restraint or anything along that line, I cannot recall any of the officers having him**." Def. Ex. 6 (Harrison Dep.) at 44–45 (emphasis added).

MM.    **DENIED**.  The testimony of Robert Turk, Plaintiff's loyal "best friend" *see* Ex. 70 (Turk Dep.) at 10, is discredited by the overwhelming testimony of Plaintiff's other JDL colleagues.  *See* Paragraph KK, *supra*.  Mr. Turk's testimony regarding the events at the ICC also cannot be credited in light of his demonstrably false testimony regarding Plaintiff being

kicked in the chest as he was removed from Gaston Hall, which is in direct contradiction to the irrefutable videotape evidence filmed from two different angles. *See* Paragraphs CC-EE, *supra*.

NN.    **DENIED**.  Plaintiff fails to provide any citation to the record supporting his assertion that "much time had passed" before he was permitted to use the bathroom is without any support from the record.  Pl. Facts ¶ NN.  To the contrary, MPD Lieutenant Michael Smith (a JDL sympathizer), testified that Plaintiff was permitted to use the bathroom after at most, "[m]aybe two or three minutes.  It wasn't long at all."  Def. Ex. 54 (Smith Dep.) at 193; *see also* Def. Ex. 29 (Finberg Dep.) at 150 ("He wanted to go to the bathroom, and they let him.").  Furthermore, the Safety Officers did not hold the door open and watch Plaintiff urinate.  Rather, an officer placed his foot in the door holding it ajar because Georgetown officials feared that Plaintiff may attempt to lock himself inside the restroom.  Def. Ex. 8 (Eddy Dep.) at 43–44; Def. Ex. 54 (Smith Dep.) at 193–95.

OO.    **DENIED**.  It is undisputed that Plaintiff was escorted back to the foyer area of the ICC Building after being permitted to use the restroom.  Def. Ex. 1 (Maniaci Dep.) at 301–02.  Defendants do not dispute that Mr. Harrison testified that Plaintiff "attempted to enter the building and attempted to enter the building in a disruptive manner."  Ex. 6 (Harrison Dep.) at 18.  Defendants similarly do not dispute that Mr. Morrell **again** advised Plaintiff that "he was being barred from the Conference."  Pl. Facts ¶ OO; *see also* Paragraph II, *supra* (Plaintiff had been asked to leave the Campus before he arrived at the ICC).  Nor do Defendants dispute that Georgetown officials requested the assistance of Metropolitan Police Department Sergeant Sam DeLisi who escorted Plaintiff off of the campus to his car.  Ex. 1 (Maniaci Dep.) at 302–03; Dep. of Sam DeLisi (Def. Ex. 55) at 37–39; 45–46.

Nevertheless, Plaintiff fails to provide any citation to the record supporting his assertion that Robert Turk and Matt Feinberg were helping him to stand and get around. Furthermore, any request by Mr. Finberg to speak with the University Provost is immaterial.

PP.  **DENIED**.  It is undisputed that Plaintiff fell down at a traffic circle near the Wyndham hotel in downtown Washington D.C. on Sunday, February 19, 2006.  Ex. 1 (Maniaci Dep.) at 305-06.  It is also undisputed that Plaintiff got back up, walked to his hotel to sit down, and that, some hours later on Sunday evening, Mr. Turk took Plaintiff to Walter Reed Army Medical Center.  *Id*. at 309-10, 316-18.

Plaintiff's assertions regarding his alleged injuries and treatment, however, grossly mischaracterize the record.  There is no evidence in the record supporting Plaintiff's assertion that he was told that he had suffered contusions to the right abdomen, right upper arm, right wrist, and abrasions to the legs.  Rather, the uncontradicted medical evidence in the record is as follows:  Dr. Gillern's physical examination of Plaintiff revealed no head injuries, no back tenderness, no ankle pain, and no bruising.  Def. Ex. 57 (Gillern Dep.) at 33–36, 45–48, 53–54. She noted that Plaintiff did not appear to be "suffering or in a lot of pain." *Id*. at 30.  She also noted that Plaintiff did not report any loss of consciousness.  *Id*. at 28–29.

Dr. Gillern ordered a CT scan and blood tests; both came back normal.  Def. Ex. 57 (Gillern Dep.) at 38–40.  She also conducted a neurological exam of the Plaintiff and that was normal as well.  *Id*. at 36–37.  Dr. Gillern concluded that Plaintiff had a sprained ankle and may have suffered a concussion.  *Id*. at 44–45.  Her conclusion regarding the concussion was not based on any physical evidence; it was based solely on Plaintiff's statements about his fall earlier that day.  *Id*. at 45.  Plaintiff received a discharge instruction for a soft tissue contusion.  *See* Pl. Ex. 12.  Nevertheless, there is no medical or other record evidence indicating that these

25

instructions were given to Plaintiff for anything other than his ankle swelling and not any other bruising.  *See* Pl. Ex. 15 at 62, 79.

Plaintiff was discharged the same evening.  Def. Ex. 57 (Gillern Dep.) at 47.  Dr. Gillern referred Plaintiff to his primary care doctor for follow–up, but he did not seek any further medical care because he soon "felt okay" and "had no further symptomology."  Def. Ex. 1 (Maniaci Dep.) at 321–22.

Plaintiff's unsupported assertion that, "[a]ccording to Dr. Gillern, it is not likely and there is no indication that Plaintiff received the injuries from anything but what he has claimed" is patently false.  *See* Paragraph JJ, *supra* (Dr. Gillern also testified that she did not recall seeing, and accordingly did not record, any of the bruising or abraisions depicted in the photographs that are part of Plaintiff's Exhibit 13).

Finally, Plaintiff's self–serving testimony that he does not bruise easily is not supported by any medical evidence or by Dr. Gillern's testimony.  Dr. Gillern's testimony was limited to whether Plaintiff suffered from any medical condition that would place him at a higher medical risk of bruising than others without the condition.  *See* Pl. Ex. 15 at 74 ("nothing that [Plaintiff] has makes him at a higher risk of being a big bruiser").

QQ.    **ADMITTED**.

RR.    **ADMITTED**.

SS.    **ADMITTED**.

TT.    **ADMITTED**.

UU.    **ADMITTED**.

VV.    **ADMITTED**.  Safety Officers Salley and Eddy were at all relevant times regular full time employees of the department of public safety at Georgetown University.


Respectfully submitted,


_____/s/_____

March 18, 2008                                John J. Buckley, Jr., D.C. Bar No. 925081
Malachi B. Jones, D.C. Bar No. 455555
Richa S. Dasgupta, D.C. Bar No. 500509

WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
jbuckley@wc.com
(202) 434–5051
(202) 434–5058 (fax)

*Of Counsel:*
Jane E. Genster, D.C. Bar No. 939850
Vice President and General Counsel
Georgetown University
37th & O Streets, N.W.
Washington, D.C. 20057
(202) 687–6500
(202) 687–6527 (fax)

*Attorneys for Defendants Georgetown
University, David F. Morrell, Darryl K.
Harrison, Todd Olson, Roy Eddy and Larry
Salley*