# EXHIBIT 71

```
                                                                    1

 1              UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF COLUMBIA
 3
 4   _____
                                      )
     WILLIAM MANIACI,                 )
 5                                    )
           Plaintiff,                 )
 6                                    )
           vs.                        )  NO. 1:06-CV-1625 (CKK)
 7                                    )
     GEORGETOWN UNIVERSITY, ET AL.,   )    ORIGINAL
 8                                    )
           Defendants.                )
 9   _____)
10
11
12
13
               VIDEOTAPED DEPOSITION OF JIM NUTTING
14
               SAN DIEGO, CALIFORNIA
15
               APRIL 12, 2007
16
17
18
19
20
21             Reported By:   CHRISTINA LOTHER
                              CSR NO. 8624
22
```


L.A.D. REPORTING & DIGITAL VIDEOGRAPHY

1100 Connecticut Avenue, NW • Suite 850, Washington, D.C. 20036
Tel: 202.861.3410 • 800.292.4789 • Fax: 202.861.3425
Web: ladreporting.com • E-mail: lisa@ladreporting.com
Additional Offices: Rockville, MD • Baltimore, MD • Greenbelt, MD • McLean, VA

**Page 169**

1  why they were going towards him. They were going to
2  him. They were not just walking nicely. They were
3  going towards him like he was a criminal. And I seen
4  something -- I just had a gut feeling something was
5  wrong.
6     Q.  Well, let me ask you, when you're on a train
7  and you're arresting somebody, do you want that person's
8  friends talking to you trying to talk you out of it?
9     A.  Actually, it would be better if somebody's
10 friends could talk them out of it before anything could
11 happen. I would rather somebody's wife or friends say,
12 "Hey, calm down." I would actually like that.
13    Q.  I think you misunderstood my question. I
14 said, if you were on a train and you were trying to
15 arrest a suspect --
16    A.  Right.
17    Q.  -- would you want some of the -- would you
18 want the suspect's friends trying to talk you out of it?
19    A.  Talk me out of it?
20    Q.  Yes.
21    A.  No, no. I would -- I wouldn't want it, but I
22 would expect it. It happens all the time.

**Page 170**

1     Q.  Would that interfere with what you were trying
2  to do?
3     A.  If they actually got in my way, I would
4  consider it interfering. If they actually physically
5  got in my way, I would -- I would consider that
6  interfering.
7     Q.  Like, if they physically stood in front of the
8  seat where the suspect was sitting.
9     A.  If -- well, it all depends. If I feel my
10 safety is being jeopardized, yeah, I think it would be
11 getting in the way. I would think that.
12    Q.  Now, when you went into the aisle because you
13 saw the -- the DPS officers approaching Mr. Maniaci,
14 didn't you go and stand right by where he was seated?
15    A.  Yeah, I stood right by -- by where he was
16 seated, and I said -- I asked the officers, I said --
17 because they started grabbing him. I said, "Wait a
18 minute. Well, don't grab him. He's an old guy."
19      Because I know Bill's physical -- I know what
20 happened to Bill. He's hurt. He carries -- he wears a
21 cane and he has heart problems. I said, "Hey, let
22 me" -- "Hey, Bill, what's going on here?" Because I

**Page 171**

1  didn't know what was going on.
2       And Bob said, "Hey, you know" -- "Hey, look,
3  stop." And Bob kind of told me to go back. And I
4  stepped back away from it.
5       And I just told them, I said, "Leave him
6  alone. He's an old man." That's all I kept saying,
7  "Leave him alone." But they grabbed him anyway. I
8  wasn't going to interfere because that's their thing,
9  but what they did was wrong. The way they did it was
10 wrong.
11    Q.  But before the officers grabbed Mr. Maniaci,
12 didn't they have to ask you to move out of the way?
13    A.  They never asked me anything. They didn't say
14 anything to me. There's a funny thing about it. They
15 didn't say one thing to me. They didn't -- they didn't
16 say one thing to me. They just kept grabbing Bill. And
17 I was the one who was talking. I said, "Please leave
18 him alone. He's an old man."
19      I said, "Bill, tell them what's going on
20 here." I said, "Let him get up on his own. Let him get
21 up on his own." But they wouldn't let him. His cane
22 was stuck, and they wouldn't -- they wouldn't let him

**Page 172**

1  get up. They just kept pulling, yanking. He was -- I
2  heard Bill grunting (indicating) like this. I said,
3  "Wait a minute. Let" -- "let" -- "Bill, Bill." "Leave
4  him alone." And that was it. And then Bob got in it,
5  and that was it.
6     Q.  How close were you to where Mr. Maniaci was
7  sitting when the --
8     A.  I was pretty close.
9     Q.  Can you just let me finish the question,
10 please.
11      How close were you to Mr. Maniaci when the
12 officers grabbed him?
13    A.  I would say I was -- I was within, when they
14 first grabbed him, probably within four, five feet,
15 heading that direction, when they were starting to -- to
16 grab him.
17    Q.  Did they grab him as soon as they got there?
18    A.  They didn't talk to him. They didn't talk to
19 him. As far -- as I say, I did not see them talk to him
20 at all. I seen them grab him. And it was the same
21 officer that I had a problem with -- you didn't go
22 through that part of it earlier. I forgot to bring that